FILED
FEB 18 1999
PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 98-02675-5-ATS |
| INTERNATIONAL HERITAGE, INC. | TAX I.D. NO. 56-1921093 |
| DEBTOR | CHAPTER 7 |

### MOTION FOR ORDER RELEASING RESERVE ACCOUNT, DETERMINATION OF THE APPLICABILITY OF THE AUTOMATIC STAY, OR FOR RELIEF FROM THE AUTOMATIC STAY

NOW COMES Chittenden Bank ("Chittenden"), by and through counsel, and moves the Court to determine that Chittenden has a right of recoupment that is not stayed by 11 U.S.C. §362(a). In the alternative, Chittenden moves the Court to grant it relief from the automatic stay pursuant to 11 U.S.C. §362(d) so that Chittenden may exercise a right of setoff pursuant to 11 U.S.C. §553 and/or liquidate collateral securing its claim against the above-referenced Debtor. In support of this Motion, Chittenden shows unto the Court the following:

General Allegations

1. This matter is a core proceeding pursuant to 28 U.S.C. §157, and the Court has jurisdiction pursuant to 28 U.S.C. §§151, 157, and 1334. The Court has the authority to hear this matter pursuant to the General Order of Reference entered on August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

2. The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on November 25, 1998 (the "Petition Date"), and Holmes P. Harden was appointed to administer the estate pursuant to 11 U.S.C. §704.

RALEIGH/017980-002/176291

Copy rec'd 2/18/99 AM    15 pp    93

3. On or about April 8, 1997, Chittenden and the Debtor entered into a Merchant Processing Agreement and Reserve Account Agreement (the "Agreement") pursuant to which Chittenden agreed to process the Debtor's credit card sales drafts. Generally, a credit card processor submits all of its various merchant credit card invoices into a net-out system among all Visa/MasterCard member banks that is similar to the clearing-house system used by the Federal Reserve. Under the Agreement, Chittenden would pay the Debtor the amount of credit card slips submitted to it by the Debtor, and Chittenden would charge back to the Debtor certain types of claims. A copy of the Agreement is attached as "Exhibit A" and incorporated herein by reference.

4. Under certain circumstances, customers who purchase items by credit card may reverse the transaction and demand a refund (a "chargeback"). The merchant (i.e., the Debtor) is obligated to fund the chargeback, and if the merchant fails to do so, the processor (i.e., Chittenden) may be obligated to fund the chargeback.

5. The Agreement between the Debtor and Chittenden provides for the establishment and maintenance of a reserve account (the "Reserve Account") to secure reimbursement for amounts which Chittenden might be required to pay for chargebacks. After an initial deposit of $10,000.00, the Reserve Account was built up out of funds due the Debtor for credit card invoices.

6. International Heritage, Inc. ("Debtor") sold retail business agreements ("RBA") which allowed sales representatives to market the Debtor's products. The Debtor was accused of marketing RBAs in violation of securities laws and laws prohibiting "pyramid schemes". Many of the sales representatives paid the Debtor by charge card.

7.  In or around June, 1998, Chittenden ceased providing credit card processing services to the Debtor; nevertheless, cardholders demanding refunds continue to file chargebacks requesting refunds of amounts paid to the Debtor. On the Petition Date, there was approximately $93,000.00 in the Reserve Account, and as of January 28, 1999, Chittenden has received approximately $106,049.67 in claimed chargebacks from customers of the Debtor.

## Summary of Argument

8.  Chittenden is entitled to process credit card chargebacks against the Reserve Account for the following reasons:

   a.  Chittenden is a recouping creditor; therefore, the automatic stay does not apply to Chittenden's processing chargebacks against the Reserve Account;

   b.  Chittenden Bank in entitled to relief from the automatic stay to set off chargebacks from the Reserve Account; and/or

   c.  Chittenden is entitled to relief from the automatic stay to process chargebacks, because it has a perfected security interest in the Reserve Account.

## Chittenden is Entitled to Recoupment

9.  The common law doctrine of recoupment allows a creditor to offset his claim against a debtor from the debtor's claim against the creditor without obtaining relief from the automatic stay if the two claims arise from the same transaction. New York State Electric and Gas Corp. v. McMahon (In re McMahon), 129 F.3d 93, 96 (2nd Cir. 1997) [citing Reister v. Cooper, 507 U.S. 258 (1993)].

10. The Reserve Account was established out of funds due the Debtor for credit card invoices. The chargebacks that Chittenden now seeks to offset against the Reserve Account are

essentially reimbursement for overpayments made to the Debtor for credit card invoices which were later refused or rejected by the Debtor's sales representatives or other customers.

11. Because the offsetting obligations arise out of the same transaction, i.e., the Agreement, Chittenden is a recouping creditor that does not need relief from the automatic stay to deduct chargebacks from the Reserve Account.

### Chittenden is Entitled to Setoff

12. Pursuant to the Agreement, Chittenden is entitled to offset chargebacks it has received and will continue to receive against any funds remaining in the Reserve Account.

13. Section 553 of the Bankruptcy Code preserves those rights to setoff which exist outside bankruptcy. Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.), 98 B.R. 243, 248 (Bankr. E.D. Va. 1989).

14. The three (3) elements which are necessary to establish a creditor's right of setoff in a bankruptcy proceeding are present in the case at bar:

   a. A debt must be owing by the creditor to the debtor that arose before the commencement of the case. The Reserve Account balance existing on the date of the petition constitutes a pre-petition debt. See A & B Homes, 98 B.R. at 249.

   b. The creditor must have a claim against the debtor that arose before the commencement of the case. Because Chittenden ceased providing credit card processing services to the Debtor before the Petition Date, all chargebacks submitted to Chittenden are claims arising out of pre-petition sales transactions. Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.), 893 F.2d 720, 724 (5th Cir. 1990) and Moratzka v. Visa U.S.A. (In re Calstar, Inc.), 159 B.R. 247, 256-57 (Bankr. D. Minn.

