**F I L E D**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

MAR 19 1999

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

| | |
|---|---|
| IN RE: | ) |
| INTERNATIONAL HERITAGE, INC. | ) CASE NO.: 98-02675-5-ATS |
| | ) CHAPTER 7 |
| INTERNATIONAL HERITAGE, | ) |
| INCORPORATED, | ) CASE NO. 98-02674-4-ATS |
| | ) CHAPTER 7 |
| Debtor. | ) |

### RESPONSE OF STANLEY H. VAN ETTEN TO TRUSTEE'S MOTION FOR AN ORDER STAYING CERTAIN LITIGATION CURRENTLY PENDING BETWEEN THE MONTANA STATE AUDITOR, THE DEBTORS AND OTHERS

NOW COMES Stanley H. Van Etten (hereinafter "Mr. Van Etten"), by and through counsel, and in response to the Trustee's motion for an order providing that certain litigation currently pending before the State Auditor and Commissioner of Securities of the State of Montana be stayed pursuant to 11 U.S.C. § 362, submits the following statements and arguments in support of the Trustee's motion:

1. On or about March 11, 1999, the Trustee filed with the Court a motion seeking an order providing that certain litigation currently pending before the State Auditor and Commissioner of Securities of the State of Montana be stayed pursuant to 11 U.S.C. § 362. Mr. Van Etten, the former President, Chief Executive Office and Chairman of the Board of the Debtors, fully supports this motion of the Trustee.

2. In support of his position as to the reasons why the litigation or proceedings initiated by the State Auditor and Commissioner of Securities of the State of Montana should be stayed pursuant to 11 U.S.C. § 362, and as a factual summary of many aspects of the litigation and proceedings pending in Montana, Mr. Van Etten will incorporate herein by reference as Exhibit A, "Stanley H. Van Etten's Brief pertaining to Hearing Status in Federal Bankruptcy

Stay" which he filed, through counsel, in Montana in the pending proceeding. This brief, again, provides a factual summary of the proceedings and makes arguments as to why the bankruptcy stay must apply.

3.     As an additional argument as to why the Montana proceeding should be stayed, Mr. Van Etten would submit to the Court that he has been indemnified by the Debtors and a stay of the litigation as to all parties is necessary and appropriate to avoid unnecessary and additional claims being asserted against the estate by Mr. Van Etten and others as a result of the indemnification.

WHEREFORE, Mr. Van Etten prays that this Court grant the motion of the Trustee and stay the proceedings pending in the State of Montana and referenced herein, enter an appropriate protective order which prohibits the State Auditor and Commissioner of Securities of the State of Montana from proceeding forward with any related proceedings against the Debtors, Mr. Van Etten and related parties, and grant such other and further relief as the Court deems appropriate.

This the 19th day of March, 1999.

WOOD & FRANCIS, PLLC

Brent E. Wood
Attorney for Stanley H. Van Etten
State Bar No. 16898
Two Hannover Square
434 Fayetteville Street Mall, Suite 2300
Post Office Box 164
Raleigh, North Carolina  27602
(919) 828-0801

## CERTIFICATE OF SERVICE

I, Brent E. Wood, attorney for Stanley H. Van Etten, certify that I served the foregoing document on the 19th day March, 1999, upon the following parties, and in the manner below specified, by placing a copy thereof for each such party(ies) in a separate envelope bearing sufficient postage and depositing the same in the United States mail at Raleigh, North Carolina and/or by facsimile:

Holmes P. Harden, Esq.
Maupin, Taylor & Ellis, P.A.
3200 Beechleaf Ct., Suite 500
P. O. Drawer 19764
Raleigh, NC  27619-9764

Terri L. Gardner
Smith Debman Narron & Myers
4700 New Bern Avenue
P. O. Box 26268
Raleigh, NC  27611-6268

Marjorie K. Lynch
Bankruptcy Administrator
P. O. Box 3758
Wilson, NC  27894-3758

Lin Deola
Reynolds, Motl & Sherwood, PLLP
401 N. Last Chance Gulch
Helena, MT  59601

Elizabeth O'Halloran
State Auditor's Office
P. O. Box 4006
Helena, MT  59604-4006

Robert Brunton
Kutak Rock
225 Peachtree Street, NE, Suite 2100
Atlanta, GA  30303-1768

David R. Paoli
Paoli Law Office
P. O. Box 8131
Missoula, MT  58807

This the 19th day of March, 1999.

WOOD & FRANCIS, PLLC

Brent E. Wood
Two Hannover Square
424 Fayetteville Street Mall, Suite 2300
Post Office Box 164
Raleigh, North Carolina  27602
Telephone:  (919) 828-0801

f:\wp\lhi-bk.RespTrusteeMot.doc

3

STATE AUDITOR'S OFFICE
SECURITIES DEPARTMENT
HELENA, MONTANA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. I-04-02-98-04 |
| | ) | |
| International Heritage, Inc., Stanley H. Van Etten, | ) | **STANLEY H. VAN ETTEN'S** |
| Claude W. Savage, Larry G. Smith and | ) | **BRIEF PERTAINING TO** |
| International Heritage, Incorporated, a Nevada | ) | **HEARING STATUS IN** |
| corporation, and their agents and representatives, | ) | **FEDERAL BANKRUPTCY** |
| | ) | **STAY** |
| Respondents. | ) | |

NOW COMES Stanley H. Van Etten (hereinafter "Mr. Van Etten"), by and through counsel, and submits this brief in support of his position as to the automatic stay resulting from the filing of the bankruptcy petitions by International Heritage, Inc. and International Heritage, Incorporated (hereinafter collectively referred to as "IHI").

## STATEMENT OF THE CASE

Essentially, this administrative proceeding was initiated on or about November 6, 1998, when Mark O'Keefe, State Auditor and Commissioner of Securities for the State of Montana (hereinafter "Commissioner"), executed a Notice of Hearing and Order in which he found that the Respondents herein had allegedly violated the securities laws of the State of Montana, ordered the Respondents to cease and desist from violating those securities laws, and noticed Respondents that a hearing would be conducted on January 11, 1999, before the Hearing Examiner, David Paoli (hereinafter "Examiner Paoli").

On November 25, 1998, IHI filed a petition pursuant to Chapter 7 of the Bankruptcy Code in the Eastern District of North Carolina. Holmes P. Harden was appointed Chapter 7 Trustee by the Bankruptcy Court.



EXHIBIT

A

On January 5, 1999, a telephone conference took place with Examiner Paoli, counsel for the Commissioner; and counsel for Mr. Van Etten in which a scheduling order was discussed for this proceeding. During that telephone conference, counsel for Mr. Van Etten indicated that the bankruptcy stay would prevent the Commissioner from proceeding forward with this administrative proceeding. During that telephone conference, Examiner Paoli asked that counsel for the Commissioner submit a brief on the bankruptcy stay issue and that counsel for Mr. Van Etten respond. Examiner Paoli also rescheduled the hearing in this proceeding for May 3, 1999. Ultimately, on January 11, 1999, Examiner Paoli entered a scheduling order in which he said: "Briefing on the issue of the Bankruptcy stay will proceed with the [Commissioner] filing its brief on January 29, 1999 and any response briefs being filed on February 9, 1999."

On or about January 29, 1999, the Commissioner served upon the undersigned its "Brief Pertaining to Hearing Status in Federal Bankruptcy Stay". This brief shall serve as a response to that brief of the Commissioner.

## STATEMENT OF FACTS

Prior to November 25, 1998, IHI was a multi-level marketing company which operated in the State of Montana, as well as most states within the nation and in several provinces of Canada. IHI was extremely successful in its operations throughout the country, and in Montana.

On March 16, 1998, the Securities and Exchange Commission (hereinafter "SEC") initiated a civil action against IHI and the individuals Respondents herein in which it alleged that IHI and the individual Respondents had violated the securities laws of the United States. With that action, the SEC sought the appointment of a Receiver and the imposition of an injunction to prohibit IHI from violating the securities laws of the United States. The SEC sought and obtained an *ex parte* order appointing a Receiver. The Honorable Richard Story (hereinafter

"Judge Story"), District Court Judge for the Northern District of Georgia, granted, in part, the *ex parte* relief sought by the SEC and appointed a Receiver. Judge Story also scheduled for hearing the SEC's request for a preliminary injunction and appointment of a Receiver for March 24, 1998.

On March 24, 1998, a hearing began before Judge Story on the SEC's request for the appointment of a Receiver and the entry of a preliminary injunction. After approximately three days of hearing before Judge Story, the SEC rested its case. At that time, IHI asked Judge Story to dismiss the SEC's motion. Ultimately, after extensive discussions with Judge Story, and after no presentation of evidence by IHI, Judge Story dissolved the Receivership, appointed a Monitor and entered an injunction which limited certain activities of IHI. This order was entered with the consent of IHI.

On April 3, 1998, Judge Story entered his order dissolving the Receivership, appointing a Monitor and confirming an injunction which was consented to by IHI. A copy of Judge Story's April 3, 1998, order is attached hereto and incorporated herein by reference as Exhibit A. Pursuant to that order, Judge Story said:

> IHI shall develop and submit to the Monitor a new compensation and marketing plan consistent with the terms of this order. Any future amendments to the plan shall also be submitted to the Monitor. The Monitor shall submit the plans to [the SEC] and the Court for review. The Monitor will review any plans submitted by IHI to assure compliance with this order and shall approve a plan only after determining that the plan complies with the terms of this Order and any applicable laws. After approval by the Monitor of a plan or amendment, such plan or amendment can be implemented by IHI. IHI will not be required to await approval by the Court of such plans. No new sales representatives shall be approved by IHI until the new composition [sic] and marketing plan is approved by the Monitor. Notwithstanding the foregoing, the Court may, upon motion of any party or *sua sponte* issue a show cause order requiring IHI to appear before the Court and show that the plans are in compliance with the terms of this Order. In addition to seeking approval of the Monitor to the new plans, IHI may, before implementation of such

3

plans, request that the Court review any new or amended plans to assure compliance with the terms of this Order.

On April 13, 1998, IHI applied to the Court for an order approving a modified compensation and marketing plan in accordance with the April 3, 1998, order of Judge Story. Despite the objection of the SEC, Judge Story entered an order authorizing IHI "to conduct business consistent with [its] modified plan submitted to the Court and under the continued observation of the Monitor" on April 22, 1998. A copy of Judge Story's order dated April 22, 1998, is attached hereto as Exhibit B. Between April 22, 1998, and the time that IHI sought protection under the Bankruptcy Code, IHI complied with all aspects of Judge Story's order. At no point during that time period did Judge Story find that IHI had violated the terms of Judge Story's April 22, 1998, order or any other order of Judge Story. In fact, at no time during that same period did the SEC file any document with the Court indicating that IHI had violated the terms of Judge Story's April 22, 1998, order or any other order of Judge Story.

Apparently, after the SEC initiated its action against IHI, the Commissioner determined that it would be appropriate to initiate his own action against IHI and the individual Respondents herein in the State of Montana. Upon information and belief, prior to the SEC's action in Atlanta, no significant investigation was ongoing in the State of Montana relating to IHI and the individual Respondents herein. On April 3, 1998, the Commissioner entered a Cease and Desist Order in which he made many of the findings which are the subject of this current proceeding. A copy of that Cease and Desist Order is attached hereto and incorporated herein by reference as Exhibit C. On April 20, 1998, the Commissioner then issued a First Amended Cease and Desist Order in which, again, he made many of the findings which are the subject of the current proceeding. The First Amended Cease and Desist Order alleged some additional violations of

4

Montana's securities laws.  A copy of the First Amended Cease and Desist Order is attached hereto and incorporated herein by reference as Exhibit D.

After the Commissioner issued his original Cease and Desist Order and First Amended Cease and Desist Order, Mr. Van Etten and the Commissioner, as well as their counsel, met to discuss a resolution of the original Cease and Desist Order and the First Amended Cease and Desist Order issued by the Commissioner.  As a result of that meeting, a Consent Order and Order Vacating Cease and Desist Orders was executed by the Commissioner and Mr. Van Etten, as the President of IHI.  A copy of this Consent Order is attached hereto and incorporated herein by reference as Exhibit E.  For purposes of the current issues before Examiner Paoli, the key findings of that Consent Order are as follows:

1. IHI currently operates as a multi-level marketing company in the state of Montana through a network of approximately of 4,000 independent retail sales representatives.

2. Pursuant to an Order entered on April 3, 1998 by the Honorable Richard Story, United States District Court Judge for the Northern District of Georgia, in a civil action initiated by the Securities and Exchange Commission against IHI and others, IHI has modified its marketing and compensation plan in an effort to ensure that neither IHI or its independent retail sales representatives are violating any laws of the United States or any state, including the laws of the state of Montana.  After modifying its marketing and compensation plans, IHI filed an Application for an Order Approving the Modified Compensation and Marketing Plan with the United States Clerk of Court for the Northern District of Georgia and sought from the Honorable Richard Story, United States District Court Judge for the Northern District of Georgia, the approval of IHI's modified marketing and compensation plans.

3. Following a hearing on the Application for an Order Approving the Modified Compensation and Marketing Plan before the Honorable Richard Story, United States District Court Judge for the Northern District of Georgia, an order was entered on April 22, 1998 by Judge Story which authorized IHI to "conduct business consistent with the modified plans submitted to" Judge Story.

4.   On or before April 30, 1998, the modified compensation and marketing plan was submitted to legal counsel for the Commissioner.

5.   With this Consent Order, the Commissioner and IHI seek to:  (a) provide an opportunity to educate the citizens of Montana of the dangers of illegal pyramid schemes; (b) provide an opportunity to educate the citizens of Montana of the value of securities statues adopted in the State of Montana; (c) avoid the expense of litigating issues contained in the two orders issued by the Commissioner; and (d) **resolve all differences between the Commissioner and IHI.**

(Emphasis added).

In the Consent Order, the Commissioner and IHI also concluded as a matter of law that "IHI is not prohibited from conducting business in the State of Montana consistent with the modified marketing and compensation plans submitted to legal counsel for the Commissioner and as authorized by United States District Court Judge Richard Story of the Northern District of Georgia".

Based upon the findings of fact and conclusions of law within the Consent Order, the following specific terms of the Consent Order were entered:

1.   Without admitting any liability under any statute in the State of Montana or any statute, rule or order adopted in the United States, IHI hereby stipulates and consents to the following:

A.   To comply with the Securities Act of Montana, and the rules and order promulgated thereunder **in the future;**

B.   To offer the right to rescind, within thirty (30) days after the mailing of written notice, the sale of any notes purchased by citizens of the State of Montana between 14 July 1997 and 31 October 1997 pursuant to the Regulation D Offering Memorandum or Term Sheet dated 17 July 1997;

C.   To offer, through a mailed written notification in cooperation with the Commissioner, to refund all Montana citizens any costs associated with a retail business agreement used by IHI as a manner of purchasing product in the past, less the amount of commissions or refunds previously paid to and the retail value of any products received by the Montana resident; provided, however, IHI shall not be obligated to pay any refund unless the Montana citizen certifies in writing that he or she was a Montana citizen at

the time that he or she executed the retail business agreement, certifies in writing his or her intent to terminate their association with IHI, requests the refund in writing, and provides the written request for refund to IHI within forty-five (45) days following the date of the written notice by IHI;

D. To pay all refunds to Montana citizens appropriately requesting the same pursuant to the preceding paragraph within six months following the receipt of said request for refund from the Montana citizen;

E. To pay, within six (6) months following the execution of this Consent Order, to the Commissioner the amount of $21,000.00 for reimbursement of investigative costs;

F. To contribute in 1998 to youth activities and consumer protection efforts in the State of Montana, including public education about the protections afforded by Montana's securities laws;

G. To provide, for the purpose of monitoring the activities of IHI and its independent retail sales representatives, documents to the Commissioner upon the reasonable requests of the Commissioner and his staff; and

H. To waive the right to a hearing on the allegations contained within the Cease and Desist Order dated 10 April 1998 and the First Amended Cease and Desist Order dated 20 April 1998.

2. The Commissioner hereby stipulates and consents to the following:

A. Under the authority of the Securities Act of Montana and Section 2-4-603, MCA, the Commissioner agrees that if the terms and conditions of this Consent Order and any other commitments pursuant to Paragraph 1.F above are fully met by IHI, he will not initiate any civil or administrative action against IHI or any individual Respondents named within the two orders issued by the Commissioner regarding the allegations contained within the Cease and Desist Order dated 10 April 1998 and the First Amended Cease and Desist Order dated 20 April 1998; and

B. That this Consent Order shall not and does not constitute a securities or investment related permanent or temporary injunction for the purposes of any collateral effects or reporting requirements under state securities laws or self-regulatory organization rules, nor shall the existence of this Consent Order restrict, limit, prohibit or disqualify the Respondents, or any affiliate of the Respondents, in any manner from: (i) engaging in any lawful activity or practice pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisors Act of 1940, or the Commodity Exchange Act, and/or any rules or regulations promulgated thereunder, and/or any state securities and commodities laws (including without limitation,

7

participating in offerings or availing themselves of exemptions including the Uniform Limited Offering Exemption, as and to the extent now or hereafter adopted), or (ii) acting as an affiliated person of any underwriter, broker, dealer, investment advisor, investment company, bank, insurance company, or other entity or person under applicable federal or state insurance, securities, banking or commodities laws.

3.   **It is hereby ordered that the Cease and Desist Orders issued in the above-captioned administrative proceeding on 3 April 1998, as amended on 20 April 1998, is vacated as it applies to the Respondents.**

(Emphasis added).

Consistent with the terms of this Consent Order, IHI did not violate the Securities Act of Montana after the execution of the Consent Order by the Commissioner and IHI on May 1, 1998. IHI also made a payment, by and through Mr. Van Etten, of $21,000.00 to the Commissioner.

Following the execution of the Consent Order, IHI used its best efforts to survive financially. Unfortunately, the negative publicity associated with the actions of the SEC and the Commissioner, as well as others, prevented IHI from surviving in the very competitive industry of multi-level marketing. As a result, at the end of October 1998, IHI released its sales force and attempted to change its manner of operation to more of a direct sales company.

After making attempts to change its manner of operation, the Commissioner issued the Notice of Hearing and Order which are the subject of the current proceeding. This Order, executed on November 6, 1998, is attached hereto and incorporated herein by reference as Exhibit F. This Order, which does not even mention the Consent Order dated May 1, 1998, vacating the two previous orders, is essentially a repeat of what had been alleged by the Commissioner in the two previously-vacated Cease and Desist Orders. As indicated above, IHI sought protection under the Bankruptcy Code on November 25, 1998, and the hearing scheduled pursuant to the notice of the Commissioner on November 6, 1998, has been postponed.

8

After Holmes Harden was appointed Chapter 7 Trustee for IHI, he delivered a letter to the Commissioner in which he acknowledged receipt of the November 6, 1998, Notice of Hearing and Order. A copy of the letter from Holmes Harden to the Commissioner is attached hereto and incorporated herein by reference as Exhibit G. With that letter, Mr. Harden set forth his position to the Commissioner as follows:

> Please be advised that International Heritage, Inc. is in Chapter 7 bankruptcy in the Eastern District of North Carolina. I am the court-appointed Chapter 7 Trustee. International Heritage, Inc. has ceased to function and does no business anywhere. International Heritage, Inc. specifically is not issuing, offering or selling securities to persons in Montana, because it is incapable of doing so. The regulatory ends sought by the State of Montana have therefore been achieved, and the January 11, 1999 hearing is superfluous as it applies to the debtor. The continued prosecution of litigation against International Heritage, Inc. for the purpose of establishing and/or collecting damages therefore may violate the automatic stay of 11 U.S.C. §362.

> Should you feel compelled to continue the prosecution of International Heritage, Inc. on January 11, I strongly suggest that you first obtain relief from the automatic stay to do so. I reserve the right to argue to the Bankruptcy Court that any judgment you obtain against International Heritage, Inc. is void *ab initio*, and, if circumstances warrant, that the State of Montana should be subject to sanctions for violation of the automatic stay if you proceed without benefit of stay relief.

Despite this letter from the Bankruptcy Trustee of IHI, and despite the previous settlement which "resolve[d] all differences between the Commissioner and IHI," the Commissioner has insisted upon proceeding forward with a hearing pursuant to his new Cease and Desist Order issued on November 6, 1998.

