# FILED

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA 23 1999
## RALEIGH DIVISION

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

|  |  |  |
|---|---|---|
| In re: | ) | **CHAPTER 7** |
|  | ) | **CASES** |
|  | ) |  |
| **INTERNATIONAL HERITAGE** | ) |  |
| **INCORPORATED,** | ) | **N0. 98-02674-5-ATS** |
| and | ) |  |
| **INTERNATIONAL HERITAGE, INC.,** | ) | **NO. 98-02675-5-ATS** |
|  | ) |  |
| **Debtors.** | ) |  |
|  | ) |  |

## MEMORANDUM OF THE STAFF OF THE SECURITIES AND EXCHANGE COMMISSION IN SUPPORT OF APPLICATION OF TRUSTEE TO ENTER INTO STIPULATION AND CONSENT TO FINAL JUDGMENT OF PERMANENT INJUNCTION

To:     The Honorable A. Thomas Small
        Chief Judge
        United States Bankruptcy Court

The Chapter 7 trustee ("Trustee") seeks bankruptcy court approval to enter into a

Stipulation and Consent to Final Judgment of Permanent Injunction ("Stipulation and

Consent") that would resolve with respect to International Heritage, Inc. ("IHI") and

International Heritage Incorporated ("Heritage International") (together, "the Debtors") a

civil enforcement action brought by the United States Securities and Exchange Commission

("Commission"), arising out of massive pyramid scheme, which raised at least $170 million

from over 170,000 investors nationwide.  The settlement, if authorized by the Commission[1]

---

[1]     The Commission staff must obtain authority from the Commission before settling any enforcement
action.  Accordingly, the Commission staff submitted a recommendation to the Commission that the
settlement embodied in the Stipulation and Consent be accepted by the Commission but has not yet

and this Court and approved by the District Court in *Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith and International Heritage, Incorporated, a Nevada corporation*, Civil Action No. 1-98-CV-0803 ("Civil Action"), will result in the liquidation of the Commission's claim; the infusion into the bankruptcy estate of $5 million from the proceeds of a surety bond ("Bond") posted in the Civil Action to secure a monetary judgment in favor of the Commission, for payment of administrative expenses and the claims of defrauded investors, thereby maximizing the use of estate assets for the payment of creditors; and a reduction in the Commission's claim by any amount paid pursuant to the Bond. Notwithstanding the obvious benefit to the estate that would result by the cash infusion and the resolution of complex securities litigation with the Commission, which would otherwise continue pursuant to the police and regulatory exception to automatic stay set forth in Section 362(b)(4) of the Bankruptcy Code,[2] six objections have been filed to the Application of Trustee to Enter Into Stipulation and Consent To Final Judgment of Permanent Injunction (the "Settlement Application"). The objectors include ACSTAR Insurance Company ("Acstar"), the surety on the Bond; the Debtors; Stanley H. Van Etten ("Van Etten"), the Debtors' President and Chief Executive Officer who is also a defendant in the Civil Action; Chittenden Bank ("Chittenden"), IHI's credit card processor that has claims against IHI as a result of credit card chargebacks that Chittenden has processed and paid as a result of claims for reimbursement made by defrauded investors who

---

received authority from the Commission to accept the settlement. The staff will advise the Court and the parties as soon as practicable of the Commission's action on the settlement recommendation.

[2]   *See, e.g., SEC v. Towers Financial Corp.*, 205 B.R. 27 (S.D.N.Y. 1997); *Bilzerian v. SEC*, 146 B.R. 871 (Bankr. M.D. Fla. 1992); *SEC v. Long*, 106 B.R. 697 (Bankr. D. Kan. 1989).

invested in IHI through the use of charge cards;[3] and L.C. Gilbert, a defrauded investor who filed an action on behalf of himself individually and a class of other similarly situated sales representatives, against IHI, Van Etten, and others, alleging violations of state and federal securities laws and common law fraud.

Although the objectors assert various objections and concerns, none have offered any persuasive rationale for this Court to deny the Trustee authority to enter into the Stipulation and Consent. In fact, as more particularly set forth below, the Commission staff believes that the proposed settlement is fair and equitable in accordance with the Supreme Court's guidance in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc.*, 390 U.S. 414, 424 (1968), and should be approved.

# PROCEDURAL HISTORY

## A. *Commission's Complaint*

Pursuant to its statutory mandate to regulate the securities markets, Section 20 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t, and Section 21 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u, the Commission instituted a civil enforcement action against the Debtors; Van Etten; and IHI's other founders and directors, Claude W. Savage ("Savage") and Larry G. Smith ("Smith") (altogether "the Defendants") on March 16, 1998, by filing a Complaint for Injunctive and Other Relief ("Complaint") in the United States District Court for the Northern District of Georgia, alleging violations of the registration, antifraud and reporting provisions of the federal securities laws set forth in

---

[3]      Chittenden established a reserve account for IHI's obligation to reimburse Chittenden for chargebacks, which contained $93,000 as of the date of the filing of IHI's bankruptcy petition. The Trustee has demanded that Chittenden turn over the reserve account, which Chittenden has refused to do, asserting that it has a security interest in the account, as well as rights of recoupment and offset against the account.

Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c); Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5; and Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), and Rule 15d-11 promulgated thereunder, 17 C.F.R. 240.15d-11, respectively. The Complaint resulted from an investigation conducted by the Commission staff.

The Commission's Complaint alleges that, beginning in April 1995 and continuing through the date of the filing of the Complaint, IHI, through its founders and directors, Van Etten, Savage, and Smith, and others, solicited thousand of investors throughout the United States to invest in a pyramid scheme, more particularly described in the Complaint, attached hereto as Exhibit A. Although IHI claimed to be a legitimate multilevel marketing program, the Complaint charges that IHI was in essence a pyramid recruiting scheme. More than 170,000 investors obtained business centers, which were nothing more than tracking positions in a matrix maintained on IHI's computer. The business center owner, known as an Independent Retail Sales Representative ("representative"), was required to certify the center before the representative could earn commissions. This was generally accomplished by the representative making a $250 payment that was denoted a "down payment" on a product to be earned out. IHI suggested that the representative would receive his product, and thereafter commissions, when the representative recruited others into the program, which other investors would deposit $250 per center and recruit still more investors. Investors were permitted to certify one, three or seven centers per retail business agreement. In addition to paying $250 per center, the investor purchased a sales kit for $100. The vast majority of investors never

4

received a product or commission.[4]  The investors were generally recruited at revival type meetings.  The vast majority of IHI's revenues came from representatives certifying business centers.  There was minimal independent retail product activity.

In addition, the Complaint charged that IHI conducted a fraudulent offering of convertible notes in 1997, raising $5 million.  The Complaint further alleged that Heritage International, a publicly traded company, filed a fraudulent report with the Commission.

### B.     Temporary Restraining Order

On March 16, 1998, the Commission filed its Complaint seeking emergency relief, including a temporary restraining order, the appointment of a receiver, and other relief.  The same day, the Court imposed a temporary restraining order, froze the assets of IHI and appointed a receiver for IHI and Heritage International.

### C.     Preliminary Injunction

On April 3, 1998, after a four day contested evidentiary hearing, the District Court entered a Memorandum Opinion and Order, attached hereto as Exhibit B, preliminarily enjoining each of the Defendants from violating the federal securities laws.  In reaching its decision, the District Court concluded that the sale of business centers constituted a sale of securities for which the Defendants failed to file a registration statement in violation of Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) & (c).  The District Court further concluded that the Defendants violated the antifraud provisions of the federal securities laws set forth in Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in connection with the sale of the business centers.  The District Court transformed the

---

[4]     The investors who never received a product or commission were the primary victims of the fraud, and accordingly, would be preferred in the distribution of the Bond proceeds.

5

receiver into a monitor to periodically review IHI's activities; lifted the freeze of IHI's assets and allowed IHI to post a $5 million cash bond, which approximated the value of the assets that had been frozen, "to ensure that at least that amount is available to satisfy any amounts that may be ordered paid by IHI in this proceeding." Memorandum Opinion and Order at 17. The District Court also enjoined specific aspects of IHI's business practices.

## D.   *Substitution of Cash Bond With Surety Bond*

The Debtors filed an Application for an Order Approving Substitution of Cash Bond With Pay Bond ("Surety Application") on June 12, 1998. In the Surety Application, the Debtors requested the court to approve the substitution of the "cash bond posted by Defendant Stanley Van Etten . . . with a conventional, preapproved surety bond from ACSTAR Insurance Company ("ACSTAR"), which has agreed to act as surety on behalf of Defendants in accordance with the terms of the payment bond attached to the proposed Order as Exhibit A." The Debtors' rationale for requesting the substitution was so that $1.5 million could be infused into IHI and the remaining $3.5 million could be used as cash collateral for the surety. Attached to the Surety Application was an instrument dated June 5, 1998, denominated "Payment Bond" (the Bond) pursuant to which Acstar and United Coastal Insurance Company ("United") agreed to act as surety for IHI and Heritage International. The undated indemnity agreement ("Indemnity Agreement") between Acstar and United, collectively as Surety, and IHI and Heritage International, Inc., as Indemnitors, executed on June 8, 1998 only by the Debtors, which Acstar has filed with this court as an Addendum to Amended Objection to Application of Trustee to Enter Into Stipulation and Consent to Final Judgment of Permanent Injunction and Request for Hearing by Acstar Insurance Company, was neither disclosed in, nor attached to, the Surety Application. The Commission objected

6

to the Surety Application, and on June 24, 1998, the District Court denied the Surety Application on the grounds that United, the co-surety was not authorized to do business in Georgia.

The Defendants filed a Request For Reconsideration of Defendant IHI's Application for an Order Approving Substitution of Cash Bond with Payment Bond ("Request for Reconsideration"), which the Commission opposed.   Although the Bond was attached to the Request for Reconsideration, the Indemnity Agreement was neither disclosed in, nor attached to, the Request for Reconsideration.  On July 1, 1998, the District Court granted the Request for Consideration and allowed the posting of the Bond.

## E.    Filing of Bankruptcy Petitions and Continuation of Civil Action

After attempting to conduct business under the various limitations imposed by the District Court, IHI and Heritage International filed voluntary petitions under Chapter 7 of the Bankruptcy Code on November 25, 1998.  Holmes P. Harden, Esquire was appointed as Chapter 7 Trustee.

In accordance with the police and regulatory exception to the automatic stay set forth in Section 362(b)(4) of the Bankruptcy Code,[5] the Commission has continued to prosecute its Civil Action against the Defendants, which has as its central purpose to protect the public by ensuring fair dealing in the securities markets. *See, e.g., SEC v. Rind,* 991 F.2d 1486, 1491 (9th Cir.), *cert. denied,* 114 S.Ct. 439 (1993) ("[t]he entire purpose and thrust of [an SEC] enforcement action is to expeditiously safeguard the public interest by enjoining securities

---

[5]     The purpose of the governmental unit exception to the automatic stay is "to prevent the bankruptcy court from becoming a haven for wrongdoers." *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 240 (D. Nev. 1985), *aff'd,* 805 F.2d 1039 (9th Cir. 1986) (quoting *CFTC v. Co Petro Marketing Group, Inc.*, 700 F.2d 1279, 1284) (9th Cir. 1983).

violations."); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801,808 (2d Cir. 1975) (SEC's

role in enforcement proceedings is not that of an ordinary litigant, rather, it is a "statutory

guardian charged with safeguarding the public interest in enforcing the securities laws."). In

order to fulfill its statutory duties and to deter others from violating the federal securities laws,

the Commission is seeking both injunctive relief and an order setting disgorgement.[6]

## STANDARD FOR APPROVING SETTLEMENT

Bankruptcy Rule 9019 empowers this Court to approve compromises and settlements

if they are in the best interest of the estate.[7] *See, e.g., In re Marvel Entertainment Group,*

*Inc.*, 222 B.R. 243 (D.Del. 1998); *In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997).

Settlements are generally favored in bankruptcy cases because they provide an "often needed

---

[6]   *See, e.g., EEOC v. McLean Trucking Co.*, 834 F.2d 398, 402 (4th Cir. 1987) (filing of voluntary Chapter 11 petition did not foreclose the Equal Employment Opportunity Commission from instituting and continuing two actions against the debtor to redress alleged age and racial discrimination, including recovery of back wages); *SEC v. Towers Financial Corporation*, 205 B.R. 27 (S.D.N.Y. 1997) (Commission enforcement action seeking injunctive relief and disgorgement not stayed by defendant's filing of Chapter 7 bankruptcy petition). *Cf. Carlton v. Firstcorp, Inc.*, 967 F.2d 942, 946 (4th Cir. 1992) (enforcement of temporary cease and desist order issued by the Office of Thrift Supervision, which required debtor savings and loan holding company to cancel capital note and transfer stock to savings in loan in fulfillment of its capital requirements, was not stayed by automatic stay; court noted, but did not rule on applicability of Section 362(b)(4) and (5) regulatory exception to automatic stay, in light of provision in Financial Institution Supervisory Act establishing jurisdiction that supersede provisions of Bankruptcy Code).

[7]   Bankruptcy Rule 9019 states in relevant part that "[o]n *motion* by the trustee and after notice and a hearing, the court may approve a compromise or settlement." (emphasis added) Acstar's assertion that the Trustee should have proceeded by filing an adversary proceeding lacks merit. The Trustee is not seeking injunctive relief or monetary relief ; nor is the Trustee seeking to determine the allowability of a claim. In fact, the Trustee is seeking authority to settle litigation in which the federal securities laws are at issue. Accordingly, the Trustee has filed a motion in accordance with Bankruptcy Rule 9019 seeking court authority to settle the Civil Action. Similarly, the Trustee has acted in accordance with Bankruptcy Rule 6009, which allows the Trustee "with or without approval" of the court to prosecute or defend any action pending against the Debtors. The Trustee has acted cautiously and is seeking court authority to appear in the Civil Action to file the Stipulation and Consent.

and efficient resolution of the bankruptcy case." *In re Mavrode*, 205 B.R. 716, 719 (Bankr.

D.N.J. 1997). *Accord, In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989).

In order to approve a compromise, the bankruptcy court must make a determination

that the compromise is fair and equitable in accordance with the standards set forth by the United

States Supreme Court in *Protective Committee for Independent Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) and is in the best interest of the estate. *Id.*

*Accord, In re Aweco, Inc.*, 725 F.2d 293 (5th Cir.), *cert. denied*, 469 U.S. 880 (1984); *In re Media*

*Central, Inc.*, 190 B.R. 316, 320 (E.D. Tn. 1994). The factors to be considered in making this

determination are the probability of ultimate success in the litigation being compromised; the

complexity of the litigation involved, and the expense, inconvenience and delay attending to it, and

likely duration of such litigation; the possible difficulties in collecting any judgment that may be

obtained; and the interest of creditors giving a proper deference to their reasonable views. *See,*

*e.g., In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997); *In re Mavrode*, 205 B.R. 716, 720

(Bankr. D. N.J. 1997).

Deference should be given to the trustee's informed judgment concerning the proposed

settlement, and the bankruptcy court should not substitute its judgment for the trustee's. *In re*

*Media Central, Inc.*, 190 B.R. 316 (E.D. Tenn. 1994); *In re Drexel Burnham Lambert Group,*

*Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991); *In re Paris Industries Corp.*, 106 B.R. 339, 343

(Bankr. D. Me. 1989). A "mini trial" on the merits is not required for Court approval of a

settlement. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr.

S.D.N.Y. 1991).

9

*A.      The Settlement is Fair and Equitable*

**1.      The Commission Is Likely To Prevail In The Civil Action**

The Commission has been in litigation with the Debtors for over a year. Virtually every issue to date has been contested, including the Commission's application for a preliminary injunction. During the four day evidentiary hearing on the Commission's application, the District Court was presented with volumes of evidence, both documentary and testimonial; had ample opportunity to observe the demeanor of witnesses, including the Debtors' principals; heard lengthy arguments from counsel; and had the opportunity to review the entire record. After the lengthy evidentiary hearing, the court issued its Memorandum Opinion and Order concluding that the Debtors offered and sold securities in violation of the federal securities laws and that the Commission had established a reasonable likelihood of future violations. In order to obtain the preliminary injunction, the Commission had the burden of proving a reasonable likelihood of prevailing on the merits. *See, e.g., In re Tally Ho, Inc.*, 889 F.2d 1018, 1022 (11th Cir. 1990). Because the evidence presented to the District Court for the preliminary injunction remains before the District Court for the duration of the Civil Action and because the District Court found that the Defendants offered and sold unregistered securities in violation of Sections 5(a) and (c) of the Securities Act and that the Defendants violated the antifraud provisions of the federal securities laws set forth in Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act at least through March 1998, it is unlikely that the District Court would reach a contrary conclusion at a trial on the merits.

As a result of the violations, the Defendants, including the Debtors, obtained ill-gotten gains, and an order of disgorgement is appropriate. Disgorgement is an equitable remedy

10

"uniquely suited to redress or cancel unfairness and promote investor confidence in securities transactions," *SEC v. World Gambling Corp.*, 555 F.Supp. 931, 934 (S.D.N.Y.), *aff'd*, 742 F.2d 1440 (2d Cir. 1983), and is ancillary to the Commission's scheme of injunctive remedies. As stated by the Second Circuit, "the effective enforcement of the securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities laws violators were not required to disgorge illicit profits." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1971).

