F I L E D

APR 2 9 1999

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

| | | |
|---|---|---|
| INTERNATIONAL HERITAGE, INC., | ) | √CASE NO. 98-02675-5-ATS |
| | ) | CHAPTER 7 |
| | ) | |
| INTERNATIONAL HERITAGE, INCORPORATED, | ) | CASE NO. 98-02674-5-ATS |
| | ) | CHAPTER 7 |
| Debtors | ) | |

MEMORANDUM IN SUPPORT OF OBJECTION OF
ACSTAR INSURANCE COMPANY TO APPLICATION OF
TRUSTEE TO ENTER INTO STIPULATION AND CONSENT
TO FINAL JUDGMENT OF PERMANENT INJUNCTION

NOW COMES Acstar Insurance Company, by and through its undersigned counsel of record, and respectfully files this Memorandum In Support Of Objection Of Acstar Insurance Company to Application Of Trustee To Enter Into Stipulation And Consent To Final Judgment Of Permanent Injunction.

STATEMENT OF THE CASE

International Heritage, Inc. was a multi-level marketing firm engaged in the sale of products such as jewelry, recreational equipment and collectible items. International Heritage Inc. was founded by Claude W. Savage, Larry G. Smith and Stanley H. Van Etten ("Van Etten") in April of 1995. Van Etten was Chairman of the Board of Directors, President and Chief Executive Officer of International Heritage, Inc.

On March 6, 1998, International Heritage, Inc. entered into a reverse merger with Kara International, Inc. As a result of the reverse merger Kara International, Inc. became International Heritage Incorporated. Both International Heritage, Inc. and International Heritage Incorporated will hereinafter be referred to collectively as IHI.

On March 16, 1998, the Securities and Exchange Commission ("SEC") brought a civil action in the United States District Court

WARD AND SMITH, P.A., ATTORNEYS AT LAW

copy retd

154

for the Northern District of Georgia, Atlanta Division (the "District Court") against IHI, Van Etten, Claude W. Savage and Larry G. Smith (collectively "Defendants"). That case bears Civil Action No. 1-98-CV-0803-RWS and is styled <u>Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith, International Heritage Incorporated, a Nevada Corporation</u> (hereinafter referred to as the "SEC litigation").

The SEC alleges Defendants engaged in the sale of securities without filing a registration statement with the SEC, Defendants made misrepresentations and material omissions in connection with the sale of securities, and Defendants knowingly misrepresented IHI's financial condition and concealed the fact that IHI was operating a pyramid scheme. Along with the institution of the SEC litigation, the District Court granted a Temporary Restraining Order against IHI.

A Preliminary Injunction Hearing was held before the District Court on March 25, 26 and 27 1998. At that hearing, the SEC presented its case. Defendants did not present their case. On March 27, 1998, after conducting the hearing and reviewing the entire record, the District Court entered an oral order which was memorialized in a Memorandum Opinion and Order filed on April 3, 1998. While not a consent order, the Memorandum Opinion and Order was agreed upon and prepared by all counsel to the SEC litigation. A photocopy of the Memorandum Opinion and Order is attached hereto and incorporated herein by reference as "Exhibit A."

The Memorandum Opinion and Order allowed IHI to resume its business activities under certain conditions. Among other decretal provisions, the District Court ordered IHI to post a dischargeable bond in the amount of Five Million and No/100 Dollars ($5,000,000.00) to ensure that at least that amount is available to satisfy any amounts ordered paid by IHI in the SEC litigation. The

2

specific conditions of said bond were set out in a Notice Of Posting Of Cash Bond And Order Approving Cash Bond filed on April 3, 1998 and incorporated by reference in the Memorandum Opinion and Order. A photocopy of the Notice Of Posting Of Cash Bond And Order Approving Cash Bond is attached hereto and incorporated herein by reference as "Exhibit B."

Defendant Van Etten, in his individual capacity, and acting as a surety on behalf of IHI, tendered to the Clerk of Court for the District Court for deposit into the Registry of the Clerk of Court the sum of Five Million and No/100 Dollars ($5,000,000.00) cash to assure that the liquid assets of IHI were not diminished during the pendency of the SEC litigation and to apply to any judgment for damages and/or order granting disgorgement or other monetary relief against IHI, or either of them, up to the principal amount of Five Million and No/100 Dollars ($5,000,000.00) that may result from the SEC litigation. The purpose for which Van Etten posted the bond was so that IHI could continue in its business operations.

> "The condition of the obligation of the Bond is such that if the [SEC] fail to obtain a judgment for damages or an order granting disgorgement or other monetary relief against the Defendants IHI or either of them in this case, then this obligation shall be null and void and the principal amount of the Bond together with any then undisbursed accrued interest thereon shall be returned to the Surety [Van Etten] upon receipt by the Clerk of Court of an order releasing the Bond; otherwise, the Bond shall remain in full force and effect, pending further order of this Court."

Notice Of Posting Of Cash Bond And Order Approving Cash Bond, ¶¶ 2, 3.

The Notice of Posting of Cash Bond and Order Approving Cash Bond expressly permitted IHI to replace the Bond with a conventional, pre-approved surety bond containing exactly the same terms and conditions during the period that the Bond remains in place.

Defendants applied for an Order Approving Substitution of Cash Bond With Payment Bond on or about June 24, 1998. Defendants proposed that ACSTAR Insurance Company ("ACSTAR") would issue the surety bond and that United Coastal Insurance Company ("United") would serve as co-surety. However, the District Court originally denied the proposed order because United was not authorized to conduct business in Georgia. Upon request for reconsideration, the District Court entered an Order on July 1, 1998 granting the motion for reconsideration and granting the application for an Order Approving Substitution of Cash Bond With Payment Bond. A photocopy of the Order is attached hereto and incorporated herein by reference as "Exhibit C." It was pursuant to these terms that ACSTAR and United jointly posted a dischargeable surety bond in the amount of Five Million and No/100 Dollars ($5,000,000.00) (the "Bond"). Three Million Five Hundred Thousand and No/100 Dollars ($3,500,000.00) was transferred to ACSTAR from the Clerk of Court as collateral for the Bond. A photocopy of the Payment Bond is attached hereto and incorporated herein by reference as "Exhibit D."

In order to induce ACSTAR and United to furnish the payment bond, IHI executed a standard form Indemnity Agreement on June 8, 1998. The Indemnity Agreement was agreed upon contemporaneously with the execution of the Bond. It states, in pertinent part, as follows:

"The Indemnitors [IHI] will (a) perform all the conditions of each said bond . . . and (b) indemnify and save the Surety [ACSTAR and United] harmless from and against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the Surety may sustain or incur by reason or in consequence of the execution of such bond . . . including but not limited to (i) sums paid or liabilities incurred in settlement of, and expenses paid or incurred (A) in enforcing the terms hereof, (B) in procuring or attempting to procure release from liability, or (C) in recovering or attempting to

4

recover losses or expenses paid or incurred, as aforesaid." Indemnity Agreement, ¶ 2.

"The Surety [ACSTAR and United] shall have the exclusive right to determine for itself and the Indemnitors [IHI] whether any claim or suit brought against the Surety or the principal upon any such bond shall be settled or defended and the Surety's decision shall be final and binding upon the Indemnitors." Indemnity Agreement, ¶7.

A photocopy of the Indemnity Agreement is attached hereto and incorporated herein by reference as "Exhibit E."

On November 25, 1998, International Heritage, Inc. and International Heritage Incorporated filed for relief under Chapter 7 of the United States Bankruptcy Code. Holmes P. Hardin was appointed the Chapter 7 Trustee (the "Trustee") in both cases. The Trustee has not intervened in the SEC litigation and has not requested that ACSTAR assume the defense. IHI is not presently represented in the SEC litigation. On January 5, 1999 the SEC filed Proofs of Claim in the captioned cases in the amount of Six Million Four Hundred Fifty Thousand and No/100 Dollars ($6,450,000.00). The Proof of Claim states that "no order setting the amount of disgorgement or penalties has been entered to date, but, on information and belief, the [SEC] estimates the disgorgement claim will be no less than $6,450,000.00." Thus, the claims are contingent.

On January 15, 1999, the Trustee filed an Application Of Trustee To Enter Into Stipulation And Consent To Final Judgment Of Permanent Injunction (the "Application"). The Application requests an order authorizing the Trustee to execute a pleading entitled Consent To Final Judgment Of Permanent Injunction As To Defendants International Heritage, Inc. and International Heritage, Incorporated, a Nevada Corporation in the underlying SEC litigation ("Consent"). This Consent would allow the entry of a Final Judgment Of Permanent Injunction As To Defendants International

WARD AND SMITH, P.A., ATTORNEYS AT LAW

5

Heritage, Inc. and International Heritage, Incorporated, a Nevada Corporation in the SEC litigation ("Final Judgment").

The Final Judgment sets the amount of disgorgement against IHI in the amount of Six Million Five Hundred Thirty-Three Thousand One Hundred Seventy-Nine and No/100 Dollars ($6,533,179.00) plus prejudgment interest. In addition, Five Million and No/100 Dollars ($5,000,000.00) of said disgorgement shall be satisfied from the surety bond posted by ACSTAR. There is no substantiation given for the derivation or amount of the SEC's claim. The Bond is not the property of IHI or the bankruptcy estates. Furthermore, the Final Judgment directs immediate payment of the Five Million and No/100 Dollars ($5,000,000.00) to the Trustee to be disbursed in the following order:

(1) payment to the Chapter 7 Trustee of an amount equal to the full statutory commission permitted pursuant to 11 U.S.C. § 326 without reduction;
(2) payment of all administrative claims allowed by the United States Bankruptcy Court for the Eastern District of North Carolina in the IHI bankruptcy case;
(3) payment of any allowed outstanding fees of Lloyd Whitaker, the monitor in the SEC litigation;
(4) pro rata payment of allowed claims by independent retail sales representatives ("IRSRs") of IHI who made payments to IHI and never received a product or commission;
(5) allowed claims of purchasers of IHI convertible notes during 1997;
(6) allowed claims of IRSRs;
(7) allowed claims of other creditors of IHI according to the priorities set forth in the United States Bankruptcy Code.

The Application does not set forth any basis of authority for the Trustee's request, statutory or otherwise. Neither the Application nor Final Judgment discuss any interest ACSTAR, United or Van Etten have or may have in the Bond. The Final Judgment appears to require the approval of the Trustee, the SEC, this Bankruptcy Court and the District Court. The Final Judgment does not request, require or mention any consent of ACSTAR. ACSTAR has not consented to the proposed Final Judgment. The Final Judgment

does not discuss the rights of ACSTAR to defend.  ACSTAR stands willing and able to defend IHI in the SEC litigation to protect ACSTAR's interest in the Bond.  Above all, the Final Judgment overlooks satisfying the pre-conditions for payment on the Bond. The pre-conditions have not been met.  Further, there is no evidence which establishes the pre-conditions will ever be met.

ARGUMENTS

The Bond and the Indemnity Agreement establish certain rights and duties between IHI as principal and ACSTAR as surety. These rights and duties are derived from the Bond, the Indemnity Agreement and the common law of suretyship.  As a result of IHI filing for bankruptcy relief, the Trustee is now the principal.

Upon satisfaction of the pre-conditions for payment on the Bond, ACSTAR is obligated to make available up to Five Million and No/100 Dollars ($5,000,000.00) to satisfy any amounts that may be ordered paid by IHI for any judgment for damages and/or order granting disgorgement or other monetary relief against IHI.  If the SEC fails to obtain such relief, then the obligation under the Bond is null and void.

Contemporaneously with the execution of the Bond, IHI and ACSTAR agreed to the execution of an Indemnity Agreement.  The Indemnity Agreement is a contractual arrangement between IHI and ACSTAR as principal and surety, respectively.  It establishes certain rights and duties of IHI and ACSTAR.  An Indemnity Agreement is normally required upon issuance of a surety bond.  In fact, it is very rare when an indemnity agreement is not obtained when a bond is procured.  Among the duties of IHI as principal is the performance of all conditions of the Bond.  IHI also agreed to hold ACSTAR harmless from and against any and all liability, loss, costs,   damages,   fees      of   attorneys   and   other   expenses.

7

Furthermore, IHI agreed to indemnify ACSTAR for sums paid under the Bond. These are among the duties of the Trustee.

Among the rights granted to ACSTAR by IHI is the exclusive right to settle any claim or suit brought against ACSTAR or IHI upon the Bond. In addition, ACSTAR has the right to defend ACSTAR or IHI in connection with any claim or suit brought against ACSTAR or IHI on the Bond. ACSTAR's decisions on whether to settle or defend shall be final and binding upon IHI. These are rights granted to ACSTAR by the principal, who is now the Trustee.

The actions of the Trustee in filing the Application are a clear breach of his contractual and common law duties as a principal on the Bond. Moreover, the actions of the Trustee cut off the exclusive rights of ACSTAR to defend or settle any claim or suit brought on the Bond. Also, ACSTAR has certain subrogation rights that arise from the common law of surety and are provided for in the Bankruptcy Code.

Additionally, the covert settlement negotiations between the Trustee and the SEC and the resulting Application, Consent, and Final Judgment reek of fraud, collusion and bad faith. Evidence of this is apparent in the secretive nature of the negotiations, the absence of communication with ACSTAR, the breach of the duty of the Trustee as principal owed to ACSTAR, the required maximum payment of the Trustee's commission, and the payment of the entire Bond to the Trustee/IHI.

