

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

MAY 28 1999

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 7 |
| INTERNATIONAL HERITAGE, INC. | ) | CASE NO. 98-02675-5-ATS |
| | ) | |
| INTERNATIONAL HERITAGE, | ) | |
| INCORPORATED, | ) | CHAPTER 7 |
| | ) | CASE NO. 98-02674-5-ATS |
| Debtors. | ) | |

RESPONSE TO MOTION FOR ORDER
ALLOWING ACSTAR TO INTERVENE
IN NON-BANKRUPTCY LITIGATION

Now comes Holmes P. Harden, Trustee in the above-captioned cases, and files this response to ACSTAR's May 20, 1999 Motion for Order Allowing Acstar to Intervene in Non-bankruptcy Litigation ("Motion").

1.      Contrary to the implication of Paragraph 9 of the Motion, the $3.5 million deposited with ACSTAR as collateral for the bond is not the property of Stanley Van Etten. The bankruptcy schedules of International Heritage, Inc. and Mr. Van Etten's 2004 testimony establish that the $3.5 million deposited with ACSTAR was a portion of $5 million loaned to the debtors by Mr. Van Etten in exchange for which IHI gave Mr. Van Etten a blanket security interest. IHI in turn posted the $5 million as a cash bond in the SEC litigation. Although Mr. Van Etten asserts a lien on the estate's reversionary interest in the bond, the right to a refund of $3.5 million from ACSTAR is the sole right of IHI and is an asset of the estate. A copy of Mr. Van Etten's 2004 testimony is attached hereto as Exhibit A.

2.      The District Court's order of July 1, 1998 converting the bond from a cash bond to a commercial bond does not require that the $3.5 million be returned to Mr. Van Etten. A copy of the July 1 order is attached hereto as Exhibit B. To the extent that the April 3, 1998 order of the district court is relevant, Trustee alleges that ACSTAR is not paying interest on the cash collateral for the bond as required by the April 3 order, to the prejudice of IHI. See attached Exhibit C.

3.      Trustee denies that the Indemnity Agreement gives ACSTAR the right to determine for itself and IHI whether the SEC litigation shall be settled or defended, or that it gives ACSTAR the right to deduct its legal fees and expenses from the $3,500,000 held by it. The language contained in the Indemnity Agreement upon which ACSTAR relies states only that

"the Surety [(ACSTAR and United] shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against the surety of the principal upon any such bond shall be settled or defended . . .". (Emphasis added.)  A copy of the Indemnity Agreement is attached hereto as Exhibit D.  ACSTAR is not a defendant in the SEC litigation and the SEC litigation is not a suit upon the bond.  Moreover, the Indemnity Agreement itself is executory, was not assumed, and has therefore been rejected as a matter of law.  ACSTAR has no right under the Indemnity Agreement to prohibit settlement of estate litigation, or to tax the estate's assets  while it delays a resolution of the SEC litigation.

4.      ACSTAR has not moved for relief from stay pursuant to 11 U.S.C. § 362.  A setoff of attorneys fees and expenses by ACSTAR against IHI's reversionary interest in the bond will therefore be violative of the automatic stay.  Moreover, this court must determine that ACSTAR is oversecured, which Trustee denies, and must rule on the reasonableness of fees and expenses incurred by ACSTAR pursuant to U.S.C. § 506(b) before any fees or expenses are paid to ACSTAR from the $3.5 million collateral for the bond.

5.      It is in the best interest of the estate that the SEC litigation be settled at the earliest possible time in order to minimize loss to the estate.  A court-ordered mediation that could resolve the SEC litigation is scheduled for June 2, 1999.

6.      This case was filed on November 25, 1998.  Trustee's application to approve a settlement of the SEC litigation has been pending since January 15, 1999.  The SEC litigation has not been stayed, yet ACSTAR has heretofore been content not to seek authority to intervene. ACSTAR has made no allegation or showing that it would be prejudiced by a further delay in determining whether it is entitled to intervene in the SEC litigation pending the result of the June 2 mediation and this court's ruling on pending motions concerning the bond, which are scheduled for hearing on June 15, 1998.

WHEREFORE, Trustee requests that:

1.      The court withhold ruling on the motion until the conclusion of mediation and that this matter be placed on its June 15, 1999 calendar, and

2.      The court deny the motion or, alternatively, that it prohibit any setoff of ACSTAR's attorney's fees and expenses against the  $3,500,000 held by ACSTAR, and, further in the alternative,

3.      Should the court allow the motion and permit setoff, that the court require ACSTAR to first file an application for the allowance of attorney's fees and that the court determine the reasonableness of any fees incurred, taking into consideration the justifiability of any further defense of the SEC litigation, whether any such defense was interposed in bad faith for the purpose of delay, and the benefit of any such defense to the estate.

RAL/197864/1

Respectfully submitted this the 28th day of May, 1999.

MAUPIN TAYLOR & ELLIS, P.A.

BY: _Holmes P. Harden_

Holmes P. Harden
N. C. State Bar No. 9835
Post Office Drawer 19764
Raleigh, NC 27619
Telephone: (919) 981-4000

RAL/197864/1

## CERTIFICATE OF SERVICE

I, Holmes P. Harden, do hereby certify that the foregoing RESPONSE TO MOTION FOR ORDER ALLOWING ACSTAR TO INTERVENE IN NON-BANKRUPTCY LITIGATION was served upon all parties of record by mailing a copy thereof to each such party at the address indicated below with its proper postage attached and deposited in an official depository under the exclusive care and custody of the United States Post Office in Raleigh, North Carolina on the 28th day of May, 1999.

MAUPIN TAYLOR & ELLIS, P.A.

BY: _Holmes P. Harden_

Holmes P. Harden
N. C. State Bar No. 9835
Post Office Drawer 19764
Raleigh, NC 27619
Telephone: (919) 981-4000

SERVED:

Marjorie K. Lynch
Bankruptcy Administrator
P. O. Box 3039
Raleigh, NC 27602-3039

Paul A. Fanning (By fax and U.S. Mail)
Michael P. Flanagan
Ward and Smith, P.A.
P. O. Box 8088
Greenville, NC 27835-8088
Fax: 252-756-3689

Terri L. Gardner
Smith Debnam Narron & Myers, L.L.P.
P. O. Box 26268
Raleigh, NC 27611-6268

Brent E. Wood
Wood & Francis, P.L.L.C.
P. O. Box 164
Raleigh, NC 27601

Chittenden Bank
c/o Louis P. Rochkind
Jaffe, Raitt, Heuer & Weiss
One Woodward Avenue, Suite 2400
Detroit, MI 48226

Kathryn N. Koonce
P. O. Box 10096
Raleigh, N C 27605-0096

N. Hunter Wyche, Jr.
Smith Debnam Narron & Myers, L.L.P.
P. O. Box 26268
Raleigh, NC 27611-6268

Lloyd W. Gathings, II
Robert W. Shores
Gathings & Associates
P. O. Box 10545
Birmingham, AL 35202-0545

Ronald H. Garber
Boxley, Bolton & Garber, LLP
P. O. Drawer 1429
Raleigh, NC 27602

RAL/197864/1

Lloyd T. Whitaker, President
Newleaf Corporation
2814 New Spring Road, Suite 330
Atlanta, GA 30339

Joel B. Piassick
Kilpatrick & Stockton, LLP
1100 Peachtree Street, N.E.
Suite 2800
Atlanta, GA 30309

William P. Hicks
Securities and Exchange Commission
3475 Lenox Road, NE, Suite 1000
Atlanta, GA 30326-1232

Stephani Humrickhouse
Nicholls & Crampton, P. A.
4300 Six Forks Road, Suite 700
Raleigh, North Carolina 27619

Jacqueline R. Clare (Hand Delivery)
1011 Vance Street
Raleigh, NC 27608

IN RE:  INTERNATIONAL HERITAGE, INC.

