**FILED**

**■ 13 ■■**

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

|  |  |  |
|---|---|---|
| INTERNATIONAL HERITAGE, INC. | ) | CASE NO. 98-02675-5-ATS |
|  | ) | CHAPTER 7 |
|  | ) |  |
| INTERNATIONAL HERITAGE, | ) | CASE NO. 98-02674-5-ATS |
| INCORPORATED, | ) | CHAPTER 7 |
| Debtors | ) |  |

MEMORANDUM OF LAW IN SUPPORT
OF OBJECTION OF ACSTAR INSURANCE COMPANY
TO APPLICATION OF TRUSTEE FOR AUTHORITY
TO ENTER INTO SETTLEMENT AGREEMENT

ACSTAR Insurance Company ("ACSTAR") submits the following Memorandum of Law in support of its Objection to the Application of Trustee for Authority to Enter into Settlement Agreement filed on August 27, 1999, and supplemented on September 10, 1999. The reasons and authorities in support of this Memorandum of Law are as follows:

**I.    INTRODUCTION**

This matter involves the Trustee's attempt to settle the claims of International Heritage, Inc., International Heritage, Incorporated (collectively "IHI") against Executive Risk Specialty Insurance Company ("ERSIC"), which provided a Directors and Officers Liability Policy to IHI and its officers and directors (the "ERSIC policy"). ACSTAR submits that the Trustee's Application should be denied for several reasons. First, the Application is defective because it provides no adequate basis to support the Trustee's decision to settle. Furthermore, the proposed settlement agreement completely ignores the indemnification rights of ACSTAR. Pursuant to the terms of a Payment Bond posted by ACSTAR for IHI's benefit, ACSTAR has agreed to pay $4.1 million to resolve claims of the Securities and

*WARD AND SMITH, P.A., ATTORNEYS AT LAW* (vertical text, left margin)

189
Copy ser'd  9/13/99 AM

195

Exchange Commission ("SEC") against IHI. An Indemnity Agreement executed by IHI in favor of ACSTAR contemporaneously with the Payment Bond entitles ACSTAR to reimbursement out of any proceeds from the ERSIC policy in preference to any other party, including the bankruptcy Trustee. In fact, the amount to which ACSTAR is entitled as a result of the Indemnity Agreement is not property of the bankruptcy estate. Additionally, ACSTAR is entitled to a portion of any proceeds from the ERSIC policy through its subrogation rights under 11 U.S.C. § 509 and under the doctrine of equitable subrogation. Given these circumstances, the Trustee's Application should be denied.

## II.  FACTS

On March 16, 1998, the SEC brought a civil action in the United States District Court for the Northern District of Georgia, Atlanta Division, against IHI, Stanley H. Van Etten, Claude W. Savage, and Larry G. Smith. That case bears Civil Action No. 1-98-CV-0803-RWS and is styled <u>Securities and Exchange Commission v. International Heritage, Inc., Stanley H. Van Etten, Claude W. Savage, Larry G. Smith, International Heritage Incorporated, a Nevada corporation</u> (the "SEC litigation").

In the SEC litigation, the District Court issued a Memorandum Opinion and Order filed on April 3, 1998. It allowed IHI to resume its business activities under certain conditions. Among other provisions, the District Court ordered IHI to post a $5,000,000 dischargeable bond to ensure that at least that amount would be available to satisfy any amounts ordered paid by IHI in the SEC litigation. The specific conditions of the bond were set out in a Notice of Posting of Cash Bond and Order Approving Cash Bond filed on April 3, 1998 and incorporated by reference in the Memorandum Opinion and Order.

Stanley H. Van Etten ("Van Etten"), then an officer and director of IHI, acting as surety on IHI's behalf, tendered to the

2

Clerk of Court for the District Court $5,000,000 cash for deposit into the registry of the Clerk of Court to ensure that IHI's liquid assets would not be diminished during the SEC litigation and would be available to satisfy to any judgment for damages or order granting disgorgement or other monetary relief against IHI.

The Notice of Posting of Cash Bond and Order Approving Cash Bond expressly permitted IHI to replace the bond with a conventional, pre-approved surety bond containing exactly the same terms and conditions during the period that the bond remained in place. The Defendants applied for an Order Approving Substitution of Cash Bond With Payment Bond on June 24, 1998. They proposed that ACSTAR would issue the surety bond and that United Coastal Insurance Company (United) would serve as co-surety. The District Court entered an Order on July 1, 1998 granting the Application for an Order Approving Substitution of Cash Bond with Payment Bond. It was pursuant to these terms that ACSTAR and United jointly posted a $5,000,000 dischargeable surety Payment Bond. $3,500,000 was transferred to ACSTAR from the Clerk of Court as collateral for the bond.

To induce ACSTAR and United to furnish the Payment Bond, IHI executed an Indemnity Agreement on June 8, 1998. The Indemnity Agreement was agreed upon contemporaneously with the execution of the bond. A photocopy of the Indemnity Agreement is attached hereto and incorporated herein by reference as "Exhibit A." Paragraph 2 of the Indemnity Agreement states that IHI will:

> indemnify and save the surety [ACSTAR] harmless from and against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the surety may sustain or incur by reason or in consequence of the execution of such bond or bonds and any renewal, continuation or successor thereof, including but not limited to, (i) sums paid or liabilities incurred in settlement of, and expenses paid or incurred

3

> in connection with claims, suits, or judgments
> under such bonds, or (ii) expenses paid or
> incurred (A) in enforcement the terms hereof,
> (B) in procuring or attempting to procure
> release from liability, or (C) in recovering
> or attempting to recover losses or expenses
> paid or incurred, as aforesaid.

Paragraph 6 of the Indemnity Agreement specifically grants ACSTAR a security interest in "all sums due or to become due to indemnitors or any of them in connection with any contract."

On November 25, 1998, IHI filed for relief under Chapter 7 of the United States Bankruptcy Code. Holmes P. Hardin was appointed Chapter 7 Trustee in both cases.

On January 15, 1999, the Trustee filed an Application to Enter into Stipulation and Consent to Final Judgment of Permanent Injunction. The Application requested an Order authorizing the Trustee to execute a pleading entitled Consent to Final Judgment of Permanent Injunction as to Defendants IHI in the underlying SEC litigation.

Before the Court ruled on this Application, the parties submitted to court-appointed mediation. As a result of the mediation, ACSTAR, in settlement of the SEC's claims against IHI, agreed to pay $4.1 million on the Payment Bond. Specifically, on June 21, 1999, this Court approved the Trustee's Application and entered an Order that stated in pertinent part:

> The Sureties (ACSTAR and United) have agreed
> to pay and the Trustee for International
> Heritage, Inc. has agreed to receive $4.1
> million under the Bond and to disburse the
> proceeds of the Bond in the International
> Heritage, Inc. bankruptcy case according to
> Paragraph V of Exhibit A(1) attached hereto.
> The Commission stipulates that the United
> States Bankruptcy Court for the Eastern
> District of North Carolina has jurisdiction
> pursuant to 28 U.S.C. § 1334 over the
> administration of the surety Bond, and further
> stipulates that any and all proceeds of such

4

Bond shall be first subject to a payment to
the Trustee of an amount equal to the full
statutory commission permitted pursuant to 11
U.S.C.  §  326(a)  without  reduction
notwithstanding the foregoing stipulation that
the Bond is not property of IHI Estate, and
that in addition to the aforesaid payment to
Trustee, to payment of all allowed IHI
administrative claims. It is further agreed
that the Sureties (ACSTAR and United) shall
have  claims  in  the  International
Heritage, Inc. bankruptcy case as set forth in
Paragraph V of Exhibit A(1) attached hereto.

The obligations in the Order are contingent on the entry
of a Final Judgment in the SEC Litigation.  Notably, no amounts
were paid to the SEC from the ERSIC policy.

On August 9, 1999, the Trustee filed an Application for
Authority to Enter into Settlement Agreement (the "Application").
A photocopy of the Application is attached hereto and incorporated
herein by reference as "Exhibit B." In the Application, Trustee,
Van Etten, Savage, and Smith propose a settlement of two lawsuits
involving IHI and ERSIC whereby ERSIC will pay $1,787,500 to the
Trustee.   ERSIC will also pay $275,000 to Van Etten in
reimbursement for attorneys' fees and expenses incurred in the
underlying actions. In addition, ERSIC will withdraw a proof of
claim for $500,000 that it advanced, on an interim basis, for
defense costs.

Paragraph 11 of the Trustee's Application states that
"the settlement agreement is contingent upon the Court granting a
motion for 11 U.S.C. § 105 injunction filed by Trustee in Adversary
Proceeding No. S-99-00043-5-AP, extending the automatic stay to all
co-defendants in the underlying actions enumerated therein." In
the proposed Settlement Agreement and Release attached to the
Application, Paragraph 6 states that the Agreement will not become
effective before "the dismissal with prejudice of all civil actions
pending against IHI and/or the directors and officers as of the

5

effective date of the settlement or the entry of an injunction by the Bankruptcy Court under 11 U.S.C. § 105 enjoining any such actions that have not been dismissed with prejudice by the effective date of the settlement."   The proposed Settlement Agreement and Release also states that the Trustee shall file a motion with the Bankruptcy Court that, among other things, finds that "ERSIC is released from any and all obligations under the policy, whether known or unknown, anticipated or unanticipated, past, present or future."   If the Application is approved, its terms would foreclose ACSTAR from pursuing any claims against ERSIC, IHI, Van Etten, Savage, or Smith.

ERSIC provided the insurance policy to IHI and its officers and directors for the policy period June 23, 1997 to June 23, 1998.   (A photocopy of the insurance policy is attached hereto and incorporated herein by reference as "Exhibit C.")   IHI is an insured under the ERSIC policy. The ERSIC policy covers IHI for claims for "Securities Activity Wrongful Acts," which is defined as any actual or alleged "(1) violation of Securities Laws; or (2) any act, error, omission, misstatement, misleading statement or breach of duty by an insured in connection with the purchase or sale, or offer purchase or sale, securities issued at any time by the Company."   The SEC filed its suit against IHI and certain of its officers and directors on March 18, 1998, during the ERSIC policy period.

The ERSIC policy is a claims-made indemnity policy for claims made during the ERSIC policy period.   It covers "loss," which is defined as Defense Expenses and any "damages, settlements, judgments or other amounts   .  .  .   that the Company   .  .  .   is obligated to pay as a result of any Claim for Securities Activity Wrongful Acts   .  .  .  ."   Defense expenses are defined as "reasonable legal fees and expenses incurred in the defense or appeal of a Claim." The ERSIC Policy limits are $5,000,000 for all

WARD AND SMITH, P.A., ATTORNEYS AT LAW

6

claims made during any single policy year, with a $100,000 retention per claim.

In settlement of the SEC's claims against IHI, ACSTAR has agreed to pay $4.1 million on the Payment Bond. ACSTAR received $3.5 million as collateral on the Payment Bond, therefore ACSTAR is out of pocket $600,000, exclusive of fees and expenses to which it is also entitled under the express terms of the Indemnity Agreement.

**III. ARGUMENT**

**A. The Court should deny the Trustee's Application because it does not contain a legally-sufficient basis to justify the Trustee's decision.**

The Trustee's Application provides no basis for verifying the Trustee's decision to settle with ERSIC. This Court must approve any settlement of litigation by the Trustee. According to Bankruptcy Rule 9019(a), the Court may approve a settlement only if it considers the probability of success on the merits, difficulties of collection, the complexity of litigation, and the expense, inconvenience, and delay associated with litigation.

The Trustee's Application does not discuss any of these factors. Rather, it offers only conclusory and subjective statements that the settlement is in the Estate's best interest:

> Trustee is of the opinion that settling the above-described controversy is in the best interests of the expeditious administration of the debtor's estate, given the merits of the defenses and the complexity, expense, inconvenience and delay of litigation. Trustee therefore deems it appropriate and consistent with his duties to enter into the Settlement Agreement with ERSIC, Van Etten, Savage and Smith which settlement by its terms, inter alia, (a) brings substantial revenue into the bankruptcy estate without incurring additional costs or expenses, and (b) avoids complicated litigation concerning

7

the insurance coverage issues.     (Trustee's
Application p.4.)

The United States Supreme Court has held that the
approval of a settlement based on mere boiler-plate approval
"phrased in appropriate language but unsupported by evaluation of
the facts or analysis of the law" is impermissible.   Protective
Committee of Independent Stockholders of TMT Trailer Ferry, Inc. v.
Anderson, 390 U.S. 414, 434 (1968).    The Trustee's application
fails to satisfy the Supreme Court's standard.  The Trustee offered
no evaluation of the facts or analysis of the law in his
Application.

Before the bankruptcy court can approve a settlement, it
has an independent duty to inform itself of all the relevant
factors and to make specific findings with respect to those
factors.   LaSalle National Bank v. Holland, 841 F.2d 159, 163 (7th
Cir. 1987).    In this case, the Trustee's Application does not
discuss the merits of the two lawsuits or the estate's likelihood
to prevail in those lawsuits.  Also, the Trustee's Application does
not discuss the merits of ERSIC's arguments.   Specifically, the
Trustee's Application does not discuss the coverage under the ERSIC
policy, the basis for any claims against that policy, or the
amounts of any possible claims against the ERSIC policy.
Therefore, without more from the Trustee, the Court should reject
his Application.

**B.    The Indemnity Agreement's express terms entitle ACSTAR to
a portion of the insurance proceeds in priority to the
bankruptcy Trustee.**

In addition to failing to adequately support his
settlement Application, the Trustee completely disregards ACSTAR's
rights to indemnification in the ERSIC policy.   IHI executed an
Indemnity Agreement with ACSTAR contemporaneous with the Payment
Bond.  Paragraph 2 of the Indemnity Agreement states that IHI will:

8

indemnify and save the surety [ACSTAR] harmless from and against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the surety may sustain or incur by reason or in consequence of the execution of such bond or bonds and any renewal, continuation or successor thereof, including but not limited to, (i) sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, or (ii) expenses paid or incurred (A) in enforcement the terms hereof, (B) in procuring or attempting to procure release from liability, or (C) in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid.

Paragraph 6 of the Indemnity Agreement specifically grants ACSTAR a security interest in "all sums due or to become due to indemnitors or any of them in connection with any contract." Under North Carolina law, an insurance policy is a contract. Brown v. Lumbermans Mut. Cas. Co., 390 S.E.2d 150, 153, 326 N.C. 387 (1990). The insurance policy contract between IHI and ERSIC is such a contract in which ACSTAR has a security interest under the Indemnity Agreement. Consequently, in accordance with the Indemnity Agreement, ACSTAR has a security interest in the ERSIC policy. ACSTAR is entitled to recover any proceeds from the ERSIC policy before any other party as indemnity for the amount it pays on IHI's behalf.

