

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

IN RE                                         )         CASE NO: 98-02675-5-ATS
                                              )
INTERNATIONAL HERITAGE, INC.                  )
(TAX I.D. 56-1921093)                         )
                                              )         CHAPTER 7
            Debtor                            )
                                              )

## ORDER ALLOWING FIRST APPLICATION OF SMITH DEBNAM NARRON WYCHE STORY & MYERS, L.L.P ALLOWANCE OF CHAPTER 7 COMPENSATION AND REIMBURSEMENT OF EXPENSES

THIS MATTER coming on before the undersigned Bankruptcy Judge upon the application ("First Application") of Smith Debnam Narron Wyche Story & Myers, L.L.P. ("SDNWS&M"), attorneys for International Heritage, Inc. (the "Debtor"), in the above-captioned case, for an entry of an order allowing interim compensation and reimbursement of expenses for services rendered by SDNWS&M in connection with its representation of the Debtor for the period from October 30, 1998 through September 15, 1999. Following appropriate notice to creditors, review of the First Application, and no objections having been filed, the court finds as follows:

1.   The Debtor filed its voluntary petition under chapter 7 of the Bankruptcy Code on November 24, 1998 (the "Petition Date"). Prior to filing, the Debtor ceased operations and effectuated a wind down of its business.

2.   The Debtor was incorporated in North Carolina on April 26, 1995. On March 6, 1998, the Debtor entered into a share for share exchange with Kara International, Inc., a Nevada corporation, and became a wholly owned subsidiary of that company. Kara International, Inc. changed its name to International Heritage, Incorporated. This company was publicly traded on NASDAQ.

Recorded in Fee Book 10/28/99 AM

cc: BA + 6 andre to serve 10/28/99 Am

3. The Debtor's business was that of direct sale of fine jewelry, collectibles, pro-line golf products and accessories, premium incentive products, and telecommunications products and services in forty-eight states. The company recruited Independent Sales Representatives ("ISRs") and many of these individuals built retail sales organizations. ISRs purchased products from the Debtor and sold them to the public.

4. The Debtor's main office had een in Raleigh, North Carolina and, at its peak, the Debtor had approximately 200 employees.

5. The Debtor's decline, after effectuating the merger with Kara International, Inc. was caused, according to the Debtor, by legal action initiated by the Securities and Exchange Commission which alleged that the Debtor was engaged in the sale of unregistered securities and was operating a pyramid scheme. The Debtor denied the allegations, but the negative publicity impeded operations.

6. Prior to the chapter 7 filing, Debtor's counsel had several extended meetings with the representatives of the Debtor to discuss pre-filing issues and preparation of the documents required in conjunction with the filing. The Debtor consulted counsel in several wind down issues, including maintenance of records and employee-related issues, including insurance coverage. The size and complexity of the chapter 7 case required many hours of work with the Debtor in the proper assimilation of information needed to prepare the Statement of Financial Affairs, Schedules and the mailing matrix. As the Debtor's representatives began preparing the information, it became clear that the information was stored in the Debtor's voluminous computer records would have to be reformatted and in order to produce the specific information required by the court.

7. At the time of filing, the Debtor submitted to the court a mailing list of creditors, shareholders, ISRs, and other interested parties (the "creditors") totaling approximately 195,000.

The ISRs comprised approximately 188,000 of the creditors. The number of creditors included in the case made it the largest in the history of the Eastern District Bankruptcy Court.

8. Due to the great number of creditors, Debtor's counsel coordinated with the office of the clerk of the Bankruptcy Court prior to the chapter 7 filing to provide the matrix on discs which were formatted as required by the court to accomplish the initial noticing of all creditors.

9. After the case was filed, Debtor's counsel was proactive in assisting the trustee and the clerk's office in raising noticing issues, drafting and filing a motion to establish a notice procedure which would limit mailed notices to the initial mailing. The initial notice provided creditors with the bar date and notice of the web page which will contain all future notices of events in the case. This approach was very novel, but appropriate to save the estate thousands of dollars in mailing expense.

