UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

# FILED

### FEB 2 2 2000

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C

IN RE:

*INTERNATIONAL HERITAGE, INC.*
*INTERNATIONAL HERITAGE, INCORPORATED*

98-02675-5-ATS
98-02674-5-ATS

TRANSCRIPTS OF PROCEEDINGS

MAY 5, 1999; SEPTEMBER 22, 1999; DECEMBER 2, 1999

BEFORE THE HONORABLE A. THOMAS SMALL
UNITED STATES BANKRUPTCY JUDGE
RALEIGH, NC

233

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

**IN RE:**   *INTERNATIONAL HERITAGE, INC.*
*98-02675-5-ATS(7)*

*INTERNATIONAL HERITAGE, INCORPORATED*
*98-02674-5-ATS*

TRANSCRIPT OF HEARING — MAY 5, 1999 — RALEIGH, NC
BEFORE THE HONORABLE A. THOMAS SMALL
UNITED STATES BANKRUPTCY JUDGE

1. *MOTION FOR ORDER RELEASING RESERVE ACCOUNT AND
   DETERMINATION OF THE APPLICABILITY OF THE
   AUTOMATIC STAY*

2. *TRUSTEE'S APPLICATION TO ENTER INTO STIPULATION
   AND CONSENT TO FINAL JUDGMENT*

3. *TRUSTEE'S MOTION FOR ORDER TO STAY PENDING
   LITIGATION*

4. *MOTION FOR RELIEF FROM AUTOMATIC STAY*

**APPEARANCES:**

Trustee:  *Holmes P. Harden*

Attorney for Trustee:  *William Janvier*

Attorneys for Acstar Insurance:  *Michael Flanagan and
Paul Fanning*

Attorney for L. C. Gilbert:  *Ronald Garber*

Attorney for Stanley Van Etten:  *Brent Wood*

Attorneys for Chittenden Bank:  *Kathryn Koonce and
Jane Quasarano*

Attorney for U.S. Securities and Exchange Commission:
*Susan Sherrill and Bill Hicks*

Bankruptcy Administrator:  *Marjorie K. Lynch*

Courtroom Deputy:  *Christine A. Castelloe*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Transcribed by:**      *Jane W. Clapp
1907 Wandering Way Drive
Charlotte, NC  28226
(704) 366-1057*

2

1    (CALL TO ORDER)

2    (Transcription Note:  All names and case citations will be

3    spelled phonetically unless verifiable spellings are

4    available.)

5              THE COURT:  All right.  Any other appearances?

6              MR. HICKS:  Your Honor, Bill Hicks, H-i-c-k-s, also

7    on behalf of the Securities & Exchange Commission.

8              THE COURT:  Ms. Koonce?

9              MS. KOONCE:  Judge Small, I'd like to introduce to

10   the Court Jane Quasarano, who is here from Detroit, Michigan,

11   with the firm Jaffrey Wright Kure & Blythe, and she will be

12   arguing on behalf of Chittenden Bank today.

13             THE COURT:  Okay.

14             MS. QUASARANO:  Good morning, Your Honor.  Thank

15   you.

16             THE COURT:  Good morning.  Okay, Mr. Harden?

17             MR. HARDEN:  I just want to raise a couple of

18   preliminary matters.  My motion for an order pertaining to

19   the Montana litigation and the State of Montana's responsive

20   Motion for Relief of Stay, we've agreed to continue both.  I

21   think we're pretty close to a settlement of that.  And Mr.

22   Callaway asked me to convey that he would request that his

23   motion be continued, and I would request that my motion be

24   continued to a later date.

25             THE COURT:  Okay.  All right, we'll continue the

3

1    Montana matters.

2           MR. HARDEN:  Okay.  And I also wanted to address the

3    motion that I had filed yesterday regarding a bifurcation of

4    the proceeding.  We're prepared to go forward on all the

5    matters today, but I'm concerned, having received a

6    disconcerting letter from Acstar, that the Court make a

7    finding and I would request the Court to make a finding that

8    I have no duty to Acstar to—not to bring this before the

9    Court—and in fact that it's my responsibility and within

10   reasonable prudence as a trustee that it be brought before

11   the Court and it's been brought before the Court and that we

12   are properly before the Court.

13          I think we can address the jurisdictional issue if

14   you want to.  I think we're here under 9019 and the

15   *Nationwide* case.  We're not here to discuss Acstar's

16   responsibilities under the bond or their duties to pay under

17   the bond.  All of that is between them and the SEC, and if

18   there's a question of avoidability, the SEC is willing to

19   take that risk in Georgia, but I want to make sure that the

20   Court—that this is the proper posture and that the Court

21   agrees that I'm the proper person to bring this before the

22   Court and that it's being brought properly before the Court

23   before we go forward.

24          THE COURT:  You mean the motion to settle?

25          MR. HARDEN:  The motion to settle, that's right.

1    The motion that we're about to hear, I presume.

2            THE COURT:  Okay.  Mr. Flanagan, you want to be

3    heard on that?

4            MR. FLANAGAN:  Your Honor, I think Mr. Harden saying

5    he attached my letter to his motion, we probably need to

6    address that particular letter.  He indicates that he

7    received a disconcerting correspondence from Acstar, and

8    there's been a series of correspondence between the parties

9    about this pending application, and we have requested that he

10   withdraw that application, and if the matter needs to go

11   forward in the state of Georgia, it can go forward in the

12   state of Georgia.  It doesn't need permission from this Court

13   to go forward in the state of Georgia.  If they reach a

14   settlement down there, then they can bring it back up here.

15           But I just didn't want there to be any confusion as

16   to what we thought ought to happen, so I wrote him a letter

17   and advised him that I wanted him to advise his carriers that

18   he was going forward despite the indemnity agreement that we

19   will be discussing, I feel sure, in more details later on.

20   That brought about this motion.

21           I would contend that as we stand procedurally, him

22   requesting that you enter an order that he had authority to

23   file the application simply is not before the Court properly

24   at this time, and I don't really know what good that would

25   do.  You know, he can do whatever he wants to do as far as

5

1   filing an application, the way I look at it.

2         The jurisdictional issues really are at the heart of

3   the arguments for later on today when we discuss the

4   application.  I've read the *Nationwide* case, which, of

5   course, you decided and it was upheld by the 4th Circuit.  We

6   do not believe that case is controlling and are prepared to

7   argue that.

8         The other two matters he seeks in his motion to

9   bifurcate, (1) the effect of pursuing the application on the

10  viability of a bond, that certainly is for the Georgia court.

11  You know, we would contend, and I think quite forcefully, at

12  least in Georgia, that if this collusion and fraud—and I use

13  those terms in the legal sense, not in any bad connotation—

14  but if there's collusion and fraud between the SEC and Mr.

15  Harden on behalf of IHI, it may in fact terminate that bond.

16  But that is for a later day and a later court.

17        The third indication is he's wanting you to enter a

18  ruling that there's no personal liability of the trustee for

19  the actions that he is taking.  Well, I don't know the end

20  result of the actions that he's trying to take, but we would

21  contend, as we will later on this morning, that if there's a

22  contractual obligation between IHI and Acstar, that IHI will

23  not increase the risk to Acstar under the bond if there's a

24  contractual obligation, if he agrees not to settle the case

25  without our permission.  If he agrees to take certain other

6

1   acts that are prohibited, clearly prohibited, by the

2   indemnity agreement, which in essence is the application for

3   the bond, then there may be some personal liability as well

4   as liability of the estate. But again, we do not believe

5   that that is properly before this Court at this time on

6   simply his application to go forward.

