UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

**FILED**

International Heritage, Inc.
International Heritage, Incorporated

FEB 22 2000

98-02675-5-ATS
98-02674-5-ATS

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

### TRANSCRIPT OF HEARING

### APPLICATION FOR AUTHORITY TO ENTER INTO SETTLEMENT AGREEMENT

BEFORE THE HONORABLE A. THOMAS SMALL
UNITED STATES BANKRUPTCY COURT
RALEIGH, NC

### SEPTEMBER 22, 1999

**APPEARANCES:**

Trustee:   *Holmes P. Harden*

Attorneys for Trustee:   *James A. Roberts, III and James T. Johnson*

Attorneys for Acstar Insurance:   *Michael Flanagan and Paul Fanning*

Attorney for Stanley Van Etten:   *Brent Wood*

Attorney for Chittenden Bank:   *Kathryn Koonce*

Attorney for U.S. Securities and Exchange Commission:   *Susan Sherrill*

Attorneys for Executive Risk Specialty Insurance:   *Jonathan Sasser, Gary Dixon, and Stacey McGraw*

Bankruptcy Administrator:   *Marjorie K. Lynch*

Courtroom Deputy:   *Christine A. Castelloe*

---

**Transcribed by:**        Jane W. Clapp
1907 Wandering Way Drive
Charlotte, NC  28226
(704) 366-1057

233A

2

1    **Proceedings recorded by electronic sound recording;**

2    **transcript produced by transcription service.**

3    (Note:  All names and case citations will be spelled

4    phonetically unless verifiable spellings are available.)

5    (CALL TO ORDER)

6        THE COURT:  All right.  Mr. Harden?

7        MR. HARDEN:  Your Honor, let me just set the stage

8    before I turn this over to Mr. Roberts here, who represents

9    the estate and has represented the estate in the declaratory

10   judgment action and actually negotiated this settlement for

11   the most part.

12        Since the Court denied our request for a Rule 105

13   injunction, we've gone back to the insurance company and have

14   renegotiated this deal, and the good news is that the deal is

15   still in place and there are some minor modifications, the

16   most significant of which obviously is that no injunction is

17   going to be required by the insurance company as to the

18   existing lawsuits, and Mr. Van Etten has agreed to release

19   the insurance company from obligations under the policy.  So,

20   in other words, Mr. Van Etten has said he will release the

21   insurance company from any obligation to defend him in the

22   existing lawsuits and any lawsuits that any third party may

23   want to file against him in the future.

24        There will not be a dismissal of the—the dismissal

25   of the existing lawsuit is not going to be required.  It will

3

1  be provided for in the alternative in the settlement

2  document, but it's not going to be a requirement for

3  settlement, nor will the resolution of the Montana

4  proceedings be required, although if they can be resolved,

5  then obviously the insurance company would like to see that

6  happen.

7       I think what that means, Your Honor, is that many of

8  the objections that have been raised are mooted, particularly

9  the concerns about the 105 injunction and the jurisdiction

10  over third parties, and we're really just left with the

11  question of the literal merits of the settlement:  Is it a

12  good settlement for the estate?  And Mr. Roberts can address

13  that.

14       Let me just add before he begins that one of the

15  objections that have been raised by a number of these parties

16  has been the fact that Mr. Van Etten is going to receive

17  $275,000 from the insurance company, but that was noticed to

18  creditors, Your Honor, because we wanted to make sure that

19  everybody understood it and in the interest of full

20  disclosure, but Mr. Van Etten, under the policy, has a

21  separate individual claim against the insurance company.  He

22  is settling his issues with them, and we are settling our

23  issues with them.

24       He's also agreeing to release the insurance company.

25  He has an uncertain future in terms of what the litigation

4

1    may be down the road.  He's paid an enormous amount in legal

2    bills so far.  This is not going to be even enough money to

3    reimburse him for that.  And he literally, by going ahead and

4    settling with the insurance company in a kind of commitment

5    manner, is making this settlement for the estate also

6    possible.

7         So, I don't have any problems with the fact that

8    he's receiving some money from the insurance company.  That

9    amount was negotiated between those two parties and really

10   shouldn't have any bearing on the merits of this settlement

11   today, in my opinion.

12        THE COURT:  Okay.  Mr. Roberts?

13        MR. ROBERTS:  Thank you, Your Honor.  Your Honor, if

14   I might approach and hand you the settlement agreement and

15   release, Mr. Dixon, who represents Executive Risk, he and I

16   were on the telephone up until about 11:30 last night trying

17   to work out language for the modification that Mr. Harden

18   described for you.

