**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

*INTERNATIONAL HERITAGE, INC.*
*98-02675-5-ATS*

**FILED**

**FEB 22 2000**

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

**TRANSCRIPT OF HEARING**

OBJECTION TO AMENDED PROOF OF CLAIM

BEFORE THE HONORABLE A. THOMAS SMALL
UNITED STATES BANKRUPTCY JUDGE

RALEIGH, NC.

**DECEMBER 2, 1999**

**APPEARANCES:**

Trustee:  *Holmes P. Harden*

Attorneys for Trustee:  *James A. Roberts, III,*
*James T. Johnson, and Stephani Humrickhouse*

Attorneys for Acstar Insurance:  *Michael Flanagan and*
*Paul Fanning*

Courtroom Deputy:  *Christine A. Castelloe*

---

**Transcribed by:**      Jane W. Clapp
1907 Wandering Way Drive
Charlotte, NC 28226
(704) 366-1057

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2336

1    (CALL TO ORDER)

2    (Names and case citations will be spelled phonetically when

3    verifiable spellings are not available.)

4              THE COURT:  All right, Mr. Roberts.

5              MR. ROBERTS:  Thank you, Your Honor.  Your Honor, as

6    you will recall, the last time we were before Your Honor,

7    there was an application of the trustee for authority to

8    enter into a settlement agreement with Executive Risk, an

9    insurance company that provided directors and officers

10   liability coverage for the company.  Acstar, the surety

11   company involved in this matter, as you will recall,

12   initially objected to the settlement, and during the course

13   of the hearing we were able to get around that issue.

14   However, Acstar, pursuant to Your Honor's instructions, filed

15   an amended proof of claim and we're here today on the

16   trustee's objection to the amended proof of claim.

17             Your Honor, I guess this matter has its genesis in

18   an action that was filed down in Georgia in March of 1998 by

19   the Securities and Exchange Commission, and I know Your Honor

20   is intimately familiar with that litigation.  It was a case

21   that was filed against International Heritage as well as

22   three of the directors:  Mr. Van Etten, Mr. Smith, and Mr.

23   Savage.

24             In an order in March of '98, the Court down in

25   Georgia from the bench entered an order or a ruling that to

3

1    continue its operations, the debtor was going to be required

2    to post a bond.  In the event that there was a judgment

3    obtained in the SEC action, the Court wanted to have funds

4    secured to pay any judgment that may be rendered.

5           As you've seen in the materials that we've provided

6    to Your Honor, there was a $5 million cash bond that was

7    posted by Mr. Van Etten on behalf of the debtor.  The order

8    giving notice and approving this cash bond also provided that

9    the debtor could substitute that cash bond with a

10   conventional type surety bond.  At the time or as part of

11   that transaction, as we pointed out in our papers, Mr. Van

12   Etten got a note from the debtor and also received a security

13   interest in all of the debtor's assets.

14          Now, subsequent to posting that $5 million cash

15   bond, the defendants applied for an order from the Court down

16   in Georgia to allow them to substitute that cash bond with a

17   conventional type surety bond, and that's what brings Acstar

18   into the picture.

19          Acstar posted a payment bond as allowed by the

20   Court, and in exchange for that, they required that

21   collateral in the amount of $3.5 million be transferred from

22   the clerk down in Georgia to Acstar, and they also required a

23   fee of $150,000.  In Attachment C to the materials that we've

24   provided to Your Honor, you will see that Acstar confirmed

25   receipt of those monies on July 2 of 1998.

4

1          Now, following the posting of the bond by Acstar,

2    the trustee, Mr. Harden, back in May of this year had applied

3    to the Court for authority to enter into a settlement with

4    the Securities and Exchange Commission, and as Your Honor

5    will recall, that hearing resulted in an order by the Court

6    that the parties engage in mediation to reach a resolution of

7    the disputes that the parties had, related to the proposed

8    settlement.

9          There was a lengthy mediation that occurred, Your

10   Honor, on June 2.  Jackie Claire was the mediator.  The

11   parties present were Acstar, the trustee, Mr. Van Etten and

12   his counsel, as well as the SEC.  It's the position of the

13   trustee, Your Honor—and I will tell, as you know, I wasn't at

14   the mediation.  Some of the folks here in the courtroom were.

15   And it's the position of the trustee that a global settlement

16   was reached during the course of that mediation, a global

17   settlement disposing of matters pertaining to the SEC action,

18   the payment bond, and claims of the parties in bankruptcy.

19   And the attorneys in the courtroom here other than myself

20   were at that mediation, and if anyone feels compelled to do

21   so, can certainly elaborate on the breadth and scope of the

22   mediation.  But it's the trustee's position that the

23   mediation resulted in a global settlement.

24          The mediation and the settlement that came out of

25   the mediation resulted in an order that was entered by Your

5

1    Honor on June 21 of 1999, and the terms of the order, we

2    believe, are significant, Your Honor.  You approved the

3    surety's payment of $4.1 million.  There was a proposed order

4    to be signed by the Court down in Georgia that provided a

5    payment schedule that Acstar would follow in making payments

6    under the payment bond that it had posted, and as you will

7    recall from the last time that we were before Your Honor,

8    there was a payment plan that provided that the bulk of the

9    monies to be paid by Acstar would not be paid for some three

10   hundred days following the Court down in Georgia entering an

11   order.  And keep in mind, Your Honor, of the 4.1 million, 3.5

12   was going to come from collateral that had been posted by Mr.

13   Van Etten.

14        The order also provided over on Page 3 that "The

15   surety shall have claims in the International Heritage

16   bankruptcy case as set forth in Paragraph 5 of Exhibit A-1."

17   And Exhibit A-1 to Your Honor's order was a copy of the

18   proposed consent judgment to be signed by the Court down in

19   Georgia.  And as a result of the mediated settlement, Acstar

20   got a priority status on a $300,000 unsecured claim.

21        Your Honor also, in Paragraph 6 of your order,

22   instructed the parties to execute a release, a mutual

23   release, both coming from the trustee and also coming from

24   Acstar.  And there's been some discussion in our materials

25   about the scope of that release, and we'll get into that here

6

1  in a few minutes.  But the bottom line is it's the trustee's

2  position that the release that Your Honor ordered the parties

3  to sign disposed of the claims that we're here today to talk

4  about.  That is the subrogation claim by Acstar.

5      Now, following the Court's entry of an order, as you

6  will recall, we applied to the Court for authority to enter

7  into our settlement with Executive Risk.  We applied on

8  August 9 for authority to enter into that settlement, and as

9  Mr. Harden may tell you, on August 13, he received a letter

10  from Acstar, Acstar's counsel, indicating that it had

11  modified the release that had been attached to Your Honor's

12  order back on June 21.

13      Judge, we have set out in our materials the bases

14  for our objection to the amended proof of claim by Acstar,

15  and I'll try to hit these and be as brief as I can.

16      The first thing we would say to the Court, it seems

17  to me that the arguments that Acstar's making about whether

18  they have a perfected security interest and how that

19  interplays with their claim for equitable subrogation are

20  sort of blended here.  We would say to the Court that if they

21  are claiming a security interest, other than through

22  Equitable subrogation, that they were required to make

23  filings under the UCC, which I think is admitted in this

24  case, never happened.

