

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

FILED

MAY 3 1 2000

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF NC

IN RE:                                )
                                      )
INTERNATIONAL HERITAGE, INC.          )      CASE NO. 98-02675-5-ATS
                                      )           CHAPTER 7
INTERNATIONAL HERITAGE,               )      CASE NO. 98-02674-5-ATS
INCORPORATED,                         )           CHAPTER 7
                                      )
        Debtor.                       )
                                      )

MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION
FOR APPROVAL OF COMPROMISE AND SETTLEMENT

NOW COME Stanley H. Van Etten and Wood & Francis, PLLC, and show the Court the

following in opposition to the Trustee's Motion for Approval of Compromise and Settlement:

INTRODUCTION (STATEMENT OF THE CASE)

On 28 March 2000, the Trustee in the above-captioned bankruptcy proceedings filed a

Motion for Approval of Compromise and Settlement.  The substance of this Motion is the

Trustee's request "for an order approving a waiver of the attorney client and work product

privileges with respect to pre-bankruptcy communications between the debtors and their legal

counsel" in exchange for certain purported concessions by the Office of the United States

Attorney for the Eastern District of North Carolina.  Several of Debtors' officers and directors

have objected to the Trustee's Motion.  One of Debtors' attorneys, Wood & Francis PLLC, has

also objected to this Motion.  This matter is currently before the court for a hearing on the

Trustee's Motion and these parties' objections.

## STATEMENT OF THE FACTS

In early 1995, the Debtor International Heritage, Inc. ("IHI") incorporated in North Carolina. After incorporation, the Board of Directors of IHI adopted By-laws in May of 1995 which included the following provision:

> Any person who at any time serves or has served as a director of the corporation, or who, while serving as a director of the corporation, serves or has served, at the request of the corporation, as a director, officer, partner, trustee, employee, or agent of another corporation, partnership, joint venture, trust, limited liability company or other enterprise, or as a trustee or administrator under an employee benefit plan, shall have a right to be indemnified by the corporation to the fullest extent permitted by law against (a) reasonable expenses, including attorneys' fees, incurred by him in connection with any threatened, pending, or completed civil, criminal, administrative, investigative, or arbitrative action, suit, or proceeding (and any appeal therein), whether or not brought by or on behalf of the corporation, seeking to hold him liable by reason of the fact that he is or was acting in such capacity, and (b) reasonable payments made by him in satisfaction of any judgment, money decree, fine (including an excise tax assessed with respect to an employee benefit plan), penalty, or settlement for which he may have become liable in any such action, suit, or proceeding.

> The Board of Directors of the corporation shall take all such action as may be necessary and appropriate to authorize the corporation to pay the indemnification required by this bylaw, including, without limitation, making a determination that indemnification is permissible in the circumstances and a good faith evaluation of the manner in which the claimant for indemnity acted and of the reasonable amount of indemnity due him. The Board of Directors may appoint a committee or special counsel to make such determination and evaluation. To the extent needed, the Board shall give notice to, and obtain approval by, the shareholders of the corporation for any decision to indemnify.

> Any person who at any time after the adoption of this bylaw serves or has served in the aforesaid capacity for or on behalf of the corporation shall be deemed to be doing or to have done so in reliance upon, and as consideration for, the right of indemnification provided herein. Such right shall inure to the benefit of the legal representatives of any such person and shall not be exclusive of any other rights to which such person may be entitled apart from the provision of this bylaw.

Those bylaws were amended on at least two occasions thereafter – December 16, 1996 and March 15, 1997 – however, on each occasion, the Board of Directors of IHI adopted the same exaction indemnification provision as was adopted in the initial bylaws of IHI. In reliance upon

the indemnification of the bylaws of IHI, Stanley H. Van Etten ("Mr. Van Etten"), and numerous

other individuals, continued to act as a director and/or officer of IHI until IHI sought protection

under the Bankruptcy Code on November 25, 1998.

In December of 1995, IHI also entered into an employment agreement with Mr. Van

Etten.  Pursuant to that employment agreement, IHI again agreed to indemnify Mr. Van Etten.

Specifically, that employment agreement provided as follows:

> In return for the services provided to Employee and many risks accepted by the
> Employee on behalf of the Employer in the start-up of Employer, Employer shall
> indemnify Employee to the fullest extent permitted by law against (1) reasonable
> expenses, including attorneys' fees, actually and necessarily incurred by
> Employee in connection with any threatened, pending, or completed action, suit,
> or proceeding, whether civil, criminal, administrative, or investigative, seeking to
> hold Employee liable by reason of the fact that Employee is or was acting in any
> capacity for Employer, and (2) payments made by Employee on behalf of
> Employer in satisfaction of any judgment, money decree, fine, penalty, or
> reasonable settlement for which Employee may have become liable in any such
> action, suit, or proceeding.  In the event that there is any threatened or pending
> action, suit, or proceeding initiated against the Employee pursuant to which the
> Employee may become liable, the Employee shall have the right to demand and
> obtain from the Employer an advance of TWELVE THOUSAND AND NO/100
> DOLLARS ($12,000.00) to insure payment of any judgment, money decree, fine,
> or penalty, which amount shall be deposited in the trust account of Employee's
> chosen counsel, but which shall not relieve Employer from satisfying Employee's
> attorneys' fees and expenses on a monthly basis while the action, suit, or
> proceeding is pending.

