98 - 02675

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

**F I L E D**

SEP - 8 1999

PEGGY B. DEANS, CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF N.C.

|  |  |
|---|---|
| *In re* | ) |
|  | ) **CHAPTER 7** |
| *INTERNATIONAL HERITAGE INCORPORATED,* | ) |
|  | ) **CASE NUMBER** |
|  | ) **98-02674-5-ATS** |
| **and** | ) |
|  | ) |
| *INTERNATIONAL HERITAGE INC,* | ) **CASE NUMBER** |
|  | ) **98-02675-5-ATS** |
| *Debtors.* | ) |
|  | ) |

## MEMORANDUM OF THE
## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## IN OPPOSITION
## TO THE APPLICATION OF TRUSTEE
## FOR AUTHORITY TO ENTER INTO SETTLEMENT AGREEMENT

TO:   THE HONORABLE A. THOMAS SMALL
      CHIEF UNITED STATES BANKRUPTCY JUDGE

The **United States Securities and Exchange Commission ("Commission")** files this memorandum in opposition to the Application of Trustee for Authority to Enter into Settlement Agreement (**"Motion to Settle"**). The Commission appears in this case as a creditor and party in interest[1] and in support of its objection, the Commission respectfully states as follows:

---

1       The Commission is the agency of the United States of America responsible, *inter alia*, for regulating and enforcing compliance with federal securities laws.  The Commission filed a proof of claim in these bankruptcy cases on January 5, 1999, asserting an unliquidated claim for disgorgement in an amount not less than $6.45 million, plus civil penalties and prejudgment interest arising out of a civil enforcement action filed by the Commission in the United States District Court for the Northern District of Georgia, *SEC v. International Heritage, Inc. et al.,* Civil Action No. 1-98-CV-0803-RWS ("the **District Court case**").  In its Complaint in the District Court case, the Commission alleged that IHI had operated as a massive pyramid scheme in violation of the federal securities laws, and had fraudulently raised more than $150 million from investors. On May 3, 1998, after a four-day evidentiary hearing, the District Court entered an Order imposing a preliminary injunction and finding that IHI had violated the

1

EXHIBIT 3

193

510B

# I. THE PROPOSED SETTLEMENT

The Trustee seeks authority of the Bankruptcy Court to settle an adversary proceeding instituted by the Trustee against the Debtor's officers' and directors' liability insurance carrier, Executive Risk Specialty Insurance Company ("**ERSIC**"), and a civil action commenced prepetition in the United States District Court for the Eastern District of North Carolina, Case No. 5:98-CV-542-F(3), by ERSIC against International Heritage, Inc. (the "**Debtor**" or "**IHI**"), and its officers and directors, Stanley H. Van Etten ("**Van Etten**"), Claude W. Savage ("**Savage**") and Larry G. Smith ("**Smith**") (together, "**the Officers and Directors**" or "**the Nondebtors**"). The coverage afforded under the Debtor's Directors and Officers Liability Insurance Policy ("**D&O Policy**") is at issue in both actions (the "**Coverage Actions**"). The Trustee seeks to enter into a settlement agreement ("**Settlement Agreement**") with Van Etten, Savage, Smith and ERSIC, pursuant to which ERSIC would pay $1,787,500 to IHI's estate and $275,000 to Van Etten under the D&O Policy in satisfaction of all claims against the D&O Policy.[2] The payment is conditioned on this Court dismissing with prejudice all "civil actions"[3] pending against IHI and/or the Officers and Directors or enjoining any such actions that have not been dismissed, and staying a regulatory action brought by the Montana State Auditor against IHI, Van Etten and others.

---

[2] registration and antifraud provisions of the federal securities laws. A settlement proposal concerning the Commission's case against IHI and International Heritage, Incorporated (a Nevada corporation) has been approved by this Court and is presently being considered by the Commission.

According to the Trustee's Motion to Settle, the D&O Policy has limits of liability of $5 million maximum aggregate for all claims during any single policy year. Before the institution of the Coverage Actions, ERSIC advanced $500,000 to the Debtor and its Officers and Directors, as reimbursement of defense costs incurred in defending certain civil actions. Pursuant to the Settlement Agreement, the payments to the IHI estate and Van Etten, along with the $500,000 advance will constitute the entirety of ERSIC's obligation under the D&O Policy.

[3] The term "civil action" is not defined in the Settlement Agreement, but six civil actions brought by private litigants, the Commission's District Court case, and an action brought by the Montana State Auditor's Office are listed in the Settlement Agreement as actions in which IHI and/or IHI's Officers and Directors are involved and which will be affected by the Settlement Agreement.

The Commission has no objection to the paying of money by ERSIC to the bankruptcy estate.[4] **The Commission, however, opposes dismissing or enjoining actions brought by private litigants, who are not parties to the litigation being settled in this Bankruptcy Court ("Nonparties"), against the Officers and Directors, who are not the Debtors in these bankruptcy cases.** Such action with respect to Nonparties' direct claims and causes of action that are not property of the estate[5] is extraordinary relief that effects a discharge or release of nondebtor third party liability in contravention of Sections 727 and 524(e) of the Bankruptcy Code ("Code"), 11 U.S.C. §§ 101, *et seq.*, as amended, and is unwarranted in this Chapter 7 liquidation case. Additionally, the Commission opposes a dismissal, injunction or stay of any regulatory action commenced by a governmental unit. Such action with respect to a regulatory agency runs afoul of Section 362(b)(4) of the Code, 11 U.S.C. § 362(b)(4).

The legal issues are ones in which the Commission has a strong interest. If the Bankruptcy Court can enjoin actions between third parties in connection with the settlement of an adversary proceeding within the bankruptcy, nondebtor third parties, such as officers and directors of a debtor corporation, could be released permanently from claims over which a bankruptcy court ordinarily lacks jurisdiction or the power to act, including potential securities fraud claims by public investors. The circumstances of this case are particularly compelling in light of the past egregious misconduct of many of the nondebtor defendants. Additionally, as a governmental entity, the Commission has a strong interest in ensuring that actions brought by a regulatory agency in furtherance of its police and regulatory power are allowed to proceed in accordance with the provisions of the Code.

---

[4]  A settlement proposal with Van Etten and IHI of the District Court case that sets an amount of disgorgement against Van Etten based upon Van Etten's financial resources is under consideration by the Commission. The Commission staff has disclosed to the Commission the terms of the Settlement Agreement that would result in Van Etten receiving money from ERSIC. The Commission staff does not know what effect, if any, the Settlement Agreement will have on the Commission's consideration of the proposed settlement of the District Court case.

[5]  A direct claim of a private litigant, in which the litigant seeks to redress the litigant's distinct and personal injury suffered as a result of an officer's or director's wrongdoing, may be contrasted with derivative claims brought on behalf of a corporation when a corporation has suffered an injury from actionable wrongs committed by its officers and directors. *See, e.g., In re Reliance Acceptance Group, Inc.*, 235 B.R. 548, 554-56 (D. Del. 1999). Derivative claims are property of the estate, and courts generally have recognized the power of the court in a bankruptcy proceeding to act pursuant to Section 105(a) of the Code, 11 U.S.C. § 105(a), to release derivative claims in the context of a settlement. *See, e.g., In re Energy Coop., Inc.*, 886 F.2d 921,930 (7th Cir. 1989); *In re All American of Ashburn, Inc.*, 805

3

# II. ARGUMENT

## A. The Code Does Not Authorize The Use Of Provisions That Effect A Discharge Of Third Party Nondebtor Liability In A Chapter 7 Liquidation Case.

### 1. *Section 524(e) prohibits the discharge of third party nondebtor liability in this Chapter 7 liquidation case.*

The proposed Settlement Agreement, which would result in a dismissal or injunction of Nonparty claims, effects a discharge of nondebtor third party liabilities, including the liabilities of IHI's Officers and Directors, by dismissing and permanently enjoining any Nonparty action against them. The Settlement Agreement, if approved, would relieve Van Etten and the other Officers and Directors, who are alleged to have defrauded more than one hundred thousand investors out of at least $150,000,000.00, from liability to public investors who are parties to the civil actions, and, in fact, would result in the payment of money to the individual the Commission alleges orchestrated the fraud. This result would be an absurd injustice, flying in the face of public policy and making a mockery of the principal purpose of bankruptcy law, which is to afford the honest but unfortunate debtor a fresh start.

Congress, in enacting the Code, never contemplated such relief. Section 524(e) addresses the scope of a bankruptcy discharge in plain language, stating, in relevant part, that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The Code provides only for the discharge of the debtor, 11 U.S.C. §§ 524(e) and 727, and contemplates that a discharge only affects the debts of those submitting to its burdens. *See, e.g., In re Arrowmill Development Corp.*, 211 B.R. 497, 503 (Bankr. D. N. J. 1997). *Accord, F.T.L., Inc. v. Crestar Bank (In re F.T.L., Inc.)*, 152 B.R. 61, 63 (Bankr. E. D. Va. 1993) (absent compelling circumstances, individual must file his own bankruptcy petition to receive benefits of bankruptcy law). The Officers and Directors, who would benefit from the settlement and the dismissal or enjoining of actions against them, are not debtors in this bankruptcy case and have not submitted their assets to the jurisdiction and scrutiny of this bankruptcy court.

The weight of case authority is consistent with the Commission's view that this type of provision runs afoul of the limitations on discharge set forth in Section 524(e) of the Code. *See, e.g.,*

F.2d 1515, 1517 (11th Cir. 1986); *In re Texaco, Inc.*, 84 B.R. 893, 903-04 (Bankr. S. D. N. Y. 1988).