1993) (the appropriate date for determining whether a chargeback is pre-petition or post-petition is the initial sales transaction date).

    c.    There must be mutuality of the creditor's debt to the debtor and the creditor's claim against the debtor. Mutuality of obligation means that the creditor is indebted to the debtor who likewise owes a debt to the creditor; that is, both sides must owe something. A & B Homes, 98 B.R. at 248. Accordingly, there is mutuality of Chittenden's debt to the Debtor for the funds contained in the Reserve Account and Chittenden's claim against the Debtor for the amount of chargebacks.

See also Coppa v. Security Bank of Nevada (In re Taylor Motors), 60 B.R. 760 (Bankr. D. Nev. 1986).

15.    Because the debts are mutual and pre-petition, Chittenden is entitled to relief from the automatic stay for cause pursuant to 11 U.S.C. §362(d)(1) to offset all chargebacks it has received since the Petition Date and any chargebacks it receives in the future against the remaining funds in the Reserve Account.

### Chittenden is a Perfected Secured Creditor

16.    A secured creditor is entitled to relief from the automatic stay if the creditor is undersecured and if the collateral is not necessary for the reorganization of the debtor. 11 U.S.C. §362(d)(2) (1994). In a Chapter 7 proceeding, there is no reorganization; therefore, a creditor must simply establish that it is undersecured. Chittenden is obviously undersecured, because there was approximately $93,000.00 in the Reserve Account on the Petition Date, and Chittenden has already received approximately $106,049.67 in claimed chargebacks against the Reserve Account.

17.  Chittenden possesses a properly perfected pledge in the Reserve Account, because the Debtor pledged the Reserve Account as security and Chittenden has possession of the Reserve Account. Duncan Box & Lumber Co. v. Applied Energies, Inc., 165 W. Va. 473, 270 S.E.2d 140, 145-46 (1980) ("where . . . a bank, by agreement with its depositor, creates a reserve account with the depositor's funds as security for loans made by the bank to the depositor, and retains the exclusive possession and control over the account, such account meets the requirements of a common law pledge."); Gillman v. Chase Manhattan Bank, 534 N.E.2d 824, 831, 537 N.Y.S.2d 787, 794 (1988); Miller v. Wells Fargo Bank, 540 F.2d 548, 561 (2nd Cir. 1976).

18.  Because Chittenden has a valid perfected security interest in the Reserve Account and is undersecured, Chittenden is entitled to relief from the automatic stay pursuant to 11 U.S.C. §362(d)(2) to access the funds in the Reserve Account.

WHEREFORE, Chittenden respectfully prays the Court to grant the following relief:

A.  To enter an Order determining that Chittenden possesses a right of recoupment against the Reserve Account that is not stayed by 11 U.S.C. §362(a);

B.  In the alternative, and in the event that the Court determines that Chittenden is stayed pursuant to 11 U.S.C. §362(a) from accessing the Reserve Account against chargebacks, to grant Chittenden relief from the automatic stay pursuant to 11 U.S.C. §362(d) to allow Chittenden to process chargebacks against the Reserve Account by exercising its right of set off pursuant to 11 U.S.C. §553 and/or liquidating its perfected security interest in the Reserve Account; and

C.  To grant such other and further relief as the Court deems just and appropriate.

This the 16th day of February, 1999.

>JAFFE, RAITT, HEUER & WEISS,
>A Professional Corporation
>
>By: *Louis P. Rochkind by KNK*
>Louis P. Rochkind
>MI State Bar Number P24121
>Counsel to Chittenden Bank
>One Woodward Avenue,, Suite 2400
>Detroit, Michigan 48226
>Telephone: (313) 961-8380
>Facsimile: (313) 961-8358
>
>POYNER & SPRUILL, L.L.P.
>
>By: *Kathryn N. Koonce*
>Kathryn N. Koonce
>NC State Bar Number 19193
>Local Counsel to Chittenden Bank
>Post Office Box 10096
>Raleigh, North Carolina 27605-0096
>Telephone: (919) 783-6400
>Facsimile: (919) 783-1075

**EXHIBIT A**



# MERCHANT PROCESSING AGREEMENT

THIS AGREEMENT is made by and between Chittenden Bank, a state chartered bank with its principal office at 2 Burlington Square, Burlington, Vermont 05401 ("BANK") and MERCHANT.

WHEREAS, BANK is engaged in the processing of transactions, which includes, but is not limited to, the processing of and providing for the payment of charges created by Cardholders; and

WHEREAS, MERCHANT hereby affirms, represents and warrants to BANK that it is engaged in the lawful business shown on the application and is duly licensed under the laws of the State, County, and City in which the MERCHANT is located, to conduct such business; and MERCHANT currently accepts or desires to accept Cards for the purchase of goods and services through transactions with cardholders; and

WHEREAS, MERCHANT warrants that it has not been terminated from settlement of Card transactions by any other bank and has not been terminated for cause or determined to be in violation of MasterCard or Visa Rules or Regulations.

NOW THEREFORE, in consideration of the representations, covenants and promises made herein, the parties hereto agree as follows:

1. **AGREEMENT:** This Agreement and all other documents executed in connection herewith by MERCHANT or incorporated herein by reference shall constitute the entire Agreement between BANK and MERCHANT.

2. **MERCHANT'S AUTHORITY:** MERCHANT specifically warrants to BANK that MERCHANT has authority to enter into this Agreement with BANK and that the person(s) signing for or on behalf of MERCHANT are specifically authorized and directed to do so by MERCHANT.

3. **TERM:** The initial term of this Agreement shall be for ONE (1) CALENDAR YEAR, commencing from the date of execution by BANK, herein referred to as the "Anniversary Date," and shall automatically renew on each Anniversary Date unless sooner terminated in accordance with the provisions of this Agreement.