Furthermore, in his brief in support of his position on the Bankruptcy stay, the Commissioner has provided inaccurate information to Examiner Paoli. Specifically, the Commissioner has attributed certain statements to an assistant to the bankruptcy counsel of IHI which are not accurate. In his brief, the Commissioner states that the "Notice of Stay . . . was filed at the request for counsel for other Respondents in this matter, and was not intended to

9

indicate [IHI's bankruptcy counsel's] representation of the corporate Respondents in this matter".

Presumably, the Commissioner made this representation to Examiner Paoli based upon his belief

that, if IHI's counsel did not believe the stay applied, the stay should not apply.

Fortunately, IHI's bankruptcy counsel (Terri Gardner of Smith, Debnam, Narron &

Meyers, LLP) has clarified her position after reviewing the brief filed by the Commissioner.

That clarification is contained within the letter to the undersigned, which is attached hereto and

incorporated herein by reference as Exhibit H.  In her letter, Ms. Gardner clarifies that she "filed

the notice of stay . . . to notify formally the State Auditor and Commissioner of Securities and

Ms. O'Halloran of the chapter 7 filings".  She also states that "No parties other than the debtors

requested the filing of the notice of stay".  Finally, she also confirms that:

> The position of the debtors, which I wholeheartedly support, is that **all legal
> action is stayed**.  At this time, the regulatory enforcement aspect of the Montana
> action which would except the action from the stay under section 362(b)(4) has
> been negated by the fact that the debtor has ceased operations.  There is no action
> of the debtors which is threatening the public.  Any restitution and penalties could
> and should be determined in the bankruptcy court.

> (Emphasis in original).

In summary, both bankruptcy counsel for IHI and the Bankruptcy Trustee have taken the position

that the Montana action should be stayed.

## ARGUMENT

I.  *The Commissioner and IHI (and, therefore, Mr. Van Etten) have resolved all of
their differences and because the Commissioner has made no allegation that
the Respondents have violated Montana's securities laws since that resolution
was executed, the Bankruptcy stay must apply and prohibit the Commissioner
from proceeding forward with any claims against IHI, Mr. Van Etten and the
other individual Respondents to the proceeding.*

In the Commissioner's brief pertaining to the hearing status and federal bankruptcy stay,

the Commissioner correctly cites the most relevant sections of the Bankruptcy Code which

would relate to the stay that would apply in this situation. In order to protect bankrupt debtors,

Congress adopted 11 U.S.C. § 362, which provides as follows:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 [15 USCS § 78eee(a)(3)], operates as a stay, applicable to all entities, of -- (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title . . .

Obviously, because the stay was so broad, Congress determined that certain exceptions to

the stay must apply. Again, as the Commissioner pointed out to Examiner Paoli, Congress

specifically adopted the following provision which serves as exemptions to the automatic stay:

> The filing of a petition under section 301, 302, or 303 of this title, or of an application under section (a)(3) of the Securities Investor Protection Act of 1970 [15 USCS § 78eee(a)(3)], does not operate as a stay - - . . . (4) under subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; (5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power . . . 11 USCS § 362(b)(4) (1998).

The Commissioner contends that this proceeding is exempt from the application of the automatic

stay because the Commissioner would argue that he is simply attempting to enforce Montana's

police or regulatory authority. Despite the arguments of the Commissioner, the automatic stay

does apply in this situation. A careful review of the documents attached to this brief will show

that the automatic stay must apply and that the Commissioner is not attempting to enforce its

police or regulatory authority.

Prior to May 1, 1998, it is possible that the Commissioner could argue that he would have been attempting to enforce his police or regulatory authority. However, on May 1, 1998, the Commissioner and IHI entered into the Consent Order and Order Vacating Cease and Desist Orders which resolved all of the differences between the Commissioner and IHI. While it is true that the Consent Order gives to the Commissioner a right to reinstate his actions, the fact that IHI is no longer conducting business in Montana and the fact that the Commissioner has offered no substantial proof of any violation of Montana's securities laws after May 1, 1998, confirms that the Commissioner is not attempting to enforce his police or regulatory authority and thus is prohibited from proceeding forward pursuant to § 362 of the Bankruptcy Code.

Prior to May 1, 1998, the Commissioner had issued two Cease and Desist Orders, the second one amending the first. On May 1, 1998, the Commissioner and IHI entered into the Consent Order, which is a binding contract, pursuant to which the Commissioner agreed that all differences between IHI and the Commissioner were resolved. The Commissioner also agreed that the two Cease and Desist Orders were vacated and that he would not reinstate the Cease and Desist Orders unless there was some breach of the Consent Order by IHI.

At this point, the Commissioner has offered absolutely no proof that IHI has violated any aspect of the Consent Order. If there was any significant violation of the Consent Order, and specifically any violation of Montana's securities laws after May 1, 1998, the Commissioner surely would have mentioned that either in his Cease and Desist Order dated November 6, 1998, or in his brief filed with Examiner Paoli on January 29, 1999. The fact that the Commissioner has failed to mention any specific violation of the Consent Order or Montana securities laws confirms that no significant violation has occurred. Thus, with no proof of any violation of Montana's securities laws after May 1, 1998, and based upon the indisputable language

12

contained within the Consent Order, the Commissioner's only motivation for moving forward with a new Cease and Desist Order must be to enforce something other than his police or regulatory authority.

In order to avoid being disingenuous, Mr. Van Etten will admit that the Commissioner may be able to argue that IHI has failed to provide refunds to Montana residents in accordance with the terms of the Consent Order. However, and even assuming that this is true, the enforcement of this provision of the Consent Order is surely not a police or regulatory power of the Montana Securities Commissioner. In fact, this is not even a pecuniary interest of the Commissioner since any benefit associated with this provision of the Consent Order is to residents of the State of Montana. As a result, the most basic interpretation of the Consent Order confirms that the attempt by the Commissioner to move forward with a new Cease and Desist Order that is essentially identical to the original Cease and Desist Orders would be a violation of § 362 of the Bankruptcy Code.

In summary, the Consent Order resolved all differences between IHI and the Commissioner. Pursuant to that Consent Order, the original Cease and Desist Orders were vacated. Since the Commissioner has brought forth no proof that any of the Respondents have in any way violated the terms of the Consent Order, and the only possible violation is one relating to the payment of refunds to citizens of Montana, it is clear that the Commissioner is not attempting to enforce his police or regulatory authority with this proceeding but is moving forward with an action for some reason other than enforcing his police or regulatory authority. Thus, the automatic stay of § 362 of the Bankruptcy Code applies and Examiner Paolimust either dismiss this action or require the Commissioner to seek relief from the automatic stay before proceeding forward with this action.

13

II.     *Even if the resolution between the Commissioner and IHI (and, therefore Mr. Van Etten) does not prohibit the Commissioner from proceeding forward against the Respondents, the automatic stay of § 362 of the Bankruptcy Code prohibits the Commissioner from proceeding since it is clear that the only interest of the Commissioner is pecuniary, especially in light of the resolution between the Commissioner and IHI.*

As was implied above, it is important to know the violations that the Commissioner seeks to remedy because it will be those remedies which ultimately will be the deciding factors in whether the Commissioner's action will be allowed to proceed against IHI and the Respondents. Under Bankruptcy law, the issue of whether a governmental unit or agency may proceed against a bankrupt entity hinges on whether that governmental unit or agency seeks to enforce a police or regulatory power or whether or not that governmental unit, like all other creditors in a bankruptcy case, are merely seeking to obtain a pecuniary interest in the *res* or property of the bankrupt debtor. *Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir.1981); *U.S. v. Troxler Hosiery Co.*, 41 B.R. 457, 459 (D.C. 1984); *In re Aegean Fare, Inc.*, 35 B.R. 923 (Bankr.D.Mass.1983). In *Missouri v. U.S. Bankruptcy Court*, the Eighth Circuit held that police and regulatory powers included the enforcement of state laws affecting health, welfare, morals and safety. In *Troxler*, the District Court cited the legislative history and explained that the police and regulatory powers referenced in the § 362 exemption included "actions related to consumer protection, environmental protection, fraud, safety, or similar police or regulatory laws." *Troxler* at 459 citing H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 343, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 6299; S.Rep. No. 95-989, 95th Cong., 2d Sess. 52, *reprinted in* U.S. Code Cong. & Ad. News 5787, 5838. At this point, it appears obvious that the Commissioner has the authority to enforce the securities laws despite the stay of § 362 of the Bankruptcy Code; however, because the Commissioner is not attempting to enforce the securities laws in this specific instance, the exemptions of § 362 do not apply.

14

The test of determining whether a governmental unit's action is of pecuniary interest or enforces a police or regulatory power originated with the U.S. Supreme Court in 1971. In that year, the Supreme Court decided *Perez v. Campbell. Perez v. Campbell, Superintendent Motor Vehicle Division, Arizona Highway Department*, 402 U.S. 637 (1971). In *Perez*, the debtor in question had been involved in a car accident prior to filing bankruptcy. As part of the settlement of the damages of the accident, both debtor, the driver of the car, and debtor's spouse confessed a judgment in the amount of $2,425.98. Just prior to confessing this judgment, Mr. and Mrs. Perez filed a voluntary petition under the Bankruptcy Act. *Ibid.* at 639. Pursuant to the Arizona Motor Vehicle Safety Responsibility Act, the Arizona Highway Department suspended the driving privileges of both debtor and spouse for non-payment of the judgment entered against them for the damages incurred by the injured party to the accident. *Ibid.* at 641. The Supreme Court held that the Arizona statute violated the Supremacy Clause by hampering the purpose of the bankruptcy process in discouragement of preexisting debt. *Ibid.* at 649. Instead of looking at the intent of the state law in *Perez,* the Supreme Court examined the effect of the statute on the execution of federal law in reviewing the state law for a violation of the Supremacy Clause. *Ibid.*, pp. 651-652.

Since the Supreme Court's ruling in *Perez*, the Bankruptcy Code was enacted in 1978 which provides for the automatic stay of litigation and exemptions from that stay. The analysis for determining whether a state action will fall within the exemption, however, remains very similar to the process used in *Perez*. The court must still look toward the effect of the particular enforcement being sought to determine whether the action falls within or outside of the exemption to the automatic stay.

Contrary to the insinuation of the Commissioner on page 5 of his Brief that many state proceedings fall outside of the automatic stay, all state proceedings may be subjected to the automatic stay. *Ibid., Collier.* In fact, the cases cited by the Commissioner for the proposition that many jurisdictions hold state proceedings to be exempt from the automatic stay say no such thing. *In re Cousins Restaurants, Inc.*, involved a motion by the debtor to enjoin the Town of Henrietta, New York, from enforcing its zoning ordinance against the debtor's restaurant. *In re Cousins Restaurant, Inc.*, 11 B.R. 521(1981). Judge Edward D. Hayes noted in the *Cousins* case that the debtor had been running his disco/restaurant without a proper special permit since prior to the bankruptcy proceedings. In denying debtor's motion, Judge Hayes noted that the debtor could seek the special permit from the town after a public hearing. *Ibid* at 522. Essentially, Judge Hayes held that the debtor had not followed the procedures for getting his special permit thus could not seek refuge before the Bankruptcy Court on this issue. Judge Hayes held that the debtor in this case needed to follow proper procedure regarding the acquisition of a special permit. Judge Hayes did not make any reference to the propriety of state actions being exempted from the bankruptcy stay.

Similarly, *In the Matter of Carmen Alessi*, the District Court fully reviewed the actions of the Illinois Racing Board before holding that the Board had not violated the Supremacy Clause. *In the Matter of Carmen Alessi*, 12 B.R. 96, 99(1981). The District Court confined its decision to the narrow facts before it in light of the fact that both the debtor and the creditors were involved in horse racing thus placing the entire subject matter before the Board. *Id.* *Alessi* is distinguishable from the present case in that the state action sought in *Alessi* did not actually seek to effect the assets of the debtor. To the contrary, the District Court found that the Illinois

writing bad checks and did not seek to make any ruling regarding the status of his outstanding debts.

Finally, in *Commonwealth Department of Environmental Resources v. Peggs Run Coal Company*, the District Court restricted it's findings to the complaint before it in ruling that the relief sought was a proper exercise of the state's police and regulatory power. *Commonwealth Department of Environmental Resources v. Peggs Run Coal Company*, 423 A.2d 765, 767 (1980). In summary, no where in the text of these cases do the courts profess that state proceedings should be generally exempt from the automatic stay in bankruptcy proceedings.

Bluntly, the Commissioner has overstated the law. State proceedings do not receive any special latitude from the courts when reviewed in bankruptcy proceedings. Both state and federal agencies may find themselves barred from proceeding against a bankrupt debtor should they seek a pecuniary advantage over other creditors of the bankrupt. In fact, such a case was cited by the Commissioner in his brief. In *Missouri v. U.S. Bankruptcy Court*, the state of Missouri, was squarely blocked from debtor assets consisting of stores of grain which the debtor had placed under the state's authority three days prior to filing bankruptcy. *Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 771(8th Cir. 1981). In striking down the action of the state of Missouri the Eighth Circuit Court of Appeals agreed with the lower court that the sole purpose of the state action was to get at assets of the debtor and merely calling the action an exercise of police and regulatory powers did not exempt the state from the automatic stay. *Ibid.* at 773. The present case involves a similar tactic by the Commissioner. The Commissioner calls this action an exercise of his agency's police and regulatory power, yet, nowhere has there been more than a vague statement of exactly what that power is trying to achieve.

Similarly, the Ninth Circuit has followed the decision in *Missouri* staying state proceedings where the state agency seeks to touch assets of the bankrupt debtor. *Hillis Motors Inc. v. Hawaii Automobile Dealer Associates*, 997 F.2d 581, 591(9th Cir. 1993). It is also clear that Bankruptcy Courts follow the pecuniary interest versus police and regulatory powers analysis when deciding whether to stay state proceedings which may reach the assets of the bankrupt debtor. In this case, the Commissioner's actions, likewise, must be measured by this standard.

As was pointed out earlier, no where has the Commissioner specified the wrong that has been done. The only accusations by the Commissioner are vague assertions that the public has been harmed and the Securities Act of Montana must be enforced to punish misdeeds. Again, following a case cited in the Commissioner's own brief, the Commissioner's action against IHI must fail. A definite statement of the pecuniary interest test can be found in *In re Commonwealth Companies, Inc.* As noted by the Eighth Circuit Court of Appeals, the proper inquiry is whether the specific actions of the government will result in an economic advantage to the government or its citizens. *In re Commonwealth Companies, Inc.*, 913 F.2d 518, 523 (8th Cir. 1990). Here, the Commissioner's action against IHI must fail because nowhere in his Notice of Hearing and Order or in his Brief Pertaining to Hearing Status and Federal Bankruptcy Stay does the Commissioner state with any specificity: 1)what actions he seeks to curtail; 2)what citizen harm(s) have been suffered; 3)what misconduct has taken place; and 4)what public interest is at stake.

As noted above, the only action plausible for the Commissioner in this matter would be to seek the redemption of refunds for Montana citizens. It is clear that this action will effect IHI's pecuniary interests which are currently in the sole custody and control of the Bankruptcy Trustee.

18

Therefore, according to the standards used in judging such matters, the Commissioner must be stayed in his action. The grounds for a stay at this time would be two fold. First, the Commissioner seeks to achieve a pecuniary advantage for certain citizens of Montana over and above the current creditors held in abeyance by the bankruptcy proceedings. Secondly, the Commissioner fails to clearly state the reasons for his actions as well as the specific objectives of his actions in this matter. Thus, Examiner Paoli should simply refuse to proceed and require the Commissioner to seek relief before the Bankruptcy Judge.

Of the cases cited by the Commissioner in his Brief, *In re Charter First Mortgage, Inc.* is probably most on point with the facts as they pertain to IHI and the Commissioner. In *In re Charter First Mortgage, Inc.*, the Attorney General for the state of Washington sought restitution on behalf of certain of its citizens pursuant to its Consumer Protection Act. *In re Charter First Mortgage, Inc.*, 42 B.R. 380 (1984). The Attorney General argued that the state's actions were exempted from the bankruptcy automatic stay. In staying the Attorney General from seeking further restitution from the debtor, the court stated in pertinent part:

> Any state court ordering restitution for certain citizens from the debtor is certainly creating for those few citizens an advantage over other potential creditors of the debtor's estate. The court will have made a binding judicial determination as to both the existence and legitimacy of those claims without having had to consider and apply the many technical conditions created by the Bankruptcy Code which test the validity of claims against the debtor's estate.

*Ibid.* at 385. The court went on to note that an action to enforce the statute seeking restitution did not fall within the language of § 362(b)(4) and thus was stayed. *Id.* This case is similar to the situation of *Charter First Mortgage, Inc.* in that here, though we cannot be sure due to the vagueness of the Commissioner's motions and pleadings, it appears that the Commissioner likewise is seeking to secure debts allegedly owed to citizens of Montana by IHI. While this action may be mandated by the Securities Act of Montana, it is clearly pecuniary in nature.

19

Moreover, like *Charter First Mortgage, Inc.*, if allowed it would put the group of Montana citizens, *i.e.* creditors, ahead of all other creditors who are bound by the Bankruptcy Court and prevented from also pursuing IHI. This is in clear contradiction to the purpose of the Bankruptcy Code and would also be a violation of the Supremacy Clause as it would take assets away from the Bankruptcy Trustee without allowing him a say in the process.

*Charter First Mortgage, Inc.* clearly shows Commissioner's actions for what they are. The Commissioner is attempting to reach IHI assets in the interest of his citizens. While these citizens may have legitimate claims against IHI, they may not have their interests put ahead of other creditors who have interests against IHI. More recently, *Charter First Mortgage, Inc.* has been followed where in similar circumstances a state agency sought to intercede on behalf of certain of the bankrupt debtor's creditors. Again, the state action in question was stayed. *In Poul v. Registrar of the State of California,* 91 B.R. 83, 86 (1988).

The Commissioner and the citizens of Montana should stand in no better position than any other creditors. Where they may have legitimate claims against IHI, they must like all creditors seek recourse through the Bankruptcy Court. By merely calling the action an exercise of police and regulatory power, the Commissioner cannot be allowed to proceed and give Montana residents with claims against IHI advantages against all other creditors of IHI. Further, such action without more specificity could be of such a large nature as to completely deplete what few resources of IHI that still exist. Under these circumstances, the Commissioner must be subjected to the bankruptcy stay and any further proceedings in this matter halted.

## CONCLUSION

After reviewing each of the Orders entered by the Commissioner in this proceeding, and specifically including the Consent Order, it is absolutely clear that the Commissioner has no right

20

to proceed forward with an action against either IHI or Mr. Van Etten. In the words of the Commissioner, IHI and the Commissioner have resolved all of their differences and Examiner Paoli should not permit the Commissioner to waste the resources of the State of Montana under these circumstances. Furthermore, the resolution between IHI and the Commissioner makes it clear that the automatic stay of Section 362 of the Bankruptcy Code must apply. In light of the resolution, it is clear that the Commissioner's only interest in this proceeding is pecuniary. Thus, under the clear circumstances of this situation, Examiner Paoli should, in the very least, force the Commissioner to seek relief from the Bankruptcy stay before proceeding forward with any action against IHI and Mr. Van Etten as is alleged in the Notice of Hearing and Order dated November 6, 1998. By taking this action, Examiner Paoli will assure that there has been no violation of the Bankruptcy laws and will serve the public interest of the State of Montana.

RESPECTFULLY SUBMITTED this the 9th day of February, 1999.

WOOD & FRANCIS, PLLC

Brent E. Wood by AEF

Brent E. Wood
Attorney for Stanley H. Van Etten
N.C. State Bar No.: 16898
Post Office Box 164
Raleigh, North Carolina 27602
Telephone: (919) 828-0801

21

## CERTIFICATE OF SERVICE

I, Brent E. Wood, attorney for Stanley H. Van Etten, certify that I served the foregoing document on the _9th_ day of February, 1999, upon the following parties, and in the manner below specified, by placing a copy thereof for each such party(ies) in a separate envelope bearing sufficient postage and depositing the same in the United States mail at Raleigh, North Carolina and/or by facsimile:

Elizabeth O'Halloran, Esq.
Montana State Auditor's Office
Post Office Box 4009
Helena, Montana 59604-4009

Holmes P. Harden, Esq.
Maupin, Taylor & Ellis, P.A.
3200 Beechleaf Ct., Suite 500
P. O. Drawer 19764
Raleigh, NC  27619-9764

David R. Paoli
Paoli Law Office, P.C.
257 West Front Street
P. O. Box 8131
Missoula, Montana  59802

This the _9th_ day of February, 1999.