The need for the Commission to continue its deterrent actions, despite the pendency of a bankruptcy action involving a violator, is well-recognized. *See, e.g., SEC v. Towers Financial Corp.*, 205 B.R. 27 (S.D.N.Y. 1997); *In re Bilzerian*, 146 B.R. 871 (Bankr. M.D. Fla. 1992). Debtors' Chapter 7 filing does not preclude the Commission from pursuing its Civil Action and obtaining an order fixing an amount of disgorgement against the Debtors. *See, e.g., SEC v. Towers Financial Corp.*, 205 B.R. 27 (S.D.N.Y. 1997) (Commission action not stayed against Chapter 7 debtor "'where a government unit is suing a debtor to prevent or stop violation of fraud, . . . or similar police or regulatory laws, *or attempting to fix damages for violation of such a law*") (quoting S. Rep. 95-989 at 52, reprinted in 1978 U.S.C.C.A.N. 5787, 5838); *In re Bilzerian*, 146 B.R. 871, 873 (Bankr. M.D. Fla. 1992) (Commission's action in seeking to set amount of disgorgement against Chapter 7 debtor is appropriate and prevents bankruptcy court from becoming a haven for wrongdoers).

The Commission is likely to prevail in the Civil Action. It is not necessary for the Commission to prevail on every cause of action in order to be entitled to disgorgement. Disgorgement is appropriate if any violation of the federal securities laws resulted in ill-gotten gains.

11

## 2.    The Civil Action Is Complex Civil Litigation That Is Unlikely To Resolve Quickly Absent A Settlement

The Civil Action involves a complicated pyramid scheme. The Defendants have litigated every material issue, and the Commission staff has seen little evidence that Van Etten and the other individual defendants will not continue their litigation tactics. While the Commission staff has been mindful of minimizing costs to the Debtors' estates in proceeding with its enforcement action, the Commission staff believes that the Civil Action is unlikely to be resolved any time soon or the substantial monetary claims of the Commission liquidated absent a settlement with the Trustee.

Although Acstar has asserted a willingness to incur the cost of the Debtors' defense, the Commission staff believes that the Trustee would have to devote a substantial amount of time and resources in cooperating with Acstar to prepare a defense for a full trial on the fraud and other issues. In light of the substantial amount of time and resources that the Trustee will need to perform his statutory duties, including investigating the Debtors' complicated financial affairs, locating assets that have been diverted from the Debtors, and pursuing various causes of action which may result in a monetary recovery for the estate, the drain on the Trustee's limited resources that would result from assisting Acstar to prepare a defense for an action that will result in no monetary judgment in favor of the Debtors is not justified.

## 3.    The Trustee Will Not Collect Any Judgment If The Debtors Were To Prevail

The Civil Action is a civil enforcement action brought against the Defendants. There are no counterclaims pending against the Commission in the Civil Action. Thus, the collectibility of a judgment by the Trustee is not at issue.

12

Even if the Debtors were to prevail in the Civil Action, the Debtors' estates likely would not receive the benefit from the bond collateral because such collateral would either go to Van Etten[8] or to the Debtors subject to a lien by Van Etten. In addition, the Debtors would incur substantial administrative expenses attached to the litigation.[9] For the Trustee to devote any resources to participating in complex litigation, in which there is no possibility that the Trustee would obtain a monetary judgment in favor of the estate and in which there is a possibility that Van Etten, the mastermind of the fraud, would benefit if the Debtors prevail, flies in the face of logic.

**4.    The Settlement Is In The Best Interests of Creditors**

In the summary of schedules filed with this Court on December 16, 1998, IHI listed assets of $5,431,040.39[10] and liabilities of $12,907,614.65, which does not include the value

---

[8]    The Bond on its face states that in the event that the Commission fails to obtain a judgment for damages or an order of disgorgement or other monetary relief against the Principal (the Debtors), then the bond shall be returned to the surety. Neither the Bond nor the Indemnity Agreement addresses the disposition of the $3.5 million held by Acstar as collateral for the Bond. In its Amended Objection to Application of Trustee to Enter into Stipulation and Consent to Final Judgment of Permanent Injunction and Request for Hearing by Acstar Insurance Company ("Acstar's Objection"), Acstar states that "[p]ursuant to the terms of the Bond and the District Court's Orders if the Bond becomes null and void then the cash deposit of Three Million Fine Hundred Thousand and No/100 Dollars ($3,500,000.00) less expenses of the bonding company, will be returned to Stanley H. Van Etten as he placed the cash bond." Acstar's Objection at 3. If the $3.5 million posted as collateral for the bond belongs to IHI, then the Debtors and other Defendants falsely represented to the District Court in their Application to substitute the surety bond for the cash bond that the $3.5 million collateral was the property of Van Etten.

[9]    The benefit to the estate from the collateral is likely to be substantially less if significant administrative expenses are incurred and Trustee resources are used to assist the Surety to defend the Civil Action and if a substantial period of time elapses before the Civil Action is tried. The value of the collateral alone, without regard to the value of estate resources that would be used to assist in the defense, is $1.5 million less than would flow to the estate if the settlement is authorized and the Commission collects on the Bond.

[10]   The schedules actually list assets totaling $9,159,409.15. An amendment filed to the schedules showed an increase in accounts receivable by $1,658,162.48. Many of the assets are of dubious value. For example, IHI lists $3.375 million in contingent, unliquidated claims. These include a valuation of $1 million for possible slander claims against media entities, a possible $1 million claim for breach of fiduciary duty against an employee, and $250,000 uncollected from an employee who embezzled money from IHI. The schedules acknowledge that is highly unlikely that the estate will collect $2.7 million purportedly owed by sales representatives. It is also unlikely that the estate will

13

of the claims of investors (sales representatives) whose claims are listed as having an unknown value. IHI has few liquid assets, having no cash and only $216,574 on deposit, a portion of which is in dispute with Chittenden. The most significant assets are contingent claims against various persons and entities ($3.375 million) and the collateral for the bond ($3.5 million).

If the Settlement Application were granted authorizing the Trustee to enter into the Stipulation and Consent, a judgment for disgorgement in the amount of $6,533,179 would be entered against IHI, thereby liquidating the Commission's claim. Because the Commission is entitled to collect on the Bond and is willing to pay the Bond proceeds to the Trustee for payment of administrative expenses and certain investor claims and to reduce its own claim by the amount of the Bond proceeds collected and distributed to the Trustee, the settlement would be funded in essence with nonstate assets, resulting in more estate assets for creditors. *See, e.g., In re Mavrode*, 205 B.R. 716, 721 (Bankr. D. N.J. 1997) (creditors benefit when a settlement is funded by a source outside of the estate, resulting in the settling party being excluded from any dividend that may be available from the bankruptcy estate). The settlement, moreover, is likely to result in an immediate flow of cash into the bankruptcy estate.

## B.   *The Objections Lack Merit*

Once there has been a showing that a settlement is in the best interests of the estate and should be approved, the burden then shifts to objecting parties. *See, e.g., In re Del Grosso*, 106 B.R. 165, 168 (Bankr. E.D. Ill. 1989). Opponents of a settlement cannot oppose the settlement by merely demanding more proof; but instead must have made a clear and specific showing that vital material was ignored by the Court in approving the settlement. *Id.*

---

receive $100,000 for IHI's trademark. The $3.5 million in collateral for the surety bond will be forfeited if the proposed settlement is approved.

14

The court may approve a settlement over the objections of some parties if the settlement is in the best interests of the estate. *Id.   Accord, In re Lee Way Holding Co.*, 120 B.R. 881, 909 (Bankr. S.D. Ohio 1990).

> **1.     The Indemnity Agreement Entered Into Between Acstar And The Debtors, Which Was Not Disclosed To The Commission Or To The District Court, Does Not Bar This Court From Approving The Settlement**

> > *a.     The surety on a bond is bound by a judgment against its principal*

Acstar, when it agreed to serve as surety for the Debtors, accepted the risk of the Debtors' inability to pay a judgment in favor of the Commission.  In an attempt to avoid the risk that it was compensated to accept, Acstar has filed with this court the Indemnity Agreement between the Debtors and Acstar, undated but executed by the Debtors several days after the Bond, which not only is not referenced in the Bond, but also was never filed with the District Court nor disclosed to the Commission staff (or the Trustee) until it was filed as an Addendum with this court .  The Indemnity Agreement, which governs the rights of Acstar against the  Debtors, does not bar the Commission from recovering on the Bond.

Acstar executed the Bond as a surety and under Georgia law[11] is jointly and severally liable with the Debtors to the Commission.  O.C.G.A. § 10-7-1.  The law in Georgia is well-

---

[11]     Neither the Bond nor the Indemnity Agreement specifies which jurisdiction's law should apply when there is a dispute among the parties concerning the performance of the contract.  Because the Bond was posted in Georgia and indicates on its face that is to be performed in the Civil Action pending in Georgia, proper deference should be given to the approach that Georgia courts take in resolving choice of law issues.  Georgia courts follow the traditional method in resolving such issues.  Under this approach, contract actions are regulated by the law of the state where the contract was made, "except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is to be performed will apply."  *General Telephone Co. v. Trimm*, 252 Ga. 95, 95, 311 S.E.2d 460, 461 (1984); *Federal Insurance Co. v. National Distributing Co., Inc.*, 203 Ga. App. 763, 765, 417 S.E.2d 671, 673 (1992) (citing *General Elec. Credit Corp. v. Home Indem. Co.*, 168 Ga. App. 344, 349, 309 S.E.2d 152 (1983).  *Accord, Wallace v. Harrison*, 166 Ga. App. 461, 304 S.E.2d 487 (1983).

15

settled that the surety on a bond is bound by a judgment entered against the principal on the

bond. *See, e.g., Waldorf v. Wolff,* 114 Ga. 610, 618, 40 S.E. 830, 834 (1902) ("[A] bond

which is in effect an undertaking to answer the judgment or decree in a given case, binds the

surety to answer whatever judgment or decree may be lawfully rendered in that case against

one who is a party to the same at the time that the undertaking was entered into by him.");

*Holmes v. Langston,* 110 Ga. 861, 36 S.E. 251, 255 (1900) (liability of security on bail bond

in an action of trover is "absolutely fixed by the judgment against their principal"); *Jackson v.*

*Guilmartin & Co.,* 61 Ga. 544, 545 (1878) ("The . . security takes the fortunes of his principal

. . . ."). This principle of Georgia surety law holds true even when the judgment was entered

with the consent of the principal. *See, e.g., Houston General Insurance Co. v. Stein Steel &*

*Supply Co.,* 134 Ga.App. 624, 628, 215 S.E.2d 511 (1975) ("judgment against principal in an

action to foreclose lien is conclusive against the surety" even when "surety had in no wise

consented to or agreed to the alleged settlement or alleged consent judgment as between

plaintiff [creditor] and defendant principal"); *Sargeant v. Starr,* 102 Ga. App. 453, 459, 116

S.E.2d 633, 637 (1960) ("It is well settled . . . that the surety is bound by the judgment

entered against the principal on the bond. And this is so where the judgment rendered was

with the consent of the principal."); *Connally v. Morris,* 29 Ga. App. 752, 752-53, 116 S.E.

338 (1923) ("A surety . . . is bound by whatever judgment is rendered against the principal,

even though the surety did not appear and plead and the judgment rendered was by the

consent of the principal and not of the surety, and was for a larger sum than was

recoverable."). *Cf. Willis v. Bivins,* 76 Ga. 745, 748 (1886) (where statute required jury trial

to replevy property, judgment against condemnation bond posted by surety cannot be entered

without trial by jury). In each of these cited cases, the bond was posted to relieve property

16

from a claim of lien or secure the payment of a judgment, a circumstance which is present in the instant case. *See Escambia Chemical Corp. v. Rocker*, 124 Ga. App. 434, 438 n.1, 184 S.E.2d 31, 34 n. 1 (1971) (in cases of "attachment, bail trover, distress and dispossessory warrant proceedings" and some instances of ordinary contracts of guaranty or surety that are conditioned to pay a judgment, the judgment is conclusive on the surety in "absence of fraud, collusion, etc."). In such circumstances, the judgment is conclusive on the principal in absence of fraud or collusion.[12] *Id.* *Cf. Price v. Carlton*, 121 Ga. 12, 48 S.E. 721, 723 (1904) (surety on condemnation bond allowed to intervene "where the surety has a defense which would discharge him, and which the principal is under no legal obligation to make, as where the principal is insolvent and is not defending in good faith").

> b.   *The Trustee has not acted fraudulently or colluded with the Commission*

The Trustee has not acted fraudulently or colluded with the Commission or Commission staff in seeking this court's authority to settle the Civil Action or in negotiating the settlement with the Commission. Collusion has been defined as a "secret cooperation for a fraudulent or deceitful purpose." *In re New York Trap Rock Corp.*, 42 F.3d 747 (2d Cir. 1994) (relying on Webster's dictionary in defining collusive bidding in a bankruptcy matter).

Neither the Commission staff nor the Trustee have engaged in secret cooperation for a fraudulent or deceitful purpose. The Commission staff and the Trustee are seeking to settle a

---

[12]   Similarly, O.C.G.A § 10-7-22 does not discharge the surety. This provision, which discharges a surety where the creditor has injured or increased the risk to the surety, does not discharge the surety in the present facts. Although a surety may be discharged where the creditor has positively acted to injure collateral security of the surety, which is in the hands of the creditor, it does not discharge a surety where the creditor has abandoned its lawsuit against the surety's principal. *See, e.g., Griffin v. H.C. Whitmer Co.*, 57 Ga. App. 203, 204, 194 S.E. 895 (1938); *McMillan v. Heard National Bank*, 19 Ga. App. 148, 153, 91 S.E. 235 (1916). *Accord, Hardaway Co. V. Amwest Surety Insurance Co.*, 15 F.3d 172, 174 (11th Cir. 1994) (quoting *Hardaway v. Amwest Surety Insurance Co.*, 263 Ga. 698, 699, 436 S.E.2d 642 (1993)).

17

regulatory action involving violations of the federal securities laws. The negotiations between the Commission staff and the Trustee were not fraudulent or collusive, instead taking place at arm's length, over a period of several months, between parties with diverse interests, with each party arguing their own strengths while asserting the weaknesses of the other party. The Civil Action has continued and remained contentious. The Trustee negotiated the terms of the settlement with the Commission staff before filing the Settlement Application and before either the Commission or the Trustee had knowledge of the Indemnity Agreement. The resulting proposed settlement reflects signs of compromise, with the Commission staff agreeing, among other things, to forego civil penalties and to pay any money received from the Bond into the bankruptcy estate, and with the Trustee agreeing to the liquidation of a large claim against the bankruptcy estates. *See, e.g., Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 359 (E.D.N.Y. 1982), *aff'd*, 721 F.2d 881 (2d Cir. 1983), *cert. denied*, 466 U.S. 944 (1984) (arms-length negotiation resulting in compromise of class action litigation is indicative of lack of collusion). When a tentative agreement was reached between the Trustee and Commission staff, each party sought approval of the agreement from their respective authorities, which for the Commission staff is the Commission itself and for the Trustee is this Court. The negotiating parties are government attorneys charged with the statutory duty of enforcing the federal securities laws and the Trustee, a well-respected attorney in this judicial district. *See, e.g., Wattleton v. Ladish Co.*, 89 F.R.D. 677, 685 (E.D.Wis. 1981) (court's opinion of counsel and litigation considered in assessing whether collusion existing in settlement agreement). The Trustee has acted cautiously in seeking court authority before entering into a settlement with the Commission, properly noticing parties in interest and giving parties in interest an opportunity to object to the Settlement Application.

18

There is a presumption of regularity in a settlement agreement and collusion is not presumed, particularly in circumstances such as these where the litigation to be settled has been pending for a long period of time, the litigation has been contentious, and settlement negotiations have been lengthy. *See, e.g., In re Lee Way Holding Co.*, 120 B.R. 881, 909 (Bankr. S.D. Ohio 1990). *Accord, Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 660, 668 (M.D.Ala. 1988).

The fact that the bankruptcy estate will receive the proceeds of the Bond is not indicative of collusion or fraud. The Bond was executed for the benefit of the Commission to secure any judgment of disgorgement. The remedy of disgorgement is not intended to compensate investors but rather to deprive a violator of unjust enrichment. *See, e.g., SEC v. Drexel Burnham Lambert, Inc.*, 956 F.Supp. 503, 507 (S.D.N.Y. 1997), *aff'd*, 133 F.3d 170 (2d Cir. 1997). While the Commission has the right to dispense with disgorgement as the Commission sees fit, in circumstances in which investors have been defrauded, the Commission generally prefers that any award of disgorgement be distributed to defrauded investors rather than paid into the United States Treasury. "Such a distribution is not required by statute, however, and may not be appropriate where, for example, 'numerous victims suffered relatively small amounts . . .; where the victims cannot be identified . . .; [or] where there are no victims entitled to damages.'" *Id.* (citations omitted).

If there had been no bankruptcy filing in the instant case and disgorgement had been ordered, it is likely that the Commission would have petitioned the District Court to establish a procedure, either through the existing monitor or the appointment of a receiver, for distributing a disgorgement award to defrauded investors. In *SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 438 (2d Cir. 1987), *cert. denied*, 485 U.S. 938 (1988), the

19

Commission was admonished by the Second Circuit for using a receivership in lieu of a bankruptcy filing to liquidate assets.  Thus, in many cases, receivers appointed in Commission enforcement actions seek bankruptcy protection in order to administer an award of disgorgement and liquidate assets.