As previously stated, the obligation for ACSTAR to make the Bond amount available is contingent on satisfaction of certain pre-conditions. The SEC has not met the pre-conditions for payment on the Bond. Therefore, the extraordinary relief requested by the Trustee must be denied.

Furthermore, the relief or authorization requested by the Trustee will result in a scheme that is in direct conflict with the spirit and intent of the Bankruptcy Code as well as direct conflict

WARD AND SMITH, P.A., ATTORNEYS AT LAW

8

with the clear statutory mandates of the specific provisions of the Bankruptcy Code.   Therefore, this Court must deny the Trustee's Application.

I.    JURISDICTION

      This United States Bankruptcy Court does not have jurisdiction to grant the relief requested by the Trustee in his Application.   It is clear the Bond is not property of either bankruptcy estate.   Both the Application and proposed Final Judgment concede this fact.   The collateral for the Bond was put up by Van Etten.   In the event the SEC is unsuccessful in the SEC litigation, the Bond would be discharged and the collateral would be paid directly to Van Etten.   The Bond is controlled solely by the District Court.   Allowing the relief requested would be to compel non-estate property to be brought into the estate. Therefore, this Court has no jurisdiction to hear this matter.   See In re Hathaway's Liquidation and Appraisers, Inc., 1 B.R. 189 (Bankr. N.D.Ga. 1979) (holding that the bond is not property of the estate, therefore, the bankruptcy court had no jurisdiction to rule on distribution of the bond proceeds); See also In re McLean Trucking Company, 74 B.R. 820 (Bankr. W.D.N.C. 1987)(holding that bond was not property of the estate so that bankruptcy court lacked jurisdiction to enjoin proceeding to collect on bond by [governmental agency]).

II.    APPLICATION SHOULD BE BROUGHT
     AS AN ADVERSARY PROCEEDING

      This Application should be brought as an adversary proceeding.   Rule 7001 of the Federal Bankruptcy Rules states, in pertinent part, as follows:

> "An adversary proceeding is governed by the rules of this Part VII.   It is a proceeding (1) to recover money or property, . . . (2) to determine the validity, priority,

WARD AND SMITH, P.A., ATTORNEYS AT LAW

9

> or extent of a lien or other interest in property, . . .
> (7) to obtain an injunction or other equitable relief,
> (8) to subordinate any allowed claim or interest, . . .
> (9) to obtain a declaratory judgment relating to any of
> the foregoing . . ."  B.R. Fed. P. 7001.

The Application requests the Court's authorization for the Trustee enter into a Final Judgment.  The result of this Final Judgment is to recover property and/or money from ACSTAR for the benefit of the bankruptcy estates of IHI.  As previously stated, neither the collateral nor the Bond are property of either bankruptcy estate.   Since this is an action taken to recover property and money from ACSTAR, it is required that this matter be brought as an adversary proceeding.

The Final Judgment, in essence, determines the validity, amount and priority of the contingent claim of the SEC.  The SEC is the beneficiary under the bond only if certain established pre-conditions are met.   The pre-conditions are that the SEC must obtain a judgment for damages or an order granting disgorgement or other monetary relief against the IHI.   The pre-conditions for payment under the Bond have not been met.  The Final Judgment also sets forth the priority for the payment of certain claims.   The priority is not consistent with the priority scheme set forth in 11 U.S.C. § 507.

The Final Judgment permanently enjoins and/or restrains IHI and any related party from taking certain actions.  Entry of the Final Judgment will result in the obtaining of a permanent injunction.  Also, the authorization requested by the Trustee is not based on any legal authority.    Therefore, it is "other equitable relief."

As previously mentioned, the Final Judgment establishes a priority scheme that is not consistent with 11 U.S.C. § 507. Therefore, the result is that certain allowed claims will automatically be subordinated.   This is inconsistent with the

10

provisions of 11 U.S.C. § 510(c).  Additionally, the Final Judgment will act as a declaratory judgment relating to the recovery of money or property, the validity, amount and priority of the SEC claims, the granting of an injunction and the subordinating of certain allowed claims.

Based on these factors, the relief requested by the Trustee in his Application should be brought as an adversary proceeding as required under Fed.R.Bankr.P. 7001.  Therefore, the Application should be dismissed.

### III. THE TRUSTEE HAS PROVIDED NO BASIS FOR SETTLEMENT OF THE SEC LITIGATION

The relief requested in the Trustee's Application will result in the settlement of the SEC litigation as to IHI.  However, the relief requested is not consistent with Fed.R.Bankr.P. 9019.

Under Rule 9019(a), the settlement of litigation by the Trustee must be approved by this Court.  Considerations of the Court include the probability of success on the merits, difficulties of collection, the complexity of the litigation, expenses likely to be incurred in the litigation, and any inconvenience and delay associated with the litigation.  The Trustee has not provided any basis for the relief requested.  The Application states that entry of the Final Judgment "will dispose of significant litigation against the Debtors without undue expense, will result in the reduction of a substantial portion of a principal unsecured claim in each of these cases, and will fund payment of administrative expense and other claims in these bankruptcies."  Application, ¶ 9.

In essence, the relief requested by the Trustee would substitute the Proof of Claim of ACSTAR for that of the SEC.  Also, if the Application is allowed, ACSTAR will be forced to initiate litigation against the bankruptcy estates and the Trustee for

11

waiving the rights ACSTAR has under the Indemnity Agreement.  This
relief will not reduce litigation of the estate but rather, will
likely create additional litigation.

      In order to approve a compromise, the bankruptcy court
has an affirmative duty to inform itself of the relevant factors
and to make specific findings with respect to those factors.
LaSalle National Bank v. Holland, 841 F.2d 159,163 (7th Cir. 1987).
The Trustee has provided no basis for approval of the settlement of
this action nor any basis for the bald assertion that the SEC has
demonstrated that it is prepared to prove up its claims in the
bankruptcies.

      The SEC states in their Memorandum that "[d]eference
should be given to the trustee's informed judgment concerning the
proposed settlement, and the bankruptcy court should not substitute
its judgment for the trustee's."  Memorandum, at 9.  It has not
been pointed out that the Trustee is not familiar with the SEC
litigation or its merits.  Upon information and belief, the only
familiararity of the Trustee with the SEC litigation is that
conveyed to him by the SEC.  The Application should be denied
absent an affirmative showing by the Trustee that the settlement as
proposed would meet the requirements of Fed.R.Bankr.P. 9019.  This
has not been accomplished.

IV.   THE RELIEF SOUGHT IS IN VIOLATION
      OF THE AUTOMATIC STAY

      The filing of the Chapter 7 bankruptcy petitions do not
operate as a stay of the SEC litigation.  11 U.S.C.§ 362(b)(4).  It
is conceded that the SEC is operating to enforce its police and
regulatory powers.  However, the bankruptcies do operate as a stay
of the enforcement of a money judgment.  The effect of the Final
Judgment is to establish and enforce a money judgment against IHI

12

directly or indirectly.   This action is in violation of the automatic stay.

The Bond is not property of either bankruptcy estate. However, IHI asserts some interest in the collateral.   The effect of the Final Judgment is to establish a money judgment and force ACSTAR to turnover to the SEC Five Million and No/100 Dollars ($5,000,000.00).   The Final Judgment also dictates how property of the estates is applied.

Furthermore, the Final Judgment grants to the SEC the ability to ask the District Court to direct IHI to pay or forfeit funds or assets of the estates.   Final Judgment, Part V.   The Trustee agrees by consent not to challenge the request by the SEC. This would result in the collection or recovery of property of the estate.

These actions are in violation of the automatic stay under 11 U.S.C. § 362(a) and should be affirmatively prohibited by this Court.   In the alternative, the Court should issue an order staying the SEC litigation as to IHI pending resolution of the various interests the parties may have in the collateral as well as to protect the estates from future stay violations.   See 11 U.S.C. § 105(a).   The Fourth Circuit supports discretion under 105(a) to "protect the integrity of a bankrupt's estate and the bankruptcy court's custody thereof and to preserve to that court the ability to exercise the authority delegated to it by Congress."   In re A.H. Robins Company, Inc., 788 F.2d 994, 1003 (4th Cir. 1986).

V.    TRUSTEE DOES NOT HAVE THE AUTHORITY
      TO ENTER INTO CONSENT TO FINAL JUDGMENT

First, the Trustee has not entered an appearance in the pending SEC litigation pursuant to Fed.R.Bankr.P. 6009.   Therefore, the Trustee is not the real party in interest and has no authority to act on behalf of IHI or enter into the Final Judgment.

13

Second, since the Bond is clearly not property of the bankruptcy estates, the Trustee does not have the authority to enter into the Consent to Final Judgment. See Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 147 B.R. 317 (S.D.N.Y. 1992)(holding that because the bond was not part of the bankruptcy estate, trustee, regardless of intent, did not have authority to enter into settlement agreement).

VI.   ANY CONSENT OR SETTLEMENT OF THE
      SEC LITIGATION WILL NOT BIND ACSTAR

The Bond was procured in the District Court forum. Therefore, it is controlled by Georgia law. Generally, Georgia law allows a surety to be bound by a judgment which is entered by consent or settlement of the principal (Trustee) and the creditor (SEC). However, it is well settled that a surety will not be bound if such a judgment is procured by fraud, collusion, mistake or bad faith. See Escambia Chemical Corporation v. Rocker, 124 Ga.App. 434, 184 S.E.2d 31 (1971); Price v. Carlton, 121 Ga. 12, 48 S.E. 721 (1904). Fraud, collusion and bad faith exist under these circumstances.

First, the entire consent was initiated by the SEC. The Trustee has no resources with which to defend IHI in the SEC litigation. The Final Judgment concept was created by the SEC to reach the goal of a Final Judgment without a trial on the merits. It simply provides a vehicle for the SEC to reach their final goal precluding opposition. This is indicia of fraud, collusion and bad faith.

Second, the Application explicitly provides that the SEC agrees that Trustee's compensation for administration and disbursement of the proceeds of the bond shall be paid from the proceeds of the bond in an amount equal to the maximum allowable commission authorized by 11 U.S.C. § 326 without reduction."

14

Application, ¶ 5, Emphasis added.  Paragraph 4 of the Application also states that the first payment from the proceeds of the bond is to "Trustee's agreed-upon compensation." Application, ¶ 4.  This is clear evidence of collusion and bad faith.

The SEC claims that the negotiations were not collusive because they were not "secret cooperation for a fraudulent and deceitful purpose." Memorandum, at 17.  This assertion is absurd. The negotiations were clearly conducted secretly.  Only upon the filing of the Application were the settlement negotiations discovered.  Neither the Trustee nor the SEC made any contact with ACSTAR regarding this proceeding.

At the time of procurement of the Bond, IHI asserted to ACSTAR that good and valid defenses existed.  ACSTAR has the right to raise those defenses.  The Final Judgment precludes the rights of ACSTAR to defend in the SEC litigation.  It is also a waiver of the defenses promised.  This is an act of fraud not only in the procurement of the Bond but also in the proposed settlement of the SEC litigation.  If the Final Judgment is entered under these circumstances, ACSTAR will not be conclusively bound.  These acts by the Trustee and the SEC are clearly fraudulent and wreak of bad faith.

The waiver of the good and valid defenses severely increases the risks associated with the provisions of the Bond. Established surety principles state that such an increase of risk has the result of voiding the Bond.  The SEC asserts that ACSTAR made an informed business decision when agreeing to post this Bond. That may be true.  However, consideration for the agreement to post the bond was the assurance that good and valid defenses to the SEC litigation existed.  ACSTAR continues to be assured that those defenses exist.  The Trustee's Application waives those defenses. This is further evidence of fraud, collusion and bad faith.

15

## VII. ACSTAR HAS THE RIGHT TO DEFEND

According to Georgia law, ACSTAR possesses the right to take up the defense of the principal (IHI) in the SEC litigation. Georgia law clearly states that where the principal on a surety bond is insolvent and does not defend in good faith, the surety will be permitted to intervene. Price, 121 Ga. at __, 48 S.E. at 723. In that regard the surety has the right to assert any and all defenses which would be available to his principal, with the exception of personal defenses. Hardaway Company v. Amwest Surety Insurance Company, 263 Ga. 698, 436 S.E.2d 642 (1993).

The SEC has in no way proven their case. In fact, they are a long way from doing so. If the case is as cut and dry as the SEC contends, a motion for summary judgment as to IHI could easily be filed. A judgment by the District Court against IHI would trigger payment of the Bond by ACSTAR. They have not done so. ACSTAR is entitled to intervene in the SEC litigation and raise the defenses of IHI. Therefore, the relief requested by the Trustee is a violation of the rights of ACSTAR and cannot be permitted. ACSTAR stands ready and willing to intervene and defend and must be given the opportunity to do so.

The SEC states in their Memorandum that they believe "that the [SEC litigation] is unlikely to be resolved any time soon or the substantial monetary claims of the [SEC] liquidated absent a settlement with the Trustee." Memorandum, at 12. By their own admission the SEC litigation will need to be tried in its entirety before a judgment is rendered. This is further evidence that the SEC is using the Final Judgment concept to circumvent obtaining a judgment after a trial on the merits.

The SEC states that it is being mindful of minimizing costs to the Debtor's estates in proceeding with its enforcement action. Memorandum, at 12. In fact, there have been little or no expenses incurred by the Trustee in the defense of the SEC

16

litigation.   The Trustee has not appeared, has not attempted to defend and plans to take no action to defend IHI in the SEC litigation.  This provides more reason why ACSTAR should be able to assert its rights in defending IHI in the SEC litigation without a ruling from this Court.  An adverse ruling from this Court could prejudice the rights of ACSTAR.