**Column 1 — Vol. 2, p. 53**

Stanley H. Van Etten        Direct            Vol. 2, p. 53

2 A    Yeah.

3 Q    Okay.  All right.  Let's move on to the bond

4    transaction.

5 A    Okay.

6 Q    Okay.  Let's -- I'm sure you've been there plenty

7    of times in your mind, but let's go back to March

8    of 1998 --

9 A    (Interposing)  Uhh-huh (yes).

10 Q    -- the SEC proceeding, and a requirement that a

11    bond be posted.

12 A    Okay.

13 Q    What is -- who -- what is your understanding of who

14    had the responsibility of posting a bond?

15 A    International Heritage.

16 Q    Did you ever understand that that was a personal

17    responsibility of yours?

18 A    Did I ever understand that it was a personal

19    responsiblity?

20 Q    Did you ever consider it a personal responsiblity

21    of yours?

22        Let me -- let me restate that.  I -- I don't

23    want to keep you from answering, and I -- I think

24    --

25 A    (Interposing)  Yeah.

**Column 2 — Vol. 2, p. 55**

Stanley H. Van Etten        Direct        Vol. 2, p. 55

2    receiver had swept, or frozen, between the credit

3    card accounts, the checking accounts, and the

4    receivable accounts, cash accounts.

5        So, I believe there was in that regard.  It

6    was spread out in many places, but it was there,

7    and I did believe that IHI could, in fact, get a

8    bond based upon the assets it had on the balance

9    sheet and the cash flow.  I do believe — I did --

10    in fact, I was told that we could get a bond, but

11    it would an expensive bond, a very large fee, three

12    hundred and fifty to five hundred thousand dollar

13    ($350,000. to $500,000) fee, but it could be -- it

14    could be had.

15 Q    Now, part of your analysis of the cash position of

16    the company with regard to whether or not it could

17    post a cash bond, involved some reserves that

18    credit card companies were holding?

19 A    Correct.

20 Q    If you were not able to touch those, would the --

21    those reserves, would the company have had the

22    ability to post a five million dollar ($5,000,000)

23    cash bond?

24 A    In cash without any bonding resources, I don't --

25 Q    (Interposing)  Uhh-huh (yes).

**Column 3 — Vol. 2, p. 54**

Stanley H. Van Etten        Direct            Vol. 2, p. 54

2 Q    — I might get a different answer than I'm really

3    looking for because of the way I asked the

4    question.

5 A    Okay.

6 Q    The document which requires the posting of a bond

7    was an Order?

8 A    Correct.

9 Q    The wording of that Order, in my opinion, and based

10    for this question assume, states that the bond

11    shall be posted by IHI?

12 A    Correct.

13 Q    Did you understand the Judge as requiring you, in

14    any personal capacity, to have any responsibility,

15    or obligation, to post a bond personally?

16 A    No.

17 Q    At the time that the bond was required by Judge

18    Story, did IHI have number one, five million

19    dollars ($5,000,000) in cash, or number two, the

20    capacity to get a bond in that amount?

21 A    Yes.

22 Q    Which one of those?

23        I asked another question.

24 A    I believe there was approximately six million

25    ($6,000,000) in cash in the bank accounts that the

**Column 4 — Vol. 2, p. 56**

Stanley H. Van Etten        Direct        Vol. 2, p. 56

2 A    — think so.  It might have been marginal at best,

3    but I don't think so.

4 Q    Okay.

5 A    It might have been able to get half cash, half

6    bonding.  I don't know though, specifically.

7 Q    But the company chose not to have the company use

8    either it's cash assets, or get a bond.  Why?

9 A    Actually we didn't have a choice.  We got

10    double-crossed by the receiver.

11        We were told and led to believe that we could

12    use the resources of the company, and post fact,

13    the receiver would not allow us to use them, and

14    would not give us the keys back to the front door,

15    and would not allow us to do so, and it is was inter-

16    — individual interpretation of the Judge's Order

17    that he could do that.

18        So, I -- I use harsh language there, but that

19    -- we had planned to --

20 Q    (Interposing)  So, your plan was to take the -- the

21    assets of the company, and purchase the bond which

22    would have given control back, or the company, to

23    management?

24 A    Correct.  But then what happened was, once the

25    order was finalized, it didn't say, specifically,

IN RE:  INTERNATIONAL HERITAGE, INC.

---

**Stanley H. Van Etten    Direct    Vol. 2, p. 57**

```
1               Where the money had to come from.
2                   In fact, it even said that we could use the
3      assets of the company, but the receiver, before he
4      would relinquish his control over the assets of the
5      company, said there had to be a bond up first, and
6      by putting the bond up first, we couldn't use the
7      company's assets or balance sheet, and since he
8      swept all the accounts, and had the money in his
9      own accounts, we couldn't use it.
10  Q   The next option being, so you, therefore, did what?
11  A   I, then, used my personal resources, and borrowed
12     funds to put the cash bond up.
13  Q   Okay. Let's take one at a — at a time.
14                  What amount of personal resources, non-loaned
15     money did you use?
16  A   Well, I consider all of it — I pledged all of my
17     assets in order to facilitate these loans. So, I
18     would say the full amount of five million
19     ($5,000,000).
20                  To break it down, specifically, it changed a
21     few times, so I'm not — I'm not sure how to answer
22     that. I — I used some of my cash, and I used my
23     credit to borrow the money for a total of five
24     million dollars ($5,000,000) immediately. That —
```

---

**Stanley H. Van Etten    Direct    Vol. 2, p. 59**

```
1      million dollars ($5,000,000)?
2   A   I'm not sure if that has a legal meaning. My
3      understanding was that I was putting the bond money
4      up to bond IHI out, and that I would be getting my
5      money back, and I secured that with promissory
6      notes and liens against the assets of the company.
7                  So, I guess, in a fundamental sense, yes. I
8      loaned it to the company with the understanding
9      that as soon as it could procure a commercial bond
10     I'd get my money back.
11  Q   You did, in fact, receive a promissory note from
12     the company in the amount of five million dollars
13     ($5,000,000)?
14  A   Correct.
15  Q   And secured — and UCC financing statements were
16     filed —
17  A   (Interposing)  Correct.
18  Q   — on your behalf?
19  A   Correct.
20  Q   For your benefit?
21                  I — I — I — I don't want to say in lay
22     terms, what your understanding of the transaction,
23     because I think it would be inappropriate, based
24     upon my individual knowledge of your business
```