The ERSIC policy covered IHI for any settlements that IHI was obligated to pay because of any claim for "securities activity wrongful acts." The SEC's claims against IHI clearly include claims for securities activities wrongful acts. IHI, however, did not pay any part of the settlement. Initially, Van Etten posted a $5,000,000 bond. Later, ACSTAR substituted a surety payment bond for Van Etten's cash bond. ACSTAR received $3.5 million as collateral for the payment bond. ACSTAR has agreed to pay the

9

entirety ($4.1 million) of the SEC litigation settlement on IHI's behalf.  As a result, ACSTAR has a $600,000 exposure, exclusive of fees and expenses to which it is entitled.

ACSTAR, not IHI, has agreed to pay $4.1 million to settle the SEC's claims.  Therefore, it is ACSTAR, not IHI that is entitled to recover first from the ERSIC policy.  To hold otherwise would grant IHI an inequitable windfall at ACSTAR's expense.  By virtue of the Indemnity Agreement, the ERSIC policy proceeds inure to ACSTAR's benefit.  Furthermore, equity demands that ACSTAR be reimbursed from the ERSIC policy proceeds for its loss.

In re Alcon Demolition, Inc., 204 B.R. 440 (Bankr. D.N.J. 1997) is directly on point.  In that case, the surety, Connecticut Indemnity Company, issued payment and performance bonds to Alcon Demolition, Inc.  Alcon subsequently filed for bankruptcy.  The surety was required to pay over $378,000 in claims on Alcon's behalf for performance and payment bonds it issued on a construction contract.

In connection with the bonds, Alcon executed a General Agreement of Indemnity with the surety similar to the Indemnity Agreement between ACSTAR and IHI.  Alcon agreed to indemnify and hold the surety harmless for any claims that might arise from the bonds.  In the indemnity agreement, Alcon signed all its interests in construction contracts to the surety, and agreed that if it defaulted on a contract, the surety was subrogated to Alcon's rights in the contracts.  Alcon sued the George Hyman Company on a construction contract and prevailed in an arbitration proceeding. The surety contended that $378,000 of the arbitration award was a claim secured under the indemnity agreement.  The Court held that, pursuant to the terms of the indemnity agreement, the surety was first entitled to reimbursement out of the arbitration award to the extent of its loss.

10

In another analogous situation, the United States Supreme Court held that when a surety performs or pays subcontractors to perform pursuant to a performance and payment bond, it has rights to reimbursement from the remaining contract funds. A surety has an "equitable lien" against the identifiable proceeds of the underlying contract. <u>Henningsen v. United States Fid. & Guar. Co.</u>, 208 U.S. 404, 28 S. Ct. 389 (1908).

Just as the <u>Alcon</u> indemnity agreement gave the surety a security interest in Alcon's construction contracts, in this case the Indemnity Agreement grants ACSTAR a security interest in the ERSIC policy. ACSTAR has an equitable lien against the proceeds of the ERSIC policy. The Trustee does not have the authority to settle with ERSIC because of ACSTAR's pre-existing security interest in the proceeds of the ERSIC policy. ACSTAR is entitled to be paid before the bankruptcy Trustee as reimbursement for its $600,000 (exclusive of costs and attorneys' fees) exposure.

C. **The Bankruptcy Court should not approve the settlement because the ERSIC policy proceeds are not property of the Bankruptcy Estate to the extent of amounts owed to ACSTAR.**

The ERSIC policy proceeds are not property of the Estate. For that reason, the Bankruptcy Court does not have authority to approve this settlement. Under payment and performance bonds, when a debtor defaults on an underlying contract he is not entitled to the contract funds because performance has not been completed and because materialmen and laborers have not yet been paid. <u>In re OC Piping Installations, Inc.</u>, 225 B.R. 553 (Bankruptcy E.D.N.Y 1998). When the surety, such as ACSTAR in this case, performs in the place of a debtor and completes the contract, the entitlement to contract funds arises. Equity demands that the debtor not receive a windfall. Thus, subrogation places the surety in the position to exercise the debtor's rights to identifiable contract funds, effectively removing that property from the estate and rendering it

11

unavailable to general creditors.  In re Alcon Demolition, Inc.,
204 Br. 440, 447 (Bankr. D.N.J. 1997).  In In re Modular
Structures, Inc., 27 F.3d 72, 77-78 (3rd Cir. 1994) the Third
Circuit held that, to the extent necessary to reimburse a surety
for monies actually paid out in accordance with its obligations
under an indemnity agreement, such funds are not property of the
estate.

    In Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S. Ct.
232 (1962), the United States Supreme Court held that a surety on
a payment bond has a superior right to funds than a bankruptcy
trustee.  The Court held that "the Bankruptcy Act simply does not
authorize a trustee to distribute other people's property among a
bankrupt's creditors."  Id. at 136.  The Court reasoned that "if
the surety at the time of adjudication was, as it claimed, either
the outright legal or equitable owner of the fund, or had an
equitable lien or prior right to it, this property interest of the
surety never became a part of the bankruptcy estate."  Id. at 136.
In ruling that the surety's right to the fund was superior than the
bankruptcy trustee's right, the Court recognized that "property
interests in a fund not owned by a bankrupt of adjudication,
whether complete or partial, legal or equitable, mortgages, liens,
or simple priority of rights, are of course not a part of the
bankrupt's property and do not vest in the trustee."  Id. at 135.

    All of these cases are on point.  ACSTAR, as surety, has
agreed to pay $4.1 million under the payment bond, and its total
exposure is $600,000, exclusive of attorneys' fees and costs.
ACSTAR has performed in place of the debtor - IHI.   Therefore,
ACSTAR has a right to that portion of the ERSIC policy proceeds
necessary to reimburse it for its loss.  The ERSIC policy is not
property of the estate to the extent of ACSTAR's loss, and, for
that reason, the Bankruptcy Court should not approve the Trustee's
Application.

12

### D.    ACSTAR is subrogated to the SEC's rights pursuant to 11 U.S.C. § 509.

Under 11 U.S.C. § 509, "an entity that is liable with the debtor on, or that has secured, a claim of the creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment." This section applies to this case.    In posting the Payment Bond, ACSTAR partially secured the claims against IHI.    ACSTAR has agreed to pay $4.1 million to settle all claims against IHI in the SEC litigation. ACSTAR's total exposure is $600,000 plus expenses and attorney's fees.    Therefore, pursuant to Section 509, ACSTAR is subrogated to the SEC's rights to this extent.    Since the SEC is entitled to payment against ERSIC, ACSTAR, by stepping into the SEC's shoes, may also proceed against ERSIC.

Section 509(c) explicitly states that "the Court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise."    Pursuant to Section 509, ACSTAR is entitled to reimbursement for its exposure under the Payment Bond in preference to any other party, including the Bankruptcy Trustee.

### E.    Under the equitable subrogation doctrine, ACSTAR is subrogated to the SEC's rights and is entitled to exercise all the SEC's rights against IHI.

As a result of the payments to be made pursuant to the District Court's Order, ACSTAR is also equitably subrogated to all the SEC's rights.    Subrogation is the substitution of one party in the place of another with respect to a lawful claim or right so that the substituted party succeeds to the rights of the other.

13

Black's Law Dictionary, 1427 (6th Ed. 1990). The principle is one that arises out of obligation, rather than out of voluntary goodwill. National Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843, 844 (1st Cir. 1969). Subrogation is a venerable doctrine of "pure unmixed equity, having its foundation in the principles of natural justice." Prairie State Nat'l Bank of Chicago v. United States, 164 U.S. 227, 231, 17th S. Ct., 142, 144 (1896). The concept is best understood in terms of one who has performed his obligatory duties, the subrogee, stepping into the shoes of another, the subrogor. In re Alcon Demolition, Inc., 204 Br. 440 (Bankr. D.N.J. 1997).

The equitable effect of subrogation is to ensure that the subrogee, who had no choice but to perform his duties, will be compensated through exercise of the subrogor's rights. To allow the subrogor to keep his rights would result in unjust enrichment. The United States Supreme Court has noted that "there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136-37, 83 S. Ct. 232, 235 (1962).

North Carolina law recognizes the doctrine of equitable subrogation. In In re White, 183 B.R. 713 (Bankr. M.D. N.C. 1995), the Court stated that equitable subrogation treats the extinguished obligation "as still subsisting for the benefit of [the provider of the funds], who is thus substituted to the rights, remedies, and securities of another." The In re White Court also recognized that an equitable lien under the doctrine of equitable subrogation is superior to the trustee's "strong arm" powers under 11 U.S.C. 544(a)(1).

It is undisputed in this case that ACSTAR has agreed to pay $4.1 million to resolve the SEC's claims against IHI. As a consequence, ACSTAR is subrogated to the SEC's rights, and is

14

entitled to enforce its right to be reimbursed from the proceeds of
the ERSIC policy.

### F.   Equitable subrogation also allows ACSTAR to assert all of IHI's rights against ERSIC.

As mentioned above, the Indemnity Agreement allows ACSTAR
to proceed against ERSIC for reimbursement.   See In re Alcon
Demolition, Inc., 204 Br. 440 (Bankr. D.N.J. 1997).   Even in the
absence of the Indemnity Agreement, however, equitable subrogation
also permits ACSTAR to recover on any of IHI's claims against
ERSIC.   In a similar case, Krawczyk v. Bank of Sun Prairie, 553
N.W.2d 299 (C.A. Wis. 1996), Ohio Casualty issued a fidelity and
theft policy to the Bank of Sun Prairie.   The bank served as
trustee for two trust funds.   The trust funds sued the bank,
alleging that the bank and one of its trust officers had
negligently transferred the trust funds to unauthorized entities.
Ohio Casualty settled the Plaintiff's claims against the bank and
moved to substitute itself for the Plaintiffs and the bank in the
underlying actions to pursue their claims against the trust officer
and the bank's Directors and Officers Liability insurer.

The Court held that Ohio Casualty had a right to
substitute to the bank's interest in the action.   The Court held
that once a fidelity insurer pays the loss caused by the wrongful
acts of a bonded employee, the insurer becomes subrogated to any
right of action the employer may have against the employee.

The reasoning of Krawczyk applies to this case as well.
Like Ohio Casualty, ACSTAR paid losses owed by IHI and caused by
the wrongful acts of IHI's employees.   There can be no dispute by
the Trustee that IHI is entitled to recover against ERSIC.   Indeed,
in his Complaint for Declaratory Relief, the Trustee specifically
alleged that IHI was covered under the ERSIC policy for the claims
brought by the SEC.   But the Trustee errs in attempting to settle
IHI's claims against ERSIC at the expense of ACSTAR.   Because

ACSTAR paid the SEC's claims for IHI, ACSTAR is subrogated to any right of action that IHI may have against its employees, and their directors and officer's liability insurer.  Although the proceeds of the ERSIC policy are for IHI's benefit, since ACSTAR has paid claims pursuant to its Payment Bond for IHI, it is entitled to a portion of these proceeds as reimbursement to the extent of its loss of $600,000 plus fees and expenses.  Any other result denies ACSTAR its proper right of reimbursement and grants IHI an inequitable windfall.

### G.  The Trustee's Application impermissibly enjoins ACSTAR from pursing any reimbursement from IHI or ERSIC for its loss.

The Trustee's Application seeks a permanent injunction against any actions against IHI and ERSIC.  Specifically, the Settlement Agreement and Release states that the Agreement will not become effective before "the dismissal with prejudice of all civil actions pending against IHI and are the Directors and Officers as of the effective date of the settlement or the entry of an injunction by the Bankruptcy Court under 11 U.S.C § 105 enjoining any such actions that have not been dismissed with prejudice by the effective date of the settlement."  The Settlement Agreement and Release also states that the Trustee shall request that the Bankruptcy Court enter an Order "finding that ERSIC is released from any and all obligations under the policy, whether known or unknown, anticipated or unanticipated, past, present or future."

The Bankruptcy Court lacks the jurisdiction to grant a Release to a Non-Debtor third-party, which is exactly what the Trustee requests in his Application.  Callaway v. Benton, 336 U.S. 132 (1946); In re Digital Impact, 223 B.R.1 (Bankr. N.D.OK. 1998).  Although Callaway was decided under the former Bankruptcy Act, it is still binding precedent and precludes the court from approving the Trustee's Application.  Furthermore, the court should

16

not grant a complete and permanent Release to IHI and ERSIC because it will fatally prejudice ACSTAR's rights. As stated before, ACSTAR is entitled to reimbursement out of the ERSIC policy proceeds for its loss under the payment bond. If the court permanently enjoins all claims against IHI or ERSIC, ACSTAR's rights will be nullified.

**IV.   CONCLUSION.**

ACSTAR respectfully requests that the court deny the Trustee's Application for authority to enter into the Settlement Agreement. The Application is vague and does not establish an adequate factual and legal basis to support the settlement. Moreover, the proposed Settlement Agreement does not consider, or protect, the rights of ACSTAR. As discussed above, ACSTAR is entitled to proceeds from the ERSIC policy in preference to the Trustee. ACSTAR's rights derive from its Indemnity Agreement with IHI, Section 509 of the Bankruptcy Code, and the doctrine of equitable subrogation. In light of these reasons, the Trustee's Application should be denied.

This the 10th day of September, 1999.

Paul A. Fanning
N.C. State Bar I.D. No.:   025477

Michael P. Flanagan
N.C. State Bar I.D. No.:   001461
For the firm of
Ward and Smith, P.A.
120 West Fire Tower Road
Post Office Box 8088
Greenville, North Carolina   27835-8088
Telephone:   (252) 355-3030
Facsimile:   (252) 756-3689
Attorneys for Acstar Insurance Company

## CERTIFICATE OF SERVICE

The undersigned, of 120 West Fire Tower Road, Post Office
Box 8088, Greenville, North Carolina  27835-8088, certifies:

That I am, and at all times hereinafter mentioned was,
more than eighteen (18) years of age;

That on the date set forth below I served copies of the
foregoing OBJECTION by first class mail at their last known
addresses on the following:

Holmes P. Harden
Maupin, Taylor & Ellis, P.A.
Post Office Drawer 19764
Raleigh, NC 27619

Terri L. Gardner
Smith, Debnam, Narron & Myers, LLP
Post Office Box 26268
Raleigh, NC 27611

Marjorie K. Lynch
Bankruptcy Administrator
Post Office Box 3039
Raleigh, NC 27602

Brent E. Woods
Post Office Box 164
Raleigh, NC 27602

Louis P. Richkind
Counsel to Chittenden Bank
One Woodward Ave., Suite 2400
Detroit, MI 48226

Kathryn N. Koonce
Poyner & Spruill, LLP
Post Office box 10096
Raleigh, NC 27605

N. Hunter Wyche, Jr.
Wyche & Story, RLLP
Post Office Drawer 1389
Raleigh, NC 27602

Lloyd W. Gathings, II
Robert W. Shore
Gathings & Associates
Post Office Box 10545
Birmingham, AL 35202

Ronald H. Garber
Boxley, Bolton & Garber, LLP
Post Office Drawer 1429
Raleigh, NC 27602

Lloyd T. Whitaker, President
Newleaf Corporation
2814 New Spring Road, Suite 330
Atlanta, GA 30339

Joel B. Piassick
Kilpatrick & Stockton, LLP
Suite 2800
1100 Peachtree Street, N.E.
Atlanta, GA 30309

William P. Hicks
U.S. Securities and Exchange Commission
Atlanta District Office
Suite 1000
3475 Lenox Road
Atlanta, GA 30326

I certify under penalty of perjury that the following is true and correct.