10. Debtor's counsel continued to assist the Trustee after the case was filed with regard to the processing of several thousand chapter 7 notices which were returned to Debtor's counsel. A procedure was established with the Trustee to re-send notices where return addresses were provided by the post office.

11. Considerable work required to prepare the Statement of Financial Affairs and Schedules of Assets and Liabilities. Due to the size and complexity of the Debtor's business, further complicated by loss of accounting personnel prior to the filing, the compilation of information was difficult. After information was produced by the Debtor, Counsel reviewed all of the information to determine whether the information was sufficient and how it should be presented. Numerous agreements were reviewed for inclusion in the Statement of Executory Contracts. Counsel for the

Debtor obtained an extension of time to file the Statement of Financial Affairs and Schedules,[1] but the documents were filed in a very complete form prior to the creditors meeting.

12. Many creditors called Debtor's counsel after the case was filed with questions regarding the filing. Due to the magnitude of calls received, a special recording was put in place by Debtor's counsel to provide answers to most inquiries. However, many lessors and employees contacted counsel with special concerns. Debtor's counsel made a special effort to deal with calls as efficiently and cost-effectively as possible.

13. Notices of stay were prepared and filed on behalf of the Debtor in most pending litigation. Numerous parties to litigation contacted Debtor's counsel with questions regarding the effect of the chapter 7 filing on the cases.

14. After the creditors meeting on December 30, 1999, Debtor's counsel was requested by the chapter 7 trustee to assist in providing additional information and an amendment to the Statement of Financial Affairs and Schedules. This was done in a prompt manner to provide the trustee with accurate information.

15. The Trustee was faced with the task of assembling the Debtor's documents and records and transporting them to his office. Counsel for the Debtor worked with the Debtor and Trustee to make this move workable considering that a very valuable and sensitive computer contains most of the Debtor's financial date.

16. The Trustee retained Jean Boyles, William Janvier and Stephani Humrickhouse to assist as special counsel. These parties contacted Debtor's counsel to obtain information regarding accounts receivable and preference actions.

---

[1] The Debtor lost most of its employees prior to the filing. The trustee had to employ several of the former employees to assist in production of information needed to complete the schedules. Much of the information was extremely voluminous and computer programs had to be developed to put the information in a format which would make it usable by the chapter 7 trustee.

17. Debtor's counsel been very conservative regarding legal services rendered after the creditors meeting. Counsel has monitored events during the chapter 7 case and responded as needed to the chapter 7 Trustee's requests and questions. Significant additional service by Debtor's counsel is not anticipated.

18. Counsel for the Debtor believes that all of her services and expenses were necessary to the effective administration of this case.

19. Smith Debnam seeks approval of its currently outstanding fees and expenses pursuant to section 330 of the Bankruptcy Code. Section 330 of the Bankruptcy Code provides that persons employed by an estate are entitled to:

> (a) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional person employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
>
> (b) reimbursement for actual, necessary expenses.

11 U.S.C. § 330.

20. From October 30, 1998 Smith Debnam provided approximately 357.15 hours of legal and paralegal services at an average hourly rate of approximately $97.00 for a total amount of fees of $34,733.50. For this same period, Smith Debnam incurred $1,790.57 in expenses.

21. Smith Debnam submits that the amount reflecting the total time actually spent by Smith Debnam in providing services to the Debtor, and the costs incurred by Smith Debnam in providing such services, should be approved as constituting reasonable compensation for the services actually rendered and reimbursement for costs actually incurred by Smith Debnam in connection with the Debtor's bankruptcy case.

22. Terri L Gardner, a partner and lead attorney in the Debtor's case, has significant experience in the area of bankruptcy and corporate reorganization. A summary of the background

and qualifications of each of the attorneys and professional staff rendering legal and paralegal services in this case was attached to the First Application.

23. Exhibit "B" to the First Application provided a detailed summary of the services rendered by Smith Debnam and recorded during the period from October 30, 1998 through September 15, 1999. This Exhibit reflected services rendered by each attorney and paralegal who provided services during the applicable period and the time spent and the fee charged for such services, billed at the attorney's or paralegal's hourly rate. Exhibit "B" also provided a detailed summary of the costs incurred by Smith Debnam during this same time period.