7        With that being said, we are prepared to argue the

8   matters out in his motion or go ahead and have the entire

9   matter heard or do whatever the Court pleases, of course.

10        THE COURT: Okay. All right. Well, I tend to agree

11   with Mr. Flanagan. I'm not sure that the issue's mine to

12   decide. I mean you can either bring the application or not.

13   You've brought it. We're here. I'm prepared to rule on it.

14        Before we get to the specifics though, I mean let

15   me say I've read everybody's brief here and I'm pretty much

16   familiar with what the issues are, but I want to focus for a

17   minute on the big picture, and we've got a number of parties

18   that have adverse interests. They are in some situations

19   aligned and in other situations adverse to each other. We've

20   got the trustee; got the SEC; we've got Acstar; we've got Mr.

21   Van Etten, who I assume claims a lien on these bond proceeds,

22   has a claim against the estate, who is also a defendant with

23   respect to the SEC and the class action in the Montana

24   litigation and possibly a defendant with respect to the

25   trustee, although no adversary proceeding—I don't believe an

7

1    adversary proceeding's been brought.  We've got Montana;

2    you've dealt with that.  We've got Mr. Gilbert, who wants a

3    class action.  I recently denied his motion for relief from

4    the stay.  We've got the claimants.  We've got different

5    classes of claimants.  We've got the claimants that entered

6    into sales agreements with the debtors, and we've got other

7    creditors whose claims arise from other circumstances, like

8    Chittenden Bank, and we've got insurance companies other than

9    Acstar who may have some liability in this case.  We've got

10   this lawsuit pending in Georgia; we've got an action in

11   Montana; we've got this class action in the Eastern District

12   of North Carolina.

13          And I guess my question is—and I know you've

14   probably worked on resolving all these matters—is there a

15   possibility of some comprehensive settlement in this case?

16   And my question is, is this a good case where mediation would

17   be helpful, and I just throw that out and I don't want to

18   know the specifics of any of your settlement talks.  I just

19   raise this question because obviously if there can be a

20   settlement of all this, that's going to be in everybody's

21   best interest, but I don't want to waste everybody's time and

22   I certainly don't want to waste the Court's time by going

23   down that road if nobody thinks—or if somebody thinks—that

24   that's not a good idea.  Mr. Harden, do you have any thoughts

25   on that?

8

1        MR. HARDEN:  Well, Your Honor, in a sense I feel

2    like I'm serving as a mediator right now, and we are making a

3    lot of progress toward getting these issues resolved.  Right

4    now the only party who seems to be totally opposed to

5    settlement is Acstar.  I think that once we resolve their

6    issue, then, you know, Mr. Van Etten—we're about to make a

7    settlement proposal to Mr. Van Etten, and we can do that

8    within a couple of days practically.  We've taken his

9    deposition.  We know what his assets are, and we know how

10   strong our preference claims are and are ready to do a deal

11   with him.

12        The Montana litigation is, Mr. Wood, I think about

13   to be resolved.  All we want you to do is approve a

14   settlement of this litigation so it can go back to Atlanta

15   and Judge Story can decide whether he wants to enter the

16   settlement or not.  This takes three levels of approval.  You

17   know, with the SEC approving it—they've done that—you need to

18   approve it.  But it's not a done deal until Judge Story

19   enters the consent order, and Acstar's going to be able to go

20   down there and argue that entering the order would void the

21   bond.  They can make their arguments to Judge Story.  Judge

22   Story has jurisdiction over the bond.  The Court really

23   doesn't have jurisdiction over the bond.  I don't think

24   anybody argues that you do, except that there's a

25   reversionary interest which is property of the estate that

9

1    I'm trying to protect.

2           I'm not sure that—I think mediation would just add

3    another—at least in this point in time—it would be premature

4    and would add a layer of administration that we don't need

5    right now.   That's my opinion.

6           THE COURT:   Anybody else want to speak to that?

7           MR. FLANAGAN:   Your Honor, we would mediate.   The

8    problem we have, he indicates that Acstar is the only person

9    who is opposed to settlement in this matter, and less than a

10   year ago, my client was approached by a bond broker, Marsh &

11   McClellan, as to whether or not they would post this—I

12   suppose disgorgement bond is what I would call that, although

13   the SEC may have a better name and a more proper name for

14   that.   My client underwrote and did their underwriting and

15   agreed for a fee to post the bond.

16          One of the major parts of the underwriting dealt

17   with whether or not Van Etten et al, IHI, was going to

18   vigorously defend the matter, and Mr. Wood, if called upon to

19   testify, I believe would indicate that he told the principal

20   parties of Acstar that there was going to be a vigorous

21   defense, that there were in fact viable defenses, and that if

22   the bond was ever called, either IHI or Mr. Van Etten,

23   through some insurance proceeds, would in fact make up the

24   difference, the million and a half, which is going to be,

25   when the next bond premium comes due on June 8, $150,000 of

1   that $3.5 million is going to disappear, according to the

2   agreement between the parties.

3            So I think it is unfair to say that we are the ones

4   opposing—

5            THE COURT:  When you say the agreement between the

6   parties, what parties are you talking about?

7            MR. FLANAGAN:  Well, IHI and Acstar.

8            THE COURT:  Okay, there's no agreement with the SEC?

9            MR. FLANAGAN:  Oh, no, no.  No, no.  No.  But their

10  bond liability remains at $5 million if the preconditions are

11  met, and I think that the SEC has indicated, at least in

12  writing, that we were trying to screw up that bond, and we

13  really aren't.  We're saying the bond's there.  If the pre-

14  conditions of the bond are met, my client is ready, willing,

15  and able to make the payment.

16            However, the concept of a consent judgment that then

17  takes $1.5 million out of our pocket totally flies in the

18  face of our original agreement.  It flies in the face of

19  surety-ship principles, and it just is unconscionable in our

20  opinion.  But yes, we would mediate this matter if it was

21  deemed necessary.

22            Now, if all Mr. Harden wants to do, which I think he

23  certainly can do, is to resolve the amount of his claim with

24  the SEC, then I agree with him.  You know, if he thinks that

25  they've presented sufficient evidence to say they've got a

11

1    six and a half million dollar claim, then that can be

2    resolved today and then everything goes down to Georgia.  We

3    file our motion to intervene; we file our cross-claim against

4    Mr. Van Etten.  You know, we're ready to go.  We're prepared

5    to do that.

6         But the only thing that really should be in front of

7    you, we think, is the actual claim of the SEC, if in fact

8    this is the right forum for that, and I'm not totally sure

9    that you pre-approve a claim like this, and, you know, you

10   look at the proof of claim as two pages and attached to it

11   are the pleadings from Georgia.  There's no place where you

12   find where it's six and a half million dollars.