19        Your Honor, the settlement agreement was modified

20   essentially to tailor the proposed settlement to Your Honor's

21   ruling that you entered back on August 27, 1999, when there

22   was not a Rule 105 injunction entered by the Court.  The two

23   changes that Mr. Harden alluded to remove the requirement

24   that there be dismissals in place in the underlying actions

25   that are subject to our complaint for declaratory relief.

5

1   That is no longer a requirement.  The requirement that a Rule

2   105 injunction be in place is no longer required.

3          What the revised agreement provides over in 6(a) is

4   that the Bankruptcy Court extend the automatic stay just so

5   long to give the insurance company and the parties to this

6   settlement agreement to effectuate the settlement.

7          The other change that Mr. Harden alluded to is the

8   treatment of the Montana litigation.  As Your Honor, I'm sure

9   recalls, there was a requirement in the original settlement

10  agreement that the proceedings in Montana be resolved as a

11  condition to the settlement going forward, and if Your Honor

12  will look at revised Paragraph 6(c), that is no longer a

13  requirement.  Executive Risk has now waived that condition of

14  the settlement.

15         Your Honor, I guess what I would propose is that we

16  be allowed to give you a little background on what this case

17  has involved and where we have been to get here today.

18         As Your Honor is aware, I was retained by the

19  trustee to represent the estate in connection with the

20  insurance coverage issue pertaining to Executive Risk.

21  Executive Risk had issued a directors and officers liability

22  insurance policy, which included securities claims coverage.

23  The limit of liability was $5 million.  The policy period was

24  June 23, 1997, through June 23, 1998.  International Heritage

25  is a named insured under that policy with respect to

6

 1   securities activity wrongful acts.

 2            There were a series of lawsuits that were filed

 3   against International Heritage as well as certain officers

 4   and directors of the company.  Those underlying actions are

 5   attached to our complaint, which I'm sure the Court has read.

 6   They involve litigation in the states of Georgia, Texas, the

 7   Eastern District of North Carolina, Alabama, litigation

 8   involving the SEC and also the state of Montana.  In, I

 9   believe, six of the actions, Mr. Van Etten, Mr. Savage, and

10   Mr. Smith were also named as defendants.

11            When the underlying action was filed, Executive Risk

12   denied coverage under its policy, and if I might approach,

13   Your Honor, I don't know if you've seen the claim that was

14   filed, I believe in Judge Fox's court, setting forth the

15   basis for Executive's position on coverage.  And I'll try to

16   be brief on setting out Executive's position, Your Honor.

17   Mr. Dixon is here to discuss with the Court in detail, if

18   necessary, the position of Executive Risk that the policy

19   does not provide coverage for the underlying actions.

20            But to briefly summarize the position of Executive

21   Risk, at the time International Heritage submitted an

22   application for insurance, there was a requirement that

23   International prepare an application, and in the application

24   it was specifically required that International identify any

25   fact, circumstance, or situation which it had reason to

7

1    suppose might affect grounds for any claim such as would fall
2    within the scope of the proposed insurance.  Obviously, what
3    the insurance company was trying to do there is avoid being
4    bound with coverage on a prior act.

5         In response to that question on the application,
6    there was a letter that was prepared by International's
7    counsel which described an investigation that the North
8    Carolina Attorney General's office was involved in pertaining
9    to allegations that International Heritage was essentially
10   operating an illegal pyramid scheme.  That letter, Your
11   Honor, is attached to the complaint which Executive Risk
12   filed in its declaratory judgment action before Judge Fox.

13        The application goes on to state that "Without
14   prejudice to any other rights and remedies of the
15   underwriter, any claim arising from any claims, facts,
16   circumstances, or situations required to be disclosed in
17   response to Question 5(c) is excluded from the proposed
18   insurance."

19        So Executive was taking the position that the
20   underlying actions essentially arose and were related to the
21   underlying investigation or the investigation that the
22   Attorney General's office was doing in North Carolina that
23   International Heritage was a pyramid scheme.  And if you go
24   back and you look at the separate underlying actions and
25   analyze the complaints which were filed, I believe seven of

8

1   the eight complaints specifically use the term "pyramid

2   scheme."  The eighth complaint refers to an illegal operation

3   and essentially describes what is obviously a pyramid scheme.

4        And Executive, picking up on this language, stated,

5   "Well, look, all these claims, regardless of how you couch

6   them, you can say they're securities claims, that they're all

7   related to this illegal pyramid operation that was

8   investigated down here in North Carolina in which Executive

9   disclosed on the application for insurance, so therefore,

10  there's no coverage."