25      The indemnity agreement that Acstar has attached to

7

1    its materials provided that the indemnitors under the bond,

2    which included the debtor, provided a security interest to

3    Acstar in all of its contracts, and they take the position

4    that based upon various legal arguments, that they weren't

5    required to do anything else to perfect that interest.  We

6    would dispute that, Your Honor.  They are saying that the

7    exception in Section 25-9-104 of the UCC applies.  They point

8    out Subparagraph (g).  They say it takes it outside the UCC.

9    We would argue to Your Honor that the exception does not

10   apply to proceeds of an insurance policy, and if you'll look

11   at the definition of proceeds, we would say to you that to

12   the extent they're arguing for security interest other than

13   through equitable subrogation, they were required to make the

14   requisite UCC filings.

15          As we also pointed out, Your Honor, even if there is

16   a security interest, which we dispute, Mr. Van Etten in May

17   of 1998, prior to any claimed security interest by Acstar,

18   received a security interest in all of International

19   Heritage's assets.  He filed the requisite filings with the

20   Wake County Register of Deeds and also with the Secretary of

21   State's office.  Pursuant to the settlement with Mr. Van

22   Etten, as Your Honor is aware, that security interest was

23   avoided, and we would say that inures to the benefit of the

24   estate.

25          Your Honor, it seem to me that the real issue before

8

1    the Court—I guess there are two issues—first of all, the

2    release.  And there's been various things said about the

3    release and what it was intended to do and so forth, and

4    we've attached the release to our materials.  I think it's

5    instructive, if Your Honor looks at the release that the

6    trustee gave to Acstar, and as Your Honor is aware, that

7    release is attached to your order.  In fact, it's the last

8    page of your order in which the trustee released any and all

9    claims, damages, arising from or relating to the SEC action.

10   And the trustee, Mr. Harden, assigned that release and it was

11   his understanding that the trustee was essentially releasing

12   Acstar from anything that related to or arose from that SEC

13   action.

14        Now, Acstar has taken the position that the release

15   that was attached to Your Honor's order somehow carved out an

16   exception for this subrogation claim or was not intended to

17   apply to the subrogation claim.

18        And Judge, we would just say to you that it seems to

19   us that the plain language of the release was intended to

20   effectuate a global settlement of everything arising from the

21   SEC action, the payment bond, and the claims of the parties

22   in the bankruptcy matter.  And, you know, Acstar is on the

23   one hand saying, "Yeah, we've got this broad blanket release

24   from the trustee, but all we were really releasing was Mr.

25   Harden and his law firm from a claim of legal malpractice."

9

1    And I would say to Your Honor that a plain reading of that

2    release simply does not support Acstar's argument.

3         Now, there was some comment made about materials

4    that we supplied to the Court and whether there were ellipses

5    added and so forth.  Your Honor, we attached the release to

6    our materials.  There was no intent to distort anything or

7    mislead the Court in any way, I can assure you.  I think if

8    you look at what we quoted, we quoted the pertinent language

9    of that release, which makes it clear, as the release defines

10   Harden in his individual capacity as Chapter 7 trustee, and

11   also his law firm and also the insurers, that there is a

12   release in place here that disposes of the subrogation claim

13   that Acstar is presenting to the Court.

14        The second issue, Your Honor, that I think goes to

15   the real heart of what brings us here today is whether or not

16   this is a case that the Court should apply the Doctrine of

17   Equitable Subrogation, and we would argue to Your Honor that

18   the cases that Acstar has cited are fundamentally different

19   than what we have in this case.  There was a statement in

20   Acstar's materials to Your Honor that it would be difficult

21   for us to distinguish the *Alcon* case, and we would say to you

22   that the *Alcon* case, *Alcon Demolition*, and the entire line of

23   cases that have been cited by Acstar are fundamentally

24   different than what we have here today.

25        The first fundamental difference, Your Honor, in

1    these cases that Acstar relies upon for equitable

2    subrogation, there was an identifiable contract fund which

3    became owing to the debtor as a result of the surety's

4    performance of the bonded obligation.  For instance, in the

5    *Alcon* case—and I'm sure Your Honor has probably read some of

6    these cases—there was a contractor default, the surety paid

7    laborers and materialmen, and there was a fund from an

8    arbitration that was determined to be owed to the general

9    contractor.  Well, the Court reasoned—and I think its

10   reasoning is significant—that those funds became due and

11   owing as a result of the surety's performance.  And over on

12   page 447 of the *Alcon* case, it states, "The reasoning that

13   underlies such a result"—referring to equitable subrogation—

14   "is that but for the acts of the surety to pay materialmen

15   and laborers and complete the project, none of the contract

16   funds would ever have been owing to the defaulting

17   contractor."

18           So, in other words, in these lines of cases that

19   Acstar's relying on, the funds became available as a result

20   of the surety performing the bonded contract, which resulted

21   in identifiable separate contract funds at that point

22   becoming owing.

23           Judge, there is even a more fundamental difference

24   in our case than the other cases relied upon by Acstar that

25   really goes, I think, to the heart of the whole subrogation

11

1    argument.  If I might hand up a case, Your Honor, that I

2    think illustrates our point, Judge, courts have not applied

3    subrogation unless the claimants in the class that the bond

4    was intended to cover have been paid in full.  And if you

5    think about it, that's an equitable and just result.  In

6    other words, the surety company that comes in and pays half

7    of the laborers or half of the materialmen is not going to be

8    allowed to come in and assert that equitable lien ahead of

9    the class of folks that the bond was intended to protect.

10        And the language in the Supreme Court case, *American*

11   *Surety vs. Sampson* that I handed up to Your Honor, there's

12   some language that appears on Page 3 that I think is very

13   instructive here, and it starts—I'm beginning now with the

14   second to last paragraph beginning with "The Court pointed

15   out that while liability of the surety company had ended,

16   controlling equitable principles forbade the surety from

17   sharing the bankrupt's assets on equal terms with any

18   creditors who were members of the class its bond had been

19   given to protect.  The rule stated by the Court was that

20   while insolvency supervenes, a surety's claim is postponed

21   until payments in full are made to all claimants who are

22   members of the class of creditors covered by the bond."

23        Now, Your Honor, the reason we say this is

24   significant, as you will recall in reading Acstar's

25   submissions to the Court, there is repeated reference to the

12

1    fact that equitable subrogation is intended and applied to

2    prevent the debtor from receiving a windfall.  Well, that's

3    not what we're talking about here.  There's not going to be

4    any windfall.  We would say to Your Honor that the class of

5    people that that bond was intended to protect remain unpaid

6    to this day, and, in fact, based on the number of claims that

7    the trustee has, it is highly unlikely that those people will

8    ever be fully paid.  And, in fact, the SEC has an unsecured

9    claim, I believe, of a little over $2 million, so the folks

10   that this bond was intended to protect—and I don't want to

11   put words in Acstar's mouth—but I believe in their

12   submissions to the Court, they have stated that this applies

13   to securities activities, wrongful acts, and they try to link

14   it up with the insurance policy by saying they've somehow,

15   you know, paid those obligations related to securities

16   activities, wrongful act.