Again, Mr. Van Etten relied upon these representations of IHI while providing services to IHI as

an officer and director

At all relevant times, IHI operated as a multi-level marketing company.  Multi-level

marketing companies, which are otherwise known as network marketing companies, are not

regulated by a single government entity even though they often operate nationwide; instead,

multi-level marketing companies are regulated by a wide variety of laws and regulatory agencies.

The applicable laws include lottery statutes, pyramid statutes, securities laws, Federal Trade

3

Commission regulations, Federal Drug Administration regulations, and related registration regulations throughout the country. Obviously, these applicable laws and regulations vary between federal and state authorities, as well as between different state and state authorities. Furthermore, a variety of different regulatory agencies attempt to scrutinize the activities of multi-level marketing companies in the United States, including Attorneys General (or similar entities) in each state, Secretaries of State (or similar entities) in each state, the Securities and Exchange Commission, the Federal Drug Administration and the Federal Trade Commission. As one would expect, the laws and regulatory agencies are not always consistent. As such, a multi-level marketing company like IHI requires the assistance of numerous lawyers to assist the company with the maze of complicated regulatory issues which may arise while a multi-level marketing company is attempting to operate. IHI was no different.

When IHI was initiating its operations, IHI sought legal assistance from at least three different law firms: Jeffrey A. Babener of Babener & Associates ("Mr. Babener"); Daniel Bell of Wyrick, Robbins, Yates & Ponton ("Mr. Bell"); and Georgina Mollick, who was employed at that time by Ragsdale, Liggett & Foley ("Ms. Mollick"). While also providing legal assistance to IHI, these three law firms (at one time or another) also provided legal advice to Mr. Van Etten individually.

After IHI had operated for approximately two years, and in or around April of 1997, the North Carolina Attorney General surprised IHI (and its officers and directors) by alleging that IHI may be operating as a pyramid scheme. After making those allegations, an agreement was reached between IHI, Mr. Van Etten, Larry Smith ("Mr. Smith"), and Claude Savage ("Mr. Savage") which resolved the allegations of the North Carolina Attorney General against IHI. After the allegations were made by the North Carolina Attorney General's office (and in addition

4

to seeking the legal advice of Mr. Babener, Mr. Bell and Ms. Mollick), IHI, Mr. Van Etten, Mr. Smith, and Mr. Savage also sought legal advice from the undersigned (Brent E. Wood of Wood & Francis, PLLC) as well as Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan. Thereafter, the undersigned's involvement with IHI, Mr. Van Etten, Mr. Smith and Mr. Savage increased as a result of other events which will be briefly described hereinbelow.

Not long after the North Carolina Attorney General's office made allegations about IHI and others, the Securities and Exchange Commission ("SEC") initiated an informal investigation of IHI. Soon thereafter, IHI retained the services of Kutak Rock, a law firm in Atlanta, Georgia, to advise and assist the company with regard to its dealings with the SEC. Kutak Rock also provided legal advice to Mr. Van Etten individually, and others, during this investigation.

In March of 1998, the SEC initiated a civil action against IHI, Mr. Van Etten, Mr. Smith, Mr. Savage and International Heritage, Incorporated (a public company with whom IHI merged in March of 1998) (IHI and International Heritage, Incorporated will collectively be referred to as the "Debtors"). After the SEC initiated its litigation in Georgia, the Debtors, Mr. Van Etten, Mr. Smith and Mr. Savage were all represented in those proceedings by, at least, Kutak Rock, Mr. Bell and the undersigned.

Furthermore, after the SEC initiated its litigation in Georgia, other civil actions and one administrative proceeding were initiated against IHI, Mr. Van Etten, Mr. Smith, Mr. Savage, and other officers and directors of IHI. Those actions were initiated in the states of North Carolina, Texas, Alabama and Montana. In those proceedings, IHI, Mr. Van Etten, and other individuals were represented by a number of additional law firms not previously mentioned herein, including: Dechert Price & Rhoads of Washington, D.C.; Gardere & Wynn, LLP of Dallas, Texas; and Sirote & Permutt of Birmingham, Alabama. In one way or another, each of these

5

civil actions have been resolved as to Mr. Van Etten individually, and only one remains unresolved as to IHI (Montana administrative proceeding).

After the Debtors sought protection under the Bankruptcy Code, and apparently, an Assistant United States Attorney for the Eastern District of North Carolina ("AUSA") has communicated with the Trustee for the Debtors about an ongoing criminal investigation of the Debtors and, presumably, some of its officers and directors. As a result of those discussions, the Trustee has filed the motion which is the subject of this memorandum. In that investigation, the AUSA has issued grand jury subpoenas to IHI and Mr. Van Etten. Pursuant to those subpoenas, Mr. Van Etten has, directly or indirectly, produced approximately 175,000 pages of documents to the AUSA, as well as a detailed list describing approximately another 30,000 pages of documents which are attorney-client or work-product privileged. Presumably, these privileged documents, many of which would be privileged as a result to the civil litigation discussed above, would be the subject, in part, of the Trustee's motion.