*In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995), *cert. denied*, 116 S. Ct. 2497 (1996) ("Section 524 does not . . . provide for the release of third parties from liability"); *Zale Corp. v. Feld (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) ("Section 524 prohibits the discharge of debts of nondebtors"); *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117-18 (3d Cir. 1993) ("Section 524(e) specifically limits the effect of a discharge . . . This section assures creditors that the discharge of a debtor will not preclude them from collecting the full amount of a debt from codebtors or other liable parties."); *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992) ("the language of [Section 524(e)] reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit"); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 602 (10th Cir. 1990), *modified sub nom., Abel v. West*, 932 F.2d 898 (10th Cir. 1991) (permanent injunction purporting to release nondebtors from liability improperly insulates nondebtors in violation of Section 524(e)).[6] *Contra Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989), *cert. denied*, 493 U.S. 959 (1989) (Section 524(e) should not be applied literally in every case as a prohibition on the power of the bankruptcy court to issue a third party injunction).

The propriety of a bankruptcy court releasing, discharging or enjoining claims against third party nondebtors has received much attention by the courts and commentators in the context of Chapter 11 when a debtor seeks to confirm a plan that contains provisions that purport to release and discharge third party nondebtor liability. *See generally* Peter E. Meltzer, *Getting Out of Jail Free: Can the Bankruptcy Plan Process be Used to Release Nondebtor Parties?*, 71 Am. Bankr. L.J. 1 (1997). The Commission recognizes that the courts in cases too numerous to discuss have taken a variety of approaches in assessing the validity of Chapter 11 plan provisions purporting to release and discharge third party nondebtors. The Fourth Circuit, for example, has approved provisions releasing or discharging third party nondebtor in a Chapter 11 plan of reorganization, but only under exceptional circumstances, not present in the Debtor's case. In *Menard v. Mabey (In re A.. H. Robins)*, 880 F.2d 694 (4th Cir. 1989), *cert. denied*, 493 U.S. 959 (1989), a

---

[6]   Indeed, some courts have found that bankruptcy courts lack jurisdiction over liabilities of nondebtor parties and, accordingly, cannot discharge liabilities of nondebtors. *See, e.g., In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990), *modified sub nom., Abel v. West*, 932 F.2d 898 (10th Cir. 1991); In re Sandy Ridge Dev. Corp., 881 F.2d 1346 (5th Cir. 1989). *See generally* Ralph Brubaker, *Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten Callaway v. Benton case*, 72 Am. Bankr. L.J. 1 (Winter 1998).

corporate debtor initiated a Chapter 11 reorganization case to resolve approximately 200,000 contingent personal injury claims. Releases of nondebtor third parties were included in the debtor's Chapter 11 plan, when certain third party nondebtors made substantial monetary contributions to the bankruptcy estate that were integral to the adequate funding and implementation of the plan. The Fourth Circuit, in affirming confirmation of the plan, expressly limited its holding to the unusual facts before it, noting the overwhelming approval of the Plan by affected creditors, the establishment of a payment fund estimated to be adequate to provide a full recovery to all claimants (including late claimants),[7] and the fact that the entire reorganization hinged on the debtor being free from indirect claims. *Id.* at 702.

Unlike the *Robins* case, this case is not a Chapter 11 reorganization in which a viable economic entity may be salvaged upon confirmation of a plan of reorganization, but instead is a Chapter 7 liquidation. The successful resolution of the IHI case is not dependent on IHI being free from indirect claims: as a liquidating corporate debtor, IHI is not eligible for and will not receive a discharge. 11 U.S.C. § 727 (a)(1). *See, e.g., In re Optical Technologies, Inc.*, 216 B.R. 989, 994 (Bankr. M. D. Fla. 1997) (the factors that may warrant the release of third party nondebtors in a corporate reorganization are not present when the Chapter 11 debtor files a plan of liquidation). In this case, unlike *Robins*, the amount of money paid into the estate is obviously insufficient to pay any substantial portion of the claims of the affected Nonparties. Additionally, unlike the circumstances in *Robins* in which affected creditors and interestholders had the opportunity to vote on the Plan containing the releases, IHI creditors and interestholders have not had any opportunity to vote on the Settlement. In fact, it is questionable whether all affected creditors and interestholders received notice of the terms of the Settlement Agreement in the instant case. The Amended Notice of Application of Trustee for Authority to Enter Into Settlement Agreement ("**Amended Notice**") was served directly on less than 300 individuals and entities, does not disclose the proposed injunction of pending civil actions, and appears on its face to involve only monetary payments by ERSIC. Even though the Amended Notice and Motion to Settle were posted on the Debtor's internet site, it is questionable whether such notice is sufficient

---

[7] The funding of the trust fund was based upon expert testimony estimating the amount of claims that could be made against the debtor's estate, and the amount of the trust fund was estimated to pay all claims in full.

when a significant property interest of Nonparties will be affected permanently.[8]  Fundamental
principles of due process require notice and the opportunity to be heard when a property interest is at
stake.  *See, e.g., Reliable Elec. Co., Inc. v. Olson Construction Co.*, 726 F.2d 620, 623 (10th Cir.
1984); *In re Bilder*, 108 B.R. 666, 666-67 (Bankr. E.D. Wis. 1989).

> ### 2.  *Section 105(a) of the Code does not authorize a Bankruptcy Court to dismiss or issue a permanent injunction against pursuit of the civil actions by the Nonparties against Nondebtors in a Chapter 7 case.*

The Trustee seeks relief under Section 105(a) of the Code, which authorizes a bankruptcy
court to "issue any order, process, or judgment that is necessary or appropriate to carry out the
provisions of [the Code]." While the court in *Robins* relied on Section 105(a) in approving the
permanent injunction as part of the debtor's Chapter 11 plan under the unusual circumstances of that
case, the Commission staff was unable to locate a single case within the Fourth Circuit that extends the
logic of *Robins* to a Chapter 7 case such as the case at bar.

Section 105 is not a license for the bankruptcy court to "disregard the clear language and
meaning of the bankruptcy statutes and rules." *Official Committee of Equity Sec. Holders v. Mabey*,
832 F.2d 299, 302 (4th Cir. 1987), *cert. denied*, 485 U.S. 962 (1988).  *Accord, Norwest Bank
Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("whatever equitable powers remain in the
bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").
Section 105(a) is not an independent source of power, but rather is an aid in "exercising other specific
provisions and powers created by the Bankruptcy Code." *In re Optical Technologies, Inc.*, 216 B.R.
989, 993 (Bankr. M.D. Fla. 1997).  *Accord, In re Arrowmill Dev. Corp.*, 211 B.R. 497, 505 n. 9
(Bankr. D.N.J. 1997).

The Supreme Court has recognized a bankruptcy court's jurisdiction to temporarily stay
actions against third party nondebtors during the pendency of a Chapter 11 reorganization case,

---

[8]   The Commission staff has no knowledge of whether the private civil actions have been certified as class
actions but notes that when a class action is instituted in federal court, Rule 23 of the Federal Rules of
Civil Procedure provides for various safeguards to insure notice to affected parties, including individual
notice to all members who can be identified through reasonable effort of the commencement of the action
and their rights to be excluded therefrom and notice of the proposed settlement to all members of the
class. Fed. R. Civ. P. 23(c)(2) &(e).  Because the Settlement Agreement will deprive Nonparties of
property rights, affected parties should receive the best notice practicable under the circumstances.

7

expressly noting that the jurisdiction of the bankruptcy court may extend more broadly in a Chapter 11 case than in a Chapter 7 case. *Celotex Corp. v. Edwards*, 115 S. Ct. 1493, 1500 (1995). In *Celotex*, however, the Supreme Court explicitly reserved decision on whether the bankruptcy court had the power pursuant to Section 105(a) to temporarily enjoin nonparty actions, stating, "[w]e need not, and do not, address whether the bankruptcy court acted properly in issuing the Section 105 Injunction." 115 S. Ct. at 1501. While other courts have relied on Section 105(a) of the Code to approve a temporary stay of actions against third party nondebtor entities related to the debtor during the pendency of a bankruptcy case, most courts have acted with much circumspect before granting even temporary relief, typically requiring evidence that the injunction is necessary to aid the administration of the estate or evidence that the continuation of the nonparty action will have an adverse effect on the debtor's ability to reorganize or formulate a plan[9] but sometimes requiring the moving party to meet the more stringent requirements for the issuance of a preliminary injunction in non-bankruptcy litigation under Rule 65 of the Federal Rules of Civil Procedure.[10]

A permanent injunction, such as sought in the instant case, goes beyond the administration of the estate and permanently affects rights against nondebtors. The jurisdiction and power of the bankruptcy court to permanently bar the assertion of claims against nondebtors is less established than

---

[9] *See, e.g., Willis v. Celotex*, 978 F.2d 146 (4th Cir. 1992), *cert. denied*, 507 U. S. 1030 (1993) (actions against surety company, which had posted supersedeas bond, enjoined based upon bankruptcy court findings that continuation of action would impede Chapter 11 reorganization). *Cf. In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995) (before issuing a temporary injunction against third party action, court should determine whether there is an identity of interest between the nondebtor and debtor so that a suit against the nondebtor is essentially a suit against the debtor and whether the institution of the third party action will have an adverse impact on the debtor's ability to reorganize).