4. **ACCEPTANCE OF CARDS:** MERCHANT agrees to honor all Cards when properly presented as payment by a Cardholder or other Authorized User upon obtaining authorization for each transaction in advance from the Authorization Center in accordance with the terms and conditions of this Agreement. MERCHANT shall not establish minimum or maximum Transaction amounts as a condition for honoring Cards.

5. **COMPLETION OF TRANSACTIONS:** MERCHANT agrees to complete all transactions with any Cardholder or other Authorized User in accordance with the provisions of this Agreement and the Rules and Regulations as presently in effect and as the same may be amended from time to time. Said Rules and Regulations are hereby incorporated by reference and made a part hereof as though fully set forth herein. MERCHANT shall not, as a regular practice, impose a requirement upon Cardholders to provide any personal information such as a home or business telephone number, a home or business address or driver's license as a condition for honoring Cards, unless deemed necessary because of suspicious circumstances or otherwise required by the Rules and Regulations. MERCHANT shall never utilize the credit available through individual cards to provide cash advances to Cardholders. Such action will subject the MERCHANT to immediate termination and all funds of MERCHANT, including those in MERCHANT'S designated account, may be placed on hold pursuant to the provisions of a CHARGEBACK RESERVE ACCOUNT.

6. **POINT OF SALES DEVICES:** MERCHANT agrees to utilize a POS terminal and related equipment approved by BANK for all Transactions. MERCHANT shall record each Transaction by "swiping" the Card through the POS terminal whenever possible. MERCHANT acknowledges that each location shall have its own POS terminal and merchant identification number. MERCHANT understands that sales completed at one location cannot be processed through a terminal at another location. If MERCHANT uses an electronic printer connected to a POS terminal, MERCHANT must still obtain the Cardholder's or other Authorized User's signature on the printed Sales Draft. Failure to comply with this section may result in a chargeback.

7. **SURCHARGES AND TAXES:** MERCHANT shall not impose any surcharge on Transactions. Any tax required to be collected by MERCHANT must be included in the total Transaction amount and not collected separately in cash.

8. **SALES DRAFTS:** MERCHANT agrees to prepare a Sales Draft for each transaction. All items, goods and services purchased in a single transaction shall be included in the total amount on a single Sales Draft. MERCHANT shall legibly type or print the following information on each Sales Draft: (a) the Cardholder's name or other Authorized User, if applicable; (b) the Cardholder's account number and expiration date; (c) MERCHANT'S name as shown on this Agreement and place of business; (d) the date of the Transaction; (e) the total cash price of the sale (including all applicable state, federal or local taxes); OR (i) the amount to be charged if a partial payment is made in cash or by check; or (ii) the amount to be charged if a partial payment is made as a deposit or as the balance owing after a deposit has been made; (f) a brief description of the goods or services; (g) the words "deposit" or "balance" if full payment is to be made in this manner at different times on different Sales Drafts; (h) the authorization code number from the Authorization Center; and (i) for telephone order Transactions, the letters "TO" shall be typed or printed on the signature line; for mail order Transactions, the letters "MO" shall be typed or printed on the signature line. MERCHANT shall deliver to the Cardholder true and completed copy of the Sales Draft.

9. **AUTHORIZATIONS:** MERCHANT understands and acknowledges that its floorlimit shall be ZERO and that ALL Transactions MUST be authorized in advance through the Authorization Center. MERCHANT shall type or print legibly on the applicable Sales Draft the authorization approval code evidencing each authorization obtained by MERCHANT. MERCHANT shall also obtain the expiration date of each Card and forward the expiration date as part of each authorization inquiry to the Authorization Center. In the event of terminal failure or communication error, MERCHANT agrees to obtain authorization according to voice back-up procedures furnished by BANK at a cost as may be established by BANK.

10. **MAIL AND TELEPHONE ORDER SALES:** BANK cautions against mail and telephone orders because of the high incidence of buyer disputes with such sales. MERCHANT must promptly advise BANK if retail/mail order/telephone order mix changes from the percentages represented to BANK on the Merchant Processing Application. MERCHANT understands that an authorized mail or telephone order does not constitute a guarantee of payment, only available credit, and may be subject to dispute or chargeback. BANK reserves the right, WITHOUT PRIOR NOTICE, and at BANK'S SOLE DISCRETION, to establish a Chargeback Reserve Account to fund chargebacks arising from mail or telephone orders.

11. **SETTLEMENT:** MERCHANT understands and agrees to balance and settle each terminal daily except on days when MERCHANT's place of business may be closed. Sales submitted for settlement after the date of authorization may be refused or assessed an additional fee by BANK. MERCHANT acknowledges that all Transactions between MERCHANT and BANK under this Agreement shall be treated as a single deposit transaction and that all settlements are provisional subject to the Cardholder's rights under the rules and regulations for disputing charges against the Cardholder's account.

12. **PAYMENT:** MERCHANT acknowledges that this Agreement provides for PROVISIONAL SETTLEMENT of MERCHANT's Transactions, subject to certain terms and conditions, including but not limited to those herein. All payments to MERCHANT for legitimate and authorized transactions shall be made by BANK through the Automated Clearing House (ACH) and shall normally be electronically transmitted directly to MERCHANT's Designated Account. MERCHANT hereby authorizes BANK to initiate debit and credit entries to MERCHANT's Designated Account. MERCHANT understands that payments are transmitted by the end of the BANK business day following the day MERCHANT closes a batch prior to 6:00 pm Eastern time, unless BANK is investigating a breach of the warranties by MERCHANT. However, BANK cannot guarantee the timeliness with which any payment may be credited by MERCHANT's bank. MERCHANT understands that due to the nature of the ACH and the electronic networks involved, and the fact that not all banks belong to an ACH, payment to MERCHANT can be delayed. In such cases, MERCHANT agrees to work with BANK to help resolve any problems in crediting MERCHANT's Designated Account. If payments to MERCHANT shall be made in full, after first deducting from them the Discount Fee, credits, chargebacks, reserves or other fees or charges for which MERCHANT is responsible pursuant to the Agreement. Said charges may be deducted from incoming transactions or may be debited against MERCHANT's Designated Account at BANK's sole discretion.