WOOD & FRANCIS, PLLC

_Brent E. Wood by hEF_
Brent E. Wood
Attorney for Stanley H. Van Etten
Two Hannover Square
424 Fayetteville Street Mall, Suite 2300
Post Office Box 164
Raleigh, North Carolina  27602
Telephone:  (919) 828-0801

montana.bew.brief.doc

22

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 0 3 1998

LUTHER D. THOMAS, Clerk
By: [signature] Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      v.

INTERNATIONAL HERITAGE, INC.,
STANLEY H. VAN ETTEN, CLAUD W.
SAVAGE, LARRY G. SMITH,
INTERNATIONAL HERITAGE,
INCORPORATED, a Nevada corporation,

      Defendants.

CIVIL ACTION

NO. 1:98-CV-803-RWS

## MEMORANDUM OPINION AND ORDER

Pursuant to Sections 20 (b) and 20 (d) of the Securities Act and Sections 21 (d) and 21 (e)

of the Exchange Act, the Securities and Exchange Commission brought this action for injunctive and

other equitable relief, alleging various violations of the securities laws. This case is before the Court

on the Commission's Motion for Preliminary Injunction. After conducting a hearing and reviewing

the entire record, this Court enters the following Order.

### I. FINDINGS OF FACT

On March 16, 1998, the Commission sought and obtained a temporary restraining order

against Defendants. The Commission has alleged Defendants engaged in the sale of securities

without filing a registration statement with the Commission, Defendants made misrepresentations

and material omissions in connection with the sale of securities, and Defendants knowingly

misrepresented International Heritage's financial condition and concealed the fact that

International Heritage [hereinafter referred to as "IHI"] was operating a pyramid scheme. The


EXHIBIT
A

Commission also alleged the Form 8-K filed with the Commission by IHI contained misrepresentations concerning the nature of IHI's business and concealed the fact that IHI was operating a pyramid scheme. The Commission requests that the Court enter a preliminary injunction enjoining all Defendants, their officers, agents, and employees from violating Sections 5 (a), 5 (c) and 17 (a) of the Securities Act and Section 10 (b) of the Exchange Act and Rule 10b-5. The Commission also requests that the Court enjoin IHI and Defendant Van Etten from violating Sections 10 (b) and 15 (d) of the Exchange Act and Rules 10b-5 and 15d-11.

IHI contends it is a multi-level marketing firm engaged in the sale of products such as jewelry, recreational equipment and collectible items. IHI was founded by Claude W. Savage, Larry G. Smith and Stanley H. Van Etten in April of 1995. Defendant Van Etten is Chairman of the Board of Directors, President and Chief Executive Officer of IHI.[1]  Defendants Claude Savage and Larry G. Smith are directors of IHI.[2]  Defendants Savage and Smith were previously associated with Gold Unlimited, a multi-level marketing firm which had gone out of business.

Defendant Van Etten presently owns Mayflower Capital, a broker dealer licensed by the National Association of Securities Dealers and the Securities Exchange Commission. Defendant Van Etten is also a shareholder and manager of Mayflower Venture Capital Fund, a one million dollar venture capital fund used to invest in start-up companies.

---

[1]  On March 6, 1998, IHI entered into a reverse merger with Kara International Inc., and on March 9, 1998, Defendant Van Etten became Chairman of the Board, President and Chief Executive Officer of International Heritage Incorporated, formerly Kara International Inc.

[2]  Both Defendants Savage and Smith are also presently directors of Heritage Incorporated.

2

Between July 17, 1997 and October 31, 1997, IHI notes were sold in a non-public offering. In connection with the sale of these notes, IHI disclosed to investors that it had suffered increased losses between May 1, 1997 and August 20, 1997.

IHI started with a small number of independent retail sales representatives. The initial independent sales representatives earned commissions by selling products through their own retail sales organizations.[3]  Prior to March 18, 1998, an individual could join IHI and sell products at retail price for a profit, purchase products for personal use or earn out products by applying commissions earned from sales toward the purchase of a product.[4]  The earn-out option required execution of a Retail Business Agreement, or "RBA." An RBA was always initially filled out as an earn-out. Regardless of the option chosen, all sales representatives were required to purchase a Retail Business Career Kit for $100. Under the earn-out option, a participant executed a RBA and paid $250 toward the purchase of a product.[5]  As stated in the IHI manual, the RBA had a cash value of $250.

One of IHI's slogan's was, "Open ... Create ... Certify ... Duplicate." With the execution of an RBA, the representative earned 200 points, or what the company referred to as "Retail Sales Business Volume." Executing a RBA would effectively open a "Retail Business Center." A business center was a position in IHI's computer tracking system for the recording of Retail Sales

---

[3]  All representatives were required to submit an application.

[4]  Although IHI constantly updates its marketing materials, the Retail Business Career Kit received by the Commission in September of 1997 contained materials with the latest revision date of October, 1996.

[5]  However, it was possible for an IHI participant to enroll and make no payment other than $100 for the Career Kit.

Business Volume or RSBV.[6]  Through March 8, 1998, approximately 90% of the business centers were certified through an RBA.  A business center also served as a necessary component in the creation of a business organization; a business organization consisted of a group of sales representatives.  Participants had the option of opening one, three or seven business centers.[7]  The incentive for multiple centers was to sponsor more business organizations.  A participant could not earn more than $2200 per week with a single business center.  Therefore, if a participant wanted more money, he had to open more business centers.

IHI conducted regular regional training events for sales representatives.  To attract new representatives, present representatives would conduct weekly opportunity meetings outlining the program.  Representatives would explain IHI's bilateral system as requiring sales representatives to develop a business organization on the left and right in order to earn money.  This process was referred to as "duplication."  Under IHI's old program, the only way to become a sales representative was by sponsorship through another sales representative.  No more than two sales representatives could be sponsored directly under one business center.

The establishment of business centers and the accumulation of RSBV were also mechanisms for calculating override commissions.  Override commissions were commissions on sales made by other sales representatives within a business organization.  In order to earn override

---

[6]  With the buy-out option, the representative had 60 days to pay IHI the balance of the cost of the product ordered with the execution of the Retail Business Agreement.  With the cash-out option the representative had 60 days to receive his $250 deposit back.  However, the cash-out option was not available if the representative had earned 1200 Retail Sales Business Volume.

[7]  The cash-out option was not available to representatives who had purchased three or seven business centers.  The cost of seven centers was $1850; this payment could be made with a credit card.

commissions, a sales representative was required to certify his retail business center by accumulating a minimum of 200 RSBV. Under the earn-out option, initial certification was accomplished by payment of $250 toward the purchase of a product order. With the $250 payment and product order, 200 RSBV was credited to the business center and to each business center above it in the retail sales organization, regardless of whether the product was ever actually purchased or "earned out." If the product was earned in its entirety, the product was delivered to the representative. Representatives did not have the option of receiving a commission check in lieu of the product ordered upon execution of the RBA.

Commissions were earned according to preset RSBV achievement levels. Once a sales representative had accumulated a total of at least 1,200 RSBV on each side of his sales organization, the representative would receive a $500 product or commission. This process resulted in Level One certification. For Level Two certification, a representative had to accumulate 2400 RSBV on each side; for Level Three, 3600 RSBV on each side. Each additional level of certification entitled the representative to an additional $500 product or commission. After Level Three certification was accomplished, a representative's RSBV total was cleared. However, that representative would receive a "free" business center which could be used to replace a business center in the representative's business organization. This free business was referred to as a Development Certificate. Also, after Level Three certification, a representative could earn a $700 commission bonus if two representatives, one on each side of his organization, earned 3600 RSBV within two commission periods.  A sales representative could not earn override commissions unless RSBV was migrating upward. To facilitate migration of RSBV, IHI also required representatives who had achieved the first level of earnings to recertify their business

5

centers every 13 weeks. Recertification was accomplished by purchasing products or executing more RBA's.[8] If a representative sponsored a new representative who certified a business center, each business center above the new representative would receive 200 RSBV.

Although IHI contends that it is a product driven company, the facts demonstrate that, across the board, selling products was not IHI's primary operation. As of April, 1997, there were 192 IHI representatives in the Macon, Georgia area. All 192 representatives were on IHI's product ship list for that area. However, only three individuals listed on the shipping list were not listed as IHI representatives. Testimony from the receiver's accountant indicated that approximately 90% of the total sales revenue of IHI comes from establishing or recertifying business centers. Participants testified that at IHI meetings there was little discussion of products and prospective participants were told they could earn money faster through recruitment. They understood that in order to make money in IHI they only had to recruit two people. The witnesses understood that their sales organization would grow through duplication. The fortunes of IHI investors were inextricably tied to the success of the efforts of IHI promoters. Furthermore, of the 569,440 total product orders since IHI's inception, 288,418 orders have not been filled.

As to the old plan, IHI's regulatory history is not unblemished. In the spring of 1997, North Carolina's Attorney General's office began an investigation of IHI operations. On June 3, 1997, Defendants entered into an agreement with the State of North Carolina requiring 70% of all North Carolina sales revenue to be retail sales to persons not connected to IHI or its participants.

---

[8] A representative could have a maximum of three outstanding RBA's per business center.

6

In March of 1997, Georgia's Attorney General's office began an investigation of IHI operations. On February 4, 1998, the Georgia Fulton County Superior Court entered an order of assurance of voluntary compliance. In this order, Defendants agreed to a requirement of 50% non-participant sales prior to payment of any commissions or dividends. IHI is presently in compliance with both agreements.

While Defendants contend the new plan does not involve the sale of securities, the new plan contains some of the same aspects of the old plan. Under the new plan, a retail business center is "qualified" rather than "certified;" although the cost and RSBV requirements are not the same, the process is the same. Requalification is still required every 13 weeks, and requalification is necessary to earn override commissions. However, a representative must also select additional bonus products to be earned out to requalify a business center. To broaden IHI's program, another compensation plan was developed, the Flex-Level Compensation Plan. This plan uses PV or personal volume rather than RSBV to calculate earnings and assign value to products. Although the alternative compensation plan entitles a representative to "Personal Volume Rebate Commission[s]," this term is not defined in the manual. Retail Sales Organizations (RSO's) still exist and sponsorship is still the only method of developing RSO's. In both plans, representatives can earn development bonuses and development certificates by similar methods described above. The new plan does not include the RBA or a $250 deposit.

## II. CONCLUSIONS OF LAW

The issue before the Court is whether Defendants have violated federal securities laws warranting an exercise of this Court's equitable jurisdiction. Before the Court may issue a preliminary injunction, the Commission must demonstrate by a preponderance of the evidence that

7

there is reasonable likelihood that Defendants are engaged or about to engage in practices that violate federal securities laws. S.E.C. v. First Financial Group of Texas, 645 F.2d 429 (5th Cir. Unit A May 1981).[9] The Commission may make such a showing by submitting proof of past substantive violations that indicate a reasonable likelihood of future substantive violations. Id. In determining whether to issue an injunction, the Court must consider the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982). With such an inquiry, the Court is required to view all evidence in a light most favorable to the Commission, and the Commission is entitled to all reasonable inferences. S.E.C. v. Blatt, 583 F.2d 1325 (5th Cir. 1978).

Before proceeding on the merits of the Commission's requests for relief, the Court must first determine whether Defendants have engaged in the offer and sale of "securities" under the terms of the Securities Act and the Exchange Act. The Commission argues the "security" involved in the case at bar can be characterized as an "investment contract."[10] As stated by the

---

[9] S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1324 n.7 (Eleventh Circuit bound by Fifth Circuit decisions handed down prior to close of business on September 30, 1981 unless and until the Eleventh Circuit speaks en banc to the issue presented).

[10] According to 15 U.S.C. § 78c (a) (10) of the Exchange Act, the term "security" means "any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . ., or any . . . transferable share, investment contract . . .; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase any of the foregoing[.]"  The Securities Act contains a similar definition found at 15 U.S.C. § 77b (1). The Supreme Court has held that the two definitions are virtually identical. Tcherepnin v. Knight, 389 U.S. 332, 335-36, 88 S.Ct. 548,

Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), "An investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." See also Tcherepin et al. v. Knight et al., 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.E.2d 564 (1967) (the test for an investment contract under the Exchange Act is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others) and United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.E.2d 621 (1975).

The Commission contends Defendants' offer and sale of business center interests are investment contracts and thus securities. While it is clear participants in IHI's old program made an investment of money in a common enterprise,[11] Defendants argue the third prong of the Howey test has not been met. In S.E.C. v. Koscot Interplanetary Inc., the Eleventh Circuit Court of Appeals expressly adopted the view of the Ninth Circuit and held an investment contract exists when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 497 F.2d 473, 478 - 479 (5th Cir. 1974). See also Eberhardt v. Waters, 901 F.2d 1578 ( 11th Cir. 1990) (where

_____

552-53, 10 L.E.2d 564 (1967). See also United American Bank of Nashville, v. Gunter et al., 620 F.2d 1108, 1114 (5th Cir. July 1980).

[11] In S.E.C. v. Koscot Interplanetary Inc. 497 F.2d 473 (5th Cir. 1974), the Court of Appeals held "the requisite commonality [of an enterprise] is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [business organization's] meetings and guidelines on recruiting prospects and consummating a sale [] while the fact that an investor's return is independent of that of other investors in the operation is not decisive." The Court of Appeals' analysis of the second prong focused on the uniformity of impact of the promoter's efforts.

third prong of Howey was satisfied even where profits were not derived "solely" from the efforts

of others but were also derived from insubstantial efforts of the investor). In the case at bar,

upper-level management of IHI implemented widespread promotional programs which included

live conferences, telephone conferences, meetings, and training events. The Retail Sales Career

Kit purchased by each representative included brochures, video presentations, audio cassettes, and

flip chart presentations which explained IHI's marketing program and were used to advertise

IHI's program to prospective participants. An IHI representative only had to find a listening ear,

while IHI promoters retained immediate control over the managerial conduct of the enterprise.

Representatives only had to find two recruits. Representatives testified that they understood their

sales organization would grow simply by duplication. After finding two recruits, investors would

profit by the geometric progression of the process of recruitment, and the success of a

representative's investment was inextricably tied to the efforts of IHI promoters. Therefore, this

Court concludes the IHI program involved the offer and sale of securities.

Section 5 of the Securities Act prohibits the sale of securities by the use of

instrumentalities of interstate commerce without the filing of a registration statement.[12] To

establish a violation of this provision of the Act, the Commission must make a prima facie

showing that no registration statement was in effect as to the securities, that Defendants sold or

_____

[12]   15 U.S.C. § 77e (a) provides, "Unless a registration statement is in effect as to a
security, it shall be unlawful for any person, directly or indirectly to make use of any means or
instruments of transportation or communication in interstate commerce or of the mails to sell such
security through the use or medium of any prospectus or otherwise; or to carry or cause to be
carried through the mails or in interstate commerce, by any means or instruments of
transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. §
77e (c) is the provision that requires filing of a registration statement when securities are offered
and sold.

offered to sell the securities, and that interstate transportation or communication and mails were
used.  S.E.C. v. Continental Tobacco Co. of South Carolina, 463 F.2d 137 (5th Cir. 1972).

The Commission contends Defendants have been selling securities since 1995 by using the
mails, traveling, and other media including telephone conference calls without filing a registration
statement.  The Commission submitted undisputed evidence that Defendants used the mails to
send promotional sales materials to investors and used instrumentalities of interstate commerce
such as telephones and travel to give sales meetings.   The Commission also demonstrated that the
use of instrumentalities of interstate commerce was for the purpose of the sale and offer of
securities.  The sale of business centers by the use of the RBA constitutes the sale of securities
and Defendants failed to file a registration statement as to these securities.  Therefore, Defendants
violated Sections 5 (a) and (c) of the Securities Act.

Several provisions of the Securities Act and the Exchange Act prohibit the use of any
manipulative device in the sale of securities.[13]  To prove violations under Sections 10 (b), Rule

---

[13]  15 U.S.C. § 78j (b) provides,
> It shall be unlawful for any person, directly or indirectly, by the use
> of any means or instrumentality of interstate commerce or of the
> mails, or of any facility of any national securities exchange [t]o use
> or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so
> registered, any manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the Commission may
> prescribe as necessary or appropriate in the public interest or for the
> protection of investors.

Rule 10b-5 is found at 17 C.F.R. § 240.10b-5. This regulation provides,
> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate
> commerce, or of the mails or of any facility of any national
> securities exchange,
> (a) To employ any device, scheme, or artifice to

11

10b-5 and 17 (a) (1), the Commission must establish that Defendants acted with scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976); Aaron v. S.E.C., 446 U.S. 680, 100 S.Ct. 1945, 64 L.E.2d 611 (1980). The Commission may demonstrate the existence of scienter by showing that Defendants engaged in knowing or intentional misconduct. Aaron, 446 U.S. at 695, 100 S.Ct. at 1955. In the Eleventh Circuit, scienter may also be established by showing that the defendant's conduct exhibited severe recklessness. Carriba Air, 681 F.2d at 1324.

Defendants' old compensation plan which included the use of the RBA is comparable to the program found in Webster v. Omnitrition International, Inc., 79 F. 3d 776 (9th Cir. 1996). Defendants exhibited at least severe recklessness in marketing and implementing the old program. Therefore, this Court concludes that Defendants violated Section 10 (b) of the Exchange Act, Rule 10b-5, and Section 17 (a)(1) of the Securities Act.

---

> defraud,
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 17 (a) of the Securities Act is found at 15 U.S.C. § 77q (a) (1), which provides, "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly to employ any device, scheme, or artifice to defraud."

12

However, this Court declines to conclude that Defendants IHI and Stanley Van Etten violated Section 15 (d) of the Exchange Act or Rule 15d-11. At this point, there is an insufficient basis in the evidence to support a violation of either provision.

Defendants contend IHI's program no longer includes the use of the Retail Business Agreement and prospective injunctive relief is not required. However, the new plan retains elements from the old plan (e.g., certification and recertification) which cause the Court concern about future violations. The nature of Defendants' past violations demonstrate the reasonable likelihood of future violations; therefore, preliminary injunctive relief is warranted. See Continental Tobacco, 463 F2d. at 162. See also S.E.C. v. Radio Hill Mines Co., Ltd., 479 F2d 4 (2nd Cir. 1973) (where court designed additional reporting requirements to insure compliance with a preliminary injunction against violations of the securities laws).

For the aforementioned reasons, the Commission's Motion for Preliminary Injunction is **GRANTED**.

## PRELIMINARY INJUNCTION

The Commission having demonstrated a reasonable likelihood of future violations by the defendants, it is hereby **ORDERED** that:

1.

Until further order of this Court, defendant International Heritage, Inc. ("IHI"), its officers (as officers and in their individual capacities), agents, servants, employees, attorneys, and those persons in active concert or participation with them be, and they hereby are, restrained from directly or indirectly:

13

**2.**

Until further order of this Court, defendant IHI, its officers (as officers and in their individual capacities), agents, servants, employees, attorneys and those persons in active concert or participation with them, in connection with the purchase or sale or in the offer or sale of securities, by use of any means or instrumentality's of interstate commerce or any means or instruments of transportation or communication in interstate commerce, or by the mails or any facility of any national securities exchange, be, and they hereby are, restrained from directly or indirectly:

(1)  employing any device, scheme or artifice to defraud;

(2)  engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person;

(3)  obtaining money or property by means of any untrue statement of a material fact, or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(4)  making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, thereunder.

15

**3.**

Until further order of this Court, defendant International Heritage Incorporated, a
Nevada corporation, its officers (as officers and in their individual capacities), agents, servants,
employees, attorneys and those persons in active concert or participation with them, be and
hereby are restrained from directly or indirectly filing reports with the Commission, on Form 8-K
or otherwise, which are false and misleading or fail to disclose material facts necessary to make
the statements made not misleading, in violation of Section 15(d) of the Exchange Act, 15
U.S.C. 780(d), and Rule 15d-11, 17 C.F.R. 240.15d-11.