Because the bankruptcy filing in the instant case has preceded the entry of an order of disgorgement, the Commission is faced with a dilemma on how to proceed in order to maximize the distribution to defrauded investors.  If the Commission had no settlement agreement with the Trustee and were to prevail in its litigation against the Debtors and collect on the Bond, the Commission likely would establish  a procedure in the District Court very similar and duplicative of the procedure established in the Debtors' bankruptcy cases for filing proofs of claim.  In such circumstances, administrative expenses would be incurred in connection with such distribution scheme for noticing the same defrauded investors who are noticed in the Debtors' bankruptcy cases as creditors.  In order to avoid unnecessary expenses and maximize the distribution to defrauded investors, the Commission is willing to give the Bond proceeds to the Trustee for distribution in accordance with the settlement.  While the Trustee will receive a small portion of the Bond proceeds for his commission, the majority of the proceeds will be used to pay administrative and investor claims.  Thus, the true beneficiaries of the settlement are the Debtors' estates and their creditors, not the parties to the settlement.  *Cf. Sutton v. Hay*, 9 F.2d 795 (7th Cir. 1925) (court declined to approve a settlement agreement entered into between appellant and appellee-principal where the appellee agreed to pay appellant amount of appeal bond in return for an abandonment of the appeal).

c.      *The District Court is the proper court for determining Acstar's rights under the Indemnity Agreement*

Whether the Indemnity Agreement is a legitimate tool for negating long established principles of Georgia surety law is a matter that should be decided by the District Court, which ordered the posting of the bond to secure any money judgment that the Commission may obtain. *See, e.g., In re General Development Corp.*, 165 B.R. 685 (S.D. Fla. 1994). The District Court was obviously concerned with whether the Debtors would have the ability to satisfy a judgment in favor of the Commission. Acstar's assertion that the Indemnity Agreement, which was executed by the Debtor after the date of the Bond but yet was a precondition to the issuance of the Bond should be a matter of great interest to the District Court, which the Commission staff believes has never viewed the Indemnity Agreement.

The relief that the Trustee seeks in this case is analogous to the relief sought by the Chapter 11 debtor in *In re General Development Corp.*, 165 B.R. 685 (S.D.Fla. 1994), a case in which the debtor presented the bankruptcy court with a proposed agreement to settle state court litigation between the debtor and the Florida Department of Revenue ("DOR"), which would authorize the debtor to consent to a judgment establishing the amount of the debtor's tax liability in the precise amount of a surety bond posted in the state court action; allow the lifting of the automatic stay in the state court litigation to allow DOR to demand payment from the debtor; and when payment was refused, allow DOR to pursue any and all remedies that DOR may have against the surety bond posted in state court action. In this case, unlike the circumstances in *General Development Corporation*, the surety was provided with notice of the bankruptcy settlement hearing. While much litigation ensued in *General Development Corporation* because the surety was not noticed on the bankruptcy court settlement, ultimately the settlement was approved by the bankruptcy court and affirmed by the district

21

court. While finding that the surety's due process rights were implicated when it was not provided with notice of the bankruptcy settlement hearing but that the violation was sufficiently rectified by subsequent actions of the bankruptcy court, the district court noted that the bankruptcy court clarified its orders to "make crystal clear that it was not adjudicating [the surety's] liability on the bond and that that matter, as well as all of [the surety's] defenses, were matters better left to be resolved in the state court action." 165 B.R. at 689.

While Acstar may have rights against the Debtors under the Indemnity Agreement for any loss it incurs in paying its obligation pursuant to the Bond, *see, e.g., Transamerica Insurance Co. v. H.V.A.C. Contractors, Inc.*, 857 F.Supp. 969 (1994); *Rhodes v. Amwest Surety Insurance Co.*, 207 Ga. App. 441, 428 S.E.2d 581 (1993); *Olympic Development Group, Inc. v. American Druggists' Insurance Co.*, 175 Ga. App. 425, 333 S.E.2d 622 (1985); *Foster v. Nix*, 173 Ga. App. 720, 327 S.E.2d 833 (1985);*United Rentals Systems, Inc. v. Safeco Insurance Co.,* 156 Ga. App. 63, 273 S.E.2d 868 *(1980),* Acstar's liability to the Commission on the Bond is not affected. The Bankruptcy Code, moreover, recognizes the rights of sureties and provides a surety, such as Acstar, with remedies for any amounts that it pays to a creditor under a surety bond. Such remedies may include allowance of a proof of claim in the indemnitee's bankruptcy case or assertion of subrogation rights under Section 509 of the Bankruptcy Code.

> d.     *Acstar's failure to represent its own interests in the Civil Action is not grounds for denying the Settlement Application*

Acstar has been aware of the litigation between the Commission and the Debtors for over nine months, but has not chosen to participate in the litigation until a settlement agreement has been negotiated. The circumstances are analogous to those in *McKersie v. IU*

22

*International Corp.*, 1987 LEXIS 10913 (N.D.Ill. 1987), where a party sought to intervene in

an action on the eve of settlement. In denying the motion to intervene the court noted:

> Movants knew their interests were implicated in this lawsuit and chose not to
> attempt an earlier intervention. Instead, movants gambled that they could
> avoid the expense of participation by relying on [the defendants] to represent
> their interests. They took a chance and now may have lost. The parties to this
> litigation should not be made to pay for the movants' gamble.

*Id.* at *6.

Similar reasoning applies in the present case. Acstar's failure to monitor and

participate in the Civil Action should not be grounds for its objection now that a settlement

has been reached between the parties.

### 2.    The Trustee Will Not Violate Section 509(b)(2) In Accepting The Bond Proceeds

Acstar's contention that the Trustee in accepting the Bond proceeds would be in direct

violation of Section 509(b)(2) of the Bankruptcy Code rings hollow. Section 509 provides for

the treatment of a claim of an entity, including a surety such as Acstar, "that is liable with the

debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such

claim." Generally, Section 509 allows such entity ("entity") to subrogate to the rights of the

creditor that receives payment. Section 509(b)(2) precludes subrogation to the extent that "as

between the debtor and such entity, such entity received the consideration for the claim held

by such creditor." 11 U.S.C. § 509(b)(2). Section 509(b)(2) is a "statutory expression of the

general principle of equitable subrogation that the right of subrogation is not available to a

party who satisfies an indebtedness for which he is ultimately and primarily liable." *In re*

*Russell*, 101 B.R. 62, 65 (Bankr. W.D. Ark. 1989). *Accord, In re Wingspread Corp.*, 145

B.R. 784, 790 (S.D.N.Y. 1992), *aff'd*, 992 F.2d 319 (2d Cir.1993) (Section 509(b)(2) is

"'designed to prevent a person who received the consideration from the creditor from being

subrogated to the creditor's rights against a guarantor, surety, accommodation maker or similar party after the debtor has satisfied his own obligations.'") (citations omitted). Unless the Trustee seeks subrogation, the exception to subrogation set forth in Section 509(b)(2) is not applicable and is not violated.

### 3.   This Court Has Allowed A Chapter 7 Trustee To Administer Surety Bond Proceeds When The Administration Was Beneficial To The Estate

There is no dispute among the parties that the Bond proceeds are not property of the estate.[13]   There is no serious contention that the distribution of the Bond proceeds to the

---

[13]   The only party that raised an issue of whether the Bond is property of the estate is Chittenden, which does not assert that the bond proceeds are estate property but rather asserts that the Trustee has not cited any authority for the proposition.  Courts that have addressed the issue of whether a surety bond issued prepetition on behalf of an entity that later files for bankruptcy is property of the estate within the meaning of Section 541 of the Bankruptcy Code have generally concluded that a surety bond issued by a third party nondebtor surety and the proceeds thereof are not property of the bankruptcy estate.  *See, e.g., O'Malley Lumber Co. v. Lockard*, 884 F.2d 1171, 1178 (9th Cir. 1989) ("In keeping with the prevailing authority, we conclude that the surety bond at issue in this case [contractor's bond] is not 'property of the estate,' within the meaning of 11 U.S.C. 541."); *In re Mansfield Tire & Rubber Company*, 660 F.2d 1108, 1115 (6th Cir. 1981) (surety bond posted under Ohio workman's compensation statute not property of estate); *In re Petroleum Piping Contractors, Inc.*, 211 B.R. 290, 312 (Bankr. N.D. Ind. 1997) (bond of surety for contractor not property of the estate of subcontractor); *In re Duplitronics, Inc.*, 183 B.R. 1010, 1014-15 (Bankr. N.D. Ill. 1995) (matured supersedeas bond not property of the bankruptcy estate); *In re McLean Trucking Co.*, 74 B.R. 820 (Bankr. W.D.N.C. 1987) (surety bond to insure compliance with California workmen's compensation laws not property of estate); *In re Capital-York Construction Corp.*, 43 B.R. 52, 56 (Bankr. S.D. N.Y. 1984) (a subcontractor's action against a debtor general contractor's surety to recover under a surety bond does not implicate the automatic stay because the bond is not property of the debtor's estate); *In re Apache Construction, Inc.*, 34 B.R. 415, 417 (Bankr. D. Ore. 1983) (surety bond for construction contractor debtor not property of contractor's bankruptcy estate); *In re M.J. Sales & Distributing Co., Inc.*, 25 B.R. 608, 612 (Bankr. S.D.N.Y. 1982) (bond posted to secured judgment not property of estate).  *Accord, Globe Construction Co. v. Oklahoma City Housing Authority*, 571 F.2d 1140 (10th Cir.), *cert. denied*, 439 U.S. 835 (1978) (bankruptcy proceeding under Bankruptcy Act did not bar action against nondebtor surety on performance bond posted for debtor contractor); *In re Buna Painting & Drywall Co., Inc.*, 503 F.2d 618 (9th Cir. 1974) (contractor's bond required by California law not property of estate; Bankruptcy Act case); **Artis v. Myracle, 1998 U.S. Dist. LEXIS 18622 (E.D.N.C. 1998) (letter of credit posted to secure payment of personal injury claims against self-insured common carrier should be treated like surety bond and is not property of common carrier's bankruptcy estate)**; *In re Goldsby*, 51 F.Supp. 849 (S.D. Fla. 1943) (surety bond for benefit of citrus producers not property of estate); *In re Hathaway's Liquidation and Appraisers*, 1 B.R. 189 (Bankr. N.D. Ga. 1979) (surety bond posted in Georgia for auctioneer not property of estate; Bankruptcy Act case);  Cases that are cited for reaching a contrary result typically involve unique circumstances that are not present in the Debtors' cases.  *See, e.g., In re Celotex Corp.*, 128 B.R. 478 (Bankr. M.D.Fla. 1991) ("If at the time of filing the [bankruptcy] petition the appellate process has not been concluded, the debtor still has an interest in the supersedeas bond cognizable under Section 541 of the Bankruptcy Code subject to the interest being

Trustee would not benefit the estate by funding the payment of administrative expenses and the partial payment of investor claims and by reducing the Commission's significant claim. This is not a case in which the parties are seeking an order of the bankruptcy court *compelling* non-estate property to be brought into the estate. *See, e.g., In re Hathaway's Liquidation & Appraisers, Inc.*, 1 B.R. 189, 192 (Bankr. N.D. Ga. 1979) (in dispute over proceeds of surety bond, court noted that "it would not be proper to require the defendant in the instant case to remit to the estate of the debtor money owed to claimants under the bond").

This Court, in a decision that was ultimately affirmed by the Fourth Circuit in *Nationwide Mutual Fire Insurance Co. v. Eason*, 736 F.2d 130 (4th Cir. 1984), authorized a Chapter 7 trustee to administer proceeds of a surety bond when the administration was beneficial to the estate. In *Nationwide*, without deciding whether the proceeds of a surety bond that had been deposited into the bankruptcy court were property of the estate, this Court directed a Chapter 7 trustee to fashion a distribution plan for the bond proceeds.[14] *Cf.*

---

divested if the debtor is unsuccessful once the appellate process is completed."); *In re Legend Homes, Inc.*, 69 B.R. 797 (Bankr. D. Ariz. 1987) (cash contractor's bond is property of the estate); *In re Wegner Farms Co.*, 49 B.R. 440 (Bankr. N.D. Iowa 1985) (surety's action in canceling bond after filing of bankruptcy petition was an act to attempt to obtain possession of property of the estate in contravention of Section 362(a)(3) of the Bankruptcy Code). *Cf. Celotex Corp. v, Edwards*, 514 U.S. 300, 310 (1995) (Court noted that in a Chapter 11 reorganization, in contrast to Chapter 7 liquidation, the "related to" jurisdiction of bankruptcy court may extend to issuing an order pursuant to Section 105 of the Bankruptcy Code to preclude execution on supersedeas bond when settlement of insurance coverage disputes with all of the Debtor's insurance "may be linchpin of Debtor's formulation of a feasible plan.").

[14]   The Commission staff recognizes the unusual procedural posture in *Nationwide*. In that case, in order for Autry Milling Co. ("Autry") to become a licensed grain dealer in North Carolina, Autry was required to post a surety bond. Nationwide Mutual Fire Insurance Co. ("Nationwide") posted a bond as surety for Autry. The obligee of the bond was the State of North Carolina, and payment under the bond was triggered if Autry failed to comply with its duties as a grain dealer, which included the duty to pay for grain. When Autry filed a Chapter 11 bankruptcy petition, Autry had not paid various grain suppliers so Nationwide became obligated under the bond to pay the amount of the bond to the State of North Carolina for the benefit of the unpaid grain suppliers. Because the claims of unpaid suppliers exceeded the amount of the bond, Nationwide faced a risk of liability greater than the face amount of the bond. Thus, Nationwide filed an interpleader action in the bankruptcy court, naming as defendants the unpaid suppliers and the North Carolina Department of Agriculture, and deposited the face amount of the bond with the bankruptcy court. In its complaint, Nationwide asked to be

25

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 147 B.R. 317 (S.D.N.Y. 1992) (bankruptcy court did not have authority to approve settlement regarding bond proceeds that were not property of the estate, and motion to compel payment of bond must fail).

### 4.   The Payment Of The Bond Proceeds To The Trustee To Be Disbursed In Accordance With The Proposed Final Judgment Does Not Violate The Priority Scheme Of The Bankruptcy Code

Section 726 of the Bankruptcy Code sets forth a distribution scheme for a Chapter 7 bankruptcy case. By its terms, Section 726 applies to "property of the estate." Because the bond proceeds are not property of the estate, the distribution scheme set forth in Section 726 is not applicable, and, thus, is not violated. The assertions of Chittenden and Van Etten to the contrary are not well-founded.

The United States Bankruptcy Court for the Western District of North Carolina approved a distribution plan for defrauded investors similar to the one proposed in the Settlement Agreement in circumstances analogous to the instant case. In *In re Donald R. Moore d/b/a Business Opportunity Club, Inc.*, Ch. 7 Case No. 93-50512 (Bankr. W.D.N.C.), the Commission staff, after obtaining a judgment of disgorgement against several nondebtor corporate defendants and tracing monies obtained from defrauded investors to two Canadian

---

dismissed from the action and sought an action barring future suits against it. The bankruptcy court found that the interpleader action was appropriate and ordered that the complaint be served on all defendants and that the defendants file their responses or defenses to the complaint. When no responses were filed, the court entered a default judgment against all defendants, discharging all of the defendants' claims against Nationwide. The bankruptcy trustee, who had been appointed when the case was converted to a Chapter 7, moved to intervene in the interpleader action, alleging that the bond proceeds were property of the estate. Nationwide asserted that the bond proceeds should be returned to it since no defendants responded to Nationwide's complaint. The motion to intervene was allowed; Nationwide's request for the return of the bond proceeds was denied; and the court order the Chapter 7 trustee to fashion a distribution plan for the bond proceeds. No determination, however, was made on whether the bond proceeds were property of the estate. The bankruptcy court found that it would be inequitable to return the proceeds to Nationwide, a disinterested stakeholder, merely because the interpleader defendants did not respond to the complaint.

banks, reached an agreement with the trustee over the disposition of the money that had been frozen in the Canadian banks. The trustee petitioned the Bankruptcy Court to pierce the corporate veil of the nondebtor corporate entities, bringing them into Moore's bankruptcy case. As part of the agreement with the Commission staff, the trustee agreed to submit a compromise and settlement order to the Bankruptcy Court pursuant to which all funds recovered from the Canadian bank accounts would be earmarked for payment solely to investors, subject only to allowed administrative expense claims. The motions and orders in the Moore case are attached hereto as Exhibit C.

### 5. The Proposed Final Judgment Does Not Result In The District Court Determining The Allowability Of The Commission's Claim

The proposed Final Judgment sets the amount of disgorgement to which the Commission is entitled, but, contrary to Chittenden's assertion, does not address the allowability of the Commission's claim. The fixing of disgorgement or civil penalties is well within the jurisdiction of the District Court, notwithstanding the pending bankruptcy case. *See, e.g., In re Bilzerian*, 146 B.R. 871, 873 (Bankr. M.D. Fla. 1992).

The District Court is not making a ruling on the allowability of a Commission penalty or disgorgement claim. The Final Judgment, moreover, does not impose a civil penalty, and, if one is later imposed, the Final Judgment states that it will be paid pursuant to Section 726(a)(4) of the Bankruptcy Code.