The SEC states that ACSTAR has failed to monitor and participate in the SEC litigation.  This is simply not true. Counsel for ACSTAR has obtained copies of all pleadings and the most pertinent deposition transcripts.  In addition, counsel for ACSTAR has been in constant contact with the current defense counsel in the SEC litigation.   The deadline for conducting discovery has been extended.  Since the current defense counsel is investigating matters which bear directly on the liability of IHI, ACSTAR has not abandoned its ability to defend IHI in the SEC litigation.

VIII.       THE TRUSTEE'S ACTIONS WILL VOID THE BOND
            BECAUSE THE TRUSTEE IS THE PRINCIPAL

It must again be pointed out that ACSTAR stands willing and able to pay any judgment and/or disgorgement amount up to Five Million and No/100 Dollars ($5,000,000.00) if the pre-conditions for the payment of the Bond are met.  The Final Judgment does not meet the pre-conditions for the Bond and will not trigger obligation on the part of ACSTAR to pay the Bond.  The collusive, fraudulent and bad faith nature of the acts of the principal (Trustee) to recover on the Bond will void ACSTAR's obligation on the Bond.   These acts constitute a material default of the terms and conditions of the Bond.

Additionally, the Trustee has a well-recognized common law duty to ACSTAR as the principal on the Bond.  Trustee has been put on notice that his actions in collusion with the SEC to force

WARD AND SMITH, P.A., ATTORNEYS AT LAW

17

ACSTAR to pay the full amount of the Bond without a trial on the merits. This represents a breach of duty and a lack of good faith on the part of the Trustee as the principal on the Bond. It must be reiterated that ACSTAR is not trying to void the Bond. ACSTAR is trying to keep the Trustee from waiving the rights of ACSTAR in violation of the Indemnity Agreement and the principles of the law of suretyship.

The Restatement (3rd) of Suretyship and Guaranty clearly states that the principal obligor owes certain duties to a surety. The principal has a duty (1) to perform the underlying obligation and (2) to refrain from conduct that impairs the expectation of the surety that the principal will honor its duty of performance. Restatement (3rd) of Suretyship and Guaranty § 21 (1995). Upon breach of the principal, the surety is entitled to relief that will properly protect its rights with respect to the principal obligor's duty of performance. Id. Without regard to the Indemnity Agreement, there is an implied agreement between the principal and the surety that the principal will perform the underlying obligation so that the surety does not have to.

It is a well-established principle of surety law that the surety relationship can be modified by contract. This modification is not contrary to the law of Georgia regarding suretyship. IHI executed an Indemnity Agreement which provides ACSTAR certain rights. The SEC Memorandum readily admits that the Indemnity Agreement "governs the rights of ACSTAR against the Debtors." Memorandum, at 15. It grants to ACSTAR the exclusive right to determine whether any claim shall be settled or defended. If the Final Judgment is entered without the express consent of ACSTAR as surety, this is in violation of the Indemnity Agreement.

IX.   SCHEME WOULD ALLOW PAYMENT OF BOND
      TO BENEFIT IHI (WRONGDOER) IN
      VIOLATION OF § 509(b)(2)

18

IHI is ultimately liable on any verdict which imposes civil penalties or disgorgement in the SEC litigation. IHI has obtained a bond posted by ACSTAR, but IHI is ultimately liable. The legislative history, as cited by Norton Bankruptcy Law and Practice (2ⁿᵈ) (1999 Ed.), sheds some light on the intent of Section 509. "Section 509(b)(2) reiterates the well-known rule that prevents a debtor that is ultimately liable on the debt from recovering from a surety or a codebtor." H. REP. No. 595, 95ᵀᴴ CONG., 2D SESS. (1978); S. REP. No. 598, 95ᵀᴴ CONG., 2D SESS. (1978). The Final Judgment directs payment of the proceeds of the Bond to be paid to the Trustee. The Trustee is the principal and the original wrongdoer. If this is accomplished, it is in violation of § 509(b)(2). This action is not permissible as the effect is to allow the principal to recover from the surety, ACSTAR.

The SEC is careful to point out their role in the SEC litigation. The SEC states that IHI (all Defendants) obtained ill-gotten gains, and an order of disgorgement is appropriate." Memorandum, at 10. "The remedy of disgorgement is not intended to compensate investors but rather to deprive a violator of unjust enrichment." Memorandum, at 19. This, however, is exactly what the SEC plans to do. The Final Judgment provides that the proceeds from the payment of the Bond would be paid directly over to the Trustee. This is inconsistent with Section 509 and the principles of surety law.

Also, the Final Judgment precludes ACSTAR from asserting subrogation rights to which it is entitled by virtue of Section 509. Section 509, in essence, permits the claim of ACSTAR to be subrogated to the claim of the SEC for the amount of payment. The Final Judgment does not provide ACSTAR with subrogation rights. In the event ACSTAR is required to pay on the Bond, ACSTAR has the option of electing to have an unsecured claim under § 502 or to be subordinated under § 509. The Final Judgment does not allow ACSTAR

to assert those rights.   Even if the SEC argues that the Final Judgment does not preclude this, the net effect of this scheme would.

## X.   SEC CLAIM IS A CONTINGENT UNSECURED CLAIM

The SEC has filed an unsecured claim that is contingent. The claim as filed provides no derivation or calculation of the amount.   Moreover, the claim is contingent on a finding of liability of IHI to the SEC litigation. There has been no judgment entered in the case.   No facts have been provided upon which to establish any liability.   The burden of proving the case falls squarely on the SEC.

In the event the SEC is ultimately successful in the SEC litigation, it would have an unsecured claim against the bankruptcy cases of IHI.   Obtaining a money judgment or disgorgement award would be an unsecured claim.   The Final Judgment impermissibly establishes the claim of the SEC as a legitimate claim.   The parties do not have the power to accept a contingent claim as valid under these circumstances.

## X.   DISTRIBUTION OF ASSETS VIOLATES
THE DICTATES OF TITLE 11

Section 507 of the Bankruptcy Code, together with various other sections of the Code, contains the only priority provisions applicable in a bankruptcy case.   To the extent a federal nonbankruptcy statute purports to affect priorities within a bankruptcy case, that statute is preempted by the more specific provisions in the Code.

The Final Judgment attempts to establish priorities of certain claims inconsistent with § 507 of the Code. It should be noted that the claims of the IRSRs, the receiver and the purchasers of convertible notes are simply unsecured claims.   The Final

20

Judgment would allow them to be paid over the claims of other unsecured creditors. This is in violation of the priority scheme as set forth in the Bankruptcy Code. It is also detrimental to unsecured creditors and a dereliction of the duties of the Trustee to allow it to happen.

ACSTAR is also a creditor in the bankruptcy cases. In fact, if ACSTAR is required to make payment on the Bond, ACSTAR may have an unsecured claim in the amount of Five Million and No/100 Dollars ($5,000,000.00). The Application of the Trustee does not discuss the rights of ACSTAR to elect subrogation under § 509 or a claim under § 502. Also, based on the distribution scheme set forth by the Trustee and the SEC, ACSTAR would not be fairly treated regardless of which election it made.

In addition, Section 326 of the Bankruptcy Code empowers a Bankruptcy Court to fix the Trustee's compensation and provide certain parameters for doing so. The Final Judgment requires, before any other payments, payment of the full statutory amount to which a Trustee may be entitled, without reduction, directly to the Trustee. The Final Judgment does not permit the Bankruptcy Court, who has exclusive authority to allow or disallow compensation to a Trustee, to exercise its exclusive powers. The Trustee nor the SEC have made any showing that this discretion should be removed from Bankruptcy Court. Further, the SEC nor the Trustee have made any showing that the Trustee is entitled to the maximum allowable compensation without reduction.

Moreover, the Final Judgment impermissibly takes away the bankruptcy case administration from the Bankruptcy Court. The Final Judgment empowers the SEC to request the District Court to make the determination of the accuracy of the information provided by IHI in their bankruptcy schedules. If the schedules are found to be fraudulent, misleading, inaccurate, or incomplete in any material respect, the SEC can ask the District Court to consider

21

all available remedies. All available remedies includes ordering IHI to pay or forfeit any funds or assets. Under the Final Judgment, the Trustee would be powerless to contest such remedies.

The result of this provision would be to allow the District Court the overriding authority to take control of the assets of both estates. This is an impermissible exercise of authority. It also subjects each claimant in the bankruptcy cases to the jurisdiction of both fora. This negates the intent of the legislatures who enacted the Bankruptcy Code to centralize the administration of assets of a bankrupt debtor.

XI. THIS COURT CANNOT ALLOW THE TRUSTEE
    TO ADMINISTER THE BOND IN THIS CASE

The SEC cites as authority for the Court to approve the Application Nationwide Mutual Fire Insurance Co. v. Eason, 736 F.2d 130 (4th Cir. 1984). This case can be easily distinguished. In that case, Nationwide filed an interpleader action and claimed no interest in the funds. Here, it is uncontroverted that ACSTAR has at least a One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.00) interest in the outcome. In Nationwide, the bankruptcy court found that it would be inequitable to return the proceeds to Nationwide, a disinterested stakeholder, simply because the interpleader defendants did not file answers. In this case, objections have been filed and IHI, ACSTAR, Van Etten and others contest the right of the SEC to recover on the Bond. "[W]e need not express any opinion as to whether the estate, the bond beneficiaries, or even the state, is entitled to the fund." Nationwide, 736 F.2d at 134. Thus, the court in Nationwide did not consider the same questions at issue here.

Additionally, the liability of the principal was clearly established in Nationwide. There was no question that the debtor in that case (Autry) was liable to the various grain suppliers.

WARD AND SMITH, P.A., ATTORNEYS AT LAW

Thus, the surety, Nationwide, was obligated to pay. In this case, however, the liability of IHI must be proven by the obtaining of a judgment for damages or an order granting disgorgement or other monetary relief against IHI. The liability of IHI to the SEC has not been established no matter what spin the SEC places on its case. Therefore, the <u>Nationwide</u> case is distinguishable.

The SEC string-cites the <u>Werbungs</u> case under a similar heading. That case clearly states that, because the bond was not part of the bankruptcy estate, the trustee, regardless of intent, did not have authority to enter into a settlement agreement whereby plaintiff would receive damages to be paid from proceeds of the bond. <u>Werbungs</u>, at 322. That case upholds the proposition that the bankruptcy court cannot compel non-estate property to be brought into the estate.

CONCLUSION

Based on the foregoing, the Application Of The Trustee To Enter Into Stipulation And Consent To Final Judgment Of Permanent Injunction should be denied.

WARD AND SMITH, P.A.

Paul A. Fanning
N.C. State Bar I.D. No.: 025477

Michael P. Flanagan
N.C. State Bar I.D. No.: 001461
120 West Fire Tower Road
Post Office Box 8088
Greenville, North Carolina 27835
Telephone: (252) 355-3030
Facsimile: (252) 756-3689
Attorneys for Acstar Insurance Company

990138-0001-001
GVLMAIN\202231.1

23

CERTIFICATE OF SERVICE

The undersigned, of 120 West Fire Tower Road, Post Office Box 8088, Greenville, North Carolina 27835-8088, certifies:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the date set forth below I served copies of the foregoing BRIEF by first class mail at their last known addresses on the following:

Holmes P. Harden
Maupin, Taylor & Ellis, P.A.
Post Office Drawer 19764
Raleigh, NC 27619

Terri L. Gardner
Smith, Debnam, Narron & Myers, LLP
Post Office Box 26268
Raleigh, NC 27611

Marjorie K. Lynch
Bankruptcy Administrator
Post Office Box 3039
Raleigh, NC 27602

Brent E. Woods
Post Office Box 164
Raleigh, NC 27602

Louis P. Richkind
Counsel to Chittenden Bank
One Woodward Ave., Suite 2400
Detroit, MI 48226

Kathryn N. Koonce
Poyner & Spruill, LLP
Post Office box 10096
Raleigh, NC 27605

N. Hunter Wyche, Jr.
Wyche & Story, RLLP
Post Office Drawer 1389
Raleigh, NC 27602

Lloyd W. Gathings, II
Robert W. Shore
Gathings & Associates
Post Office Box 10545
Birmingham, AL 35202

WARD AND SMITH, P.A., ATTORNEYS AT LAW

Ronald H. Garber
Boxley, Bolton & Garber, LLP
Post Office Drawer 1429
Raleigh, NC 27602

Lloyd T. Whitaker, President
Newleaf Corporation
2814 New Spring Road, Suite 330
Atlanta, GA 30339

Joel B. Piassick
Kilpatrick & Stockton, LLP
Suite 2800
1100 Peachtree Street, N.E.
Atlanta, GA 30309

William P. Hicks
U.S. Securities and Exchange Commission
Atlanta District Office
Suite 1000
3475 Lenox Road
Atlanta, GA 30326

I certify under penalty of perjury that the following is true and correct.

This the  _28th_  day of April, 1999.


_Paul A. F_____
Paul A. Fanning

9901038/0001
GVLMAIN\202933.1

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 0 3 1998

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

   Plaintiff,

  v.

INTERNATIONAL HERITAGE, INC.,
STANLEY H. VAN ETTEN, CLAUD W.
SAVAGE, LARRY G. SMITH,
INTERNATIONAL HERITAGE,
INCORPORATED, a Nevada corporation,

   Defendants.