---

**Stanley H. Van Etten    Direct    Vol. 2, p. 58**

```
1      that's what I did.
2   Q   Who did you borrow the money that you had to borrow
3      the money from?
4   A   Part — part of it is listed on my financial
5      statement. There is a —
6   Q   (Interposing)  It just says, loan. That's why I —
7   A   (Interposing)  Yeah, it's —
8                  MR. WOOD:  (Interposing)  Well, let me — some
9      of the people he borrowed it from, Stephani were
10     private — it's private people.
11                 MS. HUMRICKHOUSE:  All right. Let's go off
12     the record for a second.
13
14                 (DISCUSSION OFF RECORD.)
15
16  A   Of the five million dollars ($5,000,000), I
17     personally guaranteed and pledged my individual
18     assets, not joint, individual, Stanley Van Etten,
19     for one point five million (1.5) plus accrued
20     interest.
21  Q   (Ms. Humrickhouse)  Okay. And then the rest of the
22     money, three point five million (3.5)?
23  A   I derived from my own financial resources.
24  Q   Okay. Did you lend that money to IHI, the five
```

---

**Stanley H. Van Etten    Direct    Vol. 2, p. 60**

```
1      experience, that you would be considered "lay" in
2      this particular instance.
3   A   Okay.
4   Q   Based upon your other business transactions, would
5      you consider this a debtor credit relationship
6      between you and IHI?
7   A   I think those transactions reflects that, yes.
8   Q   Okay. And this is an important issue, and I — I
9      understand your reluctance to — to — to — to
10     give legal opinion, and I'm not asking that.
11  A   I know.
12  Q   I'm asking what you considered it to be?
13  A   Considered it a loan to the company to bond itself
14     off with the understanding that they would be
15     paying me that money back, and as quickly as
16     possible, and to protect myself I entered into a
17     promissory note. There was a board of director's
18     meeting to ratify that, and the security interests
19     of the UCC's.
20  Q   Okay. At the time that you posted the bond, Nov.
21     and — and that's — I want to strike that
22     question because of the wording.
23                 Physically, how did the money get to the clerk
24     of Court in Georgia?
```

---

---

1  Stanley H. Van Etten        Direct        Vol. 2, p. 61
2  A        The money was deposited into Brent Woods' trust
3        account and Brent Wood wired it to the Eastern
4        District of Georgia Clerk of Court's office.
5  Q    So, the wire transfer came directly from Wood and
6        Francis?
7  A    Correct.
8  Q    In the amount of five million dollars ($5,000,000)?
9  A    Yes.
10        MR. WOOD:  I think that there was a series of
11        transactions in total by me.
12  A    It took some time to put all the money together.
13        Pieces.  It -- it probably took two weeks?
14        MR. WOOD:  It was probably a three or four day
15        period where it would all come in.  Two weeks is
16        the total time for me to set it, but -- or
17        something like that, but when it started coming in,
18        as soon as I received any part of it, essentially,
19        I would then wire it to the Clerk's office, because
20        if -- just the general delays associated with
21        wiring money and every second seemed to count at
22        the moment, so we were trying to forward it on, and
23        when they received confirmation that they had
24        gotten the full five million ($5,000,000), I think
25        that started the clock ticking for the company for

---

1  Stanley H. Van Etten        Direct        Vol. 2, p. 62
2        Mr. Van Etten and the other officers having control
3        of the company, again.
4  Q    (Ms. Humrickhouse)  Okay.  The order that was
5        entered by Judge Story which allowed -- which dealt
6        with the five million dollar ($5,000,000) bond,
7        provided that interest would be paid on your money
8        by the Clerk of Court.  Is that correct?
9  A    Correct.
10  Q    And, in fact, interest was paid to you?
11  A    A portion of that interest was paid to me, yes.
12  Q    And was that paid directly to you, or to the
13        company, who then paid it to you?
14  A    I think that it was paid to the bond -- the new
15        bonding company received all the proceeds, and then
16        distributed them back.
17  Q    So --
18        MR. WOOD:  (Interposing)  That's not --
19  A    (Interposing)  Is that not accurate?
20        MR. WOOD:  -- that's not exactly accurate.
21  A    Okay.  I wasn't involved in it, once again, so I --
22        MS. HUMRICKHOUSE:  (Interposing)  Okay.
23  A    -- I don't know.
24  Q    (Ms. Humrickhouse)  Okay, well, let's --
25  A    (Interposing)  Are you going to help me out here?

---

1  Stanley H. Van Etten        Direct        Vol. 2, p. 83
2  Q    -- let me -- let me -- Brent, I'm going to need
3        your help in a second.
4        MR. WOOD:  That's fine.
5        MS. HUMRICKHOUSE:  I just want to make sure
6        that I'm chronologically going forward the right
7        way, because I really think this is an important
8        transaction.
9        MR. WOOD:  That's fine.
10  Q    (Ms. Humrickhouse)  We have on April the 3rd, we
11        have an injunction.  The bond -- the ability to
12        post a bond -- and -- and the requirement to post a
13        bond.  May 13th is the date that a promissory note
14        in the amount of five million dollars ($5,000,000)
15        is executed by International Heritage to you.
16  A    It probably took from April 3rd to May 13th, that
17        was how long it took me to put all that together.
18  Q    So, at the time -- your understanding is that by
19        May 13th --
20  A    (Interposing)  All the funds had been delivered.  I
21        had fulfilled what I believed the delivery of the
22        funds for the benefit of the company, and now the
23        company was in turn delivering back to me -- I
24        think that was a board meeting in which I received
25        a promissory note, and the stipulations that went

---

1  Stanley H. Van Etten        Direct        Vol. 2, p. 84
2        along with that, the UCC's and payment of some of
3        my interest back.  There was some costs associated
4        with me getting some of the funds that I didn't
5        have available.
6  Q    And what stipulations did the board agree to with
7        regard to the -- the loan.  And so -- to save time,
8        obviously, they agreed to pay you back the money?
9  A    Yes.
10  Q    And with interest?
11  A    With interest.
12  Q    And what else?
13  A    My out-of-pocket expenses associated with putting
14        that kind of money together so quickly, and then,
15        also, expenses associated with putting the money
16        together, interest on my money, pay the money back,
17        itself, and make best efforts to meet -- make --
18        facilitate that as quickly as possible.
19        Number one security position on all the assets
20        of the company, inventory, receipt -- any --
21        anything and everything to include credit card
22        accounts, whatever we could identify as assets, I'd
23        get a first security position in that, and then I
24        believe that's all that I asked for, and then I
25        recused myself.

---

**Stanley H. Van Etten        Direct        Vol. 2, p. 65**

```
 1
 2           When I came back, I think the board also gave
 3  me a fee for the bond. as well, in addition.  I did
 4  not ask for it.  I think they -- they gave me what
 5  I asked for, and then they also gave me a fee for
 6  the bond.  Instead of trying to calculate all the
 7  expenses, they just gave me a fee.
 8  Q  So, in fact, you were not given your expenses back,
 9     but were granted a hundred and seventy-five
10     thousand dollar ($175,000) fee?
11  A  I think that's how it worked out, yes.
12  Q  Okay.  And that's not something you requested?
13  A  No, it is not.
14          I believe the John Brothers and Barry Ackel
15  brought it up at the board meeting because of the
16  urgent nature of the situation.
17  Q  At some point in time the company was able to
18     contract with a surety for the posting of a three
19     point five million dollar ($3.5) bond?
20  A  Correct.
21          MR. WOOD:  It's a five million dollar
22  ($5,000,000) bond.  Upon the posting of three point
23  five million dollars ($3.5) in collateral.
24  Q  (Ms. Humrickhouse) Okay.  Let's --
25  A  (Interposing)  Well, consistent with what in the
```