This the 10th day of September, ~~August~~, 1999.

Paul A. Fanning

9901038/0001
GVLMAIN\202933.1





JAN-18-1999  15:39  INSURANCE COMPANY
233 MAIN STREET • P.O. BOX 2350
NEW BRITAIN, CT 06050-2350
(203) 224-2000

United Coastal
Insurance Company
233 Main Street • P.O. Box 2350
New Britain, Connecticut 06050-2350
(203) 224-2000

860 229 1111   P.10/22

EXHIBIT "A"

**INDEMNITY AGREEMENT**

This Agreement is made and entered into by the undersigned Indemnitor (Indemnitors) in favor of ACSTAR Insurance Company and United Coastal Insurance Company, 233 Main Street, New Britain, CT 06050-2350 collectively (Surety) for the purpose of inducing Surety to furnish bonds and/or insurance policies.

WHEREAS, in the transaction of business, certain bonds, undertakings and other writings obligatory in the nature of a bond and/or insurance policies may have heretofore been, and may hereafter be, required by, for, or on behalf of the Indemnitors or any one or more of the Indemnitors, in whose bonds and/or insurance policies the Indemnitors do hereby affirm to have a substantial material and beneficial interest, and as a condition precedent to the execution of any and all such bonds and/or insurance policies, the Surety requires execution of this Indemnity Agreement.

WHEREAS, the Indemnitors have or may have a substantial, material and beneficial interest in the obtaining of said bonds and/or insurance policies on behalf of various related companies, partnerships, entities, and/or individuals, it is agreed that this Agreement shall apply to any bonds executed and/or insurance policies issued on behalf of any individual, subsidiary, affiliated partnership, joint venture or corporation of the Indemnitors, now existing or hereafter formed or acquired, and whether partially or wholly owned or controlled, or related as fully as if the names and signatures of such subsidiary or affiliates appeared herein as Indemnitors.

NOW, THEREFORE, in consideration of the foregoing premises, and of the execution or continuance of such bonds and/or insurance policies, and for other good and valuable considerations, the Indemnitors do, for themselves, their heirs, executors, administrators and assigns, jointly and severally agree with the Surety as follows:

1) The Indemnitors will pay, when due, all premiums for each of such bonds in accordance with the Surety's rates in effect on the date each of such bonds become effective, as long as liability thereunder shall continue, and until the Surety is furnished with evidence satisfactory to the Surety of its discharge or release from the bonds or of all liability by reason thereof. The Indemnitors will pay, when due, all premiums and all deductibles for such insurance policies issued by Surety.

2) The Indemnitors will (a) perform all the conditions of each said bond or obligation, and any and all alterations, modifications, renewals, continuations, and extensions thereof, and (b) indemnify and save the Surety harmless from and against any and all liability, loss, costs, damages, fees of attorneys and other expenses which the Surety may sustain or incur by reason or in consequence of the execution of such bond or bonds and any renewal, continuation or successor thereof, including but not limited to, (i) sums paid or liabilities incurred in settlement of, and expenses paid or incurred in connection with claims, suits, or judgments under such bonds, or (ii) expenses paid or incurred (A) in enforcing the terms hereof, (B) in procuring or attempting to procure release from liability, or (C) in recovering or attempting to recover losses or expenses paid or incurred, as aforesaid. In the event of payments by the Surety, the Indemnitors agree to accept the voucher of the Surety or other evidence of such payments as prima facie evidence of the propriety thereof, and of the Indemnitor's liability therefor to the Surety.

3) If the Surety shall set up a reserve to cover any claim, liability, suit or judgment under any such bond, the Indemnitors will, immediately upon demand, deposit with the Surety a sum of money equal to such reserve and any increase thereof as collateral security on such bond or bonds.

4) Any money, letter of credit, or property which shall have been, or shall hereafter be, pledged as collateral security on any bond or bonds shall be available, in the discretion of the Surety, as collateral security on all bonds coming within the scope of this instrument or for any other indebtedness of the Indemnitors to the Surety.

5) The Surety, in its sole discretion, is authorized but not required, a) to consent to any change in the contract or the contract documents including the plans and specifications; b) to make or guarantee advances or loans for the purposes of executing the contract without any obligation to see to the application thereof, it being understood that the amount of all such advances or loans shall be conclusively presumed to be a loss hereunder for which the Indemnitors are liable; and c) in the event of any breach, delay or default asserted by the obligee in any said bonds, or in the performance of the contract, or a breach of this Agreement or of any bond or bonds connected therewith, or the failure to diligently prosecute the work under any contract, or to pay for labor and materials used in the prosecution of the contract, or in the event work has ceased or been suspended on any contract or contracts covered by any said bonds, to take possession of the work under the contract and, at the expense of the Indemnitors, to complete the contract or cause the same to be completed or to consent to the completion thereof, and to take any other action which the Surety may deem appropriate. The Indemnitors hereby release and discharge the Surety from any and all liability for all its actions and omissions.

6) The Indemnitors hereby transfer, assign, pledge and convey to the Surety a security interest in 1) all equipment, tools and material in which the Indemnitor, have any interest, whether on site or elsewhere or on order; 2) all sums due or to become due to Indemnitors or any of them in connection with any contract; and 3) all subcontracts let by Indemnitors in connection with any contract. The security interests granted herein are effective in the case of each contract as of the date of the contract. Indemnitors hereby agree to execute any form of financing statement or other agreement or writing which Surety, in its sole discretion, deems necessary or advisable to perfect the security interests granted herein, and further authorize Surety at its discretion and at any time to file or serve this instrument, or a true copy hereof, or any other instrument executed pursuant hereto as a financing statement or other notice under the Uniform Commercial Code or any similar law, and Indemnitors authorize Surety to complete this instrument in any manner required for such use, and to prepare an attached schedule describing items of security covered hereunder. The Indemnitors hereby appoint Surety as Attorney-In-Fact for each of them to endorse and to deposit or negotiate checks, drafts, and all similar instruments payable to Indemnitors, with the right, but not the obligation to exercise all of the rights of the Indemnitors assigned, transferred and set over to the Surety in this Agreement and in the name of the Indemnitors to make, execute and deliver any and all additional assignments, documents as deemed necessary and proper by the Surety to give full force and effect to this paragraph(6). The Indemnitors agree that all equipment, tools and material and all subcontracts are dedicated to the performance of the contract to which they pertain and that such equipment, tools and material and subcontracts shall be subject to a trust in favor of the contract owner and Surety and that they be used to that end.

7) The Surety shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against the Surety or the principal upon any such bond shall be settled or defended and the Surety's decision shall be final and binding upon the Indemnitors.

JAN-18-1999  15:40                                              860 229 1111    P.11/22

8)  If any of the bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, Indemnitors covenant and agree that all payments due or received for or on account of said contract shall be held in trust for Surety for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood that all monies due and to become due under any contract or contracts covered by the bonds shall be held in trust, whether such monies are in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said bonds.

9)  The Surety may, without incurring any liability, decline to execute any bond and if the Surety executes a bid or proposal bond it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the bid or proposal bond is given and such declination shall not diminish or alter the liability of the Indemnitors that may arise by reason of having executed the bid or proposal bond.

10)  The Indemnitors hereby waive notice of the execution of any such bonds or of any act, fact or information coming to the knowledge or notice of the Surety concerning or affecting its rights or liabilities under any such bonds or rights or liabilities of the Indemnitors hereunder, notice of all such being hereby expressly waived.

11)  If the Surety shall procure any other company or companies to execute or join with it in executing, or to reinsure, any such bond or bonds, this instrument shall inure to the benefit of such other company or companies, its or their successors and assigns, so as to give to it or them a direct right of action against the Indemnitors to enforce this instrument and, in that event, the word "Surety", wherever used herein, shall be deemed to include such company or companies, as their respective interest may appear.

12)  The Indemnitors hereby waive all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state.

13)  In the event any claim or demand is made by the Surety against Indemnitors, or any one or more of them, by reason of the execution of a bond or bonds, the Surety is hereby expressly authorized to settle with any one or more of the Indemnitors individually, and without reference to the others, and such settlement or composition shall not affect the liability of any of the others, and the Indemnitors hereby expressly waive the right to be discharged and released by reason of the release of any one or more of the Indemnitors and hereby consent to any settlement or compromise that may hereafter be made. Separate suits may be brought hereunder as causes of action accrue and the bringing of suit or the recovery of judgment upon any cause of action shall not bar the bringing of other suits upon other causes of action whether theretofore or thereafter arising.

14)  In the event any Indemnitor fails to execute this Agreement or in the event the execution hereof by any Indemnitor be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability of any other Indemnitor executing the same, but each and every party so executing shall be and remain fully bound and liable.

15)  This Agreement may be terminated by any Indemnitor upon twenty days written notice received by the Surety but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the bonds and/or insurance policies that may have been theretofore executed.

16)  This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed by the Surety and the Indemnitors to form a part hereof.

17)  The Indemnitors agree to notify the Surety immediately upon their receiving any notice or knowledge that their liability insurance has been or will be cancelled or non-renewed, or that such coverage is or will be reduced.

18)  At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Indemnitor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including but not limited to, the status of the work under contracts being performed by the Indemnitor, the condition of the performance of such contracts and payment of accounts.

19)  The word Indemnitor or pronouns referring to said word, whether singular or plural, are to be construed as referring to each of the undersigned Indemnitors, individually and collectively, though the Indemnitor be one or more individuals, partnerships, associations, or corporations.

IN TESTIMONY WHEREOF the Indemnitors intending to be legally bound hereby have hereunto set their hands and affixed their seals this _____ day of _____, 19 _____.

Witness or Attest

All individual and corporate signatures must be acknowledged.

Name of Individual (Type): _____          Address
Signature _____          _____
SS # _____          _____

Name of Individual (Type): _____
Signature _____          _____
SS # _____          _____

JAN-18-1999  15:41                                    860 229 1111    P.12/22

Name of Individual (Type): _____    Address
Signature _____    _____
SS # _____    _____

Name of Individual (Type): _____    _____
Signature _____    _____
SS # _____    _____

Name of Company (Type): International Heritage, Inc.    2626 Glenwood Ave., Ste 200
Signature By _____    Raleigh, NC 27608
Name _____John D Brothers_____
Title _____Chief Operating Officer____

Name of Company (Type): International Heritage Incorporated
Signature By _____    2626 Glenwood Ave., Ste 200
Name _____John D Brothers_____    Raleigh, NC 27608
Title _____Chief Operating Officer____

## INDIVIDUAL(S) ACKNOWLEDGEMENT

STATE OF _____ )
                                    )  ss:
COUNTY OF _____ )

On this _____ day of _____ , 19 ____ , before me personally came
_____ , to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____


STATE OF _____ )
                                    )  ss:
COUNTY OF _____ )

On this _____ day of _____ , 19 ____ , before me personally came
_____ , to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____


STATE OF _____ )
                                    )  ss:
COUNTY OF _____ )

On this _____ day of _____ , 19 ____ , before me personally came
_____ , to me known and known
to me to be the individual(s) who executed the foregoing instrument, and acknowledged that he/she/they
executed same.

_____

JAN-18-1999 15:41 860 229 1111 P.13/22

## PARTNER(S) ACKNOWLEDGMENT

STATE OF _____ )
                                                    ) ss:
COUNTY OF _____ )

On this _____ day of _____, 19____, before me personally came
_____, to me known,
and stated that he/she/they is (are) partner(s) in the firm of _____
_____ and acknowledge that he/she/they
executed the foregoing instrument as the act of the said firm.

## CORPORATE ACKNOWLEDGMENT(S)

STATE OF NORTH CAROLINA )
                                                    ) ss:
COUNTY OF WAKE )

On this 8TH day of JUNE , 19 98 , before me personally came
JOHN D. BROTHERS , to me known,
who, being by me duly sworn, did depose and say that he resides in RALEIGH, WAKE CO., NORTH CAROLINA
that he is the CHIEF OPERATING OFFICER of the International Heritage, Inc.
the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal
affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said
corporation, and that he signed his name to the said instrument by like order.

MY COMMISSION EXPIRES _____ NOTARY PUBLIC WAKE COUNTY, NC

STATE OF NORTH CAROLINA )
                                                    ) ss:
COUNTY OF WAKE )

On this 8TH day of JUNE , 19 98 , before me personally came
JOHN D. BROTHERS , to me known,
who, being by me duly sworn, did depose and say that he resides in RALEIGH, WAKE CO., NORTH CAROLINA
that he is the CHIEF OPERATING OFFICER of the International Heritage Incorporated
the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal
affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said
corporation, and that he signed his name to the said instrument by like order.

MY COMMISSION EXPIRES _____ NOTARY PUBLIC WAKE COUNTY

STATE OF _____ )
                                                    ) ss:
COUNTY OF _____ )

On this _____ day of _____, 19____, before me personally came
_____, to me known,
who, being by me duly sworn, did depose and say that he resides in _____
that he is the _____ of the _____
the corporation which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal
affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of the said
corporation, and that he signed his name to the said instrument by like order.

0111 (2/95)

EXHIBIT " B    FILED

UNITED STATES BANKRUPTCY COURT    AUG 0 9 1999
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

IN RE:                                     )
                                           )    CHAPTER 7
INTERNATIONAL HERITAGE, INC.               )    CASE NO. 98-02675-5-ATS
                                           )
INTERNATIONAL HERITAGE,                    )
INCORPORATED,                              )    CHAPTER 7
                                           )    CASE NO. 98-02674-5-ATS
            Debtors.                       )

**APPLICATION OF TRUSTEE FOR
AUTHORITY TO ENTER INTO SETTLEMENT AGREEMENT**

NOW COMES Holmes P. Harden, Trustee for the above-captioned Debtors, and requests

an order authorizing him to enter into a Settlement Agreement with Stanley H. Van Etten ("Van

Etten"), Claude W. Savage ("Savage"), Larry G. Smith ("Smith"), and Executive Risk Specialty

Insurance Company ("ERSIC"), a copy of which is attached as Exhibit A and incorporated

herein by reference. In support of this Application, Trustee states as follows:

1.     International Heritage, Inc. and International Heritage, Incorporated filed

voluntary petitions in bankruptcy on November 25, 1998 and Holmes P. Harden ("Trustee") was

appointed Chapter 7 Trustee.

2.     On or about August 19, 1998, ERSIC commenced an action against International

Heritage, Inc. ("Debtor"), Van Etten, Savage and Smith in the United States District Court for

the Eastern District of North Carolina, captioned Executive Risk Specialty Ins. Co. v.

International Heritage, et al., Case No. 5:98-CV-542-F(3)(E.D.N.C.) ("ERSIC Action"). On

March 18, 1999, Trustee commenced an adversary proceeding against ERSIC captioned Holmes

RAL/206885/1

24 of

185

P. Harden, Trustee in Bankruptcy for International Heritage, Inc. v. Executive Risk Specialty Ins. Co., Adversary Proceeding No. S-99-00015-5-AP (Bankr. E.D.N.C.)("Trustee Action") (collectively "the Coverage Actions").