24. Services rendered by Smith Debnam from October 30, 1998 through September 15, 1999 are as follows: Terri L. Gardner (Partner), 110.30 hours at $185.00 per hour; Joy K. Alford (Associate [contract attorney] 18.30 hours at $25.00 per hour, 2.00 hours at $35.00 per hour, 32.50 hours at $50.00 per hour, 143.80 hours at $70.00 per hour, and 8.50 hours at $90.00 per hour; Eva Monsey (Associate) 2.00 hours at $80.00 per hour; Charnel Baker (Paralegal) 15.60 hours at $25.00 per hour and 10.70 hours at no charge; and Patsy Ducharme (Paralegal) 11.30 hours at $70.00 per hour.

25. In preparing the Application, Smith Debnam did not bill for services which are considered non-reimbursable under the policies and procedures of the Bankruptcy Court for the Eastern District of North Carolina such as intra-city travel expenses, and secretarial services.

26. Smith Debnam makes use of a professional billing system in which work is delegated to the most competent individual able to provide the services at the lowest hourly rate. In reviewing the summary of services the Court notes that the many of the hours spent performing services were performed by contract attorneys and paralegals of Smith Debnam.

27. Counsel for the Debtor received a retainer of $15,000.00. A total of $175.00 of this retainer was used for the filing fee, leaving $14,825.00 to apply to fees and expenses. The total

amount of fees and expenses sought herein is $36,524.07. Therefore, $21,699.07 will be paid from the estate as a cost of administration.

28.  No agreement or understanding exists between Smith Debnam and any other entity for the sharing of compensation to be received for services rendered in or in connection with the case, except as authorized by the Bankruptcy Code and by agreement among the members of the law firm of Smith Debnam.

29.  No previous allowance of compensation for services rendered or reimbursement of proper costs and expenses has been made by the firm or any other attorney for the particular services and expenses set out in the First Application except as set forth in the Rule 2016 Statement filed at the initiation of the case; now, therefore,

IT IS ORDERED that Smith Debnam Narron Wyche Story & Myers, L.L.P. is hereby allowed total fees and expenses in the amount of $36,524.07. After application of the $14,825.00 retainer received by the firm, the amount of $21,699.07 shall be paid as a cost of administration.

Dated:    OCT 28 1999

*A. Thomas Small*
JUDGE, UNITED STATES BANKRUPTCY COURT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | | |
|---|---|---|
| IN RE | ) | CASE NO: 98-02675-5-ATS |
| | ) | |
| INTERNATIONAL HERITAGE, INC. | ) | |
| (TAX I.D. 56-1921093) | ) | CHAPTER 7 |
| Debtor | ) | |
| | ) | |

**APPLICATION OF SMITH DEBNAM NARRON WYCHE STORY & MYERS, L.L.P**
**FOR ALLOWANCE OF CHAPTER 7 COMPENSATION AND REIMBURSEMENT OF**
**EXPENSES**

Smith Debnam Narron Wyche Story & Myers, L.L.P. ("Smith Debnam"), counsel for International Heritage, Inc. (the "Debtor") in the above-captioned case, hereby applies to the Court for entry of an order approving chapter 7 compensation and reimbursement of expenses for services rendered by Smith Debnam in connection with its representation of the Debtor in the chapter 7 case. In support of this Application, Smith Debnam respectfully represents:

1. The Debtor filed its voluntary petition under chapter 7 of the Bankruptcy Code on November 24, 1998 (the "Petition Date"). Prior to filing, the Debtor ceased operations and effectuated a wind down of its business.

2. The Debtor was incorporated in North Carolina on April 26, 1995. On March 6, 1998, the Debtor entered into a share for share exchange with Kara International, Inc., a Nevada corporation, and became a wholly owned subsidiary of that company. Kara International, Inc. changed its name to International Heritage, Incorporated. This company was publicly traded on NASDAQ.

3. The Debtor's business was that of direct sale of fine jewelry, collectibles, pro-line golf products and accessories, premium incentive products, and telecommunications products and

-1-