13        But we'll be glad to mediate, but obviously if the

14   trustee does not think it beneficial—but you look at

15   procedurally, this case was filed on December—excuse me—

16   October 25, I think.  The 341 meeting was December 30.

17   January—the SEC files a proof of claim on January 5, and lo

18   and behold, on January 15, this settlement document that

19   thick appears in court.  I don't think we're being

20   unreasonable to try and examine each line of that and make

21   sure that everything's proper.

22        THE COURT:  Mr. Wood?

23        MR. WOOD:  Your Honor, certainly, as I think you've

24   pointed out, the interests of my client, Mr. Van Etten, are

25   not aligned with everyone else.  We don't agree with

· 12

1   everything Mr. Flanagan says; we don't agree with everything

2   Mr. Harden said; and certainly we've disagreed respectively

3   with the SEC.

4           But the primary comment I wanted to make is that my

5   client is trying to make headway into resolving all of this.

6   This is a nightmare that has been following him around for

7   almost a year now, and I believe we've made some headway with

8   the SEC, and I believe we've made, as Mr. Harden said, great

9   headway with him and with the State of Montana, and we are—

10  I've tried to initiate some discussions with counsel for Mr.

11  Gilbert so all of this can get away, my point being is that I

12  might be of the opinion that a mediation would be of some

13  benefit to force all the parties at a position where they

14  would be trying to make some—what are going to be hard

15  decisions for everyone involved, including my client.  So,

16  with that, I would think that a mediation might be of benefit

17  on behalf of my client.

18          THE COURT:  Okay.  Yes?

19          MR. HICKS:  May I just be heard briefly?  I do

20  agree—I'm Bill Hicks on behalf of the SEC.  I do agree that

21  the issue of the enforceability of the bond is better before

22  the District Court, and I think that the trustee's

23  application is the way to get it there.  On the

24  conscionability issue, I want to state what our view is just

25  so the Court knows.

13

1    We oppose—there originally was a cash bond posted in
2    the District Court case.  The defendants moved to substitute
3    the surety bond which is at issue today.  We opposed it for
4    various reasons, but after some back and forth, the Court
5    ultimately allowed them to do it.  The bond on its face
6    states the conditions of the bond, in essence only that a
7    judgment be entered.

8        None of us knew about the indemnity agreement.  I
9    don't believe the trustee knew about the indemnity agreement,
10   and I don't believe the District Court knew about the
11   indemnity agreement.  It first made its appearance when the
12   trustee filed this application, and then it came in with the
13   objection. So the idea that anyone was involved in trying to
14   do an end runaround it or anything like that is totally
15   false.

16       So the question remains, is the bond enforceable on
17   the terms that are stated in the bond and which were
18   presented to the District Court, or does the indemnity
19   agreement somehow void that?  It's a legitimate question.  I
20   do think it's better for the District Court to address, but
21   that's what brings us to his point.

22       The mediation, I don't feel it would be productive
23   at this stage.  I'm not sure—I'm sorry.  Go ahead.

24       MR. HARDEN:  And your judge has certain
25   jurisdictions I don't think the mediator could infringe upon.

14

1          MR. HICKS:  That's true, too.

2          MR. HARDEN:  You know, this is an administratively

3    insolvent estate at this point, Your Honor.  What we're

4    trying to do here is a sensible deal to the benefit of the

5    creditors that will bring money into the estate, and I think

6    the quickest way to get the thing resolved is to go ahead and

7    start making some decisions, make some rulings, and then

8    things are going to fall into place—that's my personal

9    opinion—to the extent they haven't already.  At least I would

10   ask the Court to give me more time to put some sort of a

11   comprehensive deal together.

12         But I agree with Mr. Hicks.  I think that if we go

13   ahead and approve a settlement today and Judge Story listens

14   to Acstar's arguments, that's the way—that's the quickest way

15   to get some money into this estate.  One way or the other, if

16   that bond—even if it turns out to be void, Your Honor, $3.5

17   million will come back into this estate.

18         THE COURT:  Do you agree with that?

19         MR. WOOD:  Your Honor, there's clearly a promissory

20   note that—where my client loaned the money to the company.

21   My client has a security interest in that, so I think that my

22   client still has a right to enforce—try to enforce that

23   security interest.  Mr. Harden may oppose it.

24         THE COURT:  It's your position that the money—that

25   your client's entitled to that money and not the—

15

1          MR. WOOD:  That's right.

2          MR. HARDEN:  But that's a position we don't share,

3     and that would be an issue that could be resolved.  That's

4     not the best result, but the best result is that we get

5     $5 million free and clear of Mr. Van Etten's lien because he

6     doesn't have a lien on the bond.  I mean if the bond gets

7     paid by the company to the SEC, then the SEC gifts it

8     essentially to the estate, there is no reversionary interest.

9          So we resolve Mr. Van Etten's claim on the

10    reversionary interest immediately, and that's one less thing

11    the Court has to consider.  We don't have to file an

12    adversary regarding that.  If we settle with Mr. Van Etten,

13    which I think we're about to do, you know, there won't be any

14    issues at all involving him.

15          But I'm concerned that there's—we have $34,500 in

16    this estate, Your Honor, and we need to get some quick

17    decisions and generate some funds so we have an

18    administratively insolvent estate to prime this case and then

19    get some things done.

20          THE COURT:  Okay.  Approving your settlement doesn't

21    get you any money though until you go down to Georgia.

22          MR. HARDEN:  But it's a step in the right direction.

23          THE COURT:  Okay.  Ms. Quasarano?

24          MS. QUASARANO:  Your Honor, as you know, Chittenden

25    Bank also filed objections to the SEC settlement.  We have

16

1    had discussions—in fact, just outside in the hallway—further

2    discussions, and probably will be able to resolve

3    Chittenden's objection to the settlement.  I do need a chance

4    to call my client.  So I don't believe it's in Chittenden's

5    best interest to go forward with the mediation either.  I

6    think we can go forward, provided I get an opportunity to get

7    aproval.

8         And my other motion, of course, will still be up

9    today.

10        MR. HARDEN:  Well, Ms. Humrickhouse represents the

11   estate with regard to avoidance actions and has taken Mr. Van

12   Etten's deposition and has something she'd like to add.

13        MS. HUMRICKHOUSE:  I'd like to make a suggestion to

14   the Court with regard to your suggestion of mediation.  I

15   think that it might be a good thing to do for the Court to

16   allow a short period of time of maybe 20 days to try to

17   resolve these issues and then to order mediation.  I have had

18   some very good luck with mediation in proceedings that have

19   been in this court.  I'm hopeful that a lot of the issues

20   might be able to be resolved outside of the mediation, and

21   then we can basically have a mediation that would deal with

22   Acstar if that's necessary.

23        I think that maybe the threat of mediation might

24   make some of the parties deal with it.  Some of these things

25   are going to shake out.  I think Montana will shake out by

17

1   itself.  I think Chittenden will shake out by itself.  I also

2   think that any deal or settlement with Mr. Van Etten, between

3   the trustee and Mr. Van Etten, will occur in that period of

4   time.  But a lot of this is conditional upon funds coming

5   into the estate.  This is an administratively insolvent

6   estate.

7           I have a concern on behalf of the trustee with going

8   forward.  Your view of Mr. Flanagan's position with regard to

9   the bifurcation is something that's given me some concern

10  because I don't think that a trustee who, at least in good

11  faith, is trying to discharge his obligations with regard to

12  getting money into the estate should have to face liability

13  by virtue of filing an application, and that concerns me.