11       When we got in the case, we—the first thing we did

12  is we researched the issue of what arguments we had for

13  coverage.  We filed the declaratory judgment action, Your

14  Honor, as you know, in the form of an adversary proceeding

15  before this Court, and we argued or alleged in our complaint

16  that the allegations, certain of the allegations in the

17  underlying complaints, were not in fact related to the

18  pyramid scheme allegation or the representation in the

19  application, but rather alleged independent securities acts

20  violations involving violations of state blue sky laws and

21  violations of the Securities and Exchange Commission Act.

22       So at that point there was a dispute as to whether

23  the underlying causes of action in these underlying cases

24  could be construed to all arise out of the illegal pyramid

25  operation which had been investigated in North Carolina and,

9

1   as I indicated to the Court, was alleged in these underlying

2   cases.

3          At that point, Your Honor, we investigated further,

4   researched further, the coverage question, and we found cases

5   on both sides of it, Your Honor.  There are certainly cases

6   that support Executive's position that regardless of how you

7   style the cause of action, if it arises or relates to that

8   same core of operative facts disclosed in the application,

9   there's no coverage.

10         And I will state, Your Honor, on the record that Mr.

11  Dixon and I have an understanding that anything we say today

12  is in the nature of settlement negotiations, and if this case

13  doesn't get settled, are not going to be used in further

14  pleadings before the Court.

15         But one of the issues that I confronted is how much

16  information do we put in a pleading before this Court setting

17  out all these potential coverage problems that the estate had

18  and one day see that pleading attached to a motion for

19  summary judgment in Judge Fox's court?  But as I stated, Your

20  Honor, we have found a couple of cases that support our

21  position that there should be coverage.

22         Weighing what we considered the relative merits of

23  both positions and after discussing this at length with Mr.

24  Harden, it was our belief that it was in the best interest of

25  the estate, if at all possible, to work out some sort of

10

1   reasonable settlement of the dispute.  At that point there
2   were, I believe, two meetings in North Carolina.  Mr. Dixon
3   was down here at least twice, excluding last night, during
4   which the settlement and some of the basic terms were
5   negotiated.

6        As Your Honor is aware, under the terms of the
7   proposed settlement, the estate is to receive $1,787,500 from
8   Executive Risk.  Executive is also waiving its claim for
9   reimbursement of defense costs of 500,000, which were
10  advanced under the policy and which pursuant to the terms of
11  the policy, if it's determined down the road that there is no
12  coverage, they would be entitled to recoup that $500,000.
13  Executive is also withdrawing its proof of claim in the
14  bankruptcy, withdrawing its proof of claim for 500,000
15  representing the attorneys' fees that were advanced on behalf
16  of IHI in the underlying actions.

17        Your Honor, as far as the $275,000 that Mr. Van
18  Etten is getting out of this deal, quite frankly we see that
19  as a matter between Mr. Van Etten and his insurance company.
20  Mr. Van Etten is a named insured under that policy, and as I
21  think Mr. Harden pointed out, it has been represented to me
22  throughout the course of these settlement negotiations that
23  Mr. Van Etten has expended large sums of money defending
24  himself in these various claims across the United States.
25        So to the extent Mr. Van Etten is getting something

11

1   out of this deal, as Mr. Harden also pointed out, he is

2   willing to go along with the settlement, not requiring a

3   dismissal of the underlying actions, so long as those actions

4   are stayed to allow us to complete the settlement, and in

5   your latest order that Your Honor entered, you certainly

6   invited people that felt that they had a right to seek relief

7   from the automatic stay to apply to the Court for that

8   relief.  And Mr. Van Etten understands that, but he is

9   willing to go forward with the settlement agreement in place.

10          And Your Honor, I don't know if you want to hear

11   further from us on the coverage questions.  I know Mr. Dixon

12   is here to address Executive's position on coverage, and I

13   would ask Your Honor how you'd like to proceed at this point.

14          THE COURT:  Well, it may depend upon how strongly

15   people are objecting.  Of course, several raise the objection

16   that you've got to justify the settlement, and we'll just

17   have to see how they react to that.

18          MR. ROBERTS:  Your Honor, that is where we are now.

19   I'd be happy to address some of the objections that have been

20   made, or would you prefer to hear from the folks that are

21   objecting and allow us to respond?

22          THE COURT:  Well, maybe I'll hear from the

23   objections.  Some of the objections are a little bit

24   different thought.  Acstar has a little bit different

25   objection.

12

1        MR. ROBERTS:  Yes, sir, Your Honor.  I'm prepared to

2    deal with that.

3        THE COURT:  Okay.  Well, maybe you ought to address

4    that.