17        As Your Honor knows, we had nine—I believe eight or

18   nine—separate lawsuits that were part of our declaratory

19   judgment action against Executive Risk.  Those folks were all

20   raising claims of securities activities, wrongful acts.  So

21   to the extent members of the class that this bond was

22   intended to protect remain unpaid, the Court should not, in

23   our judgment, Your Honor, apply the Doctrine of Equitable

24   Subrogation.  Again, there's no windfall here.  It's doubtful

25   that there are going to be sufficient assets to pay that

13

1    class of folks that were intended to be protected by this

2    bond.

3            As Acstar has also pointed out in its materials,

4    what we're talking about here, Your Honor, is equity.  It's

5    an equitable doctrine.  They cite the *Prairie State* case,

6    referring to equitable subrogation as pure unmixed equity

7    having its foundations and principles of natural justice.

8            If Your Honor doesn't allow the equitable doctrine

9    to be applied here, there's not going to be an windfall, as I

10   stated.  If you balance the equities here, Judge, we would

11   say that that balancing tips considerably in favor of the

12   estate.  We have pointed out to you that there was a $150,000

13   premium paid to Acstar, that they have earned money on that

14   collateral, and you know, we may have calculated it wrong,

15   Judge.  You know, we had that telephone conference.  We did

16   the best we could.  I think looking back at it last night, it

17   seems to me that both Acstar and the trustee are both wrong

18   in their calculation, but if they can explain how they got

19   it, I'm probably willing to defer to them.

20           But be that as it may, they earned in excess of

21   $200,000.  I think we can say that safely.  What was their

22   calculation, Jim, 240—

23           MR. JOHNSON:  Theirs may have been 220.

24           MR. ROBERTS:  Or 220, so they've gotten their bond

25   premium.  They've gotten over $200,000 that they've earned on

14

1    the collateral.  They've gotten this enhanced priority on the

2    $300,000 claim that elevates their status in the bankruptcy

3    to that of these unpaid independent retail sales reps.  So

4    they got that as part of the settlement.

5          And, you know, Your Honor, we're not here to squeeze

6    Acstar on this release or put Mr. Flanagan in an awkward

7    position.  We're not trying to do that.  What we're saying to

8    the Court is that when that settlement was negotiated, it was

9    the belief of Mr. Harden, Ms. Humrickhouse, and Mr. Wood that

10   that was a global settlement.  That was it.  Acstar was going

11   to get this enhanced priority on its claim.  It was only

12   paying 4.1 million on a $5 million bond.  It was getting the

13   benefit of the collateral that had been posted, and it was

14   getting, as I said, under that benefit by paying that $4.1

15   million over time.

16         It's clear that Mr. Flanagan did an excellent job

17   representing Acstar in that mediation, but they came out far

18   better than the other folks that had been damaged by this

19   bankruptcy, and we would say to Your Honor that to allow them

20   to come into court now and argue equitable subrogation and be

21   subrogated ahead of these folks that are going to get, you

22   know, cents on the dollar, would be entirely, entirely

23   unfair, and so we would ask that Your Honor enter an order

24   affirming our objections to their claim.

25         THE COURT:  Mr. Flanagan?

15

1    MR. FLANAGAN:  I don't exactly know where to start,
2    Judge, but let me give it a whirl.  I think the first thing
3    we really need to think about was the introduction of Acstar
4    into the bankruptcy proceeding, and I haven't gone back and
5    looked at any of these dates since we were here probably—I
6    think it was in May of last year—so give me a little license
7    on being off a week or two.  But I agree with the way the
8    bond was set up.  You have to remember that Van Etten put the
9    money in, in April of '98.  It was not until May of '98 that
10   Van Etten got security documents, etc., etc., from IHI.  I do
11   not believe he ever loaned the money to IHI.  He put the
12   money up, and then they papered it up later on.

13        In any event, the terms of the note in question, I
14   would like to add, clearly illustrate that when the surety
15   bond was put up, the note was paid in full.  Therefore, the
16   security interest he had, disappeared—if he ever had a
17   security interest.  And that makes sense because he then
18   designated where those funds should go.  The guy put a
19   million and a half in the company to try to keep it afloat,
20   bought the bond.  But if you look at that note, that note was
21   canceled.  It was paid in full upon the provision of the
22   surety bond.

23        But anyway, to kind of flash forward a little bit,
24   to stay on track, I think this bankruptcy was filed in late
25   November of '98.  Within a few weeks, somehow this consent

16

1   order deal came together between the SEC and Mr. Harden.

2   Now, I am dumfounded that Mr. Harden was able to put this

3   concept together that fast.  If you read between the lines,

4   the SEC was controlling this deal from day one as far as that

5   lawsuit was concerned.

6          But in any event, in January of '99, an

7   application's filed for approval of the consent order, and I

8   will tell you, yes, my client—I got the case, I think, the

9   day before the answer was due, referred down from Raleigh

10  because everybody in Raleigh was conflicted out of the case.

11  And we got busy in this thing and we started looking at it

12  and we said, you know, we have never seen a situation where a

13  principal, IHI, and the person to be protected under the

14  bond, the SEC, is entering into a consent judgment, in

15  essence, that then requires the bonding company to cough up

16  the entire amount of the bond, and the principal ends up

17  getting the money through this circuitous route.  I mean I

18  just thought it was fascinating the way it was done, and as

19  counsel representing the bonding company, it presented us

20  with a lot of problems on how to get it stopped.

21         But in any event, we ended up in this mediation.

22  You used the words from the bench, "As you now sit, global

23  settlement."  What I thought about—and you have to remember,

24  I didn't know anything about any lawsuit against any

25  insurance company.  Nobody had ever advised—nothing.  There

1   was nothing in the record that would so indicate whatever.

2          We go, we go to the mediation, and I've been sitting

3   here trying to figure out, particularly when I assumed that

4   Ms. Humrickhouse was not here, you know, just out of academic

5   interest or professional curiosity, you know, why she was

6   here, and then I hear it's because "Oh, we all thought it was

7   a global settlement," and this and that and so on and so

8   forth.

9          Well, you know, the only person who knows what was

10  on everybody's mind was Jackie Claire, and she knows what was

11  on my mind, and if we're going to get into testifying what

12  they thought the thing was, I can tell you what I thought it

13  was, but even better than that, I've got documentation.

14         Not to lose my train of thought, in preparing for

15  this thing I sat down and I looked at the cases they cited,

16  and basically most of the cases they cited fully support our

17  position, like the *Medicine Shoppe* case, which is a great

18  case for us, things like that.  I said, "Well, what are they

19  going to talk about?"  And it defined itself down to the

20  release.

21         And then if you want to talk about the equities a

22  little bit, and which I can and will talk about in a few

23  moments, it defined itself to the release.  I approved the

24  lease which was attached to your June 21 order.  I mean I

25  signed the consent judgment, the later judgment in Federal

18

1   Court, or the one in front of you.  I think I signed off a,

2   you know, a sheet and faxed it up to Holmes so he could

3   present it to you because you wanted to get this thing off of

4   your plate.  It then had to be approved by the SEC, which was

5   apparently no mean feat.  It then had to be approved by the

6   judge in Georgia, who was just thankful everybody, you know,

7   had resolved about it.