ARGUMENT

I.    THIS COURT SHOULD DENY THE TRUSTEE PERMISSION TO WAIVE THE DEBTORS' ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES BECAUSE THIS WAIVER IS NOT IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.

In *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985), the United States Supreme Court held that, generally, a bankruptcy trustee has the power to waive a debtor corporation's attorney-client privilege.[1] *Id.* at 358 (during an administrative investigation, the

---

[1] This proposition from *Weintraub* has been accepted by a number of courts. However, at least one court has recognized that the rationale underlying this decision was somewhat flawed. *In re Hunt*, 153 B.R. 445, 451 (Bankr. N.D. Tex. 1992) (pointing out that the Supreme Court's factual conclusion that the trustee receives wide-ranging management authority over the debtor is rather suspect since, only in rare situations, may a Chapter 7 trustee take over any of the corporate debtor's business operations). While this Court cannot reject the *Weintraub* decision, it can apply this rule cautiously. *See e.g., Hunt*, 153 B.R. at 454 (holding that only individual debtors, and not the trustee, can waive an individual debtor's attorney client privilege).

Commission sought to discover information from corporate counsel regarding the conduct of the corporation's prior managers). However, the Court recognized that this power is not unfettered and that "[t]he propriety of the trustee's waiver of the attorney-client privilege can, of course, be challenged on the ground that it violates the trustee's fiduciary duty." *Id.* at 355 (noting that those challenging the waiver argued that the trustee never had the power to waive the privilege and did not argue that the waiver violated the trustee's fiduciary duties).

Initially, it should be noted that this case is distinguishable from *Weintraub* in that this case involves a potential criminal investigation and prosecution, while *Weintraub* involved an administrative investigation. Somewhat unlike *Weintraub*, the Trustee's Motion involves important constitutional issues relating to the rights of accused individuals and entities and to present a full and fair defense in a potential federal criminal trial. As a result, the issues surrounding the Trustee's Motion are more properly before a Criminal District Court Judge or Magistrate. These issues could be heard by a Criminal Court forthwith on a Motion to Compel Production of Documents filed by the office of the United States Attorney regarding the outstanding Grand Jury Subpoenas for which extensive attorney-client privilege lists have been produced. In the event that the Office of the United States Attorney seeks to introduce any of these privileged documents in a criminal trial, this issue will necessarily have to be addressed by a Criminal Court. Allowing the Criminal Court to hear the motion now may prevent duplication of effort and preserve judicial economy. Obviously, the waiver of the Debtors' attorney-client and work-product privileges would potentially subject the Debtors and its officers and directors to criminal prosecution and sanctions. While those officers and directors have vehemently denied any criminal or related civil liability associated with the business activities of the Debtors pre-bankruptcy, the waiver of those privileges associated with the attorney-client relationship

could lead to unnecessary misinterpretations and the prosecution of innocent individuals. Accordingly, the decision whether to allow the Trustee to waive these privileges should be made cautiously and, more likely than not, preserved for a Criminal Court at a later time if necessary.

In addition, the Trustee would not fulfill his duties to the estate by waiving the privileges. "[T]he fiduciary duty of the trustee runs to shareholders as well as to creditors." *Weintraub*, 471 U.S. at 355. "[I]t is beyond dispute that the Trustee's duty is to act in the best interests of the Debtor's estate." *In re Washington Group, Inc.*, 476 F. Supp. 246 (M.D.N.C. 1979), *aff'd*, 636 F.2d 1213 (4th Cir. 1980). Furthermore, the Trustee's "actions must be calculated to bring direct benefit to the estate." *Id.*

In his Motion, the Trustee proposes to waive the privileges "in exchange" for the United States Attorney's "agree[ment] not to recommend or seek the imposition of any criminal penalties, fines or forfeitures against the debtor corporations." In addition, the Trustee mentions that the United States Attorney will "recommend and use its best efforts to insure that any restitution imposed in any criminal proceedings against any individuals and/or entities affiliated or otherwise associated with one or both debtors will be distributed to the creditors of International Heritage, Inc." The Trustee further opines that the waiver of these privileges "may result in the generation of funds with which to pay claims in the International Heritage, Inc. case." However, the Trustee has not attached any draft agreement between the Debtors and the United States Attorney which might clarify the generality set forth in the Trustee's motion.

Furthermore, it must be noted that, in the Motion for Approval of Compromise and Settlement, the Office of the United States Attorney does not agree to enter into a formal Plea Agreement with any corporate defendant (if in fact any corporate defendant is indicted in this matter, which remains to be seen). *See* Rule 11, Federal Rules of Criminal Procedure. Of

8

course, the assent of criminal counsel for the corporate defendant would be necessary to the validity of such a Plea Agreement. And, in Eastern District of North Carolina practice, even such a formal Plea Agreement, signed by both parties and specifying the exact amount of the fine, restitution, criminal penalties, and forfeitures, would not be binding upon the Court. This is so because it is standard practice for the Courts of the Eastern District to accept only "non-binding" Plea Agreements offered under Rule 11 (e)(1)(B) of the Federal Rules of Criminal Procedure and to refuse any "binding" Plea Agreements offered under Rule 11 (e)(1)(C) .