[10] *See, e.g., In re Reliance Acceptance Group, Inc.*, 235 B.R. 548, 561 (D. Del. 1999) (in Chapter 11 case, shareholders should not have been enjoined by the bankruptcy court, acting pursuant to Section 105(a) of the Code, from continuing actions against nondebtor third parties, including former officers, absent a showing by the debtor of probability of success on the merits); *In re F.T.L., Inc.*, 152 B.R. 61, 63 & 64 n.3. (Bankr. E.D. Va. 1993) (in a Chapter 11 case, court found that four part test for issuance of injunction had been met warranting the issuance of a temporary injunction enjoining pursuit of an action against a nondebtor, but court refused to issue a permanent injunction, noting that "[t]his type of extraordinary relief may be appropriate in rare circumstances like *A.H. Robins* but should not be liberally granted"). *Cf. Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (in a Chapter 7 liquidation case in which bankruptcy court issued an order pursuant to Section 105(a) temporarily enjoining investor claims against nondebtor third parties after finding the four traditional elements for issuing a preliminary injunction had been met, Seventh Circuit noted that all elements did not have to be met, but moving party must establish a likelihood of success on the merits, and court must address whether the issuance of the injunction will harm the public interest).

the jurisdiction to grant temporary stays. While some courts have adopted a *per se* rule prohibiting the discharge or release of third party nondebtor liability,[11] other courts have indicated a willingness to allow such relief when affected creditors affirmatively consent thereto,[12] or under exceptional circumstances such as those present in the *Robins* case, pursuant to Section 105(a).[13] Those courts that have not adopted a *per se* rule prohibiting the permanent release of third party nondebtor liability generally have addressed the release issue in Chapter 11 reorganization cases and have looked to the following factors, many of which were present in the *Robins* case, in determining whether to act pursuant to Section 105(a) to release third parties from liability to nonparties:

(1) An **identity of interests** between the debtor and the third party, usually an indemnity relationship, such that a suit against the nondebtor either operates as a suit against the debtor or will deplete estate assets;

(2) The **nondebtor has contributed substantial assets** to the reorganization;

(3) The **injunction is essential to reorganization**, and, without it, there is little likelihood of success;

(4) A **substantial majority of creditors agree** to such an injunction, and specifically, the impacted class, or classes, has overwhelmingly voted to accept the proposed treatment;

(5) The plan provides a **mechanism for payment of all**, or substantially all, of the claims of the class or classes affected by the injunction.

---

[11]  *See, e.g., In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995), *cert. denied*, 116 S. Ct. 2497 (1996) (citations omitted) ("This court has repeatedly held, without exception that § 524(e) precludes bankruptcy courts from discharging the liabilities of nondebtors"). *Accord, In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990), *modified sub nom., Abel v. West*, 932 F2d 898 (10th Cir. 1991).

[12]  *See, e.g., In re AOV Industries*, 31 B.R. 1005 (D.D.C. 1983), *aff'd in part*, 792 F.2d 1140 (D.C. Cir. 1986); *In re Monroe Well Services, Inc.*, 80 B.R. 324 (E.D. Pa. 1987). Few courts are willing to impose such releases on creditors and interestholders without the consent of affected creditors. *See, e.g., In re Specialty Equipment Co., Inc.*, 3 F.3d 1043, 1045-47 (7th Cir. 1993); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506-07 (Bankr. D.N.J. 1997); *In re West Coast Video Enterprises, Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994).

[13]  Certain courts have found that "special circumstances" may warrant approval of nondebtor releases. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir. 1992), *cert. dismissed*, 113 S. Ct. 1070 (1993); *In re A.H. Robins*, 880 F.2d 694 (4th Cir. 1989), *cert. denied*, 493 U.S. 959 (1989); *In re Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1987), *cert. denied*, 488 U.S. 868 (1988). In each of those cases, the debtor and their agents were seeking to resolve mass tort claims or an avalanche of litigation in a Chapter 11 case.

*See generally*, Peter Meltzer, *Getting Out of Jail Free:  Can the Bankruptcy Plan Process Be Used to Release Nondebtor Parties?*, 71 Am. Bankr. L.J. 1 (Winter 1997). *See also In re Optical Technologies, Inc.*, 216 B.R. 989, 992 (Bankr. M.D. Fla. 1997) (citing list of factors but refusing to confirm liquidating plan releasing the liability of third party nondebtors); *In re West Coast Video Enterprises*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994).

NONE OF THESE FACTORS ARE PRESENT IN THIS CASE.  The Motion to Settle does not assert any claims for indemnification by the Officers and Directors as the basis for approving the Settlement Agreement.  There is no evidence that the Officers and Directors have contributed substantial assets to the bankruptcy estate of IHI.  This case is not a Chapter 11 reorganization, so the injunction is not necessary to insure the success of the bankruptcy.  There is no evidence that a substantial majority of affected creditors and interestholders have agreed to the dismissal of their civil actions nor is there any evidence that the settlement will result in full payment of the claims of affected creditors and interestholders.  In short, the circumstances of this case are not appropriate for this court to fashion a remedy pursuant to Section 105 that permanently bars Nonparties from seeking relief against the Third Party Nondebtors.

Although Bankruptcy Rule 9019 empowers this Court to approve compromises and settlements if they are in the best interest of the estate, *see, e.g., In re Marvel Entertainment Group, Inc.*, 222 B.R. 243 (D. Del. 1998), "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *In re Zale Corp.*, 62 F.3d 746, 754 (5th Cir. 1995), quoting *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan)*, 957 F.2d 1020, 1026 (2d Cir. 1992).  Accordingly, courts that have recognized the jurisdiction and consequent power of a court in a bankruptcy case to release claims that are property of the estate in the context of a settlement have scrutinized the terms of the settlement to insure that the settlement does not contain language that could be construed to bar permanently causes of action belonging exclusively to aggrieved claimants or interestholders.[14]  *See, e.g., In re Energy Coop., Inc.*, 886 F.2d 921, 930 (7th Cir. 1989); *In re All*

---

[14]    The Commission does not concede that this court has jurisdiction over the claims of the Nonparties that belong to individual creditors and interestholders and not to the bankruptcy estate.  If the bankruptcy court has no jurisdiction over the direct claims of nonparties against nondebtor defendants or persons and entities that are not parties to the litigation being settled, the bankruptcy court has no power to shield these claims from prosecution by approving a settlement that permanently bars and enjoins these claims.

*American of Ashburn, Inc.*, 805 F.2d 1515, 1517 (11th Cir. 1986). For example, *In re Energy Coop., Inc.*, the Seventh Circuit remanded an injunction included in a settlement order to the district court with instructions to limit the permanent injunction solely to claims that were the exclusive property of the estate. 886 F.2d at 930.

Although the Trustee's interest in settling the Coverage Actions is understandable, the Settlement Agreement tramples on the rights of the Nonparties. The use of Section 105(a) to grant the extraordinary relief of a permanent injunction in favor of the Officers and Directors in this case is unsupported by existing case law and is contrary to public policy.

## B. The Code Does not Authorize The Stay of Police and Regulatory Actions that Are Excepted From the Automatic Stay Pursuant to Section 362(b)(4)

Section 362(b)(4) of the Code affords an exemption from the automatic stay to governmental units seeking to enforce their police and regulatory power. 11 U.S.C. § 362(b)(4). The Settlement Agreement, if approved, would result in the dismissal of or injunction against the continuation of all civil actions pending against IHI and/or its Officers and Directors, which may include the police and regulatory actions instituted by the Commission and the Montana State Auditor's Office. Additionally, the Settlement Agreement, if approved, allows for this court to stay the regulatory action commenced by the Montana State Auditor. This result is contrary to law and public policy.

The legislative history to Section 362(b)(4) provides insight into the intent of Congress in enacting an exemption applicable to governmental units:

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop **violation of fraud**, environmental protection, consumer protection, safety or similar police or regulatory laws, or **attempting to fix damages for violation of such a law**, the action or proceeding is not stayed under the automatic stay.

---

*See, e.g., In re Zale Corp.*, 62 F.3d 746, 756-57 (5th Cir. 1995).

H. Rep. No. 595, 95th Cong., 1st Sess. (1977) at 343; Senate Report No. 989, 95th Cong., 2nd Sess. (1978) at 52; *reprinted in* U. S. Code Cong. & Admin. News 1978 at 5787, 5838, 6229 [EMPHASIS ADDED].

IHI's Chapter 7 filing does not preclude the Commission and other regulatory agencies from pursuing actions against the Debtor, in furtherance of their police and regulatory powers, including obtaining an order fixing monetary relief. *See, e.g., SEC v. Towers Financial Corp.*, 205 B.R. 27 (S.D.N.Y. 1997) (Commission action not stayed against Chapter 7 debtor "'where a government unit is suing a debtor to prevent or stop violation of fraud, . . . or similar police or regulatory laws, *or attempting to fix damages for violation of such a law*") (quoting S. Rep. 95-989 at 52, reprinted in 1978 U.S.C.C.A.N. 5787, 5838); *In re Bilzerian*, 146 B.R. 871, 873 (Bankr. M.D. Fla. 1992) (Commission's action in seeking to set amount of disgorgement against Chapter 7 debtor is appropriate and prevents bankruptcy court from becoming a haven for wrongdoers). IHI's bankruptcy, moreover, does not effect regulatory agencies' actions against nondebtors, such as the Officers and Directors.