**13. DRAFT AND DATA STORAGE RETRIEVAL:** The Rules and Regulations require the presentation of Sales and Credit Drafts to issuers upon request. MERCHANT shall establish a system to store and maintain Sales and Credit Drafts and data in such a manner so as to allow MERCHANT to forward within twenty-four (24) hours of request, Sales and/or Credit Drafts or data for any Transaction when requested by BANK. MERCHANT understands that failure to respond to such retrieval request constitutes a violation of this Agreement and may result in a chargeback, establishment of a Chargeback Reserve Account or termination of this Agreement. MERCHANT agrees to preserve all records pertaining to Sales Drafts and Credit Drafts for at least one (1) year from the date of the document and to promptly comply with all requests by BANK for production of such records. MERCHANT further agrees that BANK or its representatives may, during normal business hours, inspect, audit, and make copies of MERCHANT's books, accounts, records and files pertaining to any Transaction and refunds or adjustments thereon.

**14. RETURNS AND CREDITS:** If, with respect to any transaction, any goods are accepted for return or any services are refunded, terminated or cancelled, or any price adjustment is allowed by MERCHANT, MERCHANT shall not make any cash refund to the Cardholder but MERCHANT shall utilize a Credit Draft evidencing such refund or adjustment. MERCHANT shall date each Credit Draft with the Transaction date and include therein a brief description of the goods returned, services cancelled or adjustment made and amount of the credit in sufficient detail to identify the transaction. One completed copy of the Credit Draft shall be delivered to the Cardholder at the time of each return or cancellation of a Transaction. The item fee will be applicable. With proper disclosure at the time of the Transaction, MERCHANT may: (a) Refuse to accept goods in return or exchange and refuse to issue a refund to a Cardholder; or (b) Accept returned goods in exchange for the MERCHANT's promise to deliver goods or services of equal value available from MERCHANT at no additional cost to Cardholder. Proper disclosure shall be deemed to have been given if, at the time of the Transaction, the following notice appears on all copies of the Sales Draft in legible letters at least one quarter (1/4) inch high and in close proximity to the space provided for the Cardholder's signature stating "NO REFUND" or "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" as applicable, or equivalent language.

**15. WARRANTIES BY MERCHANT:** MERCHANT warrants and agrees to fully comply with all federal, state and local laws, rules and regulations, as amended from time to time. As to each transaction presented to BANK for payment, MERCHANT specifically warrants that: (a) The Sales Draft is valid in form and has been completed in accordance with all applicable regulations; (b) MERCHANT has delivered goods to the Cardholder or completed the service described on the Sales Draft in accordance with MERCHANT's agreement with the Cardholder, and that MERCHANT has, in inventory, the goods sold if not delivered at the time of sale; (c) Each Sales Draft represents the Cardholder's indebtedness for the total amount shown; (d) The Cardholder has no defense, right of offset or counterclaim against MERCHANT in connection with the purchase of the goods or services; (e) MERCHANT has not charged Cardholder any separate or additional fee(s) in connection with the Transaction other than as may be required by law. The foregoing shall not prohibit MERCHANT from extending discounts to customers paying by cash, check, or any other means, other than by Card; (f) MERCHANT warrants to BANK that each Transaction was placed by a person who is the Cardholder or other Authorized user of the Card; (g) All of MERCHANT's business locations engage in the same or substantially similar business activity as that listed on the Merchant Application; (h) The percentage of mail/telephone order sales listed by MERCHANT is consistent at all of MERCHANT's locations; (i) MERCHANT offers no enticements or incentives to Cardholders in connection with the sale of MERCHANT's products; (j) MERCHANT will not use his personal credit card on the MERCHANT POS terminal; (k) MERCHANT uses the business name described on this Agreement and does not use any other name.

MERCHANT further warrants and agrees that it shall not, without the Cardholder's consent, sell, purchase, provide or exchange Card account information in the form of Sales Drafts, mailing lists, tapes or any other media obtained by reason of a Transaction or otherwise, to any third party other than to MERCHANT's agents for the purpose of assisting MERCHANT in its business, to BANK, or pursuant to a lawful government demand. All media containing Card account numbers must be stored in an area limited to select personnel until discarding.

**16. CHARGEBACKS:** MERCHANT will pay to BANK upon demand the face amount of any Transaction and BANK shall have the right to debit MERCHANT's incoming transactions "Designated Account" or any other funds of MERCHANT in BANK's control therefore, and to chargeback such sale to MERCHANT in any of the following situations: (a) Where goods have been returned or service cancelled by a Cardholder and the Cardholder requested a Credit Draft and such Credit Draft was not processed by MERCHANT; (b) Where the purchase had not been authorized in advance by the Authorization Center as required hereunder and the Transaction was charged back by the issuer; (c) Where the Transaction is for a type of good or service sold or by a means other than as disclosed in the Merchant Application or approved in advance by BANK and the Sales Draft was charged back by the issuer; (d) Where a Cardholder contends or disputes in writing to BANK or the issuer that:

(1) Goods or services were not received by Cardholder; or (2) Goods or services received by the Cardholder do not conform to the description on the Sales Draft; or (3) Goods or services were defective; or (4) The dispute reflects a claim or defense authorized against issuers or creditors by a relevant statute or regulation. (e) Where a Sales Draft or Credit Draft was not received by BANK as required in accordance with paragraphs 8 and 14 of this Agreement; (f) Where the sales Draft does not contain a Transaction date or the face of such Sales Draft shows that such date or dollar amount has been altered or incorrectly entered and the Sales Draft is charged back by the issuer; (g) Where the Sales Draft contains the imprint or description of a card other than the Card specified; (h) Where the Transaction was generated through the use of an expired Card; (i) Where no signature appears on the Sales Draft (or the Sales Draft does not contain the embossed legend from the Card in the case of a permitted manual data capture transaction) or MERCHANT failed to obtain specific authorization in advance from the authorization center to complete the Transaction and/or the Cardholder has certified in writing to BANK, or the issuer that the Cardholder did not make or authorize the Transaction; (j) Where the signature on the Sales Draft is obviously different from the signature appearing on the signature panel of the Card and the Sales Draft is charged back; (k) Where the issuer, or BANK has information that merchant fraud occurred at the time of the Transaction(s), whether or not such Transaction(s) was properly authorized by the issuer and the cardholder neither participated in nor authorized the Transaction(s); (l) In any other situation where the Sales Draft was executed or deposited to credit given to MERCHANT in circumstances constituting a breach of any representation or warranty of MERCHANT or in violation of the MasterCard/Visa Rules and Regulations, whether or not a Transaction is charged back by the issuer.