**4.**

Pending further order of this Court, defendant IHI, its officers (as officers and in their
individual capacities), agents employees, servants, attorneys, and all persons in active concert or
participation with them, and each of them are restrained and enjoined from destroying,
transferring or otherwise rendering illegible all books, records, papers, ledgers, accounts,
statements and other documents employed in any of such defendants' businesses, which reflect
the business activities of any of the defendants, or which reflect the transactions described in the
Commission's Complaint.

**5.**

**IT IS FURTHER ORDERED** that Lloyd Whittaker is hereby appointed Monitor for
IHI. The Monitor will periodically review the activities of IHI to assure IHI's compliance with
this order and the federal securities laws. This review will be performed within thirty (30) days
of this order and not less than quarterly thereafter. The Monitor will have full access to the
offices, records and officers and employees of IHI except any information protected by an

16

applicable privilege. IHI will provide quarterly financial information to the Monitor in the form and as otherwise directed by the Monitor, and will submit any changes in its compensation plan to the Monitor for approval before implementing such changes. IHI will provide the Monitor with the names, addresses and phone numbers of any new representatives who are enrolled by IHI. IHI will also make available for review by the Monitor order forms for all products and services sold by IHI, which shall contain the name and address of the purchaser, the items purchased and the purchase price. IHI shall not accept any orders which do not contain this information. The Monitor will periodically contact a sampling of such representatives and customers to determine if the IHI program is being presented in a way which is inconsistent with this order. The Monitor will report to the Court any conduct inconsistent with this Order. IHI shall be responsible for, and shall pay, the reasonable fees and costs incurred by the Monitor, including, but not limited to, professional fees.

6.

IT IS FURTHER ORDERED that IHI will post a bond in the amount of $5 million until further order of this Court, to ensure that at least that amount is available to satisfy any amounts that may be ordered paid by IHI in this proceeding. The specific conditions of said bond shall be set out in a separate order, which conditions are incorporated herein by reference.

7.

IT IS FURTHER ORDERED that defendants Stanley H. Van Etten, Claude W. Savage and Larry G. Smith shall not leave their positions with IHI without prior leave of the Court.

17

**8.**

**IT IS FURTHER ORDERED** that IHI shall not transfer its sales operation or representative networks to any other entity without prior leave of the Court.

**9.**

**IT IS FURTHER ORDERED** that defendant Van Etten's monetary compensation as set out in the Employment Agreement between Van Etten and International Heritage, Inc. will be reduced by fifty percent (50%) until further order of the Court.

**10.**

IHI shall develop and submit to the Monitor a new compensation and marketing plan consistent with the terms of this order. Any future amendments to the plan shall also be submitted to the Monitor. The Monitor shall submit the plans to Plaintiff and the Court for review. The Monitor will review any plans submitted by IHI to assure compliance with this order and shall approve a plan only after determining that the plan complies with the terms of this Order and any applicable laws. After approval by the Monitor of a plan or amendment, such plan or amendment can be implemented by IHI. IHI will not be required to await approval by the Court of such plans. No new sales representatives shall be approved by IHI until the new composition and marketing plan is approved by the Monitor. Notwithstanding the foregoing, the Court may, upon motion of any party or *sua sponte* issue a show cause order requiring IHI to appear before the Court and show that the plans are in compliance with the terms of this Order. In addition to seeking approval of the Monitor to the new plans, IHI may, before implementation of such plans, request that the Court review any new or amended plans to assure compliance with the terms of this Order.

18

## 11.

IT IS FURTHER ORDERED that IHI shall not permit any further use of the Retail Business Agreement, or any similar agreement which permits, as an aspect or part of the business operations, compensation plan, or marketing plan of IHI, sales representatives of IHI to make partial payments toward the purchase of a product or service in order to receive override commissions on the sale of products or services. However, IHI may continue to require a prospective sale representative to purchase a sales kit at a cost of $100.00, which costs shall be consistent with IHI's costs to provide the kit.

## 12.

IT IS FURTHER ORDERED that IHI shall not require new or current sales representatives of IHI to certify or recertify, through payment by the sales representative to IHI, in order to receive override commissions.

## 13.

IT IS FURTHER ORDERED that IHI shall not accept payment for products or services without either delivering the product or services or making appropriate arrangements with a carrier, manufacturer, or supplier of that product or service to deliver the product or service to the purchaser of that product or service.

## 14.

IT IS FURTHER ORDERED that IHI will give notice of this Order and its terms to all representatives within thirty (30) days, and will supply proof of this effort to the Monitor. IHI will provide notice of its Compensation Plan to all representatives within thirty (30) days of its approval, and will supply proof of this effort to the Monitor.

19

## 15.

The Court finds that the Receiver, Lloyd Whittaker, has performed his duties in full and complete compliance with the terms of this Court's previous orders. The Receiver shall be relieved of his responsibilities upon the posting of the $5 million bond required to be posted by IHI under this Order. Upon the posting of said bond, the Receiver's bond which has been filed with the Clerk of Court shall be discharged. Prior to the discharge of the Receiver, the Receiver is authorized to transfer the sum of $120,000.00 from IHI to the Trust Account of Kilpatrick Stockton, LLP, the Receiver's legal counsel, to be held for payment of the professional fees and expenses incurred by the Receiver, the Receiver's legal counsel, and the Receiver's financial consultant, in connection with the Receiver's duties and obligations during his tenure. However, such professional fees and expenses shall be paid only upon submission of appropriate applications for fees and expenses to the Court and upon the Court's approval of same. To the extent that the amount of the Court approved professional fees and expenses are less than the amount reserved in the Trust Account, then the excess would be returned forthwith to IHI. To the extent that the amount of the Court approved professional fees and expenses are more than the amount reserved in the Trust Account, IHI shall be ordered forthwith to remit the deficiency to the Receiver.

## 16.

IT IS FURTHER ORDERED that, upon the posting of the $5 million bond by IHI, the officers and directors of IHI will have the authority to resume, and may resume, their responsibilities as officers and directors of IHI in accordance with the terms of this Order.

20

17.

IT IS FURTHER ORDERED that the orders entered by the Court in this cause on March 16, 1998 and as subsequently modified on March 17, 1998, shall be vacated and modified in their entirety to conform with the terms of this Order upon the posting of the $5 million bond by IHI.

18.

IT IS FURTHER ORDERED that this Order shall not and does not constitute a securities or investment related permanent or temporary injunction for purposes of any collateral effects or reporting requirements under state securities laws or self-regulatory organization rules, nor shall the existence of this Order restrict, limit, prohibit or disqualify the Defendants, or any affiliate of the Defendants, in any manner from (a) engaging in any lawful activity or practice pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisers Act of 1940, or the Commodity Exchange Act, and/or any rules or regulations promulgated thereunder, and/or any state securities and commodities laws (including with limitation, participating in offerings or availing themselves of exemptions including the Uniform Limited Offering Exemption, as and to the extent now or hereafter adopted ), or (b) acting as an affiliated person of any underwriter, broker, dealer, investment adviser, investment company, bank, insurance company, or other entity or person under any applicable federal or state insurance, securities, banking or commodities laws.

21

**SO ORDERED** this _3rd_ day of April, 1998.

RICHARD W. STORY
United States District Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

    v.

INTERNATIONAL HERITAGE, INC.,
STANLEY H. VAN ETTEN, CLAUD W.
SAVAGE, LARRY G. SMITH,
INTERNATIONAL HERITAGE,
INCORPORATED, a Nevada corporation,

    Defendants.

CIVIL ACTION

NO. 1:98-CV-803-RWS

## O R D E R

Pursuant to Sections 20 (b) and 20 (d) of the Securities Act and Sections 21 (d) and 21 (e) of the Exchange Act, the Securities and Exchange Commission brought this action for injunctive and other equitable relief, alleging various violations of the securities laws. On April 3, 1998, the Court entered an order granting the Commission's Motion for Preliminary Injunction. This case is presently before the Court on Defendant International Heritage's Application for an Order Approving the Modified Compensation and Marketing Plan. After conducting a hearing and reviewing the entire record, the Court enters the following Order.

## FINDINGS OF FACT

The modified plan is in many ways similar to the old plan. Under both plans, an individual could join IHI and sell products at retail price for a profit, purchase products for personal use or earn out products by applying commissions earned from sales toward the purchase of a product.



Under the old plan, the earn-out option required execution of a Retail Business Agreement, or "RBA."[1] The modified plan does not include the RBA or other similar contract. However, each representative is required to purchase a $100 Career Kit.

With the execution of a RBA, the representative earned 200 points, or what the company referred to as "Retail Sales Business Volume" (RSBV). Although the modified plan does not include the RBA, compensation is still calculated according to accumulated RSVB. The modified plan contains a component referred to as the "Bilateral Compensation Plan." Under the modified bilateral compensation plan, each IHI non-consumable product carries a specified number of RSBV. Business centers are still used to track and record RSBV.[2]

As under the old plan, participants still have the option of opening one, three or seven business centers.[3] The incentive for multiple centers was and still is to sponsor more business organizations. Under the modified plan, when a representative selects 1, 3, or 7 business centers, he also selects 1, 3, or 7 bonus products to be delivered as commission upon the accumulation of a specified number of RSBV.[4] When a representative selects the number of business centers and corresponding bonus products, he is not obligated to purchase the product or products selected.

_____

[1]    An RBA was always initially filled out as an earn-out. Regardless of the option chosen, all sales representatives were required to purchase a Retail Business Career Kit for $100 under the old plan. Under the earn-out option, a participant executed a RBA and paid $250 toward the purchase of a product. As stated in the IHI manual, the RBA had a cash value of $250.

[2]    In the old plan and the modified plan, a business center serves as a necessary component in the creation of a business organization; a business organization consists of a group of sales representatives. Under IHI's old program and modified program, the only way to become a sales representative is by sponsorship through another sales representative. No more than two sales representatives can be sponsored directly under one business center under the bilateral plan.

[3]    The cost of seven centers was $1850.

[4]    Each bonus product must have a minimum representative value of $200.

However, if a bonus product has been selected, the representative will receive the product instead of a commission check.[5]

The accumulation of RSBV is still the mechanism for calculating override commissions.[6] In order to earn override commissions under the old plan, a sales representative was required to certify his retail business center by accumulating a minimum of 200 RSBV.[7] The concept of certification and recertification is not a part of the modified plan.[8] However, under the modified bilateral compensation plan, a representative is required to select a bonus product each quarter to be earned out as commission. Commissions are still earned according to preset RSBV achievement levels. A representative receives RSBV credit when he purchases a product at its representative cost. Commissions may be earned on a weekly basis under the Bilateral Compensation Plan.

Under the modified plan, once a sales representative has accumulated a total of at least

---

[5] At various places in the written materials, it appears that the new representative will receive $250 or the new representative will be able to choose between $250 and the product as the first commission.

[6] Override commissions are commissions on sales made by other sales representatives within a business organization.

[7] Under the earn-out option with the old plan, initial certification was accomplished by payment of $250 toward the purchase of a product order. With the $250 payment and product order, 200 RSBV was credited to the business center and to each business center above it in the retail sales organization, regardless of whether the product was ever actually purchased or "earned out." If the product was earned in its entirety, the product was delivered to the representative. Representatives did not have the option of receiving a commission check in lieu of the product ordered upon execution of the RBA.

[8] Under the old and modified plans, a sales representative cannot earn override commissions unless RSBV is migrating upward. To facilitate the migration of RSBV under the old plan, IHI required representatives who had achieved the first level of earnings to recertify their business centers every 13 weeks. Recertification was accomplished by purchasing products or executing more RBA's. If a representative sponsored a new representative who certified a business center, each business center above the new representative received 200 RSBV.

1,000 RSBV on each side of his sales organization, the representative will receive a $250 product.
This is referred to as a Level One commission. A representative is not required to achieve a Level
One commission in a specified amount of time. For a Level Two commission of $250, a
representative must have accumulated at total of 2000 RSBV on each side; for Level Three
commission of $500, 3000 RSBV on each side. Once a representative receives a Level Three
commission, his RSBV total is cleared.

Although there is no time limit in which a representative must earn the RSBV required to
receive commissions, a representative is required to meet a quarterly retail sales requirement to be
eligible to receive commissions. After a representative receives his first commission check, the
representative must make twelve (12) IHI sales within the following 13 week period. Of the
required twelve (12) IHI sales, six (6) must be to consumers not affiliated with IHI.

The modified plan contains the same or similar sales incentives as those found in the old
plan. Under the modified plan, the first two times a representative receives a Level Three
Commission, the representative is entitled to receive a "free" business center which can be used to
replace a business center in the representative's business organization. As under the old plan, this
free business center is referred to as a "Development Certificate." Also, after a Level Three
commission is earned, a representative can earn a $750 Development Bonus if two representatives,
one on each side of his organization, earns a Level Three Commission within a one week
commission period. If a representative earns a Level One, Two and Three commission and a
Development Bonus within a one-week commission period, the representative will receive a $750
commission referred to as a "Cycle Bonus."

In addition to the Bilateral Compensation Plan which is based on accumulation of RSBV, a
representative can also receive compensation under the Flex-Level Compensation Plan. Under the

Flex-Level Compensation Plan, each IHI consumable product carries a specified number of

Personal Volume ("PV").   Business centers are used to track and record PV and/or RSBV

simultaneously.  As under the Bilateral Compensation Plan, a representative can earn retail profits

by purchasing IHI products at wholesale and selling them at retail to consumers.  The Flex-Level

plan also provides the opportunity to earn override commissions; however, commissions are

calculated on a monthly basis.

To earn override commissions under the Flex-Level plan, a representative must meet

minimum PV requirements.  PV requirements can be met through retail sales to retail customers or

to "Preferred Customers."  A "Preferred Customer" is a non-IHI representative who purchases IHI

products on a monthly basis.  PV requirements can also be met through personal purchases.  Under

the Flex-Level plan a representative is required to accumulate a minimum total of 100 PV within a

calendar month in order to earn override commissions.   After meeting the basic Flex-Level plan

requirements, a representative may earn Personal Volume Rebate Commissions.  A rebate

commission is a percentage of the total PV sales made by one representative within a calendar

month.[9]

The Flex-Level plan is structurally different from the Bilateral-Plan.  With the Flex-Level

plan, a representative can sponsor a new representative who is positioned directly beneath him.

The first sponsored person is the first generation of a "Leg" in a retail sales organization.[10]  There

is no limit to the number of legs or generations a representative may have.

---

[9]  If a representative sells products which have a total PV of 100 to 249, the representative
earns 5% of the total PV sales; a total PV of 250 to 399 results in 10% of the total PV sales;
more than 400 total PV results in 15% of the total PV sales.

[10]   The second generation of a RSO is each person sponsored by a member of the first
generation.   The third generation is each person sponsored by those second generation
representatives, and so on.

In addition to the Person Volume Rebate Commissions, a representative can earn various "Level Bonuses" by satisfying minimum Personal Volume and "Group Volume" requirements. Group Volume ("GV") is the sum total of all PV in a retail sales organization. The head of a RSO can earn Level Bonuses for the sales of other representatives up to 5 levels down in each qualified leg of a RSO.[11]   The type of level bonus received depends on the PV and GV accumulated within a calendar month. For example, if a representative earns a total PV of 100 during a calendar month, he may earn 5% of the PV accumulated two levels down. This is called the Bronze Pin Rank. If a representative has a total PV of 100 and total GV of 500 which also consists of two legs that have accumulated 100 PV, the representative is entitled to 5% of the PV three levels down and has attained the Silver Pin Rank.[12]   If a generation fails to meet the minimum PV requirements, PV will be compressed up to the next level for purposes of calculating commissions. Similarly, if no generation within a leg meets the minimum PV requirements, the volume will be compressed up to the first qualified representative for the purpose of calculating a Rebate Commission.

Another type of override commission under the Flex-Level plan is the "Builder's Bonus." A representative may earn a Builder's Bonus from the sales of representatives within a leg of a RSO at his rank or higher. A Builder's Bonus carries a maximum value of an additional 5% of the PV generated by the leg. A Silver Pin Rank is entitled to 2% of the PV generated by the leg; a

---

[11]   A Qualified leg is a leg which has a representative above who has accumulated 100 PV.

[12]   A Gold Pin Rank entitles a representative to 5% of the PV four levels down and requires 100 PV, 1,500 GV consisting of three Qualified Legs; a Diamond Pin Rank entitles a representative to 5% of the PV five levels down and requires 200 PV, 4,500 GV consisting of six Qualified Legs of which three must have attained the pin rank of gold. The highest rank, the Double Diamond Pin Rank, also entitles a representative to 5% of the PV five levels down but requires 200 PV, 13,500 GV consisting of 12 Qualified Legs of which three must have attained the pin rank of diamond.

Gold Pin Rank, 3%; a Diamond Pin Rank, 4%; and a Double Diamond Pin Rank, 5%. [13] A Double Diamond Pin Rank representative may also earn override commissions totaling one share of 1% of IHI's monthly Flex-Level volume.

The Trendsetter Pool is also an added component of the modified plan. With the Trendsetter Pool, Flex-Level compensation and Bilateral compensation are linked.[14] If a representative sponsors a new representative and the sponsored representative sells or purchases products carrying a value of 600 RSBV while meeting the PV requirements of the Flex-Level plan, the sponsored representative will earn one share of 3% of IHI's monthly Flex-Level volume.[15] A representative who achieves this goal is called a "Trendsetter." A representative who sponsors a Trendsetter will earn one share of the Trendsetter Pool for each sponsored Trendsetter if the sponsor meets the minimum Flex-Level PV requirements. A sponsored representative is eligible for the Trendsetter Pool only within the first 30 days that he is associated with IHI, and a Trendsetter Sponsor is limited by the same 30-day period.

To meet both PV and RSBV requirements a representative may purchase various special product packs. For $275, a representative can purchase a "Quick Start Pack" and receive a Retail Business Career Kit, Heritage Essentials Nutritional Kit, Tyra Demonstration Kit, IHI Business Services Pack and 200 RSBV. For $825, a representative can purchase a "Success Pack" which includes a Retail Business Career Kit, Heritage Essentials Nutritional Kit, Heritage Essentials Tyra Skin Care Kit, a black leather portfolio, IHI Business Services Pack, and 600 RSBV. For $1925, a

[13] Bronze representatives cannot earn a Builder's Bonus.

[14] A representative can satisfy PV and RSVB requirements simultaneously by purchasing consumable products for personal use and selling non-consumables at retail.

[15] The marketing materials value products carrying 600 RSVB at the retail price of $825.

representative can purchase a "Career Pack" which includes a Retail Business Career Kit, Heritage Essentials Nutritional Kit, Heritage Essentials Tyra Skin Care Kit, a black leather portfolio, a black leather briefbag, a Bouree Crystal Bowl and Vase, IHI Business Services Pack and 1600 RSBV. The special product packs carry no PV credit although the packs contain consumable products which would normally carry PV credit under the Flex-Level plan.

The accompanying marketing materials of the modified plan are similar to those found in the old plan. With more business centers, a representative can "increase his weekly earning potential" and "leverage his time." To get started in the program, a representative is encouraged to start with more than one business center and purchase a special product pack.

IHI requests that the Court accept its modified compensation as presented while the Commission requests that the Court reject the modified plan in its entirety.

### CONCLUSIONS OF LAW

Based on the Court's finding of past violations of securities laws warranting preliminary injunctive relief, the Court is authorized to monitor IHI's business activities until a trial on the merits. The Commission contends the Court should prohibit any payment or consideration in exchange for the right to receive override commissions or bonuses. However, an individual may agree to be compensated in the form of his choosing. The primary issue before the Court is whether the modified plan involves an investment contract.

An investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." S.E.C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). In determining whether there is an investment contract, the Court should consider promotional materials, merchandising approaches, oral assurances and contractual agreements

used by the promoter. Aldrich v. McCulloch Properties Inc., 627 F.2d 1036, 1040 (10th Cir.

1980). Although IHI has submitted such materials, the Court does not have evidence related to

actual implementation of the modified plan.

The modified plan, as described in IHI materials, does not involve an investment of money.

The Commission argues an investment of services is sufficient to trigger application of the federal

securities laws and the case at bar is similar to S.E.C. v. Addison, 194 F. Supp. 709 (N.D. Tex.