The Commission has filed a proof of claim in the Debtors' bankruptcy case in accordance with Rule 3002 of the Federal Rules of Bankruptcy Procedure, which like other filed claims, is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). It is not incumbent for the Commission to "prove up" its filed claim. If Van Etten or Chittenden is concerned about the allowability of the Commission's claim, the Bankruptcy Code and Rules

27

provide the proper procedure for placing the matter before the Bankruptcy Court. A claim is not disallowed merely because it is a penalty claim.[15]

### 6.   The Trustee May Waive The Debtors' Attorney-Client Privilege

The Debtors' objection to the Trustee's agreement to waive the Debtors' attorney-client privilege is not grounds for denying the Trustee's Application. The United States Supreme Court has held that a trustee of a corporation in bankruptcy may waive the corporation's attorney-client privilege with respect to prebankruptcy communications. *CFTC v. Weintraub*, 471 U.S. 343 (1985). In *Weintraub*, like the instant case, the issue was raised in connection with a regulatory agency's investigation of fraudulent activity.

In light of the Commission's allegations of fraud, the Debtors' activities in raising millions of dollars from thousands of investors throughout the United States, the minimal assets reported in the Debtors' schedules, and the Trustee's duties to investigate the conduct of prior management, uncover assets and assert claims to maximize the value of the estate, this is precisely the type of case in which the Trustee should have control over the attorney-client privilege. While the Debtors' objection to the waiver is predictable, the objection lacks merit and should be overruled. *Id*

---

[15]   Section 502 of the Bankruptcy Code, which sets forth claims that are disallowable, does not list penalty claims, and, in fact, Section 726 of the Bankruptcy Code, which sets forth the order of distribution for claims, specifically includes claims for any "fine, penalty or forfeiture" in the distribution scheme. Pursuant to Section 726(a)(4), these claims are ranked fourth in distribution, behind priority claims, timely filed general unsecured claims, and tardily filed general unsecured claims, which distributional priority is recognized in Paragraph V of the Final Judgment.

## CONCLUSION

For the foregoing reason, the Commission staff supports the Trustee's Application and requests that the objections thereto be overruled.

Dated: April 19 1999
      Atlanta, Georgia

Respectfully submitted,

*William P. Hicks* By SRS

William P. Hicks
District Trial Counsel

OF COUNSEL:

*Susan R. Sherrill*
Susan R. Sherrill
Senior Bankruptcy Counsel
North Carolina Bar No. 9462

ATTORNEYS FOR:

U. S. SECURITIES AND EXCHANGE COMMISSION
Atlanta District Office
Suite 1000
3475 Lenox Road
Atlanta, GA 30326-1232
      Telephone:  (404) 842-7600
      Telecopier:  (404) 842-7666
      E-mail:  sherrills@sec.gov

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | | |
|---|---|---|
| In re: | ) | **CHAPTER 7** |
| | ) | **CASES** |
| | ) | |
| | ) | |
| **INTERNATIONAL HERITAGE** | ) | |
| **INCORPORATED,** | ) | **N0. 98-02674-5-ATS** |
| **and** | ) | |
| **INTERNATIONAL HERITAGE, INC.,** | ) | **NO. 98-02675-5-ATS** |
| | ) | |
| Debtors. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 19 day of April, 1999, a copy of the foregoing MEMORANDUM OF THE STAFF OF THE SECURITIES AND EXCHANGE COMMISSION IN SUPPORT OF APPLICATION OF TRUSTEE TO ENTER INTO STIPULATION AND CONSENT TO FINAL JUDGMENT OF PERMANENT INJUNCTION was sent by first class mail, postage prepaid, to all interested parties listed on Exhibit "A" attached hereto.

Susan R. Sherrill
Senior Bankruptcy Attorney
Office of Reorganization

Counsel for:

United States
SECURITIES AND EXCHANGE COMMISSION
Suite 1000
3475 Lenox Road, NE
Atlanta, GA 30326-1232
Telephone: (404) 842-7625

Exhibit "A"

Holmes P. Harden, Esquire
Maupin Taylor & Ellis, P.A.
Post Office Drawer 19764
Raleigh, North Carolina  27619

Terri L. Gardner, Esquire
Smith Debnam Narron & Myers, L.L.P.
Post Office Box 26268
Raleigh, North Carolina  27611

Marjorie K. Lynch
Bankruptcy Administrator
Century Station
Raleigh, North Carolina  27601-3039

Michael P. Flanagan, Esquire
Ward and Smith, P.A.
120 West Fire Road
Post Office Box 8088
Greenville, North Carolina  27835-8088

Brent E. Wood
P.O. Box 164
Raleigh, North Carolina  27602

Louis P. Richkind, Esquire
Counsel to Chittenden Bank
One Woodward Avenue, Suite 2400
Detroit, Michigan  48226

Kathryn N. Koonce, Esquire
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, North Carolina  27605-0096

Robert H. Frazer, Esquire
ACSTAR Insurance Company
233 Main Street
P.O. Box 2350
New Britain, Connecticut  06050-2350

N. Hunter Wyche, Jr., Esquire
Wyche & Story, RLLP
P.O. Drawer 1389
Raleigh, North Carolina 27602

Lloyd W. Gathings, II, Esquie
Robert W. Shore, Esquire
Gathings & Associates
P.O. Box 10545
Birmingham, Alabama 35202-0545

Ronald H. Garber, Esquire
Boxley, Bolton & Garber, LLP
Post Office Drawer 1429
Raleigh, North Carolina 27602

Lloyd T. Whitaker, President
Newleaf Corporation
2814 New Spring Road, Suite 330
Atlanta, Georgia 30339

Joel B. Piassick, Esquire
Kilpatrick & Stockton LLP
Suite 2800
1100 Peachtree Street, N.E.
Atlanta, Georgia 30309

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

MAR 16  1999

SECURITIES AND EXCHANGE COMMISSION,          :

                            Plaintiff,          :

                v.          :

INTERNATIONAL HERITAGE, INC.,          :
STANLEY H. VAN ETTEN,          :
CLAUDE W. SAVAGE,          :
LARRY G. SMITH and          :
INTERNATIONAL HERITAGE, INCORPORATED,          :
a Nevada corporation,          :

                Defendants.          :

                             :

CIVIL ACTION No.

1 98-CV-0803

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

It appears to Plaintiff, Securities and Exchange Commission ("Commission"), and it alleges that:

1.    The plaintiff brings this action to enjoin violations of the federal securities laws by International Heritage, Inc., ("IHI"), Stanley H. Van Etten ("Van Etten"), Claude W. Savage ("Savage"), Larry G. Smith ("Smith") and International Heritage, Incorporated, a Nevada corporation ("Heritage Incorporated").

This case involves a massive ongoing pyramid scheme which, to date, has raised at least $150 million from over 150,000 investors nationwide. The interests in the pyramid scheme are securities. No registration statement has been filed with the Commission in connection with the sales. The defendants have been selling the

EXHIBIT A

1

securities by means of misrepresentations and omissions of material fact necessary to make statements made not misleading.

In addition to selling interests in the pyramid scheme, between July 17, 1997 and November 1, 1997, the defendants sold $5 million in notes convertible into shares of IHI common stock. The defendants knowingly misrepresented IHI's financial condition to investors and concealed the fact that IHI was operating a pyramid scheme.

Finally, on March 6, 1998, IHI entered into a reverse merger with a publicly traded shell company, Kara International, Inc. ("Kara"). IHI became a majority owned subsidiary of Kara, and Kara's name was changed to International Heritage, Incorporated. The Form 8-K filed with the Commission by Heritage Incorporated made misrepresentations concerning the nature of IHI's business and concealing the fact that IHI was operating a pyramid scheme.

2.    Defendants IHI, Van Etten, Savage and Smith, by virtue of their conduct, directly and indirectly, have engaged, and unless enjoined will engage, in transactions, acts, practices and courses of business that have constituted and will constitute violations of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] promulgated thereunder. Heritage Incorporated, by virtue of its conduct, aided and abetted by Van Etten, has violated Sections

10(b) and 15(d)[15 U.S.C. 78j(b) and 78o(d)] of the Exchange Act and Rules 10b-5 and 15d-11[17 C.F.R. 240.10b-5 and 240.15d-11].

3.    Pursuant to authority granted by Sections 10(b), 15(d) and 23(a) of the Exchange Act [15 U.S.C. 78j(b) and 78w(a)], the Commission has promulgated Rules 10b-5 and 15d-11[17 C.F.R. 240.10b-5 and 240.15d-11], which rules were in effect at all times relevant herein and are now in effect.

## JURISDICTION AND VENUE

4.    The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. 77t(b) and 77t(d)], and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. 78u(d) and 78u(e)], to enjoin the defendants from engaging in the transactions, acts, practices and courses of business alleged in this complaint, and transactions, acts, practices and courses of business of similar purport and object, for appointment of a receiver, for disgorgement of illegally obtained funds and other equitable relief, and for civil money penalties.

5.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. 77t(b), 77t(d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. 78u(d), 78u(e) and 78aa].

6.    The defendants, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentality's of interstate commerce in connection with the

3

transactions, acts, practices and courses of business alleged in this complaint.

7.   Certain of the transactions, acts, practices and courses of business constituting violations of the Securities Act and the Exchange Act have occurred in the Northern District of Georgia. Specifically, investors have been solicited to purchase the investments in the Northern District of Georgia.

8.   The defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices and courses of business alleged in this complaint, and in transactions, acts, practices and courses of business of similar purport and object.

## DEFENDANTS

9.   **International Heritage, Inc.**, is a North Carolina corporation incorporated on April 28, 1995. IHI's principal offices are in Raleigh, North Carolina. On March 6, 1998, IHI entered into a reverse merger with Kara International Inc.("Kara"), a publicly traded shell company. Kara changed its name to International Heritage, Incorporated. IHI became a majority owned subsidiary of Heritage Incorporated.(formerly Kara).

10.   **Stanley H. Van Etten**, 35 years of age, is the founder, chairman of the board of directors, president and chief executive officer of IHI. As of March 6, 1998, Van Etten is the chairman

and CEO of Heritage Incorporated (formerly Kara), which now owns IHI.

11. **Claude W. Savage**, 58 years of age, is a founder and director of IHI. As of March 6, 1998, Savage is a director of Heritage Incorporated.

12. **Larry G. Smith**, 51 years of age, is a founder and director of IHI. As of March 6, 1998, Smith is a director of Heritage Incorporated.

13. **International Heritage, Incorporated, a Nevada corp.**, was known as Kara International Inc. ("Kara") until the March 6, 1998 reverse merger. Prior to the merger, Kara was a shell company with no active business. Heritage Incorporated files reports with the Commission pursuant to Section 15(d) of the Exchange Act. Heritage Incorporated common stock is traded in the over-the-counter market.

## THE IHI PYRAMID SCHEME

14. Beginning in April 1995, IHI, through Van Etten, Savage, Smith and others, has been soliciting individuals throughout the United States to invest in a pyramid scheme. To date, more than 154,500 investors have purchased interests in the program, which are described by IHI as business centers.

15. IHI, through Van Etten, Savage, Smith and others, provides written promotional materials, promotional meetings, videotapes, internet web pages and national conference calls which are used to solicit new investors.

5

16.   New investors are recruited by an investor who is already involved. The prospective investor is typically convinced to attend a promotional meeting where a presentation is made in a revival atmosphere.

17.   The IHI pyramid scheme investment is presented to prospective investors as a network marketing system. One slogan used is "All the Strengths of Corporate America with the Benefits of Network Marketing."

18.   Each IHI investor purchases one, three or seven interests, which are denoted "business centers."

19.   The investors are required to generate $250 from each center before that center is "certified." The $250 is generally generated by the investor signing a retail business agreement which includes the investor purchasing a product from IHI for $500, with the $250 serving as a down payment. The investor is also required to purchase an IHI sales kit for $100. The retail business agreement provides for payment by credit card, enabling the investor to leave the presentation with up to seven centers certified.

20.   IHI describes its program as an opportunity. Specifically, investors are told that they can earn up to $2,200 per week per business center. Although investors can nominally earn income by selling products, the sales pitch clearly implies that the significant income will come from enrolling new members, who will in turn enroll new members, in a typical pyramid

6

arrangement.    The vast majority of revenues to IHI, and the significant compensation to investors, comes from signing up new members.

21.    The IHI sales kit contains a book written by Van Etten and his father which explicitly discourages recruiting persons with experience in retail sales, because such persons might actually try to sell the products, and neglect their more important function, to bring in new members.  One passage reads:

> Now a **second** reason why traditional salespersons are a risky lot for you to deal with **also** becomes crystal clear. If you sponsor an individual with years of experience in direct sales, his natural inclination will be to sell, sell, sell the company's product, but odds are that he will do **that** at the expense of neglecting to build a sales organization beneath himself. As a result, his productivity for you will be of the flash-in-the-pan variety because as soon as he tires of selling the 'same old product' he will move on to what he sees as more interesting, if not greener, 'pastures.'Meanwhile, you will be left with a hole in your downline.... (emphasis in original)

22.    The IHI pyramid structure is bi-lateral in nature, in that each business center can have only two business centers directly below it in the pyramid.  The IHI compensation structure provides commissions to a center based on the revenue produced by the lesser producing center directly below the center being compensated.

23.    As a result of the compensation structure, if a retail sales oriented person occupies one of the centers, the compensation to the center above that person on the pyramid tends to be limited to what the retail sales person can personally sell.  In such a

situation, the power of geometric growth, which IHI preaches, will be lost. This structure provides an overwhelming incentive to recruit investors whose focus will be on perpetuating the pyramid.

## MISREPRESENTATIONS IN CONNECTION WITH THE PYRAMID SCHEME

24.  As in all pyramid schemes, the defendants do not disclose that at some point, the market becomes saturated, the supply of new members runs out, and the newest investors are unable to generate returns. Van Etten, Savage and Smith, and through them IHI, have been aware of this inevitable result throughout the scheme.

25.  IHI represents in its sales presentations that it is a model of corporate compliance, and is "regulatory right." In fact, in June 1997, IHI entered into an agreement to resolve an investigation by the State of North Carolina in which the state had concluded that IHI was violating the North Carolina Pyramid Schemes Act.  The agreement only restricted IHI's activities in North Carolina.  In October 1996, IHI voluntarily restricted its activities in the State of Florida after state inquiries.  In February 1998, IHI entered into an agreement with the state of Georgia limiting IHI's activities.

26.  IHI's true regulatory history is not disclosed to business center investors. Van Etten, Savage and Smith were aware of the regulatory actions when they occurred.

27.  The IHI materials describe Van Etten's career, including 13+ years as an "investment banker."  The materials fail to

8

disclose a past IRS lien on Van Etten's residence and his personal bankruptcy in 1990. The IHI materials also fail to disclose that Savage and Smith were involved in a prior failed multilevel marketing scheme.

## IHI'S SALE OF NOTES

28. Between August 5, 1997 and October 31, 1997, IHI, through Van Etten, Savage, Smith and others, raised $5 million by selling IHI notes convertible into IHI common stock, to approximately 95 persons in fourteen states.

29. The notes offering was conducted by WIN Capital Corp., a registered broker-dealer.

30. IHI, Van Etten, Savage and Smith authorized the use of the disclosure document used in connection with the notes offering. The disclosure document was denoted a "term sheet" and was dated July 17, 1997.

31. The term sheet disclosed that IHI had losses of approximately $1.9 million during the first four months of 1997. The term sheet did not disclose that by the time of the offering, IHI's losses for the year had increased to $7.6 million, and that IHI was facing a severe shortage of operating funds.

32. Van Etten, Savage and Smith were each aware of IHI's increased losses and shortage of operating funds at least as early as August 20, 1997. They nevertheless failed to update the term sheet, which was provided to prospective investors through October 1997.

33.   The term sheet represents that IHI pays commissions and
bonuses "derived solely from sales as opposed to headhunting or any
similar activities." In fact, IHI's compensation scheme is premised
primarily on headhunting for new members.   Van Etten, Savage and
Smith were aware of the workings of IHI's compensation scheme at
all times during the notes offering.

34.   The term sheet states that representatives "who sponsor
other   representatives   must   fulfill   supervisory   activities,
including ongoing communication and managerial supervision with the
IRSRs [representatives] within their Retail Sales Organization in
order to qualify for ongoing commissions and bonuses."   This
statement is misleading because IHI has no procedure to gather and
electronically   monitor   such   activities   and   this   purported
requirement is not enforced.

35.   The term sheet represents that IHI has "a prohibition
from   presenting   hypothetical   earnings   projections"   in   sales
presentations. In fact, IHI's presentation relies heavily on an
example using assumed earnings of $2,200 per week per center.   All
of the defendants were aware of this practice when they prepared
the term sheet.

## The Heritage Incorporated Form 8-K

36.   On or about March 10, 1998, Heritage Incorporated
(formerly Kara) filed a form 8-K with the Commission announcing
the reverse merger and describing the business of IHI, now a
majority owned subsidiary.

10

37.  The Form 8-K was signed by Van Etten and contains misrepresentations and omissions designed to conceal the fact that IHI, the only significant asset of Heritage Incorporated (formerly Kara) is operating a pyramid scheme.  The Form 8-K states that IHI's marketing program has been "structured to fit within the Amway safeguards applicable to direct selling companies" as anti-pyramiding safeguards.

38.  The Form 8-K includes, as one of those purported safeguards, a representation that "commissions and bonuses are derived solely from sales as opposed to headhunting, sponsoring or any similar activities."  This statement is a mischaracterization since IHI's structure compensates investors primarily based on recruitment of new investors. The overall representation that IHI is not operating a pyramid scheme is also false.