CIVIL ACTION
NO. 1:98-CV-803-RWS

## MEMORANDUM OPINION AND ORDER

Pursuant to Sections 20 (b) and 20 (d) of the Securities Act and Sections 21 (d) and 21 (e) of the Exchange Act, the Securities and Exchange Commission brought this action for injunctive and other equitable relief, alleging various violations of the securities laws. This case is before the Court on the Commission's Motion for Preliminary Injunction. After conducting a hearing and reviewing the entire record, this Court enters the following Order.

## I. FINDINGS OF FACT

On March 16, 1998, the Commission sought and obtained a temporary restraining order against Defendants. The Commission has alleged Defendants engaged in the sale of securities without filing a registration statement with the Commission, Defendants made misrepresentations and material omissions in connection with the sale of securities, and Defendants knowingly misrepresented International Heritage's financial condition and concealed the fact that International Heritage [hereinafter referred to as "IHI"] was operating a pyramid scheme. The

# EXHIBIT A

Commission also alleged the Form 8-K filed with the Commission by IHI contained misrepresentations concerning the nature of IHI's business and concealed the fact that IHI was operating a pyramid scheme. The Commission requests that the Court enter a preliminary injunction enjoining all Defendants, their officers, agents, and employees from violating Sections 5 (a), 5 (c) and 17 (a) of the Securities Act and Section 10 (b) of the Exchange Act and Rule 10b-5. The Commission also requests that the Court enjoin IHI and Defendant Van Etten from violating Sections 10 (b) and 15 (d) of the Exchange Act and Rules 10b-5 and 15d-11.

IHI contends it is a multi-level marketing firm engaged in the sale of products such as jewelry, recreational equipment and collectible items. IHI was founded by Claude W. Savage, Larry G. Smith and Stanley H. Van Etten in April of 1995. Defendant Van Etten is Chairman of the Board of Directors, President and Chief Executive Officer of IHI.[1]  Defendants Claude Savage and Larry G. Smith are directors of IHI.[2] Defendants Savage and Smith were previously associated with Gold Unlimited, a multi-level marketing firm which had gone out of business.

Defendant Van Etten presently owns Mayflower Capital, a broker dealer licensed by the National Association of Securities Dealers and the Securities Exchange Commission. Defendant Van Etten is also a shareholder and manager of Mayflower Venture Capital Fund, a one million dollar venture capital fund used to invest in start-up companies.

---

[1] On March 6, 1998, IHI entered into a reverse merger with Kara International Inc., and on March 9, 1998, Defendant Van Etten became Chairman of the Board, President and Chief Executive Officer of International Heritage Incorporated, formerly Kara International Inc.

[2] Both Defendants Savage and Smith are also presently directors of Heritage Incorporated.

2

Between July 17, 1997 and October 31, 1997, IHI notes were sold in a non-public offering. In connection with the sale of these notes, IHI disclosed to investors that it had suffered increased losses between May1, 1997 and August 20, 1997.

IHI started with a small number of independent retail sales representatives. The initial independent sales representatives earned commissions by selling products through their own retail sales organizations.[3] Prior to March 18, 1998, an individual could join IHI and sell products at retail price for a profit, purchase products for personal use or earn out products by applying commissions earned from sales toward the purchase of a product.[4] The earn-out option required execution of a Retail Business Agreement, or "RBA." An RBA was always initially filled out as an earn-out. Regardless of the option chosen, all sales representatives were required to purchase a Retail Business Career Kit for $100. Under the earn-out option, a participant executed a RBA and paid $250 toward the purchase of a product.[5] As stated in the IHI manual, the RBA had a cash value of $250.

One of IHI's slogan's was, "Open ... Create ... Certify ... Duplicate." With the execution of an RBA, the representative earned 200 points, or what the company referred to as "Retail Sales Business Volume." Executing a RBA would effectively open a "Retail Business Center." A business center was a position in IHI's computer tracking system for the recording of Retail Sales

---

[3] All representatives were required to submit an application.

[4] Although IHI constantly updates its marketing materials, the Retail Business Career Kit received by the Commission in September of 1997 contained materials with the latest revision date of October, 1996.

[5] However, it was possible for an IHI participant to enroll and make no payment other than $100 for the Career Kit.

3

Business Volume or RSBV.[6]  Through March 8, 1998, approximately 90% of the business

centers were certified through an RBA.  A business center also served as a necessary component

in the creation of a business organization; a business organization consisted of a group of sales

representatives.  Participants had the option of opening one, three or seven business centers.[7]  The

incentive for multiple centers was to sponsor more business organizations.  A participant could

not earn more than $2200 per week with a single business center.  Therefore, if a participant

wanted more money, he had to open more business centers.

    IHI conducted regular regional training events for sales representatives.  To attract new

representatives, present representatives would conduct weekly opportunity meetings outlining the

program.  Representatives would explain IHI's bilateral system as requiring sales representatives

to develop a business organization on the left and right in order to earn money.  This process was

referred to as "duplication."  Under IHI's old program, the only way to become a sales

representative was by sponsorship through another sales representative.  No more than two sales

representatives could be sponsored directly under one business center.

    The establishment of business centers and the accumulation of RSBV were also

mechanisms for calculating override commissions.  Override commissions were commissions on

sales made by other sales representatives within a business organization.  In order to earn override

---

    [6]  With the buy-out option, the representative had 60 days to pay IHI the balance of the
cost of the product ordered with the execution of the Retail Business Agreement. With the cash-
out option the representative had 60 days to receive his $250 deposit back.  However, the cash-
out option was not available if the representative had earned 1200 Retail Sales Business Volume.

    [7]  The cash-out option was not available to representatives who had purchased three or
seven business centers.  The cost of seven centers was $1850; this payment could be made with a
credit card.

commissions, a sales representative was required to certify his retail business center by accumulating a minimum of 200 RSBV. Under the earn-out option, initial certification was accomplished by payment of $250 toward the purchase of a product order. With the $250 payment and product order, 200 RSBV was credited to the business center and to each business center above it in the retail sales organization, regardless of whether the product was ever actually purchased or "earned out." If the product was earned in its entirety, the product was delivered to the representative. Representatives did not have the option of receiving a commission check in lieu of the product ordered upon execution of the RBA.

Commissions were earned according to preset RSBV achievement levels. Once a sales representative had accumulated a total of at least 1,200 RSBV on each side of his sales organization, the representative would receive a $500 product or commission. This process resulted in Level One certification. For Level Two certification, a representative had to accumulate 2400 RSBV on each side; for Level Three, 3600 RSBV on each side. Each additional level of certification entitled the representative to an additional $500 product or commission. After Level Three certification was accomplished, a representative's RSBV total was cleared. However, that representative would receive a "free" business center which could be used to replace a business center in the representative's business organization. This free business was referred to as a Development Certificate. Also, after Level Three certification, a representative could earn a $700 commission bonus if two representatives, one on each side of his organization, earned 3600 RSBV within two commission periods. A sales representative could not earn override commissions unless RSBV was migrating upward. To facilitate migration of RSBV, IHI also required representatives who had achieved the first level of earnings to recertify their business

5

centers every 13 weeks. Recertification was accomplished by purchasing products or executing more RBA's.[8] If a representative sponsored a new representative who certified a business center, each business center above the new representative would receive 200 RSBV.

Although IHI contends that it is a product driven company, the facts demonstrate that, across the board, selling products was not IHI's primary operation. As of April, 1997, there were 192 IHI representatives in the Macon, Georgia area. All 192 representatives were on IHI's product ship list for that area. However, only three individuals listed on the shipping list were not listed as IHI representatives. Testimony from the receiver's accountant indicated that approximately 90% of the total sales revenue of IHI comes from establishing or recertifying business centers. Participants testified that at IHI meetings there was little discussion of products and prospective participants were told they could earn money faster through recruitment. They understood that in order to make money in IHI they only had to recruit two people. The witnesses understood that their sales organization would grow through duplication. The fortunes of IHI investors were inextricably tied to the success of the efforts of IHI promoters. Furthermore, of the 569,440 total product orders since IHI's inception, 288,418 orders have not been filled.

As to the old plan, IHI's regulatory history is not unblemished. In the spring of 1997, North Carolina's Attorney General's office began an investigation of IHI operations. On June 3, 1997, Defendants entered into an agreement with the State of North Carolina requiring 70% of all North Carolina sales revenue to be retail sales to persons not connected to IHI or its participants.

---

[8] A representative could have a maximum of three outstanding RBA's per business center.

6

In March of 1997, Georgia's Attorney General's office began an investigation of IHI operations. On February 4, 1998, the Georgia Fulton County Superior Court entered an order of assurance of voluntary compliance. In this order, Defendants agreed to a requirement of 50% non-participant sales prior to payment of any commissions or dividends. IHI is presently in compliance with both agreements.

While Defendants contend the new plan does not involve the sale of securities, the new plan contains some of the same aspects of the old plan. Under the new plan, a retail business center is "qualified" rather than "certified;" although the cost and RSBV requirements are not the same, the process is the same. Requalification is still required every 13 weeks, and requalification is necessary to earn override commissions. However, a representative must also select additional bonus products to be earned out to requalify a business center. To broaden IHI's program, another compensation plan was developed, the Flex-Level Compensation Plan. This plan uses PV or personal volume rather than RSBV to calculate earnings and assign value to products. Although the alternative compensation plan entitles a representative to "Personal Volume Rebate Commission[s]," this term is not defined in the manual. Retail Sales Organizations (RSO's) still exist and sponsorship is still the only method of developing RSO's. In both plans, representatives can earn development bonuses and development certificates by similar methods described above. The new plan does not include the RBA or a $250 deposit.

## II. CONCLUSIONS OF LAW

The issue before the Court is whether Defendants have violated federal securities laws warranting an exercise of this Court's equitable jurisdiction. Before the Court may issue a preliminary injunction, the Commission must demonstrate by a preponderance of the evidence that

there is reasonable likelihood that Defendants are engaged or about to engage in practices that violate federal securities laws.  S.E.C. v. First Financial Group of Texas, 645 F.2d 429 (5th Cir. Unit A May 1981).[9]  The Commission may make such a showing by submitting proof of past substantive violations that indicate a reasonable likelihood of future substantive violations.  Id.  In determining whether to issue an injunction, the Court must consider the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.  S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982).  With such an inquiry, the Court is required to view all evidence in a light most favorable to the Commission, and the Commission is entitled to all reasonable inferences.  S.E.C. v. Blatt, 583 F.2d 1325 (5th Cir. 1978).

Before proceeding on the merits of the Commission's requests for relief, the Court must first determine whether Defendants have engaged in the offer and sale of "securities" under the terms of the Securities Act and the Exchange Act.  The Commission argues the "security" involved in the case at bar can be characterized as an "investment contract."[10]  As stated by the

---

[9]  S.E.C. v. Carriba Air, Inc., 681 F.2d 1318, 1324 n.7 (Eleventh Circuit bound by Fifth Circuit decisions handed down prior to close of business on September 30, 1981 unless and until the Eleventh Circuit speaks en banc to the issue presented).

[10]  According to 15 U.S.C. § 78c (a) (10) of the Exchange Act, the term "security" means "any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . ., or any . . . transferable share, investment contract . . .; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase any of the foregoing[.]"  The Securities Act contains a similar definition found at 15 U.S.C. § 77b (1).  The Supreme Court has held that the two definitions are virtually identical.  Tcherepnin v. Knight, 389 U.S. 332, 335-36, 88 S.Ct. 548,

8

Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed.
1244 (1946), "An investment contract for purposes of the Securities Act means a contract,
transaction or scheme whereby a person invests his money in a common enterprise and is led to
expect profits solely from the efforts of the promoter or a third party." See also Tcherepin et al.
v. Knight et al., 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.E.2d 564 (1967) (the test for an
investment contract under the Exchange Act is whether the scheme involves an investment of
money in a common enterprise with profits to come solely from the efforts of others) and United
Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.E.2d 621 (1975).

The Commission contends Defendants' offer and sale of business center interests are
investment contracts and thus securities.  While it is clear participants in IHI's old program made
an investment of money in a common enterprise,[11] Defendants argue the third prong of the Howey
test has not been met. In S.E.C. v. Koscot Interplanetary Inc., the Eleventh Circuit Court of
Appeals expressly adopted the view of the Ninth Circuit and held an investment contract exists
when "the efforts made by those other than the investor are the undeniably significant ones, those
essential managerial efforts which affect the failure or success of the enterprise."  497 F.2d 473,
478 - 479 (5th Cir. 1974). See also Eberhardt v. Waters, 901 F.2d 1578 ( 11th Cir. 1990) (where

_____

552-53, 10 L.E.2d 564 (1967).  See also United American Bank of Nashville, v. Gunter et al., 620
F.2d 1108, 1114 (5th Cir. July 1980).

[11] In S.E.C. v. Koscot Interplanetary Inc. 497 F.2d 473 (5th Cir. 1974), the Court of
Appeals held "the requisite commonality [of an enterprise] is evidenced by the fact that the
fortunes of all investors are inextricably tied to the efficacy of the [business organization's]
meetings and guidelines on recruiting prospects and consummating a sale [] while the fact that an
investor's return is independent of that of other investors in the operation is not decisive."  The
Court of Appeals' analysis of the second prong focused on the uniformity of impact of the
promoter's efforts.