**Stanley H. Van Etten        Direct        Vol. 2, p. 67**

```
 1
 2  wired to ACSTAR.  ACSTAR then produced a surety
 3  bond for five million ($5,000,000) to the Court.
 4      A fee was paid to the underwriting company,
 5  and a certificate was issued to me for the
 6  equivalent of almost a million, six hundred
 7  thousand dollars ($1,600,000) worth of options that
 8  I would exercise in order to leave the money in the
 9  company, and I think a check for forty thousand
10  dollars ($40,000) may have been released to me in
11  the form of accrued interest.
12      That's kind of vague, but was that right?
13      MR. WOOD:  He -- he -- he --
14      MS. HUMRICKHOUSE:  (Interposing)  That's okay.
15      MR. WOOD:  -- this is the part that I was
16  talking about earlier.  He --
17  A  (Interposing)  Once again, I didn't handle any of
18  the closing.  I was on the road trying to save the
19  company.  The lawyers and John Brothers, Rob
20  Hukazela, and the group that were running the
21  company, the operations, were dealing with these
22  issues.
23      MR. WOOD:  I'll be glad to try to help with
24  the factual part of the transfer, if you wish.
25      MS. HUMRICKHOUSE:  Yeah, please.
```

**Stanley H. Van Etten        Direct        Vol. 2, p. 66**

```
 1
 2  same board meeting of the 13th, the board was also
 3  -- one of the requirements was they immediately had
 4  to go out and find a commercial bond to get the
 5  money freed back up, and they began that process
 6  with numerous parties.  Insurance agents, bonding
 7  companies.  I think there was six or seven
 8  different groups of people that were working for
 9  the company in that respect.
10      Eventually, I believe it was a company called
11  ACSTAR bonded it for five million dollars
12  ($5,000,000) provided three point five million
13  ($3.5) of the cash that I had put up would remain
14  with them in their possession, so it would be a
15  secured bond for five million ($5,000,000) with
16  three point five million ($3.5) in collateral.
17      We, then, had to submit that request to the
18  Judge, and to the monitor.  The Judge was fine with
19  it, but the monitor made another stipulation that
20  the money had to go into the company.  It couldn't
21  be released to me.
22      We needed cash, and that was the stipulation,
23  and so, in fact, what happened was for the monitor
24  to sign off on it to allow that to happen, the
25  money, five million ($5,000,000) and change was
```

**Stanley H. Van Etten        Direct        Vol. 2, p. 68**

```
 1
 2      MR. WOOD:  The Court somewhat at the
 3  insistence of the monitor and the SEC, was
 4  concerned about the transfer of the money from the
 5  Clerk's office to the bonding company because the
 6  Judge did not want to relinquish control over the
 7  cash, the five million dollars ($5,000,000) in
 8  cash, without having some assurance that a bond was
 9  in place, because the bonding company wouldn't
10  guarantee that the bond was in place until they
11  received the collateral.
12      What comes first, the chicken or the egg?  So
13  the Judge entered a special order to try to cover
14  that issue, and then ultimately what that order
15  said, and what occurred, was that three million, as
16  I recall, six hundred and fifty thousand dollars
17  ($3,650,000), a total of three million six fifty
18  ($3,650,000) was wired to the bonding company
19  directly.  Three million five hundred thousand
20  dollars ($3,500,000) being their collateral.  A
21  hundred and fifty thousand dollars ($150,000) being
22  their fee.
23      The remainder, one million three hundred fifty
24  ($1,350,000) was wired directly to the company.
25  The company was cash-strapped, as Mr. Van Etten
```

IN RE: INTERNATIONAL HERITAGE, INC.

---

Stanley H. Van Etten    Direct    Vol. 2, p. 69

1
2  said, and rather than flowing it through my trust
3  account, as I recall, it went directly to the
4  company.
5       The company, then, had obligations that it
6  satisfied from that, including, I believe they paid
7  Mr. Van Etten some fees associated with — they may
8  have even paid him a —
9  A  (Interposing)  The May 13th board meeting.
10      MR. WOOD:  They may have paid him the hundred
11 and seventy-five thousand dollars ($175,000) and
12 some interest, and they — I — they may — there
13 may have been some other fees associated with the
14 bond to third parties to who helped them procure
15 the bond.
16      I was not directly involved in that, so I
17 don't know, and also to clarify, I believe the
18 amount actually wired from the Clerk's office was
19 more than three million six fifty ($3,650,000) to
20 IHI, because it included interest that had been
21 earned.
22 A  You mean the million six (1.6).  You said, three
23 million six (3.6).
24      MR. WOOD:  I'm sorry.  I'm sorry.  Million —
25 million three fifty ($1,350,000).  It may have been

---

Stanley H. Van Etten    Direct    Vol. 2, p. 70

1
2  more than a million three fifty ($1,350,000),
3  because that included the interest that it had
4  earned.
5       That could have come from — through a
6  separate wire transfer.  The records of the company
7  would reflect exactly what it received.
8  A  And the interest flowed through back to me, and
9  then I think they did pay the fee, because they
10 hadn't paid that from the May hearing — May
11 period, and I think this is now June or July?
12      MR. WOOD:  I believe it's sometime in June.
13 A  Yeah, June.  It's some period of time later, and
14 then they had just kept the money, and they issued
15 me a stock certificate, as if I'd exercised my
16 options equating to the amount that they kept.
17 Q  (Ms. Hunrickhouse)  With regard to this requirement
18 that the one point five million (1.5) be used by
19 the company, this requirement was a requirement of
20 the monitor, and not a voluntary action of yours?
21 A  That is correct.
22      Now, I had two choices.  I could issue a new
23 promissory note, or I could let it go to equity.  I
24 did have that choice, and I allowed it to go to
25 equity at the recommendation/solicitation of the

---

Stanley H. Van Etten    Direct    Vol. 2, p. 71

1
2  board.
3       At that point I deemed the company to be in a
4  state of financial condition where I'm not sure it
5  would have done any good to try and request
6  additional collateral, and try to deal with that,
7  so I left the paperwork as it was, and I just
8  agreed that I would take a stock certificate in
9  that amount.
10 Q  Do you know whether or not the bonding company
11 would have accepted collateral other than cash?
12 A  We — we worked hard on that, providing personal
13 guarantees from me, financial statements, but
14 because I had used my financials to procure some of
15 the money for the bond, there was not a net worth
16 high at this point.  They would not accept stock.
17 We tried to take all the officers' and directors'
18 stock and bonding it off.  They would not accept
19 that.
20      We tried some real property arrangements.  We
21 tried everything we could.  The only thing they
22 would accept was cash.  They would not accept
23 marketable securities, either.  If we delivered
24 marketable securities, they said they would
25 liquidate them and hold them in cash.

---

Stanley H. Van Etten    Direct    Vol. 2, p. 72

1
2  Q  So, they wouldn't hold them as marketable
3  securities, okay.
4       Do you have any understanding as to whether or
5  not the collateral — the cash collateral that was
6  to be deposited with ACSTAR was to accrue interest?
7  A  It was my understanding that it would accrue
8  interest.
9  Q  What do you base that understanding on?
10 A  The representation from the broker/agent people.
11 Q  Do you recall an actual representation with regard
12 to that?
13 A  I believe that there was a meeting — I think it
14 was Offstrander, Burch and Company that was the
15 agent that procured ACSTAR, and I want to say that
16 there was — somebody said — either it was one of
17 those parties, or somebody that works with those
18 parties, represented that that would accrue
19 interest, but I don't know — I've never read the
20 file.  I don't know.
21      I can't imagine me saying I'll put three point
22 five million dollars ($3.5) over there, and not
23 accrue interest.  I would have made that a
24 stipulation if I were aware of something different.
25 Q  Okay.