3.      The Coverage Actions are complaints for declaratory relief concerning the coverage afforded under a Directors and Officers Liability Insurance Policy, including Securities Claims Coverage and Automatic Reinstatement of the Limit of Liability for Unindemnifiable Loss Designed for Initial Public Offerings No. 751-070526-97 issued by ERSIC to Debtor effective from June 23, 1997 through June 23, 1998, extended by endorsement through July 23, 1998 ("the Policy").

4.      The Policy has limits of liability in the amount of $5,000,000.00 maximum aggregate for all claims made during any single policy year.  Prior to the Coverage Actions being commenced, ERSIC advanced, on an interim basis, $500,000.00 in reimbursement of defense costs incurred by Debtor and the officers and directors of Debtor pending resolution of the Coverage Actions.  ERSIC has filed a proof of claim asserting that Debtor will be required to repay ERSIC the $500,000.00 advanced for defense costs to the extent it is determined that such amounts do not constitute loss under the Policy.

5.      Van Etten, Savage and Smith, as Officers and Directors of the Debtor, are also insureds under the Policy and parties to the Settlement Agreement.

6.      Trustee alleges in the Trustee Action that losses incurred by Debtor as a result of certain underlying actions ("the underlying actions") commenced against it during the policy period (which underlying actions are specifically enumerated in Paragraph No. 15 of the First Amended Complaint for Declaratory Relief in the Trustee Action) are covered under the Policy.

RAL/206885/1                                    2

7.     ERSIC denies that the aforedescribed losses are covered under the Policy.  In the ERSIC Action, ERSIC seeks a declaration that the Policy does not provide any coverage for any loss incurred by Debtor and/or the directors and officers in the underlying actions on the grounds that the Policy (which includes the application thereto) does not apply to "any claim arising from any claims, facts, circumstances or situations required to be disclosed in response to . . . . [Question] 5.c.)" of the application, and the underlying actions arise from the claims, facts, circumstances and situations which Debtor disclosed in response to Question 5.c of the application.

8.     ERSIC and Trustee are in disagreement regarding the coverage afforded to Debtor under the Policy for the underlying actions, including attorneys fees.  After due consideration of the merits of each party's respective contentions regarding the coverage issue, as set forth in the Coverage Actions, Trustee believes it is in the best interest of creditors to enter into the Settlement Agreement with ERSIC.

9.     Trustee, ERSIC, Van Etten, Savage and Smith propose a settlement of the Coverage Actions whereby $1,787,500.00 will be paid by ERSIC to Trustee and $275,000.00 will be paid by ERSIC to Van Etten in reimbursement for attorneys fees and expenses incurred in the underlying actions.

10.     Pursuant to the Settlement Agreement, ERSIC will obtain releases from Debtor, Van Etten, Savage and Smith.

11.     The Settlement Agreement is contingent upon the Court granting a Motion for 11 U.S.C. § 105 injunction filed by Trustee in the Adversary Proceeding No. S-99-00043-5-AP, extending the automatic stay to all codefendants in the underlying actions enumerate therein.

RAL/206885/1                                                    3

12.     Trustee believes the proposed settlement is fair and reasonable.

13.     Trustee is of the opinion that settling the above described controversy is in the best interest of the expeditious administration of the Debtor's estate, given the merits of the defenses and the complexity, expense, inconvenience and delay of litigation. Trustee therefore deems it appropriate and consistent with his duties to enter into the Settlement Agreement with ERSIC, Van Etten, Savage and Smith which settlement by its terms, inter alia, (a) brings substantial revenue into the Bankruptcy Estate without incurring additional costs or expenses, and (b) avoids complicated litigation concerning the insurance coverage issues.

14.     Trustee is authorized to execute the Settlement Agreement with court approval.

WHEREFORE, Trustee prays that the Court authorize him to enter into a Settlement Agreement in the form attached hereto as Exhibit "A" on behalf of the Debtor corporations.

This the 9th day of August, 1999.

MAUPIN TAYLOR & ELLIS, P.A.

BY: _____
Holmes P. Harden
Trustee for International Heritage, Inc., Debtors
N. C. State Bar No. 9835
Post Office Drawer 19764
Raleigh, NC 27619
Telephone: (919) 981-4000

## SETTLEMENT AGREEMENT AND RELEASE

This SETTLEMENT AGREEMENT AND RELEASE ("Agreement") is made and entered into this _____ day of August, 1999, by and between Holmes P. Harden, as Bankruptcy Trustee for International Heritage, Inc. (the "Trustee"), Stanley H. Van Etten ("Van Etten"), Claude W. Savage ("Savage"), Larry G. Smith ("Smith"), and Executive Risk Specialty Insurance Company ("ERSIC") (collectively, the "Parties").

WHEREAS, ERSIC issued Directors and Officers Liability Insurance Policy Including Securities Claims Coverage and Automatic Reinstatement of the Limit of Liability for Unindemnifiable Loss Designed for Initial Public Offerings No. 751-070526-97, to International Heritage, Inc. ("IHI") for the period June 23, 1997 to June 23, 1998, extended by endorsement through July 23, 1998 (the "Policy");

WHEREAS, in various capacities, IHI and/or IHI's directors and officers Van Etten, Savage, and Smith (collectively, the "Directors and Officers") have been named as defendants in the matters captioned Securities and Exchange Commission v. International Heritage, Inc., et al., No. 98-CV-0803 (N.D. Ga.); Meckenstock, et al. v. International Heritage, Inc., et al., No. 5:98-CV-237-BR-2 (E.D.N.C.); Liebendorfer v. International Heritage, Inc., No. DV98-2241 (Tex. Dist. Ct.); Marsh v. International Heritage, Inc., et al., No. 98-2332-E (Tex. Dist. Ct.); Greene, et al. v. International Heritage, Inc., et al., No. CV-98-42 (Ala. Cir. Ct.); Swinney, et al. v. Van Etten, et al., No. 98 CV 04277 (N.C. Super. Ct.); Gilbert v. International Heritage, Inc., et al., No. CV-98-277 (Ala. Cir Ct.); and In the Matter of International Heritage, Inc., et al., No. I-04-02-98-04 (Mont. State Auditor's Off.) (collectively, the "Underlying Actions").

WHEREAS, IHI and the Directors and Officers have sought coverage under the Policy for payment of defense expenses and all other losses resulting from the Underlying Actions;

WHEREAS, there has been a dispute between ERSIC and IHI and the Directors and Officers regarding whether there is coverage for the Underlying Actions under the Policy, which dispute has been the subject of both a declaratory judgment action brought by ERSIC against the Directors and Officers and IHI (and from which IHI was dismissed following notice of its filing for bankruptcy), captioned Executive Risk Specialty Insurance Co. v. International Heritage, et al., Case No. 5:98-CV-542-F(3) (E.D.N.C.) ("ERSIC's Coverage Action"), and an adversary proceeding brought by the Trustee against ERSIC, captioned Holmes P. Harden, Trustee in Bankruptcy for International Heritage, Inc. v. Executive Risk Specialty Insurance Co., Adversary Proceeding No. 5-99-00015-5-AP (Bankr. E.D.N.C.) (the "Trustee's Coverage Action");

WHEREAS, ERSIC's Coverage Action seeks a declaration that the Policy does not provide any coverage for any loss incurred by IHI and/or the Directors and Officers in connection with the Underlying Actions on the grounds that, by its terms, the Policy (which includes the application thereto) does not apply to "any claim arising from any claims, facts, circumstances or situations required to be disclosed in response to . . . [Question] 5.c)" of

the application, and the Underlying Actions arise from the claims, facts, circumstances and situations that IHI was required to, and did, disclose in the application in response to Question 5.c);

WHEREAS, ERSIC has advanced, on an interim basis, $500,000 in reimbursement of defense costs incurred by IHI and the Directors and Officers, pending resolution of ERSIC's Coverage Action, and ERSIC has filed a Proof of Claim form in the IHI bankruptcy proceeding, captioned In re: International Heritage, Inc., Case No. 98-02675-5-ATS (Bankr. E.D.N.C.) (the "Bankruptcy Proceeding"), notifying the Bankruptcy Court that IHI will be obligated to repay ERSIC the $500,000 advanced for defense costs in the event that it is established that such amounts do not constitute loss covered under the Policy;

WHEREAS, the Trustee's Coverage Action seeks a declaration that the Policy affords coverage for the loss arising from the Underlying Actions, including defense expenses, and an order declaring that IHI is entitled to recover immediately from ERSIC an amount in excess of $800,000 in reimbursement of defense expenses;

WHEREAS, the Trustee, the Directors and Officers, and ERSIC desire to compromise, settle and relinquish all claims which IHI, the Directors and Officers and/or any other Insured as defined in the Policy may have arising from the Underlying Actions, in return for the payment and receipt of good and valuable consideration from ERSIC; and

WHEREAS, the Trustee has reviewed the allegations of ERSIC with respect to the coverage issues and has determined in his business judgment that a resolution by way of this proposed settlement is appropriate and is in the best interest of the estate;

NOW, THEREFORE, in consideration of the mutual agreements and covenants set forth herein, and other good and valuable consideration, the Trustee, the Directors and Officers, and ERSIC hereby agree as follows:

1.  The Trustee promptly shall file a motion in the Trustee's Coverage Action seeking the Court's approval of this settlement pursuant to Bankruptcy Rule 9019. Among other things, the Trustee's motion shall request that the Bankruptcy Court enter a final order and judgment approving the proposed settlement, and finding that ERSIC s released from any and all obligations under the Policy, whether known or unknown, anticipated or unanticipated, past, present or future. The Trustee shall serve the motion on all parties to the Underlying Actions and also shall provide notice of the proposed settlement to all interested parties, including, without limitation, all parties to the Underlying Actions and all of IHI's creditors (the "Interested Parties"). Among other things, the Trustee's notice shall apprise the Interested Parties of the material terms of the proposed settlement, the deadline and procedure for submission of any objection to the proposed settlement, and the date the Court will conduct a hearing on the Trustee's motion to approve the proposed settlement.

2.  If, for any reason, the Court does not enter an order approving the proposed settlement in a form acceptable to ERSIC, then ERSIC, in its sole discretion, may terminate this Agreement, in which case this Agreement shall become null and void and the parties

219874 v1                                    2

hereto shall be restored to the status quo ante existing prior to the execution of the Agreement.

3.      If the Court enters an order: (i) approving the proposed settlement; and (ii) declaring that ERSIC has no obligations whatsoever under the Policy, once such order becomes final; that is, the settlement documentation has been approved by final order of the United States District Court for the Eastern District of North Carolina, and that order has become final, either because the time period in which to take a timely appeal from the order has expired, or, in the case of an appeal from such order, the order has been upheld on appeal and all further rights of appeal or petitions for certiorari have been completely exhausted, then:

a.      Within ten (10) days of the date the approval of the settlement becomes final, and after all conditions set forth in Paragraph 6 are satisfied, ERSIC shall pay to IHI's bankruptcy Trustee $1,787,500 and to Stanley Van Etten $275,000. The payments specified in this paragraph, along with the $500,000 previously advanced to IHI, shall, in accordance with this Agreement, constitute the entirety of ERSIC's payment obligations pursuant to the Policy;

b.      ERSIC shall dismiss its claims against the Directors and Officers in ERSIC's Coverage Action;

c.      ERSIC shall withdraw its Proof of Claim filed in the Bankruptcy Proceeding;

d.      The Trustee shall dismiss his claim against ERSIC in the Adversary Proceeding; and

e.      The Trustee, the Directors and Officers, and ERSIC, and their affiliates, heirs, predecessors, successors, assigns and all third persons claiming through them shall release each other and their respective affiliates, employees, directors, officers, attorneys, claim managers, reinsurers, agents and any professionals retained by them from any and all claims, debts, demands, obligations, damages, liabilities, benefits, costs and causes of action, of whatever kind or character, known or unknown, past, present or future, that they have, had, or may have against each other or their respective affiliates, employees, directors, officers, attorneys, claim managers, reinsurers, agents and any professionals retained by them, whether or not asserted in ERSIC's Coverage Action or in the Trustee's Coverage Action, on account of or in any way growing out of, based on or relating to: (a) the Policy; (b) the subject matter of any of the claims asserted in the Underlying Actions, including but not limited to the claim that IHI operates or has operated as an illegal pyramid scheme; and (c) the manner in which ERSIC, its affiliates, employees, directors, officers, attorneys, claim managers, reinsurers, agents and any professionals retained by them responded to, handled and resolved the claims for coverage under the Policy in connection with the Underlying Actions.

219874 v1                                    3

4.    The Parties to this Agreement expressly assume the risk that acts, errors, omission, matters, causes, or things may have occurred which are not known or are not suspected to exist by one or more of them and waive the terms and provisions of any statute, rule or doctrine of common law which either narrowly construes releases purporting by their terms to release claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things or which restricts or prohibits the releasing of such claims.

5.    The Trustee and the Directors and Officers expressly represent and warrant that they have not sold, assigned, or otherwise transferred any interest in the claims, demands, payments, rights, obligations, loss, judgments, awards, attorneys' fees, costs, fees, interest, damages, liabilities, or causes of action related in any way to the Policy. In the event that such warranty is breached, the Trustee and the Directors and Officers expressly covenant to indemnify and hold harmless ERSIC from each and every claim or demand of any kind or character arising from breach of the representations and warranty contained here.

6.    This Agreement is conditioned on, and will not become effective prior to

a. the dismissal with prejudice of all civil actions pending against IHI and/or the Directors and Officers as of the effective date of the settlement or the entry of an injunction by the Bankruptcy Court under 11 U.S.C. § 105 enjoining any such actions that have not been dismissed with prejudice by the effective date of the settlement;

b. the final approval of a settlement between IHI, the Directors and Officers and the Securities and Exchange Commission ("SEC") in connection with the action brought against IHI and the Directors and Officers by the SEC; and

c. the resolution and/or stay of the proceeding brought by the Montana State Auditor's Office against IHI and the Directors and Officers.

In the event that any of the above conditions are not satisfied, ERSIC, in its sole discretion, may terminate this Agreement, in which case this Agreement shall become null and void and the parties hereto shall be restored to the status quo ante existing prior to the execution of the Agreement.

7.    The parties agree to execute promptly any and all documents of any nature or kind which the other parties may reasonably require in order to implement the provisions and objectives of this Agreement. The parties shall bear their own costs and fees incurred to implement the terms of this paragraph.

219R74 v1                                        4

8. Notice regarding matters involving this Agreement to the Trustee shall be provided to:

James A. Roberts, III
James T. Johnson
Lewis & Roberts, P.L.L.C.
1305 Navaho Drive, Suite 400
Post Office Box 17529
Raleigh, NC 27619-7529

Notice to ERSIC shall be provided to:

Gary V. Dixon
Stacey L. McGraw
Ross, Dixon & Bell, L.L.P.
601 Pennsylvania Avenue, N.W.
North Building
Washington, D.C. 20004

Notice to the Directors and Officers shall be provided to:

Brent E. Wood
Wood & Francis, P.L.L.C.
Two Hannover Square
434 Fayetteville Street Mall, Suite 2300
Post Office Box 164
Raleigh, North Carolina 27602

or such other addresses as the parties to this Agreement may furnish to each other pursuant to the provisions of this paragraph.