14          I think that we're all ready to go forward, Your

15  Honor.  I mean we can argue the reasonableness of the

16  settlement.  We can tell you the five-prong test by the

17  Supreme Court.  We can go through all of that.  And I think

18  that this Court would be persuaded that this settlement, if

19  funded through a ruling by Judge Story, would be in the best

20  interest of the estate.

21          But I'm concerned that without a ruling by this

22  Court, that the mere filing of this application isn't a

23  violation; it is putting Mr. Harden—like Mr. Crampton, Mr.

24  Holmes—Mr. Harden in a position that is untenable.  I would

25  not want to be in that position myself, and I'm not sure that

18

1    trustees in this district need to be put in that position—or

2    in any district.

3         I think it's unfair for him to follow the rules or

4    think that he is doing so and have to face, you know, the

5    devil or the deep blue sea.  If I don't go forward, I

6    probably am breaching my fiduciary responsibility to the

7    estate because here's a settlement that's on the plate that

8    is just a wonderful no brainer, as he's often called it, and

9    if I do go forward, I risk not only personal liability and my

10   trustee's bond being called upon and members of my firm

11   having liability, and I haven't talked to them about that,

12   but I'm sure the rest of Maupin Taylor & Ellis is a little

13   bit concerned about him going forward today, and I'm not sure

14   that it would be the Court's desire for him to face that

15   liability.

16        And I think that a very limited ruling might be

17   helpful and that the mere filing of an application seeking

18   the Court's authority to decide something should not put him

19   at that risk.  That's the only thing I needed to say, Your

20   Honor.

21        THE COURT:  All right.  Mr. Harden, having heard the

22   other arguments about mediation, do you still feel like

23   mediation would be a waste of time?

24        MR. HARDEN:  At this point, I think I need more time

25   to try to put something together.  I mean at some point

19

1   mediation might be necessary, but I mean I'm not thinking
2   that we'd—

3        THE COURT:  I'll tell you what, let me take a five-
4   minute recess and let you all think about this a little bit,
5   and then we'll decide whether we're going forward.

6        If we go forward with this hearing though, I think
7   the first issue we ought to focus on is the authority to
8   settle and whether or not, based on the terms of the
9   indemnity agreement that the debtor was a party to, you have
10  the authority to settle.  Then if I make that decision, if
11  you do have the authority to settle, then we go forward and
12  hear whether or not the settlement's a good idea or not.  Do
13  you all agree with that?  Okay.

14        All right, recess for five minutes.
15                          SHORT RECESS
16  (CALL BACK TO ORDER)

17        THE COURT:  All right.  Mr. Harden?

18        MR. HARDEN:  Your Honor, we've agreed to a short
19  period to try mediation.  We'd like to have twenty days
20  before you appoint a mediator, or you can appoint a mediator
21  but give us twenty days before the mediation and then call
22  this back before the Court.  The same hearings go back on the
23  calendar in about thirty days, or sometime convenient after
24  thirty days, so we don't lose too much time.

25        THE COURT:  Okay.  All right.  We can put this back,

20

1    Tuesday, June 8; Friday, June 11; Tuesday, June 15.

2              MR. HARDEN:  What was the last day, Your Honor?

3              THE COURT:  June 15.

4              MR. HARDEN:  That would be good for me.  I have 341

5    meetings in New Bern on the 11th.

6              MR. FLANAGAN:  Is that a Friday or—

7              THE COURT:  Tuesday.

8              MR. FLANAGAN:  Tuesday would be preferred by my

9    client, Your Honor, so the 15th would be fine.

10             THE COURT:  Okay.  We'll put all these matters then

11   back on the calendar for June 15 at—could we do it at one

12   o'clock?

13             MR. JANVIER:  Your Honor, the issue with regard to

14   Chittenden Bank or the chargeback accounts was not going to

15   be involved in the mediation, and we'd like to go ahead and

16   hear that once the mediation is set, and everybody else can

17   leave.

18             THE COURT:  Okay.  All right, so you want me to

19   appoint a mediator in twenty days?

20             MR. HARDEN:  Or before twenty days, but we don't

21   want to begin mediation.  We want to try to resolve it before

22   mediation, and we need about twenty days to do that.

23             MR. FLANAGAN:  Your Honor, from what I've heard, I'd

24   like to go ahead and appoint a mediator and Ms. Humrickhouse

25   has proposed someone whom I have no objection to and—

21

1          THE COURT:  Okay, who have you proposed?

2          MR. HARDEN:  She's proposed Jackie Claire.

3          MS. HUMRICKHOUSE:  Jackie Claire.

4          MR. HARDEN:  And that's fine with me.

5          THE COURT:  She's been successful before in this

6     court.

7          MR. FLANAGAN:  Yes, and I think the concept is

8     there's some other matters that can get resolved and should

9     be resolved within twenty days so when we go to mediation, we

10    only have the principal players involved, and so the order

11    would envision not immediate mediation, but frankly twenty

12    days from now is almost as immediate as you can get.

13         THE COURT:  Right.  Right.  Okay.  Well, if no one

14    has any objection then, I will appoint Jackie Claire, and I

15    will call her to see if she's willing to serve.  Is there

16    going to be any problem paying her in this case?

17         MR. HARDEN:  I don't think there will be.  The SEC

18    may have to get approval to participate.  I understand

19    they'll need to chip in as well under the mediation rules,

20    but we have $34,000 in the estate, and I think that would

21    cover it.

22         THE COURT:  My experience in the past is her fees

23    have been very reasonable and she's been very successful.  I

24    hope she can be successful in this case.  All right.  Okay,

25    well, I'll talk to Ms. Claire and appoint her, and if she is

22

1   unable to serve in that capacity, I will get back in touch

2   with you and see if you have—

3          MR. HARDEN:  Okay.  Mr. Flanagan has an alternate

4   that I think is satisfactory to us as well.

5          THE COURT:  Okay, who would that be, Mr. Flanagan?

6          MR. FLANAGAN:  Your Honor, I don't know that we

7   could get him, and his price is a little higher.  I just

8   mentioned Harry Goodhart, who is from Tryon, North Carolina,

9   and Florida, and his resume is remarkable but—and I'd like

10  frankly for some of the folks in this area to meet him.  He

11  would be right at the tops of what I've seen.

12         THE COURT:  Okay.  anybody have any objection to Mr.

13  Goodhart?  All right.  Well, I'll try Ms. Claire, and if she

14  can serve, I'll appoint her.

15         MR. FLANAGAN:  If not, then if you could have

16  someone call me, I will call Mr. Goodhart and check into

17  availability and get his resume to the appropriate

18  individuals.

19         THE COURT:  Okay.  All right, well, that will take

20  care of all those matters except for Chittenden Bank.

21         MR. HARDEN:  Your Honor, there was one thing I did

22  need to mention.  In the concept of people resolving things

23  in this matter, there had been a small effort on behalf of us

24  and the SEC to reach a settlement prior to coming today, and

25  I don't think they thought we made a very meaningful offer

23

1   and there was no counter back, but I did want you to know

2   that contrary to what was said, we did in fact make a

3   settlement offer.