5        MR. ROBERTS:  Okay.  Your Honor, the objections—

6    before we get to Acstar—the objections that had been lodged

7    as to the Rule 105 injunction and the dismissal of

8    nondebtors, we believe have essentially been mooted now under

9    the proposed language of the revised settlement.

10       But getting to Acstar, Your Honor, as I read the

11   papers that Acstar has filed, they're claiming that they are

12   entitled to reimbursement out of any proceeds of the policy

13   in preference to any other party to this litigation,

14   including the trustee.

15       Acstar has also taken the position that the amount

16   that it is entitled to receive is not property of the estate.

17   I'd like to just briefly address those if I could.

18       Your Honor, based on what we've seen in this case,

19   it does not appear to us that Acstar, as we stand before you

20   today, has suffered a loss whatsoever that would trigger any

21   right of subrogation on the part of the surety.  Acstar has

22   stated in its papers that at some point in the future, it

23   will be required to pay $600,000 of the 4.1 settlement

24   reached in the SEC litigation, but to date there has been no

25   payment made by Acstar which would trigger any subrogation

13

1   rights on the part of the surety.

2            Now, we also question, Your Honor, whether or not

3   Acstar is ever going to sustain a loss in this case.  It's

4   apparent that Acstar's counsel did a fine job negotiating

5   that settlement agreement with the SEC, because the net

6   effect of that is that Acstar is keeping millions of dollars,

7   which it's earning interest on or investing somewhere, for a

8   substantial period of time, and I'm sure Your Honor's

9   familiar with the payout schedule.  Of the 4.1 million, it

10  requires $600,000 within 30 days of the order approving the

11  SEC settlement, $750,000, 120 days thereafter, 750,000 within

12  210 days, and the final 200—I'm sorry—the final $2 million

13  payment is not due until 300 days later.

14           And, you know, one of the issues that Mr. Harden as

15  the trustee followed up on, they've had that three and a half

16  million as collateral posted to secure that payment by.

17  They've had it since—and I may not be exactly correct on my

18  date—but it's my understanding it's been about sixteen months

19  or longer.

20           The order by the District Court down in Georgia

21  approved the transfer on July 1, 1998, so Mr. Harden wrote

22  counsel for Acstar trying to figure out what interest, what

23  other monies had been earned on this collateral that had been

24  posted.  There was no response to that.  It appears to us,

25  Your Honor, highly unlikely—if you do the math on interest at

14

1   the legal rate—it appears highly unlikely to us that Acstar

2   will ever lose a nickel in this deal.

3         MR. FANNING:  Your Honor, this is all speculative.

4   I don't think there's any basis upon which they can argue

5   this.    Well, Acstar was not required to keep the collateral

6   under an interest bearing account.  There's no evidence to—

7         THE COURT:  I understand all that, and you can make

8   that argument in a minute.

9         MR. ROBERTS:  And Your Honor, while we're on that

10  point, as Your Honor's aware, there are arguments on

11  subrogation that it's an equitable remedy, and it allows Your

12  Honor to take into consideration—I think in looking at

13  Acstar's papers, they refer to this equitable subrogation of

14  the surety to be the purest form of equity around.

15        They cite the *Prairie* case, and if we're going to

16  apply equity in this case, Your Honor, it certainly does not

17  seem to—it certainly doesn't seem to us to be equitable to

18  allow Acstar to negotiate a deal with the SEC and Mr. Harden

19  to hold these monies, earn interest, and then come in and

20  claim a priority based on its role as surety.

21        The cases that Acstar has cited on this document of

22  equitable subrogation, beginning with the Supreme Court case

23  of *Pearlman,* we think are completely different than what we

24  have here.  In those cases, they involve a construction

25  surety which was required to complete the obligations under

1    the construction contract which its principal defaulted on.

2    The funds that were in question were held by the project

3    owner or some other third party, and therefore, to our way of

4    thinking, Judge, those analogies and those cases have no

5    application here.

6          What we are talking about is a claim by Acstar to

7    insurance proceeds which Your Honor in two orders has found

8    are in fact an asset of the estate.  So they're trying to

9    apply this subrogation argument not on some separate fund in

10   the hands of a third party such as an owner on a construction

11   project, but rather they're trying to impose it on an asset

12   of the estate.  So we would argue to Your Honor that the

13   cases that they've cited with *Pearlman* and the other ones are

14   not even anywhere near being on point.

15         THE COURT:  Okay.  They also claim a security

16   interest in those funds, I believe.

17         MR. ROBERTS:  Your Honor, I see that.  But again, to

18   the extent they're claiming a security interest, it would

19   seem to us that that issue can be taken up by the Court at

20   the appropriate time.  I don't know if there's been any UCC

21   filings.  I didn't see any attached to any of their

22   pleadings.  That's something that Mr. Harden was looking

23   into.