8        So I approved that release.  I read it.  I was

9   comfortable with its terms.  And we'll talk about it in a few

10  minutes.  I sent the thing up to my client to have it signed,

11  and he wasn't happy with the release, and I have espoused

12  some positions in this case, as you always do, that after you

13  fully explain things to your client, you know, you kind of

14  have to go with what they say unless you've got an ethical

15  problem.  He wanted to "clean up the release."  Well, I

16  thought the one that was there was fine, but I changed it the

17  way he wanted to change it.

18       I mean another example of that is the extra $150,000

19  we filed a proof of claim for, you know, for 99/2,000, I

20  mean, you know, you're not going to get anything for that.  I

21  said, "At best, you may get a pro rata for the period of time

22  from early June until the consent order was done," which

23  would be $25,000 or something like that.  But you know, but

24  he's right.  That payment was due in June for the following

25  year, and that bond was still outstanding; therefore, he

19

1  thought he was entitled to it.  A Court of Equity would not

2  give him that.  I concur in that.

3  Back to the release, I started this whole thing off

4  by telling you that in January of '99, I was concerned about

5  the procedure of the case, the way the trustee was agreeing

6  with the SEC without ample time to investigate anything.  I

7  mean he hadn't been trustee but about a month.  But yes,

8  we're going to consent to everything; we're going to dump

9  this SEC case; and the money's going to flip back around and

10 pay my administrative expenses and then go to unsecured

11 creditors, who the SEC apparently would have paid direct, but

12 they used the mechanism of the Bankruptcy Court to do it, and

13 I can't fault any of that.  You know, I mean that was just--

14 that was the deal.

15 But I kept saying we have an indemnity agreement.

16 The indemnity agreement controls IHI, and you, Holmes Harden,

17 in how you're supposed to act.  And number one, it says we

18 get to determine settlement.  In number two, you indemnify.

19 And three, you don't take any actions adverse to our

20 interests.  Just the standard contract.

21 And by the way, you know, all the big bonds I've

22 done is a 5 percent.  This was less than 5 percent.  It's not

23 like it was some exorbitant rate.

24 In any event, we wrote Mr. Harden a letter as surety

25 to principal and said, "You need to withdraw this action."

20

1   We had the right, if called upon, to go down there and defend

2   that lawsuit.  Now, I wasn't very happy about doing it.  I

3   kept asking Mr. Wood, I said, "You know, help me out a little

4   bit on this."  And then he'd tell me more about it and I'd

5   think, well, you know, maybe we need to settle this case.

6   And that's part of what brought about the settlement, was the

7   severity of the actions of Van Etten and IHI.  I mean I

8   didn't want to go down there and try that case.

9        But anyway, we looked at what Mr. Harden was trying

10  to do, and it seemed to us that he was taking actions as a

11  principal that were incredibly detrimental to the rights of

12  the surety, and we had a contractual relationship.  So we

13  wrote him the letter and said, "How about either withdraw it

14  or notify your malpractice carrier and notify your carrier

15  for your trustee's bond."  And we were dead serious about it

16  then and dead serious about it now.

17       That was faxed up to him.  He immediately filed a

18  motion to bifurcate the hearing, and you remember that.  You

19  would not do that that day.  You said everything goes

20  forward.  My letter is in the file and in the record.  I have

21  a copy here if you would like to see that instead of digging

22  through.  You just have to tell me that.

23       So, that happened, I believe, in May, May 3.  I

24  think the hearing was maybe the next day.  Within 30 days, we

25  go to mediation.  Ms. Claire did an excellent job.  I had a

21

1   client that couldn't believe it was happening to him, didn't

2   want to believe it.  After a little while, he got in the

3   swing of things and assisted us in getting this thing

4   resolved.  Ms. Claire did a handwritten agreement that was

5   signed off by everybody.  A copy of that was attached to

6   what—to our brief?  To our response to their objection.

7           And as you can see, if you read that, there is not

8   one word about a release in that document.  There's no reason

9   for there to be a release in that document.  You know, we

10  weren't even a party to the other lawsuit, but we were

11  agreeing to pay.  Why would we want to release somebody?

12  There's only one reason:  My letter of May 3.

13          And Mr. Harden—and if he's going to testify today, I

14  feel sure he would testify that he had great concern and

15  great pressure from his law firm about my letter.  I handle

16  those for my law firm.  I know what my firm's deductible is.

17  And I mean, like I get a lot of lawyers in my firm that are

18  owed fees and want me to, you know, "Well, you need to sue

19  these people," you know.  "They owe us some money."  I say,

20  "Eh," you know.  That's where malpractice claims come from.

21          And so—but in any event, to resolve the concerns, I

22  wrote out a separate document that specifically stated what

23  Acstar was willing to do, and that was to release him from

24  any personal liability—and his law firm.  That has been

25  attached.

22

1          We then go to the release in question. You are the
2   trier of fact in this particular matter. You're going to
3   read that and you're going to ascertain what it says. But I
4   would like for you to note in the release that I approved—and
5   you know, it's an interesting thing. I sent him that release
6   in early August, the one that we changed, the one that my
7   client changed and I concurred with. I never heard back from
8   him about that, not one single word, not one single letter.
9   I thought it was a done deal. I thought that it was
10  acceptable.

11          But in any event, back to the one attached to your
12  June order, the estate of IHI, the two entities—I can't
13  differentiate between the two—that release does not release
14  either one of those estates. Should not have. There was not
15  a dispute with those estates. The dispute was with the SEC.
16  The release does not release carriers for the estate, for
17  IHI. The release is very clear. It releases Mr. Harden
18  individually. It releases Mr. Harden in his representative
19  capacity. And it releases—I use the word *and*. That may be
20  the wrong word. Here we go. "Holmes P. Harden individually,
21  as Chapter 7 trustee for IHI, or as a principal in the law
22  firm of Maupin Taylor & Ellis, P.A., or"—and I repeat the
23  word—"or their agents, attorneys, employees, officers,
24  directors, and insurance carriers."

25          We released the insurance carriers of Maupin Taylor

23

1   & Ellis, the malpractice carriers, that my letter of May 3,

2   1998, got all stirred up.  Or of '99.  Excuse me.  May 3,

3   '99.  If that is the case and the only case that they're

4   putting in front of you, we stand by our brief.  We stand by

5   the terms.  I'll be glad to try to answer any questions that

6   you've got there that you might want to ask on that.  But

7   it's just clear as a bell.  We did not release the estate.

8            I've kind of gotten ahead of myself, which often

9   happens when you go second, but there were eight reasons set

10  forth.  Oh, and on the equitable deal, I can't—I don't think

11  the *Sampson* case applies to our situation, but I have to go

12  back and try and fit it in.  But I think both sides have

13  briefed each of his eight issues pretty clearly, and I think

14  that we have the bulk of the cases that show that we

15  performed on behalf of the principal to the tune of $600,000,

16  and we are entitled under subrogation rights to $600,000.