The Office of the United States Attorney's commitment that it *"will agree not to recommend or seek"* criminal penalties, fines, or forfeitures against the Debtors, and will *"use its best efforts to insure"* that any restitution imposed in a criminal proceeding be distributed to creditors, then, is a far cry from a even a "non-binding" formal Plea Agreement. This language is in fact so sketchy and tenuous that it would seem to bind the United States Attorney to do no more than utter a sentence or two to the Court at sentencing, in exchange for the waiver of a very important constitutional right - the right to speak frankly to one's attorney without fear of disclosure. There is no assurance that the Office of the United States Attorney would *affirmatively ask* that the Court not impose criminal penalties, fines, or forfeitures; the Agreement *"not to recommend or seek"* would be satisfied if the United States Attorney simply *"stood silent"* when asked by the Court for a position on criminal penalties, fines, or forfeitures. Defense attorneys for individuals or for corporate entities would be free, of course, to argue strenuously that the Court should impose a heavy fine or penalty on the corporate defendants but should exercise restraint against the individuals, or to make any other argument they wish to make.

9

Furthermore, the assurances of the Office of the United States Attorney with respect to criminal penalties, fines, forfeitures, and restitution offered here would give the bankrupt estate virtually no added benefit beyond that which would occur in the normal course of events in a criminal case. The decision of a Criminal Court with respect to criminal penalties, fines, forfeitures, and restitution is controlled by statutes which outline in great detail the factors that must be considered by the Court in each instance. Thus, the "recommendations" and "best efforts" of the Office of the United States Attorney, in this case, would have very little effect upon a Court's decision on these matters.

Section 1963 of Title 18, for example, governing criminal penalties to be imposed in the case of conviction of 18 U.S.C. 1962 (racketeering), clearly states that whoever violates any provision of Section 1962 "*shall*" be fined under this title or imprisoned not more than 20 years . . . or both, and "*shall*" forfeit certain property to the United States. Under this provision, because a corporation cannot be imprisoned, a fine would be imposed against it. Similarly, section 3663A of Title 18, which governs restitution in the case of conviction of any offense committed against property, or by fraud or deceit, clearly states that the Court "*shall*" order restitution to the "victim" of the offense as victim is defined in section 3663A(a)(2). Subsection (c)(3) of section 3663A provides that the Court may decide to forgo restitution in the event that certain carefully proscribed circumstances exist relating to the number of victims and complexity of issues of fact; however, once again, a Criminal Court would rely on the dictates of the statute rather than the prosecution's "recommendation" in defining the class of victims and in determining whether restitution is appropriate; and would likely order that restitution go to the designated creditors of a bankrupt estate, even in the absence of a recommendation from the prosecution.

While the imposition of a fine in a criminal case is given to the Court's discretion, 18 U.S.C. section 3572 carefully outlines the factors that must be found and relied upon by the court in imposing or forgoing a fine. These factors include, for example, the defendant's income or financial resources, the burden that the fine would impose, and whether restitution has been ordered. Once again, the Court would be bound by the dictates of this statute rather than by the prosecutor's recommendation as to a criminal fine. In short, the proposal submitted to this Court offers little or nothing of substance to the Debtors and, therefore, should not be approved by this Court.

Despite the Trustee's contentions, the agreement between the United States Attorney and the Trustee is far from a guarantee that the Government will not prosecute the Debtors or seek criminal penalties against them. Likewise, it does not guarantee that the Debtors will ever receive any restitution imposed against individuals affiliated with the Debtors. In fact, should the waiver lead to the prosecution of the Debtors' officers and directors, the Debtors are obligated by their bylaws and articles of incorporation, as well as various employment agreements, to defend and indemnify their officers and directors. *See* Zolman Cavitch, *Business Organizations* § 156.08(4) (1995) (noting that, depending on the circumstances, a director's indemnification claim might be viewed as a pre-petition claim or a post-petition administrative expense). In addition, if the Debtors were prosecuted, the Government might seek the forfeiture of estate funds on the grounds that they were derived from allegedly fraudulent activity.[2]  Accordingly, the waiver of

---

[2] Upon information and belief, the Trustee has reviewed only a small percentage, if any, of the documents and communications at issue in this Motion. Wood & Francis, PLLC, only one of 9 law firms that have represented the debtors and their individual officers and directors, estimates that it holds over 30,000 pages of documents to which the privilege may apply. Because he has not reviewed many of these documents and communications, the Trustee cannot be said to have fully contemplated the affects of this proposed compromise on the debtor, the debtor's estate, or its creditors.

these privileges may actually decrease the funds that are available to pay claims against the Debtors.

The Trustee also has the fiduciary duty to act as expeditiously as is compatible with the best interests of the parties in interest with respect to closing the bankruptcy estate. *In re Hutchinson*, 132 B.R. 827, 831 (Bankr. M.D.N.C. 1991) (discussing the Trustee's duties under 11 U.S.C. 704(1)). *See also In re Clements*, 201 B.R. 157 (Bankr. W.D. Va. 1996); Cavitch, *supra*, § 156.07(2) ("In a Chapter 7 case, the trustee's primary duty is to liquidate the property of the estate and make distributions to creditors in the most expeditious and efficient manner possible.").