Section 105(a) should not be used to either prevent the commencement or continuation of an action by a governmental unit, such as the Commission or the Montana State Auditor, against IHI and its Officers and Directors. The use of Section 105(a) for such purposes overrides the specific provisions of Section 362(b)(4) and encourages the bankruptcy court to become a haven for wrongdoers. *See, e.g., In re Compton Corp.*, 90 B.R. 798, 806-07 (N.D. Tex. 1988), *appeal dismissed*, 889 F.2d 1104 (Temp. Emer. Ct. App. 1989) (Department of Energy proceedings that were consistent with provisions of the Code and were exempt from the automatic stay under Section 362(b)(4) were improperly enjoined under Section 105); *In re Wilner Wood Prod. Co. v. State of Maine, D.E.P.* 1,5 (D. Me. 1991) (Section 105 must be used in a matter consistent with the Code and cannot override clear statutory language).[15]

---

[15]   The Commission staff notes that some courts that have refused to grant an injunction pursuant to Section 105(a) to enjoin regulatory actions have noted in dicta that the bankruptcy court may have power to act pursuant to Section 105 in certain limited circumstances. *Cf. U.S. v. Commonwealth Companies, Inc.*, 913 F2d 518, 527 (8th Cir. 1990) (while finding that the governmental action was excepted from automatic stay and should be allowed to stay, court noted in dicta that in appropriate cases when debtor is able to meet the "usual rules governing the issuance of injunctions," an injunction against governmental action may be appropriate); *In re Brennan*, 198 B.R. 445, 450-52 (D.N.J. 1996) (Section 105(a) injunction appropriate to stay state police power only when there is a serious conflict between the continuance of the state action and the policies of the Bankruptcy Code and the elements for issuing injunctive relief have been established); *In re Wengert*

## III.  CONCLUSION

For the foregoing reasons, the Commission objects to the Settlement and requests the Court to deny the Motion to Settle.  The Commission further requests that a hearing be held on this matter.

Dated:   September **7**, 1999
         Atlanta, Georgia

Respectfully submitted,

WILLIAM P. HICKS
District Trial Counsel
Ga. Bar No. 351649

E. GORDON ROBINSON
Senior Trial Counsel/ Bankruptcy
Ga. Bar No. 610350

SUSAN R. SHERRILL
Senior Bankruptcy Counsel
North Carolina Bar No. 9462
Georgia Bar No. 001370

**ATTORNEYS FOR THE:**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Atlanta District Office
Suite 1000
3475 Lenox Road, N.E.
Atlanta, GA 30326-1232
   Telephone:   (404) 842-7626
   Fax:          (404) 842-7633

---

*Transportation, Inc. v. Crouse Cartage Co.*, 59 B.R. 226, 231-32 (Bankr. N.D. Iowa 1986) (court held that governmental injunction fell within exception from automatic stay set forth in Section 362(b)(4) and refused to issue an injunction pursuant to Section 105(a), noting in dicta that there may be appropriate circumstances for the issuance of injunction if the debtor alleges and proves the four elements necessary for the issuance of a preliminary injunction but also stating that Section 105(a) should be used sparingly in such circumstances and only when absolutely necessary to effectuate the policy of the Bankruptcy Code.)  Even under those cases, the issuance of an injunction against regulatory action would be inappropriate in the instant case because the elements for the issuance of an injunction have not been alleged.

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

|  |  |  |
|---|---|---|
| | ) | CHAPTER 7 |
| *In re* | ) | |
| | ) | |
| *INTERNATIONAL HERITAGE* | ) | CASE NUMBER |
| *INCORPORATED,* | ) | 98-02674-5-ATS |
| | ) | |
| **and** | ) | |
| | ) | |
| *INTERNATIONAL HERITAGE* | ) | CASE NUMBER |
| *INC,* | ) | 98-02675-5-ATS |
| | ) | |
| *Debtors.* | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I, Susan R. Sherrill, do hereby certify that a copy of the foregoing MEMORANDUM OF UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN OPPOSITION TO THE APPLICATION OF TRUSTEE FOR AUTHORITY TO ENTER INTO SETTLEMENT has been served on this 8th of September, 1999, by first class mail, postage prepaid, to all interested parties listed on Exhibit "A" attached hereto.

SUSAN R. SHERRILL
Senior Bankruptcy Counsel
North Carolina Bar No. 9462

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Atlanta District Office
Suite 1000
3475 Lenox Road, N.E.
Atlanta, GA 30326-1232
   Telephone:   (404) 842-7626
   Fax:         (404) 842-7633

1

## Exhibit "A"

Holmes P. Harden, Esquire
Maupin Taylor & Ellis, P.A.
Post Office Drawer 19764
Raleigh, North Carolina 27619

Terri L. Gardner, Esquire
Smith Debnam Narron & Myers, L.L.P.
Post Office Box 26268
Raleigh, North Carolina 27611

Marjorie K. Lynch
Bankruptcy Administrator
U.S. Bankruptcy Court
P.O. Box 3079
Raleigh, North Carolina 27601-3039

Michael P. Flanagan, Esquire
Ward and Smith, P.A.
120 West Fire Tower Road
Post Office Box 8088
Greenville, North Carolina 27835-8088

Brent E. Wood, Esquire
P.O. Box 164
Raleigh, North Carolina 27602

Louis P. Richkind, Esquire
Counsel to Chittenden Bank
One Woodward Avenue, Suite 2400
Detroit, Michigan 48226

Kathryn N. Koonce, Esquire
Poyner & Spruill, LLP
P.O. Box 10096
Raleigh, North Carolina 27605-0096

Robert H. Frazer, Esquire
ACSTAR Insurance Company
233 Main Street
P.O. Box 2350
New Britain, Connecticut 06050-2350

N. Hunter Wyche, Jr., Esquire
Wyche & Story, RLLP
P.O. Drawer 1389
Raleigh, North Carolina 27602

Lloyd W. Gathings, II, Esquire
Robert W. Shore, Esquire
Gathings & Associates
P.O. Box 10545
Birmingham, Alabama 35202-0545

Ronald H. Garber, Esquire
Boxley, Bolton & Garber, LLP
Post Office Drawer 1429
Raleigh, North Carolina 27602

Lloyd T. Whitaker, President
Newleaf Corporation
2814 New Spring Road, Suite 330
Atlanta, Georgia 30339

Joel B. Piassick, Esquire
Kilpatrick & Stockton LLP
Suite 2800
1100 Peachtree Street, N.E.
Atlanta, Georgia 30309

2



# State of North Carolina

Department of Justice
P. O. Box 629
RALEIGH
27602-0629
February 18, 1998

MICHAEL F. EASLEY
ATTORNEY GENERAL

CONSUMER PROTECTION
919-716-6000
Fax: 919-716-6050

Frank Seales Jr Chief
Antitrust and Consumer Litigation Section
Office of Attorney General
900 East Main Street
Richmond VA 23219

W P
L P
—
All

RE:    International Heritage, Inc. (IHI)

Dear Mr. Seales:

As of February 16, 1998, **twenty-four (24) Virginia residents** had filed written complaints against IHI.  IHI is a so-called multi-level marketing company with its headquarters at 2626 Glenwood Ave, Suite 120, Raleigh, NC 27608.  While we are accepting and processing complaints from out-of-state residents, we do not have the resources to enforce our statute in your state.  Of the total 1,440 complaints filed against IHI, 872 are from North Carolina.

Our involvement with IHI escalated in April 1997 when we concluded an investigation of the company by informing IHI that it was in violation of the North Carolina pyramid law.  Virtually every IHI representative was purchasing at least one business center for $250 through a deposit on merchandise, valued by IHI at $500, which could then be "earned out" in lieu of $500 in commissions when 12 new centers had been set up below each of their centers.  IHI officials claimed that representatives just wanted to buy their high end products, such as Mont Blanc pens, Waterford crystal, Lenox figurines, Coach leather, etc., however the percentage of purchasers outside of the sales force was less than 5 percent.  On June 3, 1997, we entered into an agreement with IHI (enclosed).  IHI did make significant changes in its North Carolina operations (representatives now sign up customers for BTI with little recruitment and even fewer product sale in NC); however, IHI appears to still be  operating the old program in other states.  I have enclosed a brief diagram of that program stripped of IHI jargon.

**EXHIBIT**
**4**

Frank Seales Jr
Page 2
February 18, 1998


Stan Van Etten is the president of IHI; enclosed is a magazine article regarding his background. Claude Savage and Larry Smith, IHI co-founders with Van Etten, were by their accounts top earners in Gold Unlimited. There are many similarities between Gold Unlimited and IHI, including the lay-away aspect and the binary commission structure.

Please contact me at (919) 716-6032 if you either have or plan to take action against IHI. We will provide whatever assistance is possible, including copies of the complaints filed by your residents. Often when several regulators simultaneously confront a pyramid scheme, its life span is dramatically shortened.

Hope to see you at the National Law Enforcement Summit on Pyramid Schemes in Atlanta on March 19 and 20, 1998! (For conference registration materials and information contact the FTC at (202) 326-3129.)

Sincerely

Kristine L. Lanning
Assistant Attorney General
CONSUMER PROTECTION SECTION


KLL/gd
Enclosures

lanning\ihistat2



# State of North Carolina

Department of Justice
P. O. Box 629
RALEIGH
27602-0629

**MICHAEL F. EASLEY**
**ATTORNEY GENERAL**

**CONSUMER PROTECTION**
919-716-6000
Fax: 919-716-6050

July 8, 1998

Ms. Joan Fleming
Special Agent
Federal Bureau of Investigation
5511 Capitol Center Drive
Suite 460
Raleigh, North Carolina 27606

Dear Joan:

    Here is a tape of a newscast featuring Stan Van Etten and IHI. It focuses on the striking similarities between IHI and Gold Unlimited, the company that IHI founders Claude Savage and Larry Smith were previously involved in. We thought it may be of interest to you.