If with respect to any one of MERCHANT's outlets, the amount of any Card counterfeit or fraud incidents become excessive in the sole determination of BANK, MERCHANT may be charged back for all Transactions, terminated immediately without notice, and MERCHANT's funds, including but not limited to those in incoming transactions and Designated Account, shall be held pursuant to the provisions of paragraph 17 below. BANK will provide MERCHANT with any information possessed by it which may enable MERCHANT to recover from others the amount of any Transactions charged back to MERCHANT. MERCHANT understands that BANK will assess a fee for each chargeback. Furthermore, BANK may assess MERCHANT for any fines imposed by MasterCard/Visa plus a fee for processing such fine as maybe required by BANK at its sole discretion.

**17. CHARGEBACK RESERVE ACCOUNT:** Notwithstanding any other language to the contrary contained in this Agreement, BANK reserves the right to establish a Chargeback Reserve Account (and/or to raise the Discount Fee or Transaction Fees pursuant to paragraph 28) upon the occasion of any of the following:

(a) MERCHANT engages in any processing of charges which create an overcharge to the Cardholder by duplication of charges; (b) Any activity designed by MERCHANT to circumvent a "Call Center" message when attempting to process a Transaction; (c) Failure by MERCHANT to fully disclose the true nature or percentage of its actual or intended telephone and/or mail order business; (d) Failure by MERCHANT to fully disclose the true nature of its business to BANK to permit a fully informed decision as to the suitability of MERCHANT for processing through BANK; (e) Failure by MERCHANT to fully disclose the true ownership of MERCHANT's business entity; (f) Processing by MERCHANT of unauthorized charges; (g) Any material misrepresentation made by MERCHANT in completion of the Merchant Application or breach of any other covenant, warranty or representation contained in this Agreement; (h) MERCHANT has chargebacks which exceed 1% of the total number of transactions completed by MERCHANT in any thirty (30) calendar day period.

After payment or adequate provision for payment is made by BANK and for all obligations on the part of MERCHANT to BANK under this Agreement and the MasterCard/Visa Rules and Regulations, MERCHANT may request BANK for disbursement to MERCHANT of any funds remaining in the chargeback Reserve Account. In no event shall any such funds be disbursed to MERCHANT until the end of ninety (90) days from the date of the last transaction chargeback activity, whichever is later.

18. **FRAUDULENT SALES- FACTORING OR LAUNDERING:** MERCHANT shall never accept or deposit or enter into its POS terminal a fraudulent sale or a sale made by any other merchant. Should MERCHANT do so, MERCHANT shall immediately be terminated, all funds will be placed on hold, pursuant to paragraph 17 above, and MERCHANT will be placed on the "Terminated Merchant File". Said action may result in MERCHANT never being allowed to settle Transactions again.

19. **DUE CARE:** The performance by BANK of all services called for in this Agreement shall be consistent with reasonable industry standards. BANK shall indemnify and hold MERCHANT harmless from any liability, loss or damage which directly results from: (a) BANK not complying with the terms and conditions of this Agreement; or (b) Any loss suffered by MERCHANT as a result of BANK's gross negligence. BANK shall not be liable for special, consequential, exemplary or punitive damages. In no event shall BANK's cumulative liability to MERCHANT hereunder exceed the amount of the processing fees paid by MERCHANT to BANK in the immediately preceding calendar month. MERCHANT acknowledges and agrees the indemnity hereunder shall not extend to any act or failure to act by any employee of MERCHANT. BANK is authorized by MERCHANT to divulge MERCHANT's name, address and telephone number to any third party who has a reasonable right to know such.

20. **FORCE MAJEURE:** The parties to this Agreement shall be released from liability hereunder for failure to perform any of the obligations herein where such failure to perform occurs by reason of any act of God, fire, flood, storm, earthquake, tidal wave, war, military operation, national emergency, sabotage, communication, failure, mechanical or electronic breakdown, civil commotion or the order, requisition, request or recommendation of any other cause beyond either party's reasonable control, whether similar or dissimilar to such causes.

21. **TERMINATION:** This Agreement may be terminated by MERCHANT for any reason or cause whatsoever upon thirty (30) days prior written notice to BANK. BANK in addition to any rights of immediate termination without notice as may be contained elsewhere in this Agreement, may terminate this Agreement for any reason or cause whatsoever upon thirty (30) days prior written notice to MERCHANT. Notwithstanding paragraph 22, notice of termination due to breach may be given orally or in writing at the discretion of BANK. This Agreement may also be terminated without prior written notice at the discretion of BANK in the event the owner, officer or corporate entity has a separate relationship with BANK and such relationship has been terminated by BANK. MERCHANT files for bankruptcy or is otherwise shown to be insolvent, or in the event MERCHANT has chargebacks which exceed 1% of the total number of transactions, completed by MERCHANT in any thirty (30) calendar day period.