1961). But see Peyton v. Morrow Electronics, Inc., 587 F.2d 413 (9th Cir. 1978) (contract

requiring only an investment of services and not an investment of money is not an investment

contract under the federal securities statutes). In Addison, the court held an agreement whereby

non-salaried workers would share in profits made from their employer's mining and other

operations was an investment contract under the Securities Act of 1933. The court in Addison

held the exchange of services for a share of profits constituted the sale of securities because it

amounted to a disposition or giving of a security for value. Unlike the workers in Addison, an IHI

representative is not entitled to a share of IHI's profits simply by joining IHI, purchasing IHI

products or selling IHI products.

Application of the third element of the Howey test distinguishes the case at bar from

Addison. Howey requires an expectation of profits to be derived solely from the efforts of the

promoter or a third party. In Addison, the non-salaried mine workers expected a profit derived

solely from their employer's efforts in various business ventures including upgrading unmarketable

deposits into marketable commercial ore, manufacturing machines to perform tasks associated with

upgrading deposits, leasing upgrading machines and collecting royalties. In this case and at this

stage of the proceedings, it is not clear that IHI representatives have an expectation of profits to be

derived from the entrepreneurial or managerial efforts of others. See Villeneuve v. Advanced

Business Concepts Corp., 730 F.2d 1403, 1404 (11th Cir. 1984); see also United States v. Herr,

338 F2d 607 (7th Cir. 1964), cert denied 382 U.S. 999, 15 L.Ed. 2d 487, 86 S. Ct. 563 (where

investors were offered distributorhip agreements under which distributor would give money to the

defendant corporation in exchange for merchandise which salesmen would sell on behalf of

distributors, court held agreements were investment contracts in light of the fact that it was not the

defendant's or the distributor's intention to resell merchandise thereby leading the distributor to

believe that they could expect profits solely from the efforts of others). The IHI Representative

Manual and marketing materials explain that profits are derived from the sale of IHI products and

the development of a sales force within a retail organization. Even if the Court were to conclude

that the receipt of a product in lieu of a cash commission is an investment of money, there is no

evidence upon which this Court can conclude that such an investment carries with it an expectation

of profits to be derived solely from the efforts of others.

## O R D E R

The Court has concerns about several aspects of the modified plan. The optional special

product packs are particularly troubling because the cost of each pack and the corresponding

RSBV mirror the old plan's cost for certification.[16]  Certification of business centers under the old

plan was an integral part of the violations found by the Court which resulted in the preliminary

injunction. IHI asserts that the product packages are merely alternative packages of products that

representatives may choose to assist them in marketing the company's products. However, the

Court is concerned that these packages will be presented to prospective representatives as required

purchases to be made along with the selection of one, three or seven business centers. The

---

[16]  One business center ~ Quick Start Pack ~ $275 ~ 200 RSVB.
      Three business centers ~ Success Pack ~ $825 ~ 600 RSVB.
      Seven business centers ~ Career Pack ~ $1925 ~ 1600 RSVB.

Trendsetter Pool and Bonuses are also problematic because they promote the purchase and sale of special product packs by allowing a new representative to only earn Trendsetter status within the first 30 days with the company and setting the required RSBV for Trendsetter as the same amount of RSBV awarded for the Success Pack.  Thus, significant pressure may be placed on the new representative to purchase at least a Success Pack when he or she applies to join the company to assure qualification for Trendsetter within the first 30 days.  The Court strongly encourages IHI to omit the packages from its plan.  However, because the special product packages are not *per se* violations of the prohibitions in the preliminary injunction, the Court does not order that they be omitted from the modified plan.  The Monitor is instructed to inquire of new representatives concerning the presentation of the special product packages to them.  Any tie-in between the purchase of any special product packages and the obtaining of business centers would be a violation of the preliminary injunction.

Representations in the written materials are misleading concerning the initial commission which is earned by a representative.  When a representative applies with IHI, he or she selects a product for each business center the representative obtains.  When the new representative earns the first commission, the commission is the product that was previously selected.  However, at various places in the written materials, it appears that the new representative will receive $250 or the new representative will be able to choose between $250 and the product as the first commission (E.g. Application for an Order Approving the Modified Compensation and Marketing Plan, Exhibit 1, pp. 16-17, No. 3, 5, 7).  The materials should clearly state that the first commission will be a product and not cash.

The modified plan requires that each quarter there be at least twelve (12) retail sales, six (6) of which must be to consumers not affiliated with IHI.  (IHI Representative Manual, pp. 18 -

04/22/98   13:56 FAX 404 730 3745   R.W. STORY DIST. JUDGE                                      @013

19).  The plan should clearly state that six sales must be to persons who have no affiliation with
IHI either as officers, agents, directors, shareholders, employees, or sales representatives.

In the explanation of the Flex-Level plan, the manual states, "Rank status is permanent,
however, if a representative does not meet the monthly requirements of PV, GV, and leg
requirements for their actual rank, they will be compensated based on that month's qualifications."
To suggest that rank is permanent is misleading.  The plan suggests that a representative is able to
earn commissions based on "rank;" however, the mere attaining of rank does not assure ongoing
commissions.  This should be clearly stated in the materials presented to prospective
representatives.

Although the modified plan has its shortcomings, none of the concerns raised above is a
basis for denying approval to proceed with the plan.  However, IHI is cautioned that the critical
determination of the legality of its operations will not be based on the written plan but on the
actual practices of the company.  In Webster v. Omnitrition International, Inc., 79 F.3d 776 (9th
Cir. 1996), Ominitrition established policies similar to those of Amway which had been approved
by the Federal Trade Commission.  The district court granted summary judgment to Omnitrition,
finding that Omnitrition's program was not a pyramid scheme.  In reversing summary judgment,
the Ninth Circuit Court of Appeals stated, "[T]here must be evidence that the program's
safeguards are enforced and actually serve to deter inventory loading and encourage retail sales."
Webster, 79 F.3d at 783.  Therefore, the final determination of the legality of the plan will be based
on the actual implementation of it.  By permitting IHI to proceed with the plan, the Court is not
making a final determination of the plan's legality.  Further, the Court has not reviewed the plan
for compliance with any state's laws.  The Court simply finds that based upon the written proposal,
IHI should be permitted to proceed with its operations under the close scrutiny of the Monitor.

This Order is not intended to, nor should it be interpreted as, an endorsement of the plan or of the business of IHI. Any person who has an interest in associating with IHI should make an independent investigation and decision concerning the same and should not rely upon this Order as a finding or conclusion as to any matter except as specifically stated herein.

Based on the foregoing, it is hereby ORDERED that IHI is authorized to conduct business consistent with the modified plan submitted to the Court and under the continued observation of the Monitor. The Monitor is directed to monitor the Defendants' level of compliance with this and the Court's previous orders. Any violations should be reported promptly to the Court and the parties. Defendants are reminded that their full cooperation with the Monitor is required.

SO ORDERED, this 22 day of April, 1998.

RICHARD W. STORY
United States District Judge

STATE AUDITOR'S OFFICE
SECURITIES DEPARTMENT
HELENA, MONTANA

IN THE MATTER OF:

International Heritage, Inc.,
Stanley H. Van Etten,
Claude W. Savage,
Larry G. Smith,
and
International Heritage,
Incorporated, a Nevada corporation,

    and their agents &
    representatives,

      Respondents.

CASE NO. I-04-02-98-04

<u>CEASE AND DESIST ORDER</u>

The Montana Securities Commissioner (commissioner), pursuant to the authority of the Securities Act of Montana, § 30-10-101, <u>et seq.</u>, hereby issues the following findings of fact, conclusions of law, order and notice of right to a public hearing:

<u>FINDINGS OF FACT</u>

1.    International Heritage, Inc., (IHI) is a North Carolina corporation whose principal offices are located in Raleigh, North Carolina.    International Heritage, Inc., is a majority owned subsidiary of International Heritage Incorporated, a Nevada Corporation (IHI-N) (formerly "Kara International, Inc.").

2.    Stanley H. Van Etten (Van Etten), is a founder, chairman of the board of directors, president, and chief executive officer of IHI, and is chairman of the board and chief executive officer of



Page 1

1   IHI-N.

2       3.    Claude W. Savage (Savage) is a founder and a director of

3   IHI and is director of IHI-N.

4       4.    Larry G. Smith (Smith) is a founder and director of IHI

5   and a director of IHI-N.

6       5.    Johnny   Daniels   (Daniels)   is   an   independent   sales

7   representative of IHI who resides in Malta, Montana.    Daniels

8   conducts IHI training sessions and has marketed IHI business center

9   interests in Montana.

10      6.    IHI, its principals, employees, and agents solicited

11  investments  in  IHI's  program  in  Montana  through  the  use  of

12  promotional  materials,  videotapes,  recruitment  meetings,  and

13  internet  web  sites.    IHI,  through  Van  Etten,  Savage,  Smith,

14  Daniels,  and  others  solicited  residents  of  Kalispell,  Anaconda,

15  Butte, Billings, Bozeman, Lewistown, Great Falls, Glasgow, Malta,

16  Glendive, Roundup, Forsyth, Havre, Columbia Falls, Stevensville,

17  Helena, and other Montana towns to invest in a pyramid scheme.

18      7.    IHI  interests  are  described  as  "business  centers,"  of

19  which an investor may open one, three, or seven.    In order to open

20  or create a "certified" business center, Montana investors were

21  generally required to pay the sum of $200.00 to $250.00 toward the

22  purchase of an IHI product, sign a "retail business agreement,"

23  purchase an IHI retail business career kit for $100, and pay a

24  $25.00 administrative fee.

25

1    8.    At all times material hereto, IHI solicited Montana

2    investors through the purported use of a "multi-level" marketing

3    program in which prospective investors are recruited by investors

4    who have already purchased interests in IHI.    IHI established an

5    incentive for recruitment of downline sales representatives by

6    promising payment of override commissions to independent sales

7    representatives for IHI product and business center sales by that

8    representative's downline (retail sales organization).

9    9.    According to the IHI's bi-lateral compensation plan,

10   independent sales representatives could earn override commissions

11   only if their own retail business center was "certified."

12   10.    At all times material hereto, IHI promotional and sales

13   materials indicated that investors could earn up to $2,200 to

14   $2,500 per retail business center weekly.    These projected earnings

15   were based on the recruitment of downline independent sales

16   representatives, rather than the sale of products on the retail

17   market.    Similarly, the compensation structure, which included a

18   compensation cap attached to single business center earnings,

19   encouraged the purchase of multiple business centers by investors.

20   11.    Although commissions on the sale of products were

21   described in the promotional and sales material, the income from

22   the development of the retail sales organization was emphasized as

23   the significant source of income from involvement with IHI.

24   Similarly, IHI disproportionately emphasized retail sales

25

1  organization development through the promise of bonuses and
2  commissions which were not available to an independent sales
3  representative whose organization focused on retail product sales.

4      12.  At all times material hereto, the IHI compensation
5  structure and sales pitch regarding "leveraging retail sales
6  business volume" served as incentive to develop the downline and
7  disincentive to generate retail sales business volume through the
8  sale of IHI products, thus perpetuating the pyramid scheme.  The
9  IHI sales kit contains a book co-authored by Van Etten which
10 emphasizes the importance of downline regeneration.  In addition to
11 emphasizing the importance of geometric growth in marketing the IHI
12 interests, IHI's training materials clearly discourage independent
13 sales representatives from developing the retail sale portion of
14 the representatives' businesses.   Van Etten's book states:

15     There are two things that the successful network marketer must
       be very good at doing which are altogether foreign to the
16     traditional salesperson:  (1) He must be an organization
       builder, and (2) He must be a teacher.  We will speak of these
17     two things at much greater length later in this chapter, but
       suffice it to say at this point that there is nothing in the
18     experience of the traditional salesperson that would cause him
       to assign any value to either of these two skills which are so
19     essential to the individual who wants to succeed in network
       marketing.   In fact, the traditional salesperson's natural
20     tendency would be to see both organization-building and
       teaching as irrelevant obstacles to be swept out of the way of
21     what he sees as the one all-important task of every
       salesperson - selling.
22                              ***
       Earlier in this chapter we said that there is a risk in
23     sponsoring persons who have considerable experience in direct
       sales.  This is a good place to explain why that is the case.
24     An experienced salesperson might come into your downline and
       recruit like crazy.  But if he fails to teach his recruits
25

Page 4

the importance of the company's multilevel sales structure and
the necessity for "keeping it going," then he would fill your
downline organization with dead-end roadblocks. (Emphasis in
original).

13.   Though references to minimum retail sales requirements

and inventory loading prohibitions are included in the independent

retail sales representative manual, IHI's compensation program is

based on orders of products, rather than actual sales of products,

and override commissions are promised for orders made within the

retail sales organization.   Furthermore, IHI's program structure

does not provide a method by which inventory loading requirements

and   requirements   for   retail   sales   to   non-participants   are

meaningfully   enforced.     As   of   the   date   of   this   order,   a

disproportionate amount of products ordered from IHI through the

use of the "retail business agreement" in Montana have never been

received by the purchasers of the product.

14.   On or about March 28, 1996, IHI issued a memorandum

addressed   to   all   IHI   representatives   which   required   that

representatives wishing to conduct due diligence on the company

should direct "all of [their] compliance, regulatory and legal

questions to the Compliance Department at the home office rather

than the Better Business Bureau or state regulators."   IHI further

stated that "[i]f enough inquiries are made to any one particular

regulatory branch, within a particular state, the result could be

an investigation of the Company spurned {sic} by the mere volume of

1 calls." The memorandum further stated that:

2     The reason IHI is one of the only multilevel marketing
    companies with a Compliance Department is so representatives
3     will have a source for receiving answers to compliance,
    regulatory and legal questions and to assure that the Company
4     operates in compliance with the myriad of regulations
    affecting a direct marketing sales company with operations in
5     48 states and 3 Canadian provinces.

6 Though the memorandum was written in March, 1996, it was included

7 in an IHI business retail business career kit sold to a Montana

8 resident months later.

9     15. Despite IHI's claims in sales presentations and materials

10 that its program complies with state and federal laws that affect

11 direct marketing organizations, IHI entered into agreements

12 limiting IHI activities in the state of North Carolina on June 3,

13 1997, and in the state of Georgia on February 10, 1998, as a result

14 of regulatory concerns in those states. North Carolina regulators

15 alleged that IHI violated North Carolina pyramid laws. These

16 actions were not disclosed to Montana residents offered or sold IHI

17 business center interests.

18     16. Between August 5, 1997, and October 31, 1997, IHI,

19 through Van Etten, Savage, Smith, and others, raised $5 million by

20 selling IHI notes convertible into IHI common stock, to

21 approximately 95 persons in fourteen states, including at least 6

22 persons in Montana.

23     17. On August 14, 1997, IHI filed a notice filing for an

24 exemption on Form D, indicating it sold an aggregate of $295,00 of

25

IHI units to six accredited Montana investors.   The application indicated that WIN Capital was the broker/dealer making offers and/or sales to Montana investors.

18.   In connection with the offer and sale of IHI notes, IHI authorized the use of a "term sheet," dated July 17, 1997, which disclosed that IHI had losses of approximately $1.9 million during the first four months of 1997.   The term sheet did not disclose that by the time of the offering IHI's losses for the year had increased to $7.6 million, and that IHI had a shortage of operating funds.

19.   The term sheet states that IHI pays commissions and bonuses "derived solely from sales as opposed to headhunting or any similar activities," despite IHI's emphasis on compensation opportunities based on recruitment and development of retail sales organizations.

20.   The term sheet states that representatives "who sponsor other representatives must fulfill supervisory activities, including ongoing communication and managerial supervision with the IRSRs within their Retail Sales Organization in order to qualify for ongoing commissions and bonuses," despite the absence of enforcement efforts by IHI to ensure compliance.

21.   The term sheet represents that IHI has a "a prohibition from presenting hypothetical earnings projections" in sales presentations, despite IHI's standard use of projections that each

1  business center could earn up to $2,500 weekly.

2      22.  Daniels, an IHI representative in Malta, Montana, offered

3  Malta, Montana, residents the opportunity to purchase IHI notes in

4  June, 1997.

5      23.  IHI represented to the Montana Securities Department that

6  the offering of IHI notes would be conducted by WIN Capital Corp.,

7  a registered broker-dealer.  Daniels is not now, nor has he ever

8  been registered as a salesperson with WIN Capital Corp.

9      24.  The records of the Montana Securities Department disclose

10  that Respondents were not registered as broker-dealers or salesmen

11  in this state prior to the date of this Order.

12      25.  The records of the Montana Securities Department disclose

13  that the IHI business center program offered by Respondents was not

14  registered as a security in this state prior to the date of this

15  Order.

16      26.  In connection with the above offers of IHI business

17  center interests to persons in Montana, Respondents failed to

18  disclose the following material facts which facts were necessary to

19  disclose in order to make the statements made about the investment,

20  in light of the circumstances under which they were made, not

21  misleading:

22      a.  the market for IHI business center interests will

23  eventually become saturated as the supply of new members declines

24  and representatives recruited near the bottom of the retail sales

25

organization structure may be unable to generate promised returns;

b.    IHI was the subject of regulatory actions or inquiries in at least three other states based on the allegation that IHI's program violated state pyramid and securities laws;

c.    that Savage and Smith were previously involved in a pyramid scheme which was the subject of state and federal administrative and criminal proceedings, including the issuance of a permanent cease and desist order in Montana;

d.    that IHI was not an authorized dealer for some of the products listed in its retail sales catalogs and brochures; and,

d.    at all times material hereto, IHI's program was not registered as a security in the state of Montana.

27.   In connection with the above offers and sales of IHI notes convertible to IHI common stock to persons in Montana, Respondents failed to disclose the following material facts which facts were necessary to disclose in order to make the statements made about the investment, in light of the circumstances under which they were made, not misleading:

a.    that IHI's losses for the year of 1997 had increased to $7.6 million from the $1.9 million listed in IHI offering circular;

b.    that IHI's compensation scheme is premised primarily on recruitment of new members;

c.    that IHI did not adequately monitor or enforce compliance with IHI policies and procedures by independent sales

1 representatives; and,

2    d.   that IHI markets the business center program utilizing

3 and emphasizing hypothetical earnings projections.

4    28.   In connection with the above offers of securities to

5 persons in Montana, Respondents engaged in an act, practice, or

6 course of business which operates or would operate as a fraud or

7 deceit upon any person in that:

8    a.   the IHI business center program constituted a pyramid

9 scheme; and,

10    b.   IHI directed sales representatives not to contact state

11 regulators in order to avoid investigations or inquiries into the

12 IHI business center program.

13                    CONCLUSIONS OF LAW

14    1.   The commissioner has jurisdiction over this matter by

15 reason of Respondents' offer and sale of securities to persons in

16 or from Montana.

17    2.   Respondents' program is a security within the meaning of

18 the Securities Act of Montana, § 30-10-103(22), MCA.

19    3.   Offer or offer to sell includes "every attempt or offer

20 to dispose of or solicitation of an offer to buy a security or

21 interest in a security for value." Section 30-10-103(15), MCA.

22    4.   In connection with the above offers of securities to

23 persons in Montana, Respondents violated § 30-10-201(1), MCA, by

24 transacting business as broker-dealers or salesmen in Montana

25

                                                    Page 10

1 without registering as such.

2    5.   In connection with the above offers of securities to
3 persons in Montana, Respondents violated § 30-10-202, MCA, by
4 transacting business in unregistered securities.

5    6.   In connection with the above offers of securities to
6 persons in Montana, Respondents violated § 30-10-301(1)(b), MCA, by
7 failing to disclose the following material facts, which facts were
8 necessary to disclose in order to make the statements made about
9 the investment, in light of the circumstances under which they were
10 made, not misleading:

11    a.   the market for IHI business center interests will
12 eventually become saturated as the supply of new members declines
13 and representatives recruited near the bottom of the retail sales
14 organization structure may be unable to generate promised returns;

15    b.   IHI was the subject of regulatory actions or inquiries in
16 at least three other states based on the allegation that IHI's
17 program violated state pyramid and securities laws;

18    c.   that Savage and Smith were previously involved in a
19 pyramid scheme which was the subject of state and federal
20 administrative and criminal proceedings;

21    d.   that IHI was not an authorized dealer for some of the
22 products listed in its retail sales catalogs and brochures; and,

23    d.   at all times material hereto, IHI's program was not
24 registered as a security in the state of Montana.