39.  In addition, the Form 8-K discloses the Commission's "informal investigation" and represents that "IHI has provided the SEC with all information requested to date."   Although most of the Commission's requests for information have been honored, on December 17, 1997, the Commission requested certain additional information and in January 1998 requested information as to the number of persons who had entered the IHI matrix via the "retail business agreement."  All of the requested information has not been provided.

11

40.    Van Etten, who signed the Form 8-K electronically) was aware of the true nature of IHI's business and was aware that the disclosures referenced above were misleading.

41.    The business center interests, the notes offered and sold by IHI, and shares of Heritage Incorporated common stock, are securities, as that term is defined in the Securites Act and the Exchange Act.    No registration statement has ever been filed with the Commission in connection with the sale of business center interests.

### COUNT I

### FRAUD

## Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. 77q(a)(1)]

42.    Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

43. From in or about April 1995 through the present, defendants IHI, Van Etten, Savage and Smith, singly and in concert, in the offer and sale of securities, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

44. The defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

45. By reason of the foregoing, defendants IHI, Van Etten, Savage and Smith have violated, and, unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. 77q(a)(1)].

## COUNT II

### FRAUD

Violations of Sections 17(a)(2) and 17(a)(3) of the Securities
Act [15 U.S.C. 77q(a)(2) and 77q(a)(3)]

46. Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

47. From in or about April 1995 through the present, defendants IHI, Van Etten, Savage and Smith, in the offer and sale of securities, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

13

a) obtained money and property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(b) engaged in transactions, practices and courses of business which operated and would operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

48. By reason of the foregoing, defendants IHI, Van Etten, Savage and Smith have violated, and, unless restrained and enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. 77q(a)(2) and (3)].

## COUNT III

### FRAUD

Violations of Section 10(b) of the Exchange Act
[15 U.S.C. 78j(b)] and Rule 10b-5 Thereunder
[17 C.F.R. 240.10b-5]

49. Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

50. From in or about April 1995 through the present, defendants IHI, Van Etten, Savage and Smith, and from at least March 6, 1998 through the present Heritage Incorporated, in connection with the purchase and sale of securities, by the use of

14

means and instrumentality's of interstate commerce and by use of the mails, directly and indirectly:

> (a) employed devices, schemes, and artifices to defraud;
>
> (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
>
> (c) engaged in acts, practices, and courses of business which operated as a fraud and deceit upon persons,

all as more particularly described above.

51.   Said defendants knowingly, intentionally and/or recklessly engaged in the above-described conduct.

52.   By reason of the foregoing, defendants IHI, Van Etten, Savage, Smith and Heritage Incorporated have violated, and, unless restrained and enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT IV

### UNREGISTERED OFFERING OF SECURITIES

#### Violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. 77e(a) and 77e(c)]

53.   Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

54.  No registration statement has been filed or is in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the business center interests and transactions in such interests described herein.

55.  From a date unknown, but since at least in or about April 1995 continuing through the present, defendants IHI, Van Etten, Savage and Smith, singly and in concert, have and, unless enjoined, will continue to:

   a.  make use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, described herein as business center interests, through the use or medium of a prospectus or otherwise;

   b.  carry securities or cause such securities, described herein as business center interests, to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale; and

   c.  make use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, the securities described herein as business center interests, without a registration statement having been filed with the Commission as to such securities.

16

These acts include, but are not limited to, the activities described in paragraphs 1 through 27 and 41 of this complaint.

56.  By reason of the foregoing, defendants IHI, Van Etten, Savage and Smith, directly and indirectly, singly and in concert, have violated, and unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and 77e(c)].

## COUNT V

### FILING OF FALSE REPORTS

#### Violations of Section 15(d) of the Exchange Act and Rule 15d-11 Thereunder

57.  Paragraphs 1 through 41 are hereby realleged and are incorporated herein by reference.

58.  Defendant Heritage Incorporated, aided and abetted by Van Etten, filed a Form 8-K with the Commission on or about March 10, 1998, which was false and misleading or failed to disclose material facts necessary to make the statement made not misleading, as described above in paragraphs 36 through 41.

59.  By reason of the foregoing, defendant Heritage Incorporated has violated, and defendant Van Etten has aided and abetted violations, and unless restrained and enjoined, Heritage Incorporated will continue to violate and Van Etten will continue to aid and abet violations of, Section 15(d) of the Exchange Act [15 U.S.C. 78o(d)] and Rule 15d-11 [17 C.F.R. 240.15d-11].

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Securities and Exchange Commission respectfully prays for:

### I.

Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the defendants committed the violations alleged herein.

### II.

A temporary restraining order, preliminary and permanent injunctions, restraining and enjoining defendants IHI, Van Etten, Savage and Smith, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of the order of injunction, and each of them, whether as principals or as aiders and abettors, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. 77e(a), 77e(c) and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] promulgated thereunder, and enjoining Heritage International and Van Etten from violating Sections 10(b) and 15(d) of the Exchange Act [15 U.S.C. 78j(b) and 78o(d)] and Rules 10b-5 and 15d-11 thereunder[ 17 C.F.R. 240.10b-5 and 240.15d-11].

### III.

An order requiring accountings by defendants IHI, Van Etten, Savage and Smith of the use of proceeds of the sales of the securities described in this Complaint and the disgorgement of all

ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws, and an order freezing the assets of the defendants, to preserve the _status quo_.

### IV.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. 78u(d)(3)] imposing civil penalties against defendants IHI, Van Etten, Savage, Smith and Heritage Incorporated.

### V.

An order appointing a receiver to marshal the assets of IHI and to take other actions necessary to achieve a just distribution of those assets.

### VI.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

DATED: ___ 1998

RESPECTFULLY SUBMITTED,

William P. Hicks
District Trial Counsel
Georgia Bar No. 351649
Telephone: (404) 542-7675

James E. Long
District Counsel
Georgia Bar No. 457100
Counsel for Plaintiff
Securities and Exchange Commission
3475 Lenox Road, N.E., Suite 1000
Atlanta, Georgia 30326-1232

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 0 3 1998

LUTHER D. THOMAS, Clerk
By: _____
        Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

      v.

INTERNATIONAL HERITAGE, INC.,
STANLEY H. VAN ETTEN, CLAUD W.
SAVAGE, LARRY G. SMITH,
INTERNATIONAL HERITAGE,
INCORPORATED, a Nevada corporation,

         Defendants.

CIVIL ACTION

NO. 1:98-CV-803-RWS

### MEMORANDUM OPINION AND ORDER

Pursuant to Sections 20 (b) and 20 (d) of the Securities Act and Sections 21 (d) and 21 (e) of the Exchange Act, the Securities and Exchange Commission brought this action for injunctive and other equitable relief, alleging various violations of the securities laws. This case is before the Court on the Commission's Motion for Preliminary Injunction. After conducting a hearing and reviewing the entire record, this Court enters the following Order.

### I. FINDINGS OF FACT

On March 16, 1998, the Commission sought and obtained a temporary restraining order against Defendants. The Commission has alleged Defendants engaged in the sale of securities without filing a registration statement with the Commission, Defendants made misrepresentations and material omissions in connection with the sale of securities, and Defendants knowingly misrepresented International Heritage's financial condition and concealed the fact that International Heritage [hereinafter referred to as "IHI"] was operating a pyramid scheme. The

Commission also alleged the Form 8-K filed with the Commission by IHI contained misrepresentations concerning the nature of IHI's business and concealed the fact that IHI was operating a pyramid scheme. The Commission requests that the Court enter a preliminary injunction enjoining all Defendants, their officers, agents, and employees from violating Sections 5 (a), 5 (c) and 17 (a) of the Securities Act and Section 10 (b) of the Exchange Act and Rule 10b-5. The Commission also requests that the Court enjoin IHI and Defendant Van Etten from violating Sections 10 (b) and 15 (d) of the Exchange Act and Rules 10b-5 and 15d-11.

IHI contends it is a multi-level marketing firm engaged in the sale of products such as jewelry, recreational equipment and collectible items. IHI was founded by Claude W. Savage, Larry G. Smith and Stanley H. Van Etten in April of 1995. Defendant Van Etten is Chairman of the Board of Directors, President and Chief Executive Officer of IHI.[1] Defendants Claude Savage and Larry G. Smith are directors of IHI.[2] Defendants Savage and Smith were previously associated with Gold Unlimited, a multi-level marketing firm which had gone out of business.

Defendant Van Etten presently owns Mayflower Capital, a broker dealer licensed by the National Association of Securities Dealers and the Securities Exchange Commission. Defendant Van Etten is also a shareholder and manager of Mayflower Venture Capital Fund, a one million dollar venture capital fund used to invest in start-up companies.

---

[1] On March 6, 1998, IHI entered into a reverse merger with Kara International Inc., and on March 9, 1998, Defendant Van Etten became Chairman of the Board, President and Chief Executive Officer of International Heritage Incorporated, formerly Kara International Inc.

[2] Both Defendants Savage and Smith are also presently directors of Heritage Incorporated.

2

Between July 17, 1997 and October 31, 1997, IHI notes were sold in a non-public offering. In connection with the sale of these notes, IHI disclosed to investors that it had suffered increased losses between May 1, 1997 and August 20, 1997.

IHI started with a small number of independent retail sales representatives. The initial independent sales representatives earned commissions by selling products through their own retail sales organizations.[3] Prior to March 18, 1998, an individual could join IHI and sell products at retail price for a profit, purchase products for personal use or earn out products by applying commissions earned from sales toward the purchase of a product.[4] The earn-out option required execution of a Retail Business Agreement, or "RBA." An RBA was always initially filled out as an earn-out. Regardless of the option chosen, all sales representatives were required to purchase a Retail Business Career Kit for $100. Under the earn-out option, a participant executed a RBA and paid $250 toward the purchase of a product.[5] As stated in the IHI manual, the RBA had a cash value of $250.

One of IHI's slogan's was, "Open ... Create ... Certify ... Duplicate." With the execution of an RBA, the representative earned 200 points, or what the company referred to as "Retail Sales Business Volume." Executing a RBA would effectively open a "Retail Business Center." A business center was a position in IHI's computer tracking system for the recording of Retail Sales

---

[3] All representatives were required to submit an application.

[4] Although IHI constantly updates its marketing materials, the Retail Business Career Kit received by the Commission in September of 1997 contained materials with the latest revision date of October, 1996.

[5] However, it was possible for an IHI participant to enroll and make no payment other than $100 for the Career Kit.

Business Volume or RSBV.[6]   Through March 8, 1998, approximately 90% of the business

centers were certified through an RBA. A business center also served as a necessary component

in the creation of a business organization; a business organization consisted of a group of sales

representatives. Participants had the option of opening one, three or seven business centers.[7] The

incentive for multiple centers was to sponsor more business organizations. A participant could

not earn more than $2200 per week with a single business center. Therefore, if a participant

wanted more money, he had to open more business centers.

IHI conducted regular regional training events for sales representatives. To attract new

representatives, present representatives would conduct weekly opportunity meetings outlining the

program. Representatives would explain IHI's bilateral system as requiring sales representatives

to develop a business organization on the left and right in order to earn money. This process was

referred to as "duplication." Under IHI's old program, the only way to become a sales

representative was by sponsorship through another sales representative. No more than two sales

representatives could be sponsored directly under one business center.

The establishment of business centers and the accumulation of RSBV were also

mechanisms for calculating override commissions. Override commissions were commissions on

sales made by other sales representatives within a business organization. In order to earn override

---

[6] With the buy-out option, the representative had 60 days to pay IHI the balance of the cost of the product ordered with the execution of the Retail Business Agreement. With the cash-out option the representative had 60 days to receive his $250 deposit back. However, the cash-out option was not available if the representative had earned 1200 Retail Sales Business Volume.

[7] The cash-out option was not available to representatives who had purchased three or seven business centers. The cost of seven centers was $1850; this payment could be made with a credit card.

4

commissions, a sales representative was required to certify his retail business center by accumulating a minimum of 200 RSBV.   Under the earn-out option, initial certification was accomplished by payment of $250 toward the purchase of a product order. With the $250 payment and product order, 200 RSBV was credited to the business center and to each business center above it in the retail sales organization, regardless of whether the product was ever actually purchased or "earned out."  If the product was earned in its entirety, the product was delivered to the representative.  Representatives did not have the option of receiving a commission check in lieu of the product ordered upon execution of the RBA.

Commissions were earned according to preset RSBV achievement levels.  Once a sales representative had accumulated a total of at least 1,200 RSBV on each side of his sales organization, the representative would receive a $500 product or commission.  This process resulted in Level One certification.  For Level Two certification, a representative had to accumulate 2400 RSBV on each side; for Level Three, 3600 RSBV on each side.  Each additional level of certification entitled the representative to an additional $500 product or commission. After Level Three certification was accomplished, a representative's RSBV total was cleared. However, that representative would receive a "free" business center which could be used to replace a business center in the representative's business organization.  This free business was referred to as a Development Certificate.  Also, after Level Three certification, a representative could earn a $700 commission bonus if two representatives, one on each side of his organization, earned 3600 RSBV within two commission periods.   A sales representative could not earn override commissions unless RSBV was migrating upward.  To facilitate migration of RSBV, IHI also required representatives who had achieved the first level of earnings to recertify their business

5

centers every 13 weeks. Recertification was accomplished by purchasing products or executing more RBA's.[8] If a representative sponsored a new representative who certified a business center, each business center above the new representative would receive 200 RSBV.

Although IHI contends that it is a product driven company, the facts demonstrate that, across the board, selling products was not IHI's primary operation. As of April, 1997, there were 192 IHI representatives in the Macon, Georgia area. All 192 representatives were on IHI's product ship list for that area. However, only three individuals listed on the shipping list were not listed as IHI representatives. Testimony from the receiver's accountant indicated that approximately 90% of the total sales revenue of IHI comes from establishing or recertifying business centers. Participants testified that at IHI meetings there was little discussion of products and prospective participants were told they could earn money faster through recruitment. They understood that in order to make money in IHI they only had to recruit two people. The witnesses understood that their sales organization would grow through duplication. The fortunes of IHI investors were inextricably tied to the success of the efforts of IHI promoters. Furthermore, of the 569,440 total product orders since IHI's inception, 288,418 orders have not been filled.

As to the old plan, IHI's regulatory history is not unblemished. In the spring of 1997, North Carolina's Attorney General's office began an investigation of IHI operations. On June 3, 1997, Defendants entered into an agreement with the State of North Carolina requiring 70% of all North Carolina sales revenue to be retail sales to persons not connected to IHI or its participants.

---

[8] A representative could have a maximum of three outstanding RBA's per business center.

In March of 1997, Georgia's Attorney General's office began an investigation of IHI operations. On February 4, 1998, the Georgia Fulton County Superior Court entered an order of assurance of voluntary compliance. In this order, Defendants agreed to a requirement of 50% non-participant sales prior to payment of any commissions or dividends. IHI is presently in compliance with both agreements.

While Defendants contend the new plan does not involve the sale of securities, the new plan contains some of the same aspects of the old plan. Under the new plan, a retail business center is "qualified" rather than "certified;" although the cost and RSBV requirements are not the same, the process is the same. Requalification is still required every 13 weeks, and requalification is necessary to earn override commissions. However, a representative must also select additional bonus products to be earned out to requalify a business center. To broaden IHI's program, another compensation plan was developed, the Flex-Level Compensation Plan. This plan uses PV or personal volume rather than RSBV to calculate earnings and assign value to products. Although the alternative compensation plan entitles a representative to "Personal Volume Rebate Commission[s]," this term is not defined in the manual. Retail Sales Organizations (RSO's) still exist and sponsorship is still the only method of developing RSO's. In both plans, representatives can earn development bonuses and development certificates by similar methods described above. The new plan does not include the RBA or a $250 deposit.

## II. CONCLUSIONS OF LAW

The issue before the Court is whether Defendants have violated federal securities laws warranting an exercise of this Court's equitable jurisdiction. Before the Court may issue a preliminary injunction, the Commission must demonstrate by a preponderance of the evidence that

7

R.W.STORY-DIST.JUDGE

there is reasonable likelihood that Defendants are engaged or about to engage in practices that violate federal securities laws. S.E.C. v. First Financial Group of Texas, 645 F.2d 429 (5th Cir. Unit A May 1981).[9] The Commission may make such a showing by submitting proof of past substantive violations that indicate a reasonable likelihood of future substantive violations. Id. In determining whether to issue an injunction, the Court must consider the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982). With such an inquiry, the Court is required to view all evidence in a light most favorable to the Commission, and the Commission is entitled to all reasonable inferences. S.E.C. v. Blatt, 583 F.2d 1325 (5th Cir. 1978).

Before proceeding on the merits of the Commission's requests for relief, the Court must first determine whether Defendants have engaged in the offer and sale of "securities" under the terms of the Securities Act and the Exchange Act. The Commission argues the "security" involved in the case at bar can be characterized as an "investment contract."[10] As stated by the

---

[9]   S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1324 n.7 (Eleventh Circuit bound by Fifth Circuit decisions handed down prior to close of business on September 30, 1981 unless and until the Eleventh Circuit speaks en banc to the issue presented).

[10]   According to 15 U.S.C. § 78c (a) (10) of the Exchange Act, the term "security" means "any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . ., or any . . . transferable share, investment contract . . .; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase any of the foregoing[.]" The Securities Act contains a similar definition found at 15 U.S.C. § 77b (1). The Supreme Court has held that the two definitions are virtually identical. Tcherepnin v. Knight, 389 U.S. 332, 335-36, 88 S.Ct. 548,

Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed.