9

third prong of Howey was satisfied even where profits were not derived "solely" from the efforts of others but were also derived from insubstantial efforts of the investor).  In the case at bar, upper-level management of IHI implemented widespread promotional programs which included live conferences, telephone conferences, meetings, and training events.  The Retail Sales Career Kit purchased by each representative included brochures, video presentations, audio cassettes, and flip chart presentations which explained IHI's marketing program and were used to advertise IHI's program to prospective participants. An IHI representative only had to find a listening ear, while IHI promoters retained immediate control over the managerial conduct of the enterprise. Representatives only had to find two recruits.  Representatives testified that they understood their sales organization would grow simply by duplication.  After finding two recruits, investors would profit by the geometric progression of the process of recruitment, and the success of a representative's investment was inextricably tied to the efforts of IHI promoters.  Therefore, this Court concludes the IHI program involved the offer and sale of securities.

Section 5 of the Securities Act prohibits the sale of securities by the use of instrumentalities of interstate commerce without the filing of a registration statement.[12]  To establish a violation of this provision of the Act, the Commission must make a prima facie showing that no registration statement was in effect as to the securities, that Defendants sold or

---

[12]  15 U.S.C. § 77e (a) provides, "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e (c) is the provision that requires filing of a registration statement when securities are offered and sold.

10

offered to sell the securities, and that interstate transportation or communication and mails were used. S.E.C. v. Continental Tobacco Co. of South Carolina, 463 F.2d 137 (5th Cir. 1972).

The Commission contends Defendants have been selling securities since 1995 by using the mails, traveling, and other media including telephone conference calls without filing a registration statement. The Commission submitted undisputed evidence that Defendants used the mails to send promotional sales materials to investors and used instrumentalities of interstate commerce such as telephones and travel to give sales meetings. The Commission also demonstrated that the use of instrumentalities of interstate commerce was for the purpose of the sale and offer of securities. The sale of business centers by the use of the RBA constitutes the sale of securities and Defendants failed to file a registration statement as to these securities. Therefore, Defendants violated Sections 5 (a) and (c) of the Securities Act.

Several provisions of the Securities Act and the Exchange Act prohibit the use of any manipulative device in the sale of securities.[13] To prove violations under Sections 10 (b), Rule

---

[13]  15 U.S.C. § 78j (b) provides,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 is found at 17 C.F.R. § 240.10b-5. This regulation provides,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to

11

10b-5 and 17 (a) (1), the Commission must establish that Defendants acted with scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976); Aaron v. S.E.C., 446 U.S. 680, 100 S.Ct. 1945, 64 L.E.2d 611 (1980). The Commission may demonstrate the existence of scienter by showing that Defendants engaged in knowing or intentional misconduct. Aaron, 446 U.S. at 695, 100 S.Ct. at 1955. In the Eleventh Circuit, scienter may also be established by showing that the defendant's conduct exhibited severe recklessness. Carriba Air, 681 F.2d at 1324.

Defendants' old compensation plan which included the use of the RBA is comparable to the program found in Webster v. Omnitrition International, Inc., 79 F. 3d 776 (9th Cir. 1996). Defendants exhibited at least severe recklessness in marketing and implementing the old program. Therefore, this Court concludes that Defendants violated Section 10 (b) of the Exchange Act, Rule 10b-5, and Section 17 (a)(1) of the Securities Act.

---

defraud,
(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Section 17 (a) of the Securities Act is found at 15 U.S.C. § 77q (a) (1), which provides, "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly to employ any device, scheme, or artifice to defraud."

12

However, this Court declines to conclude that Defendants IHI and Stanley Van Etten violated Section 15 (d) of the Exchange Act or Rule 15d-11. At this point, there is an insufficient basis in the evidence to support a violation of either provision.

Defendants contend IHI's program no longer includes the use of the Retail Business Agreement and prospective injunctive relief is not required. However, the new plan retains elements from the old plan (e.g., certification and recertification) which cause the Court concern about future violations. The nature of Defendants' past violations demonstrate the reasonable likelihood of future violations; therefore, preliminary injunctive relief is warranted. See Continental Tobacco, 463 F2d. at 162. See also S.E.C. v. Radio Hill Mines Co., Ltd., 479 F2d 4 (2nd Cir. 1973) (where court designed additional reporting requirements to insure compliance with a preliminary injunction against violations of the securities laws).

For the aforementioned reasons, the Commission's Motion for Preliminary Injunction is **GRANTED**.

## PRELIMINARY INJUNCTION

The Commission having demonstrated a reasonable likelihood of future violations by the defendants, it is hereby **ORDERED** that:

**1.**

Until further order of this Court, defendant International Heritage, Inc. ("IHI"), its officers (as officers and in their individual capacities), agents, servants, employees, attorneys, and those persons in active concert or participation with them be, and they hereby are, restrained from directly or indirectly:

**2.**

Until further order of this Court, defendant IHI, its officers (as officers and in their individual capacities), agents, servants, employees, attorneys and those persons in active concert or participation with them, in connection with the purchase or sale or in the offer or sale of securities, by use of any means or instrumentality's of interstate commerce or any means or instruments of transportation or communication in interstate commerce, or by the mails or any facility of any national securities exchange, be, and they hereby are, restrained from directly or indirectly:

(1)    employing any device, scheme or artifice to defraud;

(2)    engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person;

(3)    obtaining money or property by means of any untrue statement of a material fact, or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(4)    making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, thereunder.

**3.**

Until further order of this Court, defendant International Heritage Incorporated, a Nevada corporation, its officers (as officers and in their individual capacities), agents, servants, employees, attorneys and those persons in active concert or participation with them, be and hereby are restrained from directly or indirectly filing reports with the Commission, on Form 8-K or otherwise, which are false and misleading or fail to disclose material facts necessary to make the statements made not misleading, in violation of Section 15(d) of the Exchange Act, 15 U.S.C. 780(d), and Rule 15d-11, 17 C.F.R. 240.15d-11.

**4.**

Pending further order of this Court, defendant IHI, its officers (as officers and in their individual capacities), agents employees, servants, attorneys, and all persons in active concert or participation with them, and each of them are restrained and enjoined from destroying, transferring or otherwise rendering illegible all books, records, papers, ledgers, accounts, statements and other documents employed in any of such defendants' businesses, which reflect the business activities of any of the defendants, or which reflect the transactions described in the Commission's Complaint.

**5.**

**IT IS FURTHER ORDERED** that Lloyd Whittaker is hereby appointed Monitor for IHI. The Monitor will periodically review the activities of IHI to assure IHI's compliance with this order and the federal securities laws. This review will be performed within thirty (30) days of this order and not less than quarterly thereafter. The Monitor will have full access to the offices, records and officers and employees of IHI except any information protected by an

16

applicable privilege. IHI will provide quarterly financial information to the Monitor in the form and as otherwise directed by the Monitor, and will submit any changes in its compensation plan to the Monitor for approval before implementing such changes. IHI will provide the Monitor with the names, addresses and phone numbers of any new representatives who are enrolled by IHI. IHI will also make available for review by the Monitor order forms for all products and services sold by IHI, which shall contain the name and address of the purchaser, the items purchased and the purchase price. IHI shall not accept any orders which do not contain this information. The Monitor will periodically contact a sampling of such representatives and customers to determine if the IHI program is being presented in a way which is inconsistent with this order. The Monitor will report to the Court any conduct inconsistent with this Order. IHI shall be responsible for, and shall pay, the reasonable fees and costs incurred by the Monitor, including, but not limited to, professional fees.

6.

**IT IS FURTHER ORDERED** that IHI will post a bond in the amount of $5 million until further order of this Court, to ensure that at least that amount is available to satisfy any amounts that may be ordered paid by IHI in this proceeding. The specific conditions of said bond shall be set out in a separate order, which conditions are incorporated herein by reference.

7.

**IT IS FURTHER ORDERED** that defendants Stanley H. Van Etten, Claude W. Savage and Larry G. Smith shall not leave their positions with IHI without prior leave of the Court.

**8.**

IT IS FURTHER ORDERED that IHI shall not transfer its sales operation or representative networks to any other entity without prior leave of the Court.

**9.**

IT IS FURTHER ORDERED that defendant Van Etten's monetary compensation as set out in the Employment Agreement between Van Etten and International Heritage, Inc. will be reduced by fifty percent (50%) until further order of the Court.

**10.**

IHI shall develop and submit to the Monitor a new compensation and marketing plan consistent with the terms of this order. Any future amendments to the plan shall also be submitted to the Monitor. The Monitor shall submit the plans to Plaintiff and the Court for review. The Monitor will review any plans submitted by IHI to assure compliance with this order and shall approve a plan only after determining that the plan complies with the terms of this Order and any applicable laws. After approval by the Monitor of a plan or amendment, such plan or amendment can be implemented by IHI. IHI will not be required to await approval by the Court of such plans. No new sales representatives shall be approved by IHI until the new composition and marketing plan is approved by the Monitor. Notwithstanding the foregoing, the Court may, upon motion of any party or *sua sponte* issue a show cause order requiring IHI to appear before the Court and show that the plans are in compliance with the terms of this Order. In addition to seeking approval of the Monitor to the new plans, IHI may, before implementation of such plans, request that the Court review any new or amended plans to assure compliance with the terms of this Order.

18

**11.**

**IT IS FURTHER ORDERED** that IHI shall not permit any further use of the Retail Business Agreement, or any similar agreement which permits, as an aspect or part of the business operations, compensation plan, or marketing plan of IHI, sales representatives of IHI to make partial payments toward the purchase of a product or service in order to receive override commissions on the sale of products or services. However, IHI may continue to require a prospective sale representative to purchase a sales kit at a cost of $100.00, which costs shall be consistent with IHI's costs to provide the kit.

**12.**

**IT IS FURTHER ORDERED** that IHI shall not require new or current sales representatives of IHI to certify or recertify, through payment by the sales representative to IHI, in order to receive override commissions.

**13.**

**IT IS FURTHER ORDERED** that IHI shall not accept payment for products or services without either delivering the product or services or making appropriate arrangements with a carrier, manufacturer, or supplier of that product or service to deliver the product or service to the purchaser of that product or service.

**14.**

**IT IS FURTHER ORDERED** that IHI will give notice of this Order and its terms to all representatives within thirty (30) days, and will supply proof of this effort to the Monitor. IHI will provide notice of its Compensation Plan to all representatives within thirty (30) days of its approval, and will supply proof of this effort to the Monitor.

19

### 15.

The Court finds that the Receiver, Lloyd Whittaker, has performed his duties in full and complete compliance with the terms of this Court's previous orders. The Receiver shall be relieved of his responsibilities upon the posting of the $5 million bond required to be posted by IHI under this Order. Upon the posting of said bond, the Receiver's bond which has been filed with the Clerk of Court shall be discharged. Prior to the discharge of the Receiver, the Receiver is authorized to transfer the sum of $120,000.00 from IHI to the Trust Account of Kilpatrick Stockton, LLP, the Receiver's legal counsel, to be held for payment of the professional fees and expenses incurred by the Receiver, the Receiver's legal counsel, and the Receiver's financial consultant, in connection with the Receiver's duties and obligations during his tenure. However, such professional fees and expenses shall be paid only upon submission of appropriate applications for fees and expenses to the Court and upon the Court's approval of same. To the extent that the amount of the Court approved professional fees and expenses are less than the amount reserved in the Trust Account, then the excess would be returned forthwith to IHI. To the extent that the amount of the Court approved professional fees and expenses are more than the amount reserved in the Trust Account, IHI shall be ordered forthwith to remit the deficiency to the Receiver.

### 16.

IT IS FURTHER ORDERED that, upon the posting of the $5 million bond by IHI, the officers and directors of IHI will have the authority to resume, and may resume, their responsibilities as officers and directors of IHI in accordance with the terms of this Order.

20

### 17.

IT IS FURTHER ORDERED that the orders entered by the Court in this cause on March 16, 1998 and as subsequently modified on March 17, 1998, shall be vacated and modified in their entirety to conform with the terms of this Order upon the posting of the $5 million bond by IHI.

### 18.

IT IS FURTHER ORDERED that this Order shall not and does not constitute a securities or investment related permanent or temporary injunction for purposes of any collateral effects or reporting requirements under state securities laws or self-regulatory organization rules, nor shall the existence of this Order restrict, limit, prohibit or disqualify the Defendants, or any affiliate of the Defendants, in any manner from (a) engaging in any lawful activity or practice pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisers Act of 1940, or the Commodity Exchange Act, and/or any rules or regulations promulgated thereunder, and/or any state securities and commodities laws (including with limitation, participating in offerings or availing themselves of exemptions including the Uniform Limited Offering Exemption, as and to the extent now or hereafter adopted ), or (b) acting as an affiliated person of any underwriter, broker, dealer, investment adviser, investment company, bank, insurance company, or other entity or person under any applicable federal or state insurance, securities, banking or commodities laws.

21

**SO ORDERED** this _3rd_ day of April, 1998.

RICHARD W. STORY
United States District Judge

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 0 3 1998

LUTHER D. THOMAS, Clerk
By: [signature]                Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

    v.

INTERNATIONAL HERITAGE, INC.,
STANLEY H. VAN ETTEN, CLAUDE W.
SAVAGE, LARRY G. SMITH and
INTERNATIONAL HERITAGE
INCORPORATED, a Nevada corporation,

       Defendants.