---

IN RE: INTERNATIONAL HERITAGE, INC.

| | | |
|---|---|---|
| 1 | Stanley H. Van Etten | Direct    Vol. 2, p. 73 |
| 2 | A | I was getting interest with the Court, so, and I |
| 3 | | would -- I can't imagine I — a corporate entity |
| 4 | | wouldn't provide the same opportunity, especially |
| 5 | | when they're being paid a fee of a hundred and |
| 6 | | fifty thousand dollars ($150,000) for the bond. |
| 7 | Q | Was it your understanding that the bond that ACSTAR |
| 8 | | was providing had to be substantially similar in |
| 9 | | all terms to the bond that you had provided — the |
| 10 | | cash money you had provided? |
| 11 | A | I would say, more specific -- I think it -- it had |
| 12 | | to be exact. |
| 13 | Q | And yours, in fact, included interest on |
| 14 | | collateral? |
| 15 | A | Yes. |
| 16 | | MS. HUMRICKHOUSE: Off the record for a |
| 17 | | minute. |
| 18 | | |
| 19 | | (DISCUSSION OFF RECORD.) |
| 20 | | |
| 21 | | |
| 22 | | (BREAK, 2:05 - 2:08 P. M.) |
| 23 | | |
| 24 | Q | (Ms. Humrickhouse) Who has acted as the debtor's |
| 25 | | corporate counsel? |

| | | |
|---|---|---|
| 1 | Stanley H. Van Etten | Direct    Vol. 2, p. 74 |
| 2 | | That may have changed. Tell me during what |
| 3 | | period it changed. |
| 4 | A | Oh, are you talking about post bankruptcy, or I'm |
| 5 | | not sure what you mean by that? |
| 6 | Q | Pre-bankruptcy. I'm sorry. |
| 7 | A | Counsel has been Wood and Francis, predominantly. |
| 8 | Q | Corporate? |
| 9 | A | Corporate, and then litigation, SEC matter is Kutac |
| 10 | | Rock, and then we probably have ten (10) to twelve |
| 11 | | (12) other law firms that represent us if we've |
| 12 | | ever had a need for any state issue, whether it be |
| 13 | | a civil action, or a regulatory issue, because we |
| 14 | | have operations in Canada and the U. S. |
| 15 | Q | Right. In what capacity would Wyrick/Robbins have |
| 16 | | offered representation to the debtor? |
| 17 | A | Wyrick/Robbins offered initial representation to us |
| 18 | | in our pre-IPO work on securities work. |
| 19 | | Then they offered provider representation to |
| 20 | | us in the North Carolina Attorney General |
| 21 | | situation, and they also provided representation to |
| 22 | | us in the SEC matter. |
| 23 | | Wyrick/Robbins has been counsel with the |
| 24 | | company since day one, so providing a variety of |
| 25 | | different services. They were not a lead party, or |

| | | |
|---|---|---|
| 1 | Stanley H. Van Etten | Direct    Vol. 2, p. 75 |
| 2 | | lead counsel, but they were providing services |
| 3 | | throughout the whole -- the entire period. |
| 4 | Q | Turning your attention to Wood and Francis, for a |
| 5 | | very short period of time, on what basis was Wood |
| 6 | | and Francis compensated by the company? |
| 7 | A | For providing legal services to the company. |
| 8 | Q | On a -- on a retainer basis, on a as-billed basis? |
| 9 | A | As billed basis. |
| 10 | A | And were you invoiced on a monthly basis? |
| 11 | A | Yes. |
| 12 | Q | What was the payment history of paying Wood and |
| 13 | | Francis? |
| 14 | | Would it be paid on a monthly basis? |
| 15 | A | Yeah. It was always paid on a monthly basis, |
| 16 | | usually within ten (10) working days of receiving |
| 17 | | the bill, we promptly, sometimes real close to the |
| 18 | | working day, we received the bill, sometimes as far |
| 19 | | as ten (10) days away. Usually within ten (10) |
| 20 | | days. |
| 21 | Q | What events would have kept you from keeping to |
| 22 | | that schedule in paying Wood and Francis, if any |
| 23 | | ever did? |
| 24 | A | Well, most of those decisions on payables for any |
| 25 | | vendor providing services would be made by the CFO |

| | | |
|---|---|---|
| 1 | Stanley H. Van Etten | Direct    Vol. 2, p. 76 |
| 2 | | and the accounting department, but by rank, they -- |
| 3 | | the Wood and Francis, because of the nature of the |
| 4 | | business and litigation surrounding it, they were |
| 5 | | always paid within ten (10) days of receiving the |
| 6 | | bill, because we couldn't jeopardize losing the |
| 7 | | representation. |
| 8 | Q | Uhh-hunh (yes). |
| 9 | A | And I — I can't -- I think that was fairly |
| 10 | | ordinary throughout the entire relationship. |
| 11 | Q | Who actually made the decision to pay what |
| 12 | | payables, the CFO? |
| 13 | A | John Brothers as operating officer and Rob Hukazela |
| 14 | | made all payment decisions. |
| 15 | Q | And if there wasn't enough money to pay everyone in |
| 16 | | the regular course of business, they would make the |
| 17 | | decisions? |
| 18 | A | They would make that decision. |
| 19 | Q | Did there -- do you know what I mean by balance |
| 20 | | sheet insolvency? |
| 21 | A | Yes. |
| 22 | Q | Okay. Did there come a time in your understanding |
| 23 | | that the company did not have balance sheet |
| 24 | | solvency? |
| 25 | A | I would say that over the entire life of the |

IN RE: INTERNATIONAL HERITAGE, INC.

Stanley H. Van Etten      Direct      Vol. 2, p. 77

```
1
2   company, that that became an issue from the
3   standpoint of financial analysis on a fairly
4   regular basis.
5         It would go in and out of solvency from
6   beginning to bankruptcy period of time, depending
7   on volumes of business and growth and payables
8   fairly regularly.
9         I did not come back out of that. It went --
10  there was a point in time where it went into that
11  state, and didn't come back out of it. It would
12  seesaw in and out of it many times over the life of
13  the company, but I think that it reached a state of
14  balance sheet insolvency sometime in '97, maybe,
15  and stayed -- and stayed there.
16 Q  Insolvency?
17 A  Insolvency.
18 Q  Using another definition, if I might, which would
19  be paying bills in the regular course of business
20   --
21 A  (Interposing) Unh-hunh (yes).
22 Q  -- as another test of solvency --
23 A  (Interposing) Unh-hunh (yes).
24 Q  -- if you will accept that --
25 A  (Interposing) Yes.
```

Stanley H. Van Etten      Direct      Vol. 2, p. 79

```
1
2   many times in the company's history, due to its
3   growth, that it could not manage its payables under
4   the terms or obligations it had with its vendors or
5   creditors, but its payment history, how it paid
6   bills in its ordinary course of business was fairly
7   consistent from beginning to end. It simply paid
8   them on a priority of what was -- there was process
9   that John and Rob would use when cash flow became
10  an issue, they would simply use the same process
11  over and over.
12        I don't know exactly what the process was, but
13  I know that they ranked their vendors and their
14  payables according to what the opportunities were
15  for generating revenues, or collecting revenues and
16  other issues from them.
17        An example might be, if I could just kind of
18  close that point out would be that if we were
19  getting ready to ship out ten thousand (10,000)
20  autoship orders, and we didn't have enough boxes to
21  handle ten thousand (10,000) shipments, and we
22  might receive a million three (1.3) in credit card
23  revenues from the autoship, we'd buy the boxes and
24  pay the vendor, maybe different than might be
25  normal course of business in order to facilitate
```