9. The parties to this Agreement acknowledge and agree that neither entry into this Agreement nor the payment of any sum of money referenced in or pursuant to this Agreement shall constitute or be construed as an admission of liability by any party to any person or entity or as an admission of coverage under the Policy.

10. This Agreement constitutes the entire agreement between the Trustee and ERSIC and between the Directors and Officers and ERSIC regarding the settlement of IHI's and the Directors' and Officers' claims for insurance coverage in connection with loss incurred as a result of the Underlying Actions. The parties to this Agreement hereby agree that the only valid and enforceable modifications to this Agreement shall be those which are reduced to a writing and signed by all parties hereto, or by their respective counsel.

11. The validity and enforceability of this Agreement shall be governed by the laws of the State of North Carolina.

219874 v1                    5

12.     This Agreement is made and executed by each of the parties hereto with the advice of counsel, and no party hereto has been coerced or induced to make this compromise and settlement by any improper action of any other party hereto. This Agreement shall not be construed either in favor of or against any party by virtue of any rules of contract construction contended to be applicable to insurance policies, nor shall any Party be deemed to be the sole drafter hereof.

13.     By their signatures below, the undersigned represent and warrant that they are duly authorized to bind the party or parties on whose behalf they have executed this Agreement.

14.     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and when taken together with the other signed counterparts, shall constitute one agreement which shall be binding upon and effective as to all parties.

IN WITNESS WHEREOF, each of the parties has executed this Agreement on the day and year indicated below.

Executive Risk Specialty Insurance Company

Date:_____          By:_____

Holmes P. Harden, as bankruptcy Trustee
for International Heritage, Inc.

Date:_____          _____

Stanley H. Van Etten

Date:_____          _____

219874 v1                              6

Claude W. Savage

Date:_____        _____

Larry G. Smith

Date:_____        _____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 98-02675-5-ATS |
| INTERNATIONAL HERITAGE, INC. | ) | |
| INTERNATIONAL HERITAGE, | ) | CASE NO.: 98-02674-5-ATS |
| INCORPORATED, | ) | |
| Address: | ) | CHAPTER 7 |
| 2626 Glenwood Avenue, #200 | ) | |
| Raleigh, NC 27608 | ) | |
| | ) | |
| TAX ID# 56-1921093 | ) | |
| | ) | |
| Debtor. | ) | |

## NOTICE OF APPLICATION OF TRUSTEE FOR AUTHORITY TO ENTER INTO SETTLEMENT AGREEMENT

TO:   THE DEBTOR, ATTORNEY FOR THE DEBTOR, AND OTHER PARTIES IN INTEREST

NOTICE IS HEREBY GIVEN of the Application of Trustee for Authority to Enter into Settlement Agreement with Executive Risk Specialty Insurance Company, Stanley H. VanEtten, Claude W. Savage and Larry G. Smith. According to the proposed settlement, Executive Risk Specialty Insurance Company ("ERSIC") will pay $1,787,500.00 to Holmes P. Harden, Trustee for International Heritage, Inc. in settlement of Holmes P. Harden, Trustee in Bankruptcy for International Heritage, Inc. v. Executive Risk Specialty Insurance Company, AP# S-99-00015-5-AP (Bankr. EDNC) by which Harden seeks declaratory relief concerning coverage afforded by a directors and officers liability insurance policy issued by ERSIC. ERSIC will also pay $275,000.00 to Stanley H. VanEtten to resolve Mr. VanEtten's independent claim against ERSIC for coverage under the same directors and officers liability insurance policy.

An objection to this Application may be filed with the Clerk, United States Bankruptcy Court, Post Office Box 1441, Raleigh, North Carolina 27602, with a copy served on the trustee whose name appears at the bottom of this notice, within twenty (20) days of the date of the mailing of this notice. A hearing on any objections to this Application for Authority to Enter into Settlement Agreement will be held on September 1, 1999 at 9:00 a.m. at the United States Courthouse and Post Office Building, Room 208, 300 Fayetteville Street Mall, Raleigh, North Carolina. Any party requesting a hearing shall appear at said hearing in support of such request or he may be assessed with costs.

RAL/206850/1

FURTHER NOTICE IS HEREBY GIVEN that if a response and a request for a hearing is filed by the Debtor or other party in interest named herein in writing within the time indicated, a hearing will be conducted on the Application and all interested parties will be notified accordingly. If no request for a hearing is timely filed, the Court may rule on the Application and response thereto ex parte without further notice.

DATE OF NOTICE:    August 27, 1999.

MAUPIN TAYLOR & ELLIS, P.A.

BY: _____
Holmes P. Harden, Trustee
N. C. State Bar No. 9835
Post Office Drawer 19764
Raleigh, NC  27619-9764
Telephone:  919/981-4000
Facsimile:  919/981-4300

RAL/206850/1

## CERTIFICATE OF SERVICE

I, Holmes P. Harden, Chapter 7 Trustee, do hereby certify that the foregoing **NOTICE OF APPLICATION OF TRUSTEE FOR AUTHORITY TO ENTER INTO SETTLEMENT AGREEMENT** was served upon all parties of record by mailing a copy thereof to each such party at the address indicated below with its proper postage attached and deposited in an official depository under the exclusive care and custody of the United States Post Office, in Raleigh, North Carolina, and by public notice via 888/895-8385 and 919-981-4033 and www.nceb.uscourts.gov. And by e-mail on the 9th day of August, 1999.

MAUPIN TAYLOR & ELLIS, P.A.

Holmes P. Harden
N.C. Stage Bar No. 9835
3200 Beechleaf Court, Suite 500
Post Office Drawer 19764
Raleigh, NC 27619
Telephone: 919/981-4000
Facsimile: 919/981-4300

SERVED:

Marjorie K. Lynch
Bankruptcy Administrator
U. S. Bankruptcy Court
P. O. Box 3079
Raleigh, NC 27602


SEE ATTACHED MAILING MATRIX

SEE ATTACHED E-MAIL LIST

RAL/206850/1

# MAUPIN TAYLOR & ELLIS, P.A.

### ATTORNEYS AT LAW
HIGHWOODS TOWER ONE, SUITE 500
3200 BEECHLEAF COURT
RALEIGH, NORTH CAROLINA  27604-1064

TELEPHONE (919) 981-4000

MAILING ADDRESS
POST OFFICE DRAWER 19764
RALEIGH, NORTH CAROLINA  27619-9764
TELEFAX (919) 981-4300

DURHAM/RESEARCH TRIANGLE PARK OFFICE
411 ANDREWS ROAD, SUITE 150
DURHAM, NORTH CAROLINA  27705
TELEPHONE (919) 382-0188

# FACSIMILE TRANSMISSION

## CONFIDENTIAL [ ]                     RUSH [ ]

TO:
*Chittenden Bank*
*c/o Louis P. Rochkind*
*Jaffe, Raitt, Heuer & Weiss*
*One Woodward Avenue, Suite 2400*
*Detroit, MI 48226*

FROM:
*Holmes P.  Harden*

MAUPIN TAYLOR & ELLIS, P.A.
POST OFFICE DRAWER 19764
RALEIGH, NORTH CAROLINA  27619-9764
DIRECT DIAL #: *919-981-4011*

CITY:

FACSIMILE #:   _313-961-8358_

DATE: **August 9, 1999**

OUR FILE NUMBER:       **BANK7A-206**

TOTAL NUMBER OF PAGES, INCLUDING COVER SHEET:

The material transmitted and communicated herein ("communication") is intended only for the use of the individual or entity to which it is addressed, and may contain information that constitutes work product, or is subject to attorney-client privilege, or is confidential and exempt from disclosure under applicable law.  If the reader of this communication is not the intended recipient or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

*MESSAGE:*

Original to follow by mail?   _X_  Yes       ___ No

We are transmitting from Group III equipment.

Facsimile #:  919/981-4300

Help #:  919/981-4063

Terri I. Gardner
Smith Debnam Narron & Myers, L.L.P.
P. O. Box 26268
Raleigh, NC 27611-6268

Managing Agent    73
International Heritage, Inc.
2626 Glenwood Avenue
Raleigh, NC 27608

...at E. Wood
Wood & Francis, PLLC
P. O. Box 164
Raleigh, NC 27602

Stephanie P. Wyatt
Coyle, Bascom & Bergman, P.C.
1000 Cambridge Square, Suite C
Alpharetta, GA 30004

James Russell Tucker
Bush, Hauder & Adkerson, P.C.
500 N. Akard Street, Suite 2100
Dallas, TX 75201

Jack T. Clary
214 St. Matthews Lane
Spartanburg, SC 29301

Richard Ieyoub, Attorney General
State of Louisiana
301 Main Street, Suite 1250
Baton Rouge, LA 70801

Susan Coon Bailey
5233 Floynell Drive
Baton Rouge, LA 70809

Dorothy H. Miller
102 Triangle Circle
Lafayette, LA 70508

Chittenden Bank
c/o Louis P. Rochkind
Jaffe, Raitt, Heuer & Weiss
One Woodward Avenue, Suite 2400
Detroit, MI 48226

Stacey Ostrom
3010 E. Nasa Road 1 #1302
Seabrook, TX 77586

Eugene W. Ellison
185 Biltmore Avenue
Asheville, NC 28801

Karl A. King
465 Sudden Valley
Bellingham, WA 98226

Securities and Exchange Commission
Attn: William P. Hicks
3475 Lenox Road, NE
Atlanta, GA 30326

Managing Agent
Internal Revenue Service
320 Federal Place
Greensboro, NC 27401

Managing Agent
North Carolina Dept. of Revenue
P. O. Box 1168
Raleigh, NC 27602

Marjorie K. Lynch
Bankruptcy Administrator
P. O. Box 3039
Raleigh, NC 27602-3039

Jane E. Chassey
1514 Azalea Drive
Saint Louis, Missouri 63119

Carolyn E. John
485 Broad River Blvd.
Beaufort, SC 29906

Managing Agent
Advanced Equities
P. O. Box 1042
Winnfield, LA 71483

Managing Agent
Centrum Bank AG, Vaduz
Heiligkreuz 8
Postfoch 1168
FL -9490 Vaduz  LIECHTENSTEIN

Gary D. McDowell
1138 Ascott Valley Dr.
Duluth, GA 30097

Jean Wedin
P. O. Box 1600
LaConner, WA 98257

Managing Agent
Jewels by Evonne
1879 Buford Hwy.
Suite 7
Buford, GA 30518

Lois Coonc
P. O. Box 699
LaConner, WA 98257

Managing Agent
Mayflower Capital, LLC
2626 Glenwood Ave., Suite 100
Raleigh, NC 27608

Pamela Johnson
18488 Best Road
Mount Vernon, WA 98273

Managing Agent
Schweizer Verband
der Raiffeisen-banken
St. Gallen
Vadianstrasse 17
CH-9000 St. Gallen   SWITZERLAND

Managing Agent
Schweizerische Hypotheken
Handelsbank, Zurich
Bahnhofstrasse/
Schutzengasse 4
CH-8023 Zurich   SWITZERLAND

Stanley H. Van Etten
10504 Tredwood Drive
Raleigh, NC 27613

Managing Agent
UBS, Zuerich
Direktion
Bahnhofstrasse 45
Postfach
CH-8021 Zurich    SWITZERLAND

Ronald H. Garber 73
Boxley Bolton & Garber
P. O. Drawer 1429
Raleigh, NC 27602

..rles Anderson
Smith Helms Mulliss & Moore
P. O. Box 27525
Raleigh, NC 27611

Marianne Kelley
142419 133 Ave.
Edmonton, Alberta
CANADA T5A5A5

Robert L. Chalmers
2800 Skymark Ave., Ste. 33
Mississauga, Ontario
CAN L4W5A6

Claude Savage
106 Benbow Land
Charlotte, NC 28214

Larry Smith
2435 E. North Street
Greenville, SC 29615

Anna M. Washburn
145 Christopher Drive
Clayton, NC 27520

Shawna Y. Staton
Jordan, Price, Wall, Gray,
Jones & Carlton
P. O. Box 2021
Raleigh, NC 27602-2021

Henry W. Nozko, Jr., President
ACSTAR Insurance Company
P. O. Box 2350
New Britain, CT 06050-2350

Henry W. Nozko, Jr., President
United Coastal Insurance Company
P. O. Box 2350
New Britain, CT 06050-2350

Managing Agent
Coeco
2525 Atlantic Avenue
Raleigh, NC 27604

John Docken
Business Credit Leasing
115 West College Drive
Marshall, MN 56258

Managing Agent
EDS Financial Services
4800 Six Forks Road
Raleigh, NC 27609

Managing Agent
Centrum Bank AG Vaduz
Heiligkreuz 8, Postfoch 1168
FL-9490 Vaduz    LIECHTENSTEIN

Managing Agent
Emil Schatz, St Gallen
Oberhofstettenstrasse 67C
CH-9012, Saint Gallen
SWITZERLAND

Managing Agent
Accurata Treuhand und Revisions AG
Vaduz
Abundt 36
FL-9490 Vaduz    LIECHTENSTEIN

Managing Agent
Mareco Treuhand Anstalt
Schlossweg 24
FL-9496 Balzers    LIECHTENSTEIN

Managing Agent
UBS AG, Zurich Direktion
Bahnhofstrasse 45
Postfach
CH-8021 Zurich    SWITZERLAND

Lloyd W. Gathings, II
Gathings & Associates
P. O. Box 10545
Birmingham, AL 35202

Robert W. Shores
Gathings & Associates
P. O. Box 10545
Birmingham, AL 35202

Mr. Herbert Towning
EPP
10 Gartenstrasse
Zurich, Switzerland
8022

Managing Agent
TransAmerica-TIG Insurance
650 California St. 2nd Floor
San Francisco, CA 94108-2702

Sherwin P. Robin
P. O. Box 9541
Savannah, GA 31412-9541

Tony Copeland
BTI
4300 Six Forks Road, Suite 500
Raleigh, NC 27609

Michael P. Flanagan
Ward and Smith, P.A.
P. O. Box 8088
Greenville, NC 27835-8088

Vickie Corbitt, #11429
Attorney for Commissioner of Revenue
Legal Services
P. O. Box 198065
Nashville, TN 37219-8065

Jean Boyles
P. O. Box 10506
Raleigh, NC 27605

James A. Roberts, III
Lewis & Roberts, PLLC
P. O. Box 17529
Raleigh, NC 27619-7529

Stephani W. Humrickhouse, Esq.
Nicholls & Crampton
4300 Six Forks Road, Suite 700
Raleigh, NC  27609

Paul Faison S. Winborne
300/200 Parham Street, Suite F
P. O. Box 1547
Raleigh, NC 27602

Patrick H. Tyler    73
Bankruptcy & Collections Division
P. O. Box 12548
Austin, TX 78711-2548

...t Cradeur
P. O. Box 66658
Baton Rouge, LA 70896

Missouri Department of Revenue
Attn: Brian S. Kuhlmann
P. O. Box 475
Jefferson City, MO 65105-0475