4          THE COURT:  Okay.  All right.  Yes?

5          MS. QUASARANO:  Ready to proceed, Your Honor?  As I—

6   I'm sorry.  As I mentioned earlier, Your Honor, I represent

7   Chittenden Bank.  We filed a motion for releasing reserve

8   account, determination of the applicability of automatic stay

9   or for releasing the automatic stay.

10         We filed for three reasons, Your Honor, because

11  Chittenden is entitled to recoup, setoff, or security

12  interest.  However, today's hearings made it a lot simpler by

13  some discussions that have taken place, including final

14  discussions in the hallway here and I'm going to put those

15  forward and, of course, if my misunderstanding is correct

16  (sic), Mr. Janvier can correct me.

17         But the trustee in the estate no longer disputes our

18  security interest but admits we have a valid perfected

19  security interest.  The question is what chargebacks are we

20  entitled to set off or to take out of security interest.

21         As a little bit of background, I wanted you to know

22  that Chittenden Bank was the credit card processor for

23  International Heritage and anytime a company wishes to use

24  customers' Visa or MasterCards to purchase, they need a

25  credit card processor.  Essentially, we provide

24

1    Visa/MasterCard to them, and they submit the credit card

2    slips to us, and subject to certain net-outs under the

3    contract we give them the money that they're entitled to

4    under the credit cards.

5         Under certain circumstances, customers can charge

6    back the credit cards.  Perhaps you've been familiar with

7    that with other cases or personally, but there are certain

8    circumstances under which they can do that, and when that

9    happens, it's debited against my client's account because we

10   previously, you know, had submitted the card.  Now, in order

11   to address that with various merchants, when we agree to

12   process credit cards for them, there's an agreement for a

13   reserve account, a security interest, specifically to prevent

14   my client from being responsible for disputes between the

15   consumer/customers and the merchant.

16        Now, in this case under our merchant agreement—and I

17   apologize—as Mr. Janvier noted, he found it difficult to read

18   the merchant agreement that was attached to our motion and

19   perhaps the Court did as well.  May I have permission to

20   approach you with an enlarged copy?

21        THE COURT:  Yes.

22        MS. QUASARANO:  Thank you, Your Honor.  Since the

23   issue of the security agreement's been resolved by

24   stipulation, the relevant paragraph is Paragraph 16, and I

25   think it's going to boil down to a phrase, a seven-sentence

25

1   phrase here, the entire dispute, as I understand it, with the

2   trustee.

3        The first sentence of Paragraph 16 says, "Merchant

4   will"—excuse me—"Merchant will pay the bank"—and then if you

5   skip over—"and bank shall have the right to debit merchant's

6   incoming transactions or any other funds of merchant in

7   bank's control"—which would address the reserve account.

8        Then if you go all the way down to (d)—I'm sorry—

9   (d), which is the last sentence of the first paragraph, it

10  says, "Where a cardholder"—and that cardholder would be the

11  customer, somebody who bought something from IHI—"contends or

12  disputes in writing the bank"—and then there's a series of

13  items that they can.  Primarily those deal with they didn't

14  get what they paid for.   That's 1, 2, 3, and 4.  Chittenden

15  Bank's position is, because this says, "Where a cardholder

16  contends or disputes in writing," all we have to do to

17  establish a valid chargeback is get the complaint from the

18  customer in writing under the chargeback procedures.

19       It was specifically my client's intent that they

20  never have to be thrust into the middle of the legitimacy of

21  a cardholder dispute.  Obviously, cardholders may dispute

22  items for merchants throughout the country that are not

23  valid.  They may be unhappy over things that don't have legal

24  merit, or they may have merit, but it's Chittenden Bank's

25  position that we never get in the middle of that.   If the

26

1   cardholder says that it is an improper charge, then we have

2   the right to debit the reserve account.

3        It's my understanding that the trustee's position is

4   that they have the right to analyze the legitimacy of the

5   charges and that they wish essentially many trials to go

6   forward as to whether or not the cardholder has properly

7   disputed these amounts.  The trustee and IHI may have that

8   right to contend against chargeholders directly that they owe

9   money, but Chittenden Bank should not be inserted into the

10  middle of it, and I'd like to allow Mr. Janvier the

11  opportunity to respond.

12       THE COURT:  Mr. Janvier?

13       MR. JANVIER:  Your Honor, the first issue I'd like

14  to address is—well, there are several arguments in the motion

15  that was made.  The first one is that they are entitled to

16  chargeback against this reserve account, and at the time of

17  the petition, there was about $93,000 in the reserve account.

18       In the matter of recoupment and do not need relief

19  from the automatic stay, to the extent that's still an issue,

20  I would cite the Court the *Eastern Airlines* case.  I'd like

21  to hand up a copy of that case.

22       MS. QUASARANO:  Do you have one for me as well?

23       MR. JANVIER:  I do.

24       MS. QUASARANO:  Thank you.

25       MR. JANVIER:  Your Honor, I'll just read a quote

1   from that case.  I really handed it up so that the Court can

2   have it for its records.  And that case says, "Courts have

3   repeatedly and consistently held that chargebacks from

4   deposit accounts are setoffs that must be approved by the

5   Courts."  I'm not going to belabor that argument, but I do

6   think that relief from the automatic stay is necessary.

7        Your Honor, these chargeback accounts are certainly

8   property of the estate. They're held in the name of the

9   debtor.  They're held by the merchant bank in this case,

10  Chittenden.  As Ms. Quasarano said, Chittenden was a merchant

11  bank for International Heritage.  There were a number of

12  other merchant banks out there as well who are in a similar

13  situation.

14        We do believe and have seen no reason why this

15  account is not subject to Chittenden's security interest.

16  The question is, is what is—what is secure?  They're taking—

17  well, the posture of this hearing is that it is a motion for

18  relief from stay, and under Bankruptcy Code, Section 362,

19  Subsection (g), they, of course, have the burden of showing

20  that there is no equity in this account for the debtor.  I

21  don't think they can meet that burden.  I don't think they

22  have met it today.  In order to meet that burden, they have

23  to show, I would contend, legitimate chargebacks of the type

24  described in their merchant agreement in amounts greater than

25  what is in the reserve account, an amount greater than

28

1   $93,000.  I don't think they can do that.

2          The first thing I would point out, pointing to the

3   same paragraph of this merchant agreement that counsel

4   pointed to, is this.  It says under that little subsection

5   (d) at the end of the first paragraph in Section 16, "When a

6   cardholder contends or disputes in writing to bank or to

7   issuers that"—and then it lists a number of things that

8   chargeholders can dispute.

9          Well, Your Honor, I have asked, but not received,

10  and been told that they are not going to provide, at least at

11  this point, evidence that they have received disputes in

12  writing from cardholders.  If they have gotten telephone

13  calls from cardholders saying, "Our goods were defective" or

14  "We didn't get our goods," that is not sufficient to allow

15  them to charge back under this agreement.  I want to see the

16  writings.

17         This is not just the trustee or myself dreaming up

18  this potential problem that's out there.  It's exactly the

19  issue that was addressed in the *Eastern Airlines* case I

20  handed up.  In that case there was an excess of a $1 million

21  chargeback account.  There was a similar provision in the

22  merchant agreement, and the Court held that it was the bank's

23  responsibility to show written chargebacks that they had

24  received from credit card holders.  The bank was unable to

25  come up with those written chargebacks, and the Court held

1   that the reserve account could not be set off or debited and

2   those assets came into the estate.  So this is something that

3   we legitimately need to see.