24         THE COURT:  So it's your position that if this is a

25   good settlement, I can go ahead and approve the settlement

16

1    and we'll deal with their entitlement later?

2         MR. ROBERTS:   That's correct, Your Honor.   And at

3    the subsequent hearing, I mean I would hope that somebody

4    would have an opportunity to cross-examine Acstar on, you

5    know, what's happened with the collateral that was posted.

6    Has there been a true loss?   What monies have they earned on

7    this three and a half million dollars that's been sitting

8    around?   And I would certainly argue to Your Honor that that

9    is a relevant inquiry when you're looking at an equitable

10   remedy such as subrogation.

11        Your Honor, finally in discussing this matter with

12   Mr. Harden over the last several days, it's the position of

13   the trustee that Acstar is essentially asking for more than

14   it bargained for in the SEC settlement, and Mr. Harden will

15   tell you that the SEC settlement negotiations, a major part

16   of those negotiations related to the timing of payments from

17   Acstar which were obviously intended to allow them to earn

18   money such that there really would not be a true loss in the

19   case.

20        Now, Your Honor, I will confess to you that I was

21   not involved in those negotiations between Mr. Harden and

22   Acstar, but the order that was attached—I'm sorry—the release

23   that was attached to the order entered by the Court appears

24   to require, in my reading of the release, a release that

25   would release the insurance companies for the debtor.   And

17

1    that release was attached to the order entered by the Court
2    on June 21, 1999.  It was clear in the order that the parties
3    were going to sign that release, and to my knowledge, that
4    release has not been signed.  There was no objection, as I
5    understand it, within what—ten days, Holmes—objecting to the
6    terms of that release.  And if that release that Acstar
7    agreed to sign controls the deal, Your Honor, we would submit
8    to you that they have waived any claims for subrogation
9    rights against anybody, including Executive Risk.

10        Your Honor, to sum this up, we believe that the
11   settlement is fair.  We believe it's reasonable to pursue the
12   coverage issues for the reasons that I advised the Court.  We
13   saw that as a complete roll of the dice.  This settlement
14   allows the estate to recover approximately 1.7, 1.8 million
15   dollars, presumably quickly if the Court approves the
16   settlement.

17        Regardless of the outcome of the litigation with
18   Executive Risk in this Court and before Judge Fox, that
19   certainly, regardless of the outcome, that was going up on
20   appeal, so you're looking at another substantial delay before
21   any money was coming from Executive Risk.  So we believe that
22   the settlement is fair, Your Honor.  It's in the best
23   interest of the estate.  And we would respectfully ask that
24   you approve the settlement.

25        THE COURT:  Okay.  Now, as to the objections, I

18

1    guess Mr. Callaway's not here representing Montana.   Is SEC

2    represented today?

3              MS. SHERRILL:  Yes, Your Honor.

4              THE COURT:  Yes.

5              MS. SHERRILL:  Susan Sherrill with Securities and

6    Exchange Commission.   Pardon my voice.   Your Honor, in

7    principle we agree with the terms of the settlement

8    agreement.   We don't have any problems with it except that we

9    do believe it needs some fine tweaking.

10             The objection that we filed addressed three issues:

11   (1) Whether the settlement would require a permanent

12   dismissal of our civil action; whether it would require a

13   permanent dismissal of the private litigants' action; and

14   whether it would require a permanent dismissal of the Montana

15   actions.

16             The amendments to the settlement agreement that were

17   presented to me this morning attempt to address all those

18   issues; however, the recitals to the settlement agreement

19   group all the civil actions together, including the SEC

20   action and including the State of Montana action.   Paragraph

21   6(a) of the settlement agreement addresses the dismissal of

22   all civil actions or the entry of an order with respect to

23   the automatic stay, with respect to all civil actions.   I do

24   think the settlement agreement needs to be fine tweaked to

25   exclude the regulatory actions from 6(a) of the settlement

1 | agreement.

2 |      THE COURT:  Okay.  Well, I don't think anybody would

3 | have any objection to that, would you?

4 |      MR. ROBERTS:  No, Your Honor.

5 |      MS. SHERRILL:  And Your Honor, the other point I'd

6 | raise this morning with respect to the settlement agreement,

7 | in light of the order the Court entered in August with

8 | respect to the private litigants extending the automatic stay

9 | to those actions, it seems that the first part of Paragraph

10 | 6(a), which requires dismissal with prejudice of all civil

11 | actions, is unnecessary.

12 |      Other than that, Your Honor, if those provisions of

13 | the settlement agreement can be tweaked to address those

14 | concerns, we should have no problem with these treatments.