17           I've already addressed his (a), which is the Van

18  Etten issue, about Van Etten's security interest.  He didn't

19  ever get one, and if he ever got one, it would cause the loan

20  to be paid.

21           The asserted security interest by Acstar is

22  unperfected.  You know, I've learned a lot of law in this

23  case, and, you know, when you get into something, you rely on

24  your past experience and you use words, and then the deeper

25  you get in it, you realize, you know, the real law is a

24

1  winding path and it fits a little bit differently.  We do not

2  believe—I mean we truly believe that the definition of

3  proceeds excludes proceeds from this particular insurance

4  policy for the reasons set forth.  We don't doubt that the

5  proceeds over and above the $600,000 are in fact property of

6  the estate, but we don't think that 600 ever hits.  Remember,

7  we performed, be it paying labor and materialmen or whoever,

8  we performed.  We have paid the SEC.  The *Alcon* case, we

9  think, supports us.  You're a student of the law.  I know

10 your view of it hopefully is going to be the same as ours.

11         We pretty much have beat that release to death, I

12 think, but again, I would answer any questions you might have

13 of me there.

14         And opposing counsel mentioned that he attached his

15 release and therefore don't fuss at him for any argument he

16 made in his brief.  But, you know, it's got to—we pointed it

17 to you and we pointed it out to you, but the—and maybe he

18 didn't read it carefully enough to start off with, but by

19 omitting the words "dealing with Maupin Taylor & Ellis," and

20 backing those insurance carriers up, to me it sure looked to

21 be misleading.  And when I read that, I mean I got scared to

22 death that if that's what the thing said, then I'd made a

23 mistake back in June.  But then when I got it out and read it

24 word for word and saw how it was, I realized that that was

25 just something in that brief probably in the heat of

25

1   argument, but that part of his brief needs to be totally

2   ignored because it's not what the release says.

3          We're not entitled to equitable relief.  You know, I

4   have a hard time arguing about that because under his view,

5   no bonding company would ever be entitled to equitable

6   relief.  Every bonding company gets a premium.  Every bonding

7   company tries not to pay everything that their bond is for.

8   I mean that's just the nature of business.

9          It's an interesting thing.  If it wasn't a good deal

10  for the SEC—and I mean you've seen them throughout the

11  history of this case.  I mean there's people--what was it—

12  Brendon—can't remember Brendon's last name, the guy with

13  Williams (unintelligible), "I'm not a potted plant"—neither

14  is that guy from the SEC, the best I've been able to figure

15  out.  But they agreed to the settlement.  Nobody wanted to

16  try the case down there.  Everybody was happy with the

17  $600,000.  The fact that we didn't agree to pay a million and

18  a half dollars is really irrelevant to the issue of equitable

19  relief.

20         I've told you about the extra $150,000 premium.  You

21  know, I mean it's there for you to deal with.

22         Global settlement, it's kind of an interesting

23  thing.  As I indicated earlier, the insurance company was not

24  a part of that mediation.  Apparently, there was a suit

25  pending at that time, but we knew nothing about it.  And I

1   don't think it was purposely hidden from us at that time.  I

2   don't know that anybody—I'm assuming that Mr. Harden was not

3   trying to specifically exclude those proceeds because if he

4   had wanted to do that, he certainly should have put more

5   language in that release than he did, you know, like—or any

6   proceeds from the ERSAC policy, or, you know, your release

7   from all that.  He didn't even mention that ERSAC policy or

8   the estate's in his release that he prepared, not me.

9          On October 4 and October 13, we requested of

10  opposing counsel—this was after we had that telephone

11  conference when we ironed out a few things—we requested that

12  they advise us of any additional policies of insurance that

13  might be of benefit to our clients, and Mr. Roberts refused

14  to provide us with that information.  Now, we have since

15  found out there's been another lawsuit filed.  Now, we

16  haven't had an opportunity to see if, in fact, we have any

17  rights in that policy that would be better or worse than they

18  are here.  But, yes, the global settlement, insurance, was

19  just not part of that.

20         Flipping through, let me try to go fast.  Creditors of

21  IHI are injured by this deal.  I looked at the *Medicine*

22  *Shoppe* case.  We think the case totally supports our

23  position.  It's got a great discussion on equitable

24  subrogation as well as 509.  I haven't seen why 509 wouldn't

25  support us.  I think that we're there with 509, but I think

27

1  we're also there with the equitable.  I don't recall if he

2  mentioned—did he talk about need to pay in full?

3       Okay, on the need to pay in full question, the

4  *Kimberly Clarke* case is kind of an interesting case.  It

5  deals with Virginia law, and the Court up there says Virginia

6  law, which is substantive on this point, says that you can't

7  get a right of subrogation or contribution, one or the other,

8  until you've actually paid the funds.  And then the Court

9  properly—promptly—ruled that the judgment could be entered

10 without payment, you know, on a procedural ground.

11      MR. FANNING:  The *Lumbermen* case.  You cited the

12 wrong case.

13      MR. FLANAGAN:  Oh, that was the *Lumbermen's* case—I'm

14 sorry—from Virginia.  *Kimberly Clarke* is the one we cited, I

15 think, from Mississippi that says the reverse.

16      You've been handed up—subsequent to all this, I did

17 some additional work over the weekend trying to get ready for

18 this and came up with what appears to be North Carolina law

19 on point, and North Carolina law on point, if you read the

20 cases carefully, would seem to indicate that if a payment is

21 made, you can go forward with the proceeding.  Now, if a

22 payment is not made, then you can't go forward for that

23 amount.  But if one is made—where are those cases, Paul?  And

24 I'll hand those up, and I would ask the Court—why don't I

25 just hand all those up.  For the Court's ease, if the Court

28

1   has any interest, I have all the cases that we have cited

2   already copied out.

3          THE COURT:  Let me have one.

4          MR. FLANAGAN:  And then the two cases in question

5   are *Harshaw vs. Mustaffa*, which is a 1987 North Carolina case

6   dealing with a bail bond, and when you first—when you read

7   the facts of that case, you'd say, "Oh, they can't go

8   forward," but if you sit back and think about it and if you

9   read what the law is in it and realize that in the *Harshaw*

10  case, no payments have been made, but if you then read what

11  they say the prevailing North Carolina law is, you can see

12  that you can in fact go forward.  And that is in 321—excuse

13  me—362 Southeast 2d 541.  And the other case is *American*

14  *National Fire vs. Gibbs*.  It is an older case, a '63 case,

15  convoluted facts dealing with insurance policies, things like

16  that, Statute of Limitations issues.  The case I am handing

17  up, I have underlined—and I apologize to the Court—under

18  Headnote No. 7, which in fact contains the language which

19  says if there's been a payment, you can go forward; you don't

20  have to pay the whole thing or anything like that.  So I

21  would hand those up to you.

22          And that pretty much is the position of the entity

23  that filed proofs of claim in this matter.  I've skipped over

24  some things.  I don't know what you deem to be important.

25  Oh, oh, Mr. Fanning makes a point, and this is kind of an

29

1    interesting thing.  It's like why was the SEC silent up here

2    in front of you a couple of months ago?  I mean they were

3    here.  You know, why are they giving up apparently what he

4    says they're entitled to under this policy?  I don't know.  I

5    don't know what kind of deals they are.