The Trustee opines "that waiving the . . . privileges is in the best interest of the expeditious administration of the estates because it will minimize the need for the estates to participate in a defense of any criminal prosecution by the United States Attorney." However, as already discussed, the United States Attorney has not guaranteed to forego a criminal prosecution against the Debtors. In addition, should the United States Attorney seek to prosecute the Debtors' officers and directors, the Debtors are obligated by their bylaws and articles of incorporation, as well as various employment agreements, to defend and indemnify their officers and directors. By waiving the Debtors' privileges, the Trustee may be increasing the probability that the Debtors' estates will need to participate in the defense of a criminal prosecution. Accordingly, the Trustee may be actually delaying the closing of the Debtors' estate and breaching his duty to administer the estate expeditiously.

Finally, as mentioned above, the Debtors owe a contractual duty to their officers and directors to defend and indemnify them for liability incurred as a result of their status as officers or directors of the debtor. By waiving the Debtors' privileges, the Trustee potentially exposes

the officers and directors to liability and breaches the Debtors' obligations under the bylaws, articles of incorporation and various employment agreements. This Court should not allow the Trustee to cause this breach of contractual duty and should protect the directors' and officers' expectations under the contracts.

As demonstrated above, the Trustee's proposed waiver of the Debtors' attorney-client and work-product privileges is inconsistent with the Trustee's duties and is not in the best interests of the Debtor's estate. Accordingly, this Court should refuse the Trustee's request to waive the Debtors' attorney-client and work-product privilege.

II.   **THIS COURT SHOULD DENY THE TRUSTEE PERMISSION TO WAIVE THE DEBTORS' ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES BECAUSE THIS WAIVER WOULD COMPROMISE THEIR OFFICERS' AND DIRECTORS' INDIVIDUAL PRIVILEGE CLAIMS.**

In the present case, the Debtors and their officers and directors were represented by the same attorneys. Accordingly, the directors and officers possess their own attorney-client and work-product privileges that cannot be waived by the Trustee. This Court should deny the Trustee permission to waive the Debtors' privileges because this waiver would also compromise their officers' and directors' individual privilege claims, which are constitutionally protected.

"It is long settled in all American jurisdictions that where two or more parties employ a lawyer as their common counsel, communications to that attorney are confidential and privileged as against all common adversaries." *Attorney-Client Privilege in Civil Litigation* at 399 (Vincent S. Walkowiak ed., 2d ed. 1997). It is undisputed that approximately 9 different law firms represented the Debtors and its officers and directors individually prior to the commencement of these bankruptcy proceedings. Most of these firms entered appearances in various courts on behalf of the Debtors and these individuals, and it is clear that these firms represented both the

13

Debtors and individual officers and directors. "An attorney's appearance in a judicial or semi-judicial proceeding creates a presumption that an attorney-client relationship exists between the attorney and the person with whom he appears." *See E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 387 (S.D. Tex. 1969) ("When the relationship is also evidenced by the entry of a formal appearance by the attorney on behalf of the person with whom he appears, the presumption becomes almost irrebutable, for the entry of a formal appearance has quite properly been called 'record evidence of the highest character.'").

Furthermore, even if the attorneys in this case had not made a personal appearance on behalf of the individual officers and directors, the circumstances surrounding the communications between these individuals and the attorneys would indicate that an attorney-client relationships existed. *See Maleski v. Corporate Life Ins. Co.*, 641 A.2d 1 (Pa. Commw. Ct. 1994) (liquidated corporation's former officers and directors held attorney-client privilege distinct from corporation's privilege where they approached counsel for purpose of seeking legal advice and clarified they were seeking advice in their individual capacities, counsel saw fit to communicate with them in individual capacities, the communications were confidential, and matters did not contain matters within company or general affairs of company). *See also United States v. Hart*, 1992 WL 348425 (E.D. La. 1992) (concluding that an indemnification provision in corporate bylaws could justify corporate officers and directors in believing that corporate attorney was providing legal services to them in their individual capacities, jointly with the corporation). (Attached as Unpublished Decision).

If the communications between a corporate officer or director and corporate counsel specifically focus upon the individual officers' or directors' personal rights and liabilities, then the individual officer or director can assert a personal privilege, despite the fact that the privilege

generally belongs to the corporation. *See In re Grand Jury Proceedings*, 156 F.3d 1038 (10th Cir. 1998) ("For example, a corporate officer's discussion with his corporation's counsel may still be protected by a personal, individual attorney-client privilege when the conversation specifically concerns the officers personal liability for jail time based on conduct interrelated with corporate affairs.").

As indicated above, the individual officers and directors in this case were represented in their individual capacities by the same attorneys as the Debtors. Their communications necessarily concerned the officers' and directors' personal liability for conduct interrelated with corporate affairs. As such, these communications are protected by the officers' and directors' individual attorney-client privileges. The waiver of a corporate Debtor's privilege by its bankruptcy trustee does not waive its individual officers' and directors' personal attorney client privilege. *See Carter v. Donovan*, 62 B.R. 1007 (Bankr. C.D. Cal. 1986).