Very truly yours,

*Kristine*

Kristine L. Lanning
Assistant Attorney General
CONSUMER PROTECTION SECTION

KLL/jlw
enclosure

**EXHIBIT**
5



**From:**     Kristine Lanning
**To:**       pyramid team
**Date:**     11/25/98 9:03am
**Subject:**  Dynamic Essentials

Dynamic Essentials has already filed notice that it will be offering securities in the form of common stock in the following states:  NC, AL, Fl, GA, Il, KS, LA, MT, SC, TX, and WA.  I've spoken to Mt and have a copy of the notice.  I have calls in to the SEC and our Securities to see what it all means and if they can block this.  Do you think Stuart or Ranii would be interested?

Dynamic Essentials is decribed as a developmental stage network marketing company that distributes Tyra skin care, nutritional products, fine jewelry, fine collectibles and sporting equipment.  The principals are Robert Hukezalie, Christopher Reid, Barry Ackel, Richard Heller, Jeff Sheehan, and John Brothers.  Georgina Mollick is Dynamic's attorney.  Sound familiar?

Minimum investment to accepted from any investor is $15,000.  They say they have $5 mil equity in the company.


EXHIBIT



# INTERNATIONAL HERITAGE
### INCORPORATED



RECEIVED
CONSUMER PROTECTION DI
DEC 4 1997
NORTH CAROLINA
DEPT. OF ATTORNEY GENE

November 26, 1997

State of North Carolina
Dept. of Justice, Consumer Protection Section
Mr. Peter H. Lawson, Consumer Protection Specialist
P.O. Box 629
Raleigh, NC 27602-0629

RE:   File No. 9710677 - Tricia S. Stangle

Dear Mr. Lawson:

We are in receipt of correspondence from your office regarding the above-named individual. Thank you for forwarding this matter to our attention.

After reviewing the records of International Heritage, Inc. ("IHI") as well as the correspondence from the above-named individual, we have determined that the above-named individual has been associated with IHI for longer than one year. As your records should reflect, IHI has adopted a 90%, one-year, buy-back policy. This policy is the industry standard, a requirement for pending members and regular members of the Direct Selling Association, as well as a requirement in many states where IHI conducts business. Because the above-named individual has been associated with IHI for more than one year and based upon this policy of IHI and the Direct Selling Association, the request for a refund by the above-named individual has been denied. We believe it would be inappropriate to reimburse the above-named individual in a manner which would be inconsistent with the policies of IHI as well as inconsistent with the industry standard.

If you have any questions regarding this matter, please contact me directly. Otherwise, we will consider this issue closed. Thank you for your consideration.

Respectfully yours,

Christopher A. Reid
Vice President of Compliance

Enclosures

cc:   F. Daniel Bell III, Esquire (securities counsel)
      Wyrick, Robbins, Yates & Ponton, PLLC

      Brent Wood, Esquire
      Wood & Francis, PLLC



EXHIBIT
7



# State of North Carolina

Department of Justice
P. O. Box 629
RALEIGH
27602-0629

December 12, 1997

MICHAEL F. EASLEY
ATTORNEY GENERAL

CONSUMER PROTECTION
919-716-6000
Fax:  919-716-6050

Brent E. Wood, Esq.
Wood & Francis, PLLC
P.O. Box 164
Raleigh, NC 27602

RE: International Heritage's one-year "buy-back" policy

Dear Brent:

We are writing in regard to Chris Reid's November 26 letters informing this office of International Heritage, Inc.'s refusal to provide refunds to its distributors of more than one year. In those letters and subsequent ones sent to this office, Mr. Reid writes "IHI has adopted a 90%, one-year, buy-back policy.  This policy is the industry standard, a requirement for pending members and regular members of the Direct Selling Association, as well as a requirement in many states where IHI conducts business.  Because the above-named individual has been associated with IHI for more than one year and based upon this policy of IHI and the Direct Selling Association, the request for a refund by the above-named individual has been denied."

This position refusing to return the deposits made by participants is unacceptable and cannot be supported legally or factually.  IHI represented to participant buyers that the $250 they paid per business center was a deposit, or layaway, on merchandise which could be "earned out" when participants made subsequent sales.  N.C.G.S. sec. 25-2-718 applies to transactions involving deposits and provides guidance for the present situation.  Section (1) permits damages for breach to be liquidated in the agreement, but only for an amount that is reasonable, and further states that a term fixing unreasonably large damages is void as a penalty.  Therefore, IHI's policy to refuse refunds of any amount to participants who did not receive the merchandise upon which they made the deposit is void.  In the case of these IHI layaway contracts, pursuant to section (2)(c) participant buyers are entitled to restitution of the amount they paid less fifty dollars.

Further, IHI has misplaced reliance on the Direct Selling Association's Code of Ethics for support of its position.  The provision in the DSA's Code of Ethics referred to in Mr. Reid's letters applies to the "repurchase of marketable inventory."  As you know, the refunds in question do not involve the repurchase of inventory or a "buy-back" from distributors.  Rather, they are simply requests for the return of money held in deposit by IHI for inventory that was

never shipped. Mr. Eric Ellman, Associate Attorney Manager of Government Affairs for the Direct Selling Association confirmed that nothing in the DSA's code of Ethics supports International Heritage's new position refusing refunds of deposits on merchandise never shipped by IHI and never received by its' distributors.

Additionally, Mr. Ellman informed this office that none of their policies would "require" International Heritage to change their policy to only refunding 90% of a distributor's money that the company has been holding or using at its' discretion. A ninety-percent return policy is not the industry standard, but rather a minimum requirement by the DSA and some states. More importantly, it again relates only to refunds for returned merchandise not deposits or layaways

Please promptly inform us of International Heritage's revised policy regarding this matter.

Sincerely,

Kristine L. Lanning
Assistant Attorney General
CONSUMER PROTECTION SECTION


Peter H. Lawson
Consumer Protection Specialist
CONSUMER PROTECTION SECTION

cc: Christopher Reid

**STATE OF NORTH CAROLINA**
**Department of Justice**
**Consumer Protection**
**P.O. Box 629**
**Raleigh, N.C. 27602**

**Telephone:  (919) 716-6000**
**Facsimile:  (919) 716-6050**

WP
LP

**FAX TRANSMISSION SHEET**

**March 18, 1998**

**RECIPIENT NAME:**    **Bill Hicks**

**COMPANY:**            **Securities & Exchange Commission**

**FAX:**                **404-842-7666**

**TELEPHONE:**          **404-842-7614**

**PAGES**: (INCLUDING COVER SHEET): **3**

**RE:**        **IHI - 4/29/97 Correspondence**

If your receipt of this transmission is in error, please notify us by telephone and return the original message by return mail at the above address.

**FROM:**    **Kristine L. Lanning, Assistant Attorney General**

**MESSAGE:**

glor/hicks.fax

Fax to Jim Long


EXHIBIT 8



MICHAEL F. EASLEY
ATTORNEY GENERAL

## State of North Carolina
Department of Justice
P. O. Box 629
RALEIGH
27602-0629

CONSUMER PROTECTIC
919-733-7741
Fax: 919-715-0577

April 29, 1997

## VIA FACSIMILE AND US MAIL

Mr. F. Daniel Bell, III
Wyrick, Robbins, Yates and Ponton
P.O. Drawer 17803
Raleigh, NC 27607

Dear Dan:

As you know, the Attorney General's Office has been investigating your client, International Heritage, Inc.(IHI), to determine whether its operation complies with North Carolina law. As part of that investigation, we requested that IHI provide substantial documentary evidence of its operation. We received the information as requested on April 21, and appreciate IHI's efforts to organize it in a comprehensible format.

As a result of this and other information, the Attorney General's Office has concluded that the IHI marketing program is in direct violation of North Carolina's pyramid statute, G.S. 14-291.2, and Unfair and Deceptive Practices Act, G.S. 75-1.1. One of the key indicia of legitimate network marketing programs is a real market for the product or service among the general public. However, a comparison of the lists of IHI participants and IHI retail purchasers indicates very few actual retail sales outside of the IHI sales organization. Put another way, the vast majority of funds received by IHI comes from its own sales force. We require legitimate network marketing programs to make at least 70 percent of sales to retail consumers, who are not now and will not become participants in the sales program.

We must insist that IHI cease operations in North Carolina until it revises its marketing program to comply with North Carolina law. We require a written agreement to that effect. Thereafter, we are prepared to enter into a formal understanding setting out the conditions of

Mr. F. Daniel Bell, III
April 29, 1997
Page 2

longer term compliance with the law.  If IHI is unwilling to enter such an agreement, our only choice will be to take legal action forthwith.  Such action will seek injunctive relief, restitution of all amounts paid, and penalties of up to $5,000 per violation.

Please inform us of your client's intentions by May 6, 1997.