22. **NOTICES:** Notices required or permitted under this Agreement shall be deemed to have been given on the date and at the time the same shall be deposited in the United States mail, by first class mail, postage prepaid and addressed to BANK and or MERCHANT at the address written on the Merchant Application or at such other address as either party may give to the other from time to time by written notice to the other party. All obligations of any party to this Agreement to pay funds to another shall survive any termination. Nothing herein shall be construed as relieving Merchant of the obligation for Minimum Discount Fee as provided in paragraph 27 for the remaining term of this Agreement.

23. **SECURITY INTEREST:** To secure all obligations of MERCHANT to BANK and arising from this Agreement, MERCHANT hereby grants BANK a security interest in all deposits, regardless of source, to MERCHANT's Designated Account, and all proceeds of said deposits. Said security interest may be exercised by BANK without notice or demand of any kind by making an immediate withdrawal from or freezing said account/deposit, upon BANK's reasonable determination that a breach of any obligation MERCHANT under this Agreement has occurred. The exercise of this security interest shall be in addition to any other rights of BANK under this Agreement or laws. The parties specifically acknowledge and affirm that pursuant to Vermont Common Law, BANK has a general lien and right of offset upon all funds on deposit with BANK, which shall stand as one continuing collateral security for the timely performance by MERCHANT of all of its obligations to BANK. BANK shall also have the right to require MERCHANT to furnish such other and different security as BANK shall deem appropriate in its sole discretion in order to secure MERCHANT's obligations under this Agreement. MERCHANT agrees to execute any documents or take any actions required in order to comply with and perfect any security interest under this paragraph.

24. **INDEMNIFICATION:** MERCHANT shall indemnify and hold BANK and its officers, employees, agents and independent contractors harmless from any liability, loss, damage, claim or complaint, and all reasonable attorney's fees and costs, arising out of MERCHANT's breach of Agreement, including but not limited to misrepresentation or breach of any covenants or warranties herein contained.

25. **ENTIRE AGREEMENT:** This Agreement, including the Merchant Application and other documents executed in connection herewith or incorporated herein by reference, shall constitute the entire agreement between MERCHANT and BANK, any and previous agreements or understandings, whether written or oral, are void and of no effect. This Agreement constitutes and expresses the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions whether express or implied, oral or written. Neither this Agreement nor any portion or provision hereof may be changed, waived or amended orally or in any manner other than by a writing specifically identified as such and signed by the duly authorized representatives of MERCHANT and BANK.

26. **DISCOUNT FEE AND TRANSACTION FEES:** BANK shall have the right to increase the Discount Fee and/or Transaction Fees from time to time in accordance with paragraphs 22 and 34. Transaction Fee shall mean a fee charged on each sales draft and each credit draft regardless of the total stated and shall also mean a fee charged for any other transaction which utilizes a POS device for transmission or reception of data or information, including but not limited to, debit card transactions, batch closings, authorizations and any other communications using the POS terminal. MERCHANT acknowledges that BANK has relied upon the information contained in the Merchant Application (including but not limited to the type of business in which MERCHANT is engaged, the product or service sold and the average sale or ticket size and monetary volume) in determining whether to accept MERCHANT's application and in setting the Discount Fee and Transaction Fees charged MERCHANT. MERCHANT acknowledges the Discount Fee quoted in the accompanying Merchant Application is contingent upon MERCHANT closing batches not less frequently than once every business day, and further understands that in the event that batches are not closed at least daily, BANK shall initiate batch closing on MERCHANT's behalf. In the event of a change in the parameters as stated above or should special circumstances arise (i.e. sales, etc.) which shall either temporarily or permanently alter the existing conditions, MERCHANT MUST notify BANK prior to those changes, so that necessary parameter adjustments can be made. Should MERCHANT's average sale or volume stated herein increase or decrease by ten(10) percent or more, MERCHANT understands it will pay the Discount Fee associated with the actual average sales or volume. Additional fees shall be assessed for processing of Sales and/or credit Drafts emanating from foreign (non-U.S.A.) Cards. MERCHANT will be charged an additional Discount Fee for all transactions which do not qualify for the lowest Interchange Fees. To qualify, batches must be closed daily and authorizations obtained, for every transaction - matching the sales amount exactly (for within 15% for hotels and car rentals, 20% for restaurants, bars and night clubs). PLEASE REFER TO RATE SCHEDULE FOR AMOUNT OF THESE FEES.

27. **MINIMUM MONTHLY PROCESSING FEE:** MERCHANT acknowledges that BANK assesses a Minimum Monthly Processing Fee for each merchant identification number assigned to MERCHANT.

28. **SEVERABILITY:** If any part of this Agreement is held unenforceable or invalid or prohibited by law, said parts shall be deemed stricken therefrom and this Agreement shall be read and interpreted as though said part did not exist.

29. **WAIVER:** Neither the failure nor any delay on the part of BANK to exercise any right, remedy, power or privilege hereunder shall operate as a waiver thereof or give rise to an estoppel, nor be construed as an agreement to modify the terms of this Agreement, nor shall any single or partial exercise of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver by a party hereunder shall be effective unless it is in writing and signed by the party making such waiver, and then waiver shall apply only to the extent specifically stated in such writing.

30. **ASSIGNMENT AND DELEGATION:** This Agreement may be assigned by BANK but not by MERCHANT without BANK's prior written consent. BANK reserves the right, in its sole discretion, to delegate or assign to third parties the performance of certain of BANK's servicing and settlement obligations to MERCHANT.

**31. DISPUTES, GOVERNING LAW, JURISDICTION AND VENUE:** BANK shall have the absolute right to initiate or defend any and all disputes arising from this Agreement with MERCHANT. This Agreement shall be governed by and construed in accordance with the laws of Vermont. Personal jurisdiction of any disputes arising out of this Agreement shall be governed by and construed in accordance with the laws of Vermont. Personal jurisdiction of any disputes arising out of this Agreement shall be in the U.S. District Court for the District of Vermont, and MERCHANT and any guarantor or guarantors of MERCHANT's obligations and duties hereunder do each hereby waive all objections to said jurisdiction and agree to submit thereto.