25

7.   In connection with the above offers of securities to persons in Montana, Respondents violated § 30-10-301(1)(b), MCA, by failing to disclose the following material facts, which facts were necessary to disclose in order to make the statements made about the investment, in light of the circumstances under which they were made, not misleading:

a.   that IHI's losses for the year of 1997 had increased to $7.6 million from the $1.9 million listed in IHI offering circular;

b.   that IHI's compensation scheme is premised primarily on recruitment of new members;

c.   that IHI did not adequately monitor or enforce compliance with IHI policies and procedures by independent sales representatives; and,

d.   that IHI markets the business center program utilizing and emphasizing hypothetical earnings projections.

8.   In connection with the above offers of securities to persons in Montana, Respondents violated § 30-10-301(1)(c), MCA, by engaging in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in that:

a.   the IHI business center program constituted a pyramid scheme; and,

b.   IHI directed sales representatives not to contact state regulators in order to avoid investigations or inquiries into the IHI business center program.

1                              ORDER

2        Respondents are hereby ordered to cease and desist issuing,

3  offering,  and  selling  securities  to  persons  in  this  state  in

4  violation of the Securities Act of Montana.

5        The  above-cited  violations  are  sufficient  grounds  for  the

6  imposition of an administrative fine not to exceed $5,000.00 per

7  violation upon any person found to have engaged in any act or

8  practice  constituting  a  violation  of  any  provision  of  the

9  Securities  Act  of  Montana  or  any  rule  or  order  promulgated

10  thereunder.   Section 30-10-305, MCA.   The above-cited violations

11  are sufficient grounds for the imposition of and order requiring

12  the payment of restitution and other costs to investors.   Section

13  30-10-309, MCA.   You will receive notice and/or an opportunity to

14  be  heard  prior  to  the  imposition  of  any  fine  or  an  order  of

15  restitution.

16        Section 30-10-306(1), MCA, provides that any willful violation

17  of this order, upon conviction, may be punished by imprisonment for

18  not  more  than  ten  (10)  years  and/or  a  fine  not  exceeding  five

19  thousand dollars ($5,000).

20                             NOTICE

21        Respondents are notified that this order has been issued by

22  the commissioner.   If Respondents wish to contest the allegations

23  herein,  they  shall  make  a  written  request  for  a  hearing  to

24  Elizabeth A. O'Halloran of this office within fifteen (15) days of

25

1  receipt of this order.   The hearing shall then be held within

2  thirty (30) days of the commissioner's receipt of the hearing

3  request unless the time is extended by agreement of the parties.

4  If no hearing is requested within fifteen (15) days of receipt of

5  this order by Respondents, and none is ordered by the commissioner,

6  this order shall become permanent.

7      Should you request a hearing, you have the right to be

8  accompanied, represented, and advised by counsel.   If the counsel

9  you choose has not been admitted to practice law in the State of

10 Montana, he or she must comply with the requirements of <u>Application</u>

11 <u>of American Smelting and Refining, Co.,</u> (1973), 164 Mont. 139, 520

12 P.2d 103.

13

14      DATED this third day of April, 1998.

15

16      _____
        Mark O'Keefe
17      State Auditor and
        Commissioner of Securities
18

19

20

21

22

23

24

25  _____

1

<u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that I mailed a true and correct copy of the

3 foregoing CEASE AND DESIST ORDER to the following persons by

4 depositing the same in the U.S. Mail - certified - return receipt

5 requested - on this ___3rd___ day of ___April___, 1998.

6

7 International Heritage, Inc.
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

8

9 Stanley H. Van Etten
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

10

11 Claude W. Savage
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

12

13 Larry G. Smith
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

14

15 Johnny Daniels
Hwy. 191
Malta, MT 59538

16

17 International Heritage Incorporated
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

18

19

20    _Sandi Bunston_
State Auditor's Office

21

22

23

24

25

RECEIVED APR 2 0 1998

```
                    STATE AUDITOR'S OFFICE
                    SECURITIES DEPARTMENT
                      HELENA, MONTANA
```

| | |
|---|---|
| IN THE MATTER OF: | CASE NO. I-04-02-98-04 |
| | |
| International Heritage, Inc., | FIRST AMENDED |
| Stanley H. Van Etten, | CEASE AND DESIST ORDER |
| Claude W. Savage, | |
| Larry G. Smith, | |
| and | |
| International Heritage, | |
| Incorporated, a Nevada corporation, | |
| | |
| and their agents & | |
| representatives, | |
| | |
| Respondents. | |

The Montana Securities Commissioner (Commissioner), pursuant to the authority of the Securities Act of Montana, § 30-10-101, et seq., hereby issues the following findings of fact, conclusions of law, order and notice of right to a public hearing:

<u>FINDINGS OF FACT</u>

1.    International Heritage, Inc., (IHI) is a North Carolina corporation whose principal offices are located in Raleigh, North Carolina.   International Heritage, Inc., is a majority owned subsidiary of International Heritage Incorporated, a Nevada Corporation (IHI-N) (formerly "Kara International, Inc.").

2.    Stanley H. Van Etten (Van Etten), is a founder, chairman of the board of directors, president, and chief executive officer of IHI, and is chairman of the board and chief



21-04-98  02:17          8728447                          A.          E-683    Nr.-461
APR. -20' 98(MON) 20:22    INTERNATIONAL HERITAGE, INCORPOR    TEL:919 8728447              P. 007
FROM : DENNIS G. LOVELESS                PHONE NO. : 406 442 8076              Apr. 20 1998 05:26PM P6

1  executive officer of IHI-N.

2      3.    Claude W. Savage (Savage) is a founder and a director

3  of IHI and is director of IHI-N.

4      4.    Larry G. Smith (Smith) is a founder and director of IHI

5  and a director of IHI-N.

6      5.    IHI, its principals, employees, and agents solicited

7  investments in IHI's program in Montana through the use of

8  promotional materials, videotapes, recruitment meetings, and

9  internet web sites.  IHI, through Van Etten, Savage, Smith, and

10 others solicited residents of Kalispell, Anaconda, Butte,

11 Billings, Bozeman, Lewistown, Great Falls, Glasgow, Malta,

12 Glendive, Roundup, Forsyth, Havre, Columbia Falls, Stevensville,

13 Helena, and other Montana towns to invest in a pyramid scheme.

14     6.    IHI interests are described as "business centers," of

15 which an investor may open one, three, or seven.  In order to

16 open or create a "certified" business center, Montana investors

17 were generally required to pay the sum of $200.00 to $250.00

18 toward the purchase of an IHI product, sign a "retail business

19 agreement," purchase an IHI retail business career kit for $100,

20 and pay a $25.00 administrative fee.

21     7.    At all times material hereto, IHI solicited Montana

22 investors through the purported use of a "multi-level" marketing

23 program in which prospective investors are recruited by investors

24 who have already purchased interests in IHI.  IHI established an

25 incentive for recruitment of downline sales representatives by

21-04-98  02:17          8728447                    A.        E-683    Nr.-461
APR. -20' 98(MON) 20:23   INTERNATIONAL HERITAGE, INCORPOR    TEL:919 8728447          P. 008
FROM : DENNISG.LOVELESS          PHONE NO. : 406 442 8076        Apr. 20 1998 05:26PM P7

1   promising payment of override commissions to independent sales
2   representatives for IHI product and business center sales by that
3   representative's downline (retail sales organization).

4      8.   According to the IHI's bi-lateral compensation plan,
5   independent sales representatives could earn override commissions
6   only if their own retail business center was "certified."

7      9.   At all times material hereto, IHI promotional and sales
8   materials indicated that investors could earn up to $2,200 to
9   $2,500 per retail business center weekly.  These projected
10  earnings were based on the recruitment of downline independent
11  sales representatives, rather than the sale of products on the
12  retail market.  Similarly, the compensation structure, which
13  included a compensation cap attached to single business center
14  earnings, encouraged the purchase of multiple business centers by
15  investors.

16     10.   Although commissions on the sale of products were
17  described in the promotional and sales material, the income from
18  the development of the retail sales organization was emphasized
19  as the significant source of income from involvement with IHI.
20  Similarly, IHI disproportionately emphasized retail sales
21  organization development through the promise of bonuses and
22  commissions which were not available to an independent sales
23  representative whose organization focused on retail product
24  sales.

25     11.   At all times material hereto, the IHI compensation

21-04-98  02:17        8728447        A.P      E-683    Nr.-461
APR. -20'98(MON) 20:23    INTERNATIONAL HERITAGE, INCORPOR    TEL:919 8728447        P. 009
FROM : DENNIS G. LOVELESS        PHONE NO. : 406 442 8076        Apr. 20 1998 05:27PM P8

1  structure and sales pitch regarding "leveraging retail sales

2  business volume" served as incentive to develop the downline and

3  disincentive to generate retail sales business volume through the

4  sale of IHI products, thus perpetuating the pyramid scheme.  The

5  IHI sales kit contains a book co-authored by Van Etten which

6  emphasizes the importance of downline regeneration.  In addition

7  to emphasizing the importance of geometric growth in marketing

8  the IHI interests, IHI's training materials clearly discourage

9  independent sales representatives from developing the retail sale

10  portion of the representatives' businesses.  Van Etten's book

11  states:

12      There are two things that the successful network marketer
        must be very good at doing which are altogether foreign to
13      the traditional salesperson: (1) He must be an organization
        builder, and (2) He must be a teacher.  We will speak of
14      these two things at much greater length later in this
        chapter, but suffice it to say at this point that there is
15      nothing in the experience of the traditional salesperson
        that would cause him to assign any value to either of these
16      two skills which are so essential to the individual who
        wants to succeed in network marketing.  In fact, the
17      traditional salesperson's natural tendency would be to see
        both organization-building and teaching as irrelevant
18      obstacles to be swept out of the way of what he sees as the
        one all-important task of every salesperson - selling.
19                          * * *
        Earlier in this chapter we said that there is a risk in
20      sponsoring persons who have considerable experience in
        direct sales.  This is a good place to explain why that is
21      the case.  An experienced salesperson might come into your
        downline and recruit like crazy.  But if he fails to teach
22      his recruits the importance of the company's multilevel
        sales structure and the necessity for "keeping it going,"
23      then he would fill your downline organization with dead-end
        roadblocks. (Emphasis in original).

24

25      12.  Though references to minimum retail sales requirements

21-04-98  02:17          ~~9 8728447                    A.~~    E-683    Nr.-461

APR. -20' 98 (MON) 20:23   INTERNATIONAL HERITAGE, INCORPOR   TEL:919 8728447          P. 010

FROM : DENNISG. LOVELESS         PHONE NO. : 406 442 8076      Apr. 20 1998 05:28PM Pg

1    and inventory loading prohibitions are included in the

2    independent retail sales representative manual. IHI's

3    compensation program is based on orders of products, rather than

4    actual sales of products, and override commissions are promised

5    for orders made within the retail sales organization.

6    Furthermore, IHI's program structure does not provide a method by

7    which inventory loading requirements and requirements for retail

8    sales to non-participants are meaningfully enforced. As of the

9    date of this order, a disproportionate amount of products ordered

10   from IHI through the use of the "retail business agreement" in

11   Montana have never been received by the purchasers of the

12   product.

13       13.  On or about March 28, 1996, IHI issued a memorandum

14   addressed to all IHI representatives which required that

15   representatives wishing to conduct due diligence on the company

16   should direct "all of [their] compliance, regulatory and legal

17   questions to the Compliance Department at the home office rather

18   than the Better Business Bureau or state regulators." IHI

19   further stated that "[i]f enough inquiries are made to any one

20   particular regulatory branch, within a particular state, the

21   result could be an investigation of the Company spurned {sic} by

22   the mere volume of calls." The memorandum further stated that:

23       The reason IHI is one of the only multilevel marketing
         companies with a Compliance Department is so representative

24       will have a source for receiving answers to compliance,
         regulatory and legal questions and to assure that the

25       Company operates in compliance with the myriad of

21-04-98  02:17          '9 8728447                    A          E-683    Nr.-461

APR. -20'98(MON) 20:24    INTERNATIONAL HERITAGE, INCORPOR    TEL:919 8728447          P. 011
FROM : DENNISG.LOVELESS         PHONE NO. : 406 442 8076     Apr. 20 1998 05:28PM P10

1   regulations affecting a direct marketing sales company with
2   operations in 48 states and 3 Canadian provinces.

3   Though the memorandum was written in March 1996, it was included

4   in an IHI business retail business career kit sold to a Montana

5   resident months later.

6       14.  Despite IHI's claims in sales presentations and

7   materials that its program complies with state and federal laws

8   that affect direct marketing organizations, IHI entered into

9   agreements limiting IHI activities in the state of North Carolina

10  on June 3, 1997, and in the state of Georgia on February 10,

11  1998, as a result of regulatory concerns in those states.  North

12  Carolina regulators alleged that IHI violated North Carolina

13  pyramid laws.  These actions were not disclosed to Montana

14  residents offered or sold IHI business center interests.

15      15.  Between August 5, 1997, and October 31, 1997, IHI,

16  through Van Etten, Savage, Smith, and others, raised $5 million

17  by selling IHI notes convertible into IHI common stock, to

18  approximately 95 persons in fourteen states, including at least

19  persons in Montana.

20      16.  On August 14, 1997, IHI filed a notice filing for an

21  exemption on Form D, indicating it sold an aggregate of $295,00

22  of IHI units to six accredited Montana investors.  The

23  application indicated that WIN Capital was the broker/dealer

24  making offers and/or sales to Montana investors.

25      17.  In connection with the offer and sale of IHI notes, IH

21-04-98  02:17        ‎ 8728447                    A.12~    E-603   Nr.-461
APR. -20' 98 (MON) 20:24    INTERNATIONAL HERITAGE, INCORPOR    Inu:919 8728447              P. 012

FROM : DENNISG, LOVELESS            PHONE NO. : 406 442 8076        Apr. 20 1998 05:29PM P11

1   authorized the use of a "term sheet," dated July 17, 1997, which

2   disclosed that IHI had losses of approximately $1.9 million

3   during the first four months of 1997.  The term sheet did not

4   disclose that by the time of the offering IHI's losses for the

5   year had increased to $7.6 million, and that IHI had a shortage

6   of operating funds.

7       18.   The term sheet states that IHI pays commissions and

8   bonuses "derived solely from sales as opposed to headhunting or

9   any similar activities," despite IHI's emphasis on compensation

10  opportunities based on recruitment and development of retail

11  sales organizations.

12      19.   The term sheet states that representatives "who sponsor

13  other representatives must fulfill supervisory activities,

14  including ongoing communication and managerial supervision with

15  the  IRSRs within their Retail Sales Organization in order to

16  qualify for ongoing commissions and bonuses," despite the absence

17  of enforcement efforts by IHI to ensure compliance.

18      20.   The term sheet represents that IHI has a "a prohibition

19  from presenting hypothetical earnings projections" in sales

20  presentations, despite IHI's standard use of projections that

21  each business center could earn up to $2,500 weekly.

22      21.   IHI represented to the Montana Securities Department

23  that the offering of IHI notes would be conducted by WIN Capital

24  Corp., a registered broker-dealer.

25      22.   The records of the Montana Securities Department

21-04-98  02:17          8728447                    A.      E-683    Nr.-461
APR. -20'98(MON) 20:24    INTERNATIONAL HERITAGE, INCORPOR    TEL:919 8728447        P.013
FROM : DENNISG. LOVELESS        PHONE NO. : 406 442 8076    Apr. 20 1998 05:30PM P12

1   disclose that Respondents were not registered as broker-dealers

2   or salesmen in this state prior to the date of this Order.

3       23.   The records of the Montana Securities Department

4   disclose that the IHI business center program offered by

5   Respondents was not registered as a security in this state prior

6   to the date of this Order.

7       24.   In connection with the above offers of IHI business

8   center interests to persons in Montana, Respondents failed to

9   disclose the following material facts, which facts were necessary

10  to disclose in order to make the statements made about the

11  investment, in light of the circumstances under which they were

12  made, not misleading:

13      a.   the market for IHI business center interests will

14  eventually become saturated as the supply of new members declines

15  and representatives recruited near the bottom of the retail sales

16  organization structure may be unable to generate promised

17  returns;

18      b.   IHI was the subject of regulatory actions or inquiries

19  in at least three other states based on the allegation that IHI's

20  program violated state pyramid and securities laws;

21      c.   that Savage and Smith were previously involved in a

22  pyramid scheme which was the subject of state and federal

23  administrative and criminal proceedings, including the issuance

24  of a permanent Cease and Desist Order in Montana;

25      d.   that IHI was not an authorized dealer for some of the

21-04-98  02:17        ~-9 8728447           A.²⁻    E-603    Nr.-461
APR. -20' 98(MON) 20:25   INTeRNATIONAL HERITAGE, INCORPOR  TeL:919 8728447      P.014
FROM : DENNIS G. LOVELESS        PHONE NO. : 406 442 8076      Apr. 20 1998 05:30PM P13

1 products listed in its retail sales catalogs and brochures; and,

2     e.   at all times material hereto, IHI's program was not

3 registered as a security in the state of Montana.

4     25.  In connection with the above offers and sales of IHI

5 notes convertible to IHI common stock to persons in Montana,

6 Respondents failed to disclose the following material facts,

7 which facts were necessary to disclose in order to make the

8 statements made about the investment, in light of the

9 circumstances under which they were made, not misleading:

10     a.   that IHI's losses for the year of 1997 had increased to

11 $7.6 million from the $1.9 million listed in IHI offering

12 circular;

13     b.   that IHI's compensation scheme is premised primarily o

14 recruitment of new members;

15     c.   that IHI did not adequately monitor or enforce

16 compliance with IHI policies and procedures by independent sales

17 representatives; and,

18     d.   that IHI markets the business center program utilizing

19 and emphasizing hypothetical earnings projections.

20     26.  In connection with the above offers of securities to

21 persons in Montana, Respondents engaged in an act, practice, or

22 course of business which operates or would operate as a fraud or

23 deceit upon any person in that:

24     a.   the IHI business center program constituted a pyramid

25 scheme; and,

b.   IHI directed sales representatives not to contact state regulators in order to avoid investigations or inquiries into the IHI business center program.

27.   Respondent Van Etten, on behalf of IHI, falsely informed Montana agents and representatives of IHI on or about April 8, 1998, that the Commissioner had agreed to rescind or cancel the April 3, 1998, Cease and Desist Order and that IHI's Montana representatives and agents were no longer subject to that Order.

28.   Respondent Van Etten, on behalf of IHI, failed to disclose to Montana agents and representatives of IHI on or about April 9, 1998, the following material facts which facts were necessary to disclose in order to make the statements made not misleading in light of the circumstances under which they were made:

a.   that the Commissioner had not agreed to rescind or cancel the April 3, 1998, Cease and Desist Order;

b.   that IHI's Montana agents and representatives were still subject to the Commissioner's April 3, 1998, Cease and Desist Order.

29.   Respondent Van Etten, on behalf of IHI, falsely informed Montana agents and representatives of IHI on or about April 15, 1998, that "we've already solved the problem" of the April 3, 1998, Cease and Desist Order; that the April 3, 1998, Cease and Desist Order is "going away" and "we're off their radar

1   scope"; and that the Commissioner had erred in issuing the Order.

2                          CONCLUSIONS OF LAW

3       1.   The Commissioner has jurisdiction over this matter by

4   reason of Respondents' offer and sale of securities to persons in

5   or from Montana.

6       2.   Respondents' program is a security within the meaning

7   of the Securities Act of Montana, § 30-10-103(22), MCA.

8       3.   Offer or offer to sell includes "every attempt or offer

9   to dispose of or solicitation of an offer to buy a security or

10  interest in a security for value." Section 30-10-103(15), MCA.

11      4.   In connection with the above offers of securities to

12  persons in Montana, Respondents violated § 30-10-201(1), MCA, by

13  transacting business as broker-dealers or salesmen in Montana

14  without registering as such.

15      5.   In connection with the above offers of securities to

16  persons in Montana, Respondents violated § 30-10-202, MCA, by

17  transacting business in unregistered securities.