1244 (1946), "An investment contract for purposes of the Securities Act means a contract,

transaction or scheme whereby a person invests his money in a common enterprise and is led to

expect profits solely from the efforts of the promoter or a third party." See also Tcherepin et al.

v. Knight et al., 389 U.S. 332, 338, 88 S.Ct. 548, 554,19 L.E.2d 564 (1967) (the test for an

investment contract under the Exchange Act is whether the scheme involves an investment of

money in a common enterprise with profits to come solely from the efforts of others) and United

Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.E.2d 621 (1975).

The Commission contends Defendants' offer and sale of business center interests are

investment contracts and thus securities.  While it is clear participants in IHI's old program made

an investment of money in a common enterprise,[11] Defendants argue the third prong of the Howey

test has not been met. In S.E.C. v. Koscot-Interplanetary Inc., the Eleventh Circuit Court of

Appeals expressly adopted the view of the Ninth Circuit and held an investment contract exists

when "the efforts made by those other than the investor are the undeniably significant ones, those

essential managerial efforts which affect the failure or success of the enterprise."  497 F.2d 473,

478 - 479 (5th Cir. 1974). See also Eberhardt v. Waters, 901 F.2d 1578 ( 11th Cir. 1990) (where

---

552-53, 10 L.E.2d 564 (1967). See also United American Bank of Nashville, v. Gunter et al., 620
F.2d 1108, 1114 (5th Cir. July 1980).

[11] In S.E.C. v. Koscot Interplanetary Inc. 497 F.2d 473 (5th Cir. 1974), the Court of
Appeals held "the requisite commonality [of an enterprise] is evidenced by the fact that the
fortunes of all investors are inextricably tied to the efficacy of the [business organization's]
meetings and guidelines on recruiting prospects and consummating a sale [] while the fact that an
investor's return is independent of that of other investors in the operation is not decisive." The
Court of Appeals' analysis of the second prong focused on the uniformity of impact of the
promoter's efforts.

third prong of <u>Howey</u> was satisfied even where profits were not derived "solely" from the efforts

of others but were also derived from insubstantial efforts of the investor).  In the case at bar,

upper-level management of IHI implemented widespread promotional programs which included

live conferences, telephone conferences, meetings, and training events.  The Retail Sales Career

Kit purchased by each representative included brochures, video presentations, audio cassettes, and

flip chart presentations which explained IHI's marketing program and were used to advertise

IHI's program to prospective participants. An IHI representative only had to find a listening ear,

while IHI promoters retained immediate control over the managerial conduct of the enterprise.

Representatives only had to find two recruits.  Representatives testified that they understood their

sales organization would grow simply by duplication.  After finding two recruits, investors would

profit by the geometric progression of the process of recruitment, and the success of a

representative's investment was inextricably tied to the efforts of IHI promoters.  Therefore, this

Court concludes the IHI program involved the offer and sale of securities.

Section 5 of the Securities Act prohibits the sale of securities by the use of

instrumentalities of interstate commerce without the filing of a registration statement.[12]  To

establish a violation of this provision of the Act, the Commission must make a prima facie

showing that no registration statement was in effect as to the securities, that Defendants sold or

---

[12] 15 U.S.C. § 77e (a) provides, "Unless a registration statement is in effect as to a
security, it shall be unlawful for any person, directly or indirectly to make use of any means or
instruments of transportation or communication in interstate commerce or of the mails to sell such
security through the use or medium of any prospectus or otherwise; or to carry or cause to be
carried through the mails or in interstate commerce, by any means or instruments of
transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. §
77e (c) is the provision that requires filing of a registration statement when securities are offered
and sold.

offered to sell the securities, and that interstate transportation or communication and mails were used. S.E.C. v. Continental Tobacco Co. of South Carolina, 463 F.2d 137 (5th Cir. 1972).

The Commission contends Defendants have been selling securities since 1995 by using the mails, traveling, and other media including telephone conference calls without filing a registration statement. The Commission submitted undisputed evidence that Defendants used the mails to send promotional sales materials to investors and used instrumentalities of interstate commerce such as telephones and travel to give sales meetings. The Commission also demonstrated that the use of instrumentalities of interstate commerce was for the purpose of the sale and offer of securities. The sale of business centers by the use of the RBA constitutes the sale of securities and Defendants failed to file a registration statement as to these securities. Therefore, Defendants violated Sections 5 (a) and (c) of the Securities Act.

Several provisions of the Securities Act and the Exchange Act prohibit the use of any manipulative device in the sale of securities.[13] To prove violations under Sections 10 (b), Rule

---

[13]  15 U.S.C. § 78j (b) provides,
>It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

>Rule 10b-5 is found at 17 C.F.R. § 240.10b-5. This regulation provides,
>>It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>>(a) To employ any device, scheme, or artifice to

10b-5 and 17 (a) (1), the Commission must establish that Defendants acted with scienter. Ernst
& Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976); Aaron v. S.E.C., 446 U.S. 680, 100
S.Ct. 1945, 64 L.E.2d 611 (1980). The Commission may demonstrate the existence of scienter
by showing that Defendants engaged in knowing or intentional misconduct. Aaron, 446 U.S. at
695, 100 S.Ct. at 1955. In the Eleventh Circuit, scienter may also be established by showing that
the defendant's conduct exhibited severe recklessness. Carriba Air, 681 F.2d at 1324.

Defendants' old compensation plan which included the use of the RBA is comparable to
the program found in Webster v. Omnitrition International, Inc., 79 F. 3d 776 (9th Cir. 1996).
Defendants exhibited at least severe recklessness in marketing and implementing the old program.
Therefore, this Court concludes that Defendants violated Section 10 (b) of the Exchange Act,
Rule 10b-5, and Section 17 (a)(1) of the Securities Act.

---

defraud,

(b) To make any untrue statement of material fact or
to omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as a fraud
or deceit upon any person, in connection with the
purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 17 (a) of the Securities Act is found at 15 U.S.C. § 77q (a) (1), which provides,
"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or
instruments of transportation or communication in interstate commerce or by the use of the mails,
directly or indirectly to employ any device, scheme, or artifice to defraud."

12

However, this Court declines to conclude that Defendants IHI and Stanley Van Etten violated Section 15 (d) of the Exchange Act or Rule 15d-11. At this point, there is an insufficient basis in the evidence to support a violation of either provision.

Defendants contend IHI's program no longer includes the use of the Retail Business Agreement and prospective injunctive relief is not required. However, the new plan retains elements from the old plan (e.g., certification and recertification) which cause the Court concern about future violations. The nature of Defendants' past violations demonstrate the reasonable likelihood of future violations; therefore, preliminary injunctive relief is warranted. See Continental Tobacco, 463 F2d. at 162. See also S.E.C. v. Radio Hill Mines Co., Ltd., 479 F2d 4 (2nd Cir. 1973) (where court designed additional reporting requirements to insure compliance with a preliminary injunction against violations of the securities laws).

For the aforementioned reasons, the Commission's Motion for Preliminary Injunction is **GRANTED**.

## **PRELIMINARY INJUNCTION**

The Commission having demonstrated a reasonable likelihood of future violations by the defendants, it is hereby **ORDERED** that:

### 1.

Until further order of this Court, defendant International Heritage, Inc. ("IHI"), its officers (as officers and in their individual capacities), agents, servants, employees, attorneys, and those persons in active concert or participation with them be, and they hereby are, restrained from directly or indirectly:

13

A.   making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell any securities through the use of any prospectus or otherwise, unless and until a registration statement is in effect with the Commission as to such securities;

B.   carrying securities or causing them to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale, unless and until a registration statement is in effect with the Commission as to such securities;

C.   making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, any interest in securities, unless and until a registration statement is filed with the Commission as to such security, or while a registration statement filed with the Commission as to such security is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act, 15 U.S.C. 77h, in violation of Sections (a) and 5 (c) of the Securities Act, 15 U.S.C. 77e(a) and 77e(c). Provided, however, that nothing in the foregoing portion of the preliminary injunction shall apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act, 15 U.S.C. 77e.

**2.**

Until further order of this Court, defendant IHI, its officers (as officers and in their individual capacities), agents, servants, employees, attorneys and those persons in active concert or participation with them, in connection with the purchase or sale or in the offer or sale of securities, by use of any means or instrumentality's of interstate commerce or any means or instruments of transportation or communication in interstate commerce, or by the mails or any facility of any national securities exchange, be, and they hereby are, restrained from directly or indirectly:

(1)   employing any device, scheme or artifice to defraud;

(2)   engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person;

(3)   obtaining money or property by means of any untrue statement of a material fact, or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(4)   making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, thereunder.

**3.**

Until further order of this Court, defendant International Heritage Incorporated, a Nevada corporation, its officers (as officers and in their individual capacities), agents, servants, employees, attorneys and those persons in active concert or participation with them, be and hereby are restrained from directly or indirectly filing reports with the Commission, on Form 8-K or otherwise, which are false and misleading or fail to disclose material facts necessary to make the statements made not misleading, in violation of Section 15(d) of the Exchange Act, 15 U.S.C. 780(d), and Rule 15d-11, 17 C.F.R. 240.15d-11.

**4.**

Pending further order of this Court, defendant IHI, its officers (as officers and in their individual capacities), agents employees, servants, attorneys, and all persons in active concert or participation with them, and each of them are restrained and enjoined from destroying, transferring or otherwise rendering illegible all books, records, papers, ledgers, accounts, statements and other documents employed in any of such defendants' businesses, which reflect the business activities of any of the defendants, or which reflect the transactions described in the Commission's Complaint.

**5.**

**IT IS FURTHER ORDERED** that Lloyd Whittaker is hereby appointed Monitor for IHI. The Monitor will periodically review the activities of IHI to assure IHI's compliance with this order and the federal securities laws. This review will be performed within thirty (30) days of this order and not less than quarterly thereafter. The Monitor will have full access to the offices, records and officers and employees of IHI except any information protected by an

applicable privilege. IHI will provide quarterly financial information to the Monitor in the form and as otherwise directed by the Monitor, and will submit any changes in its compensation plan to the Monitor for approval before implementing such changes. IHI will provide the Monitor with the names, addresses and phone numbers of any new representatives who are enrolled by IHI. IHI will also make available for review by the Monitor order forms for all products and services sold by IHI, which shall contain the name and address of the purchaser, the items purchased and the purchase price. IHI shall not accept any orders which do not contain this information. The Monitor will periodically contact a sampling of such representatives and customers to determine if the IHI program is being presented in a way which is inconsistent with this order. The Monitor will report to the Court any conduct inconsistent with this Order. IHI shall be responsible for, and shall pay, the reasonable fees and costs incurred by the Monitor, including, but not limited to, professional fees.

**6.**

IT IS FURTHER ORDERED that IHI will post a bond in the amount of $5 million until further order of this Court, to ensure that at least that amount is available to satisfy any amounts that may be ordered paid by IHI in this proceeding. The specific conditions of said bond shall be set out in a separate order, which conditions are incorporated herein by reference.

**7.**

IT IS FURTHER ORDERED that defendants Stanley H. Van Etten, Claude W. Savage and Larry G. Smith shall not leave their positions with IHI without prior leave of the Court.

17

**8.**

**IT IS FURTHER ORDERED** that IHI shall not transfer its sales operation or representative networks to any other entity without prior leave of the Court.

**9.**

**IT IS FURTHER ORDERED** that defendant Van Etten's monetary compensation as set out in the Employment Agreement between Van Etten and International Heritage, Inc. will be reduced by fifty percent (50%) until further order of the Court.

**10.**

IHI shall develop and submit to the Monitor a new compensation and marketing plan consistent with the terms of this order. Any future amendments to the plan shall also be submitted to the Monitor. The Monitor shall submit the plans to Plaintiff and the Court for review. The Monitor will review any plans submitted by IHI to assure compliance with this order and shall approve a plan only after determining that the plan complies with the terms of this Order and any applicable laws. After approval by the Monitor of a plan or amendment, such plan or amendment can be implemented by IHI. IHI will not be required to await approval by the Court of such plans. No new sales representatives shall be approved by IHI until the new composition and marketing plan is approved by the Monitor. Notwithstanding the foregoing, the Court may, upon motion of any party or *sua sponte* issue a show cause order requiring IHI to appear before the Court and show that the plans are in compliance with the terms of this Order. In addition to seeking approval of the Monitor to the new plans, IHI may, before implementation of such plans, request that the Court review any new or amended plans to assure compliance with the terms of this Order.

18

## 11.

**IT IS FURTHER ORDERED** that IHI shall not permit any further use of the Retail Business Agreement, or any similar agreement which permits, as an aspect or part of the business operations, compensation plan, or marketing plan of IHI, sales representatives of IHI to make partial payments toward the purchase of a product or service in order to receive override commissions on the sale of products or services. However, IHI may continue to require a prospective sale representative to purchase a sales kit at a cost of $100.00, which costs shall be consistent with IHI's costs to provide the kit.

## 12.

**IT IS FURTHER ORDERED** that IHI shall not require new or current sales representatives of IHI to certify or recertify, through payment by the sales representative to IHI, in order to receive override commissions.

## 13.

**IT IS FURTHER ORDERED** that IHI shall not accept payment for products or services without either delivering the product or services or making appropriate arrangements with a carrier, manufacturer, or supplier of that product or service to deliver the product or service to the purchaser of that product or service.

## 14.

**IT IS FURTHER ORDERED** that IHI will give notice of this Order and its terms to all representatives within thirty (30) days, and will supply proof of this effort to the Monitor. IHI will provide notice of its Compensation Plan to all representatives within thirty (30) days of its approval, and will supply proof of this effort to the Monitor.

19

### 15.

The Court finds that the Receiver, Lloyd Whittaker, has performed his duties in full and complete compliance with the terms of this Court's previous orders. The Receiver shall be relieved of his responsibilities upon the posting of the $5 million bond required to be posted by IHI under this Order. Upon the posting of said bond, the Receiver's bond which has been filed with the Clerk of Court shall be discharged. Prior to the discharge of the Receiver, the Receiver is authorized to transfer the sum of $120,000.00 from IHI to the Trust Account of Kilpatrick Stockton, LLP, the Receiver's legal counsel, to be held for payment of the professional fees and expenses incurred by the Receiver, the Receiver's legal counsel, and the Receiver's financial consultant, in connection with the Receiver's duties and obligations during his tenure. However, such professional fees and expenses shall be paid only upon submission of appropriate applications for fees and expenses to the Court and upon the Court's approval of same. To the extent that the amount of the Court approved professional fees and expenses are less than the amount reserved in the Trust Account, then the excess would be returned forthwith to IHI. To the extent that the amount of the Court approved professional fees and expenses are more than the amount reserved in the Trust Account, IHI shall be ordered forthwith to remit the deficiency to the Receiver.

### 16.

IT IS FURTHER ORDERED that, upon the posting of the $5 million bond by IHI, the officers and directors of IHI will have the authority to resume, and may resume, their responsibilities as officers and directors of IHI in accordance with the terms of this Order.

20

## 17.

**IT IS FURTHER ORDERED** that the orders entered by the Court in this cause on March 16, 1998 and as subsequently modified on March 17, 1998, shall be vacated and modified in their entirety to conform with the terms of this Order upon the posting of the $5 million bond by IHI.

## 18.

**IT IS FURTHER ORDERED** that this Order shall not and does not constitute a securities or investment related permanent or temporary injunction for purposes of any collateral effects or reporting requirements under state securities laws or self-regulatory organization rules, nor shall the existence of this Order restrict, limit, prohibit or disqualify the Defendants, or any affiliate of the Defendants, in any manner from (a) engaging in any lawful activity or practice pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisers Act of 1940, or the Commodity Exchange Act, and/or any rules or regulations promulgated thereunder, and/or any state securities and commodities laws (including with limitation, participating in offerings or availing themselves of exemptions including the Uniform Limited Offering Exemption, as and to the extent now or hereafter adopted ), or (b) acting as an affiliated person of any underwriter, broker, dealer, investment adviser, investment company, bank, insurance company, or other entity or person under any applicable federal or state insurance, securities, banking or commodities laws.

21

**SO ORDERED** this $\underline{\phantom{3rd}}$ day of April, 1998.

RICHARD W. STORY
United States District Judge

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF NORTH CAROLINA

STATESVILLE DIVISION

IN RE:                              )
                                    )
DONALD R. MOORE d/b/a               )
BUSINESS OPPORTUNITY CLUB, INC.     )     CASE NO. 93-50512
                                    )     CHAPTER  7
            DEBTOR.                 )
_____)

## MOTION TO COMPROMISE AND SETTLE CLAIMS

Robert H. Gourley, Sr., Trustee, by and through counsel, hereby moves the Court and alleges as follows:

1.    On September 24, 1993, Donald R. Moore filed a voluntary petition under Chapter 7 of Title 11, and Robert H. Gourley, Sr. thereafter was duly appointed and qualified as the Chapter 7 Trustee.

2.    Thereafter, on October 14, 1994, Robert H. Gourley, Sr., filed a Complaint with the Clerk of the United States Bankruptcy Court for the Western District of North Carolina, Adversary No. 94-5313, alleging, inter alia, that the Court should pierce the corporate veils of the entities listed therein; to wit, Pioneer Development Bank, Inc., Pioneer Development Bank, Ltd., Pioneer International Holdings, Ltd., Fidelity Assurance Guaranty, Inc., International Society of Investors, Business Opportunity Club, Inc., Business Opportunities, Inc., and The International Mortgage Club. On November 23, 1994, the Court granted the relief sought by Robert H. Gourley, Sr., and entered an Order accordingly (the "Order").