CIVIL ACTION
NO. 1:98-CV-803-RWS

## NOTICE OF POSTING OF CASH BOND AND ORDER APPROVING CASH BOND

WHEREAS, in open Court on 27 March, 1998 and in the above-captioned civil action pending in this Court between the Securities and Exchange Commission (hereinafter "SEC"), as Plaintiff, and the Defendants International Heritage, Inc. and International Heritage, Incorporated (hereinafter "Defendants IHI") and other individual Defendants, an Order was entered from the bench by the Honorable Richard W. Story, pending formalization of a subsequent written order requiring the Defendants IHI to post a dischargeable bond in the amount of Five Million Dollars ($5,000,000.00) to assure that the liquid assets of the Defendant IHI are not diminished during the pendency of this action and that such principal sum will be available to satisfy any amounts that may be ordered paid by the Defendants IHI in this proceeding; and

WHEREAS, the Defendant Stanley H. Van Etten, in his individual capacity, and acting as a Surety on behalf of the Defendants IHI (hereinafter "Surety"), has tendered and has agreed to transmit to the Clerk of Court for the United States District Court for the Northern District of

# EXHIBIT B

Georgia, Atlanta Division (hereinafter "Clerk of Court"), for deposit into the Registry of the Court the sum of Five Million Dollars ($5,000,000.00) cash (hereinafter "Bond") to assure that the liquid assets of the Defendants IHI are not diminished during the pendency of this action and to apply to any judgment for damages and/or order granting disgorgement or other monetary relief against the Defendants IHI, or either of them, up to the principal amount of Five Million Dollars ($5,000,000.00) that may result from this proceeding; and

**WHEREAS**, the Bond deposited by the Clerk of Court into the Registry of the Court shall be held pursuant to the terms of this order.

**NOW, THEREFORE, BASED UPON THE FOREGOING, THE COURT HEREBY ORDERS** that:

1.    The Bond posted by the Surety shall be deposited into the Registry of the Court to assure that the liquid assets of the Defendant IHI are not diminished during the pendency of this action and to make available at least the principal amount of Five Million Dollars ($5,000,000.00) to apply to any judgment for damages and/or any order granting disgorgement or other monetary relief against the Defendants IHI, or either of them in this proceeding.

2.    The condition of the obligation of the Bond is such that if the SEC shall fail to obtain a judgment for damages or an order granting disgorgement or other monetary relief against the Defendants IHI or either of them in this case, then this obligation shall be null and void and the principal amount of the Bond together with any then undisbursed accrued interest thereon shall be returned to the Surety upon receipt by

2

the Clerk of Court of an order releasing the Bond; otherwise, the Bond shall remain in full force and effect, pending further order of this Court.

3.   A further condition of the obligation of the Bond is that if the SEC obtains a judgment for damages and/or an order granting disgorgement or other monetary relief against the Defendants IHI or either of them in this case, and that judgment is and any order granting disgorgement or other monetary relief are satisfied in whole or in part from the assets of the Defendant IHI either in full or, alternatively, in at least the principal amount of Five Million Dollars ($5,000,000.00), the principal amount of the Bond or any unapplied part of the principal amount of the Bond shall be returned to the Surety; otherwise, the Bond shall remain in full force and effect, pending further order of this Court.

4.   The Bond posted by the Surety shall be placed by the Clerk of Court in a Registry of Court account by the Clerk of Court which will yield the highest interest rate possible, with any interest earned being paid to and for the benefit of the Surety quarterly, after any appropriate fees are deducted in accordance with any applicable laws which govern the activities of the Clerk of court.

5.   The Defendants IHI may replace all or a portion of this Bond with a conventional, pre-approved surety bond containing exactly the same terms and conditions during the period that the Bond remains in place, so long as the replacement principal Bond amount shall not be less than Five Million Dollars ($5,000,000.00), provided that all aspects of the replacement are approved in advance by this Court and an additional order is entered by this Court approving the replacement of the Bond and further

3

provided that no more than one (1) such Bond replacement shall be proposed by the Defendants IHI.

6.  In the event that the Surety shall no longer be employed by or serve as an officer or director or be a shareholder of either of the Defendants IHI, the Defendants IHI may, with the advance approval of this Court, replace this Bond either with a separate cash bond, or with a conventional, pre-approved surety bond containing precisely the same terms and conditions; provided, however, in no event shall the Bond be replaced unless and until the collective principal Bond amount is at least Five Million Dollars ($5,000,000.00) and all aspects of the replacement are approved by a written order entered by this Court.

**SO ORDERED**, this _3_ _d_day of April, 1998.

RICHARD W. STORY
United States District Court Judge

4

FILED IN CHAMBER
RICHARD W. STOF
U.S D.C. Atlanta

JUL 0 1 1998

LUTHER D. THOMAS, Cle
By: _____
        Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff.

v.

INTERNATIONAL HERITAGE, INC., et al.,

        Defendants.

CIVIL ACTION NO.
1:98-CV-0803-RWS

## ORDER

This matter came before the Court on the application of Defendant International Heritage,
Inc. and International Heritage, Incorporated (hereinafter "Defendants IHI") for an Order Approving
Substitution of Cash Bond with Payment. By Order dated June 24, 1998, the Court denied the
application because United Coastal Insurance Company ("United") was not authorized to conduct
business in Georgia. Defendants IHI have now presented evidence that United is authorized to issue
surplus line insurance pursuant to Georgia law and have requested that the Court vacate the June
24th Order and grant the application.

Having reviewed the entire record, including the original application and the motion for
reconsideration, the Court enters the following Order granting the motion for reconsideration and
granting the application.

The payment bond (a copy of which is attached hereto as Exhibit A) is approved by the Court
as an appropriate surety bond for posting by Defendants IHI, ACSTAR Insurance Company

# EXHIBIT C

("ACSTAR"), and United in accordance with the April 3, 1998 Order of the Court. In order to complete the terms of the payment bond, it will be necessary for the Clerk of Court to disburse to ACSTAR some of the funds currently deposited by the Clerk of Court into the Registry of the Court. Therefore, upon the receipt of an original fully executed payment bond in the form attached hereto as Exhibit A by the Clerk of Court, the Clerk of Court shall wire transfer to ACSTAR Insurance Company in accordance with the instructions of ACSTAR contained in the bond the principal sum of Three Million Six Hundred Fifty Thousand and No/100 Dollars ($3,650,000.00) from the cash bond posted by the Defendant Stanley Van Etten. The Clerk of Court shall also disburse the remaining funds held within the Registry of the Court, including both principal and interest to International Heritage, Inc. (federal tax identification number 56-1921093) by wire transfer to First Union Bank, FBO International Heritage, Account Number 2000001295391, Routing Number 053110400.

Within three (3) business days following the wire transfer from the Clerk of Court to ACSTAR of the principal sum of Three Million Six Hundred Fifty Thousand Dollars ($3,650,000.00), ACSTAR shall acknowledge in writing the receipt of the wire transfer. If ACSTAR fails to acknowledge receipt of the wire transfer from the Clerk of Court, the Defendants IHI shall be in default of the bond requirements of the April 3, 1998 Order of this Court.

SO ORDERED, this 1st day of July, 1998.

RICHARD W. STORY
United States District Judge

ENTERED ON DOCKET

DEPUTY CLERK

2

AO 72A
(Rev 8/82)

Bond No. 7719


INSURANCE COMPANY    233 MAIN STREET • P.O. BOX 2350 • NEW BRITAIN, CT 06050-2350 • (860) 224-2000

**PAYMENT BOND**

KNOW ALL MEN BY THESE PRESENTS, that International Heritage, Inc. and International Heritage Incorporated, jointly and severally, (hereinafter referred to as "Principal"), and ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, P.O. Box 2350, New Britain, CT 06050-2350, (hereinafter referred to as "Surety"), are held and firmly bound unto The Clerk Court for the United States District Court for the Northern District of Georgia, Atlanta Division (hereinafter "Clerk of Court"), (hereinafter referred to as "Obligee"), in the penal sum of FIVE MILLION and 00/100 Dollars ($5,000,000) for which payment well and truly to be made we do bind ourselves, our heirs, executors, administrators and assigns, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH, that

WHEREAS, the Principal has been required to post this disgorgement bond to assure that the liquid assets of Principal are not diminished during the pendency in the action captioned "Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith and International Heritage Incorporated", and that such FIVE MILLION DOLLARS sum will be available to satisfy any amounts that may be ordered paid by Principal in the above proceeding. This bond shall apply to any judgment for damages and/or order granting disgorgement or other monetary relief against Principal up to FIVE MILLION DOLLARS.

The condition of this obligation is such that if the Securities and Exchange Commission shall fail to obtain a judgment for damages or an order granting disgorgement or other monetary relief against the Principal, then this obligation shall be null and void and this bond shall be returned to the Surety upon receipt by The Clerk of the Court of an order releasing this bond, otherwise this bond shall remain in full force and effect, pending further order of this Court.

A further condition of this obligation is that if Securities and Exchange Commission obtains a judgment for damages and/or an order granting disgorgement or any other monetary relief against the Principal, and that judgment and any order granting disgorgement or other monetary relief are satisfied in whole or in part from the assets of the Principal or, alternatively in at least the amount of Five Million Dollars ($5,000,000), the bond or any unapplied part of the amount of the bond shall be null and void and the bond shall be returned to the Surety, otherwise this bond shall remain in full force and effect, pending further order of this court.

A further condition of this obligation is that this bond shall be null and void if either (a) the Surety does not receive U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000) by wire transfer to the Surety at Fleet Bank, 777 Main Street, Hartford, CT, ABA #011500010, to credit ACSTAR Insurance Company, Account #5017-0193 within two (2) business days following the filing of this payment bond with the Clerk of Court or (b) the Surety receives a claim against this bond before receiving by wire transfer as outlined above U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000), otherwise this bond shall remain in full force and effect, pending further order of this Court.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this ___5th___ day of ___June___, 19_98_ the name and corporate seal of each corporate party being affixed hereto and these presents duly signed by its undersigned representatives, pursuant to authority of its governing body.

| ATTEST: | INTERNATIONAL HERITAGE, INC. | (Seal) |
|---------|------------------------------|--------|
| _____ | By_____ | |
| ATTEST: | INTERNATIONAL HERITAGE INCORPORATED | (Seal) |
| _____ | By_____ | |
| ATTEST: | ACSTAR INSURANCE COMPANY | (Seal) |
| | UNITED COASTAL INSURANCE COMPANY | |
| *Natalie Sirpal* | By_____ | |
| | Name:   Henry W. Nozko, Jr. | |
| | Title:   President | |

EXHIBIT
A

Bond No. ___7719___



PAYMENT BOND

ACSTAR INSURANCE COMPANY   233 MAIN STREET • P.O. BOX 2350 • NEW BRITAIN, CT 06050-2350 • (860) 224-2000

KNOW ALL MEN BY THESE PRESENTS, that International Heritage, Inc. and International Heritage Incorporated, jointly and severally, (hereinafter referred to as "Principal", and ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, P.O. Box 2350, New Britain, CT 06050-2350, (hereinafter referred to as "Surety"), are held and firmly bound unto The Clerk Court for the United States District Court for the Northern District of Georgia, Atlanta Division (hereinafter "Clerk of Court"), (hereinafter referred to as "Obligee"), in the penal sum of FIVE MILLION and 00/100 Dollars ($5,000,000) for which payment well and truly to be made we do bind ourselves, our heirs, executors, administrators and assigns, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH, that

WHEREAS, the Principal has been required to post this disgorgement bond to assure that the liquid assets of Principal are not diminished during the pendency in the action captioned "Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith and International Heritage Incorporated", and that such FIVE MILLION DOLLARS sum will be available to satisfy any amounts that may be ordered paid by Principal in the above proceeding. This bond shall apply to any judgment for damages and/or order granting disgorgement or other monetary relief against Principal up to FIVE MILLION DOLLARS.

The condition of this obligation is such that if the Securities and Exchange Commission shall fail to obtain a judgment for damages or an order granting disgorgement or any other monetary relief against the Principal, then this obligation shall be null and void and this bond shall be returned to the Surety upon receipt by The Clerk of the Court of an order releasing this bond, otherwise this bond shall remain in full force and effect, pending further order of this Court.

A further condition of this obligation is that if Securities and Exchange Commission obtains a judgment for damages and/or an order granting disgorgement or any other monetary relief against the Principal, and that judgment and any order granting disgorgement or other monetary relief are satisfied in whole or in part from the assets of the Principal or, alternatively in at least the amount of Five Million Dollars ($5,000,000), the bond or any unapplied part of the amount of the bond shall be null and void and the bond shall be returned to the Surety, otherwise this bond shall remain in full force and effect, pending further order of this court.

A further condition of this obligation is that this bond shall be null and void if either (a) the Surety does not receive U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000) by wire transfer to the Surety at Fleet Bank, 777 Main Street, Hartford, CT, ABA #011500010, to credit ACSTAR Insurance Company, Account #5017-0193 within two (2) business days following the filing of this payment bond with the Clerk of Court or (b) the Surety receives a claim against this bond before receiving by wire transfer as outlined above U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000), otherwise this bond shall remain in full force and effect, pending further order of this Court.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this ___5th___ day of ___June___, 19 98 the name and corporate seal of each corporate party being affixed hereto and these presents duly signed by its undersigned representatives, pursuant to authority of its governing body.