Stanley H. Van Etten      Direct      Vol. 2, p. 78

```
1
2 Q  -- as a definition, did there come a time that you
3   can either pinpoint, or estimate where the company
4   was unable to pay its obligations in the regular
5   course of business, in accordance to the ordinary
6   terms?
7 A  Let me make a couple defining points there.
8 Q  Sure.
9 A  In the regular course of business I think IHI
10  always paid its bills, the same way, even to the
11  end.
12        However, did it always meet its payment
13  obligation terms with the vendors and the various
14  creditors, I think that it had that problem going
15  back into 1997.
16        The -- the company considered its most
17  valuable asset, its sales force, which was not an
18  item on the balance sheet, and without the sales
19  force, the company didn't have any operations, and
20  with it, it had value, so it was the position of
21  the board and the management team that the company,
22  whereas on paper might be insolvent, it never was
23  insolvent because of the -- the lack of financial
24  reporting of the sales force, and that value.
25        With respect to the bill paying, there were
```

Stanley H. Van Etten      Direct      Vol. 2, p. 80

```
1
2   the -- the capturing of those revenues.
3 Q  What relationship did IHI have with BTI, other than
4   the fact that their managers have similar looks?
5 A  BTI solicited International Heritage to become a
6   reseller of their long distance and their
7   telecommunications products and services in 1996,
8   or early 1997.
9 Q  Explain that to me.
10 A  There was --
11 Q  (Interposing) -- little bit.
12 A  -- an article, I believe in the News and Observer
13  and also the Triangle Business Journal that talked
14  about our underwriter had given us a firm
15  commitment, and I believe we were -- there was a
16  slated public offering date of March of '97 --
17  March 3rd of '97, and it talked about the dramatic
18  growth of the company from incorporation in, '95,
19  to seventy-five thousand (75,000) sales reps by
20  March of '97, and the volume that we were doing.
21        And I believe, if I remember correctly, there
22  was an article in the News and Observer and an
23  article in the Triangle Business Journal, and I
24  believe Pete Loftin hand-wrote me a note that said,
25  we ought to get together and talk sometime about
```

FILED IN CHAMBERS
RICHARD W. STORY
U.S.D.C. Atlanta

JUL 01 1998

LUTHER D. THOMAS, Clerk
By:
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

    CIVIL ACTION NO.
    1:98-CV-0801-RWS

INTERNATIONAL HERITAGE, INC., et al.,

    Defendants.

### ORDER

This matter came before the Court on the application of Defendant International Heritage, Inc. and International Heritage, Incorporated (hereinafter "Defendants IHI") for an Order Approving Substitution of Cash Bond with Payment. By Order dated June 24, 1998, the Court denied the application because United Coastal Insurance Company ("United") was not authorized to conduct business in Georgia. Defendants IHI have now presented evidence that United is authorized to issue surplus line insurance pursuant to Georgia law and have requested that the Court vacate the June 24th Order and grant the application.

Having reviewed the entire record, including the original application and the motion for reconsideration, the Court enters the following Order granting the motion for reconsideration and granting the application.

The payment bond (a copy of which is attached hereto as Exhibit A) is approved by the Court as an appropriate surety bond for posting by Defendants IHI, ACSTAR Insurance Company



("ACSTAR"), and United in accordance with the April 3, 1998 Order of the Court. In order to complete the terms of the payment bond, it will be necessary for the Clerk of Court to disburse to ACSTAR some of the funds currently deposited by the Clerk of Court into the Registry of the Court. Therefore, upon the receipt of an original fully executed payment bond in the form attached hereto as Exhibit A by the Clerk of Court, the Clerk of Court shall wire transfer to ACSTAR Insurance Company in accordance with the instructions of ACSTAR contained in the bond the principal sum of Three Million Six Hundred Fifty Thousand and No/100 Dollars ($3,650,000.00) from the cash bond posted by the Defendant Stanley Van Etten. The Clerk of Court shall also disburse the remaining funds held within the Registry of the Court, including both principal and interest to International Heritage, Inc. (federal tax identification number 56-1921093) by wire transfer to First Union Bank, FBO International Heritage, Account Number 2000001295391, Routing Number 053110400.

Within three (3) business days following the wire transfer from the Clerk of Court to ACSTAR of the principal sum of Three Million Six Hundred Fifty Thousand Dollars ($3,650,000.00), ACSTAR shall acknowledge in writing the receipt of the wire transfer. If ACSTAR fails to acknowledge receipt of the wire transfer from the Clerk of Court, the Defendants IHI shall be in default of the bond requirements of the April 3, 1998 Order of this Court.

SO ORDERED, this 14th day of July, 1998.

RICHARD W. STORY
United States District Judge

2

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 03 1998

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

      v.

INTERNATIONAL HERITAGE, INC.,
STANLEY H. VAN ETTEN, CLAUDE W.
SAVAGE, LARRY G. SMITH and
INTERNATIONAL HERITAGE
INCORPORATED, a Nevada corporation,

      Defendants.

CIVIL ACTION

NO. 1:98-CV-803-RWS

---

## NOTICE OF POSTING OF CASH BOND AND ORDER APPROVING CASH BOND

WHEREAS, in open Court on 27 March, 1998 and in the above-captioned civil action pending in this Court between the Securities and Exchange Commission (hereinafter "SEC"), as Plaintiff, and the Defendants International Heritage, Inc. and International Heritage, Incorporated (hereinafter "Defendants IHI") and other individual Defendants, an Order was entered from the bench by the Honorable Richard W. Story, pending formalization of a subsequent written order requiring the Defendants IHI to post a dischargeable bond in the amount of Five Million Dollars ($5,000,000.00) to assure that the liquid assets of the Defendant IHI are not diminished during the pendency of this action and that such principal sum will be available to satisfy any amounts that may be ordered paid by the Defendants IHI in this proceeding; and

WHEREAS, the Defendant Stanley H. Van Etten, in his individual capacity, and acting as a Surety on behalf of the Defendants IHI (hereinafter "Surety"), has tendered and has agreed to transmit to the Clerk of Court for the United States District Court for the Northern District of



Georgia, Atlanta Division (hereinafter "Clerk of Court"), for deposit into the Registry of the Court the sum of Five Million Dollars ($5,000,000.00) cash (hereinafter "Bond") to assure that the liquid assets of the Defendants IHI are not diminished during the pendency of this action and to apply to any judgment for damages and/or order granting disgorgement or other monetary relief against the Defendants IHI, or either of them, up to the principal amount of Five Million Dollars ($5,000,000.00) that may result from this proceeding; and

WHEREAS, the Bond deposited by the Clerk of Court into the Registry of the Court shall be held pursuant to the terms of this order.

NOW, THEREFORE, BASED UPON THE FOREGOING, THE COURT HEREBY ORDERS that:

1.    The Bond posted by the Surety shall be deposited into the Registry of the Court to assure that the liquid assets of the Defendant IHI are not diminished during the pendency of this action and to make available at least the principal amount of Five Million Dollars ($5,000,000.00) to apply to any judgment for damages and/or any order granting disgorgement or other monetary relief against the Defendants IHI, or either of them in this proceeding.