James K. Austin
Ellis Painter Ratterree & Bart LLP
P. O. Box 9946
Savannah, GA 31412-9946

Meredith P. Ezzell
Wyrick Robbins Yates & Ponton LLP
P. O. Drawer 17803
Raleigh, NC 27619

Marcia McGair Ippolito
R.I. Division of Taxation
One Capitol Hill
Providence, RI 02908-5800

J. Anthony Penry
Smith,Helms, Mulliss & Moore
2800 Two Hanover Square
Raleigh, NC 27601

William Woodward Webb
Broughton, Wilkins, Webb & Sugg, P.A.
P. O. Box 2387
Raleigh, NC 27602

Walter Calton
312 East Broad Street
Eufaula, AL 36072

Keith M. Jensen
Law Office of Keith M. Jensen
514 East Beklnap
Fort Worth, TX 76102

Joseph N. Calloway, Esq.
Battle, Winslow, Scott & Wiley, P.A.
P. O. Box 7100
Rocky Mount, NC 27804-0100

L. C. Gilbert, Jr.
74 Hilltop Lane
Alpine, AL 35014

Randall L. Greene
Rt. 1, Box 155
Randlett, OK 73562

Andrew Clark
1901 Wilmer Avenue
Anniston, AL 36201

Jackson Wayne Murphy
Rt. 6, Box 154
Troy, AL 36081

James H. Thomas
101 Robin Drive
Troy, AL 36081

Craig T. Liebendorfer
7839 Claremont Drive
Dallas, TX 75228

Denise Marsh
709 Summit Ridge
Lewisville, TX 75067

Felix Glen Ortega
9460 Dale Glade
Dallas, TX 75217

Lupe Ortega
9460 Dale Glad
Dallas, TX 75217

Sharon A. Meckenstock
1640 West 34th St., N.
Wichita, KS 67204

Dan H. Meckenstock
Custodian FBO Jean Carol Meckenstock
9685 Mohawk Trail
Cascade, CO 80809-1525

Wilbur E. Meckenstock
9685 Mohawk Trail
Cascade, CO 80809-1525

State Auditor's Office
Montana Securities Department
Mitchell Building, Room 270
State Capital Complex
Helen, MT 59620

William Swinney
3365 Silver Palm Drive
Jacksonville, FL 32250

Marshall Reddy
P. O. Box 806
Ponte Verde Beach, FL 32004

Henry W. Noziko, Jr.
United Coastal Insurance Company
P. O. Box 2350
New Britain, CT 06050-2350

Gerald A. Jeutter
Kilpatrick Stockton, LLP
P. O. Box 300004
Raleigh, NC 27622

Henry W. Noziko, Jr.
ACSTAR Insurance Company
P. O. Box 2350
New Britain, CT 06050-2350

Michael K. Wolensky
Robert G. Brunton
David J. Gellen
Kutak Rock
225 Peachtree St., NE, Suite 2100
Atlanta, GA 30303-1731

International Heritage
E-mail addresses for noticing purposes

yuanjunl@hotmail.com
beent@texoma.net
Cotner@wizzard.net
x2-song@worldnet.att.net
hual@airmail.net
mayfi23@ipa.net
Buddha623@aol.com
pgorman@vantagepointcapital.com
lwardcc2@aol.com
ridelga@pacbell.net
sstephe489@aol.com
mlafontaine@abbot-simses.com
wrightr@mindspring.com
TJWR21156@aol.com
rabbit@rockisland.com
cheryll.COSTANTINO@edmail.com
jasbircheema@amropictures.com
72320.316@compuserve.com
stann@colby.IXKS.com
lov.comptable@sympatico.ca
Cwin888@aol.com
myc888@webtv.net
virgilh@colby.ixks.com
gjack312@Intrstar.net
hdfrey@telusplanet.net
DLWARREN@BellSouth.net
michael_bhagat@hotmail.com
GBYRDJR@aol.com
rliston@spartanburg4.org
ghromero@aol.com
mommabeans@hotbot.com
joanchan@rocketmail.com
ZGU@atlantis.com
edeem@worldnet.att.net
DFITZPA400@aol.com
theboock@compuserve.com
pondman@memes.com
docchiro@ISLC.net
RIZMOE@NWRain.com
thodges@gateway.net
hlee@directv.com

RAL/180355/1

fabb@telusplanet.net
cordw@deltapineseed.com
NBECK87570@aol.com
JYANG4@FORD.COM
mccarthy@mccarthyconsultant.com
BNLHATH@aol.com
nonfemett@worldnet.att.net
digger@bcsupernet.com
BREIDYIII@aol.com
Lindastime@aol.com
pak@jcnl.com
hornsjr@mindspring.com
lpartr1072@aol.com
leadership.possibilities.mak@worldnet.att.net
aqualite@digisys.net
TIMSAMUEL@aol.com
mtheisen@efn.org
MLGeller@aol.com
willy@qni.com
englishs@digisys.net
gmahalko@vvm.com
timmoore@aol.com
mooreem@harpo.tnstate.edu
sprklmagc@aol.com
backpain@keynet.net
Hbeckbari@aol.com
mwarhurst@yahoo.com
js.baum@srs.gov
wynellh@flash.net
dlatray@mcn.net
bwood@woodfran.com
tcrow@uab-admin.vpad.uab.edu
DickLynne Ferency@compuserve.com
kaylorj@hal-pc.org
CHASSEYRAY@email.msn.com
jim.griffith@erols.com
xiaokui.shan@bakernet.com
xshan@aol.com
kkandola@theresidences.com
lrochkind@jafferaitt.com
sdostrom@hotmail.com
michaelhopkins@mailcity.com
ellesw@aol.com
sport@gvi.net

RAL/180355/1

class45@concentric.net
options-galore@yahoo.com
dadabca@netcom.ca
bchap01@aol.com
ceissngr@midrivers.com
doubled@snowcrest.com
glassgs@cadvision.com
mbrown8967@aol.com
nfl300@aol.com
diemert@northerntel.net
cgrumer@manatt.com
shouli.yang@stjude.org
RJWNLAW@aol.com
sds98@eatel.net
jwmaloy@aol.com
kanelos@mindspring.com
blairc@iname.com
Larry_Fletcher@bc.sympatico.ca
JNRRICH@Intur.net
aadrezin@Epix.net
zuyeu@wam.umd.edu
ellinger@ghg.net
websters@ls.net
liliyu@hotmail.com
dlmcguire@yahoo.com
jamesng@aol.com
ikedonn@colby.ixks.com
dbertelsen@mocc.com
Ssnowflake@aol.com
rays@c-zone.net
Larry_Hewlett@bc.sympatico.ca
kimball.peed@bigfoot.com
tammyr@falcon.ukans.cc.edu
VTPALMER27@yahoo.com
crandall@rock-springs.dowell.slb.com
gedler@bellsouth.net
sue_stephen@bc.sympatico.ca
Nicklin98@aol.com
r_brown@email.msn.com
andrelee@earthlink.net
BrAnDin420@aol.com
hou@mail.med.upenn.edu
barrettcarter@mindspring.com
calinb@earthlink.net

RAL/180353/1

BSID@CTC.NET
dsbarron@bellsouth.net
jamcgrath@yahoo.com
bbaum89@aol.com
dhilch@pacificcoast.net
bjsaw@ttc-cmc.net
smsutom@aol.com
lynn@dot.state.al.us
liuwd@earthlink.net
pingnas@ica.net
Hanna@tir.com
SteveG7574@aol.com
buddunn@quantumworld.com
Rahmati@ibm.net
docnielsen@webtv.net
mjandcarlincc@juno.com
emlabeau@gateway.net
loking@wixmail.com
Jholt@Clemson.edu
jsmusa@mindspring.com
Mainland@ticnet.com
cce3@juno.com
mcnamer@bigsky.net
Remodelyou@aol.com
mwa@wnonline.net
lesterabs@mindspring.com
shanson@kearney.net
vickylanglois@atlasta.net
an667@hwcn.org
rconant@telusplanet.net
yu241703@yorku.ca
Michael Genge@bc.sympatico.ca
lihengelle@aol.com
TJDeavers@aol.com
PDQ2CU@aol.com
BrAnDin420@aol.com
hou@mail.med.upenn.edu
calinb@earthlink.net
MSB7158@bellsouth.net
hsmiley@san.rr.com
abmk@home.com

CTBallard@aol.com
beth_pattillo@shmm.org
beatty@home.msen.com
RJNele@aol.com
swede@dmea.net
kmaxeyjr@bayou.com
Wesglynn@aol.com
calinb@earthlink.net
johnsons@pacifier.com
ambc@rhweb.com
jwarren@wyche.com
dongming.zhao@jci.com
pkloosterman@juno.com
Dsalido@webtv.net
JEEPETTE99@aol.com
pingnas@ica.net
Karen0906@aol.com
lonni@pb.quik.com

EXHIBIT

**Executive Risk Specialty**
**Insurance Company**

*Home Office*
82 Hopmeadow Street
Simsbury, Connecticut 06070-7683
(Herein referred to as Underwriter)

## THIS IS A CLAIMS MADE INDEMNITY POLICY WITH EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.

### DECLARATIONS

| POLICY NUMBER |
| --- |
| 751-070526-97 |

**DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY INCLUDING
SECURITIES CLAIMS COVERAGE AND AUTOMATIC REINSTATEMENT OF
THE LIMIT OF LIABILITY FOR UNINDEMNIFIABLE LOSS
DESIGNED FOR INITIAL PUBLIC OFFERINGS**

**NOTICE:  THIS IS A CLAIMS MADE INDEMNITY POLICY WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY EXTENDED REPORTING PERIOD.  THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION.  THE UNDERWRITER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."  THE COVERAGE AFFORDED UNDER THIS POLICY DIFFERS IN SOME RESPECTS FROM THAT AFFORDED UNDER OTHER POLICIES.  PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**COVERAGE UNDER INSURING AGREEMENT (B)(3) IS X IS NOT  PROVIDED UNDER THIS POLICY.**

| ITEM 1.   PARENT CORPORATION – NAME AND PRINCIPAL ADDRESS: | ITEM 2.   POLICY PERIOD: |
| --- | --- |
| International Heritage Inc.<br>2626 Glenwood Ave.<br>Suite 200<br>Raleigh, NC 27608 | (a)  Inception Date: June 23, 1997<br>(b)  Expiration Date: June 23, 1998<br>at 12:01 a.m. both dates at the Principal<br>Address in ITEM 1. |

**ITEM 3.   LIMITS OF LIABILITY (inclusive of Defense Expenses):**
    (a)   $5,000,000.00 maximum aggregate limit of liability for all **Claims** made during any single **Policy Year** under Insuring Agreements (A), (B)(1) and (B)(2) – Subject to reinstatement in accordance with Condition (C)(2).
    (b)   $0.00 maximum aggregate limit of liability for all **Claims** made during any single **Policy Year** under Insuring Agreement (B)(3).

**ITEM 4.   RETENTIONS:**
    (a)   $0.00 each **Insured Person** each **Claim** under Insuring Agreement (A).
    (b)   $100,000.00 each **Claim** under Insuring Agreement (B)(1) and/or (B)(2) and/or (B)(3), if applicable.

**ITEM 5.   PREMIUM:   $115,000.00  total prepaid premium.**

**ITEM 6.   ADDITIONAL PREMIUM FOR EXTENDED REPORTING PERIOD:   $86,250.00**

**ITEM 7.   NOTICES UNDER CONDITIONS (A)(1) AND (A)(2) MUST BE ADDRESSED TO:**
    Vice President of Claims
    Executive Risk Management Associates
    P. O. Box 2002
    Simsbury, CT. 06070

**ITEM 8.   ENDORSEMENTS ATTACHED AT ISSUANCE:**
B22671
D22121
D24295
D25208
D25402

These Declarations, the signed and completed Application and the Policy, with endorsements, will constitute the entire agreement between the Underwriter, the Parent Corporation and the Insureds.

EXECUTIVE RISK SPECIALTY INSURANCE COMPANY by (Authorized Company Representative)

THIS IS A CLAIMS MADE INDEMNITY POLICY
WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.

## EXECUTIVE RISK SPECIALTY INSURANCE COMPANY

DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY
INCLUDING SECURITIES CLAIMS COVERAGE AND
AUTOMATIC REINSTATEMENT OF THE LIMIT OF LIABILITY
FOR UNINDEMNIFIABLE LOSS DESIGNED FOR
INITIAL PUBLIC OFFERINGS

Executive Risk Specialty Insurance Company (the "Underwriter"), the Insured Persons and the Company, subject to all of the terms, conditions and limitations of and any endorsements to this Policy, agree as follows:

## I.    INSURING AGREEMENTS

(A)    The Underwriter will pay on behalf of the Insured Persons Loss from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, except for Loss which the Company pays to or on behalf of the Insured Persons as indemnification.

(B)    The Underwriter will pay on behalf of the Company:

    (1)    Loss from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts which the Company pays to or on behalf of the Insured Persons as indemnification; and

    (2)    Loss from Securities Claims first made during the Policy Period against the Company; and

    (3)    (OPTIONAL COVERAGE) if it is stated in the Declarations that coverage is provided under this INSURING AGREEMENT (B)(3), Loss from Securities Claims first made during the Policy Period against the Offering Underwriter which the Company pays to or on behalf of the Offering Underwriter as indemnification pursuant to the terms and conditions of an Underwriting Agreement.

Form B23839 (7/97 ed.)

Catalog No. IPOp-S

1

## II. DEFINITIONS

(A) **"Anniversary Date"** means that date and time exactly one (1) year after the date and time set forth in ITEM 2(a) of the Declarations, and each succeeding date and time exactly one (1) year after the previous Anniversary Date.

(B) **"Application"** means an application, in any form, attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of the Policy, as if physically attached.

(C) **"Claim"** means:

   (1)   any civil proceeding in a court of law or equity,

   (2)   any criminal proceeding in a court of law,

   (3)   any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; and

   (4)   any written demand or notice to an **Insured** describing circumstances that are likely to give rise to the commencement against an **Insured** of any proceeding described in clause (1), (2) or (3) above;

including without limitation any such proceeding brought by, or any such written demand or notice by, the United States Securities and Exchange Commission.

(D) **"Company"** means the **Parent Corporation** and any **Subsidiary** created or acquired on or before the Inception Date or during the **Policy Period**.

(E) **"Controlling Shareholder"** means any person or entity that owns, directly or indirectly, more than twenty-five percent (25%) of the outstanding securities representing the right to vote for election of a corporation's directors.

(F) **"Defense Expenses"** means reasonable legal fees and expenses incurred in the defense or appeal of a **Claim**. **Defense Expenses** will not include the Company's overhead expenses or any salaries, wages, fees or benefits of its directors, officers or employees.

(G) **"Determination of No Liability"** means, with respect to any **Securities Claim**:

   (1)   a final judgment of no liability obtained prior to or during trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment or any similar motion or process, after exhaustion of all appeals; or

2

(2)   a final judgment of no liability obtained after trial, in favor of all **Insureds**, after exhaustion of all appeals.