4          Apparently the practice in the industry, apparently

5   people do call, but call in chargebacks all the time and

6   don't back them up with writing, so this is a concern of the

7   trustee.  And until they do that, I think they fail to

8   demonstrate that there is no equity.

9          What I really would like to let the Court know

10  though—and my bigger concern besides just the documentation

11  concern—is what is going on here and how this is going to

12  affect the estate.  As I said, Chittenden has refused to

13  provide the trustee with any of the chargebacks, or any

14  evidence of chargebacks, they've received from customers.

15  Other banks have.  As I said, there are a number of banks in

16  a similar situation, and the chargebacks that I have

17  received—and they are voluminous—most of them are very, very

18  similar to each other.  Ninety-something percent of them look

19  the same, and I'm going to hand up a sample of one that is

20  similar to the ones I've received from other banks.  The only

21  way it's dissimilar is that this particular cardholder was

22  much clearer because they included a lot more information,

23  but the other ones are coming from the same gist, are coming

24  from the same angle.

25          The first interesting part of this agreement or of

30

1   this chargeback is the last page, and this is—the Court may
2   have seen these before and may not; I'm not sure—this is one
3   of the things that International Heritage was selling.  These
4   are the retail business agreements.  Essentially,
5   International Heritage and its salespeople, or customers,
6   whichever you want to call them, have this arrangement.
7   These salespeople would pay International Heritage a sum of
8   money, in this case $750, to become a retail business agent
9   or salesperson.  This gave them the right to market
10  International Heritage products.
11          Now, under this agreement, this is what they could
12  do.  They initially paid in $750, often by credit card, and
13  then they would start buying and selling IHI product.  When
14  they sold a sufficient amount of product, they earned back or
15  they had the right to get back the $750 in the form of future
16  product.  Now, what this individual charge person is doing on
17  his chargeback is trying to get that $750 back.  Before he
18  could sell sufficient stuff to get his $750 back in the form
19  of future product, IHI went out of business.
20          Now, instead of filing a claim in the bankruptcy
21  case, he decided that he was going to get his money back from
22  the credit card company, and he did this because he was
23  directed to do so—and this was actually prepetition—by the
24  Attorney General's office.  If you look at the fourth page of
25  this chargeback, there's a memorandum from the North Carolina

31

1   Attorney General's Office, Consumer Protection Section,
2   telling or directing IHI former salespeople that one of their
3   options was to charge back against their credit card and that
4   way they could get their money out.  And as counsel has told
5   you, people are continuing to do these chargebacks post-
6   petition.

7        Now, here is my concern and here is the trustee's
8   real concern here.  These individuals are using this
9   chargeback mechanism to get paid without going through the
10  bankruptcy claims process, and this is how it affects the
11  estate.  They charge back against banks like Chittenden.
12  Chittenden says, "Okay, I've got a chargeback and debits
13  against this chargeback account, which is property of the
14  estate."  So through this whole mechanism, these folks send
15  in their chargebacks, they get paid by the bank, the bank
16  gets paid by us, and neither the trustee nor the Court ever
17  has the ability to go in and dispute these chargebacks in any
18  meaningful manner.

19       Now, I hold no opinion and the trustee has not
20  expressed an opinion to me as to whether or not chargebacks
21  like the one I handed up are legitimate, and it's expressed
22  no opinion as to this individual who did this one, Mr.
23  Caldwell, or Ms. Caldwell, having legitimate claim in the
24  bankruptcy.  I don't hold an opinion on that.  The opinion I
25  do hold is that the Bankruptcy Court is the place it needs to

32

1   decide that.  I don't think they should be able to get paid

2   and have estate assets in the form of a chargeback account be

3   depleted without it coming through this Court, and that is

4   why we're here objecting.

5          Now, this agreement does say that where a cardholder

6   contends or disputes in writing to a bank, that they have the

7   right to chargeback.  I don't think you can read that to mean

8   any contention or any dispute.  I think there has to be some

9   legitimacy to that.  They can't take a complete sham

10  chargeback, which some of these may be determined to be—they

11  can't take one of those and use it and therefore take money

12  out of the reserve account that's property of the estate.  I

13  think there has to first be (1) they have to show that it was

14  made in writing so it complies with the agreement; (2) they

15  have to show that there is some legitimacy to it, and the

16  best way to do that is to have those claims, those chargeback

17  claims, determined right along with the claims which are

18  going to be filed in this Bankruptcy Court because my guess

19  is the same people who are filing chargebacks are filing

20  proof of claims and under the exact same reasoning.

21         So, that is why we're here objecting to them taking

22  the chargebacks.  No. 1, we haven't seen the chargebacks and

23  we don't know if there's even writing to back them up.  But,

24  No. 2, we haven't been given access to determine whether

25  these chargebacks have any legitimacy, and we need the

33

1   account to stay in place until we can do that.

2        As a matter of adequate protection, the bank really

3   can't get more protected that it is now.  The account's

4   sitting in their bank.  So there is no danger in just leaving

5   the account where it is.  We may in fact come forward with a

6   motion for turnover, and if we made a turnover demand of that

7   account, that's a different issue.  But we certainly think

8   that just to let them have the account based upon the

9   evidence before the Court now without the trustee having an

10  opportunity to see and contest it would not be correct.

11  Thank you.

12        MS. QUASARANO:  May I respond to those?

13        THE COURT:  Yes.

14        MS. QUASARANO:  My arguments fall down in four main

15  categories, and they're brief, but one, recoupment was not an

16  issue because they had conceded our security interest.

17  However, if this Court—I believe that recoupment would be

18  entirely appropriate because everything arises out of

19  chargeback processing.  It's clearly one transaction, and

20  although it's not directly before you, I would ask that you

21  order or enter a ruling that recoupment is appropriate in

22  credit card processing.  However, for the record, we have not

23  recouped.  When we learned of the petition, we did freeze the

24  account, and because we didn't want to take these actions

25  that may in violation of the bankruptcy code.

1          Two, as to the positions in *Eastern*, first of all,

2     Mr. Janvier didn't cite that in the response and I didn't

3     scour through that case in preparation for today's hearing,

4     but I have read it in the past because I represent credit

5     card processors and I'd just like to note that to my

6     understanding, there's no similar document with the language

7     of a cardholder contending in writing in *Eastern* that I

8     recall, and in that case, the merchant processor, I believe,

9     virtually admitted that they had no backup or documentation

10    for chargebacks, and that's simply not the case here today.

11    Chittenden does have backup.  I have no knowledge of any

12    telephone chargebacks.

13          It is true that I did not voluntarily turn over

14    certain information relating to the chargebacks to Mr.

15    Janvier, based on discussions that we had about this motion

16    where I understood his only question was the legitimacy of

17    the chargebacks.  Both Mr. Janvier and Mr. Holmes (sic) had

18    told me, "Well, maybe these customers are right.  Maybe

19    they're filing sham chargebacks."  And my client's position

20    is it's irrelevant if the chargeback itself is valid or not.

21    Under the contract, as long as they submit a chargeback to us

22    disputing their transaction with the debtor, we have the

23    right to take those monies out of the reserve account.