15 |      THE COURT:  Okay.  All right.  I don't guess Mr.

16 | Gilbert's represented here today, and his objection was

17 | basically that they wanted to pursue the third party, the

18 | claims against the nondebtors, and that's already taken care

19 | of in your settlement.  All right.  Chittenden Bank.  Ms.

20 | Koonce?

21 |      MS. KOONCE:  Thank you, Judge Small.  Chittenden's

22 | main concern was the same as the SEC's, and it looks like

23 | that has been primarily worked out through the amendment to

24 | the settlement agreement.  They did have some concerns about

25 | the failure—in the actual application—to address the merits

1   of granting the settlement, but those seem to be addressed
2   here today, and we certainly are in favor of having money
3   come into the estate.

4        THE COURT:  All right.  So you don't oppose the
5   settlement at this point?

6        MS. KOONCE:  No.

7        THE COURT:  All right, Mr. Flanagan, Mr. Fanning?

8        MR. FANNING:  Good morning, Your Honor.

9        THE COURT:  Good morning.

10        MR. FANNING:  As you know, Acstar's here in a
11   position as a—looking for subrogation and indemnity.  Under
12   the terms of the indemnity agreement, we're entitled to hold
13   harmless of all liabilities under the indemnity agreement and
14   also we're entitled to a security interest and all sums due
15   under any contract.  I think that's pretty plain.  That's a
16   contractual relationship between IHI, the bankruptcy
17   trustee's predecessor, and Acstar.  They know about—

18        THE COURT:  Okay.  Now, Mr. Robert raises the
19   question about is that a perfected security interest.  First
20   of all, is it perfected, and does it have to be?

21        MR. FANNING:  It does not have to be.  It is my
22   understanding that a security interest of a surety in
23   contracts of this nature are not required to be perfected.
24   No filing is necessary.  I have cases.  I believe the *Alcon*
25   case discusses the fact that a security interest in contracts

1   does not have to be perfected.  In fact, one of the cases

2   said that a surety has a priority over secured lienholders

3   which have an interest in accounts receivable and contracts.

4   THE COURT:  What about Mr. Roberts' argument though

5   that this is a separate fund and I mean it's unrelated really

6   to your claim?

7   MR. FANNING:  I think it has everything to do with

8   our claim.  First of all, it's money that the estate is

9   entitled to, and we step into the shoes not only of the SEC,

10   who is entitled to recover from IHI under several theories,

11   but we also step into the shoes of IHI because we paid on

12   behalf of them.  So any money that they're entitled to, we

13   get it first to reimburse us for the cost that we expended on

14   their behalf.  That's simple surety law.

15   Now, before we go any further, I think it's

16   important to say that Acstar is of the position that if the

17   trustee will stipulate that our rights are not affected under

18   the terms of this settlement agreement, we're fine with it.

19   We can litigate that another day, and we will do that.  I

20   would ask that the money be held in trust pending a

21   determination of the rights of Acstar in this money, and I

22   think that might help us out here today to settle a few

23   claims and we can fight it out later.

24   And he has indicated—Mr. Johnson?  Mr. Roberts, I'm

25   sorry.  Mr. Roberts has indicated that they're fine with

22

1   that, so we're all in agreement.

2          MR. ROBERTS:  Your Honor, as I understand—what is

3   it?  Could I speak with Mr. Harden briefly, Your Honor?

4          THE COURT:  Yes.

5          MR. ROBERTS:  Your Honor, as I understand what has

6   been proposed is that the funds would be paid in to the Court

7   and the trustee would have an opportunity on another day to

8   deal with the issue of whether there's a perfected security

9   interest or whether or not the arguments that have been

10  advanced to the Court about there even being a right of

11  subrogation would be taken up at that time.  Is that

12  basically what we're saying?

13         MR. FANNING:  That's correct, Your Honor.

14         THE COURT:  What's the vehicle for doing that

15  though?

16         MR. FANNING:  I'm sorry?

17         THE COURT:  I'm trying to think what's the

18  procedural vehicle for my making that determination.  That's

19  a determination that ought to be made pretty quickly, I would

20  think.

21         MR. FANNING:  I suppose we could file an adversary

22  proceeding or we could do it by motion.

23         THE COURT:  Well, I would hope we could avoid that.

24         MR. FLANAGAN:  I think an amended proof of claim.

25         MR. FANNING:  An amended proof of claim and they can

23

1   object to that.

2           THE COURT:  Well, we don't need to decide that right

3   now, but I think we probably all agree that this is something

4   that ought to be determined pretty quickly.