6         I do know that ERSIC should have paid the SEC before

7    Acstar.  That's what that insurance policy was all about.

8    They should have made that payment.  But if that action had

9    gone forward and that settlement had gone forward, then the

10   SEC would have been paid in full perhaps—I don't know—but

11   perhaps, and the bond would have been canceled and the funds

12   gone back to Van Etten, and Acstar would have been off the

13   hook.  But for some pretty clear reasons, they went at it

14   from the back forward, and here we are today.

15        If the Court has any specific questions, I'll try my

16   best to answer those, but I think as a wrap-up, the release

17   attached to your order protects my client.  We did provide

18   $600,000.  We are entitled to subrogation.  The funds are in

19   fact the same funds.  They all arise out of the same thing.

20   The exact dollar amounts, I think the 221 was right.  Oh, I

21   need to address that.  I don't know where they came up with

22   the 280.  He did not reference that other than the fact that

23   it might be wrong.  I took a calculator, albeit a simple one,

24   and worked down each principal amount, how much interest it

25   would earn for the period of time, then deducted the payment,

1   then did the calculation again, you know, like at that time

2   $2 million times 3.9 percent, got that figure, added it to

3   the principal, then deducted the next payment, and then did

4   it like that.  My figures came out exactly like my client's

5   did, about $221,000.  And if we are wrong, you know, I'd be

6   the first to—if somebody would show me we're wrong—I'd be the

7   first to admit, but until they do, we've got an affidavit in

8   the record which I think controls.

9        On the equitable side, I think you've heard the

10  arguments of both sides.  Do you have any questions of me,

11  Your Honor?

12       THE COURT:  No questions at this time.  Mr.

13  Robinson?  Mr. Harden?

14       MR. HARDEN:  Let me just address a couple.  I've

15  listened to both attorneys speak and I wrote down some things

16  that I felt like I need to correct.

17       Mr. Flanagan was surprised at the speed with which

18  this settlement with the SEC came together.  Well, you know,

19  it took me about five minutes to realize that we had no—there

20  was no benefit to the estate to go forward with that

21  litigation in Georgia, because even if we won, Mr. Van Etten

22  was back there saying, "I want that three and a half million

23  dollars back."  So the estate had no—there was no benefit for

24  the creditors of this estate to go through with any

25  litigation in Georgia; moreover, I didn't have any money to

31

1   do it.  So I said to the SEC, "We need to get those things

2   settled.  You know, I have no money to fight you down there."

3   And they said, "Fine.  We'll access the bond," and that's how

4   the deal came together.  And I couldn't be prouder of the way

5   it came together.  I think that was an excellent result for

6   the creditors.  It happened quickly.  It was the right thing

7   to do.  And, you know, I don't have any apologies to make

8   about the way that thing happened.  It was a great

9   resolution, and I'm happy that it worked out that way.

10          I had no pressure from my firm about, you know, the

11  letter that Mr. Flanagan sent me.  I shared it with them, of

12  course.  What the lawyers at my firm told me was, "What's

13  probably going to happen is Acstar's going to, if the judge

14  enters this order and then the Georgia judge also enters the

15  order down there, they're probably going to refuse to pay on

16  the bond and file a collateral suit down there and bring you

17  into it as a party."

18          But there's no malpractice here.  It's an issue, you

19  know, of whether there's been fraud or collusion, and, you

20  know, we're not concerned about the malpractice issue, but

21  that was the allegation and it was meant—you know, it was

22  obviously meant—to stir everybody up, and it did do that, but

23  that didn't result in any pressure on me and it didn't result

24  in my handling the matter any differently than I would have

25  anyway.  I was going to come before you as a trustee.  I felt

32

1  like I had a certain amount of unity if the Court ruled for

2  me, and the matter would have to be dealt with again in

3  Georgia perhaps, but, you know, there were no—the threats

4  that were made were not a significant pressure to me or to my

5  firm.

6        Mr. Roberts said that the SEC had a two and a half

7  million dollar claim.  They have a six and a half million

8  dollar claim, and so when you look at the 4.1 million that's

9  coming in from the Acstar bond, you will see that there's not

10  enough money to pay the protected class.  I think I need to

11  correct that for Mr. Roberts, because that six and a half

12  million means it's not a fully protected class.

13        I also wanted to point out that Mr. Van Etten had a

14  first lien on all the assets of the estate.  I mean his

15  blanket UCC covers everything, including contracts, general

16  intangibles, the whole works.  Every asset of that bankruptcy

17  was covered by that lien.

18        So I was very careful when we settled this with Mr.

19  Van Etten, in the mediation and thereafter, to ask Mr. Van

20  Etten to agree to avoid his lien.  I didn't want anybody else

21  coming along with a subordinate lien like Acstar, saying,

22  "Well, we're going to move up into that position and we have

23  a right to the three and a half million dollars."  The whole

24  point was to access 551 and preserve that position for the

25  benefit of the creditors.

1        Mr. Van Etten was the first lienholder in the case.

2   We established that, you know, soon after the case was filed,

3   and we knew we had to deal with him and we also knew that we

4   had to avoid the lien and make that position available to pay

5   the claims of the creditors.

6        It was my understanding at the mediation—and I think

7   Ms. Humrickhouse is going to say the same thing, as would

8   Mr. Wood—that we agreed that Acstar would pay $4.1 million

9   into this case and that they would have a claim with limited

10   priority.  It says that in the settlement order.  And that

11   all the issues pertaining to the bond were going to be

12   settled.  And when you look at the release, you will see that

13   the release was drafted to abrogate any claims of

14   subrogation.  I took that release to the attorneys in my firm

15   who practice insurance law and I said, "We have got a

16   complete global absolute settlement here.  Is this release

17   appropriate?"

18        "Yes."

19        I took it to Mr. Roberts, who's also special counsel

20   handling insurance matters in this case.  I said, "Mr.

21   Roberts, is this going to cause me any problems in the

22   Executive Risk or the TIG insurance matters?"

23        "No."

24        That was why it was drafted the way it was drafted.

25   I drafted it with the help of people in my firm, and I'm the

34

1    one who can tell you what it means.  It means exactly what we

2    say it means.  There are no rights of subrogation, period.

3    This was a complete settlement, and that's consistent with

4    that position.

5         Mr. Flanagan didn't reserve any rights against third

6    parties in the settlement agreement, but he assumes that I

7    should have somehow segregated or mentioned in the release

8    the funds that were available from Executive Risk or TIG.

9    Well, my position is Mr. Flanagan should have said, "We're

10   not waiving claims against third parties."  Why should I

11   mention the other insurance policies?  That's not—you know,

12   my job is not to protect Executive Risk in these matters.

13        I also made sure in the settlement agreement there

14   was no admission of liability on the part of the debtor, and

15   the purpose in that was to establish that there's not going

16   to be any problem with these insurance cases later on, and

17   companies like Executive Risk are not going to be able to

18   say, "Well, you know, the real bad guys were the debtor.  You

19   paid on a securities based claim; therefore, you should have

20   been the one making the payment—not us."  There's been no

21   admission of liability.  You know, this company has not

22   admitted that it did anything wrong.  This was a complete

23   compromise between all the parties, and, you know, it's being

24   mischaracterized as something else.