Even if the individual officers and directors were determined not to have employed or shared the same counsel, it is clear that, at the very least, the individuals and the Debtors worked together and chose for their attorneys to work together in a shared defense arrangement. *See Attorney Client Privilege in Civil Litigation* at 399 ("In a joint defense arrangement, the attorney-client privilege protects communications by a client to his own lawyer, even though the lawyer may subsequently share that information with co-defendants.") The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter. *See In re Grand Jury Subpoenas*, 902 F.2d 244, 248-49 (4th Cir. 1990) ("the rule applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine). The joint defense privilege or common interest rule has been applied to, among other parties, civil co-defendants and potential

parties to prospective litigation. *Id.* at 249. The joint defense privilege cannot be waived without the consent of all parties who share the privilege. *Id.* at 248. *See In re Madison Management Group, Inc.*, 212 B.R. 894 (Bankr. N.D. Ill. 1997) (Chapter 7 trustee who brought adversary proceeding against debtor's former parent corporation, could not unilaterally waive attorney client privilege as to documents prepared for parent corporation while parent-subsidiary relationship was in place). At the very least, the Debtors and individual officers and directors in this case engaged in a joint defense or "common interest." The Trustee should not be allowed to waive the privilege as to information the Debtors obtained by virtue of this joint defense posture.

As demonstrated above, the individual officers and directors possess their own attorney-client privilege and work product that cannot be waived unilaterally by the Trustee. Because of the danger that this privileged information would be revealed in the Trustee's efforts to waive the Debtors' privileges, this Court should refuse to grant the Trustee the authority to waive these privileges.

However, should this Court decide that the Trustee can properly waive the Debtors' attorney-client and work-product privileges[3], then the Court must determine which documents

---

[3] The work product doctrine embodied in Rule 26 of the Federal Rules of Civil Procedure is distinct from and broader than the attorney-client privilege. To be protected, documents must have been prepared by or for a party by the party's representative, who need not be an attorney, and must have been prepared in anticipation of litigation. *See* John Gergacz, *Attorney-Corporate Client Privilege* § 7.04, 7.26 (3d ed. 2000) (the relevant inquiry in determining whether a document is prepared in anticipation of litigation is, whether at the time of the document's creation, "there would have been a legitimate concern about protecting the materials from discovery"). In the present case, the Debtors and their individual directors and officers first came under investigation by the North Carolina Attorney General by at least April 1997. Between that time and the filing of the bankruptcy petitions, there were ongoing investigations and prosecutions by various state and federal agencies as well as civil plaintiffs. Accordingly, from April 1997 or slightly before, many of the documents produced by the Debtors, the individual officers and directors and their representatives, including their attorneys, would have been produced in anticipation of litigation and would be privileged.

The privilege protects the attorney's mental impressions, conclusions, opinions or legal theories, as well as factual materials compiled by the attorney or his or her agents. The work product privilege is traditionally a privilege of the attorney and not of the client. *See Duplan Corp. v. Moulinage*, 487 F.2d

and communications are solely related to the Debtors' interests and subject to unilateral waiver by the Trustee. *See In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 125 (3d Cir. 1986) (noting that the district court correctly recognized that individuals could potentially demonstrate that some of the communications were personal and protected communications relating to the principal's personal liabilities, the court affirmed the trial court's holding that it would review in camera any communication over which there was a question whether it was personal or corporate in nature). *See also Maleski v. Corporate Life Insurance Co.*, 641 A.2d 1 (Penn. 1994) (describing process by which parties would conduct inventory of documents and would file petition identifying those documents they contend are privileged; if necessary, court would conduct in camera inspection of documents to determine to which documents the attorney-client privilege attaches).

The Trustee's waiver of the Debtors' attorney-client and work product privileges would potentially compromise the individual officers' and directors' individual privilege claims. Furthermore, to eliminate this danger, the parties in interest and this Court would be forced to engage in a lengthy and complicated inventory and in camera review process to determine which documents and communications are subject to the individuals' privileges. When these factors are considered, it is clear that this Court should deny the Trustee's request to waive the Debtors' privileges.

---

480, 483 (4th Cir. 1973) (noting that it has been held that waiver of the attorney-client privilege does not constitute a waiver of an objection that the information falls within the qualified immunity from discovery provided by the work product rule). "Further, even if the client somehow acts to waive the [work product] privilege, the attorney may still successfully assert it." *In re Crescent Towing & Salvage Co.*, 1993 WL 483525 (E.D. La. 1993). (Attached as an Unpublished Opinion). *See also In re Doe*, 662 F.2d 1073, 1079 (4th Cir. 1981) ("the attorney or the client, expressly or by conduct, can waive or forfeit [the work product privilege], but only as to himself"). Accordingly, the attorneys that have represented the debtors have the ultimate authority to waive the work product privilege as to materials produced in relation to the debtors' representation. This Court should deny the Trustee permission to unilaterally waive the work product privilege.

## CONCLUSION

For the foregoing reasons, Stanley H. Van Etten and Wood & Francis, PLLC respectfully urge this Court to deny the Trustee's Motion for Approval of Compromise and Settlement and his request that he be allowed to waive the Debtors' attorney client and work product privileges.

Respectfully submitted this the 31st day of May, 2000.