Sincerely,

Kristine Lanning
Assistant Attorney General
CONSUMER PROTECTION SECTION

cc.    Forrest Goldston
       NC Secretary of State's Office

# ACTIVITY REPORT(TX)

## 03.18.1998   15:24

NC ATTY GEN CONSUMER PROTECTION

| DATE | TIME | DURATION | REMOTE ID | MODE | PAGES | RESULT |
|---|---|---|---|---|---|---|
| 03.17 | 13:33 | 00'00" | 98338287 | G3 | 0 | BUSY |
| 03.17 | 13:43 | 00'00" | 98338287 | G3 | 0 | BUSY |
| 03.17 | 14:16 | 01'13" | 202 331 1463 | ECM | 4 | O.K. |
| 03.17 | 14:22 | 02'15" | 87043349400 | G3 | 2 | N.G.25 |
| 03.17 | 14:29 | 03'43" | 87043349400 | G3 | 6 | O.K. |
| 03.17 | 14:48 | 01'28" | 212 416 6003 | ECM | 4 | O.K. |
| 03.17 | 14:57 | 00'00" | 83123534438 | G3 | 0 | N.G.25 |
| 03.17 | 15:02 | 00'00" | 83123534438 | G3 | 0 | N.G.25 |
| 03.17 | 15:06 | 02'11" | 3129605600 | ECM | 5 | O.K. |
| 03.17 | 15:12 | 00'40" | 3129605600 | ECM | 1 | INTERRUPT |
| 03.17 | 15:13 | 04'25" | 3129605600 | ECM | 10 | O.K. |
| 03.17 | 16:33 | 02'03" | 919 876 7215 | ECM | 5 | O.K. |
| 03.17 | 16:39 | 05'27" | 804 323 3566 | ECM | 8 | N.G.39 |
| 03.17 | 16:46 | 03'17" | 804 323 3566 | ECM | 10 | O.K. |
| 03.17 | 17:16 | 00'27" | 7046581094 | ECM | 1 | O.K. |
| 03.18 | 08:35 | 00'00" | 97821942 | G3 | 0 | INTERRUPT |
| 03.18 | 08:37 | 01'20" | 97821941 | G3 | 2 | O.K. |
| 03.18 | 10:55 | 00'54" | 8028282154 | G3 | 2 | O.K. |
| 03.18 | 11:21 | 01'08" | 919 832 8287 | ECM | 4 | O.K. |
| 03.18 | 12:09 | 00'57" | 919  380 0830 | ECM | 3 | O.K. |
| 03.18 | 12:20 | 01'54" | 404 842 7666 | ECM | 5 | O.K. |
| 03.18 | 12:22 | 01'53" | 954 453 7039 | ECM | 6 | O.K. |
| 03.18 | 14:09 | 00'00" | 82167327171 | G3 | 0 | INTERRUPT |
| 03.18 | 14:10 | 03'50" | 216 731 7724 | ECM | 10 | O.K. |
| 03.18 | 14:25 | 00'00" | 98351687 | G3 | 0 | INTERRUPT |
| 03.18 | 14:26 | 00'00" | 98351687 | G3 | 0 | INTERRUPT |
| 03.18 | 14:28 | 05'13" | 98361687 | ECM | 13 | O.K. |
| 03.18 | 15:17 | 00'57" | 404 842 7666 | ECM | 3 | O.K. |
| 03.18 | 15:20 | 00'23" | 82128368689 | ECM | 1 | O.K. |
| 03.18 | 15:22 | 01'00" | 82128368689 | ECM | 3 | O.K. |

AO 93 (Rev. 5/85)  Search Warrant

# United States District Court

EᴀˢTERN _____ DISTRICT OF ___ NORTH CAROLINA _____

In the Matter of the Search of

(Name, address or brief description of person or property to be searched)

A HEWLETT PACKARD — HP900 SYSTEM
MODEL K220 COMPUTER; PRODUCT NO. A3455A
SERIAL NUMBER 3806A10505

## SEARCH WARRANT

CASE NUMBER: 5:99M638

TO: ___ SPECIAL AGENT JOAN M. FLEMING _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___ SA JOAN M. FLEMING _____ who has reason to
Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)
THE LAW FIRM OF MAUPIN, TAYLOR, AND ELLIS, P.A., 3200 BEECHLEAF COURT, RALEIGH, NORTH
CAROLINA 27619

in the ___ EASTERN _____ District of ___ NORTH CAROLINA _____ there is now
concealed a certain person or property, namely (describe the person or property)

ALL COMPUTER RELATED DOCUMENTATION CONSISTING OF WRITTEN, RECORDED, PRINTED, OR
ELECTRONICALLY STORED MATERIAL CONTAINED ON THE ABOVE DESCRIBED COMPUTER PRESENTLY
IN THE CUSTODY OF FEDERAL BANKRUPTCY TRUSTEE HOLMES P. HARDEN AT THE ABOVE DESCRIBED
LOCATION

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person
or property so described is now concealed on the person or premises above-described and establish grounds for
the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before ___ 6/25/99 ___
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant
and making the search (in the daytime — 6:00 A.M. to 10:00 P.M.) (at ~~any time in the day or night as I find
reasonable cause has been established~~) and if the person or property be found there to seize same, leaving a copy
of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or prop-
erty seized and promptly return this warrant to _any Eastern District such a magistrate judge_
as required by law.                                                  U.S. Judge or Magistrate

___ 6/16/99 at 1:40 pm ___   at   _Raleigh NC_
Date and Time Issued                  City and State

WALLACE W. DIXON                     _Wann Word_
UNITED STATES MAGISTRATE JUDGE       Signature of Judicial Officer
_____
Name and Title of Judicial Officer

EXHIBIT
**9**

# United States District Court

FILED
JUN 16 1999
David W. Daniel, Clerk
US District Court, EDNC
By 3455a ___ Dep. Clerk

EASTERN _____ DISTRICT OF _____ NORTH CAROLINA _____

In the Matter of the Search of

(Name, address or brief description of person or property to be searched) David W. Daniel, Clerk

HEWLETT PACKARD-HP900-SYSTEM
MODEL K220 COMPUTER::·PRODUCT NO. By3455a
SERIAL NUMBER 3606A10505

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: 5:99M1638

I, JOAN M. FLEMING _____ being duly sworn depose and say:

I am a(n) SPECIAL AGENT OF THE FBI _____ and have reason to believe
_____ Official Title

that ☐ on the person of or ☒ on the premises known as (name, description and/or location) THE LAW FIRM OF MAUPIN, TAYLOR,
AND ELLIS, P.A., 3200 BEECHLEAF COURT, RALEIGH, NORTH CAROLINA 27619

in the _____ EASTERN _____ District of ___ NORTH CAROLINA _____

there is now concealed a certain person or property, namely (describe the person or property)
ALL COMPUTER RELATED DOCUMENTATION CONSISTING OF WRITTEN, RECORDED, PRINTED, OR ELECTRONICALLY
STORED MATERIAL CONTAINED ON THE ABOVE DESCRIBED COMPUTER PRESENTLY IN THE CUSTODY OF FEDERAL
BANKRUPTCY TRUSTEE HOLMES P. HARDEN AT THE ABOVE DESCRIBED LOCATION

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure) EVIDENCE, FRUITS, AND/OR
INSTRUMENTALITIES OF A FEDERAL CRIME

in violation of Title 15,18 _____ United States Code, Section(s) 77(g), 1343, 1341, AND 371 _____
The facts to support the issuance of a Search Warrant are as follows:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.              ☒ Yes    ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

6/16/99                              at Raleigh N.C.
Date                                     City and State

WALLACE W. DIXON
UNITED STATES MAGISTRATE JUDGE

Name and Title of Judicial Officer                Signature of Judicial Officer

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

I, Joan M. Fleming, having been duly sworn under oath, make the following statements in support of a request for a search warrant:

1. I am employed as a Special Agent of the Federal Bureau of Investigation (FBI) and have been employed in that position for twelve years. As such, I am authorized to conduct investigations and have conducted investigations of Federal violations of law, including violations of Title 18, United States Code (USC), Sections 1343 (Wire Fraud), 1341 (Mail Fraud), and 371 (Conspiracy) and Title 15, United States Code, Section 77q (Securities Fraud).

2. The statements contained in this affidavit are based on information provided by Special Agents of the FBI and the U.S. Postal Inspection Service, representatives of the North Carolina Attorney General's Office of Consumer Protection, representatives of the U.S. Securities and Exchange Commission (SEC) and others, as well as on my experience and background as a Special Agent. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

3. The primary subjects of this investigation are International Heritage Inc. (IHI), also known as International

1

Heritage Incorporated, formerly headquartered at 2626 Glenwood Avenue, Raleigh, North Carolina, and its three principal co-founders, Stanley H. Van Etten, the President and Chief Executive Officer of IHI, Claude W. Savage and Larry G. Smith.

IHI was incorporated in North Carolina on April 28, 1995, by Van Etten, Savage and Smith, and conducted business in 48 states and in at least three provinces in Canada until approximately November 25, 1998, when the company filed Chapter 7 Bankruptcy in the Eastern District of North Carolina (EDNC). IHI represented itself to be a "network marketing company" that initially marketed jewelry items and fine collectibles through a network of independent sales representatives ( "reps") who would be paid commission based upon a compensation plan devised by IHI.

4. As background, the investigation to date has disclosed that both Claude W. Savage and Larry G. Smith were formerly associated with another network marketing company identified as Gold Unlimited, Inc. (GU) as "independent sales representatives." GU was a Delaware corporation that was headquartered in Madisonville, Kentucky. Among many individuals and entities associated with GU in the sales representative category, was a company owned and operated by Stanley H. Van Etten, identified as Mayflower Holdings, Inc., which was and still is located in Raleigh, North Carolina. During 1995 and 1996, GU was the subject of a Federal investigation, primarily by the United States Postal Inspection Service, that led to an indictment in the Western District of Kentucky based on allegations that GU fraudulently induced

2

1  individuals to participate in a "pyramid scheme" and a "ponzi

2  scheme" known as the "Binary Compensation Plan." A "pyramid

3  scheme" was defined in the indictment as "any plan, program,

4  device, scheme, and other process by which a participant gives

5  consideration for the opportunity to receive compensation and

6  other things of value in return for inducing other persons to

7  become participants in the program." A "ponzi scheme" was

8  defined as a "fraudulent arrangement in which investors or

9  participants are attracted by the lure of exorbitant profits

10 that scheme participants may make. The operators of the scheme

11 maintain and promote this bogus concept by making payments of

12 seemingly large profits to early investors from monies obtained

13 by later investors, rather than from any "profits" or

14 "commissions" earned by the underlying business venture. The

15 fraud consists of funneling the funds received from new

16 investors to previous investors in the guise of profits or

17 commissions from the alleged business venture. In this manner

18 the scheme operators cultivate the illusion that a legitimate

19 profit-making business opportunity exists. Through these

20 payments to early investors, the operators attract later

21 investors." The GU indictment further stated that the very

22 nature of the above schemes dictates that they eventually must

23 fail when the market for new investors becomes saturated.