**32. COMPLIANCE AND DISCLOSURE OF INFORMATION:** MERCHANT shall provide such information and certifications as BANK may reasonably require from time to time to determine MERCHANT's compliance with the terms and conditions of this Agreement and the MasterCard/Visa Rules and Regulations. MERCHANT further agrees to produce and make available for inspection by BANK, or its officers, agents or representatives, such books and records of MERCHANT as BANK may deem reasonably necessary to be adequately informed of the business and financial condition of MERCHANT, or the ability of MERCHANT to observe or perform its obligations to BANK pursuant to this Agreement. MERCHANT further agrees to provide to BANK from time to time upon request such information as BANK may request including, but not limited to, credit reports, personal and/or business financial statements, income tax returns or other such information as BANK may request. MERCHANT grants to BANK continuing authority to conduct credit checks and background investigations and inquiries concerning MERCHANT and MERCHANT's owner(s) including, but not limited to, character and business references and the financial condition of MERCHANT and MERCHANT's owner(s). MERCHANT expressly authorizes BANK or its agents and representatives to gather and receive such information from any and all third parties directly, without further consent or authorization on the part of MERCHANT.

**33. AMENDMENTS:** No provision of this Agreement may be amended, modified or waived except in writing and signed by BANK. This Agreement may be amended by BANK from time to time upon written notice of the change(s) in terms and conditions. Any amendment to this Agreement shall be effective on the later of the effective date specified in the notice or seven (7) days after the notice is mailed to MERCHANT in the manner prescribed for notices herein.

**34. AMEX AND DISCOVER AUTHORIZATION AND CAPTURE SERVICES**

34.1 At MERCHANT'S request, shall provide authorization for MERCHANT'S Discover and American Express (AMEX) transactions to the MERCHANT. Such services shall include authorization only or authorization and capture. MERCHANT agrees and understands that it will provide Discover and AMEX authorization services only if MERCHANT has entered into a separate Merchant Agreement with Discover or AMEX pursuant to which MERCHANT may accept the Discover Card or American Express Card.

34.2 MERCHANT agrees and understands that BANK shall provide Discover or AMEX authorization (and capture) services only and that BANK shall in no respect be responsible for the funding of said transactions. Said funding shall be the sole responsibility of Discover or AMEX.

34.3 Except where such failure results from acts of gross negligence or willful misconduct by BANK, MERCHANT hereby indemnifies and holds BANK harmless from any and all claims, damages, liabilities, chargebacks, costs, expenses and loss of revenue or profits arising from Discover's or AMEX's failure to authorize or fund timely or accurately.

34.4 If BANK fails to provide authorization or to capture Discover or AMEX transactions for Discover AMEX and MERCHANT seeks to correct this situation, MERCHANT must provide adequate documentation to substantial MERCHANT claim and BANK will investigate the claim, and if appropriate, use its best efforts to resolve the claim. MERCHANT agrees to assist BANK in investigating and reconciling any issues, including but not limited to, providing BANK with copies of sales media, Discover or AMEX settlement statements and any other documentation needed to assist in the investigation and reconciliation.

**35. ELECTRONIC FUNDS AUTHORIZATION:** MERCHANT grants authority to BANK to transfer funds electronically as described in the Electronic Funds Authorization section of the Application. The authorization granted will remain in effect for one hundred eighty (180) days after BANK receives written notice of MERCHANT'S cancellation of such authorization. MERCHANT will reimburse BANK for any pending debit that cannot be processed against MERCHANT'S bank account as an ACH debit for any reason, immediately upon demand of BANK. MERCHANT agrees that in the event of a second or subsequent occurrence of a debit that is rejected by MERCHANT'S bank and returned to BANK unpaid, BANK reserves the right to require MERCHANT to establish a demand deposit account directly with BANK to be operated by MERCHANT in accordance with then current BANK requirements for such accounts.

**36. SURVIVAL:** All representations, warranties and covenants shall survive the execution of this Agreement.

**37. CONSTRUCTION:** The captions contained in this Agreement are for the convenience of the parties and shall not be construed or interpreted to limit or otherwise define the scope of this Agreement. This Agreement shall not be deemed to have originated with either party.

**38. COUNTERPARTS:** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, such counterparts to constitute but one and the same instrument.

**39. FEE SCHEDULE:** Attached to this Agreement and incorporated herein by reference is the Merchant Fee Schedule which contains the Discount Fee, Transaction Fees and other terms. BANK reserves the right at all times to unilaterally change all or part of the Merchant Fee Schedule or any other terms of this Agreement in accordance with paragraphs 33 and 22.

**IN WITNESS WHEREOF** the parties hereto have caused this Agreement to be executed as a document under seal as of the date below.

| FOR MERCHANT | FOR BANK |
|---|---|
| International Heritage, Inc. | Chittenden Bank |
| Legal Name of Business | Bank Name |
| same | 110 Merchants Row, Rutland, VT 05701 |
| Trade Name of Business | Address |
| Authorized Signature: Stanley H. VanEtten [signed] | Authorized Signature: Donna Munson [signed] |
| Print Name of Signer: Stanley H. VanEtten, Title: Pres./CEO | Print Name of Signer: Donna Munson  Title: Underwriter |
| Date: 4/8/97 | Date: 4/9/97 |

RESERVE ACCOUNT AGREEMENT

This agreement is made by and between Chittenden Bank ("Bank"), having its principal offices at Two Burlington Square, Burlington, Vermont and ___International Heritage, Inc.___ ("Merchant"), having its principal
(merchant name)
offices at ___Raleigh, NC___.
(address)

**WHEREAS**, Bank and Merchant have entered into a certain MasterCard/Visa Processing Agreement dated ___9/8/97___ (the "Merchant Processing Agreement"); and
**WHEREAS**, Merchant has agreed under the Merchant Processing Agreement to have Bank establish a Reserve Account (the "Reserve Account"); and
**WHEREAS**, Merchant and Bank desire to establish and further define the rights and obligations under the Reserve Account;