18      6.   In connection with the above offers of securities to

19  persons in Montana, Respondents violated § 30-10-301(1)(b), MCA,

20  by failing to disclose the following material facts, which facts

21  were necessary to disclose in order to make the statements made

22  about the investment, in light of the circumstances under which

23  they were made, not misleading:

24      a.   the market for IHI business center interests will

25  eventually become saturated as the supply of new members declines

and representatives recruited near the bottom of the retail sales organization structure may be unable to generate promised returns;

b.   IHI was the subject of regulatory actions or inquiries in at least three other states based on the allegation that IHI's program violated state pyramid and securities laws;

c.   that Savage and Smith were previously involved in a pyramid scheme which was the subject of state and federal administrative and criminal proceedings;

d.   that IHI was not an authorized dealer for some of the products listed in its retail sales catalogs and brochures; and,

e.   at all times material hereto, IHI's program was not registered as a security in the state of Montana.

7.   In connection with the above offers of securities to persons in Montana, Respondents violated § 30-10-301(1)(b), MCA, by failing to disclose the following material facts, which facts were necessary to disclose in order to make the statements made about the investment, in light of the circumstances under which they were made, not misleading:

a.   that IHI's losses for the year of 1997 had increased to $7.6 million from the $1.9 million listed in IHI offering circular;

b.   that IHI's compensation scheme is premised primarily on recruitment of new members;

c.   that IHI did not adequately monitor or enforce

21-04-98  02:17     ᴺᴿ 8728447              A.ᴵᴺ      E-683    Nr.-461
APR. -20' 98(MON) 20:26   INTERNATIONAL HERITAGE, INCORPOR   TEL:919 8728447           P. 018
FROM : DENNISG.LOVELESS              PHONE NO. : 406 442 8076      Apr. 20 1998 05:33PM P17

1 compliance with IHI policies and procedures by independent sales

2 representatives; and,

3     d.   that IHI markets the business center program utilizing

4 and emphasizing hypothetical earnings projections.

5     8.   In connection with the above offers of securities to

6 persons in Montana, Respondents violated § 30-10-301(1)(c), MCA,

7 by engaging in an act, practice, or course of business which

8 operates or would operate as a fraud or deceit upon any person in

9 that:

10     a.   the IHI business center program constituted a pyramid

11 scheme; and,

12     b.   IHI directed sales representatives not to contact state

13 regulators in order to avoid investigations or inquiries into the

14 IHI business center program.

15     9.   In connection with the above offers of securities to

16 persons in Montana, Respondents Van Etten and IHI violated §30-

17 10-301(1), MCA, when they falsely informed Montana agents and

18 representatives of IHI on or about April 8, 1998, that the

19 Commissioner had agreed to rescind or cancel the April 3, 1998,

20 Cease and Desist Order and that they were no longer subject to

21 that Order.

22     10.   In connection with the above offers of securities to

23 persons in Montana, Respondents Van Etten and IHI violated §30-

24 10-301(1), MCA, when they falsely informed Montana agents and

25 representatives of IHI on or about April 15, 1998, that "we've

21-04-98   02:17      059 8728447                    A.J°⌐      E-683    Nr.-461
APR. -20' 98(MON) 20:26   INTERNATIONAL HERITAGE, INCORPOR   TEL:919 8728447         P.019
FROM : DENNISG.LOVELESS              PHONE NO. : 406 442 8076      Apr. 20 1998 05:33PM P18

1   already solved the problem" of the April 3, 1998, Cease and

2   Desist Order; that the April 3, 1998, Cease and Desist Order is

3   "going away" and "we're off their radar scope"; and that the

4   Commissioner had erred in issuing the Order.

5       11.   Respondent Van Etten and IHI violated §30-10-302, MCA,

6   when they failed to disclose to Montana agents and

7   representatives of IHI on or about April 9, 1998, the following

8   material facts which facts were necessary to disclose in order to

9   make the statements made not misleading in light of the

10  circumstances under which they were made:

11      a.   that the Commissioner had not agreed to rescind or

12  cancel the April 3, 1998, Cease and Desist Order;

13      b.   that IHI's Montana agents and representatives were still

14  subject to the Commissioner's April 3, 1998, Cease and Desist

15  Order.

16      12.   Respondents Van Etten and IHI violated §30-10-302, MCA,

17  when they knowingly made a materially false or misleading

18  statement by informing Montana agents and representatives of IHI

19  on or about April 8, 1998, that the Commissioner had agreed to

20  rescind or cancel the April 3, 1998, Cease and Desist Order and

21  that they were no longer subject to that Order.

22      13.   Respondents Van Etten and IHI violated §30-10-302, MCA,

23  when they knowingly made a materially false or misleading

24  statement by informing Montana agents and representatives of IHI

25  on or about April 15, 1998, that "we've already solved the

21-04-98  02:17        P19 8728447              A.20-    E-683   Nr.-461
APR.-20'98(MON) 20:27    INTERNATIONAL HERITAGE, INCORPOR   TEL:919 8728447          P.020
FROM : DENNISG.LOVELESS          PHONE NO. : 406 442 8076       Apr. 20 1998 05:34PM P19



1.   problem" of the April 3, 1998, Cease and Desist Order; that the
2    April 3, 1998, Cease and Desist Order is "going away" and "we're
3    off their radar scope"; and that the Commissioner had erred in
4    issuing the Order.

5                              ORDER

6        Respondents are hereby ordered to cease and desist issuing,
7    offering, and selling securities to persons in this state in
8    violation of the Securities Act of Montana.  Respondents Van
9    Etten and IHI are also hereby ordered to cease and desist
10   knowingly making any materially false or misleading statement
11   regarding the April 3, 1998, Cease and Desist Order, the effect
12   of that Order, or the status of that Order.

13       The above-cited violations are sufficient grounds for the
14   imposition of an administrative fine not to exceed $5,000.00 per
15   violation upon any person found to have engaged in any act or
16   practice constituting a violation of any provision of the
17   Securities Act of Montana or any rule or order promulgated
18   thereunder.  Section 30-10-305, MCA.  The above-cited violations
19   are sufficient grounds for the imposition of an order requiring
20   the payment of restitution and other costs to investors.  Section
21   30-10-309, MCA.  Staff is recommending that the Commissioner
22   impose total fines of $250,000 and order Respondents Van Etten,
23   IHI, IHI-N, Savage, and Smith to make restitution for all
24   financial losses sustained by Montana residents as a result of
25   Respondents' violations of the Montana Securities Act.

21-04-98   02:17        ^'9 8728447                    A.^·     E-683    Nr.-461
APR. -20' 98 (MON) 20:27   INᴛᴇRNATIONAL HERITAGE, INCORPOR   ᴛᴇL:919 8728447         P. 021
FROM : DENNISG. LOVELESS              PHONE NO. : 406 442 8076     Apr. 20 1998 05:34PM P20

1   <u>Section 30-10-306(1), MCA, provides that any willful</u>

2   <u>violation of this order, upon conviction, may be punished by</u>

3   <u>imprisonment for not more than ten (10) years and/or a fine not</u>

4   <u>exceeding five thousand dollars ($5,000).</u>

5                              <u>NOTICE</u>

6        Respondents are notified that this Order has been issued by

7   the Commissioner.  If Respondents wish to contest the allegations

8   herein, they shall make a written request for a hearing to

9   Elizabeth A. O'Halloran of this office within fifteen (15) days

10  of receipt of this Order.  The hearing shall then be held within

11  thirty (30) days of the Commissioner's receipt of the hearing

12  request unless the time is extended by agreement of the parties.

13  If no hearing is requested within fifteen (15) days of receipt of

14  this order by Respondents, and none is ordered by the

15  Commissioner, this Order shall become permanent.

16       Should you request a hearing, you have the right to be

17  accompanied, represented, and advised by counsel.  If the counsel

18  you choose has not been admitted to practice law in the State of

19  Montana, he or she must comply with the requirements of

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

21-04-98  02:17      919 8728447          A 22.        E-683    Nr.-461
APR. -20'98(MON) 20:27   INTERNATIONAL HERITAGE, INCORPOR   TEL:919 8728447            P.022

FROM : DENNISG.LOVELESS          PHONE NO. : 406 442 8076      Apr. 20 1998 05:35PM P21

1   Application of American Smelting and Refining, Co., (1973), 164

2   Mont. 139, 520 P.2d 103.

3

.4          DATED this 20th day of April, 1998.

5

6

7                              Mark O'Keefe

8                              State Auditor and
                               Commissioner of Securities

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

21-04-98  02:17          019 8728447                     A.2x        E-683      Nr.-461
APR. -20' 98 (MON) 20:28    IN..RNATIONAL HERITAGE, INCORPOR    ..L:919 8728447         P. 023
FROM : DENNIS G. LOVELESS            PHONE NO. : 406 442 8076        Apr. 20 1998 05:35PM P22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I hereby certify that I hand-delivered a true and correct copy of the foregoing Cease and Desist Order to the following persons by depositing the same in the U.S. Mail - certified - return receipt requested - on this _20_ day of _April_, 1998.

Dennis Loveless, Esq.
320 E.  6th Ave.
Helena, MT 59601

_Darla Sautter_
State Auditor's Office

AL INN        ID:406-4420301        MAY 01'98    11:28 No.006 P.02

STATE AUDITOR'S OFFICE
SECURITIES DEPARTMENT
HELENA, MONTANA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. I-04-02-98-04 |
| | ) | |
| International Heritage, Inc., | ) | CONSENT ORDER AND |
| Stanley H. Van Etten, | ) | ORDER VACATING CEASE |
| Claude W. Savage, | ) | AND DESIST ORDERS |
| Larry G. Smith, and | ) | |
| International Heritage, Incorporated, | ) | |
| Respondents | ) | |

The Montana Securities Commissioner (hereinafter "Commissioner"), and

International Heritage, Inc. and International Heritage Incorporated (hereinafter

collectively referred to as "IHI"), hereby consent to the following order:

FINDINGS OF FACT

1.      International Heritage, Inc. is a North Carolina corporation whose

principal offices are located in Raleigh, North Carolina. International Heritage, Inc. is a

majority owned subsidiary of International Heritage Incorporated, a Nevada Corporation.

2.      IHI is a multi-level marketing company which contends that it is engaged

in the sale of products such as jewelry, recreational equipment and collectible items. IHI

currently operates as a multi-level marketing company in the State of Montana through a

network of approximately 4,000 independent retail sales representatives, which IHI

contends are independent contractors who sell products marketed by IHI. Citizens of

Montana own some of the publicly-traded stock of IHI as well as notes convertible to

stock of IHI.

3.      On 3 April 1998, the Commissioner issued a Cease and Desist Order

pursuant to the Montana Statutes which prohibited IHI and other Respondents from

violating Montana law, *inter alia*. On 20 April 1998, the Commissioner issued a First

1



...ended Cease and Desist Order pursuant to the Montana Statutes which prohibited IHI and other Respondents from violating Montana law, *inter alia* The Cease and Desist Order and the First Amended Cease and Desist Order were issued by the Commissioner in order to insure that neither IHI or its independent retail sales representatives are violating any laws of the State of Montana.

4.     Pursuant to an Order entered on 3 April 1998 by the Honorable Richard Story, United States District Court Judge for the Northern District of Georgia, in a civil action initiated by the Securities and Exchange Commission against IHI and others, IHI has modified its marketing and compensation plan in an effort to insure that neither IHI or its independent retail sales representatives are violating any laws of the United States or any state, including laws in the State of Montana. After modifying its marketing and compensation plans, IHI filed an Application for an Order Approving the Modified Compensation and Marketing Plan with the United States Clerk of Court for the Northern District of Georgia and sought from the Honorable Richard Story, United States District Court Judge for the Northern District of Georgia, the approval of IHI's modified marketing and compensation plans.

5.     Following a hearing on the Application for an Order Approving the Modified Compensation and Marketing Plan before the Honorable Richard Story, United States District Court Judge for the Northern District of Georgia, an order was entered on 22 April 1998 by Judge Story which authorized IHI "to conduct business consistent with the modified plan submitted to" Judge Story.

6.     On or before 30 April 1998, the modified compensation and marketing plan was submitted to legal counsel for the Commissioner.

AIAL INN                    ID:406-4420301                    MAY 01 '98    11:29 No.006 P.04

7.      With this Consent Order, the Commissioner and IHI seek to: (a) provide an opportunity to educate the citizens of Montana of the dangers of illegal pyramid schemes; (b) provide an opportunity to educate the citizens of Montana of the value of securities statutes adopted in the State of Montana; (c) avoid the expense of litigating issues contained in the two orders issued by the Commissioner; and (d) resolve all differences between the Commissioner and IHI.

## CONCLUSIONS OF LAW

1.      The Commissioner has jurisdiction over this matter pursuant to Montana Statutes.

2.      IHI is not prohibited from conducting business in the State of Montana consistent with the modified marketing and compensation plan submitted to legal counsel for the Commissioner and as authorized by United States District Court Judge Richard Story of the Northern District of Georgia.

## CONSENT ORDER

1.      Without admitting any liability under any statute in the State of Montana or any statute, rule or order adopted in the United States, IHI hereby stipulates and consents to the following:

A.      To comply with the Securities Act of Montana, and the rules and orders promulgated thereunder in the future;

B.      To offer the right to rescind, within thirty (30) days after the mailing of written notice, the sale of any notes purchased by citizens of the State of Montana  between 14 July 1997 and 31

3

October 1997 pursuant to the Regulation D Offering Memorandum or Term Sheet dated 17 July 1997;

C.    To offer, through a mailed written notification in cooperation with the Commissioner, to refund to all Montana citizens any costs associated with a retail business agreement used by IHI as a manner of purchasing product in the past, less the amount of commissions or refunds previously paid to and the retail value of any products received by the Montana resident; provided, however, IHI shall not be obligated to pay any refund unless the Montana citizen certifies in writing that he or she was a Montana citizen at the time that he or she executed the retail business agreement, certifies in writing his or her intent to terminate their association with IHI, requests the refund in writing, and provides the written request for refund to IHI within forty-five (45) days following the date of the written notice by IHI;

D.    To pay all refunds to Montana citizens appropriately requesting the same pursuant to the preceding paragraph within six months following the receipt of said request for refund from the Montana citizen;

E.    To pay, within six (6) months following the execution of this Consent Order, to the Commissioner the amount of $21,000.00 for reimbursement of investigative costs;

4

B/W·COLONIAL INN              ID:406-4420301              MAY 01'98    11:30 No.006 P.06

F. To contribute in 1998 to youth activities and consumer protection efforts in the State of Montana, including public education about the protections afforded by Montana's securities laws;

G. To provide, for the purpose of monitoring the activities of IHI and its independent retail sales representatives, documents to the Commissioner upon the reasonable requests of the Commissioner and his staff; and

H. To waive the right to a hearing on the allegations contained within the Cease and Desist Order dated 10 April 1998 and the First Amended Cease and Desist Order dated 20 April 1998.

2. The Commissioner hereby stipulates and consents to the following:

A. Under the authority of the Securities Act of Montana and Section 2-4-603, MCA, the Commissioner agrees that if the terms and conditions of this Consent Order and any other commitments pursuant to Paragraph 1.F above are fully met by IHI, he will not initiate any civil or administrative action against IHI or any individual Respondent named within the two orders issued by the Commissioner regarding the allegations contained within the Cease and Desist Order dated 10 April 1998 and the First Amended Cease and Desist Order dated 20 April 1998; and

B. That this Consent Order shall not and does not constitute a securities or investment related permanent or temporary injunction for the purposes of any collateral effects or reporting requirements

under state securities laws or self-regulatory organization rules, nor shall the existence of this Consent Order restrict, limit, prohibit or disqualify the Respondents, or any affiliate of the Respondents, in any manner from: (i) engaging in any lawful activity or practice pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisors Act of 1940, or the Commodity Exchange Act, and/or any rules or regulations promulgated thereunder, and/or any state securities and commodities laws (including without limitation, participating in offerings or availing themselves of exemptions including the Uniform Limited Offering Exemption, as and to the extent now or hereafter adopted), or (ii) acting as an affiliated person of any underwriter, broker, dealer, investment advisor, investment company, bank, insurance company, or other entity or person under applicable federal or state insurance, securities, banking or commodities laws.

3.    It is hereby ordered that the Cease and Desist Orders issued in the above-captioned administrative proceeding on 3 April 1998, as amended on 20

///

///

B/W COLONIAL INN          ID:406-4420381          MAY 01'98   11:31 No.006 P.08

April 1998, is vacated as it applies to the Respondents.

DATED this 1st day of May, 1998.

RESPONDENTS INTERNATIONAL HERITAGE, INC.
And
INTERNATIONAL HERITAGE INCORPORATED

By: Stanley H. Van Etten, President of IHI

COMMISSIONER OF SECURITIES

Mark O'Keefe
State Auditor and Commissioner of Securities

7





Rec ¹²/₂/98
Wake County Sheriff
SV̄

STATE AUDITOR'S OFFICE
SECURITIES DEPARTMENT
HELENA, MONTANA

| IN THE MATTER OF: | ) | CASE NO. I-04-02-98-04 |
|---|---|---|
| | ) | |
| International Heritage, Inc., | ) | NOTICE OF HEARING |
| Stanley H. Van Etten, | ) | AND ORDER |
| Claude W. Savage, | ) | |
| Larry G. Smith, | ) | |
| and | ) | |
| International Heritage, | ) | |
| Incorporated, a Nevada corporation,) | | |
| | ) | |
| and their agents & | ) | |
| representatives, | ) | |
| | ) | |
| Respondents. | ) | |

The Montana Securities Commissioner (commissioner), pursuant to the authority of the Securities Act of Montana, § 30-10-101, et seq., hereby issues the following findings of fact, conclusions of law, order and notice of hearing:

FINDINGS OF FACT

1.   International Heritage, Inc., (IHI) is a North Carolina corporation whose principal offices are located in Raleigh, North

Notice of Hearing and Order  Page 1

Carolina.    International Heritage, Inc., is a majority owned subsidiary of International Heritage Incorporated, a Nevada Corporation (IHI-N) (formerly Kara International, Inc.).

2.    Stanley H. Van Etten (Van Etten), is a founder, chairman of the board of directors, president, and chief executive officer of IHI, and is chairman of the board and chief executive officer of IHI-N.

3.    Claude W. Savage (Savage) is a founder and a director of IHI and is director of IHI-N.

4.    Larry G. Smith (Smith) is a founder and director of IHI and a director of IHI-N.

5.    IHI, its principals, employees, and agents solicited investments in IHI's program in Montana through the use of promotional materials, videotapes, recruitment meetings, and internet web sites.  IHI, through Van Etten, Savage, Smith, and others solicited residents of Kalispell, Anaconda, Butte, Billings, Bozeman, Lewistown, Great Falls, Glasgow, Malta, Glendive, Roundup, Forsyth, Havre, Columbia Falls, Stevensville, Helena, and other Montana towns to invest in a pyramid scheme.

6.    IHI interests are described as "business centers," of which an investor may open one, three, or seven.  In order to open or create a "certified" business center, Montana investors were generally required to pay the sum of $200.00 to $250.00 toward the purchase of an IHI product, sign a "retail business agreement," purchase an IHI retail business career kit for $100, and pay a

1   $25.00 administrative fee.

2   7.   At all times material hereto, IHI solicited Montana

3   investors through the purported use of a "multi-level marketing

4   program" in which prospective investors are recruited by investors

5   who have already purchased interests in IHI.   IHI established an

6   incentive for recruitment of downline sales representatives by

7   promising payment of override commissions to independent sales

8   representatives for IHI product and business center sales by that

9   representative's downline (retail sales organization).

10   8.   According to the IHI's bi-lateral compensation plan,

11   independent sales representatives could earn override commissions

12   only if their own retail business center was "certified."

13   9.   At all times material hereto, IHI promotional and sales

14   materials indicated that investors could earn up to $2,200 to

15   $2,500 per retail business center weekly.   These projected earnings

16   were based on the recruitment of downline independent sales

17   representatives, rather than the sale of products on the retail

18   market.   Similarly, the compensation structure, which included a

19   compensation cap attached to single business center earnings,

20   encouraged the purchase of multiple business centers by investors.

21   10.   Although commissions on the sale of products were

22   described in the promotional and sales material, the income from

23   the development of the retail sales organization was emphasized as

24   the significant source of income from involvement with IHI.

25   Similarly, IHI disproportionately emphasized retail sales

1   organization development through the promise of bonuses and

2   commissions which were not available to an independent sales

3   representative whose organization focused on retail product sales.