EXHIBIT C

3.    Based on the Order, the Debtor was doing business as all the entities listed in Paragraph 2 hereinabove as of the date of the filing of his bankruptcy petition.  As of the petition date, the Royal Canadian Trust Company in Calgary, Alberta, Canada had on deposit approximately U.S. $250,000.00 in the name of "Pioneer International Holdings, Ltd."

4.    The Alberta Securities Commission Agency, the legal authority in the province of Alberta for handling alleged securities violations, has obtained an administrative freeze order prohibiting the transfer of the funds on deposit.  The Alberta Securities Commission Agency, however, has agreed to release the funds to the Trustee on the condition that all "Canadian Investors" of any entity listed in Paragraph 2 hereinabove are first fully compensated from the proceeds of the fund.  Based on the books and records obtained by the Trustee, this amounts to approximately U.S. $26,000.00.

5.    Trustee also has been able to determine that the funds on deposit in the Royal Canadian Trust Company are "proceeds" from investors who purchased securities from Pioneer Development Bank, Inc. and/or Pioneer Development Bank, Ltd.

6.    Based on the foregoing, the Trustee recommends that he be authorized to settle the various claims and actions as follows:

(a)    That he be authorized to pay all "Canadian investors" in full so that he will be able to obtain the funds presently held in the bank account maintained at the Royal Canadian Trust Company;

(b)    That once the Trustee has obtained possession of the remaining funds in the Royal Canadian Trust Company, the funds be

"earmarked" for payment only to investors of the funds, subject to allowed administrative expense claims; and

        (c)   The Trustee be authorized to amend the schedules in this case to include the claims of all known and suspected non-Canadian investors.

     7.   For purposes of this Motion, the term "investors" means those persons who paid money to the Debtor or any of the entities listed in paragraph 2 hereinabove for the purpose of purchasing an alleged security or certificate of deposit.

     8.   In support of this Motion, the Trustee believes that it will take excessive time and cost to obtain the funds in the Royal Canadian Trust Company if this Motion is not approved and that the "earmarking" of the remaining funds is fair and equitable given the facts of this matter.

     WHEREFORE, the Trustee prays the Court as follows:

     1.   That the Trustee be, and hereby is, authorized to effect a settlement of the subject claims in accordance with the recommendations in paragraph 6 hereinabove; and

     2.   For such other and further relief as the Court may deem just and proper.

     This the _13TH_ day of April, 1995.

                   . HOLCOMB & PETTIT, P.A.
                   Attorneys for Trustee

                   By: _____
                   William Walt Pettit
                   State Bar No.  9407

                   By: _____
                   Donald H. Caldwell, Jr.
                   State Bar No.  15489

Suite 2170
227 West Trade Street
Charlotte, NC 28202
Telephone: (704) 333-5800
Telecopier: (704) 377-1045

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF NORTH CAROLINA

STATESVILLE DIVISION

IN RE:                                )
                                      )
DONALD R. MOORE d/b/a                 )
BUSINESS OPPORTUNITY CLUB, INC.       )    CASE NO. 93-50512
                                      )    CHAPTER  7
          DEBTOR.                     )
                                      )
_____)

## NOTICE OF MOTION TO COMPROMISE AND SETTLE CLAIMS

NOTICE IS HEREBY GIVEN that Robert H. Gourley, Chapter 7 Trustee (hereinafter "Trustee"), has filed with the Court a Motion to Compromise and Settle Claims.  As shown in the Motion, the Trustee alleges as follows:

1.    On October 14, 1994, Robert H. Gourley, Sr. filed a Complaint with the Clerk of the United States Bankruptcy Court for the Western District of North Carolina, Adversary No. 94-5313, alleging, inter alia, that the Court should pierce the corporate veils of the entities listed therein; to wit, Pioneer Development Bank, Inc., Pioneer Development Bank, Ltd., Pioneer International Holdings, Ltd., Fidelity Assurance Guaranty, Inc., International Society of Investors, Business Opportunity Club, Inc., Business Opportunities, Inc., and The International Mortgage Club.  On November 23, 1994, the Court granted the relief sought by Robert H. Gourley, Sr., and entered an Order accordingly (the "Order").

2.    Based on the Order, the Debtor was doing business as all the entities listed in Paragraph 1 hereinabove as of the date of the filing of his bankruptcy petition.  As of the petition date, the Royal Canadian Trust Company in Calgary, Canada had on deposit approximately  U.S.  $250,000.00  in  the  name  of  "Pioneer International Holdings, Ltd."

3.    The Alberta Securities Commission Agency, the legal authority in the province of Alberta for handling alleged securities violations, has obtained an administrative freeze order prohibiting the transfer of the funds on deposit.  The Alberta Securities Commission, however, has agreed to release the funds to the Trustee on the condition that all "Canadian Investors" of any entity listed in Paragraph 1 hereinabove are first fully compensated from the proceeds of the fund.  Based on the books and records obtained by the Trustee, this amounts to approximately U.S. $26,000.00.

4.    Trustee has also been able to determine that the funds on deposit in the Royal Canadian Trust Company are "proceeds" from

559 94 MO                                                    MOTIONS\COMP&SET\-----922.WMP

investors who purchased securities from Pioneer Development Bank, Inc. and/or Pioneer Development Bank, Ltd.

5.    Based on the foregoing, the Trustee recommends that he be authorized to settle the various claims and actions as follows:

(a)    That he be authorized to pay all "Canadian investors" in full so that he will be able to obtain the funds presently held in the bank account maintained at the Royal Canadian Trust Company;

(b)    That once the Trustee has obtained possession of the remaining funds in the Royal Canadian Trust Company, the funds be "earmarked" for payment only to investors of the funds, subject to allowed administrative expense claims; and

(c)    The Trustee be authorized to amend the schedules in this case to include the claims of all known and suspected non-Canadian investors.

NOTICE IS FURTHER GIVEN that, for purposes of this Motion to Promise and Settle Claims, the term "investors" means those persons who paid money to the Debtor or any of the entities listed in paragraph 1 hereinabove for the purpose of purchasing a security.

NOTICE IS FURTHER GIVEN that the Royal Canadian Trust Company has agreed to release the funds on the conditions set forth in Paragraph 5(a) above and that Trustee has agreed to accept this sum on those conditions.

NOTICE IS FURTHER GIVEN that the Motion has been filed with the Clerk of Court and is available for anyone to review and that any party desiring to object to the proposed compromise and settlement of the foregoing proceeding must file an objection specifying with particularity the ground(s) therefore within twenty (20) days from the date hereof with the Office of the Clerk, United States Bankruptcy Court for the Western District of North Carolina, 402 W. Trade Street, Charlotte, North Carolina 28202 and timely serve a copy on the undersigned counsel for the Trustee.    If an Objection is timely filed the Court will conduct a hearing on **Tuesday, June 6, 1995 at 9:30 o'clock a.m.** in the Main Court Room, 2nd Floor, United States Post Office and Courthouse, 200 West Broad Street, Statesville, North Carolina 28677.  No further Notice of this hearing shall be given.

This the ___13___ day of April, 1995.

For further information contact:    William Walt Pettit
227 W. Trade St., Suite 2170
Charlotte, NC 28202
Telephone No.(704)333-5800
NC Bar No:   9407

559 94 NO                                                MOTIONS\COMP&SET\-----922.WWP

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF NORTH CAROLINA

STATESVILLE DIVISION

F I L E D

U.S. BANKRUPTCY COUR.
WESTERN DISTRICT OF N C

MAY - 8 1995

J. BARON GROSHON
BY:_____
Deputy Clerk

IN RE:                                    )
                                          )
DONALD R. MOORE d/b/a                     )
BUSINESS OPPORTUNITY CLUB, INC.           )    CASE NO. 93-50512
                                          )    CHAPTER  7
            DEBTOR.                       )
_____)

## ORDER AUTHORIZING TRUSTEE TO COMPROMISE AND SETTLE CLAIMS

THIS CAUSE, coming on for consideration before the undersigned United States Bankruptcy Judge for the Western District of North Carolina, upon the Motion to Compromise and Settle Claims and Notice of Motion to Compromise and Settle Claims filed herein on April 13, 1995 by Robert H. Gourley, Sr., Chapter 7 Trustee (hereinafter "Trustee"); and

It appearing to the Court that all parties in interest have been property served with a copy of the Motion to Compromise and Settle Claims and Notice of Motion to Compromise and Settle Claims, as required by the Bankruptcy Rules; and

It further appearing to the Court that no responses have been filed to the Motion to Compromise and Settle Claims and Notice of Motion to Compromise and Settle Claims, as required by the Local Rules of Bankruptcy Procedure and that Trustee's Motion should be granted;

Based on the record herein, the Court makes the following

### FINDINGS OF FACT:

1.    On September 24, 1993, Donald R. Moore filed a voluntary

petition under Chapter 7 of Title 11 of the United States Code, and Robert H. Gourley, Sr., thereafter was duly appointed and qualified as the Chapter 7 Trustee.

2.    On October 14, 1994, the Trustee filed a Complaint with the Clerk of the United States Bankruptcy Court for the Western District of North Carolina, Adversary No. 94-5313, alleging inter alia that the Court should pierce the corporate veils of the entities listed therein; to wit, Pioneer Development Bank, Inc., Pioneer Development Bank, Ltd., Pioneer International Holdings, Ltd., Fidelity Assurance Guaranty, Inc., International Society of Investors, Business Opportunity Club, Inc., Business Opportunities, Inc., and The International Mortgage Club.

3.    On November 23, 1994, the Court granted the relief sought by the Trustee and entered an order accordingly (the "Order").

4.    Based on the Order, the Debtor was doing business as all the entities listed in Paragraph 2 hereinabove as of the date of the filing of his bankruptcy petition.

5.    As of the petition date, the Royal Trust Company in Calgary, Alberta, Canada had on deposit approximately U.S. $250,000.00 in the name of "Pioneer International Holdings, Ltd." (hereinafter the "Funds").

6.    The Alberta Securities Commission Agency, the legal authority in the province of Alberta for handling alleged securities violations, has obtained an administrative freeze order prohibiting the transfer of the Funds pending further order of the Court.

7.     The Alberta Securities Commission Agency and Royal Trust Company, however, have agreed to release the Funds to the Trustee on the condition that all "Canadian Investors" of any entity listed in Paragraph 2 hereinabove are first fully compensated from the proceeds of the Funds.

8.     Based on the books and records obtained by the Trustee, the claims of "Canadian Investors" total approximately U.S. $25,000.00.

9.     Trustee also has been able to determine that the Funds are "proceeds" from investors who purchased securities from Pioneer Development Bank, Inc. and/or Pioneer Development Bank, Ltd.

## CONCLUSIONS OF LAW

1.     The Motion to Compromise and Settle Claims is in the best interests of the Chapter 7 Estate and all creditors herein, and the Trustee's Motion should be granted.

2.     Findings of Fact that are Conclusions of Law shall be deemed as such, and vice versa.

NOW, THEREFORE, IT HEREWITH IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.     That the Trustee shall be and he hereby is authorized to request that the appropriate officials of the Royal Trust Company, the Province of Alberta and the government of Canada transfer the Funds to the Trustee.

2.     That the Trustee shall be and he herewith is authorized and ordered to pay all "Canadian Investors" in full so that he will be able to obtain possession of the Funds;

P:\WP51\DATA\ANNE\MOTIONS\ORD.DRM

3. That once the Trustee has obtained possession of Funds that the Funds be and they hereby are earmarked for payment only to investors of the Funds, subject to allowed administrative expense claims;

4. The Trustee shall be and herewith is authorized to amend the schedules in this case to include the claims of all known or suspected non-Canadian investors; and

5. For purposes of this order, the term "investors" is defined as those persons who paid money to the Debtor or any of the entities listed in Paragraph 2 hereinabove for the purpose of purchasing an alleged security or securities or certificate of deposit or certificates of deposit.

SO ORDERED, this the 8th day of May, 1995.

CERTIFIED TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL
U. S. BANKRUPTCY COURT
J. BARON GROSHON
WESTERN DISTRICT OF N. C.
BY
DEPUTY CLERK
DATE: 5 . 8 . 95

/s/ J. Craig Whitley
UNITED STATES BANKRUPTCY JUDGE

F I L E D
U.S. Bankruptcy Court
WDNC, Charlotte, NC

IN THE UNITED STATES BANKRUPTCY COURT   'JUN - 8 1998

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

STATESVILLE DIVISION

Geraldine Treutelaar Crockett,
Clerk
. /sh

IN RE:                                )
                                      )
DONALD R. MOORE d/b/a                 )
BUSINESS OPPORTUNITY CLUB, INC.       )    Case No: 93-50512
                                      )    Chapter 7
      Debtor.                         )
                                      )
_____       )    JUN - 8 1998
                                      )
              JUDGMENT ENTERED ON _____

## ORDER

THIS CAUSE, coming on to be heard and being heard before the
Honorable J. Craig Whitley, United States Bankruptcy Judge for the
Western District of North Carolina, upon the Motion filed hereby
Robert H. Gourley, Jr.; and

It appearing to the Court that all parties as set forth in the
Motion were properly served with the Motion, that the hearing
originally scheduled on this matter for May 5, 1998 was continued
to May 21, 1998, that each party was given notice of the continued
hearing, and that no party of interest filed an objection or
responce to said Motion.

Based on the record herein, Court make the following findings
of fact:

1.    On or about September 24, 1993, the Debtor commenced this
bankruptcy case by filing a voluntary petition under Chapter 7 of
Title 11 of the United States Code, and Robert H. Gourley, Sr. was
thereafter appointed Trustee.

2.    As shown by the record herein, the Debtor has been
sanctioned for and convicted of violating § 17(a) of the Securities
Act and § 10(b) of the Securities Exchange Act and Rule 10b-5
promulgated as a result. (See 15 U.S.C. § 77q(a), 15 U.S.C. §
78j(b) and 17 C.F.R. § 240.10b-5).

3.    Based on the acts and omissions as set forth hereinabove,
the Debtor was able to obtain funds from investors from the sale of
alleged securities, certificates of deposit and other fraudulent
activities.

4.    Although the Debtor did not disclose any of the entities
in which he was doing business in his bankruptcy petition or at any
time thereafter, the .Trustee eventually determined and located

1

these businesses, pierced various corporate veils of these entities and ultimately recovered approximately $300,000.00 for the benefit of creditors.

5.   The Trustee has traced the source of all funds recovered and has determined that the amounts recovered by the Trustee were ultimately from funds forwarded to the Debtor by various defrauded investors.

6.   Based upon the foregoing, the Trustee is entitled to an Order allowing him to disburse the funds which he received first to all administrative and priority claims as required by the Bankruptcy Code and thereafter to unsecured investors.  In the event there are sufficient proceeds to pay all unsecured investors in full, the Trustee is entitled to an Order allowing him to pay the amounts remaining on a pro-rata basis to all non-investor creditors as set forth in Schedule F of the Debtor's petition and these creditors are as follows:

American Express
P.O. Box 630012                          $11,173.54
Dallas, TX 75263-0012

American Express
P.O. Box 6300001                         $4,241.33
Dallas, TX 756363-0001

American Express
P.O. Box 630012                          $4,876.36
Callas, TX 75263-0012

American Express
P.O. Box 15325                           $9,839.09
Wilmington, DE 19886-0578

Associate Credit Card Sv
P.O. Box 660370                          $2,835.78
Dallas, TX 75266-9623

Bob Printing Service, Inc.
c/o Robert Gourley                       $1,530.82
P.O. Drawer 1776
Statesville, NC 28687

Chemical Bank
P.O. Box 1012                            $6,903.78
Hicksville, NC 11819

Distribution Source
c/o John H. Cutter III                   $3,210.06
402 W. Trade Street
Charlotte, NC 28202

2

| | |
|---|---|
| First Bankcard Center<br>P.O. Box 3331<br>Omaha, NE 68103 | $3,598.66 |
| GCI Leasing<br>c/o Mark C. Kirby<br>P.O. Box 18425<br>Raleigh, NC 27619 | $14,000.00 |
| Monogram Bank<br>P.O. Box 429302<br>Cincinnati, OH 45242 | $2,161.77 |
| NationsBank<br>P.O. Box 21846<br>Greensboro, NC 27420-18546 | $10,429.08 |
| Primerica Bank<br>P.O. Box 15066<br>Wilmington, DE 19850 | $3,913.85 |
| South Carolina National<br>P.O. Box 15145<br>Wilmington, DE 19886 | $1,300.00 |
| Southern National Bank<br>P.O. Box 890038<br>Charlotte, NC 28289-0038 | $4,845.79 |
| Southern National Bank<br>P.O. Box 5849<br>Statesville, NC 28687 | $14,500.24 |
| Unijaz Sloan<br>c/o Robert J. Bernhardt<br>P.O. Box 32248<br>Charlotte, NC 28232 | $ 1,175.53 |

Based on the foregoing findings of facts, the Court makes the following conclusions of law:

1. That the Court has jurisdiction over this proceeding and the parties referenced hereinabove;

2. That the property recovered by the Trustee is not property of the estate and that non-investor creditors should not be entitled to receive any distribution from the amounts recovered which constitute investor funds until such time all investors have been paid in full from such funds.