ATTEST:

_____

INTERNATIONAL HERITAGE, INC.    (Seal)

By_____

ATTEST:

_____

INTERNATIONAL HERITAGE INCORPORATED    (Seal)

By_____

ATTEST:

Natalie Silpel

ACSTAR INSURANCE COMPANY
UNITED COASTAL INSURANCE COMPANY    (Seal)

By_____
Name:    Henry W. Nozko, Jr.
Title:    President

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE           )
COMMISSION,                       )
                                  )
        Plaintiff,                )
                                  )
vs.                               )   CIVIL ACTION FILE
                                  )   NO. 1:98-CV-803-RWS
INTERNATIONAL HERITAGE, INC.,     )
et al.,                           )
                                  )
        Defendants.               )

## NOTICE OF FILING OF PAYMENT BOND

Defendant, International Heritage, Inc. ("IHI") hereby files
with the Court, a payment bond in the amount of $5,000,000.00 in
substitution of the Cash Bond previously filed with the Court.

This 1st day of July, 1998.

                          Respectfully submitted,

                          _Robert C. Brunton_

                          Michael K. Wolensky
                          Georgia Bar No. 773125
                          Robert G. Brunton
                          Georgia Bar No. 090784
                          David J. Gellen
                          Georgia Bar No. 289172
                          Kutak Rock
                          Suite 2100
                          225 Peachtree Street, N.E.
                          Atlanta, GA  30303-1731
                          (404) 222-4600
                          Brent E. Wood
                          Wood and Francis, PLLC
                          Attorneys and Counselors at Law
                          Two Hanover Square, Suite 2300
                          Raleigh, NC  27602
                          (919) 828-0801
                          Attorneys for Defendants

04/93084.1

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing

**NOTICE OF FILING OF PAYMENT BOND** to be served on opposing counsel

of record and counsel for the Court's Monitor by depositing same in

the United States Mail, postage prepaid and properly addressed as

follows:

>William P. Hicks, Esq.
>District Trial Counsel
>Securities and Exchange Commission
>3475 Lenox Road, N.E., Suite 1000
>Atlanta, GA  30326-1232

>Joel Piassick, Esq.
>Kilpatrick Stockton LLP
>1100 Peachtree Street, N.E., Suite 2800
>Atlanta, GA  30309-4530

>Mr. Lloyd T. Whittaker
>Newleaf Corporation
>2810 Spring Road, Suite 106
>Atlanta, GA  30327

This _1st_ day of July, 1998.

Robert G. Brunton

04/93084.1



**PAYMENT BOND**

INSURANCE COMPANY   233 MAIN STREET · P.O. BOX 2350 · NEW BRITAIN, CT 06050-2350 · (860) 224-2000

KNOW ALL MEN BY THESE PRESENTS, that <u>International Heritage, Inc. and International Heritage Incorporated</u>, jointly and severally, (hereinafter referred to as "Principal"), and ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, P.O. Box 2350, New Britain, CT 06050-2350, (hereinafter referred to as "Surety"), are held and firmly bound unto <u>The Clerk Court for the United States District Court for the Northern District of Georgia, Atlanta Division</u> (hereinafter "Clerk of Court"), (hereinafter referred to as "Obligee"), in the penal sum of <u>FIVE MILLION and 00/100 Dollars</u> (<u>$5,000,000</u>) for which payment well and truly to be made we do bind ourselves, our heirs, executors, administrators and assigns, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH, that:

WHEREAS, the Principal has been required to post this disgorgement bond to assure that the liquid assets of Principal are not diminished during the pendency in the action captioned "Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith and International Heritage Incorporated", and that such FIVE MILLION DOLLARS sum will be available to satisfy any amounts that may be ordered paid by Principal in the above proceeding. This bond shall apply to any judgment for damages and/or order granting disgorgement or other monetary relief against Principal up to FIVE MILLION DOLLARS.

The condition of this obligation is such that if the Securities and Exchange Commission shall fail to obtain a judgment for damages or an order granting disgorgement or other monetary relief against the Principal, then this obligation shall be null and void and this bond shall be returned to the Surety upon receipt by The Clerk of the Court of an order releasing this bond, otherwise this bond shall remain in full force and effect, pending further order of this Court.

A further condition of this obligation is that if Securities and Exchange Commission obtains a judgment for damages and/or an order granting disgorgement or any other monetary relief against the Principal, and that judgment and any order granting disgorgement or other monetary relief are satisfied in whole or in part from the assets of the Principal or, alternatively in at least the amount of Five Million Dollars ($5,000,000), the bond or any unapplied part of the amount of the bond shall be null and void and the bond shall be returned to the Surety, otherwise this bond shall remain in full force and effect, pending further order of this court.

A further condition of this obligation is that this bond shall be null and void if either (a) the Surety does not receive U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000) by wire transfer to the Surety at Fleet Bank, 777 Main Street, Hartford, CT, ABA #011500010, to credit ACSTAR Insurance Company, Account #5017-0193 within two (2) business days following the filing of this payment bond with the Clerk of Court or (b) the Surety receives a claim against this bond before receiving by wire transfer as outlined above U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000), otherwise this bond shall remain in full force and effect, pending further order of this Court.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this <u>5th</u> day of <u>June</u>, 19 <u>98</u> the name and corporate seal of each corporate party being affixed hereto and these presents duly signed by its undersigned representatives, pursuant to authority of its governing body.

ATTEST:

ATTEST:

ATTEST:

_Natalie Sihpel_

INTERNATIONAL HERITAGE, INC.                    (Seal)

By_____

INTERNATIONAL HERITAGE INCORPORATED             (Seal)

By_____

ACSTAR INSURANCE COMPANY                        (Seal)
UNITED COASTAL INSURANCE COMPANY

By_____
Name:   Henry W. Nozko, Jr.
Title:    President



**ACSTAR**
INSURANCE COMPANY

233 MAIN STREET • P.O. BOX 2350
NEW BRITAIN, CT 06050-2350
(860) 224-2000

**POWER OF ATTOR**

**Know all men by these presents:** That ACSTAR Insurance Company, a corporation of the State of Illinois, havi principal office in the City of New Britain, Connecticut, pursuant to the following Resolution, which was adopted by the Board of Directors o said Company on June 30, 1994 to wit:

thereof: RESOLVED, That the following Rules shall govern the execution for the Company of bonds, undertakings, recognizances, contracts and other writings in the i

(1) That the Chairman, the President, the Vice President and General Counsel, or any Attorney-in-Fact, may execute for and on behalf of the Company any a bonds, undertakings, recognizances, contracts and other writings in the nature thereof, the same to be attested when necessary by the Corporate Secreta any Assistant Corporate Secretary, and the seal of the Company affixed thereto; and that the Chairman or President may appoint and authorize any Officer (elected or appointed) of the Company, and the seal of the Company thereto. to affix the seal of the Company thereto.

(2) Any such writing executed in accordance with these Rules shall be as binding upon the Company in any case as though signed by the President and attest by the Corporate Secretary.

(3) The signature of the Chairman or the President of the Company may be affixed by facsimile on any power of attorney granted pursuant to this Resolution the signature of a certifying officer and the seal of the Company may be affixed by a facsimile to any certificate of any such power, and any such pow certificate bearing such facsimile signature and seal shall be valid and binding on the Company.

(4) Such other Officers of the Company, and Attorneys-in-Fact shall have authority to certify or verify copies of this Resolution, the By-Laws of the Company, any affidavit or record of the Company necessary to the discharge of their duties.

**does hereby nominate, constitute and appoint**

Henry W. Nozko, Sr., Henry W. Nozko, Jr., Robert H. Frazer, David A. Price, Joseph D. Scollo, Jr. each individually if there more than one named, its true and lawful Attorney-in-Fact, to make, execute, seal and deliver on its behalf, and as its act and deed any and all bo undertakings, recognizances, contracts and other writings in the nature thereof in penalties not exceeding TWENTY MILLION DOLLA ($20,000,000.00) each, and the execution of such writings in pursuance of these presents, such be as binding upon said Company, as fully amply, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its principal office.

IN WITNESS WHEREOF, Henry W. Nozko, Sr., Chairman and Henry W. Nozko, Jr., President, have hereunto subscribed their names affixed the corporate seal of the **ACSTAR INSURANCE COMPANY** this 4th day of September 1996.

ACSTAR Insurance Company

by _____
Henry W. Nozko, Sr., Chairman

by _____
Henry W. Nozko, Jr., President

STATE OF CONNECTICUT )
) ss. NEW BRITAIN
COUNTY OF HARTFORD )

On this 4th day of September A.D. 1996, before me, a Notary Public of the State of Connecticut came, Henry W. Nozko, Sr., Chairman a and Henry W. Nozko, Jr., President of the **ACSTAR Insurance Company**, to me personally known to be the individuals and officers who execute the preceding instrument, and they acknowledged that they executed the same, and the seal affixed to the preceding instrument is the corporate se of said Company; that the said corporate seal and their signatures were duly affixed by the authority and direction of the said corporation, and th Resolution adopted by the Board of Directors of said Company, referred to in the preceding instrument, is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at the City of New Britain the day and year fir above written.



_____
Notary Public - Darral Aquino

I, the undersigned, Secretary of **ACSTAR Insurance Company**, do hereby certify that the original POWER OF ATTORNEY of which the foregoing is a full, true and correct copy, is in full force and effect.

In witness whereof, I have hereunto subscribed my name as Secretary and affixed the corporate seal of the Corporation, this _____ day of _____ June _____, 19 _____.

_____
Robert H. Frazer                    Secretary

Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.

United Coastal
Insurance Company
233 Main Street - P.O. Box 2350
New Britain. Connecticut 06050-2350
(203) 723-5000

## POWER OF ATTORNEY

Know all men by these presents: That United Coastal Insuranc Company, a corporation of the State of Arizona, having its principa office in the City of New Britain, Connecticut, pursuant to the followin Resolution, which was adopted by the Board of Directors of the sai Company on September 28, 1989, does hereby nominate, constitute an appoint HENRY W. NOZKO, SR., HENRY W. NOZKO, JR., and JOSEPH D. SCOLLO al of the City of New Britain, State of Connecticut ------each individually i there be more than one named, its true and lawful Attorney-in-fact, t make, execute, seal and deliver on its behalf, and as its act and deed any and all bonds, undertakings, recognizances, contracts and other writings in the nature thereof, and the execution of such writings in pursuance of these presents, shall be as binding upon said Company, as fully and amply, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its principal office.

President, has he  unto subscribed his name and affixed the corporate s
of the UNITED COASTAL INSURANCE COMPANY this 30th day of January, 1991.

                                    United Coastal Insurance Company

                          by        Joseph D. Scollo
                                    Senior Vice President

STATE OF CONNECTICUT )
                     ) ss.  NEW BRITAIN
COUNTY OF HARTFORD   )

    On  this  30th day of January, A.D. 1991, before me, a Notary Public
the  State  of Connecticut came, Joseph D. Scollo, Senior Vice President
the  United  Coastal  Insurance  Company,  to me personally known to be t
individual  and  officer  who executed  the  preceding  instrument, and :
acknowledged  that  he  executed  the  same,  and  the  seal affixed to tl
preceding  instrument  is the corporate seal of said Company; that the sa.
corporate  seal  and  his  signature were duly affixed by the authority a:
direction  of  the  said corporation, and the Resolution adopted by the Boa:
of  Directors  of said Company, referred to in the preceding instrument, i
now in force.

    IN  TESTIMONY  WHEREOF,  I  have  hereunto  set  my hand and affixed n
official  seal  at  the  city  of  New Britain the day and year first abov
written.

                       FRANK E. EVENS
                       NOTARY PUBLIC
                       NO. 25560
              MY COMMISSION EXPIRES MARCH 31, 19  Notary Public – Frank E. Evens

    I,  the  undersigned,  Secretary  of  United Coastal Insurance Company,
do  hereby  certify  that  the  original POWER OF ATTORNEY of which th:
foregoing is a full, true and correct copy, is in full force and effect.

    In  witness  whereof,  I  have hereunto subscribed my name as Secretary,
and affixed the corporate seal of the Corporation, this

    30th    day of    June    , 1998

                                    Robert H. Frazer      Secretary


Not  valid  for  mortgage,  note,  loan,  letter  of  credit, bank deposit,
currency rate, interest rate or residual value guarantees.

Bond No. 7719



**PAYMENT BOND**

233 MAIN STREET • P.O. BOX 2350 • NEW BRITAIN, CT 06050-2350 • (860) 724-2000

KNOW ALL MEN BY THESE PRESENTS, that International Heritage, Inc. and International Heritage Incorporated, jointly and severally, (hereinafter referred to as "Principal"), and ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, P.O. Box 2350, New Britain, CT 06050-2350, (hereinafter referred to as "Surety"), are held and firmly bound unto The Clerk Court for the United States District Court for the Northern District of Georgia, Atlanta Division (hereinafter "Clerk of Court"), (hereinafter referred to as "Obligee"), in the penal sum of FIVE MILLION and 00/100 Dollars ($5,000,000) for which payment well and truly to be made we do bind ourselves, our heirs, executors, administrators and assigns, firmly by these presents.

THE CONDITION OF THIS OBLIGATION IS SUCH, that:

WHEREAS, the Principal has been required to post this disgorgement bond to assure that the liquid assets of Principal are not diminished during the pendency in the action captioned "Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith and International Heritage Incorporated", and that such FIVE MILLION DOLLARS sum will be available to satisfy any amounts that may be ordered paid by Principal in the above proceeding. This bond shall apply to any judgment for damages and/or order granting disgorgement or other monetary relief against Principal up to FIVE MILLION DOLLARS.