2.    The condition of the obligation of the Bond is such that if the SEC shall fail to obtain a judgment for damages or an order granting disgorgement or other monetary relief against the Defendants IHI or either of them in this case, then this obligation shall be null and void and the principal amount of the Bond together with any then undisbursed accrued interest thereon shall be returned to the Surety upon receipt by

2

the Clerk of Court of an order releasing the Bond; otherwise, the Bond shall remain in full force and effect, pending further order of this Court.

3. A further condition of the obligation of the Bond is that if the SEC obtains a judgment for damages and/or an order granting disgorgement or other monetary relief against the Defendants IHI or either of them in this case, and that judgment is and any order granting disgorgement or other monetary relief are satisfied in whole or in part from the assets of the Defendant IHI either in full or, alternatively, in at least the principal amount of Five Million Dollars ($5,000,000.00), the principal amount of the Bond or any unapplied part of the principal amount of the Bond shall be returned to the Surety; otherwise, the Bond shall remain in full force and effect, pending further order of this Court.

4. The Bond posted by the Surety shall be placed by the Clerk of Court in a Registry of Court account by the Clerk of Court which will yield the highest interest rate possible, with any interest earned being paid to and for the benefit of the Surety quarterly, after any appropriate fees are deducted in accordance with any applicable laws which govern the activities of the Clerk of court.

5. The Defendants IHI may replace all or a portion of this Bond with a conventional, pre-approved surety bond containing exactly the same terms and conditions during the period that the Bond remains in place, so long as the replacement principal Bond amount shall not be less than Five Million Dollars ($5,000,000.00), provided that all aspects of the replacement are approved in advance by this Court and an additional order is entered by this Court approving the replacement of the Bond and further

3

provided that no more than one (1) such Bond replacement shall be proposed by the
Defendants IHI.

6.      In the event that the Surety shall no longer be employed by or serve as an officer or

director or be a shareholder of either of the Defendants IHI, the Defendants IHI may,

with the advance approval of this Court, replace this Bond either with a separate cash

bond, or with a conventional, pre-approved surety bond containing precisely the same

terms and conditions; provided, however, in no event shall the Bond be replaced

unless and until the collective principal Bond amount is at least Five Million Dollars

($5,000,000.00) and all aspects of the replacement are approved by a written order

entered by this Court.

SO ORDERED, this 3 day of April, 1998.



                                        RICHARD W. STORY
                                        United States District Court Judge



233 MAIN STREET • P.O. BOX 2350
NEW BRITAIN, CT 06050-2350
(203) 224-2000

United Coastal
Insurance Company

860 229 1111   P.19/22

**INDEMNITY AGREEMENT**

This Agreement is made and entered into by the undersigned Indemnitor (Indemnitors) in favor of ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, New Britain, CT 06050-2350 collectively (Surety) for the purpose of inducing Surety to furnish bonds and/or insurance policies.

WHEREAS, in the transaction of business, certain bonds, undertakings and other writings obligatory in the nature of a bond and/or insurance policies may have heretofore been, and may hereafter be, required by, for, or on behalf of the Indemnitors or any one or more of the Indemnitors, in whose behalf or in the execution of any and all such bonds and/or insurance policies the Indemnitors do hereby affirm to have a substantial material and beneficial interest, and as a condition precedent to the execution of any and all such bonds and/or insurance policies, the Surety requires execution of this Indemnity Agreement.

WHEREAS, the Indemnitors have or may have a substantial, material and beneficial interest in the obtaining of said bonds and/or insurance policies on behalf of various related companies, partnerships, entities, and/or individuals. It is agreed that this Agreement shall apply to any bonds executed and/or insurance policies issued on behalf of any individual, subsidiary, affiliated partnership, joint venture or corporation of the Indemnitor, now existing or hereafter formed or acquired, and whether partially or wholly owned or controlled, or related as fully as if the names and signatures of such subsidiary or affiliates appeared herein as Indemnitors.

NOW, THEREFORE, in consideration of the foregoing premises, and of the execution or continuance of such bonds and/or insurance policies, and for other good and valuable consideration, the Indemnitors do, for themselves, their heirs, executors, administrators and assigns, jointly and severally agree with the Surety as follows:

1) The Indemnitors will pay, when due, all premiums for each of such bonds in accordance with the Surety's rates in effect on the date each of such bonds become effective, as long as liability thereunder shall continue, and until the Surety is furnished with evidence satisfactory to the Surety of its discharge or release from the bonds or of all liability by reason thereof. The Indemnitors will pay, when due, all premiums and all deductibles for such insurance policies issued by Surety.

2) The Indemnitors will (a) perform all the conditions of each said bond or obligation, and any and all alterations, modifications, renewals, continuations and extensions thereof, and (b) indemnify and save the Surety harmless from and against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the Surety may sustain or incur by reason or in consequence of the execution of such bond or bonds and any renewal, continuation or successor thereof, including but not limited to, (i) sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, or (ii) expenses paid or incurred (A) in enforcing the terms hereof, (B) in procuring or attempting to procure release from liability, or (C) in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid. In the event of payments by the Surety, the Indemnitors agree to accept the voucher of the Surety or other evidence of such payments as prima facie evidence of the propriety thereof, and of the Indemnitor's liability therefor to the Surety.

3) If the Surety shall set up a reserve to cover any claim, liability, suit or judgment under any such bond, the Indemnitors will, immediately upon demand, deposit with the Surety a sum of money equal to such reserve and any increase thereof as collateral security on such bond or bonds.

4) Any money, letter of credit or property which shall have been, or shall hereafter be, pledged as collateral security on any bond or bonds shall be available, in the discretion of the Surety, as collateral security on all bonds coming within the scope of this instrument or for any other indebtedness of the Indemnitors to the Surety.

5) The Surety, in its sole discretion, is authorized but not required, a) to consent to any change in the contract or the contract documents including the plans and specifications; b) to make or guarantee advances or loans for the purposes of executing the contract without any obligation to see to the application thereof, it being understood that the amount of all such advances or loans shall be conclusively presumed to be a loss hereunder for which the Indemnitors are liable; and c) in the event of any breach, delay or default asserted by the obligee in any said bonds, or in the performance of the contract, or a breach of this Agreement or of any bond or bonds connected therewith, or the failure to diligently prosecute the work under any contract, or to pay for labor and materials used in the prosecution of the contract, or in the event work has ceased or been suspended on any contract or contracts covered by any said bonds, to take possession of the work under the contract and, at the expense of the Indemnitors, to complete the contract or cause the same to be completed or to consent to the completion thereof, and to take any other action which the Surety may deem appropriate. The Indemnitors hereby release and discharge the Surety from any and all liability for all its actions and omissions.