(H)   **"Insured"** means the **Insured Persons** and, with respect only to **Claims** for **Securities Activity Wrongful Acts**, the **Company** and, if coverage is provided under INSURING AGREEMENT (B)(3), the **Offering Underwriter**.

(I)   **"Insured Person"** means (i) any past, present or future director or officer, or member of the Board of Managers, of the **Company**, (ii) or any **Controlling Shareholder** of the **Company**, but only if and to the extent that a **Securities Claim** is made and maintained against any such **Controlling Shareholder** and any other **Insured**, and (iii) any past, present or future employee of the **Company**, but only if and to the extent that a **Claim** is made against any such employee for a **Securities Activity Wrongful Act**. In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

(J)   **"Loss"** means **Defense Expenses** and any damages, settlements, judgments or other amounts (including punitive or exemplary damages, where insurable under applicable law):

(1)   that an **Insured Person** is obligated to pay as a result of any **Claim**; or

(2)   that the **Company** or, if coverage is provided under INSURING AGREEMENT (B)(3), any **Offering Underwriter**, is obligated to pay as a result of any **Claim** for **Securities Activity Wrongful Acts**;

provided, that the above amounts will be **Loss** only to the extent that they are in excess of any applicable retention and, further, that **Loss** will not include wages, fines, taxes or penalties, or the multiplied portion of any multiplied damage award or matters which are uninsurable under the law pursuant to which this Policy is construed.

(K)   **"Offering"** means any actual or proposed transaction involving a purchase or sale, or an offer to purchase or sell, securities issued at any time by the **Company**.

(L)   **"Offering Underwriter"** means each entity with which the **Company** enters into an **Underwriting Agreement**, and each person who was, is or becomes:

(1)   a **Controlling Shareholder**, partner, principal, director or officer of such entity; or

(2)   a full-time salaried employee of such entity, or of an incorporated partner of such entity.

3

(M) **"Outside Capacity"** means service by an **Insured Person** as a director, officer, trustee, regent or governor of an **Outside Entity**, but only during such time that such service is part of the regularly assigned duties of the **Insured Person** with the **Company**.

(N) **"Outside Entity"** means a corporation or organization other than the **Company** which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, as the same may be amended from time to time.

(O) **"Parent Corporation"** means the entity named in ITEM 1 of the Declarations.

(P) **"Policy Period"** means the period from the Inception Date to the Expiration Date in ITEM 2 of the Declarations or to any earlier cancelation date.

(Q) **"Policy Year"**, means, within the **Policy Period**, first, the period from the date and time set forth in ITEM 2(a) of the Declarations to the first Anniversary Date or any earlier date of cancelation by the **Parent Corporation** and, second, the period from an Anniversary Date to its succeeding Anniversary Date or any earlier date of cancelation by the **Parent Corporation**.

(R) **"Related Claims"** means all **Claims** for **Wrongful Acts** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

(S) **"Securities Activity Wrongful Act"** means any actual or alleged:

   (1)    violation of **Securities Laws**; or

   (2)    any act, error, omission, misstatement, misleading statement or breach of duty by an **Insured** in connection with the purchase or sale, or offer to purchase or sell, securities issued at any time by the **Company**.

(T) **"Securities Claim"** means any **Claim** for **Securities Activity Wrongful Acts**.

(U) **"Securities Laws"** means the Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, or any other federal, state or local securities law or any rule or regulation promulgated under any of the foregoing.

(V) **"Subsidiary"** means:

   (1)    any corporation during any time in which the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such corporation's directors; and

4

    (2)   any limited liability company organized under the laws of any state, during any time in which the **Parent Corporation** and/or the **Insured Persons** own(s), directly or through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of the members of such company's Board of Managers.

(W)  **"Underwriting Agreement"** means any written contract or agreement between the **Company** and any **Offering Underwriter** pursuant to which such **Offering Underwriter** provides underwriting services to the **Company** in connection with an **Offering.**

(X)  **"Wrongful Act"** means:

    (1)   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an **Insured Person** in his or her capacity as such;

    (2)   any matter asserted against an **Insured Person** solely by reason of his or her status as such;

    (3)   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an **Insured Person** in his or her **Outside Capacity;** and

    (4)   any **Securities Activity Wrongful Act.**

## III.  EXCLUSIONS

(A)  Except for **Defense Expenses** payable in accordance with, and subject to, CONDITION (A), the Underwriter shall not pay **Loss** for **Claims:**

    (1)   against any **Insured Person** brought about or contributed to in fact by any intentional dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any **Insured Person;** or

    (2)   against any **Insured** brought about or contributed to in fact by the gaining by any **Insured** of any profit, remuneration or advantage to which such **Insured** is not legally entitled; or

    (3)   seeking relief or redress in any form other than money damages;

except that clauses (1) and (2) of this EXCLUSION (A) shall not apply unless the dishonest or fraudulent act or omission or willful violation of statute, rule or law, or the gaining by such **Insured Person** of such profit, remuneration or advantage to which he or she is not legally entitled, has been established by a final adjudication in any judicial or administrative proceeding, or by admission of an **Insured Person.**

(B)   The Underwriter will not pay **Loss,** including **Defense Expenses,** for **Claims** for:

    (1)   any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; or

    (2)   any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of, any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants, or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any of the foregoing, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

By way of clarification of the foregoing, this EXCLUSION (B) will not apply to those portions of any **Claim** that (i) allege that **Wrongful Acts** resulted in any actual or alleged violation of any **Securities Laws,** or (ii) are a derivative action by or on behalf of, or in the name or right of, the **Company** brought by a security holder of the **Company,** and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, any **Insured.**

(C)   The Underwriter will not pay **Loss,** including **Defense Expenses,** for **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (1)   any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding as of the Inception Date in ITEM 2(a) of the Declarations;

    (2)   any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date in ITEM 2(a) of the Declarations, was the subject of any notice given under any other policy of directors and officers liability or other similar insurance;

6

(3)    any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation;

(4)    any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance; or

(5)    the service by any **Insured Person** as a director or officer of:

    (a)    any entity other than the **Company** or an **Outside Entity,** even if directed or requested by the **Company** to serve as a director, officer or employee of such other entity, or

    (b)    any entity acquired by the **Company,** whether by merger, consolidation or otherwise, at any time prior to the **Company's** acquisition of such entity.

(D)    The Underwriter will not pay **Loss,** including **Defense Expenses,** for **Claims:**

(1)    by or on behalf of, or in the name or right of, any **Insured,** except that this exclusion will not apply to:

    (a)    any derivative action by or on behalf of, or in the name or right of, the **Company** brought by a security holder of the **Company,** and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, any **Insured;**

    (b)    any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** or an **Offering Underwriter** or which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy, or

    (c)    any **Claim** for the actual or alleged wrongful termination of an **Insured Person;**

(2)    by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such **Outside Entity;** or

(3)    against the **Insured Persons** of any **Subsidiary** in their capacities as such for any **Wrongful Act** committed during any time in which such entity is not a **Subsidiary;** or

7

(4)   with respect to any **Subsidiary**, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving (i) any **Securities Activity Wrongful Act** occurring at any time during which such entity is not a **Subsidiary**, or (ii) any **Securities Activity Wrongful Act** occurring at any time during which such entity is a **Subsidiary** which arises out of, is based on, relates to, or is in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events as any **Securities Activity Wrongful Act** occurring at any time during which such entity was not a **Subsidiary**.

No conduct of any **Insured** will be imputed to any other **Insured** to determine the application of any of the above EXCLUSIONS.

## IV. EXTENSIONS OF COVERAGE

(A) **Spouses of Insured Persons:**

(1)   The coverage afforded under this Policy will, subject to all of its terms, conditions, limitations and exclusions, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse of an **Insured Person**, but only if:

(a)   the **Claim** against such spouse results from a **Wrongful Act** actually or allegedly committed by the **Insured Person** to whom the spouse is married, and

(b)   such **Insured Person** and his or her spouse are represented by the same counsel in connection with such **Claim**.

(2)   No spouse of an **Insured Person** will, by reason of this EXTENSION OF COVERAGE (A), have any greater right to coverage under this Policy than the **Insured Person** to whom such spouse is married.

(3)   The Underwriter will not be liable under this EXTENSION OF COVERAGE (A) to make any payment of **Loss** in connection with any **Claim** against a spouse of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse.

8

(B) **Adjustments:**

If, during the **Policy Period**, the **Company** acquires a **Subsidiary** or acquires any entity by merger and, at the time of such transaction, the assets of the entity so acquired exceed twenty-five percent (25%) of the total assets of the **Company** as reflected in the **Company's** most recent audited consolidated financial statements, such entity will be included within the term **"Subsidiary"** for a period of ninety (90) days after the date of such transaction. There will be no coverage under this Policy in respect of any **Claim** against the **Insureds** which is first made more than ninety (90) days after the formation thereof unless the Underwriter has received written notice containing full details of such transaction and the Underwriter, at its sole discretion, has agreed by written endorsement to provide such coverage upon such terms, conditions and limitations as it may require. No coverage will be available under this Policy for **Loss**, including **Defense Expenses**, from any **Claim** against any entity, or the **Insured Persons** of any entity, included within the term **"Subsidiary"** by reason of this EXTENSION OF COVERAGE (B) for any **Wrongful Act** committed or allegedly committed before the date of such transaction.

(C) **Extended Reporting Period:**

(1) If, for any reason, the Underwriter or the **Parent Corporation** determines, as of the Expiration Date set forth in ITEM 2(b) of the Declarations, not to renew this Policy, the **Parent Corporation** will have the right to purchase an extension of the coverage otherwise afforded by this Policy for **Loss** from **Claims** first made during the period of one (1) year after the Expiration Date set forth in ITEM 2 of the Declarations (the "Extended Reporting Period"), but only if such **Claims** are for **Wrongful Acts** committed before the end of the **Policy Period** or the date of any conversion of coverage under CONDITION (E), whichever is earlier. The additional premium for the Extended Reporting Period is set forth in ITEM 6 of the Declarations. The election of, and the payment of the premium for, the Extended Reporting Period must be made within thirty (30) days after the Expiration Date set forth in ITEM 2(b) of the Declarations. If such election and payment are not made within thirty (30) days after the Expiration Date set forth in ITEM 2(b) of the Declarations, the **Parent Corporation** will have no right to purchase the Extended Reporting Period at any later date.

9

(2)    If the **Parent Corporation** purchases the Extended Reporting Period in accordance with EXTENSION OF COVERAGE (C)(1) above, any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the last **Policy Year.** The Underwriter's limit of liability in respect of **Claims** made during the Extended Reporting Period shall be part of, and not in addition to, the applicable limit of liability for **Claims** made or deemed made during the most recently ended **Policy Year** prior to the inception of the Extended Reporting Period.

(3)    As conditions precedent to the right to purchase the Extended Reporting Period, the total premium for this Policy must have been paid, and the Policy may not have been canceled by the **Parent Corporation** under CONDITION (F)(2).

(4)    In the event that the Extended Reporting Period is purchased, the entire premium for the Extended Reporting Period will be deemed to have been fully earned at its commencement.

(5)    The purchase of the Extended Reporting Period will not in any way increase the Underwriter's annual limit of liability, as stated in ITEM 3(a) of the Declarations.

## V.    CONDITIONS

### (A)    Notice; Timing and Interrelationship of Claims:

(1)    As a condition precedent to any right to payment in respect of any **Claim,** including any **Claim** for a **Wrongful Act** of which notice was previously given under CONDITION (A)(2), the **Insured** must give the Underwriter written notice of such **Claim,** with full details, as soon as practicable after it is first made. A **Claim** is first made when it is commenced by the filing of a complaint, notice of charges, formal investigative order or similar document, or by the return of an indictment, against an **Insured,** or when an **Insured** first receives written demand or notice describing circumstances that are likely to give rise to any of the foregoing.

(2)    If, during any **Policy Year,** the **Insured** first becomes aware of a **Wrongful Act** which may subsequently give rise to a **Claim** and as soon as practicable thereafter, but before the expiration or cancelation of the Policy:

10

(a)   gives the Underwriter written notice of such **Wrongful Act**, including a description of the **Wrongful Act** in question, the identities of the potential claimants, the consequences which have resulted or may result from such **Wrongful Act**, the damages which may result from such **Wrongful Act** and the circumstances by which the **Insured** first became aware of such **Wrongful Act**, and

(b)   requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then the Underwriter will treat any such subsequently resulting **Claim** as if it had been first made during such **Policy Year**.

(3)   All notices under CONDITIONS (A)(1) and (2) must be sent by certified mail to the address set forth in ITEM 7 of the Declarations.

(4)   All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with CONDITION (A)(2), whichever is earlier.

(B)   **Defense and Settlement of Claims; Payment and Allocation of Loss:**

(1)   The Underwriter will have no duty under this Policy to defend any **Claim**. No **Defense Expenses** may be incurred and no settlement of any **Claim** may be made without the Underwriter's consent, such consent not to be unreasonably withheld.

(2)   The Underwriter will, upon written request, pay on a current basis **Defense Expenses** for which this Policy provides coverage. Otherwise, the Underwriter will pay **Loss** only on the final disposition of a **Claim**.

(3)   As a condition of any payment of **Defense Expenses** under CONDITION (B)(2), the Underwriter may require a written undertaking on terms and conditions satisfactory to the Underwriter guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that **Loss** incurred by such **Insured** would not be covered.

(4)   In the event of **Loss**, including **Defense Expenses**, from any **Claim** under INSURING AGREEMENTS (A) and (B)(1) and/or (B)(2), then the following shall apply:

(a)   If such **Loss** exceeds the remaining available annual limit of liability set forth in ITEM 3(a) of the Declarations (and subject to CONDITION (C)(2) below):

11

(i)   the Underwriter will first pay **Loss** from such **Claim** under INSURING AGREEMENT (A), then

(ii)   to the extent that any amount of the applicable annual limit of liability shall remain available, the Underwriter shall pay **Loss** from such **Claim** under INSURING AGREEMENTS (B)(1) and/or (B)(2), as applicable.

(b)   In all events (including those described in clause (a) above), upon the written request of the **Company:**

(i)   the Underwriter will first pay **Loss** from any **Claim** under INSURING AGREEMENT (A), then

(ii)   to the extent that any amount of the applicable annual limit of liability shall remain available, either pay or withhold payment of **Loss** from such **Claim** under INSURING AGREEMENTS (B)(1) and/or (B)(2), as applicable, all as requested by the **Company.**

If the **Company** requests that the Underwriter withhold payment of **Loss**, as provided in clause (ii) above, the Underwriter shall continue to withhold such payment unless and until the **Company** shall request the Underwriter either to release such payment to the **Company** on account of such **Claim**, or apply such payment to **Loss** from any future **Claim** under INSURING AGREEMENT (A).

(c)   Nothing in this CONDITION (B)(4) shall be construed to increase the Underwriter's maximum aggregate annual limit of liability as described in CONDITION (C)(1) below.