24          Looking at the documents provided by Mr. Janvier,

25    these don't look like sham chargebacks.  These are the types

35

1   of things that people have gone through and prepared in

2   accordance with the credit card processing rules through

3   their issuing bank where they've put a valid dispute in

4   writing.  And I have an affidavit from my client that says

5   that they have received over $129,000 worth of chargebacks

6   that they have had to pay that conform—that are within the

7   scope of Paragraph 16 of our agreement.

8          If the Court would like to rule that we actually

9   have to give paper copies of the chargebacks to prove that

10  the consumer contended the dispute, I would be happy to

11  comply with that; but I did not want to feed the argument

12  that we have to prove the legitimacy.  Chittenden Bank

13  nowhere stepped into the role of arbitrating disputes between

14  the customer and IHI.  The fact that IHI granted a

15  prepetition security interest in this reserve account gives

16  us these rights.  They signed an agreement with the terms,

17  and the terms weren't that you have to prove that each

18  dispute with a cardholder is legitimate.

19         So, even though this account may be property of the

20  estate, it's subject to our security interest, as Mr. Janvier

21  just said, and our security interest allows us to charge the

22  account when a customer disputes in writing to us.

23         Mr. Janvier would like to stop this process where

24  consumers get credit on their charge cards for charges that

25  they believe are invalid or fraudulent.  If the trustee had

36

1   really wanted that process to be stopped, there is a

2   mechanism within the Bankruptcy Code, Section 105, Relief for

3   Extension of the Scope of the Automatic Stay.  It could have

4   been an option.  I don't know whether this Court would or

5   would have not granted such a request.  I certainly believe

6   that customers who purchase items on charge cards have rights

7   under those charge cards, even though a bankruptcy petition

8   is filed, but the trustee didn't do that.

9       So this process has gone on, and my client has been

10  personally charged—as personally as a corporation can be

11  charged—with 129,000, or I think my attribute is

12  approximately 120—the number rose every day--$120,000 in

13  charges that are directly attributable to IHI.  We advanced

14  those funds, and now they have been taken back from us.

15      Because there is no equity in this account, we have

16  already processed chargebacks that exceed the amount, and

17  because there's no reorganization, there's simply no reason

18  today that we shouldn't be granted relief from the automatic

19  stay.

20      And again, I do have an affidavit, and if this Court

21  rules that that doesn't satisfy the burden of proof, I'd be

22  happy to produce copies of the written chargebacks in that

23  amount as long as the Court's ruling is clear that all I have

24  to do is demonstrate that the cardholders contended there was

25  a dispute, not that their dispute is a legitimate one.

37

1        Thank you, Your Honor.

2        THE COURT:  Okay.  Mr. Janvier?

3        MR. JANVIER:  Your Honor, again, the effect of that

4    ruling would be—let me start this way.  With respect to

5    Chittenden, they stopped processing IHI credit cards in—I

6    think it was June of '98—so even four months prepetition,

7    there were no new monies being paid to IHI, no new charges

8    coming through.  The chargebacks that happened after post-

9    petition were at least four or five months old, and most of

10   them much earlier than that, I suspect, although again I

11   haven't seen the documents.

12        So these claimants are able to come in postpetition

13   and take money of the debtors without this Court or the

14   trustee being able to do anything about it.  Now, if

15   Chittenden has been paying these customers back, I think that

16   may have been a mistake.  I think maybe they should have come

17   into court and had some resolution of this.  I don't think

18   they can pay the customers back and then come in and say,

19   "Oh, we are safe because we've got $93,000 in estate money

20   that we're allowed to charge back on."  I think they do have

21   some burden of making sure the chargebacks are legitimate.

22        And as for the chargeback I handed up, I'm sure this

23   person did pay $750 for a retail sales agreement, retail

24   business agreement.  My question is, is he entitled to that

25   money back or not, and that's something I think the

38

1   Bankruptcy Court will have to decide, and until it does, I
2   don't think Chittenden is allowed to take this money, and I
3   think it would be a very clear question if the credit card
4   holders individually were coming and taking estate money.
5   That would clearly be a violation of the automatic stay, but
6   that's in effect what's happening.  It's just one step
7   removed. They're taking from Chittenden, and Chittenden is
8   taking it from us.  I don't think that makes a difference.  I
9   think the result is the same, that estate assets get depleted
10  without this Court or the trustee having a say in it.

11          So, I would ask that the chargeback account stay
12  where it is and that Chittenden have to prove or that
13  Chittenden bring before the Court the issue of whether or not
14  these chargebacks are legitimate, because like I said, my
15  guess is—my hypothesis is—they're all very much the same,
16  that they all look much like the one I handed up unless they
17  are different from the other banks that are out there.  This
18  one is from Centura; it's not from Chittenden.

19          THE COURT:  Okay.  Well, Chittenden finds itself at
20  this point in a situation of not taking money from the estate
21  but they're in the paying out business at this point.  These
22  claims are going to keep coming in, and I mean it may be it
23  has that effect on the estate, but Chittenden does have a
24  security interest and—

25          MR. JANVIER:  Your Honor, they do to the extent that

39

1  they got—and the one chargeback's in writing, which we don't

2  have evidence of—

3          THE COURT:  Right, but they'll supply you with that.

4          MR. JANVIER:  --and they'll supply that.  But I also

5  think that there is a—that these chargebacks must have some

6  legitimacy.

7          THE COURT:  It doesn't say that in the agreement

8  though.

9          MR. JANVIER:  Well, Your Honor—

10         THE COURT:  I mean you say it's an unwritten—

11         MR. JANVIER:  It doesn't say, "Even if"--you know,

12  it doesn't say after that, "Even if these things are

13  completely fanciful."  I think you read a duty of good faith

14  and fair dealing into every contract.  I think you read

15  reasonableness into every contract, particularly—and I think

16  you construe the contract's against them since they drafted

17  it—but I don't think this gives them a blank check to take

18  estate assets anytime somebody writes them a letter saying,

19  "I want my money back."

20         THE COURT:  All right.

21         MS. QUASARANO:  Very briefly, Your Honor, is that my

22  client isn't just voluntarily paying off, you know,

23  individual checks to people.  The credit card processing

24  system is a net out system among various banks, and we are

25  being charged these to the credit card processing net out

40

1  system.  I mean I don't have a choice.  And as you've noted,

2  we are continuing to pay out on customers who file valid

3  chargebacks.  We have to continue to pay for IHI's debts.

4        The agreement was specifically drafted to protect us

5  in this type of a situation and not to require us to inquire

6  into, you know, the legitimacy of the dispute between the

7  customer and a merchant.  And even in good faith, we're more

8  than performing as we continue to address chargebacks from

9  IHI.

10        And the trustee does have a remedy.  If the trustee

11  feels that a particular chargeback was improperly granted and

12  that a customer has absolutely no basis for this, they may

13  file a claim.  They may file a claim.  They can file a

14  lawsuit against them saying, "Now, your action, which was

15  void and fraudulent and everything else, resulted in a

16  depletion of the security account that could have been

17  property of the estate if the chargebacks hadn't exceeded the

18  amount."  And there's a procedure for the trustee to do so,

19  so they're not without a remedy here.