5           MR. FLANAGAN:  Your Honor, if I could interject on

6   behalf of Acstar, I would not think that any discovery would

7   be necessary.  They primarily are legal arguments.  I didn't

8   think we could intervene, so to speak, into his motion to

9   approve this insurance settlement.  We could file the

10  defensive motions that we did.  And the purpose and the real

11  thing we were trying to do by all this was to protect our

12  interest.  We didn't know about the settlement.  You know, we

13  got the thing in the mail, we filed it, and we never got a

14  response or reply or anything.

15          I am certainly willing on a very short time frame,

16  willing to have a hearing as to whether or not we are

17  entitled under our—

18          THE COURT:  Well, you've got two theories.  Right?

19          MR. FLANAGAN:  Pardon?

20          THE COURT:  You've got the security interest and

21  you've got the subrogation?

22          MR. FLANAGAN:  Subrogation and indemnity issue.  And

23  subrogation is equitable; it also is contractual.  We don't

24  know their position.  I've heard it espoused for the first

25  time today, two or three different things.  I would need a

24

1  response from them and then a few days—ten days, fifteen

2  days—to file a response to their position, and then we'd be

3  ripe for hearing.  I mean we've done about all the research

4  we know to do until we know what their position is.

5          MR. ROBERTS:  Your Honor—I'm sorry.

6          THE COURT:   Yes.

7          MR. FLANAGAN:  But as Mr. Fanning indicated, the

8  overall settlement is fine.  We just want to protect our

9  right and what we perceive to be a portion of those funds.

10          MR. ROBERTS:  Your Honor, I guess our only concern—

11  and I'm assuming I'm representing the trustee on this matter—

12  would be the issue of what funds were earned on the

13  collateral that was posted by Mr. Van Etten.  You know, my

14  concern on cutting off discovery, coming in here on just the

15  bare bones of the pleading—

16          THE COURT:  Oh, sure, you would need that

17  information.

18          MR. ROBERTS:  Yes, sir.  We would ask that Acstar

19  provide that to us prior to responding to their papers before

20  the Court.

21          THE COURT:  Okay.  All right.  Well, we don't need

22  to decide that right now, but we do need to decide it pretty

23  quickly as to how we're going to proceed procedurally on to

24  determine that issue.

25          Now, has everybody had an opportunity to review the

25

1   new settlement agreement?  I know it was just handed out, but
2   there obviously needs to be a little tweaking, as you say,
3   and there may be other parties that have a question about it,
4   too.  Maybe the thing to do is to take a recess here and give
5   you an opportunity to look at that and work out the language
6   of this, and then we'll come back in court, and I can approve
7   it, assuming everybody's in agreement with this language, and
8   I want to look at it myself.
9        Okay.  Well, let's recess for ten minutes, and I
10  know it's going to be longer than ten minutes but I'm just
11  saying that.
12                         SHORT RECESS
13       THE COURT:  Any progress out there?
14       MR. ROBERTS:  Judge, Mr. Dixon is on the phone with
15  his client.  I think we are making some progress.
16       THE COURT:  Okay.  Do you think it will be before
17  noon or—
18       MR. ROBERTS:  What do you think?  Probably doubtful.
19       THE COURT:  Doubtful?
20       MR. ROBERTS:  Yes, sir.
21       THE COURT:  Okay.  Well, I'll be around the
22  courthouse.  May not necessarily be in my office, but you can
23  find me.  Okay.  Recess until indefinitely.
24                           RECESS
25  (CALL BACK TO ORDER)

1    THE COURT:  Mr. Roberts?

2    MR. ROBERTS:  Thank you, Your Honor.  Your Honor, I

3  will go through the changes that have been agreed upon this

4  morning.  Then at the conclusion of what I've got to say, I

5  think Mr. Flanagan wants to read a short statement into the

6  record.

7    Beginning over on Paragraph—I'm sorry—on Page 4 of

8  the settlement agreement, Paragraph 6(a), the parties have

9  agreed to strike the first sentence down to the second line

10 beginning with the, "the entry of an order."  In other words,

11 we're striking the "dismissal with prejudice of all civil

12 actions pending against IHI and/or the debtors and officers

13 as of the effective date of the settlement."  That's to be

14 stricken.

15   THE COURT:  Okay.

16   MR. ROBERTS:  At the end of that paragraph, the

17 following language has been agreed upon:  "This condition

18 does not apply to the action filed by the Securities and

19 Exchange Commission (SEC)."

20   Paragraph 6(b), "The final approval of a settlement

21 agreement between IHI"—strike "directors and officers" and

22 insert "Van Etten, Savage, and the SEC."