25        Do you want to add any thing to that at this point,

35

1    Stephani?

2         MS. HUMRICKHOUSE:   With the Court's permission, just

3    a couple points if that's all right.   Your Honor, I

4    represented Mr. Harden as special counsel in order to pursue

5    preference actions and avoidance actions.   That was the

6    reason that I was at the hearing, I think back in April or

7    May of 1999.   When this whole matter came to a head, there

8    was a motion pending for the approval of the SEC settlement,

9    and there was a motion to bifurcate by the trustee.

10        The reason I was there, Your Honor, is because an

11   integral portion of this settlement was whether or not there

12   was going to be some ultimate resolution of that $3.5 million

13   that Mr. Van Etten had put up as collateral for the Acstar

14   bond, and we all knew that that had to be dealt with because

15   if all we were going to be able to accomplish was getting

16   funds into the estate that were going to come right back out

17   and go to Mr. Van Etten, we hadn't really done very much.

18        So my recollection—and I hope the Court's

19   recollection is the same as mine—is that we appeared that day

20   on the motion to bifurcate, and the motion to bifurcate was

21   in fact filed in part by the trustee because there was a

22   threat by Mr. Flanagan's client with regard to the propriety

23   of him even filing the motion.   And so there was a motion to

24   bifurcate, and we wanted the Court to deal with that first so

25   that Mr. Harden could go on with dealing with the substantive

36

1    issues.  That motion to bifurcate was not denied, Your Honor.

2    Instead, what happened was Mr. Flanagan stood up and said,

3    "You know, maybe this is something that we should mediate."

4    And we were against it.

5            THE COURT:  No, I don't think it was Mr. Flanagan's

6    idea.  I think it was my idea.

7            MR. FLANAGAN:  Yes, the Court did that.

8            MS. HUMRICKHOUSE:  Well, well, but—I'm sorry—I think

9    that my—and then he said, "Well, that's okay."  Then over

10   here, we stood, Your Honor, and in fact, in a motion, in an

11   action that I took without the permission of Mr. Harden, I

12   said, "Well, wait a minute, Your Honor.  Give us a few

13   minutes.  Maybe that's something we should do."  And the

14   reason we did that was because we realized there were so many

15   issues—there was the issue of Mr. Van Etten and the viability

16   of his security interest.  There was the issue of whether or

17   not Acstar's insurance bond was compromised or whether they

18   had the right to stop a settlement.  That was an issue.

19           And it appeared—and even your order appointing the

20   mediator recognizes that the right way to do this would be a

21   global settlement.  And a global settlement in my mind, and a

22   global settlement, I think, in the Court's mind—and I hate to

23   presume what it was—was that all of these issues would be

24   resolved in one mediation, if possible, and you write in your

25   mediation order—and I looked at it last night—that you will

37

1   expand the scope of the mediation in order to do that, is

2   your penultimate paragraph in your order appointing a

3   mediary.

4        And we had a mediation that was, from the very

5   beginning of it, intended by all parties to be an absolute

6   resolution of all issues between the parties.  We sat around

7   a huge conference table in Mr. Harden's office and we—all of

8   us—realized that unless Acstar could be brought to the table

9   and determined that that could be resolved, that nothing else

10  was going to get resolved because that's where the money was.

11       Now, what may not be apparent to the Court is that

12  Mr. Flanagan did not appear at this mediation by himself.  He

13  had his clients with him—his client, excuse me—a gentleman

14  whose name I cannot remember.  But he was there.

15       So this argument that Mr. Flanagan's making that

16  after he got back and he let the release be seen by his

17  client and that his client didn't like it, is a little bit—I

18  don't know if the correct word is disingenuous—because when

19  Mr. Acstar, I'll call him for want of not knowing his name,

20  left to catch his plane so that he could get back, I think to

21  Atlanta, he said—we all said, "You can't go.  We're not done

22  yet."  He said, "There's only a few things left, and I will

23  let Mr. Flanagan have my authority to do it."  So that

24  release was executed by Mr. Flanagan with the full express

25  authority of his client.  The fact that his client later on

38

1   decided by sitting down and looking at it that maybe he

2   wanted something different is really not—I think it's a red

3   herring.

4          We actually talked about the next premium in that

5   mediation and the fact that everything was all—everything was

6   being settled.  There was not going to be an issue of whether

7   or not another premium would be due because there was one

8   coming up.  We talked about it.

9          MR. FLANAGAN:  I have some concerns, Your Honor,

10  about, you know, are we going to have a full evidentiary

11  hearing on what went on in a ten-hour or twelve-hour

12  mediation?  I—

13         THE COURT:  Well, we're not.  We're not.

14         MR. FLANAGAN:  Okay, thank you.

15         MS. HUMRICKHOUSE:  Yes, I'm only a minute away.

16         MR. FLANAGAN:  Then I would object to this then.

17         MS. HUMRICKHOUSE:  I'm sorry, Mr. Flanagan, I

18  understood you to have been telling a little bit about what

19  happened at the mediation, and since we both were there, I

20  thought I'd let the Court know what my thoughts were.

21         There were two reasons for the release, Your Honor,

22  not one.  The first reason for the release or the first one

23  that is mentioned is the fact that there was an allegation of

24  malpractice and malfeasance by the trustee, and it was made

25  as an individual attack, and that's the way that we

1   interpreted it.  But the fact that the release is worded in

2   the disjunctive as opposed to the conjunctive, I think is not

3   relevant.

4           The trustee is the entity who represents the estate.

5   When you release a trustee—

6           MR. FLANAGAN:  Your Honor, how many people do I have

7   to argue against?  I mean she is not special counsel in this

8   particular matter, and she's gone now beyond what she wanted

9   to say about what went on in the mediation.  I mean I just

10  want to bring it to the Court's attention that she's not

11  counsel in this particular matter, and now she is delving

12  into the legal arguments set forth by Mr. Harden's counsel in

13  this particular matter.

14          MS. HUMRICKHOUSE:  I was there when the release was

15  drafted, Your Honor.  I was in the room.

16          THE COURT:  Right.  I'm—

17          MR. FLANAGAN:  In all due respect—

18          THE COURT:  Right, I'm not going to—

19          MR. FLANAGAN:  --which release are you talking

20  about?

21          THE COURT:  Okay, wait a minute.  Wait a minute.

22  We're not going to get into what happened at the mediation.

23          MR. FLANAGAN:  Thank you.

24          THE COURT:  The release speaks for itself, and I'm

25  going to read the release and I'll determine what it means.

1          MS. HUMRICKHOUSE:  That's fine, Your Honor.  I just

2    wanted to make one other point because—about global

3    settlement—and that's because that was my intent, and if it

4    wasn't the intent of all the parties—and maybe Mr. Flanagan

5    wishes this had happened—then I shouldn't have been there

6    because my issue was something that was tangential to the

7    settlement.  The reason I was there is because one of the

8    issues that had to be dealt with was a settlement with Mr.