WOOD & FRANCIS, PLLC

Brent E. Wood
N.C. State Bar No. 16898
Two Hannover Square
424 Fayetteville Street, Suite 2300
Post Office Box 164
Raleigh, North Carolina 27602
Telephone: (919) 828-0801

## CERTIFICATE OF SERVICE

I, Brent E. Wood, attorney for Stanley H. Van Etten and representative for Wood & Francis, PLLC, certify that I served the foregoing document on the 31st day of May, 2000, upon the following parties and in the manner below specified, by depositing a copy thereof for each such party(ies) in a separate envelope bearing sufficient postage and depositing the same in the United States mail at Raleigh, North Carolina and/or by hand-delivery:

> Holmes P. Harden, Esq.
> Maupin, Taylor & Ellis, P.A.
> 3200 Beechleaf Ct., Suite 500
> P.O. Drawer 19764
> Raleigh, NC 27619-9764

Respectfully submitted this the 31st day of May, 2000.

WOOD & FRANCIS, PLLC

Brent E. Wood
N.C. State Bar No. 16898
Two Hannover Square
424 Fayetteville Street, Suite 2300
Post Office Box 164
Raleigh, North Carolina 27602
Telephone: (919) 828-0801

f:\wp\ihi-bk.MemoOppApprovalOfCompromise.doc

Not Reported in F.Supp.
(Cite as: 1993 WL 483525 (E.D.La.))

In the Matter of CRESCENT TOWING &
SALVAGE COMPANY, INC.

Civ. A. No. 93-1892.

United States District Court, E.D. Louisiana.

Nov. 15, 1993.

ORDER AND REASONS

WYNNE, United States Magistrate Judge.

*1 Before the Magistrate Judge is a motion of
Crescent Towing & Salvage Company, Inc.
["Crescent"], to compel the return of a privileged
communication. This action involves a collision
between a tug (being steered by Michael Henson) and
another vessel. Henson has alleged injuries and filed
a claim for damages. After investigation, Crescent's
counsel prepared a twelve- page memorandum setting
out synopses of interviews with witnesses and experts
and discussing trial strategy and the opinions of
counsel. Counsel sent the memorandum to Crescent.
A union official visiting Crescent came into
possession of the memorandum and sent a copy to
Henson, who provided it to his attorney, who called
Crescent's counsel and told him he had it. The union
official, when contacted by Crescent's counsel,
returned a copy of the memorandum which he had
retained. Henson's counsel has refused to return his
copy.

Crescent has presented affidavits from a vice
president and a supervisor stating that they were the
only persons at Crescent with copies of the
memorandum and that they neither personally
provided nor instructed anyone else to provide a copy
to the union official and that they do not know how he
came to have a copy. Crescent has also submitted a
letter from the union representative stating that he
requested information and was given the report,
perhaps inadvertently. He does not state who gave it
to him.

Henson's counsel did not file an opposition to this
motion and does not dispute that the memorandum is
privileged: but at the hearing he suggested that any
privilege had been waived by the client's providing
the report to the union official and that he wished to
retain it for possible impeachment purposes. A copy
of the memorandum was provided for in camera

inspection, which shows that it is protected by the
attorney-client and work-product privileges.

The attorney-client privilege exists to protect
confidential communications and the attorney-client
relationship and may be waived by disclosure of the
communication to a third party. Alldread v. City of
Grenada, 988 F.2d 1425 (5th Cir.1993). However,
inadvertent disclosure may or may not be a waiver of
the attorney-client privilege; that determination
depends on the facts of the disclosure. Alldread, at
1433-1434.

The work-product privilege is distinct from and
broader than the attorney- client privilege. United
States v. Nobles, 422 U.S. 225, 238, 95 S.Ct. 2160,
2170 n. 11 (1975). The work product doctrine
protects any document prepared by or for an attorney
in anticipation of litigation: and, while the client must
invoke the attorney-client privilege, both the attorney
and the client may invoke work product. In re
Antitrust Grand Jury, 805 F.2d 155 (6th Cir.1986).
The work product privilege is the attorney's, not the
client's. Duplan Corporation v. Moulinage et
Retorderie de Chavanoz, 487 F.2d 480 (4th
Cir.1973). Further, even if the client somehow acts
to waive the privilege, the attorney may still
successfully assert it. In re Antitrust Grand Jury,
supra, at 164. Mere voluntary disclosure of work
product materials to a third party is not sufficient in
itself to waive the privilege. Shields v. Sturm, Ruger
& Company, 864 F.2d 379, 382 (5th Cir.1989).

*2 While it is not clear how the union official came
into possession of the memorandum, the submissions
of Crescent indicate that the disclosure was, at most,
an inadvertent act by the client. The memorandum is
very clearly and obviously the work-product of the
attorneys for Crescent, who assert their privilege.
Based upon the facts of the matter, the Magistrate
Judge finds that the inadvertent disclosure by the
client does not act as a waiver of the work- product
privilege. Accordingly,

IT IS ORDERED that counsel for Henson is to return
to counsel for Crescent, within two days of receipt of
this order, any and all copies of the memorandum
which may be in the possession or control of counsel
or client.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1992 WL 348425 (E.D.La.))