24        5.  In August of 1996, GU, along with its principal

25 owners, David and Martha Crowe, were convicted by a jury in

26 United States District Court, Western District of Kentucky, on

27 charges of  Mail Fraud, Conspiracy to Commit Money Laundering,

28 and Money Laundering.  The Crowes subsequently were sentenced

3

1   to prison terms for which they failed to report and they are

2   presently in a fugitive status.

3       6.  Based upon investigation conducted to date, the

4   affiant has reason to believe that the basic structure of IHI's

5   solicitations to new recruits and its compensation plan closely

6   resembles the scheme for which GU and its principals were

7   indicted and convicted.  In addition to other facts which the

8   investigation of IHI has uncovered to support this conclusion,

9   the affiant has been provided with a letter, which was received

10  by David N. Kirkman, Assistant Attorney General, NCAG, Raleigh,

11  North Carolina, on January 23, 1997, that was purportedly

12  written by David C. Crowe subsequent to his conviction.   Page

13  8 of the letter states in part:  "There is also a company by

14  the name of International Heritage, Inc. that is operating in

15  Raleigh, North Carolina, close to David Kirkman's office.

16  International Heritage was started by several top

17  representatives of Gold Unlimited after the company was shut

18  down by the government.  They have copied the Gold Unlimited

19  Binary Plan; the Gold Unlimited Layaway Agreement, which they

20  call their Retail Business Agreement and it works exactly the

21  same; it is such an exact copy that in their marketing brochure

22  they even use 'John' and 'Mary' as there (sic) examples of

23  representatives getting into the company; and they even have

24  the same products."

25       7.  In January of 1997, the Macon Police Department

26  (MPD), Macon, Georgia, advised the Atlanta, Georgia office of

27  the FBI of a possible pyramid scheme operating in Macon,

28  Georgia, under the company name International Heritage

4

1   Incorporated (IHI).  IHI was identified as a network marketing

2   company, headquartered in Raleigh, North Carolina, under the

3   leadership of its president and Chief Executive Officer (CEO),

4   Stanley H. Van Etten.  FBI Atlanta learned that independent

5   sales representatives of IHI were making presentations,

6   otherwise known as "opportunity meetings", to solicit

7   investments of $1,800.00 or more, for the purchase of

8   "business centers", which marketed the retail sale of jewelry,

9   coins, and collectibles.  According to the complainant(s), the

10  IHI representatives were promised commissions based on the

11  amount they invested and the number of individuals they were

12  able to recruit in their "down lines."   Subsequent

13  investigation by FBI Atlanta revealed that little or no product

14  of IHI's company was being sold to individuals outside of the

15  company.   These results were based in part on a "preliminary

16  report of investigation" that was furnished to FBI Atlanta by

17  the State of Georgia, Secretary of State's Office, Division of

18  Securities and Business Regulations on or about February 28,

19  1996.  The report concluded, among other things, that IHI

20  representatives were "concentrating their sales efforts in the

21  area of recruitment of new members as opposed to sale of the

22  product", that "new members are told to disregard selling the

23  product and to concentrate on recruitment" and that new and old

24  members were told they had a "60 day money back guarantee."

25          8.  On August 5, 1997, the IHI investigation was

26  shifted to the Charlotte Division of the FBI based upon the

27  location of IHI's home office in Raleigh, North Carolina, and a

28  referral from the North Carolina Attorney General's Office of

5

1   Consumer Protection (NCAG).[45] The NCAG began an investigation
2   into IHI's business practices in March of 1997 based upon an
3   increasing volume of consumer inquiries and complaints being
4   received by the NCAG.  The NCAG learned that the vast majority
5   of the people joining IHI were doing so by purchasing "business
6   centers" via retail business agreements (RBA's) at a cost of
7   $250.00 per business center for the opportunity to receive
8   compensation in the form of a commission for introducing new
9   participants into the program.  A "business center" was not a
10  physical location or place of business, but rather an abstract
11  "position" within the sales representative structure of the
12  company that was maintained in a computer database by IHI.
13  Based upon complaints received from former IHI sales
14  representatives, the NCAG learned that the average amount of
15  money invested by an individual representative was
16  approximately $1,000.00 and that, although purchasing one
17  business center was sufficient to qualify to earn commission
18  payments under the IHI "binary commission plan", new recruits
19  were encouraged to purchase three or seven centers, at a cost
20  of $250.00 each, in order to enhance their earning potential.
21  Further investigation by the NCAG revealed that IHI was
22  concentrating its efforts on the recruiting of new sales
23  representatives at "opportunity meetings", with very little
24  retail sales outside of the company, and that IHI was operating
25  in violation of N.C.G.S. 14-291.2 (pyramid and chain schemes
26  act).  The elements of the North Carolina State statute which
27  were found by the NCAG to be present in IHI were as follows:
28          (1)  A participant gives valuable consideration;

6

(2)  For the opportunity to receive compensation or

   things of value; and

(3)   For inducing other persons to become

   participants.

Initially, complaints for refund requests which were referred to the NCAG's office by former IHI sales representatives were responded to by IHI and IHI refunded approximently one million dollars in 1997 in response to approximately one thousand complaints.  However, IHI subsequently became less responsive to refund requests by its representatives and during 1998 the NCAG received approximately two thousand complaints from IHI representatives across the United States and Canada.  The total number of complaints received against IHI by the NCAG was approximately three thousand which, according to the NCAG, vastly exceeded the number of complaints received against any other company in the thirty year history of the Consumer Protection Division.   The NCAG has seen evidence that suggests IHI was selectively refunding money to former sales representatives who made official complaints through attorney general's offices in order to avoid further scrutiny by authorities.

9.   On April 2, 1997, the NCAG had a meeting with corporate representatives of IHI including, Stanley H. Van Etten,  during which Van Etten produced a resume.  Under the heading of  "Network Marketing Experience" Van Etten represented that he had "extensive experience in network marketing and the development of organizations" through his consulting and corporate finance practice.  However, when asked by the NCAG's

7

1  office to elaborate on this aspect of his resume, Van Etten

2  responded that he had no experience in network marketing and

3  that the above statement in his resume was a "typographical

4  error". During a subsequent meeting with Van Etten on May 15,

5  1997, Van Etten confirmed that more than 95 percent of the

6  sales representatives joining IHI joined using the Retail

7  Business Agreements by paying a fee of $250.00 per business

8  center. This further supported the NCAG's finding that the

9  majority of IHI representatives were paying a fee for the

10  "opportunity" to recruit additional sales representatives in

11  order to earn their commission. On June 3, 1997, the NCAG and

12  IHI entered into a consent agreement which required IHI to

13  substantially change the way IHI could conduct business within

14  the State of North Carolina. Under the basic terms of the

15  agreement, IHI was prohibited from continuing to charge

16  participants a fee to join or advance in the organization and

17  required that 70 percent of all sales revenue be generated by

18  sales to persons outside the IHI organization. The NCAG

19  thereafter monitored IHI's compliance with the agreement and

20  reports showed very little sales activity or recruitment of new

21  participants in North Carolina after June 1997.

22       10. In May of 1997, the United States Securities and

23  Exchange Commission (SEC) in Atlanta, Georgia, began an

24  investigation into IHI's business practices based upon

25  information that IHI was potentially violating federal

26  securities statutes by selling "positions" in the company

27  through the sale of Retail Business Agreements (RBA's) and that

28  representatives of IHI may have provided false or misleading

8

1  required for participation in IHI (other than purchase of a

2  "sales kit") and there would be no transactions involving

3  products or services where those products and services were not

4  provided upon payment.  Additionally, the court required IHI to

5  post a $5 million bond to cover any potential judgments

6  resulting from the civil complaint filed by the SEC.  .

7          12.  Based upon information obtained from the NCAG,

8  the SEC, and other sources, the affiant has learned that

9  company employees and sales representatives of IHI routinely

10 conducted IHI business by using the mails, by traveling

11 throughout the United States for sales meetings and

12 presentations and used various wire media.

13         13.  A recent review of IHI's financial statements by

14 the FBI and the U.S. Attorney's Office disclosed that from its

15 inception in April 1995 through December 31, 1997, IHI

16 accumulated losses of $13,178,393.00.  The financial records

17 show that IHI's annual revenues grew from $4,852,242.00 in 1995

18 to over $109 million in 1997 and that IHI's liabilities exceeded

19 its assets during the entire period of IHI's existence.

20 Examination of the  accounting records and bank correspondence

21 indicates that IHI was consistently overdrawing their bank

22 account(s), and holding back checks from vendors.  During 1997,

23 IHI was spending approximately $1,000,000.00 more each month

24 than it was receiving in revenues.  In order to generate

25 additional cash in 1997, IHI issued convertible notes totaling

26 $13,085,662.00, which yielded just over $10 million after legal

27 and placement fees were paid.  However, the additional funds

28 were overcome by the continuing excess of expenses over

1 revenues, which included a salary to Stanley H. Van Etten of

2 approximately $3.2 million.  As of December 31, 1997, IHI was

3 technically insolvent and did not have sufficient assets to pay

4 its debts.  At that time, IHI's liabilities exceeded its assets

5 by approximately $12,000,000.00.