**NOW THEREFORE**, in consideration of these premises and for good and valuable consideration, the parties agree as follows:

1. All terms not otherwise defined herein shall have the meaning stated in the Merchant Processing Agreement.
2. Merchant agrees that charges for amounts due, as described in Section 12, 16, 26, 27, 39, of the Merchant Processing Agreement, will be assessed against the designated checking account (the "Designated Account) as stated in the Electronic Transfer Authorization on the Application. In the event there are insufficient funds in the Designated Account to cover the above stated charges, the Bank has the right to assess the charges against this Reserve Account.
3. Merchant agrees to an initial and minimum Reserve Account deposit amount of $__10,000.00__, to be held at Bank in an individual account controlled solely by the Bank.
4. The Reserve Account balance, at the end of each month, will be increased or decreased so as to equal __5__ % of the preceding six months gross sales volume or $__10,000__, whichever is greater. The amount of the monthly adjustment will be charged or credited to the above referenced Reserve Account, and be moved to or from the Designated Account.

It is the intention of this Reserve Account that it be used primarily (but not exclusively) for unfunded chargebacks, returns, fees and other unfunded Merchant account activity, not to fund regular activity in the Designated Account while the Merchant is open and functioning, nor as overdraft protection for said Designated Account.

Should the Merchant account be closed to sales activity, voluntarily or involuntarily, this Reserve Account will become restricted from some activity as outlined above in #4, except at the sole discretion of the Bank.

Reserve Account Agreement
page two

This Reserve Account will be closed only after the Merchant account has been closed and after the Merchant account has shown no activity for six months. This account cannot be closed without the written authorization of the Bank and at its sole discretion.

The Merchant should be aware that, as per the Merchant Processing Agreement, he is liable for all unfunded charges assessed against the Designated Account and/or the Reserve Account as long as there is any relationship with the Bank, i.e. processing of sales, returns, chargebacks, and similar activities.

The Bank reserves the right to amend this Agreement should, in the Bank's sole discretion, the Merchant Account activity warrant it, or should there be any change in the business circumstances, including, but not limited to, financial condition.

Executed:

_____ 8 day of 4 ___ 19 97          This 9 day of April 19 9

International Heritage, Inc.              _Patricia McNeil_
(Merchant name)                           (Chittenden Bank)

By _____                        By _Patricia McNeil_
Title _President & CEO_                   Title _Community Banking Officer_

---

**Account Number Card**
Use this card as a pocket record of your important numbers.
PLEASE CALL OUR CUSTOMER INFORMATION CENTER AT 1-800-545-2236 FOR ADDITIONAL PRODUCT AND SERVICE INFORMATION.

_Chittenden_
B A N K   VERMONT
ROUTING NUMBER    YOUR ACCOUNT NUMBER
⑈011600062⑈  ⑈ 21045⸺3706⸺4⑈

58-6/116

**Important Numbers**
SOCIAL SECURITY NO. _____
SAVINGS ACCOUNT NO. _____
CREDIT CARD NO. _International Heritage Inc_
_C B Agent_

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:  

INTERNATIONAL HERITAGE, INC.

DEBTOR

CASE NO. 98-02675-5-ATS

TAX I.D. NO. 56-1921093

CHAPTER 7

## NOTICE OF MOTION

TO:   TO ALL PARTIES IN INTEREST

NOTICE IS HEREBY GIVEN of the Motion for Order Releasing Reserve Account, Determination of the Applicability of Automatic Stay, or for Relief from the Automatic Stay filed simultaneously herewith by Chittenden Bank in the above-captioned case; and

FURTHER NOTICE IS HEREBY GIVEN that if you fail to respond or otherwise plead or request a hearing in writing within FIFTEEN (15) days from the date of this Notice, the relief requested in the Motion may be granted without further hearing or notice; and

FURTHER NOTICE IS HEREBY GIVEN that if a response and request for hearing is filed by any party in interest within the time indicated, a hearing will be conducted on the matter at a date, time, and place to be set by the Court, and all interested parties will be notified accordingly.

This the 16th day of February, 1999.

POYNER & SPRUILL, L.L.P.

By: _____
Kathryn N. Koonce
NC State Bar Number 19193
Local Counsel to Chittenden Bank
Post Office Box 10096
Raleigh, North Carolina 27605-0096
Telephone: (919) 783-6400
Facsimile: (919) 783-1075

RALEIGH/017980-002/176291

## CERTIFICATE OF SERVICE

I, Kathryn N. Koonce of Poyner & Spruill, L.L.P., hereby certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 16th day of February, 1999, I served a copy of the foregoing Motion for Order Releasing Reserve Account, Determination of the Applicability of the Automatic Stay, or for Relief from the Automatic Stay and Notice of Motion on:

International Heritage, Inc.
ATTN: Officer or Managing Agent
2626 Glenwood Avenue, Number 200
Raleigh, North Carolina 27605-0096

Holmes P. Harden, Esq.
Chapter 7 Trustee
Post Office Box 17169
Raleigh, North Carolina 27619

Terri L. Gardner, Esq.
Post Office Box 26268
Raleigh, North Carolina 27611-6268

Marjorie K. Lynch, Esq.
Bankruptcy Administrator
Post Office Box 3758
Wilson, North Carolina 27895-3758

William P. Janvier, Esq.
Post Office Box 3007
Raleigh, North Carolina 27602-3007

by depositing the same in the United States mail, first class, postage prepaid.

I certify under penalty of perjury that the foregoing is true and correct.

This the 16th day of February, 1999.

POYNER & SPRUILL, L.L.P.

By: *Kathryn N. Koonce* (signature)
Kathryn N. Koonce
NC State Bar Number 19193
Local Counsel to Chittenden Bank
Post Office Box 10096
Raleigh, North Carolina 27605-0096
Telephone: (919) 783-6400

RALEIGH/017980-002/176291