4       11. At all times material hereto, the IHI compensation

5   structure and sales pitch regarding "leveraging retail sales

6   business volume" served as incentive to develop the downline and

7   disincentive to generate retail sales business volume through the

8   sale of IHI products, thus perpetuating the pyramid scheme. The

9   IHI sales kit contains a book co-authored by Van Etten which

10   emphasizes the importance of downline regeneration. In addition to

11   emphasizing the importance of geometric growth in marketing the IHI

12   interests, IHI's training materials clearly discourage independent

13   sales representatives from developing the retail sale portion of

14   the representatives' businesses.

15       12. Though references to minimum retail sales requirements

16   and inventory loading prohibitions are included in the independent

17   retail sales representative manual, IHI's compensation program is

18   based on orders of products, rather than actual sales of products,

19   and override commissions are promised for orders made within the

20   retail sales organization. Furthermore, IHI's program structure

21   does not provide a method by which inventory loading requirements

22   and requirements for retail sales to non-participants are

23   meaningfully enforced. As of the date of this order, a

24   disproportionate amount of products ordered from IHI through the

25   use of the "retail business agreement" in Montana have never been

1 received by the purchasers of the product.

2     13.   On or about March 28, 1996, IHI issued a memorandum

3 addressed to all IHI representatives which required that

4 representatives wishing to conduct due diligence on the company

5 should direct "all of [their] compliance, regulatory and legal

6 questions to the Compliance Department at the home office rather

7 than the Better Business Bureau or state regulators."  IHI further

8 stated that "[i]f enough inquiries are made to any one particular

9 regulatory branch, within a particular state, the result could be

10 an investigation of the Company spurned {sic} by the mere volume of

11 calls."  The memorandum further stated that:

12        The reason IHI is one of the only multilevel marketing
         companies with a Compliance Department is so representatives
13        will have a source for receiving answers to compliance,
         regulatory and legal questions and to assure that the Company
14        operates in compliance with the myriad of regulations
         affecting a direct marketing sales company with operations in
15        48 states and 3 Canadian provinces.

16 Though the memorandum was written in March, 1996, it was included

17 in an IHI business retail business career kit sold to a Montana

18 resident months later.

19     14.   Despite IHI's claims in sales presentations and materials

20 that its program complies with state and federal laws that affect

21 direct marketing organizations, IHI entered into agreements

22 limiting IHI activities in the state of North Carolina on June 3,

23 1997, and in the state of Georgia on February 10, 1998, as a result

24 of regulatory concerns in those states.  North Carolina regulators

25 alleged that IHI violated North Carolina pyramid laws.  These

1  actions were not disclosed to Montana residents offered or sold IHI

2  business center interests.

3      15. Between August 5, 1997, and October 31, 1997, IHI,

4  through Van Etten, Savage, Smith, and others, raised $5 million by

5  selling IHI notes convertible into IHI common stock, to

6  approximately 95 persons in fourteen states, including at least 6

7  persons in Montana.

8      16. On August 14, 1997, IHI filed a notice filing for an

9  exemption on Form D, indicating it sold an aggregate of $295,00 of

10  IHI units to six accredited Montana investors. The application

11  indicated that WIN Capital was the broker/dealer making offers

12  and/or sales to Montana investors.

13      17. In connection with the offer and sale of IHI notes, IHI

14  authorized the use of a "term sheet," dated July 17, 1997, which

15  disclosed that IHI had losses of approximately $1.9 million during

16  the first four months of 1997. The term sheet did not disclose

17  that by the time of the offering IHI's losses for the year had

18  increased to $7.6 million, and that IHI had a shortage of operating

19  funds.

20      18. The term sheet states that IHI pays commissions and

21  bonuses "derived solely from sales as opposed to headhunting or any

22  similar activities," despite IHI's emphasis on compensation

23  opportunities based on recruitment and development of retail sales

24  organizations.

25      19. The term sheet states that representatives "who sponsor

other representatives must fulfill supervisory activities, including ongoing communication and managerial supervision with the IRSRs within their Retail Sales Organization in order to qualify for ongoing commissions and bonuses," despite the absence of enforcement efforts by IHI to ensure compliance.

20. The term sheet represents that IHI has a "a prohibition from presenting hypothetical earnings projections" in sales presentations, despite IHI's standard use of projections that each business center could earn up to $2,500 weekly.

21. The records of the Montana Securities Department disclose that Respondents were not registered as broker-dealers or salesmen in this state at all times material hereto.

22. The records of the Montana Securities Department disclose that the IHI business center program offered by Respondents was not registered as a security in this state prior to the date of this Order.

23. In connection with the above offers of IHI business center interests to persons in Montana, Respondents failed to disclose the following material facts which facts were necessary to disclose in order to make the statements made about the investment, in light of the circumstances under which they were made, not misleading:

a. the market for IHI business center interests would eventually become saturated as the supply of new members declines and representatives recruited near the bottom of the retail sales

1   organization structure may be unable to generate projected returns;

2       b.    IHI was the subject of regulatory actions or inquiries in

3   at least three other states based on the allegation that IHI's

4   program violated state pyramid and securities laws;

5       c.    that Savage and Smith were previously involved in a

6   pyramid scheme which was the subject of state and federal

7   administrative and criminal proceedings, including the issuance of

8   a permanent cease and desist order in Montana;

9       d.    that IHI was not an authorized dealer for some of the

10  products listed in its retail sales catalogs and brochures; and,

11      e.    at all times material hereto, IHI's program was not

12  registered as a security in the state of Montana.

13      24.   In connection with the above offers and sales of IHI

14  notes convertible to IHI common stock to persons in Montana,

15  Respondents failed to disclose the following material facts which

16  facts were necessary to disclose in order to make the statements

17  made about the investment, in light of the circumstances under

18  which they were made, not misleading:

19      a.    that IHI's losses for the year of 1997 had increased to

20  $7.6 million from the $1.9 million listed in IHI offering circular;

21      b.    that IHI's compensation scheme is premised primarily on

22  recruitment of new members;

23      c.    that IHI did not adequately monitor or enforce compliance

24  with IHI policies and procedures by independent sales

25  representatives; and,

d.    that IHI markets the business center program utilizing and emphasizing hypothetical earnings projections.

25.    In connection with the above offers of securities to persons in Montana, Respondents engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in that:

a.    the IHI business center program constituted a pyramid scheme; and,

b.    IHI directed sales representatives not to contact state regulators in order to avoid investigations or inquiries into the IHI business center program.

26.    Respondent Van Etten, on behalf of IHI, informed Montana agents and representatives of IHI on or about April 8, 1998, that the Commissioner had agreed to rescind or cancel the April 3, 1998, Cease and Desist Order and that IHI's Montana representatives and agents were no longer subject to that Order.

27.    Respondent Van Etten, on behalf of IHI, failed to disclose to Montana agents and representatives of IHI on or about April 9, 1998, the following material facts which facts were necessary to disclose in order to make the statements made not misleading in light of the circumstances under which they were made:

a.    That the Commissioner had not agreed to rescind or cancel the April 3, 1998, Cease and Desist Order; and,

b.    That IHI's Montana agents and representatives were still subject to the Commissioner's April 3, 1998, Cease and Desist

1 | Order.

2 | 28. Respondent Van Etten, on behalf of IHI informed Montana
3 | agents and representatives of IHI on or about April 15, 1998, that
4 | "we've already solved the problem" of the April 3, 1998, Cease and
5 | Desist Order, that the April 3, 1998, Cease and Desist Order is
6 | "going away" and "we're off their radar scope," and that the
7 | Commissioner had erred in issuing the order.

8 |

9 | ## CONCLUSIONS OF LAW

10 | 1. The commissioner has jurisdiction over this matter by
11 | reason of Respondents' offer and sale of securities to persons in
12 | or from Montana.

13 | 2. Respondents' program is a security within the meaning of
14 | the Securities Act of Montana, § 30-10-103(22), MCA.

15 | 3. Offer or offer to sell includes "every attempt or offer
16 | to dispose of or solicitation of an offer to buy a security or
17 | interest in a security for value." Section 30-10-103(15), MCA.

18 | 4. In connection with the above offers of securities to
19 | persons in Montana, Respondents violated § 30-10-201(1), MCA, by
20 | transacting business as broker-dealers or salesmen in Montana
21 | without registering as such.

22 | 5. In connection with the above offers of securities to
23 | persons in Montana, Respondents violated § 30-10-202, MCA, by
24 | transacting business in unregistered securities.

25 | 6. In connection with the above offers of securities to

1 persons in Montana, Respondents violated § 30-10-301(1)(b), MCA, by
2 failing to disclose the following material facts, which facts were
3 necessary to disclose in order to make the statements made about
4 the investment, in light of the circumstances under which they were
5 made, not misleading:

6   a. the market for IHI business center interests will
7 eventually become saturated as the supply of new members declines
8 and representatives recruited near the bottom of the retail sales
9 organization structure may be unable to generate promised returns;

10   b. IHI was the subject of regulatory actions or inquiries in
11 at least three other states based on the allegation that IHI's
12 program violated state pyramid and securities laws;

13   c. that Savage and Smith were previously involved in a
14 pyramid scheme which was the subject of state and federal
15 administrative and criminal proceedings;

16   d. that IHI was not an authorized dealer for some of the
17 products listed in its retail sales catalogs and brochures;

18   e. at all times material hereto, IHI's program was not
19 registered as a security in the state of Montana; and,

20   f. That the Commissioner had not agreed to rescind or cancel
21 the April 3, 1998, Cease and Desist Order; and,

22   g. That IHI's Montana agents and representatives were still
23 subject to the Commissioner's April 3, 1998, Cease and Desist
24 Order.

25   7. In connection with the above offers of securities to

Notice of Hearing and Order            Page 11

1   persons in Montana, Respondents violated § 30-10-301(1)(b), MCA, by

2   failing to disclose the following material facts, which facts were

3   necessary to disclose in order to make the statements made about

4   the investment, in light of the circumstances under which they were

5   made, not misleading:

6        a.   that IHI's losses for the year of 1997 had increased to

7   $7.6 million from the $1.9 million listed in IHI offering circular;

8        b.   that IHI's compensation scheme is premised primarily on

9   recruitment of new members;

10       c.   that IHI did not adequately monitor or enforce compliance

11  with   IHI   policies   and   procedures   by   independent   sales

12  representatives; and,

13       d.   that IHI markets the business center program utilizing

14  and emphasizing hypothetical earnings projections.

15       8.   In connection with the above offers of securities to

16  persons in Montana, Respondents violated § 30-10-301(1)(b), MCA, by

17  making an untrue statement of material fact when Stanley Van Etten

18  informed   Montana   agents   and   representatives   of   IHI   that   the

19  Commissioner had not agreed to rescind the April 3, 1998, Cease and

20  Desist Order, that representatives were no longer subject to the

21  order, that the problem had already been solved, and that the

22  Commissioner had erred in issuing the order.

23       9.   In connection with the above offers of securities to

24  persons in Montana, Respondents violated § 30-10-301(1)(c), MCA, by

25  engaging in an act, practice, or course of business which operates

1  or would operate as a fraud or deceit upon any person in that:

2       a.   the IHI business center program constituted a pyramid
3  scheme; and,

4       b.   IHI directed sales representatives not to contact state
5  regulators in order to avoid investigations or inquiries into the
6  IHI business center program.

7                              ORDER

8       Respondents are hereby ordered to cease and desist issuing,
9  offering, and selling securities to persons in this state in
10 violation of the Securities Act of Montana.

11                             NOTICE

12      On Monday, January 11, 1999, before Hearing Examiner David
13 Paoli, at at 9:30 a.m., a hearing shall be conducted for the
14 purpose of determining whether a Permanent Cease and Desist Order
15 shall be imposed against the above-named Respondents, along with a
16 fine of up to $5,000 per violation and an Order of Restitution of
17 costs to investors.

18      The hearing is held in accordance with § 2-4-601, MCA, and §
19 30-10-305, MCA.  Respondents are entitled to attend this hearing
20 and respond and present evidence.

21      (1)  Respondents may waive formal proceedings in this matter
22 and proceed informally by stipulation, agreed settlement, consent
23 order or default under § 2-4-603, MCA.

24      (2)  If Respondents intend to appear at the hearing, written
25 notice must be sent to this office within 10 business days of

1 receipt of service.

2     (3)  Failure to appear at this hearing may result in the

3 imposition of a Permanent Cease and Desist Order and an Order of

4 Restitution.

5     The above-cited violations are sufficient grounds for the

6 imposition of an administrative fine not to exceed $5,000.00 per

7 violation upon any person found to have engaged in any act or

8 practice constituting a violation of any provision of the

9 Securities Act of Montana or any rule or order promulgated

10 thereunder. Section 30-10-305, MCA. The above-cited violations

11 are sufficient grounds for the imposition of an order requiring the

12 payment of restitution and other costs to investors. Section 30-

13 10-309, MCA.

14

15                     RIGHT TO COUNSEL

16     Parties have a right to be accompanied, represented and

17 advised by counsel. If counsel chosen is not admitted to practice

18 law in the State of Montana, he or she must comply with Application

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

Notice of Hearing and Order                    Page 14

1  of American Smelting and Refining Co. (1973), 164 Mont. 139, 520

2  P.2d 103.

3        DATED this sixth day of November, 1998.

4

5        _____

6        Mark O'Keefe
         State Auditor and
7        Commissioner of Securities

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I mailed a true and correct copy of the foregoing CEASE AND DESIST ORDER to the following persons by depositing the same in the U.S. Mail - certified - return receipt requested - on this 14th day of November , 1998.

International Heritage, Inc.
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

Stanley H. Van Etten
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

Claude W. Savage
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

Larry G. Smith
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

International Heritage Incorporated
2626 Glenwood Ave., Suite 200
Raleigh, NC 27608

Robert Brunton, Esq.
Kutak Rock
225 Peachtree Street, NE, Suite 2100
Atlanta, GA 30303-1766

Brent Wood, Esq.
Wood & Francis
2 Hannover Square
434 Fayetteville Street Mall,
Suite 2300
Raleigh, NC 27601

Dan Bell, Esq.
Wyrick, Roberts, Yates & Ponton, LLP
P.O. Drawer 17803
Raleigh, NC 27619

Dennis Loveless, Esq.
P.O. Box 225
Helena, MT  59624

_Steinstech_
State Auditor's Office

---

Notice of Hearing and Order                                          Page 16

## MAUPIN TAYLOR & ELLIS, P.A.

ATTORNEYS AT LAW

HIGHWOODS TOWER ONE, SUITE 500

3200 BEECHLEAF COURT

RALEIGH, NORTH CAROLINA 27604-1064

TELEPHONE (919) 981-4000

MAILING ADDRESS
POST OFFICE DRAWER 19764
RALEIGH, NORTH CAROLINA 27619-9764
TELEFAX (919) 981-4300

HOLMES P. HARDEN
BOARD CERTIFIED SPECIALIST
IN BANKRUPTCY LAW
WRITER'S DIRECT DIAL NUMBER
(919) 981-4011

DURHAM/RESEARCH TRIANGLE OFFICE
411 ANDREWS ROAD, SUITE 150
DURHAM, NORTH CAROLINA 27705
TELEPHONE (919) 382-0188

December 11, 1998

Mr. Mark O'Keefe
State Auditor & Commissioner
    of Securities
State Auditor's Office
Securities Department
Helena, Montana

Re:    In Re International Heritage, Incorporated and International Heritage, Inc.
       Case No. 98-02674 & 02675-5-ATS (EDNC)
       Your File No. I-04-02-98-4
       Bank7A.206

Dear Mr. O'Keefe:

    I am in receipt of your Notice of Hearing and Order according to which I understand a hearing will be conducted on January 11, 1999 at 9:30 a.m. before Hearing Examiner David Paoli for the purpose of determining whether a permanent cease and desist order should be imposed against International Heritage, Inc. and others, whether a fine of up to $5,000.00 per violation should be imposed and whether an Order of Restitution of Costs to Investors should be entered.

    Please be advised that International Heritage, Inc. is in Chapter 7 bankruptcy in the Eastern District of North Carolina. I am the court-appointed Chapter 7 Trustee. International Heritage, Inc. has ceased to function and does no business anywhere. International Heritage, Inc. specifically is not issuing, offering or selling securities to persons in Montana, because it is incapable of doing so. The regulatory ends sought by the State of Montana have therefore been achieved, and the January 11, 1999 hearing is superfluous as it applies to the debtor. The continued prosecution of litigation against International Heritage, Inc. for the purpose of establishing and/or collecting damages therefore may violate the automatic stay of 11 U.S.C. §362.

    Should you feel compelled to continue the prosecution of International Heritage, Inc. on January 11, I strongly suggest that you first obtain relief from the automatic stay to do so. I reserve the right to argue to the Bankruptcy Court that any judgment you obtain against International Heritage, Inc. is void *ab initio*, and, if circumstances warrant, that the State of Montana should be subject to sanctions for violation of the automatic stay if you proceed without benefit of stay relief.

RAL/176719/1



Mr. Mark O'Keefe
December 11, 1998
Page 2

Please confirm that the State of Montana will not commence or continue any judicial, administrative, or other action or proceeding against International Heritage, Inc. without benefit of relief from stay.

Sincerely,

Holmes P. Harden

Enclosures

cc:    Ms. Elizabeth O'Halloran
       Mr. David Paoli
       Mr. Brent Wood

## SMITH DEBNAM NARRON & MYERS, L.L.P.

### Attorneys at Law

Writer's Direct Dial
(919) 250-2110

Fred J Smith, Jr
W Thurston Debnam, Jr
John W Narron
Rodin Kelley Sessac
Terri L Gardner
Jerry T Myers

Laura K Howell
Elizabeth B Godfrey
Rose H Stout
Byron L Saintsing
Franklin Drake
Gerald H Groon, Jr

Terry M Kilbride
Susan Tolson Ellinger
Melanie J Hogg
Carrm D Enloe
Jeff D Rogers
Connie E Carrigan

Staci F Katz
Kimberly W Duffley
Tabetha L Cruden
David M Schwoppe
Tracy T Hyde
Sharon B Christopher
*of counsel*

4700 New Bern Avenue
Post Office Box 26268
Raleigh NC 27611-6268

Telephone: (919) 250-2000
Facsimile: (919) 250-2100

February 8, 1999

Mr. Brent Wood
Wood & Francis, PLLC
Attorneys and Counsellors at Law
Two Hannover Square
434 Fayetteville Street Mall
Suite 2300
Raleigh, North Carolina  27601

Re:   International Heritage, Inc.
      International Heritage, Incorporated

Dear Mr. Wood:

Thank you for sending me a copy of the Brief Pertaining to Hearing Status and Federal Status and Federal Bankruptcy Stay. I have reviewed the Brief and must take issue with the statement of Elizabeth A. O'Halloran, Attorney for the State Auditor and Commissioner of Securities on page 2. She indicates that "Gardner is listed as the attorney for the debtor of the corporate Respondents' bankruptcy petitions in North Carolina.  The Notice of Stay, according to Gardner's assistant Joy, was filed at the request of counsel for other respondents in this matter, and was not intended to indicate Gardner's representation of the corporate respondents in this matter."

I did not instruct Joy Alford, a law school graduate working with me while seeking application for admission to the North Carolina Bar, to make this statement to Ms. O'Halloran, and Ms. Alford has indicated to me that she did not make this statement.  I am sure Ms. O'Halloran misunderstood what was said. It is my position, as related to Ms. Alford, that I filed the notice of stay, as counsel for the debtors, to notify formally the State Auditor and Commissioner of Securities and Ms. O'Halloran of the chapter 7 filings.  No parties other than the debtors requested the filing of the notice of stay.  I filed notices of stay in approximately twelve other pending lawsuits, as well.

The position of the debtors, which I wholeheartedly support, is that **all legal action is stayed.** At this time, the regulatory enforcement aspect of the Montana action which would except the action from the stay under section 362(b)(4) has been negated by the fact that the debtor has ceased operations.  There is no action of the debtors which is threatening the public.  Any restitution and penalties could and should be determined in the bankruptcy court.

If you have any questions, please give me a call.



Mr. Brent Wood
Page Two
February 8, 1999

Yours truly,

SMITH DEBNAM NARRON & MYERS, L.L.P.

Terri L. Gardner