3

NOW, THEREFORE, IT IS HEREWITH ORDERED, ADJUDGED and DECREED, as follows:

1.   That the Trustee's Motion be and the same is herewith is granted; and

2.   That the Trustee be and he herewith is authorized to disburse all funds received in this estate first to investor-creditors and then to the non-investor creditors as set forth herein.

This is the ___8th___ day of June, 1998.

/s/ J. CRAIG WHITLEY
_____
J. Craig Whitley
United States Bankruptcy Judge

CERTIFIED TO BE A TRUE AND
CORRECT ... OF THE ORIGINAL
U. S. ... COURT

WESTERN DISTRICT OF N. C,
BY _____
        (DEPUTY CLERK)
DATE: 6/8/99

# DECISIONS NOT APPEARING IN CERTAIN PUBLISHED REPORTS

Case 98-02675-5-DMW   Doc 168   Filed 04/26/99   Page 92 of 96

claimant, and they serve to illustrate the motive and purpose °of the maker. They bear, in some degree, upon the question of fraud, in so far as that question has concern with the mind of one of the parties. The deed purports to have been made for and in consideration of the sum of three thousand dollars, the receipt whereof is acknowledged on the face of the deed; the memorandum throws light on the meaning of this acknowledgment. The objection to the evidence was properly overruled.

3. It is complained that the court erred in charging the jury, and in not charging certain requests of the claimant, without addition or qualification. The substance of the charge was correct, and nothing was added to the requests which a possible view of the facts in evidence did not render appropriate. It is further complained that the verdict was contrary to evidence and to law. The evidence was enough; for the No law was violated by it. The claimant was her own witness, and the nature of the case was such as to leave a wide scope for the jury to reason and infer. It may be that we should have found differently, had we been of the panel.

Judgment affirmed.

JACKSON et al. v. GUILMARTIN & COMPANY.

(August Term, 1878)

Trover—Bail—Judgment—Illegality.—After judgment in an action of trover was issued against principal and bail; the principal had an affidavit of illegality on the following grounds: that the judgment was obtained on a forthcoming bond, when any service on the bail; that no writ, process or summons was ever issued against him, nor this last service waived, nor did said bail appear in the forthcoming bond, was, by the principal, mentioned in the forthcoming bond, was, by the principal, turned to the sheriff, and by the latter sold, and the proceeds delivered to the judgment; that the two mules died before judgment, applied to the judgment:

*Trover—Bail—Judgment—Illegality.—Jackson v. Guilmartin, 41 Ga., 544, holds, that "the bail of security takes the fortunes of his principal, and is bound equally with him by the judgment in the main action. No suit on the bond is necessary. The bail can no more go behind the judgment ... affidavit of illegality, after it is offered as against both, than can the principal. 2d, Cobb, 23. See also, Holmes v. Langston, 110 Ga., 860, 36 S. E. Rep. 251; Thomas v. Price, 88 Ga. 535, 15 S. E. Rep. 11; Glover v. Conn, 74 Ga. 684. In Waldrop v. Wolff, 114 Ga. 620, 40 S. E. Rep. 820, citing principal case, it is said, that "it is too late to admit of any discussion that a surety bound by the judgment against his principal, in an action of [trover] can be heard after judgment to raise any question which could have been raised by his principal before judgment." See Finey. Dig. Ga. Rep., vol. 5, p. 303; ib., vol. 12, p. L seq.; Finey. Dig. Ga. Rep., vol. 5, p. 589 et seq.

without any fault or negligence of the principal or the bail, 2d, that the mules were taken by consent of the principal, for a larger sum than was received by execution by reason of the death of the said mules, and that this was done without the knowledge or consent of the bail; that the judgment entered on the verdict was contrary to law; that the court did not err in dismissing the affidavit of illegality.

Trover. Bail. Judgment. Practice in the Superior Court. Term, 1878.

Before Judge BARTLETT. Wilkinson Superior Court, April

Report unnecessary.

F. CHAMBERS, for plaintiffs in error, cited Code, §§ 3419, 2150, 3028, 3563, 3564, 3828, 3594; 59 Ga., 395, 799.
J. W. LINDSEY, for defendants, cited the same sections of the Code, and 33 Ga. (supplement) 104; also Code, §§ 3077, 3079.

BLECKLEY, Justice.

Notice that the bail sought to resist the judgment by affidavit of illegality, and that the sole question is, whether the court erred in dismissing the affidavit. [Treating of "bail" trover," § 3419 of the Code declares, that "such security shall be bound for the payment of the eventual condemnation money," and execution had thereon without further proceeding." The bail or security takes the fortunes of his principal, and is bound equally with him by the judgment in the main action. No suit on the bond is necessary. "The bail can no more go behind the judgment, or attack it, by affidavit of illegality, after it is duly entered up against both, than can the principal.

Judgment affirmed.

DURDEN, J. P., v. BELT.

(August Term, 1878.)

1. Garnishment—Justice of the Peace—Jurisdiction.—When the basis of a garnishment is a suit pending in, or a judgment rendered by, the superior court, the garnishment, if returnable to a justice court, is void. The latter court has no jurisdiction of the subject matter.

*2. Same—Same—Payment to Justice—Recovery.—If money be paid to a justice of the peace by the defendant in an execution issued from the justice court of the district in which said justice of the peace presides, the payment being induced by a void summons of garnishment, and a void judgment rendered thereon by the justice, he having no jurisdiction of the garnishment proceeding, the justice acts ministerially in receiving the money, and the defendant in the execution has filed an affidavit of illegality thereto, on the ground of such payment, thereby yielding his right to reclaim the money, the plaintiff in the execution may, by rule to the superior court, compel the justice of the peace to pay over said money to him as a collection made upon the fi. fa.; and that the

## 744   SUPREME COURT OF GEORGIA.

Bivem, constable, vs. Penny, trustee, et al.

sued on, "whereby the said John C. Penny, trustee, as aforesaid," received possession of the property and there-after appropriated it to his use as trustee, and used and consumed it. It was also alleged that the breach of the bond was in the failure to deliver the property, which was rendered impossible by its consumption by "John C. Penny, trustee, as aforesaid," and his surety. Process was prayed against "John C. Penny, trustee, as aforesaid," and Adams, and it issued accordingly.

The bond sued on was given by "J. C. Penny, principal," and Adams as surety.

On demurrer, the court dismissed the declaration on the ground that it did not authorize a judgment against the trust estate. The plaintiff excepted.

J. M. DuPree; John B. Holmes; W. A. Hawkins, for plaintiff in error.

R. G. Ozier; Gustin & Hall, by J. H. Lumpkin, for defendants.

Blandford, Justice.

This was an action of debt upon a forthcoming bond given in a claim case, the claim having been interposed by John C. Penny, trustee for his wife, M. T. Penny. The property having been found subject to the fi. fa. levied thereon, and the same being perishable property, and having been consumed by the claimant, the suit was instituted, alleging the foregoing facts.

There was a general demurrer to the sufficiency of the plaintiff's declaration. This demurrer the court sustained, and dismissed plaintiff's action, and thereupon plaintiff excepted, and error is assigned thereon to this court.

1. The allegations in the declaration show a breach of the bond, as they show the property replevied had been entirely consumed by claimant; hence there was no neces-

---

## MARCH TERM, 1886.   745

Willis et al. vs. Bivins.

sily for a re-advertisement of the property, as the claimant could not produce it. 55 Ga., 606.

2. This action is against John C. Penny individually. Although he signed the bond as trustee for his wife, M. T. Penny, his is an individual liability. The words "trustee for M. T. Penny" are words of description merely, and in nowise restrict his liability. He put in the claim, the property levied on was turned over to him, and was consumed by him, and he is liable to the plaintiff.

Judgment reversed.

---

Willis et al. vs. Bivins.

1. Where a counter-affidavit was filed to a distress warrant, the surety on the bond given, in obligating themselves to pay "the eventual condemnation money," bound themselves to pay whatever amount might be found against their principal by the jury, upon the trial of the issue made by the counter-affidavit, and, in order to bind them, the issue should have been submitted to the jury. Where a judgment was entered against the defendant by the presiding judge, without the verdict of a jury, in pursuance of an arrangement entered into between the plaintiff and defendant, without the knowledge or consent of the sureties, and several years elapsed without further action, the court should not, on application of the plaintiff, have entered a judgment nunc pro tunc against the defendant's sureties.

2. There was no mistake in the judgment as originally entered, but it seems to be in accordance with the understanding between the parties thereto, and the plaintiff was not entitled to have it amended or to have another and fuller judgment rendered at a subsequent term of the court nunc pro tunc.

April 27, 1886.

Principal and Surety. Bonds. Distress Warrant. Practice in Superior Court. Judgments. Before Judge Willis. Taylor Superior Court. August Term, 1885.

On January 27, 1879, Bivins sued out a distress warrant against Walker for $156.24. It was levied, and the defendant filed a counter affidavit, denying indebtedness, and

Willis et al. vs. Bivins.

gave a replevin bond with Willis and Lockett as sureties. At the April term, 1887, of court, the following judgment was rendered:

"Jas. H. Bivins )
       vs.     } Distress warrant and levy on illegality.
Richard Walker. )

"The parties in this case appeared in open court and announced that a compromise and settlement had been made between them, and the liability of Richard Walker to the plaintiff, Jas. H. Bivins, had been fixed at the sum of two hundred and twenty-four dollars and thirty-two cents, with interest from October 8th, 1879. Whereupon it is considered and adjudged by the court and the parties consenting thereto, that said execution do proceed only as to the sum of two hundred and twenty-four dollars, principal, and seven dollars and fifty cents, interest to April 6th, 1887; and whom said sums shall have been made on said warrant, that the same shall be held to be satisfied in full as the principal amount thereof. It is further adjudged that the plaintiff do recover of the defendant the sum of —— dollars cost in this behalf laid out and expended. This April 6th, 1880."

The plaintiff then brought suit on the bond against the sureties. What became of this case does not appear from the record. It was stated in the argument before the Supreme Court that it was dismissed.

The plaintiff then moved to enter judgment *nunc pro tunc* against the sureties on the replevin bond. They objected, and for cause against said motion set up the following defenses:

(1.) Because the judgment rendered showed on its face that it was against Walker alone, and not against the sureties, and was not intended to be.

(2.) Because the judgment entered was a consent judgment against Walker alone, and on the understanding that the sureties were discharged.

(3.) Because the liability of the sureties could be fixed only by the verdict of the jury; but the judgment sought to be amended was a compromise judgment, without the intervention of a jury, under an agreement between Walker and the plaintiff.

(4.) Because the entire property levied on and replevied

Willis et al. vs. Bivins.

went into the hands of the plaintiff, part of it without a sale, and he accepted it in discharge of the liabilities of the sureties on the replevin bond.

The plaintiff testified that Walker claimed a set off against the amount of the distress warrant, which he agreed to allow; that the attorney who had been representing him was drinking; and he retained another, who entered up the judgment; that no instructions as to the form of the judgment was given; that the plaintiff was not a lawyer, as it is nor nothing of the necessary form; and that he did not give instructions to enter a judgment which would relieve the sureties.

One of the defendants testified that the plaintiff's attorney told him that the whole matter had been settled and he need not trouble himself further about it. The other surety knew nothing of the settlement except what the first told him. There was some other testimony, as to the possession of the property, not material here.

The jury found the issue in favor of the plaintiff, and the court ordered the judgment amended accordingly. The defendants moved for a new trial, on the following among other grounds:

(1.) Because the court erred in striking the first and third pleas of defences set out above.

(2.) Because the court permitted the plaintiff, during the last argument, to amend his motion to enter judgment *nunc pro tunc* and add to it a motion to amend and correct the judgment formerly entered, and because the court allowed the amendment to be made over the objections of the defendants.

The motion was overruled, and the defendants excepted.

W. S. Wallace & Son, for plaintiff in error.

C. J. Thornton, for defendant.

748    SUPREME COURT OF GEORGIA.

Willis et al. vs. Blevins.

Hall, Justice.

The question in this case is simple and single. Can the court, on the application of the plaintiff in a distress warrant, to which a counter-affidavit was filed, enter judgment *nunc pro tunc* against the defendant's sureties after a lapse of several years, when the judgment was entered by the presiding judge without the verdict of a jury, in pursuance of an arrangement entered into between the plaintiff and defendant without the knowledge or consent of the sureties?

1. We are of opinion that this cannot be done, and that there was error in so deciding. The sureties obligated themselves to pay "the eventual condemnation money" (Code, §3082); that is to say, they bound themselves to pay whatever amount might be found against their principal by the jury, upon the trial of the issue made by the counter-affidavit. This statute is positive that the issue thus formed "shall be tried by a jury as provided for in the trial of claim cases." Code, *ut supra*, and citations. There can be no alteration of the terms and conditions to which the sureties agreed, without their consent; such an alteration makes a different contract from that into which they entered, and is a novation which, without their consent, discharges the sureties. Code, §2163. A release or compounding with one surety will discharge his co-surety (*Ib.*, §2152); and *a fortiori* where the creditor releases or compounds with the principal, will this exonerate the sureties; indeed, any act of the creditor, either before or after judgment against the principal, which injures the surety or increases his risk, or exposes him to greater liability, will discharge him. *Id.*, §3154.

2. These considerations are decisive of the motion made; but were it not so, we are unable to perceive any error or omission in the judgment rendered, which entitles the plaintiff to have it amended, or to have another and fuller judgment rendered at a subsequent term of the court *nunc pro tunc*. There is no mistake in it as originally entered;

MARCH TERM, 1886.    749

Mooney vs. The Rome Railroad.

It seems to be in accordance with the understanding between the parties thereto, and it was intended to bind nobody but them; had it not been so understood by the court, he would not, without the intervention of a jury, have awarded it. *Tirrell vs. The Justices*, etc., 20 Ga., 102, 104; *Pitman vs. Lowe*, 24 Id., 429.

Judgment reversed.

Mooney vs. The Rome Railroad.

Railroads. Eminent Domain. Title. Before Judge Estes. Floyd Superior Court. September Term, 1885.

[May 1, 1886.]

Although the charter of a railroad company authorized it to acquire such strips of land between its terminal points as it might deem necessary, the width of the right-of-way not being stated, yet when the road was located along and near the land now in dispute, and for thirty years the company did in taking it, but it remained in the possession of others who claimed title to it, this was conclusive that it was not deemed necessary by the company for the exclusive operation of the road, and was not, therefore, a part of its right-of-way under its charter, no conveyance to the company or condemnation of the land appearing; and a verdict finding in favor of the company for the land, under such facts, was without sufficient evidence to support it.

The Rome Railroad Company brought suit against Mooney to recover a strip of land ten feet wide and eighty yards long. The plaintiff claimed under its charter, allowing it to acquire such strips of land as might be necessary. It showed also that the deeds under which the defendant held excepted the right-of-way of the company and bounded his land by such right-of-way. Several witnesses testified that a right-of-way fifty feet in width, twenty five feet each way from the center of the track, was necessary for a railroad, and that such width would include the strips sued for. One witness testified that he was employed by the road, and in 1872, notified Leigh (under whom the defendant held) that the right-of-way was

1987 U.S. Dist. LEXIS 10913 printed in FULL format.

Robert B. McKersie, Floyd R. Carberry, William L. Shue, and
Herbert Drew, Plaintiffs, v. IU International Corporation,
Federated Freightway, Inc. and Maxitron, Inc., Defendants;
and P-I-E Nationwide, Inc., Nominal Defendant

No. 86 C 1683

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

1987 U.S. Dist. LEXIS 10913

November 23, 1987, Decided; November 24, 1987, Filed

CORE TERMS: movants, motion to intervene, intervenor, settlement, intervene,
negotiations, untimely, lawsuit, adequately represented, unusual
circumstances, implicated, settlement agreement, unusual circumstance,
length of time, right to intervene, irreparably, litigating, harmed, confers

OPINIONBY:    [*1]

   ASPEN

OPINION: MEMORANDUM OPINION AND ORDER

   MARVIN E. ASPEN, District Judge

   Currently before the Court is the motion of Christopher Jansen, Bernard
Krakower and Gilbert Granet ("movants") to intervene as a party of interest
under Rule 24(a) Fed.R.Civ.P. For the reasons noted below, we deny the motion.

   Rule 24(a) provides that upon timely application anyone shall be permitted to
intervene when either a statute confers a right to intervene or "when the
applicant claims an interest relating to the property or transaction which is
the subject of the action and the application is so situated that the
disposition of the action may as a practical matter impair or impede the
applicant's ability to protect that interest, unless the applicant's interest is
adequately represented by existing parties." Because movants have not cited any
statute which confers a right to intervene, we examine movant's request under
the second prong of Rule 24(a).

   The first issue we must decide is whether this motion is "timely." NAACP v.
New York, 413 U.S. 345, 366, 93 S.Ct. 2591, 1603 (1973) ("If it is untimely,
intervention must be denied. Thus, the court where the action is pending must
first be satisfied    [*2]   as to timeliness.") The Seventh Circuit has set forth
four factors that we should consider in determining whether a motion to
intervene is timely: (1) The length of time the intervenor knew or should have
known of her or his interest in the case; (2) the extent of prejudice to the
original litigating parties from the intervenor's delay; (3) the extent of
prejudice to the would-be intervenor if her or his motion is denied; and (4) any
unusual circumstances. Bloomington v. Westinghouse Electric Corp., 824 F.2d 531,
534 (7th Cir. 1987).