The condition of this obligation is such that if the Securities and Exchange Commission shall fail to obtain a judgment for damages or an order granting disgorgement or other monetary relief against the Principal, then this obligation shall be null and void and this bond shall be returned to the Surety upon receipt by The Clerk of the Court of an order releasing this bond, otherwise this bond shall remain in full force and effect, pending further order of this Court.

A further condition of this obligation is that if Securities and Exchange Commission obtains a judgment for damages and/or an order granting disgorgement or any other monetary relief against the Principal, and that judgment and any order granting disgorgement or other monetary relief are satisfied in whole or in part from the assets of the Principal or, alternatively in at least the amount of Five Million Dollars ($5,000,000), the bond or any unapplied part of the amount of the bond shall be null and void and the bond shall be returned to the Surety, otherwise this bond shall remain in full force and effect, pending further order of this court.

A further condition of this obligation is that this bond shall be null and void if either (a) the Surety does not receive U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000) by wire transfer to the Surety at Fleet Bank, 777 Main Street, Hartford, CT, ABA #011500010, to credit ACSTAR Insurance Company, Account #5017-0193 within two (2) business days following the filing of this payment bond with the Clerk of Court or (b) the Surety receives a claim against this bond before receiving by wire transfer as outlined above U.S. Three Million Six Hundred Fifty Thousand Dollars ($3,650,000), otherwise this bond shall remain in full force and effect, pending further order of this Court.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this 5th day of June, 19 98 the name and corporate seal of each corporate party being affixed hereto and these presents duly signed by its undersigned representatives, pursuant to authority of its governing body.

ATTEST:

INTERNATIONAL HERITAGE, INC. (Seal)

By

ATTEST:

INTERNATIONAL HERITAGE INCORPORATED (Seal)

By

ATTEST:

Natalie Sirpel

ACSTAR INSURANCE COMPANY (Seal)
UNITED COASTAL INSURANCE COMPANY

By

Name: Henry W. Nozko, Jr.
Title: President

**EXHIBIT D**



This Agreement is made and entered into by the undersigned Indemnitor (Indemnitors) in favor of ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, New Britain, CT 06050-2350 collectively (Surety) for the purpose of inducing Surety to furnish bonds and/or insurance policies.

WHEREAS, in the transaction of business, certain bonds, undertakings and other writings obligatory in the nature of a bond and/or insurance policies may have heretofore been, and may hereafter be, required by, for, or on behalf of the Indemnitors or any one or more of the Indemnitors, in whose bonds and/or insurance policies the Indemnitors do hereby affirm to have a substantial material and beneficial interest, and as a condition precedent to the execution of any and all such bonds and/or insurance policies, the Surety requires execution of this Indemnity Agreement.

WHEREAS, the Indemnitors have or may have a substantial, material and beneficial interest in the obtaining of said bonds and/or insurance policies on behalf of various related companies, partnerships, entities, and/or individuals, it is agreed that this Agreement shall apply to any bonds executed and/or insurance policies issued on behalf of any individual, subsidiary, affiliated partnership, joint venture or corporation of the Indemnitors, now existing or hereafter formed or acquired, and whether partially or wholly owned or controlled, or related as fully as if the names and signatures of such subsidiary or affiliates appeared herein as Indemnitors.

NOW, THEREFORE, in consideration of the foregoing premises, and of the execution or continuance of such bonds and/or insurance policies, and for other good and valuable considerations, the Indemnitors do, for themselves, their heirs, executors, administrators and assigns, jointly and severally agree with the Surety as follows:

1)  The Indemnitors will pay, when due, all premiums for each of such bonds in accordance with the Surety's rates in effect on the date each of such bonds become effective, as long as liability thereunder shall continue, and until the Surety is furnished with evidence satisfactory to the Surety of its discharge or release from the bonds or of all liability by reason thereof. The Indemnitors will pay, when due, all premiums and all deductibles for such insurance policies issued by Surety.

2)  The Indemnitors will (a) perform all the conditions of each said bond or obligation, and any and all alterations, modifications, renewals, continuations, and extensions thereof, and (b) indemnify and save the Surety harmless from and against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the Surety may sustain or incur by reason or in consequence of the execution of such bond or bonds and any renewal, continuation or successor thereof, including but not limited to, (i) sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, or (ii) expenses paid or incurred (A) in enforcing the terms hereof, (B) in procuring or attempting to procure release from liability, or (C) in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid. In the event of payments by the Surety, the Indemnitors agree to accept the voucher of the Surety or other evidence of such payments as prima facie evidence of the propriety thereof, and of the Indemnitor's liability therefor to the Surety.

3)  If the Surety shall set up a reserve to cover any claim, liability, suit or judgment under any such bond, the Indemnitors will, immediately upon demand, deposit with the Surety a sum of money equal to such reserve and any increase thereof as collateral security on such bond or bonds.

4)  Any money, letter of credit, or property which shall have been, or shall hereafter be, pledged as collateral security on any bond or bonds shall be available, in the discretion of the Surety, as collateral security on all bonds coming within the scope of this instrument or for any other indebtedness of the Indemnitors to the Surety.

5)  The Surety, in its sole discretion, is authorized but not required, a) to consent to any change in the contract or the contract documents including the plans and specifications; b) to make or guarantee advances or loans for the purposes of executing the contract without any obligation to see to the application thereof, it being understood that the amount of all such advances or loans shall be conclusively presumed to be a loss hereunder for which the Indemnitors are liable; and c) in the event of any breach, delay or default asserted by the obligee in any said bonds, or in the performance of the contract, or a breach of this Agreement or of any bond or bonds connected therewith, or the failure to diligently prosecute the work under any contract, or to pay for labor and materials used in the prosecution of the contract, or in the event work has ceased or been suspended on any contract or contracts covered by any said bonds, to take possession of the work under the contract and, at the expense of the Indemnitors, to complete the contract or cause the same to be completed or to consent to the completion thereof, and to take any other action which the Surety may deem appropriate. The Indemnitors hereby release and discharge the Surety from any and all liability for all its actions and omissions.

6)  The Indemnitors hereby transfer, assign, pledge and convey to the Surety a security interest in 1) all equipment, tools and material in which the Indemnitor, have any interest, whether on site or elsewhere or on order; 2) all sums due or to become due to Indemnitors or any of them in connection with any contract; and 3) all subcontracts let by Indemnitors in connection with any contract. The security interests granted herein are effective in the case of each contract as of the date of the contract. Indemnitors hereby agree to execute any form of financing statement or other agreement or writing which Surety, in its sole discretion, deems necessary or advisable to perfect the security interests granted herein, and further authorize Surety at its discretion and at any time to file or serve this instrument, or a true copy hereof, or any other instrument executed pursuant hereto as a financing statement or other notice under the Uniform Commercial Code or any similar law, and Indemnitors authorize Surety to complete this instrument in any manner required for such use, and to prepare an attached schedule describing items of security covered hereunder. The Indemnitors hereby appoint Surety as Attorney-In-Fact for each of them to endorse and to deposit or negotiate checks, drafts, and all similar instruments payable to Indemnitors, with the right, but not the obligation to exercise all of the rights of the Indemnitors assigned, transferred and set over to the Surety in this Agreement and in the name of the Indemnitors to make, execute and deliver any and all additional assignments, documents as deemed necessary and proper by the Surety to give full force and effect to this paragraph (6). The Indemnitors agree that all equipment, tools and material and all subcontracts are dedicated to the performance of the contract to which they pertain and that such equipment, tools and material and subcontracts shall be subject to a trust in favor of the contract owner and Surety and that they be used to that end.

7)  The Surety shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against the Surety or the principal upon any such bond shall be settled or defended and the Surety's decision shall be final and binding upon the Indemnitors.

# EXHIBIT E

8) or any part thereof, Indemnitors cov    it and agree that all payments due or received for c    , account of said contract shall be held in trust for Surety for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof: and, further, it is expressly understood that all monies due and to become due under any contract or contracts covered by the bonds shall be held in trust, whether such monies are in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said bonds.

9) The Surety may, without incurring any liability, decline to execute any bond and if the Surety executes a bid or proposal bond it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the bid or proposal bond is given and such declination shall not diminish or alter the liability of the Indemnitors that may arise by reason of having executed the bid or proposal bond.

10) The Indemnitors hereby waive notice of the execution of any such bonds or of any act, fact or information coming to the knowledge or notice of the Surety concerning or affecting its rights or liabilities under any such bonds or rights or liabilities of the Indemnitors hereunder, notice of all such being hereby expressly waived.

11) If the Surety shall procure any other company or companies to execute or join with it in executing, or to reinsure, any such bond or bonds, this instrument shall inure to the benefit of such other company or companies, its or their successors and assigns, so as to give to it or them a direct right of action against the Indemnitors to enforce this instrument and, in that event, the word "Surety", wherever used herein, shall be deemed to include such company or companies, as their respective interest may appear.

12) The Indemnitors hereby waive all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state.

13) In the event any claim or demand is made by the Surety against Indemnitors, or any one or more of them, by reason of the execution of a bond or bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of any one or more of the Indemnitors and hereby consent to any settlement or compromise that may hereafter be made. Separate suits may be brought hereunder as causes of action accrue and the bringing of suit or the recovery of judgment upon any cause of action shall not bar the bringing of other suits upon other causes of action whether theretofore or thereafter arising.

14) In the event any Indemnitor fails to execute this Agreement or in the event the execution hereof by any Indemnitor be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability of any other Indemnitor executing the same, but each and every party so executing shall be and remain fully bound and liable.

15) This Agreement may be terminated by any Indemnitor upon twenty days written notice received by the Surety but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the bonds and/or insurance policies that may have been theretofore executed.

16) This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed by the Surety and the Indemnitors to form a part hereof.

17) The Indemnitors agree to notify the Surety immediately upon their receiving any notice or knowledge that their liability insurance has been or will be cancelled or non-renewed, or that such coverage is or will be reduced.

18) At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including but not limited to, the status of the work under contracts being performed by the Indemnitor, the condition of the performance of such contracts and payment of accounts.

19) The word Indemnitor or pronouns referring to said word, whether singular or plural, are to be construed as referring to each of the undersigned Indemnitors, individually and collectively, though the Indemnitor be one or more individuals, partnerships, associations, or corporations.

IN TESTIMONY WHEREOF the Indemnitors intending to be legally bound hereby have hereunto set their hands and affixed their seals this
——————— day of ————————————————— , 19 ——— .

Witness or Attest

All individual and corporate signatures must be acknowledged.

Name of Individual (Type):                                    Address
Signature ——————————————————           ————————————————
SS # —————————————————————           ————————————————

Name of Individual (Type):
Signature ——————————————————           ————————————————
SS # —————————————————————           ————————————————

Name of Individual (Type):
Signature _____

Address

SS # _____    _____

Name of Individual (Type):
Signature _____

SS # _____    _____

✗ Name of Company (Type): International Heritage, Inc.
Signature By _____
Name ___John D Brothers_____    2626 Glenwood Ave., Ste 200
Title ___Chief Operating Officer___    Raleigh, NC 27608

✗ Name of Company (Type): International Heritage Incorporated
Signature By _____
Name ___John D Brothers_____    2626 Glenwood Ave., Ste 200
Title ___Chief Operating Officer___    Raleigh, NC 27608

## INDIVIDUAL(S) ACKNOWLEDGEMENT

STATE OF _____ )

COUNTY OF _____ )    ss:
_____ )

On this _____ day of _____, 19____, before me personally came
_____, to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____

STATE OF _____ )

COUNTY OF _____ )    ss:
_____ )

On this _____ day of _____, 19____, before me personally came
_____, to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____

STATE OF _____ )

COUNTY OF _____ )    ss:
_____ )

On this _____ day of _____, 19____, before me personally came
_____, to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____

## PARTNER(S) ACKNOWLEDGMENT

STATE OF _____ )

COUNTY OF _____ )  ss:

On this _____ day of _____, 19 _____, before me personally came

_____ and stated that he/she/they is (are) partner(s) in the firm of _____, to me known,

executed the foregoing instrument as the act of the said firm. _____ and acknowledge that he/she/they

_____

## CORPORATE ACKNOWLEDGMENT(S)

STATE OF NORTH CAROLINA )

COUNTY OF WAKE )  ss:

On this 8TH day of JUNE, 19 98, before me personally came

JOHN D. BROTHERS

who, being by me duly sworn, did depose and say that he resides in RALEIGH, WAKE CO. NORTH CAROLINA, to me known,

that he is the CHIEF OPERATING OFFICER of the International Heritage, Inc.

the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said corporation, and that he signed his name to the said instrument by like order.

_____

MY COMMISSION EXPIRES _____

STATE OF NORTH CAROLINA )

COUNTY OF WAKE )  ss:

On this 8TH day of JUNE, 19 98, before me personally came

JOHN D. BROTHERS

who, being by me duly sworn, did depose and say that he resides in RALEIGH, WAKE CO. NORTH CAROLINA, to me known,

that he is the CHIEF OPERATING OFFICER of the International Heritage, Inc.

the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said corporation, and that he signed his name to the said instrument by like order.

_____

MY COMMISSION EXPIRES _____

STATE OF _____ )

COUNTY OF _____ )  ss:

On this _____ day of _____, 19 _____, before me personally came

_____

who, being by me duly sworn, did depose and say that he resides in _____, to me known,

that he is the _____ of the _____

the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said corporation, and that he signed his name to the said instrument by like order.

_____

0111 (2/96)