6) The Indemnitors hereby transfer, assign, pledge and convey to the Surety a security interest in 1) all equipment, tools and material in which the Indemnitor, have any interest, whether on site or elsewhere or on order; 2) all sums due or to become due to Indemnitors or any of them in connection with any contract; and 3) all subcontracts let by Indemnitors in connection with any contract. The security interests granted herein are effective in the case of each contract as of the date of the contract. Indemnitors hereby agree to execute any form of financing statement or other agreement or writing which Surety, in its sole discretion, deems necessary or advisable to perfect the security interests granted herein, and further authorize Surety at its discretion and at any time to file or serve this instrument, or a true copy hereof, or any other instrument executed pursuant hereto as a financing statement or other notice under the Uniform Commercial Code or any similar law, and Indemnitors authorize Surety to complete this instrument in any manner required for such use, and to prepare an attached schedule describing items of security covered hereunder. The Indemnitors hereby appoint Surety as Attorney-In-Fact for each of them to endorse and to deposit or negotiate checks, drafts, and all similar instruments payable to Indemnitors, with the right, but not the obligation to exercise all of the rights of the Indemnitors assigned, transferred and set over to the Surety in this Agreement and in the name of the Indemnitors to make, execute and deliver any and all additional assignments, documents as deemed necessary and proper by the Surety to give full force and effect to this paragraph(6). The Indemnitors agree that all equipment, tools and material and all subcontracts shall be dedicated to the performance of the contract to which they pertain and that such equipment, tools and material and subcontracts shall be subject to a trust in favor of the contract owner and Surety and that they be used to that end.

7) The Surety shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against the Surety or the principal upon any such bond shall be settled or defended and the Surety's decision shall be final and binding upon the Indemnitors.



8) If any of the bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, Indemnitors covenant and agree that all payments due or received for or on account of said contract shall be held in trust for Surety for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood that all monies due and to become due under any contract or contracts covered by the bonds shall be held in trust, whether such monies are in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said bonds.

9) The Surety may, without incurring any liability, decline to execute any bond and if the Surety executes a bid or proposal bond it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the bid or proposal bond is given and such declination shall not diminish or alter the liability of the Indemnitors that may arise by reason of having executed the bid or proposal bond.

10) The Indemnitors hereby waive notice of the execution of any such bonds or of any act, fact or information coming to the knowledge or notice of the Surety concerning or affecting its rights or liabilities under any such bonds or rights or liabilities of the Indemnitors hereunder, notice of all such being hereby expressly waived.

11) If the Surety shall procure any other company or companies to execute or join with it in executing, or to reinsure, any such bond or bonds, this instrument shall inure to the benefit of such other company or companies, its or their successors and assigns, so as to give to it or them a direct right of action against the Indemnitors to enforce this instrument and, in that event, the word "Surety", wherever used herein, shall be deemed to include such company or companies, as their respective interest may appear.

12) The Indemnitors hereby waive all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state.

13) In the event any claim or demand is made by the Surety against Indemnitors, or any one or more of them, by reason of the execution of a bond or bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of any one or more of the Indemnitors and hereby consent to any settlement or compromise that may hereafter be made. Separate suits may be brought hereunder as causes of action accrue and the bringing of suit or the recovery of judgment upon any cause of action shall not bar the bringing of other suits upon other causes of action whether theretofore or thereafter arising.

14) In the event any Indemnitor fails to execute this Agreement or in the event the execution hereof by any Indemnitor be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability of any other Indemnitor executing the same, but each and every party so executing shall be and remain fully bound and liable.

15) This Agreement may be terminated by any Indemnitor upon twenty days written notice received by the Surety but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the bonds and/or insurance policies that may have been theretofore executed.

16) This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed by the Surety and the Indemnitors is form a part hereof.

17) The Indemnitors agree to notify the Surety immediately upon their receiving any notice or knowledge that their liability insurance has been or will be cancelled or non-renewed, or that such coverage is or will be reduced.

18) At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including but not limited to, the status of the work under contracts being performed by the Indemnitor, the condition of the performance of such contracts and payment of accounts.

19) The word Indemnitor or pronouns referring to said word, whether singular or plural, are to be construed as referring to each of the undersigned Indemnitors, individually and collectively, though the Indemnitor be one or more individuals, partnerships, associations, or corporations.

IN TESTIMONY WHEREOF the Indemnitors intending to be legally bound hereby have hereunto set their hands and affixed their seals this _____ day of _____, 19 ____

Witness or Attest

All individual and corporate signatures must be acknowledged.

Name of Individual (Type): _____
Signature _____    Address _____
SS # _____    _____

Name of Individual (Type): _____
Signature _____    _____
SS # _____    _____

Name of Individual (Type):
Signature _____                 Address
SS # _____                      _____
                                                    _____

Name of Individual (Type):
Signature _____
SS # _____                      _____
                                                    _____

Name of Company (Type): International Heritage, Inc.
Signature By _IHS_                                   2626 Glenwood Ave., Ste 200
Name _John D Brothers_                               Raleigh, NC 27608
Title _Chief Operating Officer_

Name of Company (Type): International Heritage Incorporated
Signature By _IHS_                                   2626 Glenwood Ave., Ste 200
Name _John D Brothers_                               Raleigh, NC 27608
Title _Chief Operating Officer_

## INDIVIDUAL(S) ACKNOWLEDGEMENT

STATE OF _____ )
                                   ) ss:
COUNTY OF _____ )

On this _____ day of _____, 19 ____, before me personally came
_____, to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____


STATE OF _____ )
                                   ) ss:
COUNTY OF _____ )

On this _____ day of _____, 19 ____, before me personally came
_____, to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____


STATE OF _____ )
                                   ) ss:
COUNTY OF _____ )

On this _____ day of _____, 19 ____, before me personally came
_____, to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____

05/26/99 16:40 FAX 919 782 0465 NICHOLS&CRAMPTON
Case 98-02675-5-DMW Doc 174 Filed 05/28/99 Entered 05/28/99 00:00:00 Page 22 of 22

JAN-18-1999 15:41 868 229 1111 P.13/22

## PARTNER(S) ACKNOWLEDGMENT

STATE OF _____ )
                                                       ) SS:
COUNTY OF _____ )

On this _____ day of _____ , 19 ____ , before me personally came _____ , to me known,

and stated that he/she/they is (are) partner(s) in the firm of _____ , and acknowledge that he/she/they

executed the foregoing instrument as the act of the said firm.

---

## CORPORATE ACKNOWLEDGMENT(S)

STATE OF NORTH CAROLINA )
                                                       ) SS:
COUNTY OF WAKE )

On this 8TH day of JUNE , 19 98 , before me personally came JOHN D BROTHERS , to me known
who, being by me duly sworn, did depose and say that he resides in RALEIGH, WAKE CO. NORTH CAROLINA
that he is the CHIEF OPERATING OFFICER of the International Heritage, Inc.
the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal
affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said
corporation, and that he signed his name to the said instrument by like order.

MY COMMISSION EXPIRES 27 JULY (99)

*[Notary seal: NOTARY PUBLIC, WAKE COUNTY, N.C.]*

STATE OF NORTH CAROLINA )
                                                       ) SS:
COUNTY OF WAKE )

On this 8TH day of JUNE , 19 98 , before me personally came JOHN D BROTHERS , to me known,
who, being by me duly sworn, did depose and say that he resides in RALEIGH, WAKE CO. NORTH CAROLINA
that he is the CHIEF OPERATING OFFICER of the International Heritage, Inc. Incorporated
the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal
affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said
corporation, and that he signed his name to the said instrument by like order.

MY COMMISSION EXPIRES 27 JULY 99

*[Notary seal]*

STATE OF _____ )
                                                       ) SS:
COUNTY OF _____ )

On this _____ day of _____ , 19 ____ , before me personally came _____ , to me known,
who, being by me duly sworn, did depose and say that he resides in _____ , to me known,
that he is the _____ of the _____
the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal
affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said
corporation, and that he signed his name to the said instrument by like order.

6111 (2/98)