(5)   If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**" set forth in DEFINITION (H), the **Company**, the **Insured Persons** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts. In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured Persons** and the **Company**. In the event that an allocation cannot be agreed to, then the Underwriter shall be obligated

12

to make an interim payment of the amount of **Loss**, including **Defense Expenses**, which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

(C) **Limit of Liability:**

    (1)    Regardless of the time of payment by the Underwriter:

        (a)    Subject to paragraph (2) below, the amount stated in ITEM 3(a) of the Declarations will be the maximum aggregate limit of liability of the Underwriter under this Policy for all **Loss**, including **Defense Expenses**, from all **Claims** under INSURING AGREEMENTS (A), (B)(1) and (B)(2) first made or deemed made during any single **Policy Year**, which amount shall be in addition to, and not part of, the maximum aggregate limit of liability set forth in ITEM 3(b) of the Declarations, which is applicable to all **Loss** from **Claims** under INSURING AGREEMENT (B)(3).

        (b)    The amount stated in ITEM 3(b) of the Declarations will be the maximum aggregate limit of liability of the Underwriter under this Policy for all **Loss**, including **Defense Expenses**, from all **Claims** under INSURING AGREEMENT (B)(3) first made or deemed made during any single **Policy Year**, which amount shall be in addition to, and not part of, the maximum aggregate limit of liability set forth in ITEM 3(a) of the Declarations, which is applicable to all **Loss** from **Claims** under INSURING AGREEMENTS (A), (B)(1) and (B)(2).

The limits of liability described above which are applicable to **Claims** first made or deemed made during any **Policy Year** may not be aggregated or transferred, in whole or in part, so as to provide any additional coverage in respect of **Claims** first made or deemed made during any other **Policy Year**.

    (2)    The Underwriter's maximum aggregate limit of liability set forth in ITEM 3(a) of the Declarations shall be reinstated upon full or partial exhaustion thereof by reason of payment of **Loss**, including **Defense Expenses**, under this Policy (the "Reinstated Limit"), subject to the following:

        (a)    Only one full Reinstated Limit shall be available under this Policy.

        (b)    The Reinstated Limit shall apply only to **Loss**, including **Defense Expenses**, from **Claims** under INSURING AGREEMENT (A) first made against the **Insured Persons** during the **Policy Period**.

13

(c)    The Reinstated Limit shall be excess of any excess insurance which was in force on and as of the Inception Date set forth in ITEM 2(a) of the Declarations. Before the Underwriter shall have any obligation to make any payment on account of the Reinstated Limit, the full amount of all such excess insurance must be completely exhausted by actual payment, from any source, of claims and losses thereunder, including without limitation payment by the excess insurers, the **Company** and/or the **Insured Persons**.

(d)    Notwithstanding anything in this CONDITION (C)(2) to the contrary, the Underwriter's maximum aggregate limit of liability for any one **Claim** (including **Related Claims**) under INSURING AGREEMENT (A) first made against the **Insured Persons** during the **Policy Period** shall be the amount set forth in ITEM 3(a) of the Declarations.

(3)    If any **Claim** made against the **Insured Persons** gives rise to coverage both under this **Policy** and under any other policy or policies of directors and officers liability or other similar insurance issued by the Underwriter to any **Outside Entity**, the Underwriter's maximum aggregate limit of liability under all such policies for all **Loss**, including **Defense Expenses**, in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy.

(4)    **Defense Expenses** will be part of and not in addition to the Underwriter's limit of liability, and payment of **Defense Expenses** by the Underwriter will reduce its limit of liability.

(D)    **Presumption of Indemnification; Applicable Retention:**

(1)    The certificate of incorporation, charter, articles of association or other organizational documents of the **Parent Corporation**, each **Subsidiary** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(2)    Regardless of whether **Loss** in connection with any **Claim** against the **Insured Persons** (including any **Claim** against the **Insured Persons** for **Wrongful Acts** in their **Outside Capacities**) is payable under INSURING AGREEMENT (A) or (B)(1), the retention set forth in ITEM 4(b) of the Declarations will apply to any **Loss** as to which indemnification by the **Company** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Company** or such **Outside Entity** solely by reason of its financial insolvency.

14

(3)     If different retentions are applicable to different parts of any **Loss**, the applicable retentions will be applied separately to each part of such **Loss**, and the sum of such retentions will not exceed the largest applicable retention as set forth in ITEM 4 of the Declarations.

(4)     Notwithstanding anything to the contrary contained in this Policy, no retention shall apply to **Defense Expenses** incurred in connection with any **Securities Claim**, and the Underwriter will reimburse the **Insureds** for any **Defense Expenses** paid by the **Insureds** in connection with any such **Securities Claim**, if:

    (a)     there is a **Determination of No Liability** of all **Insureds** with respect to such **Securities Claim**, or

    (b)     such **Securities Claim** is dismissed, or there is a stipulation to dismiss such **Securities Claim**, with or without prejudice and without the payment of any monetary consideration by the **Insureds**.

With respect to any reimbursement of **Defense Expenses** under clause (b) above, the Underwriter will pay such amount within ninety (90) days after the date of any such dismissal or stipulation provided that (i) the **Securities Claim** (or any **Related Claim**) is not reinstituted prior to payment by the Underwriter, and (ii) the **Insureds** provide the Underwriter with an undertaking, on terms and conditions satisfactory to the Underwriter, guaranteeing the repayment of such amounts in the event that such **Securities Claim** (or any **Related Claim**) is reinstituted after payment by the Underwriter and before the expiration of the statute of limitations for such **Securities Claim**.

(E)   **Conversion of Coverage Under Certain Circumstances:**

If, during the **Policy Period**, any of the following events occurs:

(1)     the acquisition of the **Parent Corporation**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Corporation** into or with another entity such that the **Parent Corporation** is not the surviving entity;

(2)     the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the **Parent Corporation**; or

15

(3)    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors or members of the Board of Managers, as the case may be, of the **Parent Corporation;**

coverage under this Policy will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed after such event. After any such event, the Policy may not be canceled, regardless of CONDITION (F)(2), and the entire premium for the Policy will be deemed fully earned.

(F)    **Cancelation; No Obligation to Renew:**

(1)    The Underwriter may not cancel this Policy except for failure to pay a premium when due, in which case twenty (20) days' written notice will be given.

(2)    The **Parent Corporation** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancelation will be effective. In such event, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancelation is effective or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

(3)    The Underwriter will not be required to renew this Policy upon its expiration. If the Underwriter elects not to renew this Policy, the Underwriter will deliver or mail to the **Parent Corporation** written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Declarations.

(G)    **Other Insurance; Other Indemnification:**

(1)    All **Loss** payable under this Policy will be specifically excess of and will not contribute with other valid insurance (whether collectible or not), including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this Policy, subject, however, to CONDITION (C)(2) respecting reinstatement of the limit of liability set forth in ITEM 3 of the Declarations. This Policy will not be subject to the terms of any other insurance.

16

(2)    All coverage for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with, any other valid and collectible insurance available to such **Insured Persons** by reason of their service in **Outside Capacities,** and any indemnification by any person or entity other than the **Company,** including any **Outside Entity,** available to such **Insured Persons** in connection with their service in **Outside Capacities.**

(H)    **Exhaustion:**

If the Underwriter's limit of liability is exhausted by the payment of **Loss,** the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

(I)    **Cooperation; Subrogation:**

The **Insureds** will provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests, and will do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The Underwriter will be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds.** The **Insureds** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in their name. The obligations of the **Insureds** under this CONDITION (I) will survive the Policy.

(J)    **Representations; Severability:**

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application.** In the event that any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth.

17

**(K) No Action Against the Underwriter:**

    (1)   No action may be taken against the Underwriter unless, as conditions precedent thereto, there has been full compliance with all of the terms of this Policy and the amount of the obligation of the **Insureds** to pay has been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Underwriter.

    (2)   No person or entity will have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor may the Underwriter be impleaded by an **Insured** or his or her or its legal representative in any such **Claim**. The Underwriter will not be relieved of any of its obligations under the Policy by the bankruptcy or insolvency of any of the **Insureds** or, in the case of the **Insured Persons**, their estates.

**(L) Authorization and Notices:**

The **Parent Corporation** will act on behalf of the **Insureds** with respect to the giving and receiving of any notices and the payment and return of premiums from the Underwriter.

**(M) Changes:**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Underwriter will not effect a waiver or change in any part of this Policy or estop the Underwriter from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

**(N) Assignment:**

No assignment of interest under this Policy will bind the Underwriter without its consent.

**(O) Entire Agreement:**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

18

(P)  **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In Witness Whereof, the Underwriter has caused this Policy to be executed by its authorized officers, but this Policy shall not be valid unless countersigned on the Declarations page by a duly authorized representative of the Underwriter.**

_____
Secretary

_____
Co-Chairman

19



ENDORSEMENT NO. 1
SERVICE OF SUIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 23, 1997, forms part of

Policy No.        751-070526-97
Issued to         International Heritage Inc.
Issued by         Executive Risk Specialty Insurance Company

In consideration of the premium charged, it is hereby understood and agreed that the following Condition is made part of this Policy:

SERVICE OF SUIT.

In the event of any failure by the Underwriter to pay any amount claimed to be due under this Policy, the Underwriter, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. This endorsement does not constitute and should not be understood to constitute an agreement by the Underwriter that any action, suit or proceeding is properly maintained in a specific forum, nor may it be construed as a waiver of the Underwriter's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or any state in the United States, all of which rights the Underwriter expressly reserves. It is further agreed that service of process in such suit may be made upon Senior Vice President, Claims, Executive Risk Specialty Insurance Company, 82 Hopmeadow Street, Simsbury, CT 06070 or his or her representative, and that in any suit instituted against the Underwriter upon this contract, the Underwriter will abide by the final decision of such court or of any appellate court in the event of any appeal.

Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose by statute, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named Senior Vice President as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

B22671 (1/96)                          Page 1



ENDORSEMENT NO. 2
NON-ENTITY EMPLOYMENT PRACTICES ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 23, 1997, forms part of

Policy No.    751-070526-97
Issued to    International Heritage Inc.
Issued by    Executive Risk Specialty Insurance Company

In consideration of the premium charged:

(1)    "Employment Practices Wrongful Act" will mean any actual or alleged:

    (a)    wrongful termination, whether actual or constructive, of the employment of, or demotion of, or failure or refusal to hire or promote, any person in violation of law or in breach of any agreement to commence or continue employment;

    (b)    employment discrimination, including any failure or refusal to hire any person, or discharge of or other discrimination against any person with respect to his or her compensation or any of the terms, conditions or privileges of his or her employment, or any limitation, segregation or classification of employees or applicants for employment in any way which would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy or other protected status;

    (c)    sexual harassment, including unwelcome sexual advances, requests for sexual favor or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or create a work environment that interferes with performance; or

    (d)    retaliatory treatment against an employee of the Company on account of such employee's exercise or attempted exercise of his or her rights under law.

(2)    The term "Claim" shall include a written notice from any person or entity, including but not limited to the Equal Employment Opportunity Commission or any other state or federal agency or authority with jurisdiction over the Company's employment practices, that such person or entity intends to hold any Insured Person responsible for an Employment Practices Wrongful Act.

(3)    The term "Insured Person" shall include any past or present employee of the Company, but only if and to the extent that a Claim is made against any such employee for an Employment Practices Wrongful Act. Nothing in this endorsement is intended, nor shall it be construed, to afford coverage for Loss in connection with any Claim against an employee of the Company who is not a past or present officer or director of the Company unless, and then only to the extent that, such Claim is for an Employment Practices Wrongful Act by such employee.



(4)     The term "Wrongful Act" shall include any Employment Practices Wrongful Act by an Insured Person in the discharge of his or her duties solely in his or her capacity as an employee of the Company or as an officer or director of the Company.

(5)     Section III Exclusions (B) shall not apply to Loss, including Defense Expenses, resulting from allegations of:

    (a)     libel or slander or oral or written publication of defamatory or disparaging material, or

    (b)     mental anguish or emotional distress;

            but only to the extent that such allegations are made as part of a Claim against an Insured Person for an Employment Practices Wrongful Act.

(6)     Section III Exclusions (D)(1)(c) is amended to read as follows:

    "(c)    any Claim for an Employment Practices Wrongful Act."

(7)     Notwithstanding anything to the contrary contained in the Policy or this endorsement, no coverage will be available under this Policy for Loss, including Defense Expenses, from Claims against the Insured Persons for Employment Practices Wrongful Acts committed or allegedly committed by them before April 28, 1995.


All other terms, conditions and limitations of this Policy shall remain unchanged.



_____
Authorized Representative



ENDORSEMENT NO. 3
SECURITIES CLAIMS SUB-RETENTION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 23, 1997, forms part of

Policy No.      751-070526-97
Issued to       International Heritage Inc.
Issued by       Executive Risk Specialty Insurance Company

In consideration of the premium charged:

1)      With respect only to Securities Claims, Item 4 of the Declarations is amended to read in its entirety as follows:

        "ITEM 4.     RETENTIONS:

                (a)     $0.00 each Insured Person each Claim under Insuring Agreement (A)

                (b)     $200,000.00 each Claim under Insuring Agreement (B)(1) and/or (B)(2) and/or (B)(3), if applicable."

(2)     With respect to all other Claims, Item 4 of the Declarations shall remain unchanged.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

D24295 (3/97)

Page 1

 

ENDORSEMENT NO. 4
AMEND DEFINITION OF "OUTSIDE ENTITY" ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 23, 1997, forms part of

Policy No.      751-070526-97
Issued to       International Heritage Inc.
Issued by       Executive Risk Specialty Insurance Company

In consideration of the premium charged, the term "Outside Entity" as defined in Section II Definitions (H) of the Policy shall be amended to read in its entirety as follows:

"(H)      'Outside Entity' means an entity other than the Company which is organized as a non-profit organization whether or not that entity is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, as the same may be amended from time to time."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

D25208 (10/97)

Page 1



ENDORSEMENT NO. 5
NOTIFICATION REQUIREMENT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 23, 1997, forms part of

Policy No.    751-070526-97
Issued to     International Heritage Inc.
Issued by    Executive Risk Specialty Insurance Company

In consideration of the premium charged:

(1)    If, during the Policy Period, the Company will be required to register a class of the Company's debt or equity securities with the United States Securities and Exchange Commission, will engage in any transaction which will cause the Company to become a reporting company under the federal Securities Exchange Act of 1934 or will undertake an offering of debt or equity securities which is exempt from registration under the United States securities laws (any of which, a "Transaction"), the Company will, no later than thirty (30) days prior to the effective date of such Transaction, give the Underwriter written notice containing full details thereof, and the Underwriter shall be entitled to impose, and the Company and the Insured Persons agree to accept, such terms, conditions and limitations of coverage in connection with the foregoing which the Underwriter, in its sole discretion, reasonably may require.

(2)    If the Company fails for any reason to give the Underwriter notice of any Transaction, or fails to accept such terms, conditions or limitations of coverage, or fails to pay any such additional premium, in connection with any Transaction as the Underwriter, in its sole discretion, may require, the Underwriter will not be liable to pay Loss, including Defense Expenses, from any Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving such Transaction.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

D25402 (11/97)

Page 1