20        THE COURT:  What's the bank's remedy at this point,

21  say if I did allow you to take the $93,000; where are you

22  then?  I mean do you just continue to have these losses?

23        MS. QUASARANO:  Yes, we will continue to have the

24  losses; however, we will be permitted to apply this money

25  that was in our—you know, in the bank's accounts to our

41

1   losses.  As of this time, you know, we have incurred—we have
2   not accessed that reserve account.

3        THE COURT:  Right, but the bank has no defense at
4   all to these?  All you need—

5        MS. QUASARANO:  No.  The defense is that we initiate
6   through the credit card processing rules, which we are doing
7   vigorously because every charge credit that comes in, we may
8   have to pay out more money.  However, we have already been
9   charged back.  I mean Visa has said, "These are valid
10  chargebacks.  They are coming out of your account,
11  Chittenden," period—for one hundred and twenty-some thousand.
12  We have another $22,000 still pending.

13       THE COURT:  Right, but if one comes in today, as it
14  probably will, what's your defense?  I mean is there any
15  defense to it?

16       MS. QUASARANO:  No, there are only very limited
17  defenses under the credit card rules, so we look at a
18  chargeback for those purposes, but we could very well
19  continue to be held liable for ongoing chargebacks.

20       THE COURT:  Have you asserted any defenses with
21  respect to these?

22       MS. QUASARANO:  Yes, we have, Your Honor.  We have.

23       THE COURT:  What are those defenses generally?

24       MS. QUASARANO:  Oh, it can be that someone hasn't
25  attached the required—for example, if a consumer makes a

42

1   claim that the debtor promised it a refund in writing and the

2   debtor never gave the refund, never processed it on their

3   credit card, under the Visa rules, then you have to attach a

4   copy of the promise from the debtor.

5        THE COURT:  Okay, but those are all technical

6   things?

7        MS. QUASARANO:  Right.  It's only technical defenses

8   that we're entitled to make.

9        THE COURT:  So if you get all the paperwork, then

10  you've got to pay it out, even though it's a bogus claim?

11       MS. QUASARANO:  Right.  We don't get that

12  opportunity.  So we've been defending vigorously, but many of

13  these will be valid under the Visa/MasterCard system. And

14  when I had talked to Mr.  Janvier earlier, I said, "Visa's

15  ruled on these."  And, you know, his opinion was that Visa's

16  ruling can't affect property of the estate.

17       MR. JANVIER:  Your Honor, and that's part of my

18  problem with this, is that Visa is ruling on things that

19  affect estate monies instead of this Court, and I don't trust

20  Visa to rule quickly on it.

21       THE COURT:  Well, does Visa get into the legitimacy

22  of the claim?

23       MS. QUASARANO:  Not to my knowledge.  It's more of a

24  proof system because remember—and I could—Your Honor, if you

25  have a specific question about this, I would prefer to answer

43

1    it with a brief when I have an expert who can give you—but

2    I'm going to tell you—

3         THE COURT:  Right.  Well, I'm just thinking, I mean

4    if I bought a refrigerator and paid for it with my Visa card

5    and everything was fine and I just sent in a claim that I

6    wanted my money back—

7         MS. QUASARANO:  Perhaps it might get honored under

8    the Visa system, but the store would still have recourse

9    because they could go back against you.  Remember,

10   Visa/Mastercard is simply a payment system—okay?—and it's not

11   designed to be the ultimate arbiter of every dispute between

12   consumers and merchants.  It's a method of electronic

13   transfer of funds that facilitates commerce.  The banks that

14   participate in this system facilitate that, and there are

15   rights under the system for cardholders.  But, you know,

16   those rights aren't perfect.  The system isn't perfect.

17        If you had a series of specific questions about how

18   Visa ultimately decides these disputes, I could—I'd have to

19   go get an expert—but I know from this case and other cases

20   that the merchant bank, the processing bank, sends them back

21   with whatever dispute that they have, primarily technical

22   effect.  I've only seen technical.  And then Visa decides if

23   it's going to be valid or not, and then if the customer

24   itself—if IHI has a problem—they can sue the consumer and not

25   use Visa as an intermediary.  Visa was never intended to

44

1   intermediate between all consumer disputes.

2          MR. JANVIER:  Your Honor, that's sort of an illusory

3   remedy.  I mean I don't think that this Court really wants

4   the trustee to go filing twenty, thirty, fifty thousand

5   lawsuits against consumers around the nation who did

6   allegedly illusory chargebacks.  It makes much more sense as

7   a practical matter to let—well, to have the banks here and do

8   it very simply with a few banks rather than with, you know,

9   however many tens of thousands of chargeback customers—

10  chargeback individuals—around the nation.  I mean it's just

11  not practical for the estate to go after all those

12  individuals.

13          And, yes, the Visa/Mastercard is a payment system,

14  but I don't think it's such an illusory payment system that

15  the debtor can get paid by a credit card and, you know, not

16  know if they're really paid, and somebody can come and charge

17  it back a year later and get money out of their reserve

18  account.  I just don't understand credit cards to work that

19  way.  There needs to be some finality, and we're not—you

20  know, neither the trustee nor International Heritage was a

21  part of this Visa system except that they were, you know,

22  allowed to accept charge cards.  You know, we're not privy to

23  whatever hearing, but I assume there are no hearings.  I

24  assume there's just paperwork that's going to the Visa system

25  to determine whether it's legitimate or not.

45

1      THE COURT:  Well, on the other hand, I mean
2  International Heritage did sign this agreement, and they
3  wouldn't have had a MasterCard or a Visa processor unless
4  they agreed to these terms so—

5      MS. QUASARANO:  I don't want to take up too much of
6  the Court's time, but my client needs a less illusory, you
7  know, more substantial and with deeper pockets than one
8  person, but that doesn't mean that under the terms of the
9  agreement it's our obligation to prove the legitimacy of the
10 chargeback.

11     THE COURT:  Okay.  Well, let me think about this a
12 little bit and I'll let you know my decision.  At a minimum,
13 I would require at least the paper writings and the names of
14 all the chargebacks so that the trustee could at least match
15 those up with the claims that have come in.

16     Anyway, I think there are good arguments on both
17 sides of this.  Do you have any other cases, any cases you
18 want me to look at?

19     MS. QUASARANO:  Well, I had cited in my brief—
20 perhaps I could request the opportunity to just submit a
21 supplemental brief on *Eastern* if necessary, just a paragraph,
22 since—

23     THE COURT:  Well, just a paragraph.
24     MS. QUASARANO:  Okay.  We'll—okay.
25     THE COURT:  Not more than that.

46

1           MS. QUASARANO:  Okay.

2           THE COURT:  Okay, we can adjourn for the day.

3           MS. QUASARANO:  Thank you, Your Honor.

4                    (HEARING CONCLUDED)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

In Re:     International Heritage, Inc.
           International Heritage, Incorporated
           98-02675-5-ATS
           98-02674-5-ATS


C E R T I F I C A T E

I, Jane W. Clapp, having been tested and approved by the Administrative Office of the Court in Washington, D.C., to provide transcription of legal proceedings from electronic sound recordings, do hereby certify that the foregoing is a true and accurate transcript, to the best of my ability, of the above entitled matter.


*Jane W Clapp*                    2-14-00

Jane W. Clapp                          Date