23   With respect to Paragraph 6(c), I think the SEC's

24 counsel would like to be heard briefly on the first part of

25 that paragraph, "Resolution and/or stay of the proceedings

27

1    brought."  I think she had a comment on that for the record.

2            MS. SHERRILL:  Your Honor, as a matter of record,

3    the SEC would object to the language in that provision of the

4    order, Paragraph 6(c)—or pardon me—in the settlement

5    agreement, that addresses the stay of the proceeding by the

6    Montana State Auditor's Office.

7            THE COURT:  Okay.

8            MR. ROBERTS:  Your Honor, those are the changes that

9    we have.  Mr. Dixon informs me that the settlement agreement

10   is on disk down at Mr. Sasser's office and we would be

11   prepared to go ahead and make these changes, along with the

12   order authorizing the trustee to enter into a settlement

13   agreement that's previously been submitted to the Court.

14           There's of course been some changes that would

15   affect the language of the order, but hopefully we'd be in a

16   position to get that to Your Honor today as well.  And I

17   think that Mr. Flanagan had a statement he wanted to read on

18   the record.

19           MR. FLANAGAN:  All right.  It is my understanding it

20   is stipulated and agreed between the parties, the parties of

21   course being the movant and Acstar, that Acstar is not a

22   party to this settlement agreement.  However, it is

23   stipulated that the settlement does not have any effect on

24   the rights, if any, that Acstar has or can assert through

25   subrogation or otherwise to the additional settlement funds

28

1   of $1,787,500.  Acstar does not have—does not claim—any right

2   or entitlement under the policy, but rather only in the

3   proceeds of the settlement.

4        And perhaps after the hearing, we could have a

5   conference to try and work out how to assert these—how to

6   wrap that up in points that you made earlier on.

7        THE COURT:  Okay.  Well, that's my—your statement is

8   understanding of this approval and its effect on Acstar.

9   Now, as to 6(c), will that statement suffice, or do I need to

10  change this 6(c)?

11       MS. SHERRILL:  Your Honor, pardon me.  The

12  Commission would like to see the language with respect to—

13  that begins with "and/or stay of the proceeding brought by

14  the Montana State Auditor's Office" eliminated, and we would

15  object to that as a matter of record.

16       THE COURT:  Mr. Roberts?

17       MR. ROBERTS:  Your Honor, I think the previous order

18  that Your Honor entered allowed Montana to proceed, and I

19  think there was language in Your Honor's order to the effect

20  that so long as they did not seek to recover any monetary

21  judgment against the proceeds of the policy, that they were

22  certainly permitted to go forward with whatever regulatory

23  action that they have.

24       We sort of see that as a moot issue.  It's clear

25  that it's not going to be resolved prior to this settlement

29

1    agreement.  We want the agreement to reflect what is in fact
2    reality.  I mean there still, as I understand from Mr. Wood,
3    there's still some activity going on in Montana, but I think
4    Your Honor has dealt with that issue in your previous order.
5    You haven't stayed the folks in Montana from proceeding as
6    they are now.

7         THE COURT:  Okay.  "The agreement is conditioned on
8    and will not become effective prior to."  What was that,
9    Holmes?

10        MR. HARDEN:  The affected second sentence is
11   essentially to render—

12        MR. ROBERTS:  Well, I mean it gives them an
13   opportunity—gives the insurance company an opportunity to
14   waive that, which they have waived it.  We might be simply
15   talking semantics.  I don't know if Mr. Dixon wants to be
16   heard on that.

17        THE COURT:  Well, I mean it makes sense to me to
18   just take that out, but I mean it's your settlement.  I mean
19   it's not—the Montana action is not going to be resolved by
20   that time, and that could hold up the effectiveness of the
21   settlement.

22        MR. DIXON:  Your Honor, we'll agree to take (c) out.

23        THE COURT:  Okay.  All of (c).  Okay.

24        Okay, anybody else have anything else?  With those
25   changes then, I'll be happy to sign the settlement.  Well, I

30

1  won't sign the settlement agreement, but I'll sign the order

2  approving the settlement agreement.   Okay.   And we can

3  adjourn for the day. Thank you.

4                    (HEARING CONCLUDED)

In Re:      International Heritage, Inc.
            International Heritage, Incorporated

            98-02675-5-ATS
            98-02674-5-ATS


C E R T I F I C A T E

I, Jane W. Clapp, having been tested and approved by the Administrative Office of the Court in Washington, D.C., to provide transcription of legal proceedings from electronic sound recordings, do hereby certify that the foregoing is a true and accurate transcript, to the best of my ability, of the above entitled matter.


*Jane W. Clapp*                    2-14-00

Jane W. Clapp                         Date