9    Van Etten at that time.  And so that's why I was there, and I

10   think that lends credence, if that's all the Court wants to

11   hear about now, to the fact that there was a global

12   settlement.

13          I'm amazed at the fact that this issue has come up

14   at this point based upon my understanding of why we mediated

15   these issues because in my mind, my understanding was that

16   everything was going to be resolved, and that when Acstar

17   agreed to this settlement, it assumed—it said, "This is what

18   we're paying."  And let me tell you, that wasn't easy to get

19   them to say that that's what they were paying.  And that

20   everything else—if Mister—if I, as the trustee's special

21   counsel, were able to recover $50 million in preference

22   actions in this case, it would have no effect on whether—on

23   the amount that Acstar was going to pay.  This is what they

24   were going to pay, and anything else that the trustee could

25   recover was his business, and it was supposed to be a final

41

1    resolution of the issues with Acstar.  And I'm sorry to have

2    taken so much of the Court's time.  It's just it's very clear

3    in my mind what we were supposed to be doing that day.

4         THE COURT:  Okay.  Mr. Roberts?

5         MR. ROBERTS:  Your Honor, I'm happy to say I wasn't

6    at this mediation.  It sounds like it was a lot of fun.  But

7    Your Honor, I don't want to beat this release to death, but

8    as Mr. Harden pointed out, he sent this release over for us

9    to look at, and I looked at it, and when he sent it to me, he

10   said, "This is the deal. They are releasing everything."

11   Okay?

12        When I look at the release that the trustee gave to

13   Acstar, why does Acstar presume that we would be getting back

14   less than we were going to give them in a release?  And the

15   release that Acstar gets clearly waives any and all damages,

16   claims arising from or relating to the Securities and

17   Exchange Commission action.  And I think that speaks volumes,

18   Your Honor, regardless of how the various parties want to

19   interpret the release that was attached to your order coming

20   back to the trustee.  It seems to me that when you look at

21   what they ask of the trustee, it was clear that this in fact

22   was intended to cover what we say it was intended to cover.

23        The argument, very briefly, that they made about the

24   promissory note, Your Honor, that was attached in our

25   materials, or their materials, I guess.  Our materials—I'm

42

1    sorry—as Attachment D.  What that said was that the principal

2    and interest may be satisfied by replacing the cash bond with

3    a conventional surety bond.  We would argue to Your Honor

4    that the obvious intent of that was to allow Mr. Van Etten to

5    get all of his money back.  In other words, if they posted a

6    cash bond—posted a conventional surety bond which replaced

7    the cash bond—and he got his money back, then that would

8    satisfy the debt.  I don't see how you can read it any other

9    way.  I mean it was clear, it seems to me in looking at the

10   documents, that if he got his money back in full, that that

11   satisfied the note.  And I would say, Your Honor, that's the

12   only reasonable way to interpret that note.

13        Judge, what I have not heard from Acstar this

14   morning is a response to our argument that there are still

15   folks out there that were in the class that were intended to

16   be protected by this bond that have not been paid.  The two

17   cases that they handed up to you—and I glanced at these

18   quickly—*The American National Fire Insurance Company* and the

19   *Harshaw* case, it looks to me that both of those—that there's

20   payment in full.  So the surety fully performed.

21        Now, we're not saying, as Mr. Flanagan said, we're

22   not taking the position that no bonding company is ever

23   entitled to equitable relief.  What we're saying is that a

24   bonding company is entitled to equitable relief if it

25   performs in such a way and in such a manner that the class of

1   people that the bond is intended to protect have been paid in

2   full.  Otherwise, the surety has not completely performed its

3   obligations, and we think it would be an absurd result to

4   allow the surety to subrogate and take monies away from the

5   very folks that their bond is intended to protect.

6           And we'll hand up one more case, Your Honor, on

7   509(c).  I believe Mr. Flanagan brought something up on that.

8    We think this case of *Hall, Harley G. Hall*, supports our

9   argument that the surety's got to fully perform, even under

10  Rule 509(c).  And again, Your Honor, we would say to you that

11  if you balance the equities here and you take into account

12  the effect that allowing equitable subrogation has on the

13  very class of people that the bond was intended to protect,

14  that this is just simply not a case for equitable

15  subrogation.

16          THE COURT:  Mr. Flanagan?

17          MR. FLANAGAN:  Just a couple matters.  The

18  promissory note speaks for itself.  I feel sure you'll look

19  at that, Judge.  It's contained in Exhibit D to the trustee's

20  verified objection to Acstar.  The language says, "Principal

21  and interest may be satisfied by replacing the cash bond

22  posted in the action pending in the U.S. District Court for

23  the Northern District."  Now, Mr. Roberts says that's not

24  what it really meant, it meant something else, but that's

25  what it says.  They drew it.

44

1       I think maybe to beat the dead horse for the last
2   time on the release issue, the release does not release the
3   estate.  It does not release carriers for the estate.  It was
4   drawn by Mr. Harden.  If anybody had come forward in the
5   mediation and said, "We've got two or three insurance
6   policies that we're planning on collecting for the same
7   thing," I'm not real sure that mediation would have turned
8   out exactly the way it did.  That information was kept
9   secret, and here we are.

10       But I read the release; you're going to read the
11   release.  I think what people thought that they were doing
12   that day really doesn't have anything to do with that unless
13   you want to have an evidentiary hearing on that.  I'll have
14   to get another lawyer to represent Acstar, and then I can
15   testify and we can get Jackie in here, Ms. Claire in here,
16   and she can testify as to the conversation she had with me.

17       But in any event, the real issue here is that we
18   should not be going behind the written words.  The written
19   words are clear.  509, I think, is clear.  It's been briefed
20   by us.  I haven't had a chance to look at this case and run
21   the citations on this case.  I am comfortable that you will
22   do that.  We would submit to the Court that we are entitled
23   to be subrogated for the amount of funds we have paid out.
24   If that happens, our $300,000 claim, whatever that thing's
25   worth—nobody knows—would be waived, and we would be out of

1    this case.  And that is the position of Acstar in here.

2             Again, if you have any additional questions—and, of

3    course, as Mr. Fanning points out to me, that we're here with

4    a three-pronged attack:  the indemnity agreement, equitable

5    subordination, as well as 509.  And I think that if that

6    release were supposed to release insurance carriers, such as

7    ERSAC, then it should have so stated.  That's it, Your Honor.

8    Thank you for your time.

9             THE COURT:  Okay.  All right, thank you very much.

10   I've got a lot of interesting reading here.  Recess until

11   eleven o'clock.

12                       (HEARING CONCLUDED)

13

14

15

16

17

18

19

20

21

22

23

24

25

In Re:      International Heritage, Inc.
            International Heritage, Incorporated

            98-02675-5-ATS
            98-02674-5-ATS


C E R T I F I C A T E

I, Jane W. Clapp, having been tested and approved by the Administrative Office of the Court in Washington, D.C., to provide transcription of legal proceedings from electronic sound recordings, do hereby certify that the foregoing is a true and accurate transcript, to the best of my ability, of the above entitled matter.


Jane W. Clapp                              2-14-00

Jane W. Clapp                               Date