# UNITED STATES of America
v.
## M.W. "Webb" HART, et al.

### Crim.A. No. 92-219.

United States District Court, E.D. Louisiana.

Nov. 16, 1992.

### ORDER AND REASONS

MENTZ, District Judge.

**\*1** Before the Court is the Government's Motion to Compel Defendants to Establish an Attorney-Client Privilege. Based upon evidence presented by the Government and defendants, David Walters and Craig Van der Voort, at an evidentiary hearing, the Court finds that defendants are entitled to invoke an attorney-client privilege so as to prevent disclosure of statements made by them to attorneys Ben Gill and Pauline Hardin.

### FACTS

In October, 1991, subpoenas were issued by a federal grand jury, sitting in the Eastern District of Louisiana, for certain documents from the Little Rock office of A.J. Gallagher & Co. Later, two officers of the Little Rock office, Walters and his superior Jack Cowell, were summoned to produce documents and appear before the grand jury. The grand jury was investigating the payment of consulting fees to M.W. Hart by Gallagher on behalf of St. Tammany Parish. Upon learning of the grand jury investigation, the head office of Gallagher directed Ben Gill, the corporate counsel of Gallagher, to investigate. Gill interviewed several employees. Over the next several months, Gill had two telephone conversations and one meeting with defendant Walters and several telephone conversations and meetings with defendant Van der Voort. During the course of these interviews, Gill did not inform either defendant whether the company would assume their defense or whether they should employ their own counsel throughout the interviews. It was not until a February 1, 1992 meeting with Walters and a February 7, 1992 telephone conversation with Van der Voort, that Gill informed each defendant that he should get separate counsel.

Also, around December 16, 1991, Pauline Hardin and her firm were hired as local counsel for the

corporation. Hardin met with Walters and had a telephone conversation with Van der Voort. Hardin testified that she told Walters that she represented the corporation and was not his attorney. Walters and Van der Voort each testified that Hardin never said she represented the corporation and not them. Van der Voort testified that he considered Hardin as an extension of Ben Gill. Jack Cowell, who was also interviewed by Hardin, testified that Hardin never told him that she represented the corporation and not him.

Defendants have claimed an attorney-client privilege as to their conversations with Gill and Hardin. The Government claims that the only attorney-client privilege belongs to the corporation which has waived the privilege as to the investigation of this matter conducted by its attorneys.

### ANALYSIS

The Court considers that defendants' belief that their conversations with Gill and Hardin were confidential was reasonable, based on the circumstances surrounding their discussions with Gill and Hardin. An attorney-client privilege attaches to communications between a client and his attorney where at least an implied relationship exists between them. Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 (7th Cir.1978). This relationship "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." Id., at 1319, citing, McCormick on Evidence (2d ed. 1972), § 88, p. 179. The relationships must be established by more than the individual clients' mere subjective belief that they are represented individually by the attorney, jointly with the corporation. United States v. Keplinger, 776 F.2d 678, 701 (7th Cir.1985); Odmark v. Westside Bancorporation, Inc., 636 F.Supp. 552, 555 (W.D.Wash.1986).

**\*2** In support of their belief that they were being individually represented by Gill and Hardin, the defendants point to the indemnification provision set forth in Article VII of the By-Laws of A.J. Gallagher & Co., wherein the corporation promises to:

indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than action by or in the right of the corporation) by reason of the fact that he is or was a director, officer, employee or agent of the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1992 WL 348425, *2 (E.D.La.))

corporation or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

Pat Gallagher, President of the corporation, stated that his general policy was that the company would protect its employees in the case of civil or criminal proceedings involving the employees.

While the indemnification provision is not dispositive of the attorney-client privilege issue, in the absence of any advice by Gill or Hardin to the contrary, defendants were justified in believing that Gill and Hardin were there to protect their individual interests as well as those of the corporation. [FN1]   Also significant is the fact that the communications between the defendants and Gill and Hardin were initiated, not by the defendants, but by Gill and Hardin as part of a "factfinding" mission.

Given this background, defendants reasonably believed that, during their conversations with Gill and Hardin, they were clients of Gill and Hardin, that they were communicating with them in their capacities as lawyers, and that they were providing legal services to them in their individual capacities, jointly with the corporation.  In Re Grand Jury Proceedings, 517 F.2d 666, 670 (5th Cir.1975);   Upjohn Co. v. United States, 449 U.S. 383, 396 (1981).

This Court finds that defendants, Walters and Van der Voort, are entitled to assert an attorney-client privilege as to all communications made to Ben Gill and Pauline Hardin in the course of Gill's and Hardin's investigation, preventing disclosure of those communications until such time as defendants choose to waive this privilege.

Accordingly,

IT IS ORDERED that all communications between corporate counsel, Ben Gill and Pauline Hardin, and the defendants, David Walters and Craig Van der Voort, are protected by the attorney-client privilege belonging to Walters and Van der Voort.

> FN1. The Court notes that, under Rule 1.13(d) of the ABA Model Rules of Professional Conduct, Gill and Hardin should have informed the defendants at the inception of their conversation that any revelations made by them might not be covered by the privilege in the event that Gill decided that they should obtain separate counsel, which he ultimately did advise.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works