6     14.  Interviews conducted by your affiant and

7 information contained in IHI's financial statements has

8 disclosed that the major source of IHI revenues was the

9 purchase of "business  centers" by IHI sales representatives,

10 who, in turn, would recruit other representatives to invest in

11 additional business centers which would be placed in their

12 "down lines."  Compensation flowed by formula up the legs of the

13 sales representatives sales organization in the form of

14 "commissions" as new representatives purchased business centers

15 down line.  There is evidence to suggest that IHI was

16 mischaracterizing these commission payments as "sales" in order

17 to create the impression that IHI was making true sales of

18 products to its sales representatives. While the company

19 offered a catalogue of products which included fine jewelry and

20 collectibles, evidence indicates that sales from these products

21 amounted to less than 20 percent of revenues, and included

22 items sold to new representatives (inside sales) who were

23 mandated to select an item for "purchase" when they joined the

24 company.  There is evidence that approximately 80 percent of

25 the IHI revenues were derived from the payments made by new

26 recruits for the "opportunity" to earn commissions from IHI and

27 that IHI was continuing to lose money each month.  However, in

28 spite of IHI's deteriorating financial condition, IHI continued

1    to encourage sales representatives to solicit new recruits

2    through "opportunity meetings" and by other means during which

3    the new recruits would be lulled by promises of a chance for

4    an "opportunity of a lifetime" to "realize their dreams" and

5    "help others" by earning large commission payments from IHI.

6    During some opportunity presentations, new representatives were

7    advised they could earn a "six figure passive income" or up to

8    "$2,200 per week" per business center. A former IHI employee

9    interviewed by your affiant has advised that by the summer of

10   1998, at the same time that IHI was soliciting new sign-ups at

11   opportunity meetings, IHI was significantly behind on

12   commission payments due to sales representatives already on

13   board and did not have sufficient funds to pay those sales

14   representatives. The information that IHI was behind on its

15   commission payments as well as the fact that IHI's cash flow had

16   "dwindled to nothing" appears to have been withheld from

17   prospective representatives for their consideration.

18         In October, 1998, in spite of IHI's poor financial

19   condition, Stanley H. Van Etten, and others in control of IHI's

20   finances, made a decision to go ahead with IHI's annual trip to

21   the Bahamas which was called the "3rd Annual Trip to Paradise"

22   and was described in an IHI flyer as an "all expenses paid,

23   dream vacation to Paradise Island in the Bahamas" for "hundreds"

24   of IHI representatives who qualified. In addition, another

25   former IHI employee interviewed by your affiant has advised

26   that company payroll was no longer being met on a regular basis

27   by the summer of 1998 and at times payroll checks would

28   "bounce". Former IHI employees interviewed by your affiant have

12

described Van Etten's spending decisions as very "extravagant", noting that large amounts of money were spent on the December 1997 Christmas party, for door prizes and other gifts, including a vehicle, and that IHI funded several "employee appreciation" events late into 1998, that included an all expenses paid trip by chartered buses to a water park for employees and up to five guests with food catered.  When some employees questioned the logic of funding the above Bahamas trip in light of IHI's inability to meet its expenses, they were told the trip was "already paid for" and that it would be "good for morale".

15.  The affiant has reviewed promotional and training materials prepared and used by IHI to recruit new IHI representatives, including video tape presentations of the IHI "pitch" by Stanley H. Van Etten, Claude W. Savage, and Larry G. Smith and "testimonials" of others.  These materials and video tapes promise the opportunity for new representatives to earn extraordinary income and financial freedom.  However, the discussion of the products appears to be minimal and the emphasis is placed on the recruiting of new representatives into IHI.  In IHI opportunity presentations, Van Etten and others used the phrases, "It only takes two", "build your organization", "the power of duplication", "share the opportunity", among other statements, in order to motivate IHI sales representatives to recruit new representatives into the pyramid.

16.  The affiant has reviewed numerous refund request/ complaint letters from former IHI representatives.

13

Many of the former representatives state that they were
initially drawn to the IHI program by the promises of wealth,
freedom from financial worry, and "helping others" and that when
they joined IHI they were led to believe that IHI was a
financially sound, legitimate company.  These letters reveal a
pattern of  IHI failing to pay commission payments and refunds
to representatives who qualified for such payments or making
payments with worthless checks.  Many IHI representatives paid
the up front fees required to join IHI (which IHI characterized
as "sales" by  requiring the representative to select a
product), but never received products that were paid for and
earned out.  Many representatives who requested refunds under
the policies and procedures of IHI made repeated written
requests and/or telephone calls to IHI with unsuccessful
results.  In some cases the representatives were lulled into
believing they would receive their refunds by being told their
refund check was being "processed" and would be sent out "next
week".  A form letter was often issued to representatives
seeking refunds which stated: "We are in receipt of your letter
regarding a refund.  Our Refund Department is working to
process all such requests, including yours.  Upon completion of
the review, you will receive a letter regarding your refund.
Any calls into the department inquiring about the status of
your refund will slow down the process.  Thank you for your
patience."  Many representatives reported that IHI's promise to
help them to succeed as sales representatives by providing
support were not fulfilled and  their telephone calls to IHI
went unanswered or they were put on "hold" for long periods of

14

time. Many representatives who joined IHI by paying for their
business centers and materials under a credit card program
initiated by IHI found that IHI was issuing charges on their
credit cards without sending them the product or materials
ordered or that IHI was failing to honor their membership
cancellation and was continuing to submit charges after they
had resigned from IHI. As a result, many former IHI
representatives were forced to cancel their credit cards and
dispute the charges made by IHI on those cards.

17. On November 25, 1998, IHI filed for Chapter 7
Bankruptcy in U.S. Bankruptcy Court, Eastern District of North
Carolina, Raleigh, North Carolina. The affiant has reviewed
complaints from former sales representatives and bills from
unpaid vendors received by the bankruptcy trustee which is
consistent with other evidence that IHI was failing to meet its
financial obligations.

18. Interviews conducted by your affiant with former
IHI employees has disclosed that IHI maintained the bulk of its
records pertaining to its sales representatives, including each
business center "position" in the pyramid, through the use of a
computer described as a Hewlett Packard-HP900 System, Model
K220, Product Number A3455A, Serial Number 3606A10505, which is
approximately 5 feet tall and 36 inches wide and which is
presently in the custody of the bankruptcy trustee, Holmes P.
Harden, at the law offices of Maupin, Taylor, and Ellis, P.A.,
3200 Beechleaf Court, Raleigh, North Carolina 27619, where it
is being maintained in an operating condition.

19. Based upon the information set forth above,

15

permission is being requested to seize custody of the above

referenced computer for a period of time sufficient for FBI

personnel trained in the specialized area of obtaining and

securing computer evidence to make a complete "back up" copy of

all  files in existence on that computer after which custody

and control of the computer will be returned to the trustee for

the needs of the bankruptcy proceedings.    Your affiant is

aware that computer hardware, software, documentation,

passwords, and data security devices may be important to a

criminal investigation in two distinct and important respects:

(1) the objects themselves may be instrumentalities, fruits, or

evidence of crime, and/or (2) the objects may have been used to

collect and store information about crimes (in the form of

electronic data).  Rule 41 of the Federal Rules of Criminal

Procedure permits the government to search and seize computer

hardware, software, documentation, passwords, and data security

devices which are (1) instrumentalities, fruits, or evidence of

crime: or (2) storage devices for information about crime.

Based upon your affiant's knowledge, training, and experience,

and consultations with FBI computer examiners, your affiant

knows that searching and seizing information from computers

often requires agents to seize most or all electronic storage

devices (along with related peripherals) to be searched later

by a qualified computer expert in a laboratory or other

controlled environment.  This is because of the following:

        a) The volume of evidence.  Computer storage devices

(like hard disks, diskettes, tapes, laser disks, Bernoulli

drives) can store the equivalent of thousands of pages of

16

1   information.  Additionally, a suspect may try to conceal

2   criminal evidence;  He or she might store it in random order

3   with deceptive file names.  This may require searching

4   authorities to examine all the stored data to determine which

5   particular files are evidence or instrumentalities of crime.

6   This sorting process can take weeks or months, depending on the

7   volume of data stored, and it would be impractical to attempt

8   this kind of data search on site.

9         b)   Technical requirements.  Searching computer

10   systems for criminal evidence is a highly technical process

11   requiring expert skill and a properly controlled environment.

12   The vast array of computer hardware and software available

13   requires even computer experts to specialize in some systems

14   and applications, so it is difficult to know before a search

15   which expert is qualified to analyze the system and its data.

16   In any event, however, data search protocols are exacting

17   scientific procedures designed to protect the integrity of the

18   evidence and to recover even "hidden", erased, compressed,

19   password protected, or encrypted files.  Since computer

20   evidence is extremely vulnerable to inadvertent or intentional

21   modification or destruction (both from external sources or from

22   destructive code imbedded in the system as a "booby trap"), a

23   controlled environment is essential to its complete and

24   accurate analysis.

25         20.  Based on the information as set forth above, the

26   affiant has probable cause to believe that the above described

27   computer is presently located at the place described, that the

28   computer was used by IHI, Stanley H. Van Etten, Claude W.

17

1  Savage, Larry G. Smith, and others, in the commission of

2  criminal offenses in violation of Title 18, USC, Sections 1341,

3  1343, and 371 and and Title 15, United States Code, Section

4  77q, and that information presently stored in that computer may

5  constitute evidence of those offenses.

6

7  _____

8  JOAN M. FLEMING
   SPECIAL AGENT, FBI

9  Subscribed and sworn to before me
   this 16 day of June, 1999

10

11  _____
    United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18